NO. 26-1217

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT, et al.,

Defendants-Appellants.

On Appeal from the U.S. District Court for the District of Rhode Island
No. 1:25-cv-00626-MSM-AEM
The Honorable Mary S. McElroy

# SUPPLEMENTAL APPENDIX TO PLAINTIFFS-APPELLEES'
# RESPONSE TO EMERGENCY MOTION FOR STAY

NICHOLAS W. BROWN
Attorney General of Washington

ANDREW R.W. HUGHES
ZANE MULLER
ALIANA KNOEPFLER
ANDREA ALEGRETT
Assistant Attorneys General
CRISTINA SEPE
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
*Attorneys for State of Washington*

LETITIA JAMES
Attorney General of New York

BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General
28 Liberty Street
New York, NY 10005
212-416-6274
*Attorneys for State of New York*

PETER F. NERONHA
Attorney General of Rhode Island

KATHRYN M. SABATINI
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN
Unit Chief, Civil and Community Rights
Assistant Attorney General
LEONARD GIARRANO IV
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400
*Attorneys for State of Rhode Island*

# TABLE OF CONTENTS

| Document Title | USDC Docket No. | Suppl. App. Page Range |
|---|---|---|
| Declaration of Andrew Hughes | 12 | 1–2 |
| Hughes Declaration, Exhibit 1 | 12-1 | 3–86 |
| Hughes Declaration, Exhibit 2 | 12-2 | 87–216 |
| Hughes Declaration, Exhibit 3 | 12-3 | 217–345 |
| Declaration of Rachel Stucker | 13-10 | 346–353 |
| Declaration of Winifred Kaye Smith | 13-13 | 354–392 |
| Declaration of Greg Payne | 13-14 | 393–400 |
| Declaration of Sarah Squirrell | 13-15 | 401–410 |
| Declaration of Danielle Meister | 13-16 | 411–421 |
| Declaration of Karen Byron | 13-17 | 422–439 |
| Declaration of Sarah Rennie | 13-19 | 440–448 |
| Declaration of Jennifer Leimaile Ho | 13-20 | 449–461 |
| Declaration of Ruby Dhillon-Williams | 40 | 462–474 |
| Notice of Withdraw of FY 25 CoC NOFO | 41 | 475–477 |
| Notice of Withdraw of FY 25 CoC NOFO, Exhibit B | 41-2 | 478–481 |
| Supplemental Declaration of Pascale Leone | 49-2 | 482–487 |
| Transcript of Hearing on December 19, 2025 | | 488–560 |
| Notice of New 2025 NOFO | 66 | 561–653 |
| Notice of New 2025 NOFO, Exhibit A | 66-1 | 654–701 |
| Plaintiff States' Motion for Summary Judgement | 81 | 702–795 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>          Defendants. | C.A. No. 1:25-CV-00626-MSM-AEM<br><br>DECLARATION OF ANDREW R.W. HUGHES |

1

**Suppl. App. 1**

## <u>DECLARATION OF ANDREW R.W. HUGHES</u>

I, Andrew R.W. Hughes, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.    Attached hereto as Exhibit 1 is a true and correct copy of the HUD, Fiscal Year 2022–2026 HUD Strategic Plan, available at https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf.

3.    Attached hereto as Exhibit 2 is a true and correct copy of the FY 2024 and FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO.

4.    Attached hereto as Exhibit 3 is a true and correct copy of the FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO.

5.    Attached hereto as Exhibit 4 is a true and correct copy of the General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

Executed this 25th day of November 2025.

*/s/ Andrew R.W. Hughes*  
ANDREW R.W. HUGHES, WSBA #49515  
Assistant Attorney General  
Washington State Attorney General's Office

# Exhibit 1

**Suppl. App. 3**



# FISCAL YEAR 2022–2026 STRATEGIC PLAN

## U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT

Suppl. App. 4



*Page intentionally left blank*

**Message from Secretary Fudge** ................................................................................4

   **One HUD, For All** ............................................................................................ 5

   **HUD's Mission** .............................................................................................. 6

   **HUD's Overarching Goal** ............................................................................. 6

**Introduction** ............................................................................................................7

   **Development of the Strategic Plan** ............................................................. 8

   **Departmental Structure** .............................................................................. 9

   **FY 2022-2026 HUD Strategic Framework** ................................................10

   **FY 2022-2023 Agency Priority Goals** .......................................................13

**Overarching Priority: Increase Equity** .............................................................. 14

**Overarching Priority: Improve Customer Experience** ..................................... 16

**Strategic Goal 1: Support Underserved Communities** ................................... 18

   **Strategic Objective 1A: Advance Housing Justice** ..................................20

   **Strategic Objective 1B: Reduce Homelessness** .......................................24

   **Strategic Objective 1C: Invest in the Success of Communities** ...............27

**Strategic Goal 2: Ensure Access to and Increase the Production of Affordable Housing** ........................... 31

   **Strategic Objective 2A: Increase the Supply of Housing** .........................32

   **Strategic Objective 2B: Improve Rental Assistance** .................................35

**Strategic Goal 3: Promote Homeownership** ..................................................... 39

   **Strategic Objective 3A: Advance Sustainable Homeownership** ...............40

   **Major Initiative: Expand Homeownership Opportunities** .........................43

   **Strategic Objective 3B: Create a More Accessible and Inclusive Housing Finance System** .............45

**Strategic Goal 4: Advance Sustainable Communities** ..................................... 47

   **Strategic Objective 4A: Guide Investment in Climate Resilience** .............49

   **Strategic Objective 4B: Strengthen Environmental Justice** .....................53

   **Strategic Objective 4C: Integrate Healthcare and Housing** .....................56

**Strategic Goal 5: Strengthen HUD's Internal Capacity** ................................... 59

   **Strategic Objective 5A: Enable the HUD Workforce** ................................61

   **Strategic Objective 5B: Improve Acquisition Management** .......................64

   **Strategic Objective 5C: Strengthen Information Technology** ...................67

   **Strategic Objective 5D: Enhance Financial and Grants Management** ......70

   **Strategic Objective 5E: Improve Ease, Effectiveness, and Trust in HUD Services** ...........................73

**Cross-Agency Priority Goals** ............................................................................ 76

**Icon List** ............................................................................................................ 82

## Message from Secretary Fudge

 I am pleased to present the Fiscal Year (FY) 2022-2026 Strategic Plan for the U.S. Department of Housing and Urban Development (HUD). The Strategic Plan describes the Department's goals, objectives, and strategies, as well as describes how we will measure progress toward achieving our mission to create strong, sustainable, inclusive communities and quality affordable homes for all.

We deliver this Strategic Plan at a pivotal moment. The United States is grappling with a crisis in affordable housing, made worse by the COVID-19 pandemic. Today, it is harder to find an affordable home in America than at any point since the 2008 financial crisis. Racial bias in the home appraisal process erodes equity in homeownership and robs communities of color of the opportunity to build generational wealth. Far too many families are experiencing homelessness, when they need and deserve a safe, stable place to call home.

To confront these and other challenges head on, and to help our Nation build back better, HUD must strengthen its efforts to increase equity across all departmental programs and improve the customer experience of those we serve. Since the start of the Biden-Harris administration, HUD has prioritized this work, playing a key role in the Administration's goal to support those in greatest need. The bold action we have taken over the past year has increased equity, removed barriers to homeownership, expanded the Nation's housing supply, and kept Americans housed. But important work remains, and HUD's Strategic Plan charts a path to complete this work and provide every American with the chance to live each day with security, with dignity, and with hope.

This plan details HUD's efforts to expand housing opportunities for underserved Americans and to reduce homelessness by enforcing our Nation's fair housing laws and fueling equitable economic development. The Department will help increase our affordable housing supply and improve rental assistance programs. We will advance new tools and capital that put homeownership within reach for more individuals and families, while promoting equitable reforms to America's housing finance system. In addition, we will guide investment in climate resilience, reduce exposure to environmental hazards, and integrate healthcare and housing.

Finally, HUD will invest in its people, technology, and processes, with the understanding that strengthening the Department's internal capacity will lead to better results for the American people. Each of these efforts will be focused on increasing equity and improving the customer experience for those seeking and receiving HUD services.

At HUD, we understand that a quality home in a thriving community provides the foundation for a good life. Children who grow up in stable and healthy homes have a better chance to succeed in school and achieve their dreams. Adults who live in an affordable home near good jobs will have a greater opportunity to enjoy economic security and begin saving to buy a place to call their own.

HUD's Fiscal Year 2022-2026 Strategic Plan demonstrates our commitment to help forge a stronger, fairer, and more prosperous America. We look forward to continuing our work on behalf of the people we serve.

Sincerely,

*Marcia L. Fudge*

Marcia L. Fudge

Suppl. App. 7

# One HUD, For All

*Together, we are building an empowered agency focused on housing and community development and dedicated to equity, inclusive communities, and quality, affordable homes for all.*

- *Housing is the foundation on which we live, grow, and thrive.*
- *Yet millions of Americans struggle with housing and remain shut out from the opportunities a good home provides.*
- *At HUD, we're committed to the people and communities behind this crisis – and by advancing inclusive, equity-focused policy and programs, we're delivering the support they need to make their way home.*



## HUD's Mission

HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. HUD is working to strengthen the housing market to bolster the economy and protect consumers; meet the need for quality affordable rental homes; utilize housing as a platform for improving quality of life; build inclusive and sustainable communities free from discrimination; and transform the way HUD does business.

## HUD's Overarching Goal

HUD's overarching goal is to pursue transformative housing and community-building policy and programs. The Department will ensure it centers its focus on people and their lived experiences, with policy and programs that are equity-focused, anti-discriminatory, and that advance housing justice so that everyone has an affordable, healthy place to live.



# Introduction

This document presents the U.S. Department of Housing and Urban Development's Strategic Plan for fiscal years (FY) 2022 through 2026. HUD was created as a cabinet-level agency in 1965. The Department's mission is to create strong, sustainable, inclusive communities and quality, affordable homes for all. To provide a framework for the delivery of HUD's mission and vision, the Strategic Plan outlines a set of strategic goals, objectives, and performance measures. Simply put, this plan serves as a guide for what the Department will achieve, how HUD will achieve it, and how HUD will measure success.

HUD is working to strengthen the housing market to bolster the economy and protect consumers; expand homeownership and meet the need for quality affordable rental homes; utilize housing as a platform for improving quality of life; build inclusive and sustainable communities free from discrimination; and transform the way HUD does business. HUD will accomplish its mission by pursuing transformative housing and community-building policies and programs. Central to HUD's efforts will be ensuring HUD's work focuses on individuals, communities, and their lived experiences. These overarching commitments are reflected in this plan's approach toward equity-focused, anti-racist, anti-discriminatory, and justice-driven priorities.

HUD's FY 2022-2026 Strategic Plan lays out this administration's strategy for ensuring everyone has an affordable, healthy place to live. Over the course of the next four years HUD will pursue two overarching priorities focused on increasing equity and improving customer experience across all HUD programs. Five strategic goals undergird the Plan as follows:

- Strategic Goal 1: Support Underserved Communities
- Strategic Goal 2: Ensure Access to and Increase the Production of Affordable Housing
- Strategic Goal 3: Promote Homeownership
- Strategic Goal 4: Advance Sustainable Communities
  Strategic Goal 5: Strengthen HUD's Internal Capacity

The five goals of the FY 2022-2026 Strategic Plan present the core vision of what HUD hopes to accomplish, the strategies to accomplish those objectives, and the indicators of success.

In carrying out its work on each of its strategic goals, HUD is committed to the following core values:

<u>Accountability</u>: HUD individually and collectively takes responsibility for its performance and conduct.

<u>Efficiency and Effectiveness</u>: HUD will maximize its resources and efforts to continually improve the efficiency and effectiveness of its individual and collective performance. The Department strives for simplicity in its lines of authority and clarity in its lines of communication and strives to eliminate the red tape of bureaucracy. HUD supports a productive work environment that balances high performance with the need for healthy personal and community life.

<u>Fairness and Respect</u>: HUD values others, demonstrates compassion for those it serves, and treats others the way it would like to be treated. In respecting others, the Department conducts its work and administers its programs with fairness and justice and with a commitment to civil rights, inclusion, and diversity.

<u>Integrity</u>: HUD approaches others, its stakeholders, and its work with honesty and the highest ethical standards.

**Suppl. App. 10**

# Development of the Strategic Plan

**Stakeholder Engagement**

The Department is reengaging its customers, partners, and career professionals to ensure HUD services meet the needs of all who need them. The FY 2022-2026 HUD Strategic Plan is informed by their views and input received in individual meetings, focus group discussions, and surveys. HUD has used the feedback gathered from these engagements to inform the strategic goals and objectives the Department will pursue over the next four years. Stakeholder outreach activities will continue over the next four years to inform, improve, and make course corrections, if needed, to HUD programs laid out in this plan. These engagements are integral to HUD's pursuit of effective strategies that enable Departmental services to be informed by and tailored to the lived experiences of HUD's customers.

**Enterprise Fraud and Risk Management**

Effective enterprise fraud and risk management requires the use of strong internal controls and tracking at strategic, programmatic, as well as operational levels. HUD has been integrating fraud and risk management into its planning processes since it began developing annual risk profiles in FY 2017. The enterprise, programmatic, and operational risks identified by these annual assessments have also been used to inform this plan. HUD risk officers, stakeholders, and business owners will continue to work together to integrate and align performance, budget, and risk management activities to better inform leadership decisions and the strategic planning process.

**Building the Evidence Base**

The Department is committed to using evidence-based policymaking to implement cost-effective solutions that support HUD's mission. To guide HUD policy in a changing environment, it is essential that research be strategic, systematic, and well-structured. This document identifies critical policy questions that require further investigation. The Plan also highlights research investments that are needed to ensure strategic objectives—and supporting policy initiatives—are properly informed by evidence. Research in support of each strategic objective is highlighted throughout this strategic plan and the FY 2022-2026 HUD Learning Agenda. HUD's long-term strategic framework will continue to evolve based on the evidence base provided by Departmental research activities. As required by the Foundations for Evidence-Based Policymaking Act of 2018, the Learning Agenda and the Capacity Assessment for Research, Evaluation, Statistics, and Analysis are two integral yet standalone components of this Strategic Plan and the role of evidence and learning in creating a stronger HUD future.

# Departmental Structure



HUD, a Cabinet-level Department created in 1965, is responsible for National policy and programs that address America's housing needs, improve and develop the Nation's communities, and enforce fair housing laws. It accomplishes its mission through component organizations and offices that administer programs carried out through a network of regional and field offices and partnerships with other Federal agencies, state and local grantees, and for-profit, philanthropic, and non-profit organizations of the private sector.

- ▶ Learn more about HUD's major organizational units and program offices.
- ▶ Learn more about HUD's regions and field offices.

# FY 2022-2026 HUD Strategic Framework
## *One HUD, For All*

| **HUD's Mission** |
|:---:|
| Create strong, sustainable, inclusive communities and quality affordable homes for all. |
| **Overarching Goal: Pursue Transformative Housing and Community-Building Policy and Programs**<br><br>Ensure HUD centers its focus on people, and their lived experiences, with policy and programs that are equity-focused, anti-discriminatory, and that advance housing justice, so that everyone has an affordable, healthy place to live. |
| **Overarching Priority: Increase Equity**<br><br>Increase equity across all HUD programs. |
| **Overarching Priority: Improve Customer Experience**<br><br>Improve the customer experience for those seeking and receiving HUD services. |

| **Strategic Goal 1: Support Underserved Communities** |
|:---:|
| Fortify support for underserved communities and support equitable community development for all people. |
| **1A: Advance Housing Justice**<br><br>Fortify support for vulnerable populations, underserved communities, and Fair Housing enforcement. |
| **✪ 1B: Reduce Homelessness**<br><br>Strengthen Federal, State, Tribal, and community implementation of the Housing First approach to reducing the prevalence of homelessness, with the ultimate goal of ending homelessness. |
| **1C: Invest in the Success of Communities**<br><br>Promote equitable community development that generates wealth-building for underserved communities, particularly for communities of color. |

✪ These objectives include a FY 2022-2023 Agency Priority Goal.

\* These objectives reflect FY 2022-2026 HUD management objectives.

**Suppl. App. 13**

## Strategic Goal 2: Ensure Access to and Increase the Production of Affordable Housing

Ensure housing demand is matched by adequate production of new homes and equitable access to housing opportunities for all people.

### 2A: Increase the Supply of Housing

Enhance HUD's programs that increase the production and supply of housing across the country.

### ✪ 2B: Improve Rental Assistance

Improve rental assistance to address the need for affordable housing.

## Strategic Goal 3: Promote Homeownership

Promote homeownership opportunities, equitable access to credit for purchase and improvements, and wealth-building in underserved communities.

### ✪ 3A: Advance Sustainable Homeownership

Advance the deployment of tools and capital that put sustainable homeownership within reach.

### 3A – Major Initiative: Expand Homeownership Opportunities

Promote financing for innovative ownership models to increase the availability of affordable housing.

### 3B: Create a More Accessible and Inclusive Housing Finance System

Advance new policy, programs, and modernization initiatives that support a more equitable housing finance system. Promote the preservation and creation of affordable housing stock.

✪ These objectives include a FY 2022-2023 Agency Priority Goal.

\* These objectives reflect FY 2022-2026 HUD management objectives.

### Strategic Goal 4: Advance Sustainable Communities

Advance sustainable communities by strengthening climate resilience and energy efficiency, promoting environmental justice, and recognizing housing's role as essential to health.

#### 4A: Guide Investment in Climate Resilience

Invest in climate resilience, energy efficiency, and renewable energy across HUD programs.

#### ✪ 4B: Strengthen Environmental Justice

Reduce exposure to health risks, environmental hazards, and substandard housing, especially for low-income households and communities of color.

#### 4C: Integrate Health and Housing

Advance policies that recognize housing's role as essential to health.

### Strategic Goal 5: Strengthen HUD's Internal Capacity

Strengthen HUD's internal capacity and efficiency to ensure better delivery of HUD's mission.

#### * 5A: Enable the HUD Workforce

Enable the HUD workforce through hiring, training, opportunities for growth, and promoting a more engaged and inclusive work environment.

#### * 5B: Improve Acquisition Management.

Identify, procure, and execute acquisition management.

#### * 5C: Strengthen Information Technology

Strengthen information technology, cybersecurity, and data management.

#### * 5D: Enhance Financial and Grants Management

Provide sound financial and grants management.

#### * 5E: Improve Ease, Effectiveness, and Trust in HUD Services

Institutionalize customer experience (CX) management and elevate the customer perspective across HUD.

✪ These objectives include a FY 2022-2023 Agency Priority Goal.

* These objectives reflect FY 2022-2026 HUD management objectives.

**Suppl. App. 15**

# FY 2022-2023 Agency Priority Goals

Agency Priority Goals (APGs) reflect the Department's key priorities for the next two years. Through public goal setting, quarterly leadership discussions, and regular public updates, HUD has made significant progress to advance the selected mission outcomes of APGs. For FY 2022-2023, HUD will track progress on these APGs:

### Objective 1B: Reduce Homelessness

✪ By September 30, 2023, make homelessness rare, brief, and non-recurring by reducing the number of people experiencing homelessness by 15% from 2020 levels.[1] ✪

### Objective 2B: Improve Rental Assistance

✪ By September 30, 2023, maximize the reach of HUD's rental assistance programs by increasing the occupancy rates to 96% in the Public and Multifamily Housing programs and the budget utilization rate to 100% in the Housing Choice Voucher program. ✪

### Objective 3A: Advance Sustainable Homeownership

✪ HUD will maximize homeownership for creditworthy first-time homebuyers and preserve homeownership for existing homeowners. By September 30, 2023, HUD will maintain a first-time homebuyer rate of at least 80% for newly endorsed FHA-insured purchase mortgages and a re-default rate for seriously delinquent homeowners who received a loss mitigation action that is below 30%. ✪

### Objective 4B: Strengthen Environmental Justice

✪ By September 30, 2023, protect families from lead-based paint and other health hazards by making an additional 20,000 units of at-risk housing units healthy and lead-safe. ✪

---

[1]This reduction is compared to the 2020 Point-in-Time (PIT) count. Due to the COVID-19 pandemic, many communities were not able to conduct and unsheltered PIT count in 2021 and thus a 2021 National Homelessness number is unavailable.

# Overarching Priority: Increase Equity

The Biden-Harris Administration has placed equity front and center through a series of Executive Orders and has issued a memorandum specific to HUD instructing the Department to redress the Nation's long history of discriminatory housing practices and reaffirming the Administration's commitment to ending housing discrimination.[2] HUD is well-positioned to advance those directives as its mission is focused on people in underserved communities. The Department's operations are designed to reach people who have been systemically locked out of opportunities to succeed. HUD has been a lifeline for people in need, creating affordable housing in every state, rebuilding communities ravaged by disasters, and supporting community development to unlock opportunity. While current HUD leadership recognizes the extraordinary legacy, mission, and potential the Department brings to building equitable communities across the Nation, HUD also recognizes that several of its core programs were operated for decades in a manner that supported discriminatory practices against persons of color. The Biden-Harris Administration's HUD is eager to use the Department's authorities to reverse the harm caused by prior Federal policies and prioritize equity in all of HUD programs.

Executive Order 13985 ("Advancing Racial Equity and Support for Underserved Communities Through the Federal Government") mandates that the Federal Government "pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."[3] Additionally, President Biden issued a Presidential Memorandum for the "Federal Government to recognize and acknowledge its role in systematically declining to invest in communities of color and preventing residents of those communities from accessing the same services and resources as their white counterparts."[4] This acknowledgement states that it is the policy of the Federal Government to "work with communities to end housing discrimination, to provide redress to those who have experienced housing discrimination, to eliminate racial bias and other forms of discrimination in all stages of home-buying and renting, to lift barriers that restrict housing and neighborhood choice, to promote diverse and inclusive communities, to ensure sufficient physically accessible housing, and to secure equal access to housing opportunity for all."[5] It is through this plan, HUD looks to further these goals. Each agency is directed to work to redress inequities in their policies and programs that serve as barriers to equal opportunity. Equity is defined in Executive Order 13985 as the "consistent, systematic, fair, just, and impartial treatment of all individuals, including underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality." Additional Executive Orders address diversity, equity, inclusion, and accessibility in the Federal workforce; gender policy combatting discrimination based on gender identity or sexual orientation; inclusion of new Americans; equity, justice, and opportunity for Asian Americans, Native Hawaiians and Pacific Islanders; environmental justice; and other issues related to equity and opportunity.[6]

---

[2] Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Practices and Policies, Memorandum for the Secretary of Housing and Urban Development, 86 FR 7487, https://www.Federalregister.gov/documents/2021/01/29/2021-02074/redressing-our-nations-and-the-Federal-governments-history-of-discriminatory-housing-practices-and

[3] https://www.Federalregister.gov/documents/2021/01/25/2021-01753/advancing-racial-equity-and-support-for-underserved-communities-through-the-Federal-government

[4] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-redressing-our-nations-and-the-Federal-governments-history-of-discriminatory-housing-practices-and-policies/

[5] Id.

[6] Executive Order 14035, Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce, 86 FR 34593, https://www.Federalregister.gov/documents/2021/06/30/2021-14127/diversity-equity-inclusion-and-accessibility-in-the-Federal-workforce; Executive Order 14020, Establishment of the White House Gender Policy Council, 86 FR 13797, https://www.Federalregister.gov/documents/2021/03/11/2021-05183/establishment-of-the-white-house-gender-policy-council

Housing plays a key role in improving lives, and the Federal implementation of policies to eliminate systemic discrimination and promote equity can produce long-lasting, positive impacts by providing access to safe, stable housing in inclusive and sustainable communities. Doing so will necessitate harnessing the strengths of economic development at the community, municipal, Tribal, and state levels. Given the vital importance of housing and community to well-being, and HUD's role in promoting fair housing policies, HUD has an opportunity to remove barriers and promote equity for people in communities that have been historically underserved by its programs. The Department also recognizes the significant racial disparities in homelessness and is committed to addressing these disparities. To accomplish this effort, HUD will address systemic inequities in housing and grants programs, environmental justice, and resident services, to ensure every person has access to safe and high-quality housing.

HUD has launched a comprehensive effort under Secretary Fudge's leadership to embed equity within the Department's programs, policymaking, and operations. To ensure Department-wide alignment as HUD moves this work forward, the FY 2022-2026 Strategic Plan has placed equity as an overarching priority to embed specific equity focused strategies throughout the Department's strategic goals and objectives.

# Overarching Priority: Improve Customer Experience

Rapid advances in consumer services and digital technologies have transformed customer expectations over the past decade. The public brings these heightened expectations from the private sector with them as they engage with HUD services. A failure to meet these expectations can have a profound and adverse effect on customers and the Department. Designing customer experiences intentionally, with the needs of the customer at the forefront of decision-making, can help HUD to: 1) better deliver on its mission; 2) serve greater proportions of targeted populations more effectively and equitably; 3) build trust; 4) improve customer satisfaction; and 5) lower operational costs.

Customer Experience (CX) is more than improved customer service.[7] CX is the sum of an individual's perception of HUD as a Department and the services and products it provides. It is built over time, along multiple interactions. "Customers" are individuals, businesses, and organizations (such as grantees and state and municipal agencies) that interact with a Federal Government agency or program. Interactions can be direct or through partner organizations executing Federally funded programs. Federal government customers could also include public servants and employees themselves in their interactions with Federal processes.[8] A "service" is defined as the sum of the help provided – by an agency and its partners – throughout the process a customer goes through to obtain, receive, or make use of a public offering (or comply with a policy).[9] Adopting a customer-centric approach to service delivery and putting people at the core of what HUD does and how the Department works, ensures successful outcomes as customers navigate HUD services.

Federal law and regulation continue to progress government-wide CX transformation. HUD worked across its programs in accordance with Executive Order 14058 ("Transforming Federal Customer Experience and Service Delivery To Rebuild Trust in Government") and Office of Management and Budget Circular A-11 Section 280, focused on CX transformation.[10] This has allowed HUD to embed CX strategies throughout its FY 2022-2026 Strategic Plan objectives to ensure this customer-centric focus will align HUD with Federal compliance requirements. HUD will rise to address complex challenges in real time and re-orient program operations to improve customer interactions by elevating CX as an overarching priority in the Strategic Plan. HUD will focus on empowering employees to design HUD's policies and technology to better deliver on behalf of end customers.

HUD's CX vision is to integrate the customer perspective into everything the Department does to make its interactions feel easy, effective, positive, and equitable. This unified focus on CX will enable HUD's customers across its five service ecosystems to better understand and access relevant housing and community development information.[11] Customers will be able to feel confident and supported while navigating HUD services, offer actionable feedback based on lived experiences, and achieve productive outcomes that support HUD's mission. Utilizing Human-Centered Design (HCD) and CX tools will enable HUD to implement solutions that positively impact all customers based on specific needs as a top priority.[12] Understanding HUD's customers' experiences

---

[7] HUD's CX on performance.gov, where quarterly reports can be found at: https://www.performance.gov/cx/agencies/hud/

[8] "Who is a Federal Government customer?" https://www.performance.gov/cx/assets/files/a11_2021-FY22.pdf

[9] "What is Federal Government service delivery?" https://www.performance.gov/cx/assets/files/a11_2021-FY22.pdf

[10] https://www.Federalregister.gov/documents/2021/12/16/2021-27380/transforming-Federal-customer-experience-and-service-delivery-to-rebuild-trust-in-government and https://www.performance.gov/cx/assets/files/a11-280.pdf.

[11] HUD programs can be organized into five Service Ecosystems that address distinct sets of customer needs: 1) Access to Affordable Rental Homes are programs to grow, preserve, and fund affordable rental home access, and provide supportive services to residents; 2) Homeownership Opportunity & Housing Market Stability are programs and lending/securities products that facilitate equal opportunity homeownership and strengthen the market; 3) Housing Quality & Improved Living Conditions are programs to assess and mitigate hazards or deficiencies in housing, and tools to facilitate asset management for HUD and improved living conditions for citizens; 4) Economic Growth & Community Resilience are grants and programs to stimulate economic development and grow strong, resilient communities or revitalize those in disaster areas; and 5) Fair Housing and Equal Opportunity Enforcement are support to agencies and organizations ensuring fair, safe, equitable housing practices and channels for citizen reporting of potential housing discrimination. *Please reference Strategic Objective 5E.*

[12] HCD is a methodology to problem-solving that incorporates the lived experience and feedback for whom you are designing in all steps of the design process. The goal of HCD is to end up with a solution that is tailored to meet people's needs, with little wasted effort and reduced risk: https://methods.18f.gov/about/

and expectations, in real time, provides insights into various pain points. Therefore, HUD will be enabled to determine where to equitably improve service delivery and operations.

**Suppl. App. 20**

# Strategic Goal 1: Support Underserved Communities

Fortify support for underserved communities and support equitable community development for all people.

### LEADING THIS GOAL

Office of the Secretary

## GOAL

HUD will fortify support for underserved communities and support equitable community development for all people residing in America. To achieve this goal, HUD will bolster Fair Housing compliance and enforcement, implement a Housing First approach to reducing homelessness, and drive equitable community development.[13] The Department is committed to building an inclusive future, that promotes wealth-building for all people and lifts underserved communities to share in the Nation's prosperity. Increased Fair Housing compliance and enforcement, aimed at preventing housing discrimination, along with strengthening community partnerships, confirms HUD's deep commitment to its mission. These commitments, coupled with strategic investments to make homelessness increasingly rare, render the Department a leader in re-envisioning a more prosperous future for all people who call this Nation home.



At the core of HUD's commitment to underserved communities is the advancement of equity in the Department's policies and programs. Historically, some of HUD's policies have perpetuated inequities in housing access and economic opportunity. The absence of an equity lens has resulted in policies that contributed to segregated neighborhoods, mortgage redlining, lending discrimination, and inhibited wealth-building opportunities for families of color, immigrants, women, individuals with disabilities, and lesbian, gay, bisexual, transgender, and queer (LGBTQ+) individuals. The Department recognizes and acknowledges the role it has played in declining to invest in communities of color and preventing residents of those communities from accessing needed services and resources. These inequities are particularly clear in homelessness, in which Black and indigenous people, people with disabilities, and LGBTQ+ people experience homelessness at rates significantly higher than their representation in the general population. As HUD designs and implements new programs and policies, as well as re-evaluates existing ones, the Department will seek to understand the lived experiences of the people its programs are intended to serve. HUD will address the systemic issues of racism and inequality by understanding and including the diverse

---

[13] The U.S. Interagency Council on Homelessness defines Housing First as an approach and framework for ending homelessness that is centered on the belief that everyone can achieve stability in permanent housing directly from homelessness and that stable housing is the foundation for pursuing other health and social services goals. Implementing Housing First involves both project-level and community-level dimensions. Implementing Housing First at the project level, including in permanent supportive housing models, means having screening practices that promote the acceptance of applicants regardless of their sobriety or use of substances, completion of treatment, and participation in services. At the community-level, Housing First means that the homelessness crisis response system is oriented to help people obtain permanent housing as quickly and with as few intermediate steps as possible. https://www.usich.gov/resources/uploads/asset_library/Implementing_Housing_First_in_Permanent_Supportive_Housing.pdf.

**Suppl. App. 21**

perspectives of those who use or could benefit from HUD programs. The Department will develop its strategies for achieving this goal through a Customer Experience (CX) lens, focused on Human-Centered Design, research, and customer understanding. The most impactful way to serve HUD's vulnerable populations is to empower them by giving them a voice in designing solutions specific to their diverse needs and perspectives.

The goal of supporting underserved communities will be carried out across three objectives focused on advancing housing justice, reducing homelessness, and investing in the success of communities. HUD's primary focus in advancing housing justice is to expand the Department's role in proactively supporting and protecting vulnerable and underserved communities while increasing enforcement of, and compliance with, Fair Housing laws. The Department's commitment to reduce homelessness, centered on the Agency Priority Goal to make homelessness rare, brief, and non-recurring, focuses on providing housing as the initial platform for improving quality of life, and improving access to housing services. Lastly, investing in the success of communities will revolve around creating inclusive development, proactive policies to fight discrimination, and enduring measures to gauge impacts. Supporting underserved communities is not only essential to HUD's mission of creating strong, sustainable, inclusive communities and quality, affordable homes for all, but represents the Nation's moral and civil obligation to care for one another in the pursuit of everyone's best selves.

This goal consists of three objectives:

> *1A. Advance Housing Justice*
>
> *1B. Reduce Homelessness*
>
> *1C. Invest in the Success of Communities*

**Suppl. App. 22**

# Strategic Objective 1A: Advance Housing Justice

| |
|---|
| Fortify support for vulnerable populations, underserved communities, and Fair Housing enforcement. |
| **LEADING THIS OBJECTIVE** |
| Office of Fair Housing and Equal Opportunity |

## OBJECTIVE

A person's future should never be limited by the zip code where they live. Furthermore, a person's race, disability or other protected characteristics should never limit their access to housing or their ability to fully live and participate in the community. HUD recognizes that where a person lives greatly impacts nearly every aspect of their life. HUD is committed to learning from the lived experiences of those who utilize or could benefit from HUD programs to inform the Department's process in addressing systemic issues of racism and inequality. HUD's mission and work are focused on ensuring underserved populations have equitable access to housing and the long-term advantages that a safe, stable home provides. The Department's efforts are informed by HUD's commitment to prevent further discrimination against traditionally underserved groups as the Department strives to create diverse, inclusive communities.

This administration has placed equity front and center through a series of Executive Orders focused on underserved populations to ensure equitable and fair access to housing and to Federal programs. The Department has identified underserved populations to include, but not be limited to the following: people of color; members of religious minorities; members of the lesbian, gay, bisexual, transgender, and queer (LGBTQ+) community; persons with disabilities; persons who live in rural areas; immigrants; populations with limited English proficiency (LEP); survivors of domestic violence and sexual assault; survivors of human trafficking; people involved in the criminal justice system; and persons otherwise adversely affected by persistent poverty or inequality.

Advancing equity in housing means creating pathways for underserved populations to be reached by 1) building relationships with service provider partners; 2) improving outreach and marketing of housing opportunities; 3) changing admissions policies; and 4) targeting housing programs. HUD will collaborate with Federal, state, local, Tribal, and nonprofit partners to ensure nationwide efforts are implemented in accordance with communities' localized needs. Additionally, a thorough customer understanding, communication, and outreach efforts will inform HUD's tailored support to communities to fight discrimination. A central element of HUD's approach will be the provision of education and technical assistance to help identify, prevent, and eliminate discriminatory practices. HUD will also revise and develop policy levers and guidance to remove barriers to housing access. New data collection tools will further the Department's collective efforts by ensuring HUD has access to the latest information on fair housing complaints, trends that must be addressed, and community efforts.

HUD is working to fortify fair housing rights by implementing guidance and new rules that will increase protections under the Fair Housing Act. In particular, the Department is working toward the successful rollout of an improved Affirmatively Furthering Fair Housing (AFFH) rule. HUD anticipates issuing a proposed rule that will help recipients of HUD funding to take meaningful actions to overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to equal opportunity based on protected characteristics. HUD also anticipates publishing a final rule setting out the framework for assessing whether policies or practices have

**Suppl. App. 23**

an unjustified discriminatory effect in violation of the Fair Housing Act.[14] Subject to finalization of those rulemakings, the Department anticipates having a focus on providing technical assistance for Federal agencies and grantees to meet their obligations at all levels.

HUD continues to implement the Housing Counseling Program and the FY 2021 Eviction Protection Grant Program to help low-income renter families and individuals avoid eviction or minimize the disruption and damage caused by the eviction process in areas with high rates of evictions or prospective evictions, including rural areas. Advancing housing justice and strengthening housing protections for underserved populations ensures the Federal government affirmatively furthers fair housing. HUD is unwavering in its commitment to proactively break down barriers that block people from living in healthy and prosperous neighborhoods that provide economic opportunities.

## STRATEGIES

Denotes a customer experience-focused strategy

Denotes an equity-focused strategy

- ❖ **Advance equity and combat discrimination** in HUD-funded programs.
- ❖ **Fortify fair housing rights by developing guidance and regulations** that will increase protections under the Fair Housing Act.
- ❖ **Expand housing opportunities and strengthen partnerships** to reach marginalized, underserved, and vulnerable populations.

## METRICS

To help achieve this objective, HUD has established the following performance indicators:

- ▶ Number of fair housing cases referred by Fair Housing Initiatives Program (FHIP) organizations
- ▶ Number of fair housing cases processed by Fair Housing Assistance Program (FHAP) agencies
- ▶ Number of Limited English Proficiency Initiative (LEPI) services provided
- ▶ Number of FHIP and FHAP fair housing practitioners and others who attend National Fair Housing Training Academy (NFHTA) courses and Fair Housing Forums

## EVIDENCE-BUILDING

HUD's Office of Policy Development and Research (PD&R) has produced an extensive body of evidence on the scope and severity of affordable housing needs among households nationally and how those needs vary by region and by demographic and socioeconomic characteristics. PD&R conducts monthly surveys of national and regional market activity and every two years produces a report to Congress about renter households with "worst-case housing needs." Renter households with very low incomes who do not receive government housing assistance and who pay more than one-half of their income for rent, live in severely inadequate conditions, or both, have worst case needs for adequate, affordable rental housing. According to the most recent report, worst-case housing needs affect 7.77 million very low-income renter households nationwide in 2019, before the pandemic's disruptions of the housing market. Most households who experience worst-case housing needs have severe rent burdens. These severe rent burdens result from a shortage of available and affordable rental housing. Worst-case housing needs are present in every geography and with all populations, but rates are highest in the

---

[14] Reinstatement of HUD's Discriminatory Effects Standard, 86 FR 33590, https://www.Federalregister.gov/documents/2021/06/25/2021-13240/reinstatement-of-huds-discriminatory-effects-standard

South and West, in suburban areas, and among Native Hawaiian or Pacific Islander, Asian, Hispanic, and non-Hispanic white households.[15]

In 2017, HUD produced a study of the housing needs of American Indians and Alaska Natives in Tribal Areas.[16] This study found that the overcrowding and physical housing problems of American Indians and Alaska Natives living on reservations and other Tribal areas are strikingly more severe than those of other Americans. Particular circumstances of Tribal areas—remoteness, lack of infrastructure, and complex legal and other constraints related to land ownership—make it extremely difficult to improve the housing conditions, though the details and the extent of the challenges vary substantially across Tribal areas.

HUD has regularly conducted national housing discrimination studies every decade since 1977, with new iterations in 1989, 2000, and 2012. Most recently, PD&R conducted a suite of studies focused on a broad range of topics, including a national study of discrimination on the basis of disability, and pilot studies measuring levels of discrimination based on source of income, sexual orientation and gender status, and against families with children. These studies have employed rigorous study designs such as paired testing to measure the size and scope of discrimination in the rental and sales markets.[17] The 2017 pilot study of housing discrimination against same-sex couples and transgender individuals in three metropolitan areas found moderate, and statistically significant, discrimination against gay male couples at the initial stage of the rental transaction, and no evidence of discrimination against lesbian couples, and showed transgender testers who disclosed their gender status were less likely to be told about available rentals.[18] The study created new protocols for testing for discrimination against these classes and is an important step forward in testing for discrimination in the rest of the country. PD&R is currently undertaking a qualitative study of discrimination against people with LEP and a study to identify and test new methods for measuring housing discrimination.

In addition to studying housing discrimination, PD&R has commissioned research to understand the other factors that can make it hard for HUD-assisted households to live in neighborhoods that provide economic opportunities. One such factor is the level of rental assistance provided through HUD's largest rental assistance program, the Housing Choice Voucher (HCV) program. A 2018 study found that Small Area Fair Market Rents (SAFMRs), an alternative method of determining rent standards in the HCV program, increased the pool of rental units potentially available to HCV holders in high-opportunity neighborhoods and decreased the pool in low-opportunity neighborhoods.[19] Another factor that can affect households' access to neighborhoods of economic opportunity is landlord willingness to rent to households receiving Federal rental assistance. In 2021, PD&R launched a five-year study of innovative methods—made possible through the Moving to Work Demonstration—to incentivize landlords to rent to HCV-assisted households.

HUD's Learning Agenda includes several research questions that relate to Objective 1A. Examples of such questions are:

- What do early findings show about the experiences of voucher holders in jurisdictions with local source of income discrimination ordinances?

---

[15] "Worst Case Housing Needs: 2021 Report to Congress" (2021), https://www.huduser.gov/portal/publications/Worst-Case-Housing-Needs-2021.html.

[16] "Housing Needs of American Indians and Alaska Natives in Tribal Areas: A Report from the Assessment of American Indian, Alaska Native, and Native Hawaiian Housing Needs" (2017), https://www.huduser.gov/portal/publications/HNAIHousingNeeds.html.

[17] For a list of current and historical studies, see https://www.huduser.gov/portal/publications/housingdiscriminationreports.html.

[18] "A Paired-Testing Pilot Study of Housing Discrimination against Same-Sex Couples and Transgender Individuals" (2017), https://www.huduser.gov/portal/publications/HDS-LGBT.html.

[19] "Small Area Fair Market Rent Demonstration Evaluation: Final Report" (2018), https://www.huduser.gov/portal/sites/default/files/pdf/SAFMR-Evaluation-Final-Report.pdf.

- Do home seekers with communication-related disabilities experience substantial barriers to information in seeking rental units?

## Strategic Objective 1B: Reduce Homelessness

Strengthen Federal, State, Tribal, and community implementation of the Housing First approach to reducing the prevalence of homelessness; with the ultimate goal of ending homelessness.

### LEADING THIS OBJECTIVE

Office of Community Planning and Development

✪ **Agency Priority Goal for FY 2022-2023: By September 30, 2023, make homelessness rare, brief, and non-recurring by reducing the number of people experiencing homelessness by 15% from 2020 levels.[20]** ✪

## OBJECTIVE

On a single night in January 2020, 580,466 people experienced homelessness across the United States. This represents a two percent increase from 2019 and marks the fourth consecutive year that total homelessness increased in the United States. These numbers are staggering, especially considering the threat of Coronavirus Disease 2019 (COVID-19) to people experiencing homelessness. HUD will work to make homelessness rare, brief, and non-recurring, while strengthening Federal, State, Tribal, and community implementation of evidence-based practices, such as Housing First, to address homelessness.[21]

To make homelessness rare, HUD will partner with local, state, Tribal, and Federal organizations to prevent homelessness for people exiting public systems. The Department's focus will include, but not be limited to, child welfare, prison, and mental health institutions. HUD will seek to make homelessness brief by reducing the length of time people experience homelessness. This will be achieved by helping communities provide equitable access to all people seeking homeless assistance through the coordinated entry system. Individuals and families will then be connected to appropriate permanent housing options, such as permanent supportive housing, Emergency Housing Vouchers, and rapid re-housing. To prevent people from experiencing homelessness again, the Department will develop strategies to increase access to affordable housing and healthcare among this vulnerable population.

Promoting equity is a key component in reducing homelessness. People experiencing homelessness are among the most underserved and overlooked – especially persons of color, who are significantly over-represented among this population. The Department will improve community efforts to identify, engage, and re-house people experiencing unsheltered homelessness through a Housing First approach. HUD will work with partners to create tailored, equitable solutions for individuals' needs that are informed by their lived experiences.

The lack of affordable housing creates additional obstacles for families experiencing homelessness who are trying to get back on their feet. This is especially true in rural communities and major West Coast cities where unsheltered homelessness is a considerable problem. To increase access to affordable housing, the Department

---

[20]This reduction is compared to the 2020 Point-in-Time (PIT) count. Due to the COVID-19 pandemic, many communities were not able to conduct and unsheltered PIT count in 2021 and thus a 2021 National Homelessness number is unavailable.
[21] More information on Housing First can be found at https://files.hudexchange.info/resources/documents/Housing-First-Permanent-Supportive-Housing-Brief.pdf

**Suppl. App. 27**

will deploy tailored assistance that addresses the geographic, economic, and service needs of families as well as individuals.

Housing is foundational to—not the reward for—health, recovery, and economic success. Proof exists that homelessness can be ended. Ensuring that everyone has a safe, stable place to live is crucial to effectively and efficiently bringing an end to homelessness.

## STRATEGIES

⚇ Denotes a customer experience focused strategy

⚖ Denotes an equity focused strategy

- ❖ **Prevent people from becoming homeless** when they exit public systems, including but not limited to child welfare, prisons, and mental health institutions, through national and local partnerships.
- ❖ **Improve retention in housing** by improving access to affordable housing, healthcare, and other client-centered supportive services.
- ❖ **Improve capacity of Continuums of Care (CoCs)** to use existing data to measure and track system performance.
- ❖ **Identify opportunities to increase access to housing** for Veterans who cannot be served by HUD Veterans Affairs Supportive Housing (HUD-VASH), Supportive Services for Veteran Families (SSVF), or through programs such as Emergency Housing Vouchers, CoCs, and Housing Choice Vouchers.
- ❖ **Improve community approaches**—including getting contributions from those experiencing homelessness—to identify, engage, and re-house people experiencing unsheltered homelessness, including through a Housing First approach. ⚇
- ❖ **Reduce the average length of homelessness** through improved coordinated entry system implementation and targeted homeless programs. ⚇⚖

## METRICS

To help achieve this objective, HUD has established the following performance indicators:

- ✪ Number of people experiencing homelessness
- ▶ Length of homelessness
- ▶ Number of people experiencing unsheltered homelessness
- ▶ First time homeless
- ▶ Number of Veterans experiencing homelessness
- ▶ Percentage of people exiting to permanent housing destinations
- ▶ Returns to homelessness
- ▶ Percentage of new admissions of people experiencing homelessness into other HUD-subsidized housing programs

## EVIDENCE-BUILDING

HUD's research helps form the backbone of the evidence supporting efforts to prevent and end homelessness among several key populations. The Department's Office of Policy Development and Research (PD&R) landmark Family Options study found that families who received priority access to deep housing subsidies experienced major decreases in returns to homelessness and increases in family well-being relative to those offered usual care in shelters, and documented major cost savings of rapid rehousing and permanent housing relative to shelter

**Suppl. App. 28**

and transitional options on a per-month basis.[22] HUD draws on the considerable research literature regarding Permanent Supportive Housing (PSH) and the Housing First program model when implementing programs for chronically homeless individuals. Randomized controlled trials evaluating PSH programs that use a Housing First approach show that it improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services.[23]

In partnership with the Assistant Secretary for Planning and Evaluation at the U.S. Department of Health and Human Services (HHS), HUD recently completed a research effort exploring the rise in unsheltered homelessness encampments in many major cities and the costs of the interventions being deployed. The final report on the costs of encampment responses in four major cities, published in early 2021, provides a useful template for local governments to assess their own interventions.[24] The Understanding Rapid Re-Housing (RRH) study, published in early 2020, provides the first comprehensive documentation of RRH participant experiences and program practices in different types of communities.[25] Other recent projects such as the Youth Homelessness Demonstration Program are designed to build on available research to understand how program models can meet the needs of key target populations, and how they have evolved from demonstration projects to components of the HUD homeless assistance system nationally.

In 2022, PD&R will begin a study of the long-term outcomes of participants in the Family Options Study. This project will support a 10-year follow up with the families who were randomly assigned to receive one of four interventions: rapid re-housing, project-based transitional housing, subsidy only, or usual care, and were followed for three-years. A follow-up survey will provide valuable additional information on outcomes for the study families, such as homelessness and doubling up, housing quality, family separations and reunifications, child and adult well-being, employment and income, and food security.

HUD's Learning Agenda includes several research questions that relate to Objective 1B. Examples of such questions are:

- To what extent did the Emergency Rental Assistance Program prevent evictions and homelessness in the short-term, did it have lasting effects on housing stability, and could it serve as a model for future HUD programs? How are crisis response approaches to prevent and end homelessness different in Tribal areas?
- What kinds of homelessness prevention and diversion strategies are communities employing, and which strategies are most effective at resolving homelessness and preventing returns to homelessness?

---

[22] "Family Options Study: 3-Year Impacts of Housing and Services Interventions for Homeless Families" (2016), https://www.huduser.gov/portal/publications/Family-Options-Study.html.

[23] Permanent Supportive Housing: Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness (2018), https://www.ncbi.nlm.nih.gov/books/NBK519597/#ref_000409.

[24] Exploring Homelessness Among People Living in Encampments and Associated Cost: City Approaches to Encampments and What They Cost (2021), https://www.huduser.gov/portal/publications/Exploring-Homelessness-Among-People.html.

[25] https://www.huduser.gov/portal/publications/RRH-community-scan-report.html.

# Strategic Objective 1C: Invest in the Success of Communities

Promote equitable community development that generates wealth-building for underserved communities, particularly for communities of color.

## LEADING THIS OBJECTIVE

Office of Public and Indian Housing

## OBJECTIVE

The Department's commitment to creating a more equitable and prosperous future for all communities in the United States places a specific focus on initiatives and programs that: 1) promote barrier removal and provide tools to help HUD-assisted residents move toward economic prosperity; 2) encourage individual and community wealth-building; and 3) provide holistic supportive services for underserved communities and those living in HUD-assisted housing.

HUD will invest in inclusive economic development and equitable wealth-building opportunities that center on the specific needs of underserved communities. The Department's programs will be informed by individuals' and communities' self-expressed determinations of economic prosperity and wealth. HUD will pursue knowledge of the people it intends to serve and their interests via community outreach and engagement. The Department will act on this feedback, using Human-Centered Design strategies, to improve the design and impact of its community and supportive services (CSS) programs.

Place-based initiatives represent an important strategy for realizing the Department's commitment to wealth-building stemming from community self-determination. In a place-based strategy, each local initiative or program the Department creates or engages is nuanced, tailored to meet the community's particular needs for housing and services, based on the local context and resources. Such a community-driven, place-based strategy can help ensure HUD's response to any special designations such as preference points, that enhance coordination and leverage among Federal economic and social investments.

HUD will bolster support of small businesses in communities that include HUD-assisted housing through enforcement of Section 3 requirements.[26] These efforts, led by the Office of Field Policy and Management, will be reinforced by building the capacity of its partner organizations and grantees to improve the delivery of HUD programs. Where it is possible and practical to do so, HUD will advance inclusive hiring practices and local contracting policies for delivery of housing and community-related projects. This will build wealth and income in low-income communities as part of the provision of housing and services. The Department aims to better reach individuals and communities who experience heightened barriers to accessing HUD services. Furthermore, the Department will seek to better promote entrepreneurship as an avenue for building wealth in underserved communities, including Tribal lands.

---

[26] Section 3 is a provision of the Housing and Urban Development Act of 1968. The purpose of Section 3 is to ensure that employment and other economic opportunities generated by certain HUD financial assistance shall, to the greatest extent feasible, and consistent with existing Federal, State, and local laws and regulations, be directed to low- and very low-income persons, particularly those who are recipients of government assistance for housing, and to business concerns which provide economic opportunities to low- and very low-income persons. https://www.hud.gov/sites/dfiles/FPM/documents/Section-3-FAQs.pdf.

Suppl. App. 30

HUD recognizes the benefit and need for holistic services to improve assisted resident outcomes and overall community economic health. The Department will work to collaborate with both governmental and nongovernmental partners to empower greater economic development, and community wealth-building. HUD will also better align supportive services for wealth-building opportunities for individuals. HUD, with its partners, will increase assisted residents' access to financial empowerment opportunities and advancement, workforce development programs, pre-apprenticeship programs, apprenticeships, entrepreneurship, and additional wealth-building opportunities. Programs will be designed to equip participants with the requisite skills and resources for building assets. The Department's focus includes addressing existing gaps in services while mitigating the potential steep drop in government benefits that accompany rising income. Such drops in benefits often pose barriers to wealth creation and improved economic outcomes. Expanding HUD's understanding of what success looks like, as well as how it is achieved, is crucial to accomplishing this objective.

## STRATEGIES

Denotes a customer experience focused strategy

Denotes an equity focused strategy

- **Align cross-Departmental and Federal interagency supportive benefits** to empower wealth-building.
- **Develop programs and services to support entrepreneurship** as a vehicle to support wealth-building.
- **Actively foster self-determination among HUD-assisted residents (customers)** to understand and respond to their lived experiences and wealth-building goals effectively.
- **Improve collaboration with small businesses** by working with Small Business Administration (SBA), other Federal agencies, unions, and worker advocacy groups to help more small businesses compete for Section 3 project contracts.
- **Foster existing place-based initiatives and programs** and create new place-based initiatives.[27]
- **Invest catalytic resources focused on equity** and community wealth-building for community and neighborhood revitalization.[28]
- **Improve the accuracy of data collection** on job creation, including jobs created through the Indian Housing Block Grant (IHBG) and the Indian Community Development Block Grant (ICDBG).

---

[27] HUD will focus on developing healthy, thriving communities that provide access to equitable economic opportunity for residents of HUD-assisted housing and for all community members in under-resourced or under-invested communities.
[28] HUD will achieve this through the development and implementation of cross-departmental and interagency initiatives and programs for response, restoration, and recovery from the pandemic.

## METRICS

To help achieve this objective, HUD has established the following performance indicators:
- ▶ Number of attendees participating in HUD-sponsored wealth-building webinars
- ▶ Percentage of public housing financial assistance recipients that meet benchmark labor-hour goals
- ▶ Percentage of completed Section 3 projects that meet benchmark labor-hour goals

## EVIDENCE-BUILDING

Evidence for equitable community development covers a broad range of issues and programs, from regulatory barriers that prevent development of affordable housing options, to access to mortgage credit, to development of economic security and wealth by assisted renters. HUD's Office of Policy Development and Research (PD&R) regularly evaluates the complex nexus between HUD's investments in resident services programs focusing on economic self-sufficiency versus residents' ability to maintain successful tenancy and grow economically, with opportunities to develop savings that contribute toward a path to wealth-building.

PD&R is studying the following programs with self-sufficiency components and developing findings for use by PIH and other HUD staff: the Jobs Plus place-based program, which has as a core component an earned-income disregard relative to rent increases; an escrow savings program in the Family Self Sufficiency (FSS) Program; and a demonstration program on Rent Reform. What these initiatives have in common is that they offer alternatives to the practice in Federally-assisted housing that increases in family income are accompanied by increases in the family's share of the rent —a potential impediment to savings and wealth-building.

The Rent Reform Demonstration was designed to test an alternative to HUD's current rental assistance structure requiring less frequent income recertifications to assess its effect on the employment, earnings, and hardship of the residents that rely on housing vouchers. The results indicate that, when the findings for all four study PHAs are combined, the new policy did not have a statistically significant impact on the quarterly employment rate of household heads. The story, however, varied substantially across locations as there were some positive effects on earnings in one site, and on earnings and employment in another, but they were not sustained, and no effect at one site and negative effects at one site.[29]

The Family Self-Sufficiency Evaluation analyzes the FSS program's impacts among a sample of resident families receiving Housing Choice Vouchers, evaluating those families' changes in financial literacy, credit worthiness, and family stability, including (but not limited to) growth in employment and earned income. In FSS, participants work with HUD-funded Coordinators to set goals and access services. During the period of participation, any increases in the family's rent as a result of increased earned income result in a credit to an escrow account that can be accessed upon "graduation" from the program or, in many cases, while still in the program, in pursuit of self-sufficiency goals. The FSS evaluation has documented implementation, participants' engagement in the program, and program impacts on employment and government benefits receipt over what is typically a five-year program. Data thus far evidence that, FSS participants have increased enrollment in employment-related services and support services by a statistically significant 13 percentage points. However, there are no statistically significant impacts on employment or earnings when compared to the control or comparison group.[30] One of the challenges in understanding program impacts is that many of those in the FSS sample stopped participating short of the five-year term of the participation contract. PIH will be working with FSS grantees and industry partners for strategies to increase the percentage of FSS participants who remain in the program through graduation and the completion of all goals, as there appears to be a correlation with successful outcomes for those participants.

---

[29] "The Rent Reform Demonstration: Interim Findings on Implementation, Work, and Other Outcomes" (2019), https://www.huduser.gov/portal/publications/RentReform-InterimFindings.html.
[30] https://www.huduser.gov/portal/publications/Promoting-Work-and-Self-Sufficiency-for-Housing-Voucher-Recipients.html.

Unequal access to credit presents a challenge for renters looking to build wealth and move to areas that provide greater economic opportunities. Recent PD&R research documented that credit visibility of assisted renters can be strengthened substantially by providing credit agencies with their rental payment histories.[31] Economic mobility is essential for disadvantaged households to get ahead. Recent research has shown the importance of exposure to opportunity neighborhoods, with adult economic outcomes improving about 4 percent per year of childhood exposure to good neighborhoods.[32]

HUD's Learning Agenda includes several research questions that relate to Objective 1C. Examples of such questions are:

- What proportion of low-skill public housing residents employed under Section 3 requirements receive training or certifications to improve their long-term employment prospects?
- Are there service delivery models evaluated in the research literature that could improve self-sufficiency outcomes for HUD-assisted households?
- What is the unmet need for childcare among HUD-assisted parents and guardians?
- What additional opportunities exist for HUD to encourage asset building among assisted households?

---

[31] Policy and Economic Research Council. 2019. Potential Impacts of Credit Reporting Public Housing Rental Payment Data. https://www.huduser.gov/portal/sites/default/files/pdf/Potential-Impacts-of-Credit-Reporting.pdf.

[32] Chetty, Raj and Nathaniel Hendren. 2018. "The Impacts of Neighborhoods on Intergenerational Mobility I: Childhood Exposure Effects. Quarterly Journal of Economics. 133, 3: 1107-1162. https://scholar.harvard.edu/hendren/publications/impactsneighborhoods-intergenerational-mobility-i-childhood-exposure-effects.

**Suppl. App. 33**

# Strategic Goal 2: Ensure Access to and Increase the Production of Affordable Housing

Ensure housing demand is matched by adequate production of new homes and equitable access to housing opportunities for all people.

## LEADING THIS GOAL

Office of the Secretary

## GOAL

HUD will increase access to rental assistance and the production of affordable housing. Department-led increases will benefit families and communities by increasing the availability of safe, high quality, and affordable housing. Accomplishing this goal includes evaluating HUD's programs to identify ways the Federal government can make assisted and other affordable housing and related services work better for families. HUD will achieve this by

implementing best practice improvements that have been demonstrated to be effective. These improvements will be aimed at growing the supply of housing and making newly created housing affordable for families. Equitably achieving this goal requires diversifying the location of affordable housing developments and landlords that accept rental assistance. These efforts will give families real, viable choices in where they live. Success will be furthered by the delivery of services and supports that strengthen families.



At the center of HUD's goal to increase housing affordability is the need to listen to customers and other stakeholders. Through a robust Customer Experience (CX) effort, the Department will elevate voices to the diverse population of customers that it serves. The policies, objectives, and strategies HUD will pursue in support of this goal will be based upon continuous outreach to understand the lived experiences of HUD customers.

Expanded access to homeownership opportunities, rental assistance, and affordable housing options are all vital for families to thrive.

This goal consists of two objectives:

> *2A. Increase the Supply of Housing*

> *2B. Improve Rental Assistance*

**Suppl. App. 34**

# Strategic Objective 2A: Increase the Supply of Housing

Enhance HUD's programs that increase the production and supply of housing across the country.

## LEADING THIS OBJECTIVE

Office of Housing

## OBJECTIVE

An abundant supply of housing is essential to ensuring that all households have access to quality, affordable homes. HUD aims to increase the supply of housing across the country to ensure all people's housing needs to improve housing security in all American communities. The Department will work to strengthen housing production in a safe and timely manner. HUD programs will make more single-family homes available to owner-occupants, local governments, and non-profit organizations. Doing so will support the Biden Administration's priority to increase the supply of housing for the lower and middle segments of the housing market.[33] HUD will also increase the supply of rental housing, with an emphasis on creating more affordable housing in areas of opportunity. The Department will continue to work with state and local governments to boost the housing supply. HUD and its partners will achieve this by leveraging existing Federal funds to spark action at the local level. HUD will provide its partners technical assistance in eliminating barriers to housing production, such as exclusionary zoning, while promoting homeownership opportunity to more individuals and families.

HUD will employ all resources at its disposal to bolster the national housing supply by 1) increasing new construction; 2) preserving existing housing; 3) and supporting the production of manufactured housing.

## STRATEGIES

Denotes a customer experience-focused strategy

Denotes an equity-focused strategy

- **Support the financing and production of new affordable housing.**
- **Conduct research and provide tools** on additional methods to increase the housing supply.
- **Launch learning and listening sessions** with local leaders.[34]
- **Strengthen FHA multifamily housing programs** for underserved communities.
- **Bolster capacity building** of state agencies, developers, and property owners, particularly those serving underserved communities.
- **Preserve existing HUD-assisted affordable housing**, by leveraging Rental Assistance Demonstration (RAD) to stabilize and rehabilitate properties.
- **Increase opportunities for state and local government and non-profit organizations** to participate in FHA asset sales.[35]

---

[33] White House press release can be found here: https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/01/fact-sheet-biden-harris-administration-announces-immediate-steps-to-increase-affordable-housing-supply/.

[34] The White House, HUD, and FHFA will convene state and local officials and stakeholders for a series of peer learning and listening sessions. These sessions will allow for the exchange of best practices on locally led zoning reform to address supply and affordability challenges.

[35] The use of direct and competitive sales of defaulted FHA-insured mortgage notes to units of local government and nonprofits allows HUD to make bulk sales to purchasers with affordable housing and community revitalization goals in specific geographic areas.

❖ **Prioritize Homeownership** in the sale of FHA-single-family insured properties.

❖ **Capture resident perspectives** to improve the preservation and development of affordable housing.

## METRICS

To help achieve this objective, HUD has established the following performance indicators:

▶ Number of affordable and market-rate housing units produced or preserved through FHA multifamily mortgage insurance – Multifamily Accelerated Processing (MAP) new construction or substantial rehabilitation programs[36]

▶ Number of affordable housing units produced or preserved through FHA multifamily mortgage insurance – Risk-Sharing new construction or substantial rehabilitation programs, including the Federal Financing Bank (FFB) Initiative

▶ Rental Assistance Demonstration for Public Housing Authorities (PHAs) – total and affordable units

▶ Rental Assistance Demonstration for Multifamily Housing and Other Preservation Programs – total and affordable units

▶ Number of manufactured homes produced

▶ Number of HOME Investment Partnerships Program (HOME) and Housing Trust Fund Program (HTF) units[37]

## EVIDENCE-BUILDING

Each month, HUD's Office of Policy Development and Research (PD&R) produces the National Housing Market Indicators report to document the status of rental and owner housing markets including production, transactions, and affordability.  Production of housing in proportion to household formation is critical to achieving affordability. Rental affordability is near historic lows, as affordability of the median rent relative to the median renter income at the end of 2020 was 27 percent below its peak in the first quarter of 2001.  Affordability of owner-occupied homes is variable because of shifting mortgage interest rates and home prices, and in 2020 was 52 percent better than its pre-recession low point in 2006.

PD&R produces an annual report on how to encourage the production of new rental housing in high-cost and high-productivity metropolitan areas.  The report identifies the metropolitan areas with the greatest affordability challenges and offers recommendations for what these communities can do to alleviate shortages of affordable rental housing. The report also highlights a select number of exemplary approaches that some of these high-cost communities have already implemented to address the affordability crisis.

Low-Income Housing Tax Credits (LIHTC) continue to be the largest Federal production subsidy for the creation of affordable housing units; research indicates that the majority of LIHTC units remain affordable after the 15-year initial compliance period ends.  FHA also makes a substantial contribution to multifamily housing. Administrative data show that on average over the last three years (FY 2018 to FY 2020), FHA completed initial endorsements on 1,179 multifamily mortgages per year representing 174,176 units and $19.2 billion of financing. Of these endorsements, new construction represented 219 mortgages per year, 34,850 units, and $5.1 billion of financing.

HUD's Learning Agenda includes several research questions that relate to Objective 2A. Examples of such questions are:

---

[36] Affordable is defined as meeting the affordable housing definition in the Mortgage Insurance Premium (MIP) Federal Register Notice.
[37] Information on HOME can be found here: https://www.hud.gov/program_offices/comm_planning/home. Information on HTF can be found here: https://www.hud.gov/program_offices/comm_planning/htf.

Suppl. App. 36

- How do zoning, subdivision regulations, procedural processes, and local land use conditions affect housing supply, and what regulatory reforms are most effective at matching housing supply to demand in a way that promotes inclusive communities?
- What are the gaps in financing for multifamily housing in America, and under what conditions would an expanded FHA role be likely to support increasing the supply of multifamily housing, while also preserving and enhancing the supply of naturally occurring affordable housing?
- How is the HTF Program being used to increase the production of affordable housing?
- To what extent can modular or other off-site construction methods produce affordable accessible rental units, and how do off-site methods compare with site-built housing?
- What happens to the LIHTC portfolio as communities start to reach the end of the extended use affordability period?

# Strategic Objective 2B: Improve Rental Assistance

| Improve rental assistance to address the need for affordable housing. |
|---|
| **LEADING THIS OBJECTIVE** |
| Office of Public and Indian Housing |

✪ **Agency Priority Goal for FY 2022-2023: By September 30, 2023, maximize the reach of HUD's rental assistance programs by increasing occupancy rates to 96% in the Public and Multifamily Housing programs and the budget utilization rate to 100% in the Housing Choice Voucher program.[38]** ✪

## OBJECTIVE

The Nation's housing affordability crisis highlights the importance of maximizing the reach of HUD's rental assistance programs to assist as many households as possible. Underscoring this crisis is the need for assisted renters to have equitable access to quality housing options best suited to their needs. To do this HUD will further efforts to ensure all housing — especially housing tied to HUD rental assistance — is consistently high quality, healthy, and safe. To meet these goals, HUD will focus its efforts on 1) Increasing the utilization of Housing Choice Vouchers, including vouchers for special populations[39]; 2) Increasing the occupancy of Public Housing and Multifamily units; 3) Addressing the backlog of inspections for Public Housing and Multifamily properties; and 4) Reviewing existing processes and developing necessary processes to hold owners of Multifamily and Project-Based Voucher properties with poor conditions accountable.

HUD will increase Public and Multifamily Housing occupancy rates to 96% by September 30, 2023. For the Housing Choice Voucher program, HUD will work with Public Housing Authorities (PHAs) to restore budget utilization to its pre-COVID pandemic average of 100% by September 30, 2023. This will serve as an interim step toward the goal of enabling families to use all available vouchers, including those that could be funded with excess reserves. The COVID-19 pandemic, and its economic aftermath, have disrupted the operations of PHAs, Multifamily property owners, and, more broadly, rental markets. These disruptions have reduced Housing Choice Voucher utilization and Public Housing and Multifamily properties' occupancy rates. The Department will leverage its technical assistance and policy tools to help PHAs and Multifamily owners improve performance as the pandemic's effects subside.

Because well-located, accessible housing is critical to the wellbeing of successful adults and children, HUD will reinforce its efforts to expand housing opportunities for households receiving rental assistance.[40] This will include: 1) Disseminating a new toolkit for PHAs on how to launch and run a mobility program that draws on lessons from the Housing Choice Voucher Mobility Demonstration; and 2) Strengthening PHAs' incentives to expand households' housing options by revamping the Section Eight Management Assessment Program.

---

[38] For the Housing Choice Voucher program, HUD will work with PHAs to restore budget utilization to its pre-COVID pandemic average of 100% by September 20, 2023, as an interim step toward the goal of enabling families to use all available vouchers, including those that could be funded with excess reserves. Note that the feasibility of this goal depends in part on the characteristics of the FY22 and FY23 appropriations for the program.

[39] Special populations include, but are not limited to, veterans, foster youth, people with disabilities, and those eligible for emergency housing vouchers.

[40] https://www.huduser.gov/portal/pdredge/pdr_edge_featd_article_071414.html.

**Suppl. App. 38**

HUD will focus on ensuring the units occupied by households receiving HUD assistance are safe and habitable. The Department will eliminate the backlog of inspections of Public and Multifamily Housing properties that have been delayed because of the COVID-19 pandemic. Moreover, HUD plans to institute the National Standards for the Physical Inspection of Real Estate (NSPIRE). NSPIRE will prioritize the detection and elimination of in-unit health and safety hazards, in accordance with these improved standards.

Additionally, the Department will focus on addressing poor performing property owners participating in HUD's Multifamily Project-Based Section 8, Section 202, and Section 811 programs and HUD's Office of Public and Indian Housing (PIH) Project-Based Voucher program. HUD will review existing processes and establish new procedures necessary for HUD and PHAs to hold poor performers accountable. These measures will advance HUD's ability to improve the quality and increase the occupancy of these forms of assisted housing.

To support these strategies to improve rental assistance, HUD will modernize its information technology systems to use real-time data. Having access to the latest information will allow HUD to identify Multifamily owners with large portfolios and low occupancy rates. It will also provide insights into PHAs with low Housing Choice Voucher utilization rates and high reserves, including Moving to Work (MTW) agencies. Conversely, improved data will enable HUD to better reward high-performing owners and agencies for their effective execution of HUD programs.

## STRATEGIES

Denotes a customer experience focused strategy

Denotes an equity focused strategy

- **Strengthen PHAs' and Multifamily property owners' incentives and capacity** to serve more households.
- **Determine the quality, health, and safety of the HUD rental assistance** portfolio by significantly increasing physical inspections of Public Housing and Multifamily properties.
- **Address poor performing property owners** participating in HUD's Multifamily Project-Based Section 8, Section 202, and Section 811 programs and Public and Indian Housing Project-Based Voucher program.
- **Strengthen PHAs' capacity and incentives** to expand housing opportunities for households using Housing Choice Vouchers.
- **Gather resident feedback** to help inform physical inspections of Public Housing and Multifamily properties.

## METRICS

To help achieve this objective, HUD has established the following performance indicators:
- Occupancy rates in the Public Housing and Multifamily programs and utilization rate in the Housing Choice Voucher program
- Utilization Rates of Special Purpose Vouchers[41]
- Percentage of Real Estate Assessment Center's (REAC) Physical Inspections Completed
- Number of families served through HUD rental assistance

## EVIDENCE-BUILDING

HUD's Office of Policy Development and Research (PD&R) routinely commissions evaluations assessing the effectiveness of its rental assistance programs in addressing the need for affordable housing. Two landmark

---

[41] Special Purpose Vouchers are often more difficult to utilize because of the added dimension of working through referrals from supportive service agencies or searching for units that meet individual special needs.

studies conducted in the past 20 years attest to the effectiveness of housing vouchers in increasing housing stability and reducing homelessness. For example, the 2006 report "Effects of Housing Vouchers on Welfare Families" found that receiving a housing voucher helped families move to neighborhoods with lower poverty rates, higher employment rates, and lower rates of public benefit receipt. Receiving a housing voucher also substantially decreased the likelihood that a household would experience homelessness and doubling up.[42] In 2016, the Family Options Study found that homeless families who were offered a voucher experienced major decreases in returns to homelessness and increases in family well-being relative to those offered standard care in shelters.[43]

More recent research has built on this evidence base. In 2021, PD&R published a multi-part evaluation of the Moving to Work (MTW) Demonstration program as it is currently operating in the initial 39 MTW PHAs.[44] This retrospective evaluation produced six reports that together provide the most comprehensive description to date of the housing assistance provided by current MTW agencies, the households served by MTW agencies, and the success of MTW agencies in relation to the demonstration's statutory objectives of increasing cost effectiveness, self-sufficiency, and housing choice. PD&R is also conducting a multi-part evaluation of the ongoing expansion of the MTW Demonstration. This expansion will grant 100 PHAs the flexibility to restructure some programs, reallocate resources, and implement innovative programs. HUD is rolling out the expansion in cohorts to allow for more rigorous analysis of various elements of the MTW Demonstration program. The first cohort will test how small PHAs used their flexibility to better meet community needs and the three MTW statutory objectives of housing choice, cost-effectiveness, and household self-sufficiency. The second cohort will evaluate stepped and tiered rent policies, the third cohort will evaluate landlord incentives, and a fourth cohort will evaluate asset building initiatives.

Through its public and assisted housing inspection standards and protocols, HUD seeks to ensure that households receiving rental assistance live in good quality units, free from health and safety hazards and providing adequate space and amenities. A 2017 study of the assisted housing stock using data from the American Housing Survey found that the prevalence of housing quality problems in the assisted stock overall is low, with most units having no problems, and that the quality of assisted housing is comparable to the quality of unassisted housing.[45] However, the study also found that assisted housing in central cities and the Northeast had lower quality than assisted housing in suburban or rural areas and other parts of the country. Furthermore, the study found that nonelderly disabled persons, non-White persons, and large households experienced lower than average housing quality, which raises equity concerns.

In the absence of funding for capital improvements to the public housing stock, HUD's Rental Assistance Demonstration (RAD) has been a key strategy for preserving public housing units through conversion to the more financially sustainable project-based Section 8 assisted housing platform. PD&R's evaluation of RAD shows that as of October 2018 over 100,000 units of public housing were converted to the Section 8 platform under RAD and over $12.6 billion was raised, with significant leverage, from numerous sources to improve the physical and financial condition of properties. The study confirmed that the physical and financial condition of converted properties improved, and a majority of tenants reported that the physical condition of their units and developments was better after conversion. More than 80 percent of interviewed tenants expressed satisfaction with their units and developments post-conversion.

In 2022, HUD is launching a new study to assess the capital needs of the public housing portfolio. The most recent capital needs assessment, published in 2011, estimated that the nation's 1.2 million public housing units needed $25.6 billion in large-scale capital improvements to make the housing decent and economically

---

[42] "Effects of Housing Vouchers on Welfare Families" (2006), https://www.huduser.gov/portal/publications/commdevl/hsgvouchers.html.
[43] "Family Options Study: 3-Year Impacts of Housing and Services Interventions for Homeless Families" (2016), https://www.huduser.gov/portal/publications/Family-Options-Study.html.
[44] https://www.huduser.gov/portal/mtw/study.html.
[45] "The Quality of America's Assisted Housing Stock" (2017), https://www.huduser.gov/portal/sites/default/files/pdf/Quality-Assisted-Housing-Stock.pdf.

sustainable and a total of $89 billion to address capital needs over the next 20 years.  The 2022 study will feature a survey of all PHAs with public housing, asking them questions about their inventory and their expected plans over the next five years. The research will yield estimates of capital needs for the sampled PHAs based on PHA assessment of inventory condition; describe their expectations for inventory change; and develop a detailed methodology for a new national Capital Needs Assessment to update the 2011 study.

HUD's Learning Agenda includes several research questions that relate to Objective 2B. Examples of such questions are:

- How does housing quality affect self-sufficiency, quality of life, and assisted housing tenure of public housing and Housing Choice Voucher tenants?
- Is the Project-Based Voucher program benefiting HUD's target populations and do underserved communities have equitable access to the program?
- What are the most effective ways of engaging with and attracting landlords to the voucher program?

# Strategic Goal 3: Promote Homeownership

Promote homeownership opportunities, equitable access to credit for purchase and improvements, and wealth-building in underserved communities.

## LEADING THIS GOAL

### Office of the Secretary

## GOAL

Homeownership is vital to promoting viable, inclusive economic opportunities to all. HUD is dedicated to helping individuals develop wealth by improving access to affordable homeownership. This will be achieved by maximizing the extension of credit for low-to-moderate income homebuyers and those underserved by the conventional mortgage market.



HUD will focus on policies that preserve homeownership for existing homeowners through all economic cycles. HUD will examine and revise regulatory burdens and policies that create barriers to sustainable homeownership. Departmental programs will, concurrently, promote tools that boost homeownership opportunity.

HUD will be a leading voice in the transformation of the housing finance system. HUD is committed to ensuring that housing policies do not reinforce discriminatory practices against protected classes under the Fair Housing Act. HUD services will be bolstered by policies and programs that support an equitable housing finance system. The Department will ensure this system serves all people equitably and fairly – from the Federal Housing Administration underwriting process through the Government National Mortgage Association's engagement of capital markets.

This goal consists of two objectives and one major initiative:

> *3A. Advance Sustainable Homeownership*
>
> > *Major Initiative: Expand Homeownership Opportunities*
>
> *3B. Create a More Accessible and Inclusive Housing Finance System*

Suppl. App. 42

# Strategic Objective 3A: Advance Sustainable Homeownership

Advance the deployment of tools and capital that put sustainable homeownership within reach.

**LEADING THIS OBJECTIVE**

Office of Housing

✪ **Agency Priority Goal for FY 2022-2023: HUD will maximize homeownership for creditworthy first-time homebuyers and preserve homeownership for existing homeowners. By September 30, 2023, HUD will maintain a first-time homebuyer rate of at least 80% for newly endorsed FHA-insured purchase mortgages and a re-default rate for seriously delinquent homeowners who received a loss mitigation action that is below 30%. ✪**

## OBJECTIVE

HUD is dedicated to addressing the needs of the people it serves by expanding access to credit and counseling support throughout all stages of the homeownership process. The Department will work to ensure that creditworthy borrowers can buy homes in a safe, secure, and nondiscriminatory manner.[46] Knowledge-building and the promotion of safe, secure loan insurance products that meet consumers' needs will be Departmental priorities. HUD will also analyze the insured mortgage programs of the Federal Housing Administration (FHA) and the loan guarantee programs of the Office of Native American Programs for ways to help make capital more accessible to potential homebuyers.[47]

Additionally, HUD will ensure that manufactured and other factory-built housing types are a thriving source of affordable, quality, durable, and safe housing. This will be achieved in part by the implementation of updated Manufactured Housing Construction and Safety Standards. The new standards will improve the efficiency of construction and align Federal standards with industry best practices.

FHA mortgage insurance and the Government National Mortgage Association (Ginnie Mae) Mortgage-Backed Securities program provide greater access to capital and liquidity for those participating in aforementioned homeownership programs, particularly during times of economic stress. HUD will continue to examine its servicing standards to serve as many homebuyers as possible. Counter-cyclical liquidity will also be provided to ensure there is always a sustainable market for FHA-insured mortgages. HUD will utilize its resources to increase capital and ensure safe and responsible lending practices enabling more Americans to both purchase and keep their homes.

---

[46] FHA issued a mortgagee letter on November 17, 2021, providing clarifying guidance regarding Fair Housing Act and anti-discrimination requirements for appraisals. Mortgagee Letter (ML) can be found here: https://www.hud.gov/sites/dfiles/OCHCO/documents/2021-27hsgml.pdf?utm_medium=email&utm_source=govdelivery.

[47] HUD's Federal Housing Administration (FHA) serves individuals and families that are not traditionally served in private or conventional housing markets. HUD's Office of Native American Programs (ONAP) administers the Section 184 and 184A loan guarantee programs, which benefit American Indian, Alaska Native, and Native Hawaiian homebuyers who have historically lacked access to capital. FHA and ONAP work collaboratively to ensure that policies are consistent across FHA and ONAP programs, where appropriate.

## STRATEGIES

⛎ Denotes a customer experience focused strategy

⚖ Denotes an equity focused strategy

- ❖ **Ensure FHA underwriting guidelines, lending standards, and servicing protocols more effectively serve the needs of borrowers.** ⚖
- ❖ **Expand access** to small-dollar loans.
- ❖ **Improve access to HUD-approved Housing Counseling** agencies and HUD-certified housing counselors. ⛎⚖
- ❖ **Engage renters earlier in the process** to help them plan for homeownership.
- ❖ **Provide targeted counseling sessions** in response to natural and human-made disasters.
- ❖ **Modernize IT systems** to mitigate operational risk and better serve low-income and first-time homebuyers.
- ❖ **Update manufactured housing standards**.
- ❖ **Grow partnerships with Historically Black Colleges and Universities (HBCUs)** and other Minority Serving Institutions (MSIs) to train the next generation of housing counselors. ⚖

## METRICS

To help achieve this objective, HUD has established the following performance indicators:
- ✪ Percentage of new FHA-insured purchase mortgages approved for first-time home buyers
- ✪ Re-Default Rate after loss mitigation actions
- ▶ Number of clients served through HUD's Housing Counseling Program
- ▶ Percentage of FHA forward endorsements made to minority borrowers
- ▶ Early payment default rate
- ▶ Number of certified Housing Counselors

## EVIDENCE-BUILDING

Inequities in homeownership opportunity and access to credit remain a significant challenge for the Nation. Harvard researchers report that the Black-White homeownership gap has reached 31 percentage points, the greatest disparity in decades.[48] Increasing access to credit is a key component for expanding homeownership opportunities as is access to down payment assistance (DPA). A study of the potential of DPA through the HOME-American Dream Down payment Initiative found that small amounts of savings can have significant impact on the probability of transitioning to homeownership, and simulations suggest that small amounts of DPA can stimulate substantial homebuying.[49] Recent studies have assessed the role of down payments in reducing mortgage risk under varied macroeconomic conditions.[50]

Housing Counseling is another way to increase access to homeownership and to help ensure that homeownership is sustainable and supports household wealth-building. HUD's Office of Policy Development and Research (PD&R) Housing Counseling Works report summarizes recent research evidence on the role of Housing Counseling to improve housing outcomes for homebuyers, homeowners, and renters.[51] Some evidence suggests pre-purchase counseling may help individuals determine if they are ready for homeownership and

---

[48] Joint Center for Housing Studies. 2020. "State of the Nation's Housing 2020." https://www.jchs.harvard.edu/state-Nationshousing-202.
49 HUD. 2005. "The Potential of Down payment Assistance for Increasing Homeownership Among Minority and Low-Income Households." https://www.huduser.gov/portal/publications/homeown/downpayasstlih.html.
[50] https://www.huduser.gov/portal/sites/default/files/pdf/Downpayment-FinalReport.pdf.
[51] Report can be found here: https://www.huduser.gov/Portal/sites/default/files/pdf/Housing-Counseling-Works.pdf.

connect them with safer, more affordable mortgage products, and both pre-purchase education and housing counseling appear to be associated with factors related to sustainable homeownership. Early evidence from PD&R's First Time Homebuyer Education and Counseling demonstration – which examines the impact of in-person and remote services for prospective purchasers who have established relationships with lenders and who are not referred to counseling as a part of participating in a special program like DPA – provided useful context about what types of clients are more likely to take advantage of counseling services. The report on long-term impacts of education and counseling on homebuyer outcomes, and loan performance of low- to moderate- and middle-income first-time homebuyers is expected in 2022.

HUD's Learning Agenda includes several research questions that relate to Objective 3A. Examples of such questions are:

- What risks and benefits are associated with providing DPA and other assistance to first-time homebuyers?
- How effectively does a post-purchase, light-touch homeownership counseling program prepare FHA borrowers for sustainable homeownership?
- Who is served by Public Housing Authority-administered homeownership programs and to what extent have assisted households been able to maintain homeownership and build assets?

**Suppl. App. 45**

# Major Initiative: Expand Homeownership Opportunities

| Promote financing for innovative ownership models to increase the availability of affordable housing. |
|---|
| **LEADING THIS OBJECTIVE** |
| Office of the Secretary |

## INITIATIVE

Today, families must navigate a housing market in crisis, with high prices and low supply. Supply is particularly limited for starter homes—smaller houses and condominiums that are more affordable for first-time homebuyers. Such high prices prevent millions of American households from owning their own homes.

HUD is dedicated to ensuring all people have access to affordable homeownership opportunities. Since its founding, HUD has helped individuals and families purchase homes at a variety of price points.

To better serve individuals and families, HUD will enhance existing supply programs to increase the supply of affordable owner-occupied housing and support innovations that lower the cost of homeownership. The Department will partner with communities to increase the use of HUD programs for affordable and sustainable homeownership. New investments in innovative homeownership models and housing types will be developed to further increase homebuyers' affordable housing options. The Department will also prioritize homeownership in the sale of foreclosed properties, helping to limit conversions to rentals. Through enhanced use of existing programs and the pursuit of new and innovative solutions, more individuals and families will be able to obtain the dream of homeownership.

## STRATEGIES

❖ **Support the enhanced use of HOME Investment Partnerships Program (HOME) and other HUD programs** for homeownership-related activities, such as housing construction, rehabilitation, preservation, and down payment assistance
❖ **Preserve affordability in high-cost markets** through shared equity models.
❖ **Promote the use of factory-built housing/off-site construction, adaptive reuse, and other innovations** that can provide lower-cost options for homeownership.
❖ **Expand financing for construction and renovation** of Accessory Dwelling Units (ADUs), 2–4-unit properties, and condominiums.
❖ **Enhance FHA's Title I Property Improvement and 203(k) loan insurance programs.**[52]

---

[52] These programs will facilitate programs' layering with other HUD-assisted sources of renovation funding to make rehabilitation financially feasible in more areas.

Suppl. App. 46

## METRICS

To help achieve this major initiative, HUD has established the following performance indicators:

- ▶ The percentage of appraisals on forward purchase mortgages for detached and townhome property types that identify an Accessory Dwelling Unit (ADU)
- ▶ The number of FHA Title 1 Property Improvement and 203(k) Endorsements

# Strategic Objective 3B: Create a More Accessible and Inclusive Housing Finance System

> Advance new policy, programs, and modernization initiatives that support a more equitable housing finance system. Promote the preservation and creation of affordable housing stock.

> **LEADING THIS OBJECTIVE**

> Government National Mortgage Association

## OBJECTIVE

For over fifty years, the Department has achieved the goal of reliably providing low-cost financing to American homeowners. HUD has achieved this through the home loan insurance programs administered by its Federal Housing Administration (FHA) and the mortgage-backed securities (MBS) program administered by the Government National Mortgage Association (Ginnie Mae).[53]

HUD aims to develop new methods of supporting affordable housing for homeowners and renters. The Department's emphasis will be on reaching individuals and families who have not been afforded the opportunity to access Federal housing credit programs. This will include engagement with non-traditional lenders, including community-based institutions, to better reach underserved communities.

The Department is also committed to creating new methods of attracting and deploying capital in support of Federal housing credit programs. Improvements will be supported by the continued program expansion and modernization of Ginnie Mae's IT platforms. Planned IT upgrades will ensure HUD delivers services to the marketplace more efficiently and securely. HUD will also work toward removing unnecessary barriers between government programs and those they are intended to serve.

In collaboration with Federal partners, HUD will play an active role in shaping the future of the housing finance system. Together, the Department will ensure the housing finance system operates more cohesively and effectively for both market participants and citizens.

## STRATEGIES

👥 Denotes a customer experience focused strategy

⚖️ Denotes an equity focused strategy

- ❖ **Broaden housing finance availability** for underserved participants and expand access to Ginnie Mae programs. 👥⚖️
- ❖ **Pursue further methods of enhancing the value of Ginnie Mae securities.**
- ❖ **Develop the operational capacity** to advance the digitalization and optimization of the Ginnie MBS securities platform.

---

[53] Ginnie Mae guarantees the timely payment of principal and interest on mortgage-backed securities issued by financial institutions and backed by pools of mortgage that use loans insured or guaranteed by FHA, the Office of Public and Indian Housing (PIH), Department of Veterans Affairs (VA), PIH, and United States Department of Agriculture (USDA) as collateral.

❖ **Provide a leading voice** in the housing finance system.

## METRICS

To help achieve this objective, HUD has established the following performance indicators:

▶ The number of eMortgages securitized and new eIssuers in Ginnie Mae mortgage-backed securities
▶ The number of institutions and borrowers served through Extended Term modification pools
▶ Single-family mortgage originations by funding source

## EVIDENCE-BUILDING

HUD prepares the annual Agency Financial Report and an Annual Report to Congress Regarding the Financial Status of the Mutual Mortgage Insurance Fund, which provides important insights for Congress and the American taxpayer into the financial performance of FHA.[54] Affordable loan products play an important role in supporting access to homeownership and homeownership sustainability. HUD's Office of Policy Development and Research (PD&R) recently produced an analysis of past FHA loan limit policies, and future efforts will continue to build evidence of effective approaches to fostering homeownership through original research and more extensive collaboration with outside partners.[55] HUD also recently examined alternative FHA mortgage insurance programs for financing single-family rental and small multifamily rental properties and identified options for expanding FHA's role.[56] Research on housing finance, securitization, and risk assessment will be critical to bolstering HUD's future evidence base.

HUD's Learning Agenda includes several research questions that relate to Objective 3B. Examples of such questions are:

- How can equity in mortgage lending best be advanced, especially as algorithmic decision making is becoming more prevalent?
- What are the implications for the housing finance system of differences in the composition of mortgage-backed securities of Ginnie Mae versus those of the housing GSEs and their changes over time?
- What are the gaps in financing for multifamily housing in America, and under what conditions would an expanded FHA role be likely to support both increasing the supply of multifamily housing, and at preserving and enhancing the supply of naturally occurring affordable housing?
- What have HUD programs done to close the homeownership gap, and what role does homeowner equity play?

---

[54] The HUD Agency Financial Report is available online at: https://www.hud.gov/program_offices/cfo/reports/cforept. The Annual Report to Congress Regarding the Financial Status of the Mutual Mortgage Insurance Fund is available at https://www.hud.gov/fhammifrpt.
[55] https://www.huduser.gov/portal/publications/FHA-Loan-Limits.html.
[56] "Examination of Alternative FHA Mortgage Insurance Programs for Financing Single-Family Rental and Small Multifamily Rental Properties" (2015), https://www.huduser.gov/portal/publications/hsgfin/externalfha042015.html.

# Strategic Goal 4: Advance Sustainable Communities

Advance sustainable communities by strengthening climate resilience and energy efficiency, promoting environmental justice, and recognizing housing's role as essential to health.

**LEADING THIS GOAL**

Office of the Secretary

## GOAL

HUD will advance sustainable communities by: 1) strengthening climate resilience and energy efficiency; 2) promoting environmental justice; and 3) recognizing housing's role as essential to health. Health, climate resilience, and energy efficiency are critical to HUD's mission to create strong, sustainable, inclusive communities, and will be embedded across HUD programs. These issues deeply affect the well-being of every resident of HUD-assisted housing and their wider communities.

Everyone deserves a safe and healthy place to live. HUD seeks to integrate best practices in the areas of community health, customer experience, and equity to effectively adapt policies to the individual needs of local communities. Many residents of HUD-assisted housing face health- and climate-related challenges, especially in underserved communities, which is defined as populations sharing a particular characteristic, as well as geographic communities, that have been systematically denied a full opportunity to participate in aspects of economic, social, and civic life. This would also include the elderly, persons with disabilities, and individuals with experience with the justice system. Where a person lives is a reliable predictor of his or her long-term health, education, and employment outcomes. Due to this Nation's history of segregating persons of color in close proximity to environmental hazards, and corresponding lack of investment in mitigating infrastructure, these communities have disproportionately experienced high and adverse human health, environmental, and other climate related impacts, Families and individuals living in underserved communities experience greater inequity and often face more dismal health outcomes as a result. They are also often more vulnerable to extreme weather events and natural disasters resulting from changing climate.

Recognizing that each community's needs are as unique as the communities themselves, HUD will renew efforts to embed equity considerations in its programs to ensure they promote environmental justice for underserved populations. Placing customer experience at the center of service delivery empowers the Department to better understand the people it serves. Ensuring HUD stakeholders' and customers' needs drive policies will make the Department a better partner in supporting more equitable and sustainable, community-driven solutions; enabling neighborhoods across the country to be safer; and empowering its partners to be better, more efficient stewards of finite resources.

HUD will guide investment in climate preparedness and resilience to achieve the goal of advancing sustainable communities. It is crucial that the Federal government and its local partners effectively coordinate policies related to community development, climate change, energy efficiency, hazard mitigation, and resilience. When homes are more sustainable, operating expenses are lower. This reduces financial burdens on residents and preserves our world's finite resources. HUD supports millions of housing units that could be made more energy-efficient and climate-resilient. Hence, HUD has a great opportunity to significantly increase climate resiliency and reduce greenhouse gas emissions nationwide. Robust utility data tracking will inform desired impacts and outcomes.

The Department's commitment to environmental justice includes developing and implementing a plan under the Administration's Justice40 Initiative.[57] This initiative will ensure at least 40 percent of the overall benefits of many of HUD's programs, including climate and sustainable affordable housing programs, are delivered to underserved communities. This will enable HUD to eliminate poor housing conditions that are associated with a wide range of health conditions, especially for the most vulnerable communities.

Lastly, this goal seeks to integrate healthcare and housing. HUD will help the health care sector to understand the role that housing plays as a determinant of health through use of data linkages with other health care organizations and summarization of evidence. HUD must also ensure that housing is used as a platform for better health care connections and delivery. HUD will collaborate with the U.S. Department of Health and Human Services to improve health care services and delivery for people in HUD-assisted housing as well as ensure that HUD-assisted households know how to access those services.

Promoting environmental sustainability, protecting underserved populations from environmental hazards, and recognizing housing's essential role in the health of residents are key elements of HUD's vision; a vision to establish strong, sustainable communities that protect the natural environment, provide every resident with a healthy place to live and are more resilient to the effects of climate change.

This goal consists of three objectives:

> *4A. Guide Investment in Climate Resilience*
>
> *4B. Strengthen Environmental Justice*
>
> *4C: Integrate Healthcare and Housing*

---

[57] More information on the Justice40 Initiative can be found here: https://www.whitehouse.gov/omb/briefing-room/2021/07/20/the-path-to-achieving-justice40/

**Suppl. App. 51**

## Strategic Objective 4A: Guide Investment in Climate Resilience

| Invest in climate resilience, energy efficiency, and renewable energy across HUD programs. |
|---|
| **LEADING THIS OBJECTIVE** |
| Office of Community Planning and Development |

## OBJECTIVE

A key component of HUD's plan to advance sustainable communities is to adopt policies that encourage and support climate resilience, energy efficiency, and renewable energy across HUD investments. Climate change is a worsening crisis that impacts communities across the United States and the world. Due to historic discrimination and disinvestment, underserved communities often suffer climate change's consequences most acutely, deepening pre-existing societal inequities.[58] The importance of addressing this crisis is reflected in this objective's aim of improving national preparedness through proven climate resilience techniques. Concurrently, it promotes environmental justice practices that underpin strong, sustainable, and prosperous communities.

Among the Department's most powerful tools to advance resilience are community development block grants provided for disaster recovery Community Development Block Grant Disaster Recovery (CDBG-DR) and mitigation (Community Development Block Grant Mitigation (CDBG-MIT)). These funds place partner communities in the driver's seat to shape their responses to climate change-related risks and disaster events. The Department will expand the resources it offers to guide and encourage grantee practices that foster resilient projects and promote environmental justice. These resources will ensure grantees have the capacity to leverage HUD funds effectively to achieve their climate resilience goals and promote environmental justice in their allocations.

HUD will also lower greenhouse gas emissions through energy efficiency and renewable energy in HUD-assisted, financed, and insured projects. The Department will refocus its policies and programs to help transition the country to carbon-free energy sources and contribute toward the Administration's goal of lowering economy-wide greenhouse gas emissions by at least fifty percent by 2030. HUD will promote energy efficiency by strengthening energy and green building codes and standards across its programs.[59] The Department will work to advance energy efficiency throughout its portfolio of HUD-assisted housing by taking steps to develop enterprise-wide standards for utility data collection, reporting, and tracking. These steps will facilitate the adoption of portfolio-wide utility benchmarking, which will enable better evaluation and tracking of energy and water usage – both at the individual property level and across HUD programs. The Department will also continue to offer Federal Housing Administration (FHA)-insured financing that allows borrowers to make energy efficient and climate hazard mitigation improvements. Additionally, HUD will continue to collaborate with Federal partners to foster innovation in the energy sector and remove barriers to energy efficiency and renewable energy.[60]

---

[58] EPA. 2021. Climate Change and Social Vulnerability in the United States: A Focus on Six Impacts. U.S. Environmental Protection Agency, EPA 430-R-21-003, https://www.epa.gov/cira/social-vulnerability-report.

[59] Section 109, Cranston Gonzalez National Affordable Housing Act (42 USC 12709) as amended by the Energy Independence and Security Act of 2007 (41 USC 12709) requires HUD to establish minimum energy codes for new HUD-assisted, financed, or insured properties (42 USC 12709).

[60] This includes supporting location efficient housing investments that increase transportation options for low- and moderate-income households, promote economic development, lower combined housing-transportation expenditures, increase access to employment, schools,

Through these and other investments, HUD will advance the global effort to empower communities to adapt and thrive in the face of climate change. Together, with Departmental partners, HUD will chart a path to a sustainable energy future.

## STRATEGIES

🌿 Denotes content featured in HUD's Climate Action Plan[61]

🗒️ Denotes alignment with a President's Management Agenda Cross-Agency Priority (CAP) Goal

👥 Denotes a customer experience focused strategy

⚖️ Denotes an equity focused strategy

- ❖ **Promote climate resilience and environmental justice** across HUD programs. 🌿
- ❖ **Create community resilience** and sustainability resources. 🌿
- ❖ **Improve utility data collection, reporting, and tracking**. Initiate utility benchmarking requirements. 🌿
- ❖ **Strengthen green codes and standards** across HUD programs. 🌿
- ❖ **Foster innovation while removing barriers** to energy efficiency and renewable energy in HUD portfolio.[62] 🌿 🗒️
- ❖ **Inform the public about preparedness** activities in communities that are prone to climate change hazards by sharing information on interagency resources for disaster mitigation, response, and recovery. 👥
- ❖ **Eliminate discriminatory barriers to ensure CDBG-DR and CDBG-MIT grantees can access** disaster and mitigation-related needs. [63] 🗒️ ⚖️

## METRICS

To help achieve this objective, HUD has established the following performance indicators:
- ▶ Number of Climate Action Plan actions completed
- ▶ Number of HUD-assisted units successfully benchmarked
- ▶ Number of homes affected by recent disaster events that are rehabilitated, reconstructed, newly constructed, or elevated using CDBG-DR and CDBG-MIT funds
- ▶ Number of HUD-assisted or HUD-associated (i.e., FHA-insured) housing units made energy efficient or aligned to green building standards through retrofits, rehabilitations, or new construction

## EVIDENCE-BUILDING

Climate change has increased the risk of natural disasters and threats to health and well-being. For instance, changes in historical precipitation patterns account for an estimated one-third of cumulative flood damages from

---

services and amenities, and encourage equitable transit-oriented development. Federal partners with whom HUD collaborates on these issues include the Department of Energy (DOE), U.S. Department of Agriculture, and Environmental Protection Agency (EPA), and the Department of Transportation.

[61] HUD's Climate Action Plan is an ambitious multi-year plan designed to guide integration of climate resilience and environmental justice into HUD's core programs and policies. Every HUD program and office has committed specific, time-bound actions to increase climate resilience, reduce greenhouse gas emissions, and pursue environmental justice. The Climate Action Plan is publicly available online https://www.hud.gov/sites/dfiles/Main/documents/HUD-Climate-Action-Plan.pdf.

[62] This strategy is aligned with CAP Goal 3.2: Build capacity in Federal financial management and through Federal financial assistance to catalyze American industrial strategy, address climate-related risks, and deliver equitable results.

[63] This strategy is aligned with CAP Goal 3.2: Build capacity in Federal financial management and through Federal financial assistance to catalyze American industrial strategy, address climate-related risks, and deliver equitable results.

1988 to 2017 at a cost of $73 billion; climate models predict continued intensification.[64] Sea level rise and coastal subsidence exacerbate coastal flooding risks from increasingly strong hurricanes.[65]

HUD has helped build the evidence base for designing effective future disaster response and climate resilience efforts. The "Natural Hazard Mitigation Saves: 2019 Report," funded by HUD and other Federal agencies, represents an exhaustive benefit-cost analysis of natural hazard mitigation measures, from adopting up-to-date building codes and exceeding codes, to addressing the retrofit of existing buildings and utility and transportation infrastructure.[66] The study found that natural hazard mitigation saves $6 on average for every $1 spent on Federal mitigation grants.

In early 2021, HUD released a report on accelerating housing recovery after severe disasters, based on an examination of housing recovery activities funded by CDBG-DR during 2005 to 2015.[67] Going forward, the Office of Policy Development and Research (PD&R) is funding research that will create and test models for optimizing disaster recovery labor and supply chains to expedite housing recovery for the most vulnerable populations. PD&R is also funding CDBG-DR resilience cost-effectiveness and implementation studies that have the potential to help grantees save public resources, modernize infrastructure, and improve access to opportunity for vulnerable populations through cost-benefit analyses and best practice guidebooks directed to states, local governments, and Indian tribes recovering from flood-related natural disasters. Through a research partnership with the National Institute of Standards and Technology, resilience planning case studies will produce best practice guidance using climate projection data as part of community planning. Results from these studies are expected in 2022 and 2023. Finally, PD&R is working to acquire proprietary data on flood and wildfire threats that can be used to assess the risk exposure of HUD assets and HUD-assisted populations and to inform policy and programmatic decision-making.

Residential energy use accounts for roughly 20 percent of greenhouse gas emissions in the U.S., and the Nation cannot meet the Paris Agreement target of an 80 percent emissions reduction by 2050 without residential sector initiatives, including deep energy retrofits and transitioning to low- and carbon energy sources, and reducing energy intensity.[68] The DOE's retrospective evaluation of its Weatherization Assistance Program demonstrated the substantial net benefits of home weatherization as well as of healthy homes interventions. The program generated a savings-to-investment ratio of 1.4 and a benefit-cost ratio, including health and safety benefits, of 4.1.[69]

One source of data for utility reduction in public housing and HUD-assisted housing is PD&R's evaluation of the American Recovery and Reinvestment Act (ARRA) of 2009 (P.L. 111-5).[70] Of the approximately $13.6 billion in ARRA funds appropriated to HUD, about $4 billion was allocated to the Public Housing Capital Fund for the modernization and renovation of the Nation's public housing stock, and $250 million was allocated to establish the Green Retrofit Program for Multifamily Housing. The amount of electricity saved is sufficient to power about 29,000 average U.S. homes for one year. The water savings are sufficient to supply about 7,000 U.S. families for one year, and the carbon dioxide savings are equivalent to removing 37,400 vehicles from the road.

---

[64] Davenport, Frances V., Marshall Burke, and Noah S. Diffenbaugh. 2021. "Contribution of historical precipitation change to US flood damages." Proceedings of the National Academy of Sciences. 118, 4. https://doi.org/10.1073/pnas.2017524118.

[65] Perkins, Sid. 2020. "Often driven by human activity, subsidence is a problem worldwide." Proceedings of the National Academy of Sciences.118, 20. https://www.pnas.org/content/118/20/e2107251118; Emanuel, Kerry. 2020. "Evidence that hurricanes are getting stronger." Proceedings of the National Academy of Sciences. 117, 24. www.pnas.org/cgi/doi/10.1073/pnas.2007742117.

[66] Available at https://www.nibs.org/projects/natural-hazard-mitigation-saves-2019-report.

[67] Housing Recovery and CDBG-DR: A Review of the Timing and Factors Associated with Housing Activities in HUD's Community Development Block Grant for Disaster Recovery Program (2021). https://www.huduser.gov/portal/publications/HousingRecovery-CDBG-DR.html.

[68] Goldstein, Benjamin, Dimitrios Gounaridis, and Joshua P. Newell. 2020. "The carbon footprint of household energy use in the United States." Proceedings of the National Academy of Sciences.117, 32. www.pnas.org/cgi/doi/10.1073/pnas.1922205117.

[69] https://www.energy.gov/eere/wap/about-weatherization-assistance-program/weatherization-National-evaluation.

[70] https://www.huduser.gov/portal/sites/default/files/pdf/Assessment-of-ARRA-Green.pdf.

**Suppl. App. 54**

Since the 1980s, HUD has approved more than 300 Energy Performance Contracts (EPCs) that have generated nearly $1.5 billion in energy efficiency investments for about 250,000 public housing units. PD&R recently completed two studies of the use of EPCs. The 2020 Review of Energy Performance Contracts in Public Housing found that the EPC program effectively helped PHAs improve their units' energy efficiency.[71] A follow-up study, focusing on smaller PHAs, found that small PHAs that used EPCs experienced greater reductions in energy and water consumption than PHAs that did not use EPCs.[72] Such PHAs often undertook efficiency improvements using alternative financing means such as capital and operating funds, grants, or subsidies. Since 2015, however, financial restructuring through HUD's Rental Assistance Demonstration has become an attractive alternative to the EPC program for PHAs that view EPCs as complex or difficult.

HUD's Learning Agenda includes several research questions that relate to Objective 4A. Examples of such questions are:

- Are current building efficiency, safety and resilience codes for various types of housing adequate?
- What are the distinct impacts and challenges of climate change in Tribal communities, and what are implications for housing and community development?
- How are climate change risk and disasters impacting mortgage performance, and what are implications of including climate risk in underwriting procedures?

---

[71] "Review of Energy Performance Contracts in Public Housing" (2020), https://www.huduser.gov/portal/publications/epc-evaluation.html.
[72] "Review of Energy Performance Contracts in Small and Very Small Public Housing Authorities" (2021), https://www.huduser.gov/portal/publications/Review-of-Energy-Performance-Contracts.html.

## Strategic Objective 4B: Strengthen Environmental Justice

> Reduce exposure to health risks, environmental hazards, and substandard housing, especially for low-income households and communities of color.

> **LEADING THIS OBJECTIVE**

> Office of Lead Hazard Control and Healthy Homes

✪ **Agency Priority Goal for FY 2022-2023: By September 30, 2023, protect families from lead-based paint and other health hazards by making an additional 20,000 units of at-risk housing units healthy and lead-safe.** ✪

## OBJECTIVE

HUD has been a champion of the Federal government's goal to address lead-based paint and other health and safety hazards in housing for families and children. Young children are especially at risk of the harmful effects of lead, to which even low-level exposure can increase the likelihood of behavioral problems, learning disabilities, seizures, and in extreme cases, death. Exposure to other home environmental hazards, such as mold, radon, and pests are linked to chronic health conditions like asthma and cancer. HUD recognizes these hazards are disproportionately found in low-income housing and communities of color, making the remediation of such hazards a critical step to promoting environmental justice by increasing equity in housing and in health and safety. Through its programs, HUD has made over 400,000 homes lead-safe, contributing to a significant decline in blood-lead levels among US children in the past decade. HUD will continue work to reduce exposure to housing-related health hazards, environmental hazards, and substandard housing, especially for underserved communities that are disproportionately impacted by these threats.

The Department continues to seek collaborations with Federal partners and state, Tribal, and local organizations to drive transformational change that will improve the lives of the people it serves. HUD will partner with fellow Federal agencies to advance a coordinated, whole-of-government approach to protecting families and children from lead hazards. The Department's comprehensive strategy to remove lead-based paint and other housing-related health and safety hazards includes leveraging public-private partnerships. These engagements will maximize the effect of lead-safe and healthy housing investments and increasing funding for local jurisdictions to build capacity to address lead-based paint and other housing-related health and safety hazards. To prevent lead poisoning and adverse effects of other hazards in HUD-assisted households, HUD will also: ensure compliance with lead safety rules through improved enforcement mechanisms; report annually on the production of public housing units made lead safe and/or healthy under PIH grant programs; increase community awareness of lead and other health and safety hazards through outreach events; increase participation in HUD and stakeholder services; and improve online content and its dissemination to the public seeking lead and healthy homes information and resources. HUD will lead an interagency pilot program, called RECLAIM, to support community-driven efforts to revitalize distressed neighborhoods that are located near Superfund hazardous waste sites and contain public and/or HUD-assisted housing. Also, HUD will encourage Choice Neighborhoods grant applications for transforming neighborhoods with distressed public or other HUD-assisted multifamily housing, in communities where EPA has also provided grant funding to address Brownfields.

Recognizing the critical need to reduce exposure to harmful contamination from environmental hazards in addition to lead, HUD will develop Department-wide and program-specific radon policies. These will be joined by the development of best practices for Public Housing Authorities (PHAs) and other HUD grantees. HUD will also work

**Suppl. App. 56**

to update the Department's National Environmental Policy Act (NEPA) implementing regulations, policy and guidance to better integrate strategies that mitigate climate and other environmental and health hazards, in HUD-assisted activities, especially in underserved communities. These efforts include enhancing HUD's Tribal Directory Assessment Tool (TDAT) to become a government-wide information system.[73] Addressing environmental health hazard exposures and strengthening health and safety regulations and policies ultimately advances the Department's work to eliminate socioeconomic disparities. Furthermore, HUD will protect underserved communities by developing and implementing a plan under the Administration's Justice40 Initiative. [74] This initiative will ensure at least 40 percent of the overall benefits of HUD lead hazard control and healthy homes investments are delivered to underserved communities. Through this work, HUD will reduce housing inequity and improve health outcomes for residents of HUD-assisted housing.

## STRATEGIES

 Denotes content featured in HUD's Climate Action Plan[75]

Denotes a customer experience focused strategy

Denotes an equity focused strategy

- **Increase community awareness of lead** and other health and safety hazards in homes, to increase participation in HUD and stakeholder programs and services.
- **Align and enforce HUD-assisted housing inspections** and mitigation measures to consistently address lead-based paint hazards across HUD-assisted housing programs.
- **Continue to prioritize comprehensive reductions** in Americans' exposure to lead in their homes by addressing lead contamination in soil, water, and paint.
- **Minimize residential radon exposure**.
- **Update HUD's environmental review regulations and policies**.
- **Design and deliver targeted lead and healthy homes programs** through improvements in data quality and access.
- **Leverage HUD's relationships with stakeholders** across the public and private sectors to maximize the impact of every dollar invested in lead, health, and safety activities.
- **Advance the Federal research agenda on the effects, evaluations, and control of lead** and other health and safety hazards in housing and the impacts on resident health.

## METRICS

To help achieve this objective, HUD has established the following performance indicators:

- Number of at-risk housing units made healthy, physically safe, and lead-safe each year
- Non-Federal dollars leveraged by HUD-funded remediation investments
- Percentage of OLHCHH's covered grant funds expended to provide benefits to disadvantaged communities

---

[73] TDAT was developed for the purpose of identifying and engaging tribes to consult on HUD-assisted projects and those of other Federal agencies, including infrastructure projects covered under Title 41 of the Fixing America's Surface Transportation Act (FAST-41). Title 41 of the Fixing America's Surface Transportation Act (FAST-41) establishes a governance structure, set of procedures, and funding authorities to improve the Federal environmental review and authorization process for certain large, complex infrastructure projects. The Federal Permitting Improvement Steering Council is responsible for FAST-41. https://www.permits.performance.gov/documentation/fast-41-fact-sheet
[74] Executive Order 14008, Tackling the Climate Crisis at Home and Abroad, section 223, Justice40 Initiative. https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.
[75] HUD's Climate Action Plan is an ambitious multi-year plan designed to guide integration of climate resilience and environmental justice into HUD's core programs and policies. Every HUD program and office has committed specific, time-bound actions to increase climate resilience, reduce greenhouse gas emissions, and pursue environmental justice. The Climate Action Plan is publicly available online https://www.hud.gov/sites/dfiles/Main/documents/HUD-Climate-Action-Plan.pdf.

## EVIDENCE-BUILDING

Exposure to lead in housing is a major environmental justice issue and one for which HUD has developed a significant evidence base. There is no safe level of blood lead and the prevalence of elevated blood lead at or above the Centers for Disease Control and Prevention's (CDC's) blood lead reference value persists at significant levels among children under age 6.[76] Elevated blood lead is associated with, among other effects, cardiovascular mortality in adults and harmful outcomes for children related to education, behavior, and criminal justice involvement that are mitigated by early intervention.[77] CDC-HUD analysis of tenant data linked with health surveys shows that children ages 0–5 who lived in HUD-assisted housing in 2005–2012 had lower blood lead levels than expected given their demographic, socioeconomic, and family characteristics.[78] Evaluations of HUD's Lead Hazard Control Grant Program showed significant reductions in concentrations of dust lead, the major pathway for U.S. children's lead exposure, for multi-year periods after intervention.[79] A 2015 survey of the practices and capabilities for achieving dust-lead clearance showed the feasibility of further strengthening the current dust-lead risk assessment and clearance standards, informing EPA rulemaking in 2019 and 2020.[80] A variety of research grants and partnerships continue to improve the efficacy and cost-effectiveness of methods for evaluation and control of residential lead-based paint, other housing-related health and safety hazards, and site contamination hazards. Another major public health challenge relating to housing is asthma. Triggered by residential dampness and mold, asthma costs the Nation about $16.8 billion annually.[81] Reducing household allergens, which contribute to or trigger asthma and allergies, results in a return of $5.30 to $16.50 for every $1 invested in mitigation and prevention.[82]

HUD's Learning Agenda includes several research questions that relate to Objective 4B. Examples of such questions are:

- What do the next generation surveys on lead hazards and healthy homes tell us?
- What are the most significant problems with indoor air quality in HUD-assisted housing?
- What are cost-effective ways to influence positive changes in indoor air quality?
- How can HUD reduce the incidence of elevated blood lead levels among children of families in the Housing Choice Voucher program?

---

[76] CDC. CDC Response to Advisory Committee on Childhood Lead Poisoning Prevention Recommendations in "Low Level Lead Exposure Harms Children: A Renewed Call of Primary Prevention". June 7, 2012. https://www.cdc.gov/nceh/lead/docs/cdc_response_lead_exposure_recs.pdf.

[77] Brown L, et al. 2020. Developing a Health Impact Model for Adult Lead Exposure and Cardiovascular Disease Mortality. Environmental Health Perspectives, 128(9). https://ehp.niehs.nih.gov/doi/10.1289/EHP655255. Billings SB and Schnepel KT. 2018. Life after Lead: Effects of Early Interventions for Children Exposed to Lead. American Economic Journal: Applied Economics, 10(3): 315–344. https://doi.org/10.1257/app.20160056.

[78] Ahrens KA, Haley BA, Rossen LM, Lloyd PC, and Aoki Y. (2016). Housing assistance and blood lead levels in children in the United States, 2005–2012. American Journal of Public Health, 106(11):2049–2056. http://ajph.aphapublications.org/doi/10.2105/AJH.2016.303432.

[79] National Center for Healthy Housing and University of Cincinnati Department of Environmental Health. 2004. "Evaluation of the HUD Lead-Based Paint Hazard Control Grant Program: Final Report." HUD, Office of Lead Hazard Control and Healthy Homes. https://nchh.org/resource-library/report_evaluation-of-the-hud-lead-based-paint-hazard-control-grant-program_final-report.pdf. Wilson, Jonathan, Tim Pivetz, Peter Ashley, et al. 2006. "Evaluation of HUD-funded lead hazard control treatments at 6 years post-intervention." Environmental Science. https://doi.org/10.1016/j.envres.2006.04.007.

[80] Cox, David and Gary Dewalt. 2015. Lead Hazard Control Clearance Survey: Final Report. HUD, Office of Lead Hazard Control and Healthy Homes. https://www.hud.gov/sites/documents/ClearanceSurvey_24Oct15.pdf. EPA. Review of Dust-Lead Post-Abatement Clearance Levels. 85 Federal Register 37810-37819. June 24, 2020. https://www.Federalregister.gov/d/2020-13582.

[81] Mudarri, DH. 2016. Valuing the Economic Costs of Allergic Rhinitis, Acute Bronchitis, and Asthma from Exposure to Indoor Dampness and Mold in the US. Journal of Environmental and Public Health. May 29, 2016. https://doi.org/10.1155/2016/2386596.

[82] Nurmagambetov TA et al. Economic Value of Home-Based, Multi-Trigger, Multicomponent Interventions with an Environmental Focus for Reducing Asthma Morbidity: A Community Guide Systematic Review. American Journal of Preventive Medicine. 41(2S1): S33– S47. 2011. https://www.thecommunityguide.org/sites/default/files/publications/Asthma-AJPM-econ-homebased.pdf or www.ajpmonline.org/article/S0749-3797(11)00314-X/fulltext.

Suppl. App. 58

# Strategic Objective 4C: Integrate Healthcare and Housing

Advance policies that recognize housing's role as essential to health.

**LEADING THIS OBJECTIVE**

Office of Policy Development & Research

## OBJECTIVE

Health begins at home. The quality, affordability, stability, and location of a home are important factors for health and well-being.[83] Over the past two decades, housing has been increasingly identified as an important social determinant of health.[84] Federal collaboration in the health and housing arena is critical to appropriately respond to ongoing and emergent public health needs. As highlighted in Healthy People 2030, promoting "healthy and safe home environments" has the potential to significantly improve the Nation's health and well-being over the next decade.[85]

Recognizing the strong relationship between housing and health, HUD will improve health outcomes for assisted residents. Departmental efforts will tailor service delivery within assisted housing by focusing on the unique needs of special populations and increasing coordination with Federal health partners. Specifically, HUD embraces a life course perspective, an approach that emphasizes that health is shaped by lifelong exposures to various physical, environmental, and psychosocial factors.[86] HUD is well positioned to support health at every stage of the life course. HUD's public and assisted housing programs annually serve more than 10 million persons, including approximately 3.3 million children, 4.2 million women, 1.8 million older adults, and 2.6 million persons living with a disability. Additionally, an estimated 50,000 babies are born to HUD-assisted women every year.

To promote positive maternal and child health outcomes, the Department will work with public health partners to address housing insecurity for pregnant women. Prior research shows that women who experience evictions and other forms of housing insecurity during pregnancy are more likely to experience poor maternal and infant health outcomes.[87] The COVID-19 pandemic has also highlighted the need for cross-sector approaches to promote health and wellbeing for Americans of all ages. The COVID-19 public health crisis has underscored the significant health disparities faced by HUD-assisted households and the need to increase HUD-assisted households' access to quality healthcare and supportive services. Older adults living in public and assisted housing also represent a special population that could greatly benefit from increased service integration. A substantial fraction of HUD-assisted households consists of older persons living independently—some residing with grandchildren and other family members—yet many need supports and services to continue to remain in their homes. Although assisted living facilities and nursing homes can provide crucial care when independent living is no longer appropriate, early, or avoidable moves to these settings can unnecessarily separate families. HUD will support the integration of healthcare and supportive services to enable older adults to continue living in an independent setting safely and remain close to their families.

---

[83] Krieger J, Higgins DL. Housing and health: time again for public health action. Am J Public Health. 2002;92(5):758-768.
[84] See: https://www.usich.gov/resources/uploads/asset_library/Housing-Affordability-and-Stablility-Brief.pdf.
[85] See: https://health.gov/healthypeople/objectives-and-data/browse-objectives/housing-and-homes.
[86] Kuh D, Ben-Shlomo Y, Lynch J, Hallqvist J, Power C. Life course epidemiology. J Epidemiol Community Health. 2003;57(10):778–783. Braveman P, Barclay C. Health disparities beginning in childhood: a life-course perspective. Pediatrics. 2009;124:S163–S175.
[87] See: https://health.gov/healthypeople/objectives-and-data/social-determinants-health/literature-summaries/housing-instability#cit27.

Similarly, individuals with disabilities were disproportionately impacted by COVID-19. HUD will focus on decreasing the proportion of individuals with disabilities living in institutions and other congregate settings, by further promoting access to affordable and accessible housing with sufficient supportive services to enable individuals with disabilities to live independently in the community.

To achieve these milestones, HUD must systematically examine opportunities to build stronger partnerships with health agencies to facilitate cross-sector policy integration. HUD plans to seek out and leverage improved data sharing mechanisms to better understand the complex health needs of HUD-assisted tenants. The Federal government, housing and healthcare providers, and philanthropic organizations must work together to successfully contribute to the integration of housing and healthcare services. The basic human need for a home encompasses more than simply shelter—it is a pathway to better health and wellness.

## STRATEGIES

⚲ Denotes a customer experience focused strategy

⚖ Denotes an equity focused strategy

- ❖ **Build stronger partnerships to facilitate cross-sector policy integration**, data linkage, and regular, structured meetings.
- ❖ **Better understand HUD-assisted residents'** risk from public health crises and work to strengthen resiliency and protections from such crises.
- ❖ **Prioritize aging in place** for older adults. ⚲⚖
- ❖ **Improve maternal and child health outcomes.** ⚲
- ❖ **Enhance the capacity of assistance programs** to address the housing-related needs of persons with disabilities and support community living. ⚖

## METRICS

To help achieve this objective, HUD has established the following performance indicators:

- ▶ Number of times HUD administrative data is linked with health-related datasets
- ▶ Number of policy and research products produced that address housing and health connection
- ▶ Number of evaluations conducted that incorporate health metrics in the evaluation process
- ▶ Number of convenings that address cross-sector health and housing initiatives and opportunities

## EVIDENCE-BUILDING

HUD's Office of Policy Development and Research (PD&R) has produced two reports assessing the health of HUD-assisted households by linking HUD administrative records to the National Health Interview Survey. PD&R's "A Health Picture of HUD-Assisted Adults, 2006-2012" found that relative to unassisted low-income renters, HUD-assisted adults are an older population with more disabilities and more prevalent health needs. More than one-third of HUD-assisted adults reported their health as either fair or poor, a proportion considerably higher than that reported among unassisted low-income renters and the general adult population. Additionally, HUD-assisted tenants reported the highest rate of "utilizing the emergency room two or more times during the prior 12 months." The majority of HUD-assisted adults were overweight or obese and more than one-half of them lived with a disability at the time of their health interview.[88] PD&R's "A Health Picture of HUD-Assisted Children, 2006–2012" found that HUD-assisted children were frequent users of emergency room services and that about one in five

---

[88] "A Health Picture of HUD-Assisted Adults, 2006-2012" (2017), https://www.huduser.gov/portal/publications/Health-Picture-of-HUD.html.

**Suppl. App. 60**

HUD-assisted children had asthma. The study also found that school-aged, HUD-assisted children experience high rates of learning disabilities.[89]

With the aging of the U.S. population, the share of HUD-assisted households headed by older adults is growing. In 2010, 32 percent of all HUD-assisted households were headed by people aged 62 or over. By 2020, this percentage had grown to 38 percent.[90] Older adults may need physical accommodations and health and supportive services to safely age in place. In 2017, HUD undertook a major randomized control trial to test the impact of a new housing-based model of health, wellness, and supportive services for older adults. The Integrated Wellness in Supportive Housing (IWISH) model funds a full-time Resident Wellness Director and a part-time Wellness Nurse to work in HUD-assisted multifamily housing serving primarily older adults. The IWISH evaluation will use HUD administrative data linked with Medicare and state Medicaid claims data to assess the impact of IWISH on healthcare utilization, including the use of emergency services, and on transitions to nursing homes, among other measures. The final evaluation will be completed in 2022.[91]

HUD's Learning Agenda includes several research questions that relate to Objective 4C. Examples of such questions are:

- What are the most significant health disparities affecting HUD-assisted households? To what extent do health challenges represent opportunities for cost-effective coordination of healthcare services with housing assistance?
- What home visiting model would be most successful in Public Housing, Multifamily properties, or Emergency Shelters?
- How well do HUD's homeless assistance programs meet the health needs of infants and their parents?
- How prevalent is receipt of Medicaid Home and Community Based Services among HUD-assisted households?

---

[89] "A Health Picture of HUD-Assisted Children, 2006-2012" (2018), https://www.huduser.gov/portal/publications/Health-Picture-of-HUD-Assisted-Children.html.
[90] See HUD's Picture of Subsidized Households, https://www.huduser.gov/portal/datasets/assthsg.html.
[91] For a description of the study, see https://www.huduser.gov/portal/IWISH_Evaluation.html#impact-overview-tab.

# Strategic Goal 5: Strengthen HUD's Internal Capacity

| |
| --- |
| Strengthen HUD's internal capacity and efficiency to better ensure delivery of HUD's mission. |
| **LEADING THIS GOAL** |
| Office of the Secretary |

## GOAL

HUD will strengthen the Department's internal capacity and efficiency to better ensure delivery of its mission by: 1) supporting and developing HUD staff; 2) improving acquisition management; 3) strengthening information technology (IT), cybersecurity, and data management; 4) providing sound financial and grants management; and 5) institutionalizing the management of customer experience (CX) across HUD services.

Strengthening its workforce is vital to the successful delivery of HUD's mission of creating strong, sustainable, inclusive communities and quality affordable homes for all. Without the Department's talented staff, HUD would not be able to provide housing programs that many individuals rely on across the U.S. As such, HUD is committed to bolstering and enabling its workforce through hiring, training, providing opportunities for growth, and promoting a more inclusive work environment.

The Department is also committed to improving acquisition management through the development of a governance structure that promotes collaboration. Stronger, transparent ties will be made between the Office of the Chief Procurement Officer and the Departmental offices involved in procurement management. HUD aims to identify and implement procurement best practices that will streamline the acquisition process while encouraging participation from business partners in underserved communities. Targeted attention will be paid toward identifying solutions to potential gaps in outreach efforts.

Improvements to HUD's information technology infrastructure is a key management objective that will be instrumental to strengthening the Department's internal capacity and efficiency. HUD aims to bolster its IT and cybersecurity by prioritizing enterprise-wide IT modernization solutions. HUD is committed to working with the U.S. Government Accountability Office and Office of Inspector General to close outstanding audit findings, strengthen governance, and improve processes.

HUD will continue to enhance its financial resource management by re-engineering business processes and improving internal controls. The Department will build on financial reporting improvements to continue achieving clean audit opinions. Efforts will include a key focus on automation-driven strategies to improve grants management HUD-wide.

Lastly, the Department will establish a more customer-centric culture using CX tools to deliver thoughtful, well-designed, and accessible information and services to the people HUD serves. A CX mindset offers a holistic approach to solving problems of equity. It does so by placing customers' needs and success at the heart of the Department's creation and delivery of services. CX provides tools to uncover patterns and causes of inequity while providing ways to "rewire" systems to produce more equitable outcomes. At the same time, CX provides methods to elevate the voice and power of underserved people by inviting individuals into the solution development process as experts in their lived experiences. The understandings and empathy developed by CX

**Suppl. App. 62**

engagements with customers will provide the knowledge needed to bridge the equity gap to ensure HUD fully serves the needs of all people.



This goal consists of five objectives:

*5A. Enable the HUD Workforce*

*5B. Improve Acquisition Management*

*5C: Strengthen Information Technology*

*5D: Enhance Financial and Grants Management*

*5E: Improve Ease, Effectiveness and Trust in HUD Services*

Suppl. App. 63

## Strategic Objective 5A: Enable the HUD Workforce

Enable the HUD workforce through hiring, training, opportunities for growth, and promoting a more engaged and inclusive work environment.

### LEADING THIS OBJECTIVE

Office of Administration

## OBJECTIVE

HUD requires a workforce that reflects the best and brightest of American society. The Department's workforce must be inclusive, equitable, and accessible to all. These characteristics are essential to the provision of high-quality, responsive service to the public.

HUD aims to better serve households and communities by attracting top talent to the right positions. Doing so requires the Department to effectively engage, manage, and support employees' needs. HUD will provide improved hiring, training, growth, and innovation opportunities to all its employees. The Department will hire a diverse and highly skilled staff to help fill gaps inexperience across programs and operations. The Department also recognizes that some attrition is inevitable. HUD will address the loss of employees by prioritizing retention through employee engagement and succession planning.

Belonging is at the core of each of HUD's foundational needs. The Department recognizes an inclusive culture, supportive of employee engagement, is essential to supporting its workforce to bring their full selves to work. Fostering such a culture will allow all employees to be heard, share fresh ideas, and provide unique perspectives. This is critical to employees' well-being, sense of purpose, and motivation for enhancing HUD's performance and mission success. The Department values the unique differences and shared values of each member of the HUD team. This commitment will be reflected in the prioritization of diversity, equity, inclusion, and accessibility (DEIA) in the Department's programs, policies, and practices.

Supporting HUD staff will involve various strategies. The first will be to ensure human capital planning processes enable HUD to hire and retain diverse, top talent. This will be supported by a focus on providing opportunities for continuous development and professional growth to meet HUD's mission needs. Underlying the Department's activities will be efforts to prevent discrimination on the basis of race, color, religion (including failure to accommodate), sex (including pregnancy and gender identity), national origin, age, disability (including failure to accommodate), genetic information, sexual orientation, and parental status, as well as retaliation for prior protected EEO activity. HUD's focus will support the elimination of barriers that impede free and open competition in the workplace. The integration of DEIA principles into all of HUD's programs, policies, and practices will ensure improvements are sustained over the long-term. These activities will feed the creation of a safe, engaged, and high-performing work culture at HUD. Such a positive work environment will increase workforce resiliency so Departmental operations can be sustained in times of crisis. Finally, HUD's strategic improvements will be further supported by improved delivery of facility services to employees.

HUD's people are the Department's most valuable resource. The COVID-19 pandemic is a defining moment in the nation's history; one which highlights the extent to which the country depends on the resiliency of its government workforce. The pandemic has presented an opportunity for HUD leadership to rethink how it operates. It has taught the Department that, as a public institution, it must be innovative and constantly seek new, better ways of doing business. HUD must constantly empower and enable its people. The Department's

**Suppl. App. 64**

workforce must be prepared, resourced, supported, and capable of providing the essential services necessary to the creation of strong, sustainable, inclusive communities and quality affordable homes for all.

## STRATEGIES

🗐 Denotes alignment with a President's Management Agenda Cross-Agency Priority (CAP) Goal

👥 Denotes a customer experience focused strategy

⚖ Denotes an equity focused strategy

- ❖ **Allocate resources to ensure human capital planning and operations** enable HUD to hire, and retain, a highly-skilled workforce.[92] 🗐
- ❖ **Provide opportunities for continuous development and professional** growth to meet HUD's mission needs.[93] 🗐 👥
- ❖ **Proactively prevent discrimination** on the basis of race, color, religion (including failure to accommodate), sex (including pregnancy and gender identity), national origin, age, disability (including failure to accommodate), genetic information, sexual orientation, and parental status, as well as retaliation for prior protected EEO activity.[94] 🗐 👥 ⚖
- ❖ **Integrate principles of diversity, equity, inclusion, and accessibility** (DEIA) into all HUD programs, policies, and practices.[95] 🗐 👥 ⚖
- ❖ **Create a safe, engaged, and high performing work culture.**[96] 🗐
- ❖ **Develop a resilient workforce** that can sustain operations in times of crisis.[97] 🗐
- ❖ **Allocate resources to ensure the equitable, timely and efficient delivery** of facility support services to meet the needs of all HUD employees.[98] 🗐 ⚖

## METRICS

To help achieve this objective, HUD has established the following performance indicators:

- ▶ Average Time-to-Hire (Office of Personnel Management (OPM) model to tentative offer)
- ▶ Percentage of hiring execution plan achieved
- ▶ Non-retirement Voluntary Attrition Rate

---

[92] This strategy is aligned with CAP Goal 1.1 Attract and hire the most qualified employees, who reflect the diversity of our country, in the right roles across the Federal Government.

[93] This strategy is aligned with CAP Goal 1.2 Make every Federal job a good job, where all employees are engaged, supported, heard, and empowered, with opportunities to learn, grow, join a union and have an effective voice in their workplaces through their union, and thrive throughout their careers; 1.4 Build the personnel system and support required to sustain the Federal Government as a model employer able to effectively deliver on a broad range of agency missions.

[94] This strategy aligns with CAP Goal 1.2: Make every Federal job a good job, where all employees are engaged, supported, heard, and empowered, with opportunities to learn, grow, join a union and have an effective voice in their workplaces through their union, and thrive throughout their careers.

[95] This strategy aligns with CAP Goal 1.2: Make every Federal job a good job, where all employees are engaged, supported, heard, and empowered, with opportunities to learn, grow, join a union and have an effective voice in their workplaces through their union, and thrive throughout their careers.

[96] This strategy is aligned with CAP Goal 1.2 Make every Federal job a good job, where all employees are engaged, supported, heard, and empowered, with opportunities to learn, grow, join a union and have an effective voice in their workplaces through their union, and thrive throughout their careers.

[97] This strategy is aligned with CAP Goal 1.3 Reimagine and build a roadmap to the future of Federal work informed by lessons from the pandemic and nationwide workforce and workplace trends.

[98] This strategy is aligned with CAP Goal 1.3 Reimagine and build a roadmap to the future of Federal work informed by lessons from the pandemic and nationwide workforce and workplace trends; 1.4 Build the personnel system and support required to sustain the Federal Government as a model employer able to effectively deliver on a broad range of agency missions.

▶ Percentage of positive responses to Federal Employee Viewpoint Survey (FEVS) employee engagement and performance questions

## EVIDENCE-BUILDING

According to the 2021 HUD Enterprise Risk Profile, human capital and staffing remain top priorities for the Department; 14 of 16 HUD program offices identified at least 1 talent-related risk as a top risk to achieving HUD's mission. Currently, HUD has close to 7,500 employees, which is about 30% lower than HUD's staffing levels 20 years ago. Additionally, during the 10-year period from 2008 to 2017, HUD lost 18.5% of its full-time permanent staff. Over half of HUD's workforce is eligible for retirement within the next five years, posing a risk to staffing, succession planning, and knowledge transfer. According to the FY22 Congressional Budget Justification, HUD is budgeting for a staffing increase of approximately 10% over the prior year; which does not include staffing ramp-ups that will be required to respond to pandemic and other disaster-related assistance. For HUD to meet staffing goals, time-to-hire and retention will need to significantly improve.

Employee satisfaction surveys are a core tool for tracking employee outcomes and improving and monitoring progress on workforce changes and engagement pursued in this objective. HUD participates in the annual, government-wide Federal Employee Viewpoint Surveys (FEVS).[99] OPM defines engagement as "An employee's sense of purpose that is evident in their display of dedication, persistence, and effort in their work or overall attachment to their organization and its mission." HUD's FY21 Employee Engagement Index (EEI) score was 77%, 2 percentage points higher than HUD's FY20 EEI score of 75%. In FY21, 85.1% of HUD employees who participated in the FEVS agreed "Supervisors in my work unit support employee development," 2 percentage points over the 83% of HUD employees who agreed with that statement in FY20. HUD will continue striving to make the Department a better place to work by focusing on improving in the following goals of the 2022 Departmental Employee Engagement Plan: improving employees' belief that HUD uses employee feedback to make the agency a better place to work; strengthen the Leaders Lead sub-factor of Employee Engagement; and enhancing HUD's employee performance management and recognition programs.

The effects of the COVID pandemic highlighted the need for the Department to enhance workforce resilience and leverage employee experiences to explore future of work options. As the Department transitioned into year two of the pandemic, HUD Leadership initiated a series of interactive employee visioning sessions to get input from employees on how HUD's working environment might change in the future. The visioning sessions obtained feedback from both bargaining and non-bargaining employees, with 76% of employees indicating their preference for full-time telework; 79% of employees agreeing that work objectives are being achieved with remote work; 69% agreeing that team goals are clear; 67% of employees feeling empowered to prioritize employee well-being; and 45% agreeing that HUD has effectively communicated strategies for prioritizing well-being during the pandemic. Another conclusion was that more flexible workforce models and initiatives to support performance and well-being are needed. HUD leadership will continue to listen and collect feedback from its internal and external stakeholders to identify and prioritize critical staffing needs.

---

[99] Page 68 For the FEVS, see https://www.opm.gov/policy-data-oversight/data-analysis-documentation/employee-surveys/.

# Strategic Objective 5B: Improve Acquisition Management

| Identify, procure, and execute acquisition management. |
|---|
| **LEADING THIS OBJECTIVE** |
| Office of Administration |

## OBJECTIVE

HUD programs rely on a well-functioning acquisition management process to execute mission objectives. To support these programs, the Department will increase capacity, transparency, communication, and intra-Departmental collaboration to ensure that mission-critical acquisitions are timely, strategic, and cost-effective.[100] The Department will also strive to provide equitable access to contracting opportunities as they relate to engagement of small and large businesses.

To fully serve Departmental needs, HUD will provide quality professional development opportunities to members of the acquisition workforce, both in the Office of the Chief Procurement Officer and program offices. This will allow HUD employees to earn procurement certifications and build expertise in project and program management. Attrition and retention concerns will be addressed by increasing the size of the acquisition workforce across HUD to the level needed to ensure contracting processes are managed without delay. Workforce development activities, such as trainings, certifications, and skills gap assessments, will help ensure that the acquisition professionals have the knowledge and skills to fully serve the Department.

Acquisition management is a Department-wide process that relies on cooperation between HUD offices. Consistent annual procurement reviews enable HUD to evaluate its internal policy and risk management systems. To improve transparency and build accountability, HUD will develop an acquisition dashboard that will track each acquisition through its lifecycle – from planning and requirement development to contract closeout. This dashboard will ensure all members of the acquisition workforce, including those in HUD program offices, have continuous visibility into and can efficiently shepherd acquisitions through each stage of the contracting process.

HUD will further improve the procurement process by providing best practices to help offices develop requirements, identify funding, and submit requests on time. The goal will be to decrease the number of HUD-initiated unplanned acquisition actions. Cross-Departmental collaboration will ensure an increase in the percentage of timely procurement actions awarded, actionable acquisition requirements submitted, and actionable acquisition requirements awarded. Improved acquisition planning will also yield quality market research, which may produce: 1) more targeted socio-economic small business set-asides; 2) facilitate greater understanding of small business participation in the marketplace; 3) provide more realistic projections for small business utilization; and 4) allow more time to disseminate requirements to the small business community so they can better plan and prepare competitive proposals.[101]These improvements will connect HUD to necessary goods and services earlier while reducing overhead costs.

---

[100] Acquisition management is the planning, execution, and administration of the process supporting the full lifecycle of a requirement and resulting in the award of a contractual instrument to procure the goods and services needed to support the mission of the Department.
[101] A procurement action is an action which officially awards or changes a prime contract (i.e., a direct contract with the Federal government). This may include the award of a new prime contract, a debit or credit change to an existing prime contract, or an order written against an indefinite delivery-type contract or basic ordering agreement. Federal regulations require that HUD consider socio-economic programs first, as defined by the Small Business Administration, for set-aside and sole-source contracts at or above the simplified acquisition threshold (currently set at $250,000). This will depend on the number and type of small businesses that are able to do the work and how much the contract is worth. Contracting officers can use these vehicles to help the Federal government meet its small business contracting goals.

**Suppl. App. 67**

HUD will increase equity in contracting opportunities by improving communication with and opportunities for small businesses. Furthermore, HUD will build on knowledge gained from the equity assessment it conducted on Departmental procurement activities. The Department will improve its practices to ensure small and small disadvantaged businesses have equitable access to HUD's prime and sub-contracting procurement opportunities. This will be accomplished by the: 1) expansion of outreach to small business owners in underserved communities, 2) exploration of mechanisms for building the pipeline of qualified small businesses, and 3) continuation of data analyses to identify and address barriers to accessing HUD contracting opportunities.

The Department will also implement various sustainability practices in its acquisition process. HUD's goal is to ensure that 100 percent of new eligible contract actions, including task or delivery orders under new contracts and existing contracts, meet applicable sustainable acquisition requirements. HUD will also require the supply or use of products and services that meet environmentally preferable categories, including those that are energy efficient, bio-based, water efficient, or are non-toxic or less toxic.

## STRATEGIES

Denotes alignment with a President's Management Agenda Cross-Agency Priority (CAP) Goal

Denotes a customer experience focused strategy

Denotes an equity focused strategy

- **Improve the HUD-wide governance structure** for acquisition planning by increasing transparency, collaboration, and efficiency.[102]
- **Increase visibility across the Department** in the HUD contract management process.[103]
- **Leverage the Program Management Improvement Accountability Act (PMIAA)** to strengthen the knowledge base of HUD's acquisition workforce.
- **Increase the inclusion of small and small disadvantaged businesses** by helping them navigate Federal contracting opportunities.[104]
- **Improve policies processes, and procedures** for assisted acquisitions.[105]
- **Ensure that new eligible contracts meet sustainable acquisition requirements**.[106]

## METRICS

To help achieve this objective, HUD has established the following performance indicators:

- On-Time Execution of All Procurement Actions - Procurement Acquisition Lead Times (PALT)
- On-Time Submission of Planned Actionable Acquisition Requirements
- On-Time Award of Planned Actionable Acquisition Requirements

---

[102] This strategy is aligned with CAP Goal 3.1 Foster lasting improvements in the Federal acquisition system to strengthen the U.S. domestic manufacturing base, support American workers, lead by example toward sustainable climate solutions, and create opportunities for underserved communities.

[103] The Office of the Chief Procurement Officer will be leading this strategy to develop a tool that will provide greater insight to HUD's internal procurement process.

[104] 3.1 Foster lasting improvements in the Federal acquisition system to strengthen the U.S. domestic manufacturing base, support American workers, lead by example toward sustainable climate solutions, and create opportunities for underserved communities.

[105] An assisted acquisition is a type of interagency acquisition where a servicing agency (e.g., General Services Administration) performs acquisition activities on a requesting agency's behalf. This strategy is aligned with CAP Goal 3.1 Foster lasting improvements in the Federal acquisition system to strengthen the U.S. domestic manufacturing base, support American workers, lead by example toward sustainable climate solutions, and create opportunities for underserved communities.

[106] This strategy is aligned with CAP Goal 3.1 Foster lasting improvements in the Federal acquisition system to strengthen the U.S. domestic manufacturing base, support American workers, lead by example toward sustainable climate solutions, and create opportunities for underserved communities.

**Suppl. App. 68**

## EVIDENCE-BUILDING

Each year, the Council of Inspectors General on Integrity and Efficiency announces the top challenges facing Federal agencies; in 2021, procurement was identified as one of the top challenges. Key areas of concern across all agencies include defining requirements, awarding contracts, managing and overseeing contractor performance, reviewing invoices and payments, and training and retaining procurement personnel.

Acquisition management is at the core of HUD's ability to meet its mission and a top priority for HUD leadership. Like other agencies, HUD has identified risks in the acquisition management process. Procurement- and acquisition-related risk has appeared as one of the top ten risks on HUD's Department Enterprise Risk Profile as well as one of the "Top Management Challenges" in the FY21 HUD Office of Inspector General report. HUD has addressed these risks in the FY 2022-2026 Strategic Plan.

HUD has committed to improving policy and processes for assisted acquisition. To keep the acquisition community informed and to monitor performance and target solutions, HUD is also building a dashboard to track key metrics, such as timeliness of procurement actions.

# Strategic Objective 5C: Strengthen Information Technology

Strengthen information technology, cybersecurity, and data management.

## LEADING THIS OBJECTIVE

Office of the Chief Information Officer

## OBJECTIVE

HUD will continue to provide tools that are efficient, safe, secure, and resilient through improvements in Information Technology (IT), cybersecurity, and data management that support the Department's mission.

Information Technology is the underpinning that allows HUD to properly function and provide essential services to the American public. By combining business and technology strategy efforts, HUD is better positioned to serve the needs of the public effectively and efficiently. HUD has identified several operations that would benefit from the modernization of its technology infrastructure, IT systems, and internal processes. HUD's operations will be strengthened by increased ease of access to relevant and reliable data. This will drive the Department to experience an increase in public confidence, derived from a focus on cybersecurity, data governance and reliability. The Department envisions a safe and secure HUD that provides the tools for program offices, staff, and partners to accomplish their work in a safe and secure manner. Toward this end, HUD will address Government Accountability Office (GAO) findings. Efforts will ensure there are increased investments in IT infrastructure, cybersecurity improvements, and staff have the necessary knowledge, as well as resources, to succeed. HUD will continue to focus on decommissioning legacy IT systems. Simultaneously, HUD, will move to safe, sustainable, and standardized IT platforms that support operations enterprise-wide. HUD will strengthen its IT and data governance and structure to ensure proper support for program areas, oversight, and management.

HUD will renew its strategic focus on data governance. The Department's core focus will be on increasing collaboration and transparency. This will enable leaders to make timely, well-informed policies and decisions. Enterprise-wide data solutions that support this purpose will allow HUD to work more efficiently and be more informed toward the execution of its mission

## STRATEGIES

📋 Denotes alignment with a [President's Management Agenda](#) Cross-Agency Priority (CAP) Goal

👥 Denotes a customer experience focused strategy

⚖️ Denotes an equity focused strategy

❖ **Continue Implementation of Technology Modernization Efforts**.[107] 📋
❖ **Manage Internal and External Customer Relationships**; incorporate feedback surveys from customer groups.[108] 📋
❖ **Optimize Agency IT Operational Costs;** improve the IT Life-cycle assessment.
❖ **Implement Modern Cybersecurity Capabilities** by reviewing the HUD Supply Chain's Risk exposure.

---

[107] This strategy is aligned with CAP Goal 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes.
[108] This strategy is aligned with CAP Goal 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes.

- ❖ **Strengthen and Modernize the OCIO Organizational Structure**; enhance training and information on IT for all HUD Employees.[109]
- ❖ **Leverage data as a strategic asset**.
- ❖ **Develop a HUD-wide Digital Asset Management Process** for information ingestion, delivery management and safeguarding procedures.
- ❖ **Leverage available sources of information from customer feedback** that will enable HUD to measure the effectiveness of program delivery.[110]
- ❖ **Establish a process that improves public access** to HUD's government records and information through the Freedom of Information Act (FOIA) and proactive disclosure.
- ❖ **Establish relationships with local communities and diverse groups** to better improve the collection of accurate information and the development of modern technology.[111]

## METRICS

To help achieve this objective, HUD has established the following performance indicators:
- ▶ IT Customer Satisfaction Survey
- ▶ Improved Federal Information Security Modernization Act (FISMA) and Federal Information Technology Acquisition Reform Act (FITARA) Scorecards[112]
- ▶ Decrease in Non-Compliance Audit Findings

## EVIDENCE-BUILDING

IT modernization is subject to known high risks area with multiple root causes (including lack of data strategy) and multiple potential impacts (including cybersecurity vulnerability). IT-related risks consistently represent the top 10 risks to the Department, including IT modernization, Data governance, Cybersecurity, and an emerging risk is supply chain management.

In employee visioning sessions held in 2021, during the second year of the pandemic, to engage employees about the future of work at HUD, 87% of survey respondents stated that improved IT bandwidth, updated software, and IT hardware were necessary technology priorities to facilitate alternative working models.

HUD is not alone in addressing longstanding and severe challenges with IT. The GAO 2021 High Risk List identified cybersecurity as one of five government-wide risk areas that increased in severity since the last high-risk report was issued in 2019.

According to the FY21 OIG Management Challenges Report, "several long-standing issues that harm IT program effectiveness included poor management of HUD's IT resources and difficulty completing their initiatives." Another report issued by the OIG in June 2021 stated that considerable progress has been made in implementing the

---

[109] This strategy is aligned with CAP Goal 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes.

[110] This strategy is aligned with CAP Goal 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes; 2.3 Identify and prioritize the development of Federal shared products, services, and standards that enable simple, seamless, and secure customer experiences across High Impact Service Providers.

[111] This strategy is aligned with CAP Goal 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes.

[112] FISMA definitions can be found here: https://www.whitehouse.gov/wp-content/uploads/2021/05/FY-2020-FISMA-Report-to-Congress.pdf.
High Risk: Key, fundamental cybersecurity policies, processes, and tools are either not in place or not deployed sufficiently.
At Risk: Some essential policies, processes, and tools are in place to mitigate overall cybersecurity risk, but significant gaps remain.
Managing Risk: The agency institutes required cybersecurity policies, procedures, and tools and actively manages their cybersecurity risks.

multiyear roadmap, but due to setbacks and delays "hundreds of millions of dollars in potential savings from modernization have not been realized, and security risks have remained."

The Council of the Inspectors General on Integrity and Efficiency Top Management and Performance Challenges Report issued in February 2021 cited HUD as an example of the impact of lack of IT modernization, observing that HUD has dedicated a significant amount of its IT budget to operations and maintenance, and a better priority would be to develop, modernize, and enhance its IT systems."

HUD is committed to overcoming the technology challenges needed to modernize its technology infrastructure and provide the systems needed to achieve the Department's mission.

# Strategic Objective 5D: Enhance Financial and Grants Management

| Provide sound financial and grants management. |
|---|
| **LEADING THIS OBJECTIVE** |
| Office of the Chief Financial Officer |

## OBJECTIVE

HUD aims to provide sound financial and grants management services so the Department can achieve financial excellence. HUD will work to maintain a clean audit opinion through sustaining improvements to internal controls, cash management, and cost accounting processes and coordination with the Office of Inspector General (OIG) and the Government Accountability Office (GAO). To ensure priorities are aligned throughout the Department, HUD will facilitate quarterly governance meetings among program and support offices. The Department continues to modernize financial systems while simultaneously working to decommission legacy systems that burden HUD and the communities it serves. Improvements to the budget process will also be pursued.[113]

In addition to improvements to Departmental financial, budget, and cost accounting processes, HUD will continue building the Department's Enterprise Fraud and Risk Management (EFRM) Program. HUD aims to develop tools to help prevent and detect the misuse of taxpayer funds. HUD will address long-standing issues by bringing together program offices to preemptively identify and quickly resolve weaknesses. Doing so will drive progress toward the achievement of a positive, HUD-wide statement of assurance that internal controls over financial reporting are free of material weaknesses.  Improvements made under this objective will enable HUD to be in a better position to reduce the number of open audit recommendations identified by OIG and GAO.

The Department remains focused on improving grants management and oversight by continuing to support the Federal government's drive toward results-oriented accountability for grants. HUD will leverage the use of analytics and launch a dashboard that will measure the efficiency and timeliness of program offices' Notices of Funding Opportunity (NOFO) submissions. This increase in transparency will lead to the timely identification of obstacles, as well as yield data that will improve the Department's overall NOFO issuance to ultimately benefit current and future grantees. HUD will also work to provide a more seamless grants management process by analyzing its current grants landscape and launching a pilot program to help program offices identify and address their grants-related business needs. This will include launching the Grants Evaluation Management System (GEMS) to provide a single portal for HUD's Office of Native American Programs (ONAP)  grant lifecycle.[114] GEMS will provide a grant lifecycle management solution that provides more efficient oversight, reduces manual workload, and improves customer experience for HUD grantees. These focused efforts will provide Department-wide opportunities to strengthen HUD's data collection, the grants lifecycle, and overall financial management.

---

[113] The implementation of a streamlined budget formulation system is expected in FY22.
[114] One of HUD's largest grant programs, the Indian Housing Block Grant, will launch GEMS. Additional HUD grant programs are planned to follow this initial launch.

# STRATEGIES

🗒 Denotes alignment with a President's Management Agenda Cross-Agency Priority (CAP) Goal

👥 Denotes a customer experience focused strategy

- ❖ **Coordinate with OIG and GAO to ensure HUD receives a clean audit.**
- ❖ **Continue maturing the EFRM Program.**
- ❖ **Streamline HUD's financial accounting processes.**
- ❖ **Analyze HUD's grants landscape** through oversight and data collection activities.[115] 🗒
- ❖ **Develop analytics to decrease the time between NOFO publication and award.** 👥
- ❖ **Launch GEMS to provide HUD ONAP grant programs with a single portal for the entire grant lifecycle.**

# METRICS

To help achieve this objective, HUD has established the following performance indicators:
- ▶ Percentage of OIG and GAO recommendations closed
- ▶ Percentage of Timely-Certified Open Obligations Reviews
- ▶ Percentage of the completed inventory of HUD grant programs and mapping to the corresponding Assistance Listing

# EVIDENCE-BUILDING

Significant increases in FY20 and FY21 funding for HUD programs, accompanied with requirements for quick distribution to meet housing needs, has accelerated stakeholder interests in the strong administration and effective oversight of HUD funding. HUD has responded to GAO, OIG, and the Pandemic Response Accountability Committee regularly about its efforts to ensure funds are awarded and distributed properly.

In FY20, HUD received its first unmodified opinion on its consolidated financial statements since fiscal year 2012. OIG reported the following internal control weaknesses, indicating significant improvements over FY18 to FY20

| Year | Material Weaknesses | Significant Deficiencies | Non-compliances |
|------|---------------------|--------------------------|-----------------|
| FY18 | 5 | 0 | 8 |
| FY19 | 1 | 3 | 3 |
| FY20 | 1 | 0 | 1 |

GAO annually publishes a report on status of "priority open recommendations" which are the GAO recommendations "that warrant priority attention from heads of key departments or agencies." Between April 2020 and June 2021, the number of outstanding priority recommendations at HUD decreased from 17 to 13. OIG open recommendations have also been reduced significantly.

Grants management and oversight has been a key focus area of the Department. As significant funding surges occurred, such as Coronavirus Aid, Relief, and Economic Security (CARES) Act funds received in 2020 and the

---

[115] This strategy is aligned with CAP Goal 3.2 Build capacity in Federal financial management and through Federal financial assistance to catalyze American industrial strategy, address climate-related risks, and deliver equitable results.

**Suppl. App. 74**

American Rescue Plan (ARP) in 2021, the Department formed special teams to promote increased emphasis on internal controls and oversight of funding distributions. HUD's OIG FY21 Top Management Challenges Report highlighted the potential impact of waivers granted by the law to accelerate distribution to the American people and businesses. The report states, "Given the breadth and scope of HUD's grant programs – which now include supplemental CARES Act and ARP funding which permit numerous waivers from standard program requirements – grantees and subrecipients face challenges ensuring that they are expending, documenting, and reporting in compliance with the rules of each grant program." In anticipation of these concerns, programs receiving ARP funding performed Front-end Risk Assessments to identify, assess, and plan mitigation actions to reduce program risks. Targeted areas included training, staffing, technology systems, processes, and internal controls.

In order to ensure proper oversight of grantees and manage funding increases for anticipated and unanticipated disaster relief efforts, the Department will need to continue to bolster recent improvements to financial and grant oversight.

**Suppl. App. 75**

# Strategic Objective 5E: Improve Ease, Effectiveness, and Trust in HUD Services

Institutionalize customer experience (CX) management and elevate the customer perspective across HUD.

## LEADING THIS OBJECTIVE

Office of the Chief Financial Officer

## OBJECTIVE

HUD exists to ensure safe and affordable housing for all people residing in America by working with a wide range of customers—individuals, businesses, and organizations—that interact with the HUD directly or indirectly.[116] HUD will meet the needs of its diverse customers by integrating their perspectives and lived experiences into the very fabric of what the Department does. In alignment with the Biden-Harris Management Agenda, HUD is committed to providing equitable customer experiences that will improve the efficiency, security, and effectiveness of Departmental services.[117] HUD will drive this transformation toward customer-centricity by: 1) better understanding the lived experiences of HUD's customers; 2) establishing a customer listening practice; 3) designing and implementing solutions that measurably improve CX; and 4) integrating customer-centricity into the culture and organization of HUD.

Identifying the scope of customer needs is critical to ensuring the Department is truly removing barriers to its offerings and improving public trust in government. To gain this understanding, HUD will investigate how its policies, programs, and services impact customers across the Department's five Service Ecosystems. In doing so, HUD will apply special attention to exploring the impacts of two critical life events within each ecosystem – surviving a disaster and experiencing homelessness.[118]

HUD will elevate the voice of its customers by establishing a robust customer listening practice in compliance with OMB Circular A-11 Section 280.[119] A Department-wide implementation of a Voice of the Customer (VOC) tool would allow the Department to capture real-time feedback from customers at pivotal "Moments that Matter."[120] Measuring the experience of HUD's customers and employees will equip the Department with the data and insight necessary to advance proactive solutions that improve accessibility and usability of services and information.

The Department will conduct CX improvement initiatives that will measurably improve HUD's operations. HUD will create a formalized process for involving stakeholders by designing high-quality solutions using Human-Centered Design and co-creation methods. Furthermore, HUD will better enable cross-program and cross-partner

---

[116] Who is a Federal Government customer?" https://www.performance.gov/cx/assets/files/a11_2021-FY22.pdf
[117] The Biden-Harris Management Agenda: https://www.performance.gov/pma/
[118] HUD programs can be organized into five Service Ecosystems that address distinct sets of customer needs: 1) Access to Affordable Rental Homes are programs to grow, preserve, and fund affordable rental home access, and provide supportive services to residents; 2) Homeownership Opportunity & Housing Market Stability are programs and lending/securities products that facilitate equal opportunity homeownership and strengthen the market; 3) Housing Quality & Improved Living Conditions are programs to assess and mitigate hazards or deficiencies in housing, and tools to facilitate asset management for HUD and improved living conditions for citizens; 4) Economic Growth & Community Resilience are grants and programs to stimulate economic development and grow strong, resilient communities or revitalize those in disaster areas; and 5) Fair Housing and Equal Opportunity Enforcement are support to agencies and organizations ensuring fair, safe, equitable housing practices and channels for citizen reporting of potential housing discrimination.
[119] OMB Circular A-11 section 280: https://www.performance.gov/cx/assets/files/a11-280.pdf
[120] "Moments that Matter" are the specific interactions along a customer journey that trigger customer feelings and leave lasting impressions that can likely lead to a make-or-break decision about their future relationship and trust with the Department.

collaboration by promoting data-sharing protocols and improving enterprise technology solutions. This will be achieved by embedding CX practices into the system development life cycle to ensure technology solutions are well-designed, widely accessible, and measurably improve customer experiences.

Sustaining customer-centricity means changing culture at every level. HUD will develop a customer-centric culture by providing employees with new CX tools, skills, and knowledge. The guiding focus will be on instilling the principles, practices, and processes necessary to ensure HUD decisions that are equitable, inclusive, and customer-centric. Together, these efforts will drive HUD toward an operational paradigm that puts customers first in the creation of strong, sustainable, inclusive communities and quality affordable homes for all.

## STRATEGIES

📋 Denotes alignment with a President's Management Agenda Cross-Agency Priority (CAP) Goal

👥 Denotes a customer experience focused strategy

⚖ Denotes an equity focused strategy

- ❖ **Better understand the lived experience** of HUD's customers.[121] 📋 👥 ⚖
- ❖ **Establish a customer listening practice.**[122] 📋 👥 ⚖
- ❖ **Design and implement solutions** that measurably improve HUD CX.[123] 📋 👥 ⚖
- ❖ **Integrate customer-centricity** into the culture and organization of HUD. 👥 ⚖

## METRICS

To help achieve this objective, HUD has established the following performance indicators:
- ▶ Customer satisfaction of the Federal Housing Administration (FHA) Resource Center
- ▶ Customer trust measurement of the Federal Housing Administration (FHA) Resource Center

## EVIDENCE BUILDING

Federal government is focused on delivering programs and services more effectively, building trust for recipients, advancing equity, and supporting underserved communities. Evidence from America's Customer Satisfaction Index suggests there is substantial need for improvement. ACSI estimates of customer satisfaction are generated by econometric modeling of survey data, where expectations and perceptions of the quality of government services are used as inputs and complaints and citizen trust in government are used as outputs. The 2019 ACSI found that HUD ranked 14 points below the mean government score of 68.1.[124]

---

[121] This strategy is aligned with CAP Goal 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes; 2.2 Design, build, and manage Government service delivery for key life experiences that cut across Federal agencies; 2.3 Identify and prioritize the development of Federal shared products, services, and standards that enable simple, seamless, and secure customer experiences across High Impact Service Providers.

[122] This strategy is aligned with CAP Goal 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes; 2.2 Design, build, and manage Government service delivery for key life experiences that cut across Federal agencies; 2.3 Identify and prioritize the development of Federal shared products, services, and standards that enable simple, seamless, and secure customer experiences across High Impact Service Providers.

[123] This strategy is aligned with CAP Goal 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes.

[124] American Customer Satisfaction Index. 2020. "ACSI Federal Government Report 2019." https://www.theacsi.org/images/stories/images/reports/20jan_gov-report-2019.pdf.

Improving CX depends critically on building evidence to inform effective change. The development of the Voice of the Customer (VOC) tool by the Chief Financial Officer is foundational to this evidence-building work.[125] HUD is committed to centering equity considerations through CX evidence-building.

Earlier HUD research in the CX domain remains pertinent. HUD has used statistically representative surveys in various ways to measure satisfaction of final customers (assisted renters), including through use of the Resident Assessment Subsystem by the Real Estate Assessment Center for project-based programs during 2000–2003[126] and PD&R surveys of voucher households.[127] In support of the Government Performance and Results Act, PD&R also conducted several program partner satisfaction surveys to measure service delivery outcomes for partner groups such as housing providers, cities, lenders, and grantees.[128] The partner survey work provided the insight that satisfaction of HUD's program partners depends in part on whether they perceive the Department as primarily regulating or primarily supporting them. Such evidence suggests that engaging employees and partners in a compelling shared mission could be a key strategy for improving customer experience and outcomes in the present CX initiative.

HUD's Learning Agenda includes a research question principally related to objective 5E:

- Which drivers of customer experience most frequently hinder satisfaction and trust for specific program services?

---

[125] HUD. 2020. *HUD Research Roadmap: 2020 Update*. https://www.huduser.gov/PORTAL/sites/default/files/pdf/ResearchRoadmap-2020.pdf. See p.58.
[126] See for example indicators 1.2.4.5 and 5.1.3 of HUD FY 2001 Annual Performance Report. https://www.hud.gov/program_offices/cfo/reports/cforept/priorcforep.
[127] PD&R, 2009. "Tell Us About Your Home: Three Years of Surveying Housing Quality and Satisfaction in the Housing Choice Voucher Program." https://www.huduser.gov/portal/publications/Tell-Us-About-Your-Home.html.
[128] See "Partner Satisfaction With HUD's Performance: 2010 Survey Results and Trends Since 2005," https://www.huduser.gov/portal/publications/polleg/partnersatis_2011.html; "Partner Satisfaction with HUD's Performance" (2006), https://www.huduser.gov/portal/publications/polleg/partnersatis.html; "How's HUD Doing: Agency Performance as Judged by Its Partners" (2001), https://www.huduser.gov/portal/publications/polleg/hows_hud.html; and indicator E.16 in HUD FY 2008 Performance and Accountability Report.

# Cross-Agency Priority Goals

Established by the GPRA Modernization Act of 2010, Cross-Agency Priority (CAP) Goals are a tool used by the Administration to accelerate progress on a limited number of Presidential priority areas where implementation requires active collaboration between multiple agencies, overcoming organizational barriers to achieve better performance than one agency can achieve on its own.

Set or revised at least every four years, CAP Goals include outcome-oriented goals that cover a limited number of crosscutting policy areas as well as management goals focused on management improvements across the Federal Government. Each goal focuses on driving cross-governmental collaboration and tackling government-wide management challenges affecting most agencies. Goals will feature clearly named accountable officials; data-driven reviews that incorporate a broad range of quantitative and qualitative inputs; and reporting to the public through a common website as a framework to drive performance improvements.

A series of Administration-wide CAP Goals will be determined during FY22. Please refer to https://www.performance.gov/ for the Department's contributions and progress toward the CAP Goals, where applicable.

| President's Management Agenda (PMA) Priority | PMA Strategy (CAP Goal) | HUD Strategic Objective | HUD Strategy | Page Number |
|---|---|---|---|---|
| 1: Strengthening and empowering the Federal workforce | 1.1 Attract and hire the most qualified employees, who reflect the diversity of our country, in the right roles across the Federal Government | 5A: Enable the HUD Workforce | Allocate resources to ensure human capital planning and operations enable HUD to hire, and retain, a highly-skilled workforce. | 62 |
| 1: Strengthening and empowering the Federal workforce | 1.2 Make every Federal job a good job, where all employees are engaged, supported, heard, and empowered, with opportunities to learn, grow, join a union, and have an effective voice in their workplaces through their union, and thrive throughout their careers | 5A: Enable the HUD Workforce | Provide opportunities for continuous development and professional growth to meet HUD's mission needs. | 62 |
| 1: Strengthening and empowering the Federal workforce | 1.2 Make every Federal job a good job, where all employees are engaged, supported, heard, and empowered, with opportunities to learn, grow, join a union, and have an effective voice in their workplaces through their union, and thrive throughout their careers | 5A: Enable the HUD Workforce | Proactively prevent discrimination on the basis of race, color, religion (including failure to accommodate), sex (including pregnancy and gender identity), national origin, age, disability (including failure to accommodate), genetic information, sexual orientation, and parental status, as well as retaliation for prior protected EEO activity. | 62 |

| President's Management Agenda (PMA) Priority | PMA Strategy (CAP Goal) | HUD Strategic Objective | HUD Strategy | Page Number |
|---|---|---|---|---|
| 1: Strengthening and empowering the Federal workforce | 1.2 Make every Federal job a good job, where all employees are engaged, supported, heard, and empowered, with opportunities to learn, grow, join a union, and have an effective voice in their workplaces through their union, and thrive throughout their careers | 5A: Enable the HUD Workforce | Integrate principles of diversity, equity, inclusion, and accessibility (DEIA) into all HUD programs, policies, and practices. | 62 |
| 1: Strengthening and empowering the Federal workforce | 1.2 Make every Federal job a good job, where all employees are engaged, supported, heard, and empowered, with opportunities to learn, grow, join a union, and have an effective voice in their workplaces through their union, and thrive throughout their careers | 5A: Enable the HUD Workforce | Create a safe, engaged, and high performing work culture. | 62 |
| 1: Strengthening and empowering the Federal workforce | 1.3 Reimagine and build a roadmap to the future of Federal work informed by lessons from the pandemic and nationwide workforce and workplace trends | 5A: Enable the HUD Workforce | Develop a resilient workforce that can sustain operations in times of crisis. | 62 |
| 1: Strengthening and empowering the Federal workforce | 1.3 Reimagine and build a roadmap to the future of Federal work informed by lessons from the pandemic and nationwide workforce and workplace trends | 5A: Enable the HUD Workforce | Allocate resources to ensure the equitable, timely and efficient delivery of facility support services to meet the needs of all HUD employees. | 62 |
| 1: Strengthening and empowering the Federal workforce | 1.4 Build the personnel system and support required to sustain the Federal Government as a model employer able to effectively deliver on a broad range of agency missions | 5A: Enable the HUD Workforce | Provide opportunities for continuous development and professional growth to meet HUD's mission needs. | 62 |
| 1: Strengthening and empowering the Federal workforce | 1.4 Build the personnel system and support required to sustain the Federal Government as a model employer able to effectively deliver on a broad range of agency missions | 5A: Enable the HUD Workforce | Allocate resources to ensure the equitable, timely and efficient delivery of facility support services to meet the needs of all HUD employees. | 62 |

**Suppl. App. 80**

| President's Management Agenda (PMA) Priority | PMA Strategy (CAP Goal) | HUD Strategic Objective | HUD Strategy | Page Number |
|---|---|---|---|---|
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes | 5C: Strengthen Information Technology | Continue Implementation of Technology Modernization Efforts. | 67 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes | 5C: Strengthen Information Technology | Manage Internal and External Customer Relationships; incorporate feedback surveys from customer groups. | 67 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes | 5C: Strengthen Information Technology | Strengthen and Modernize the OCIO Organizational Structure; enhance training and information on IT for all HUD Employees. | 68 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes | 5C: Strengthen Information Technology | Leverage available sources of information from customer feedback that will enable HUD to measure the effectiveness of program delivery. | 68 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes | 5C: Strengthen Information Technology | Establish relationships with local communities and diverse groups to better improve the collection of accurate information and the development of modern technology. | 68 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes | 5E: Improve Ease, Effectiveness, and Trust in HUD Services | Better understand the lived experience of HUD's customers. | 74 |

Fiscal Year 2022-2026 HUD Strategic Plan                                                Page | 79

| President's Management Agenda (PMA) Priority | PMA Strategy (CAP Goal) | HUD Strategic Objective | HUD Strategy | Page Number |
|---|---|---|---|---|
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes | 5E: Improve Ease, Effectiveness, and Trust in HUD Services | Establish a customer listening practice. | 74 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.1 Improve the service design, digital products, and customer-experience management of Federal High Impact Service Providers by reducing customer burden, addressing inequities, and streamlining processes | 5E: Improve Ease, Effectiveness, and Trust in HUD Services | Design and implement solutions that measurably improve HUD CX. | 74 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.2 Design, build, and manage Government service delivery for key life experiences that cut across Federal agencies | 5E: Improve Ease, Effectiveness, and Trust in HUD Services | Better understand the lived experience of HUD's customers. | 74 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.2 Design, build, and manage Government service delivery for key life experiences that cut across Federal agencies | 5E: Improve Ease, Effectiveness, and Trust in HUD Services | Establish a customer listening practice. | 74 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.3 Identify and prioritize the development of Federal shared products, services, and standards that enable simple, seamless, and secure customer experiences across High Impact Service Providers | 5C: Strengthen Information Technology | Leverage available sources of information from customer feedback that will enable HUD to measure the effectiveness of program delivery. | 68 |
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.3 Identify and prioritize the development of Federal shared products, services, and standards that enable simple, seamless, and secure customer experiences across High Impact Service Providers | 5E: Improve Ease, Effectiveness, and Trust in HUD Services | Better understand the lived experience of HUD's customers. | 74 |

**Suppl. App. 82**

| President's Management Agenda (PMA) Priority | PMA Strategy (CAP Goal) | HUD Strategic Objective | HUD Strategy | Page Number |
|---|---|---|---|---|
| 2: Delivering excellent, equitable, and secure Federal services and customer experience | 2.3 Identify and prioritize the development of Federal shared products, services, and standards that enable simple, seamless, and secure customer experiences across High Impact Service Providers | 5E: Improve Ease, Effectiveness, and Trust in HUD Services | Establish a customer listening practice. | 74 |
| 3: Managing the Business of Government to Build Back Better | 3.1 Foster lasting improvements in the Federal acquisition system to strengthen the U.S. domestic manufacturing base, support American workers, lead by example toward sustainable climate solutions, and create opportunities for underserved communities | 5B: Improve Acquisition Management | Increase the inclusion of small and small disadvantaged businesses by helping them navigate Federal contracting opportunities. | 65 |
| 3: Managing the Business of Government to Build Back Better | 3.1 Foster lasting improvements in the Federal acquisition system to strengthen the U.S. domestic manufacturing base, support American workers, lead by example toward sustainable climate solutions, and create opportunities for underserved communities | 5B: Improve Acquisition Management | Improve the HUD-wide governance structure for acquisition planning by increasing transparency, collaboration, and efficiency. | 65 |
| 3: Managing the Business of Government to Build Back Better | 3.1 Foster lasting improvements in the Federal acquisition system to strengthen the U.S. domestic manufacturing base, support American workers, lead by example toward sustainable climate solutions, and create opportunities for underserved communities | 5B: Improve Acquisition Management | Improve policies, processes, and procedures for assisted acquisitions. | 65 |
| 3: Managing the Business of Government to Build Back Better | 3.1 Foster lasting improvements in the Federal acquisition system to strengthen the U.S. domestic manufacturing base, support American workers, lead by example toward sustainable climate solutions, and create opportunities for underserved communities | 5B: Improve Acquisition Management | Ensure that new eligible contracts meet sustainable acquisition requirements. | 65 |

Suppl. App. 83

| President's Management Agenda (PMA) Priority | PMA Strategy (CAP Goal) | HUD Strategic Objective | HUD Strategy | Page Number |
|---|---|---|---|---|
| 3: Managing the Business of Government to Build Back Better | 3.2 Build capacity in Federal financial management and through Federal financial assistance to catalyze American industrial strategy, address climate-related risks, and deliver equitable results | 4A: Guide Investment in Climate Resilience | Foster innovation while removing barriers to energy efficiency and renewable energy in the HUD portfolio. | 50 |
| 3: Managing the Business of Government to Build Back Better | 3.2 Build capacity in Federal financial management and through Federal financial assistance to catalyze American industrial strategy, address climate-related risks, and deliver equitable results | 4A: Guide Investment in Climate Resilience | Eliminate discriminatory barriers to ensure CDBG-DR and CDBG-MIT grantees can access disaster and mitigation-related needs. | 50 |
| 3: Managing the Business of Government to Build Back Better | 3.2 Build capacity in Federal financial management and through Federal financial assistance to catalyze American industrial strategy, address climate-related risks, and deliver equitable results | 5A: Enable the HUD Workforce | Allocate resources to ensure the equitable, timely and efficient delivery of facility support services to meet the needs of all HUD employees. | 62 |
| 3: Managing the Business of Government to Build Back Better | 3.2 Build capacity in Federal financial management and through Federal financial assistance to catalyze American industrial strategy, address climate-related risks, and deliver equitable results | 5D: Enhance Financial and Grants Management | Analyze HUD's grants landscape through oversight and data collection activities. | 71 |

# Icon List

| Icon | Definition |
|------|-----------|
| ⭐ | Denotes an Agency Priority Goal (APG) |
| 📋 | Denotes alignment with a President's Management Agenda Cross-Agency Priority (CAP) Goal |
| 🍃 | Denotes content featured in HUD's Climate Action Plan |
| 👍 | Denotes a customer experience focused strategy |
| ⚖️ | Denotes an equity focused strategy |



# FISCAL YEAR 2022–2026 STRATEGIC PLAN

U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT

**Suppl. App. 86**

# Exhibit 2



**U.S. Department of Housing and Urban Development**

Community Planning and Development

FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth
Homeless Demonstration Program Grants
FR-6800-N-25
08/29/2025

**Suppl. App. 88**

# Table of Contents

I. FUNDING OPPORTUNITY DESCRIPTION.............................................................................3

A. Program Description ..............................................................................................................3

B. Definitions and CoC Program Concepts .............................................................................10

II. AWARD INFORMATION.......................................................................................................33

A. Available Funds ...................................................................................................................33

III. ELIGIBILITY INFORMATION ...........................................................................................34

A. Eligible Applicants..............................................................................................................34

B. Rules and Regulations Applicable to HUD NOFOs ...........................................................35

C. Rules that Affect How HUD Evaluates Applications .........................................................57

IV. APPLICATION AND SUBMISSION INFORMATION .......................................................67

A. Application Package.............................................................................................................67

B. System for Award Management (SAM) and Unique Entity Identifier (UEI).......................67

C. Other Guidance and Notifications.......................................................................................68

D. Application Verification.......................................................................................................69

E. Content and Form of Application Submission .....................................................................69

F. CoC Consolidated Application ............................................................................................72

G. Submission Dates and Times ..............................................................................................75

H. Intergovernmental Review ..................................................................................................77

I. Funding Restrictions.............................................................................................................77

J. Other Submission Requirements ..........................................................................................77

V. APPLICATION REVIEW INFORMATION ..........................................................................80

A. Criteria.................................................................................................................................80

B. CoC Application Scoring .....................................................................................................81

C. Project Review and Selection Process...............................................................................108

D. Adjustments to Projects.....................................................................................................111

E. Corrections to Deficient Applications ...............................................................................112

F. Other Federal Statutes........................................................................................................112

VI. AWARD ADMINISTRATION INFORMATION................................................................113

A. Award Notices....................................................................................................................113

B. Administrative, National and Departmental Policy Requirements and Terms for HUD's
Financial Assistance Programs ...............................................................................................115

C. Environmental Review .......................................................................................................117

D. Lead-Based Paint Requirements .......................................................................................118

**Suppl. App. 89**

E. Remedies for Noncompliance ....................................................................................118

F. Reporting ..................................................................................................................118

G. Debriefing ................................................................................................................120

H. Administrative and Other Program Requirements. ...................................................120

I. Timeliness Standards. ...............................................................................................120

VII. APPEALS................................................................................................................120

A. Description ...............................................................................................................121

B. Types of Appeals......................................................................................................121

C. Solo Applicant..........................................................................................................122

D. Denied or Decreased Funding...................................................................................122

E. Consolidated Plan Certification.................................................................................124

F. Appeals Submission..................................................................................................125

VIII. AGENCY CONTACT .............................................................................................126

C. General Clarification. ...............................................................................................126

IX. OTHER INFORMATION ..........................................................................................127

Appendix....................................................................................................................128

Community Planning and Development
FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth
Homeless Demonstration Program Grants

**Funding Opportunity Number:**
FR-6800-N-25

**Assistance Listing Number (formerly CFDA Number):**
14.267

**Due Date for Applications:**
08/29/2025

The U.S. Department of Housing and Urban Development (HUD) issues this Notice of Funding
Opportunity (NOFO) to invite applications from eligible applicants for the program and purpose
described within this NOFO. You, as a prospective applicant, should carefully read all
instructions in all sections to avoid sending an incomplete or ineligible application. HUD funding
is highly competitive. Failure to respond accurately to any submission requirement could result
in an incomplete or noncompetitive proposal.

In accordance with Title 24 part 4, subpart B of the Code of Federal Regulations (CFR), during
the selection process (which includes HUD's NOFO development and publication and concludes
with the award of assistance), HUD is prohibited from disclosing covered selection information.
Examples of impermissible disclosures include: 1) information regarding any applicant's relative
standing; 2) the amount of assistance requested by any applicant; and 3) any information

Page 2 of 128

**Suppl. App. 90**

contained in the application. Prior to the application deadline, HUD may not disclose the identity of any applicant or the number of applicants who have applied for assistance.

For further information regarding this NOFO, direct questions regarding the specific requirements of this NOFO to the agency contact identified in Section VIII.

**Paperwork Reduction Act Statement.** The information collection requirements in this notice were approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. §§ 3501- 3520) (PRA). In accordance with the PRA, HUD may not conduct or sponsor, and a person is not required to respond to a collection of information unless the collection displays a valid OMB control number. This NOFO identifies the applicable OMB control number, unless the collection of information is excluded from these requirements under 5 CFR part 1320.

**OMB Control Number(s):**
2506-0112

# I. FUNDING OPPORTUNITY DESCRIPTION

# A. Program Description

The Continuum of Care (CoC) Program is designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, States, Indian Tribes or Tribally Designated Housing Entities [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)], and local governments to quickly rehouse individuals and families experiencing homelessness, persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, and youth experiencing homelessness while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs by homeless individuals and families, and to optimize self-sufficiency among those experiencing homelessness.

The goal of the Youth Homelessness Demonstration Program (YHDP) is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness and sharing that experience with and mobilizing communities around the country toward the same end. The population to be served by the demonstration program is youth ages 24 and younger who are experiencing homelessness, including unaccompanied and pregnant or parenting youth.

**1. Authority**

The CoC Program is authorized by subtitle C of title IV of the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act), and the CoC Program rule found in 24 CFR part 578 (the Rule).

The FY 2024 funds are authorized by the Consolidated Appropriations Act, 2024 (Public Law 118-42, approved March 9, 2024). The noncompetitive or competitive renewal or replacement of YHDP grants under the CoC program, and HUD's authority to issue a 2-year NOFO are authorized by the Consolidated Appropriations Act, 2024 and any FY 2025 funding will be authorized by a FY 2025 Congressional Appropriation.

**Suppl. App. 91**

**2. Deadline.**

This NOFO establishes two deadlines for submitting applications to HUD for the FY 2024 - FY 2025 CoC Program Competition and the Renewal and Replacement of YHDP grants. The deadline to submit CoC Consolidated applications and project applications for FY 2024 funds is 8:00 PM EDT on October 30, 2024. Applicants must complete and submit their applications in *e-snaps* at **https://esnaps.hud.gov/**. See Sections IV.F and G of this NOFO for application submission and timely receipt requirements.

CoC and YHDP Renewal grants that do not meet the renewal eligibility requirements for FY 2024 funding but are eligible for renewal when FY 2025 Congressional Appropriations are made available, must submit applications for FY 2025 funding by the application submission deadline of 8:00 PM EDT on August 29, 2025. Applicants with CoC projects that wish to reallocate eligible renewal projects and create new projects in the FY 2025 funding process must also submit those applications for reallocation by the application submission deadline of 8:00 PM EDT on August 29, 2025. Applicants with YHDP Projects that expire in CY 2025 may non-competitively renew or replace those projects and must submit an application by 8:00 PM EDT on August 29, 2025.

HUD may also amend this NOFO if necessary to make additional funds available.

**3. Changes from Previous NOFO**

**a. Changes to Tiering**. Tier 1 is set at 90 percent of the CoC's Annual Renewal Demand (ARD).

**b. 2-Year NOFO**. The Consolidated Appropriations Act, 2024 authorizes HUD to issue a single 2-year NOFO for fiscal years 2024 and 2025.

The application and selection process for the FY 2024 funds awarded through this NOFO (the FY 2024 CoC Program and YHDP funds) will proceed much like it has in prior-year competitions. However, CoCs are only required to submit one CoC application that will be applicable to the FY 2024 and FY 2025 funds. HUD reserves the right to award available FY 2025 funds (the FY 2025 CoC program and YHDP funds) based on this NOFO competition. Projects that are awarded FY 2024 funds may be eligible for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds. CoC and YHDP renewal projects expiring in CY 2025 (January 1, 2025, and ending December 31, 2025) are eligible to be renewed with FY 2024 CoC and YHDP funds. Projects that will be eligible for renewal with FY 2025 CoC Program and YHDP funds must have an expiration date in CY 2026 (January 1, 2026, and ending December 31, 2026). Should there not be sufficient appropriated amounts to fully fund all FY 2025 renewal grants, grant amounts may be reduced proportionately. If new competitive funding becomes available for FY 2025, this NOFO may be amended and the FY 2024 - 2025 CoC Application and score may be used for the FY 2025 application selection process. Applications for FY 2025 eligible CoC and/or YHDP renewal projects and new projects created through CoC and/or DV reallocation or YHDP replacement, must be submitted in e-snaps by the application submission deadline for FY 2025 CoC and YHDP funds on August 29, 2025. HUD also reserves the right to modify this NOFO or issue a supplemental FY 2025 CoC and YHDP NOFO if necessary (e.g., to accommodate a new CoC or YHDP priority or new funding source).

Suppl. App. 92

**c. Funding for Specific Subpopulations.** The House and Senate Committees on Appropriations expressed that for projects awarded for specific subpopulations (e.g., homeless youth or survivors of domestic violence, dating violence, sexual assault or stalking), before funding for such projects may be reallocated to other populations, HUD must consult with relevant stakeholders. For the FY 2024 funds, HUD requires funding reallocated from projects previously funded with YHDP or DV Bonus funding to be used for projects serving the same subpopulation. Therefore, prior to executing the reallocation of any project, HUD strongly recommends reviewing the Grant Inventory Worksheets (GIWs) published on the CoC Program Competitions page on the HUD.gov website to determine the type of new projects that can be created with reallocated funding intended for the specific subpopulations.

**d. DV Reallocation and YHDP Replacement.** In this NOFO, HUD has expanded reallocation to include DV Reallocation and has expanded the definition of YHDP Replacement to include YHDP Reallocation. HUD establishes these terms to distinguish between funding sources that must continue to serve the same populations of the projects being reallocated or, in the case of YHDP, replaced.

> **(1) *DV Reallocation Applications.*** HUD is establishing a definition of DV reallocation to implement a congressional directive that requires projects previously funded using DV Bonus funds to continue to serve the same population, even when projects are reallocated. CoCs may reallocate eligible Renewal projects that were previously funded, in whole or in part, with DV Bonus funding to create DV Reallocation projects that are dedicated to serving the same population. New DV Reallocation projects must be 100 percent dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act [see sections I.B.2.b.(24) and III.B.4.a.(4) of this NOFO for more information].

> **(2)*YHDP Replacement definition changes.*** Language allowing HUD to competitively or noncompetitively renew or replace YHDP projects allows for reallocation of YHDP projects. HUD is allowing YHDP recipients to reallocate YHDP grants to increase the flexibility of the YHDP program. In this NOFO, CoCs may now submit applications for YHDP Replacement projects by:

>> **(a)** reallocating a YHDP Renewal project with a new YHDP Replacement project that has the same recipient (in this NOFO this is referred to as a YHDP Replacement project);

>> **(b)** reallocating YHDP Renewal project(s) to create one or more YHDP Reallocation projects with a new recipient, so long as the YHDP renewal project(s) being reallocated have already renewed in a prior CoC Program competition. In this NOFO, this is referred to as YHDP Reallocation projects [See sections I.B.2.b.(32), and III.B.4.a.(5) of this NOFO for more information]; and

>> **(c)** reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process.

**e. Special YHDP Activities.** In the FY 2024 – 2025 CoC NOFO, YHDP Renewal projects and YHDP Replacement projects (including YHDP Reallocation) may include requests to include special YHDP activities, subject to the requirements in section III.B.4.b.(5) of this NOFO.

Page 5 of 128

**f. Cost of Living Adjustments for Conditionally Selected Grants.** The Consolidated Appropriations Act, 2024 authorizes HUD to make reasonable cost of living adjustments to renewal amounts to help afford increasing cost of operations due to inflation. See section V.D below.

**4. HUD's Strategic Planning Goals and Homelessness Policy Priorities**

**a. HUD Strategic and Other Goals**

HUD's Strategic Plan sets the direction and focus of our programs and staff to create strong, sustainable, inclusive communities and quality, affordable homes for all. This NOFO supports HUD's Strategic Plan for Fiscal Years (FY) 2022-2026 to accomplish HUD's mission and vision. Each of the five goals in the Strategic Plan includes what HUD hopes to accomplish, the strategies to accomplish those objectives, and the indicators of success.

HUD will pursue two overarching priorities focused on increasing equity and improving customer experience across all HUD programs. Five strategic goals and several objectives undergird the Plan; however, the following goals are applicable to this NOFO:

**Applicable Goals and Objectives from HUD's Strategic Plan**
**Strategic Goal 1: Support Underserved Communities**
Fortify support for underserved communities and support equitable community development for all people.

**1A: Advance Housing Justice**
Fortify support for vulnerable populations, underserved communities, and Fair Housing enforcement.

**1B: Reduce Homelessness**
Strengthen Federal, State, Tribal, and community implementation of the Housing First approach to reducing the prevalence of homelessness, with the ultimate goal of ending homelessness.

**1C: Invest in the Success of Communities**
Promote equitable community development that generates wealth-building for underserved communities, particularly for communities of color.

**Strategic Goal 2: Ensure Access to and Increase the Production of Affordable Housing**
Ensure housing demand is matched by adequate production of new homes and equitable access to housing opportunities for all people.

**2A: Increase the Supply of Housing**
Enhance HUD's programs that increase the production and supply of housing across the country.

**2B: Improve Rental Assistance**
Improve rental assistance to address the need for affordable housing.

**Strategic Goal 3: Promote Homeownership**
Promote homeownership opportunities, equitable access to credit for purchase and improvements, and wealth-building in underserved communities.

**3A: Advance Sustainable Homeownership**
Advance the deployment of tools and capital that put sustainable homeownership within reach.

**Suppl. App. 94**

**3A – Major Initiative: Expand Homeownership Opportunities**
Promote financing for innovative ownership models to increase the availability of affordable housing.

**3B: Create a More Accessible and Inclusive Housing Finance System**
Advance new policy, programs, and modernization initiatives that support a more equitable housing finance system. Promote the preservation and creation of affordable housing stock.

**Strategic Goal 4: Advance Sustainable Communities**
Advance sustainable communities by strengthening climate resilience and energy efficiency, promoting environmental justice, and recognizing housing's role as essential to health.

**4A: Guide Investment in Climate Resilience**
Invest in climate resilience, energy efficiency, and renewable energy across HUD programs.

**4B: Strengthen Environmental Justice**
Reduce exposure to health risks, environmental hazards, and substandard housing, especially for low-income households and communities of color.

**4C: Integrate Health and Housing**
Advance policies that recognize housing's role as essential to health.

You are expected to align your application to the applicable strategic goals and objectives below. Use the information in this section to describe in your application the specific goals, objectives, and measures that your project is expected to help accomplish. If your project is selected for funding, you are also expected to establish a plan to track progress related to those goals, objectives, and measures. HUD will monitor compliance with the goals, objectives, and measures in your project.

**b. HUD Homeless Policy Priorities**

This section provides additional context regarding the selection criteria found in section V.B. of this NOFO and is included here to help applicants better understand how the selection criteria support the goal of ending homelessness:

> **(1)** *Ending homelessness for all persons.* In 2023, the United States Interagency Council on Homelessness (USICH) presented All In: The Federal Strategic Plan to Prevent and End Homelessness to the President and Congress. The plan is built around six pillars: three foundations — equity, data and evidence, and collaboration — and three solutions — housing and supports, crisis response, and prevention. The work funded through this NOFO will support the actions and strategies proposed within the pillars. To end homelessness, CoCs should identify, engage, and effectively serve all persons experiencing homelessness. CoCs should measure their performance based on local data that consider the challenges faced by all subpopulations experiencing homelessness in the geographic area (e.g., veterans, youth, families, older adults, those experiencing chronic homelessness, and people with disabilities, including those living with HIV/AIDS). CoCs should partner with housing, health care, and supportive services providers and agencies to expand housing options, such as permanent supportive housing, housing subsidies, and rapid rehousing. Additionally, CoCs should use local data to determine the characteristics of individuals and families with the highest needs and longest periods experiencing homelessness to develop housing and supportive services tailored to their needs.

**Suppl. App. 95**

**(2)** *Use a Housing First approach.* Housing First prioritizes rapid placement and stabilization in permanent housing and utilizes housing as a platform for providing supportive services that improve a person's health and well-being. CoC Program funded projects should help individuals and families move quickly into permanent housing without preconditions and ensure that participants can choose the services they need to improve their health and well-being and remain in their housing. Additionally, CoCs should engage landlords and property owners to identify housing units available for rapid rehousing and permanent supportive housing participants, remove barriers to entry, and adopt client-centered service practices. HUD encourages CoCs to assess how well Housing First approaches are being implemented in their communities.

**(3)** *Reducing Unsheltered Homelessness.* In recent years, the number of people experiencing unsheltered homelessness has risen significantly, including a rising number of encampments in many communities across the country. People living unsheltered have high rates of physical and mental health challenges, including substance use disorders. CoCs should explore all available resources, including CoC and ESG funded assistance, housing subsidies, health care programs, and other supportive services to help improve unsheltered people's well-being and help them move as quickly as possible to permanent housing. CoCs should work with law enforcement and their state and local governments to enlist their support for housing people residing in encampments, and to avoid practices that criminalize homelessness. Criminalization of homelessness risks the health of people living unsheltered and makes it more difficult for them to move into permanent housing. Additionally, CoCs should use their Coordinated Entry process to promote participant choice, coordinate homeless assistance and mainstream housing and services, and ensure people experiencing homelessness receive assistance quickly.

**(4)** *Improving System Performance.* CoCs should be assessing the performance of all homelessness projects using system performance measures (e.g., average length of homeless episodes, rates of return to homelessness, rates of exit to permanent housing destinations). CoCs should review all projects eligible for renewal under this FY 2024 – 2025 CoC NOFO to determine their effectiveness in serving people experiencing homelessness, including their cost-effectiveness. The CoC Competition includes several options to help CoCs improve their effectiveness, including reallocation, expansion, and transition grants, and CoC's should take advantage of these options to improve their overall performance. CoCs should also look for opportunities to implement continuous quality improvement and other process improvement strategies.

**(5)** *Partnering with Housing, Health, and Service Agencies.* Using cost performance and outcome data, CoCs should improve how all available resources are utilized to end homelessness. HUD encourages CoCs to maximize the use of mainstream and other community-based resources when serving persons experiencing homelessness and should:

> **(a)** Work closely with health care systems and agencies and assist program participants to obtain health care and supportive services, including behavioral health services, including those covered and financed by Medicaid. In addition, CoCs should develop close partnerships with public health agencies to analyze data and design approaches that reduce homelessness, improve the health of people experiencing homelessness, and prevent and address disease outbreaks, including HIV/AIDS.

Page 8 of 128

**(b)** Partner closely with PHAs and state and local housing organizations to utilize coordinated entry, develop housing units, and provide housing assistance to people experiencing homelessness. These partnerships can also help CoC Program participants exit permanent supportive housing through Housing Choice Vouchers and other available housing options. CoCs and PHAs should especially work together to implement targeted programs such as HUD-VASH, Mainstream Vouchers, Family Unification Program (FUP) Vouchers, Fostering Youth Independence (FYI) Vouchers, and other housing voucher programs targeted to people experiencing homelessness. CoCs should coordinate with their state and local housing agencies on the utilization of new program resources provided through the Homelessness Assistance and Supportive Services Program (HOME-ARP) that was created through the American Rescue Plan. CoCs should also work with organizations administering other housing assistance, such as assistance provided through HUD's Section 202 and 811 programs, HUD's Project Based Rental Assistance, and U.S. Department of Agriculture's housing assistance programs.

**(c)** Partner with local workforce development centers to improve employment opportunities.

**(d)** Work with Tribal organizations to ensure that Tribal members can access CoC-funded assistance when a CoC's geographic area borders a Tribal area.

**(6)** *Racial Equity.* In nearly every community, Black, Indigenous, and other people of color are substantially over-represented in the homeless population. In this NOFO, HUD is emphasizing system and program changes to address racial equity within CoCs and projects. Responses to preventing and ending homelessness should address racial inequities to ensure successful outcomes for all persons experiencing homelessness using proven approaches, such as: partnering with a racially diverse set of community partners and people experiencing homelessness and partnering with organizations with experience serving underserved populations. CoCs should review local data, policies, procedures, and processes to identify barriers that result in racial disparities and take steps to eliminate barriers to improve racial equity and to address disparities.

**(7)** *Improving Assistance to LGBTQ+ Individuals.* Discrimination on the basis of gender identity or sexual orientation manifests differently for different individuals and often overlaps with other forms of prohibited discrimination. CoCs should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes. Additionally, when considering which projects to select in their local competition to be included in their application to HUD, CoCs should ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation. CoCs should also partner with organizations with expertise in serving LGBTQ+ populations.

**(8)** *Persons with Lived Experience/Expertise.* The people who know best what solutions will effectively end homelessness are those who are experiencing homelessness. HUD expects CoCs to include people with lived homeless expertise and experience in their local planning and decision-making processes. People with lived experience/expertise should determine how local policies may need to be revised and updated to improve the effectiveness of homelessness assistance programs, including participating in planning and

Page 9 of 128

Suppl. App. 97

oversight activities, developing local competition processes, monitoring and evaluation. CoC leaders and community partners should prioritize hiring people who have experienced homelessness in areas where their expertise is needed.

**(9) *Building an Effective Workforce.*** Homeless assistance providers need effective, well-supported staff to provide high quality assistance. Unfortunately, recruiting and retaining qualified staff for programs to assist persons experiencing homelessness has proven difficult due to low pay and the challenging nature of the work. To address this issue, HUD is applying cost of living adjustments to supportive service activities and other staffing-focused budget lines to allow CoC budgets to better keep up with rising costs. HUD also encourages CoCs to work with their funders and other community stakeholders to improve pay and support for people who work in the homelessness sector.

**(10) *Increasing Affordable Housing Supply.*** The lack of affordable housing is the main driver of homelessness. CoCs play a critical role in educating local leaders and stakeholders about the importance of increasing the supply of affordable housing and the specific consequences of the continued lack of affordable housing. CoCs should be communicating with jurisdiction leaders, including for the development of Consolidated Plans, about the harmful effects of the lack of affordable housing, and they should engage local leaders about steps such as zoning and land use reform that would increase the supply of affordable housing. This NOFO awards points to CoCs that take steps to engage local leaders about increasing affordable and accessible housing supply.

## B. Definitions and CoC Program Concepts

### 1. Standard Definitions

**Affirmatively Furthering Fair Housing (AFFH)** means taking meaningful actions, in addition to combating discrimination, to overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics. Specifically, affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunities, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially and ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws. The duty to affirmatively further fair housing extends to all program participant's activities and programs relating to housing and urban development. See 24 CFR 578.93(c) for specific Affirmatively Furthering Fair Housing requirements that apply to the CoC program.

**Assistance Listing Number** refers to the unique number assigned to each Federal assistance program publicly available in the Assistance Listing, which is managed and administered by the General Services Administration. The Assistance Listing number was formerly known as the Catalog of Federal Domestic Assistance (CFDA) number.

**Deficiency**, with respect to the making of an application for funding, is information missing or omitted within a submitted application. Examples of deficiencies include missing documents, missing or incomplete information on a form, or some other type of unsatisfied information requirement. Depending on specific criteria, a deficiency may be either Curable or Non-Curable.

*(1) A Curable Deficiency* is missing or incomplete application information that may be corrected by the applicant with timely action. To be curable, the deficiency must:

- not be a threshold requirement, except for documentation of applicant eligibility;
- not influence how an applicant is ranked or scored versus other applicants; and
- be remedied within the time frame specified in the notice of deficiency.

*(2) A Non-Curable Deficiency* is missing or incomplete application information that cannot be corrected by an applicant after the submission deadline. A non-curable deficiency is a deficiency that is a threshold requirement, or a deficiency that, if corrected, would change an applicant's score or rank versus other applicants. If an application includes a non-curable deficiency, the application may receive an ineligible determination, or the non-curable deficiency may otherwise adversely affect the application's score and final funding determination.

**Eligibility requirements** are mandatory requirements for an application to be eligible for funding.

**Environmental Justice** means investing in environmental improvements, remedying past environmental inequities, and otherwise developing, implementing, and enforcing environmental laws and policies in a manner that advances equity and provides meaningful involvement for people and communities that have been environmentally underserved or overburdened, such as Black and Brown communities, indigenous groups, and individuals with disabilities. This definition does not alter the requirements under HUD's regulations at 24 CFR 58.5(j) and 24 CFR 50.4(l) implementing Executive Order 12898.  E.O. 12898 requires consideration of how Federally assisted projects may have disproportionately high and adverse human health or environmental effects on minority and/or low-income populations. For additional information on environmental review compliance, refer to: https://www.hud.gov/program_offices/comm_planning/environment_energy/regulations.

**Equity** has the meaning given to that term in Section 2(a) of Executive Order 13985 and means the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality.

**Federal award** has the meaning, depending on the context, in either paragraphs (1) or (2) of this definition:

(1)

(a) The Federal financial assistance that a recipient receives directly from a Federal awarding agency or indirectly from a pass-through entity, as described in 2 CFR 200.101; or

(b) The cost-reimbursement contract under the Federal Acquisition Regulations that a non- Federal entity receives directly from a Federal awarding agency or indirectly from a pass- through entity, as described in 2 CFR 200.101.

Page 11 of 128

**Suppl. App. 99**

(2) The instrument setting forth the terms and conditions. The instrument is the grant agreement, cooperative agreement, other agreement for assistance covered in paragraph (2) of the definitions of Federal financial assistance in 2 CFR 200.1, and this NOFO, or the cost-reimbursement contract awarded under the Federal Acquisition Regulations.

(3) Federal award does not include other contracts that a Federal agency uses to buy goods or services from a contractor or a contract to operate Federal Government owned, contractor operated facilities (GOCOs).

(4) See also definitions of Federal financial assistance, grant agreement, and cooperative agreement in 2 CFR 200.1.

**Federal financial assistance** has the same meaning defined at 2 CFR 200.1.

**Grants.gov** is the website serving as the Federal government's central portal for searching and applying for Federal financial assistance throughout the Federal government. Although the CoC Program NOFO is officially posted on Grants.gov, registration on Grants.gov is not required for submission of applications for this NOFO. This program only accepts applications submitted in *e-snaps*, an electronic application system.

**Primary Point of Contact (PPOC)** is the person who has the authority to submit the CoC Registration and the CoC's Consolidated Application on behalf of the CoC.

**Racial Equity** is the elimination of racial disparities, and is achieved when race can no longer predict opportunities, distribution of resources, or outcomes – particularly for Black and Brown persons, which includes Black, Latino, Indigenous, Native American, Asian, Pacific Islander, and other persons of color.

**System for Award Management (SAM)** is the Federal Repository into which an entity must provide information required for the conduct of business as a recipient. Registration with SAM is required for submission of applications via *e-snaps*. You can access the website at https://www.sam.gov/SAM/. There is no cost to use SAM.

**Threshold Requirements** are eligibility and quality requirements that must be met for an application to be reviewed, rated, and ranked. Threshold requirements are not curable, except for documentation of applicant eligibility and are listed in Section III.C.4. Similarly, there are eligibility requirements under Section III.A.

**Underserved Communities** has the meaning given to that term in Section 2(b) of Executive Order 13985 and refers to populations sharing a particular characteristic, as well as geographic communities, that have been systematically denied a full opportunity to participate in aspects of economic, social, and civic life, as exemplified by the list in the definition of "equity" above.

**Unique Entity Identifier (UEI)** means the identifier assigned by SAM to uniquely identify business entities. As of April 4, 2022, the Federal government has transitioned from the use of the DUNS Number to the use of UEI, as the primary means of entity identification for Federal awards government-wide.

## 2. Program-Specific Definitions and Concepts

Regulatory citations are provided below so applicants can refer to specific areas of the Rule. Projects awarded CoC Program funds are subject to the program regulations as they may be

**Suppl. App. 100**

amended from time to time. However, YHDP Renewal and YHDP Replacement projects and awards are subject to CoC Program regulations except as otherwise provided in this NOFO [see section I.B.3.e].

The definitions and concepts contained in this section include terms that are important for all applicants to understand in order to complete all parts of the FY 2024 - 2025 CoC Consolidated Application in e-snaps on behalf of the CoC.

**a. Definitions from 24 CFR 578.3.** The following terms are defined in 24 CFR 578.3. Applicants must refer to the Rule for the definitions contained in this section.

**(1)** Annual Renewal Amount (ARA)
**(2)** Applicant
**(3)** Centralized or Coordinated Assessment System
**(4)** Chronically Homeless
**(5)** Collaborative Applicant
**(6)** Continuum of Care
**(7)** Consolidated Plan
**(8)** High Performing Community (HPC)
**(9)** Homeless Management Information System (HMIS)
**(10)** HMIS Lead
**(11)** Homeless. - Although not reflected in the regulation, section 605 of Violence Against Women Act Reauthorization Act of 2022 amended Section 103(b) of the Act and requires HUD to consider certain individuals and families as homeless. This amendment took effect on October 1, 2022. Notwithstanding anything to the contrary contained elsewhere in this NOFO, where 578.3 paragraph (4) is referenced, applicants may apply to serve the population as defined in Section 103(b) of the Act.
**(12)** Permanent Housing
**(13)** Permanent Supportive Housing
**(14)** Private Nonprofit Organization
**(15)** Program Participant
**(16)** Project
**(17)** Recipient
**(18)** Subrecipient
**(19)** Transitional Housing
**(20)** Unified Funding Agency
**(21)** Victim Service Provider

**b. CoC Program NOFO Concepts.** The following terms are not found in 24 CFR 578.3 but are used in other areas of the Rule or are used in this NOFO to define concepts that pertain specifically to the FY 2024 - 2025 CoC Consolidated Application.

**(1)** *Annual Renewal Demand (ARD) (24 CFR 578.17(b)(2)).* The total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items (BLIs) based on FMR changes. HUD will calculate the ARD by combining the total amount of funds requested by eligible renewal projects in each FY funding opportunity, including:

Page 13 of 128

**Suppl. App. 101**

**(a)** renewal projects approved and ranked on the Renewal Project Listing;

**(b)** renewal project amount(s) that were reallocated as recorded on the reduced or eliminated reallocation forms of the CoC Priority Listing;

**(c)** YHDP renewal projects on the YHDP Renewal Project Listing; and

**(d)** YHDP Replacement projects, including YHDP Reallocation projects, on the YHDP Reallocation and Replacement Project Listing. YHDP Replacement projects are eligible for funding through the replacement of YHDP Renewal projects. The YHDP Replacement application must request the same amount of funding that is eligible for YHDP Renewal.

**(2)** ***Beds Dedicated to Chronically Homeless Individuals and Families.*** A permanent supportive housing bed that is dedicated specifically for use by individuals and families experiencing chronic homelessness [see 24 CFR 578.3 definition of Chronically Homeless] within a CoC's geographic area, as reported in the CoC's housing inventory count (HIC) and permanent housing (PH) project applications. When a program participant exits the project, the bed must be filled by another participant who is experiencing chronic homelessness unless there are no persons experiencing chronic homelessness within the CoC's geographic area. This concept only applies to PSH projects.

**(3)** ***CoC Bonus Project.*** The CoC Bonus allows CoCs to use up to 12 percent of their Final Pro Rata Need (FPRN) to create one or more new project applications. New projects created through the CoC Bonus must meet the project eligibility and project quality threshold requirements established by HUD in sections III.C.4.a. and b. of this NOFO. To be eligible to receive a CoC Bonus project, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.2.b of this NOFO.

**(4)** ***CoC Merger.*** The CoC merger is a process where two or more CoCs voluntarily agree to merge the entire geographic areas of all CoCs into one larger CoC. HUD strongly encourages CoCs that struggle with capacity to merge with a neighboring CoC or Balance of State CoC during each fiscal year's CoC Program Registration process. To encourage CoC mergers and mitigate the potential adverse scoring implications that may occur when a high performing CoC merges with one or more lower-performing CoC(s), HUD will award up to 25 bonus points to the FY 2024 - 2025 CoC Application Score for CoCs that registered as a merged CoC during the FY 2024 CoC Program Registration process. The minimum number of points awarded will be 5 with the maximum points awarded up to 25.

To be eligible for these points, the merged CoC must include all the geographic areas previously included in two or more CoCs that received funding in the FY 2023 CoC Program Competition. Points will be awarded as follows:

**(a)** 5 bonus points to CoCs that merged;

**(b)** 10 bonus points to CoCs where one or more of the merging CoCs had a CoC Application score of 140 points or lower in either the FY 2022 or FY 2023 CoC Program Competitions; and

**Suppl. App. 102**

**(c)** 10 bonus points to CoCs that demonstrate that the results of their Point-in-Time counts were affected by the changes in methodology that resulted from the merger in a way that would affect their CoC score.

**(5)** *DedicatedPLUS Project.* A PSH project where 100 percent of the beds are dedicated to serve individuals, households with children, and unaccompanied youth (including pregnant and parenting youth) that at intake meet one of the following categories:

**(a)** experiencing chronic homelessness, meaning they qualify as "chronically homeless" as defined in 24 CFR 578.3;

**(b)** residing in a TH project that will be eliminated and meets the definition of chronically homeless in effect at the time in which the individual or family entered the TH project;

**(c)** residing in a place not meant for human habitation, emergency shelter, or Safe Haven and had been admitted and enrolled in a PH project within the last year but were unable to maintain a housing placement and met the definition of chronically homeless as defined by 24 CFR 578.3 prior to entering the project;

**(d)** residing in transitional housing funded by a Joint TH/PH-RRH component project and who were experiencing chronic homelessness as defined by 24 CFR 578.3;

**(e)** residing and has resided in a place not meant for human habitation, Safe Haven, or emergency shelter for at least 12 months in the last three years, but has not done so on four separate occasions and the individual or head of household meet the definition of 'homeless individual with a disability; or

**(f)** receiving assistance through a Department of Veterans Affairs (VA)-funded homeless assistance program and met one of the above criteria at initial intake to the VA's homeless assistance system.

A renewal project where 100 percent of the beds were dedicated to individuals and families experiencing chronic homelessness, as described in section I.B.2.b.(2), under the grant that is being renewed may either be reallocated as a DedicatedPLUS project or may continue as a renewal dedicating 100 percent of its beds to individuals and families experiencing chronic homelessness. If the project is reallocated as a DedicatedPLUS project, the project must adhere to all fair housing requirements at 24 CFR 578.93.

Projects HUD awarded as DedicatedPLUS in a previous CoC Program Competition must continue to include households with children to qualify as a DedicatedPLUS project in the FY 2024 - 2025 CoC Program Competition.

**(6)** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus).* A new project that is dedicated to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under the paragraphs (1) or (4) of definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. As described in paragraph (13) below, survivors of human trafficking may qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act because they are often also victims of

Page 15 of 128

**Suppl. App. 103**

domestic violence, dating violence, sexual assault, or stalking, however, a DV Bonus project may not exclusively serve people fleeing or attempting to flee human trafficking. New DV Bonus projects are subject to the limitation on new projects in section I.B.3.a.(1) of this NOFO. CoCs may apply for DV Bonus projects where the total amount for one year of funding for all DV Bonus applications is up to 15 percent of its Preliminary Pro Rata Need (PPRN); however, this amount is limited to:

(a) a minimum of $50,000 if 15 percent of the CoC's PPRN is less than $50,000; or

(b) a maximum of $5 million if 15 percent of the CoC's PPRN is more than $5 million.

See sections I.B.3.j and I.B.2.b.(6) of this NOFO for project application requirements and how DV Bonus projects will be reviewed and selected.

(see definition of PPRN in section I.B.3.u. below)

(7) *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Renewal Projects (DV Renewal Projects)*. Are eligible renewal projects that were originally funded with DV Bonus funding or were at some point expanded using DV Bonus funding and continue to serve the same population.

(8) *Eligible Renewal Project.* Consists of YHDP, CoC and DV projects eligible to renew under this NOFO. An eligible FY 2024 renewal project must have an expiration date in CY 2025 (between January 1, 2025 and December 31, 2025) and eligible FY 2025 renewal projects must have an expiration date in CY 2026 (between January 1, 2026, and December 31, 2026). Renewal project applications must be submitted by the same recipient operating the project. See section III.B.4.c for more information on renewal projects.

In cases where an expiring grant agreement is amended to have a new recipient after a renewal application is submitted, the new recipient will be eligible to receive the renewal award (Section VI.A.4).

(9) *Expansion.* The process used by eligible renewal project applicants to add funds to an existing CoC Renewal, DV Renewal or YHDP Renewal project to expand its current operations either through reallocation, DV Bonus or a CoC Bonus project application. Project applicants may expand their current project by adding units, beds, persons served, services provided to existing program participants, or in the case of HMIS, increase the current HMIS activities within the CoC's geographic area. Applications to expand YHDP Renewal projects through the YHDP Replacement process can only be funded with funding reallocated from another YHDP Renewal project. For more information on expansion applications see section III.B.4.a(6) of this NOFO.

(10) *Final Pro Rata Need (FPRN) (24 CFR 578.17(b)(3)).* The higher of PPRN or ARD for the Continuum of Care is the FPRN, which is the base for the maximum award amount for projects within the CoC.

(11) *Formula Area.* Defined in the Indian Housing Block Grant Program at 24 CFR 1000.302.

(12) *Grant Consolidation.* The process by which two or more projects eligible for renewal under this NOFO apply for funding and are combined into a single renewal project upon award. See sections I.B.3.d and III.B.4.a.(7) of this NOFO for additional information.

**Suppl. App. 104**

**(13)** *Homelessness and Human Trafficking.* HUD is clarifying that persons who are fleeing or attempting to flee human trafficking may qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and may be eligible for certain forms of homeless assistance under the CoC Program, subject to other restrictions that may apply. HUD considers human trafficking, including sex trafficking, to be "other dangerous or life-threatening conditions that relate to violence against the individual or family member" under paragraphs (1) and (4) of the definition of homeless at 24 CFR 578.3 and "other dangerous, traumatic, or life-threatening conditions related to the violence against the individual or a family member in the individual's or family's current housing situation" under section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(14)** *Host Home and Kinship Care.* Host Home and Kinship Care is limited to YHDP Renewal and replacement grants. This is a model of housing where a family agrees to permit a youth program participant to reside with them. Recognizing the addition of another person in the home may increase costs to the family, HUD will consider YHDP Replacement project applications that propose to house youth with families and subsidize the additional costs attributable to housing the youth, including recruitment of hosts. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination for HUD review upon request. The residence is in a community-based setting and the family may be related to youth program participants with a time-limited or unlimited length of stay.

**(15)** *Housing First.* A model of housing assistance that prioritizes rapid placement and stability in permanent housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services. Transitional Housing and Supportive Services Only projects are considered to be using a Housing First model for the purposes of this NOFO if they operate with low barriers; work to quickly move people into permanent housing; do not require participation in supportive services for continued tenancy, occupancy, or participation in the project; and, for Transitional Housing projects, do not require preconditions for moving into the transitional housing (e.g., sobriety or minimum income threshold) but do provide or assist with access to such supportive services. Additional information regarding Housing First is in section I.A.4.b.(2) of this NOFO.

**(16)** *Housing Inventory Count (HIC).* A complete listing of the CoC's HUD and non-HUD funded beds dedicated to individuals and families experiencing homelessness in the CoC's geographic area.

**(17)** *Indian Tribe.* A federally recognized Tribe or a State recognized Tribe as defined in Section 4 of NAHASDA (25 U.S.C. 4103).

**(18)** *Joint TH/PH-RRH Component Project.* The Joint TH/PH-RRH component project combines two existing program components – Transitional Housing and Permanent Housing-Rapid Rehousing – in a single project to serve individuals and families experiencing homelessness. The recipient must adopt a Housing First approach [see sections I.A.4.b.(2) and I.B.2.b.(15) of this NOFO] across the entire project and program participants may only

receive up to 24-months of total assistance. For more information about Joint TH/PH-RRH component project quality threshold requirements, see section III.C.4.b. of this NOFO.

If funded, HUD will limit eligible costs as follows, in addition to other limitations found in the Rule:

(a) leasing of a structure or units, and operating costs to provide transitional housing;

(b) short- or medium-term tenant-based rental assistance on behalf of program participants to pay for the RRH portion of the project;

(c) supportive services;

(d) costs of contributing data to the HMIS; and

(e) project administrative costs.

Project applicants must provide details in the project description of how TH and PH-RRH assistance will be provided. Additionally, if CoC Program funds are not being requested for both TH and PH-RRH units, the project application must describe and include the number of the project's TH and PH-RRH units that will be paid for from another funding source. Applicants may only use CoC Program Leasing funds or non-CoC Program Funds to house program participants enrolled in the TH portion of the project.

When a program participant is enrolled in a Joint TH/PH-RRH component project, the recipient or subrecipient must be able to provide both components, including the units supported by the TH component and the tenant-based rental assistance and services provided through the PH-RRH component, to all participants. A program participant may choose to receive only the assistance provided through the TH portion of the project or the assistance provided through the PH-RRH component, but the recipient or subrecipient must make both types of assistance available.

**(19)** *Non-Dedicated Permanent Supportive Housing Beds.* Permanent Supportive Housing beds within a CoC's geographic area that are not currently classified as dedicated for use by chronically homeless individuals and families or as DedicatedPLUS.

**(20)** *Project Applicants.* Eligible project applicants for the CoC Program are identified in section III.A.4 of this NOFO. For-profit entities are ineligible. HUD will not review applications submitted by ineligible entities.

**(21)** *Preliminary Pro Rata Need (PPRN).* The amount of funds a CoC could receive based upon the geographic areas included by the CoC as part of their geography and reviewed by HUD during the CoC Program Registration process. To determine the amount of funding available for each geographic area, HUD will use the formula defined in section IV.B.7 of CPD-22-02: CoC Program Registration Notice.

**(22)** *Racial Disparities.* Racial disparities are differences in the population of persons experiencing homelessness based on race or ethnicity, which includes individuals who are Black, Latino, Indigenous, Native American, Asian, Pacific Islander, and other persons of color relative to the general population or differences in the provision or outcomes of homelessness assistance based on race or ethnicity.

Page 18 of 128

**Suppl. App. 106**

**(23)** *Rapid Rehousing (RRH).* A type of permanent housing meeting the requirements of 24 CFR 578.37(a)(1)(ii).

**(24)** *Reallocation.* Reallocation is a process CoCs use to shift funds in whole or in part from existing eligible renewal projects to create one or more new projects without decreasing the CoC's ARD. New projects created through reallocation must meet the requirements in sections I.B.3.a, III.B.4.a.(3), (4) and (5), and the project eligibility and project quality thresholds established in sections III.C.4.a. and b. of this NOFO. CoCs may only reallocate eligible renewal projects so long as the renewal project being reduced or eliminated has a current grant agreement and has renewed under the CoC Program at least once. First time renewals are not eligible for reallocation.

> **(a)** The House and Senate Committees on Appropriations expressed that for projects awarded for specific subpopulations (e.g., youth experiencing homelessness or survivors of domestic violence, dating violence, sexual assault or stalking), before funding for such projects may be reallocated to other populations, HUD must consult with relevant stakeholders. For the FY 2024 Funding Opportunity, HUD requires funding reallocated from projects previously funded with YHDP or DV Bonus funding must be used for projects serving the same subpopulation. Therefore, prior to executing the reallocation of any project, HUD strongly recommends reviewing the Grant Inventory Worksheets (GIWs) published on the CoC Program Competitions page on the HUD.gov website to determine the type of new projects that can be created with reallocated funding intended for the specific subpopulations.

> **(b)** DV Reallocation. DV Reallocation Projects are projects created from the reallocation of eligible DV Renewal projects [I.B.2.b.(7)]. CoCs may reallocate eligible DV Renewal projects to create new DV Reallocation projects, so long as 100 percent of the population served by the new DV Reallocation project are individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

> When reallocating DV Renewal project(s), the new project(s), including new expansion projects created with reallocation DV Renewal funding, in their entirety must meet all the same requirements of a DV Bonus project (see section III.B.4.a.(4)) and the sum of all DV Reallocation applications must be for the same amount of funding made available from the DV Renewal funding being reallocated. If a CoC reallocates funding from a DV Renewal grant and does not earmark those funds for new project(s) that are 100 percent dedicated to that subpopulation, HUD may condition the project applications to ensure the projects are serving the required subpopulation. If an applicant does not resolve the condition placed on the project, HUD will reject the project application. To avoid any potential delays in funding or a loss in ARD, CoC should review the GIWs published on the CoC Program Competitions page on the HUD.gov to determine which renewal projects were previously awarded DV Bonus funds, including CoC projects that were previously expanded and partially includes DV Bonus funding.

> The following restrictions also apply:

(i.) DV Renewal projects that have an SSO-CE component cannot be reallocated.
(ii.) Reallocated DV Renewal funding cannot be used to expand a CoC Renewal grant.

**(c)** In addition to reallocations that occur using FY 2024 funding, subject to the language in the FY 2025 HUD Appropriation, CoCs may reallocate eligible FY 2025 renewal grants, including grants awarded FY 2024 funding, to create new grants for FY 2025 CoC and YHDP Funding. However, YHDP projects that have not been renewed in a prior CoC program competition may not be reallocated.

**(d)** To create a Transition Grant through the reallocation process, the CoC must wholly eliminate one or more projects and use those funds to create the single, new transition grant [see section I.B.2.b.(30) of this NOFO].

**(e)** For information on reallocating YHDP projects through the replacement process, see sections I.B.2.b.(32), I.B.3.e and III.B.4.a.(5) of this NOFO.

**(25)** *Reservation.* For purposes of this Notice, reservations are a type of formula area as specifically delineated under HUD's IHBG program at 24 CFR 1000.302.

**(26)** *Rural Area.* For this competition a rural area is a county which:

**(a)** has no part of it within an area designated as a standard metropolitan statistical area by the Office of Management and Budget;
**(b)** is within an area designated as a metropolitan statistical area or considered as part of a metropolitan statistical area and at least 75 percent of its population is local on U.S. Census blocks classified as non-urban; or
**(c)** is located in a state that has a population density of less than 30 persons per square mile (as reported in the most recent decennial census), and of which at least 1.25 percent of the total acreage of such State is under Federal jurisdiction, provided that no metropolitan city in such State is the sole beneficiary of the grant amounts awarded under this NOFO. A metropolitan city means a city that was classified as a metropolitan city under section 102(a) of the Housing and Community Development Act of 1974 (42. U.S.C. 5302(a)) for the fiscal year immediately preceding the fiscal year for which Emergency Solutions Grants program funds are made available.

**(27)** *Shared Housing.* YHDP Renewal and replacement grants may provide rental assistance for shared housing where youth may reside with family or another unrelated person. The youth leases from the property owner and shares the unit with the family or unrelated person. The unit may be a house or an apartment.

**(a)** YHDP rental assistance cannot be provided to a youth to reside in a unit occupied by an immediate family member. For this NOFO "immediate family member" includes parents, grandparents, and legal guardians.

**(b)** YHDP rental assistance cannot be provided to a youth in a shared housing unit if the landlord is an immediate family member of the youth.

**(c)** YHDP rental assistance may only be provided to a youth if the youth can enter into a valid, binding, and enforceable lease under applicable state or local law. This includes a

**Suppl. App. 108**

legally appointed guardian executing a lease on behalf of a youth or an emancipated youth entering into a lease.

**(d)** YHDP Renewal and replacement grants may provide a shared housing option for youth program participants who are not part of a household but are interested in sharing a housing unit with a roommate unrelated to the program participant.

**(28) *Solo Applicants.*** Per the Act, "A solo applicant may submit an application to the Secretary for a grant under subsection (a) and be awarded such grant on the same basis as such grants are awarded to other applicants based on the criteria described in section 427 [42 U.S.C. 11386a], but only if the Secretary determines that the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner. The Secretary may award such grants directly to such applicants in a manner determined to be appropriate by the Secretary." A solo applicant must submit a solo applicant project application in e-snaps prior to the application deadline of 8:00 PM EDT on October 30, 2024, for FY 2024 CoC and YHDP Funding., or 8:00 PM EDT on August 29, 2025 if Congressional Appropriations authorize HUD to solicit applications for new FY 2025 CoC and YHDP Funding. Additionally, for HUD to consider its solo application, a solo applicant must also meet all the requirements outlined in section VII.C of this NOFO.

**(29) *Tribally Designated Housing Entity.*** For purposes of this Notice, this term has the same meaning as in Section 4 of NAHASDA (25 U.S.C. 4103).

**(30) *Transition Grant.*** A grant to fund a new CoC project through the reallocation process to transition an eligible renewal project from one program component to another eligible new component over a 1-year period. The renewal project transitioning to a new component must be fully eliminated through reallocation. Transition grants in this Competition may apply to renew in subsequent fiscal year competitions for eligible activities of the new component. Prior to applying for a transition grant, the current recipient must have the consent of its Continuum of Care; and the new project application must meet project eligibility and project quality thresholds established by HUD in sections III.C.4.a. and b. of this NOFO.

Transition grants HUD conditionally awards in the CoC Program Competition have 1 year to fully transition from the original component to the new component. The transition grant's operating start date will be the day after the end of the previous grant term for the expiring component. For transition grants reallocated from more than one project, the operating start date of the transition grant will be the day after the end of the earliest expiring grant term. The grant term may be extended consistent with 2 CFR 200.308 and 2 CFR 200.309. After the first operating year for which FY 2024 funds are awarded, the transition grant must be fully operating under the new component and will be eligible for renewal in the FY 2025 Operating year under the component to which it transitioned subject to the language in the FY 2025 HUD Appropriation. Projects seeking to renew with FY 2025 funds (including grants that renewed with FY 2024 funds) may submit a transition grant application for FY 2025 funds. Subject to the language in the FY 2025 HUD Appropriation, transition grant applications awarded FY 2025 funds must fully transition to the new component by the end of the 1-year grant term and must apply for renewal in the next CoC Program Competition under the component to which it transitioned.

For a new project to be considered a transition grant, the new project applicant must be the recipient listed on the current grant agreement for the eligible renewal grant(s) being eliminated and must include the grant number(s) of the project(s) being eliminated to create the new project and attach a copy of the most recently awarded project application. For example, expiring FY 2023 grants applying to transition to a new component during the FY 2024 funding process will attach a copy of the FY 2023 CoC Program Competition project application.

> **(a)** If the project application identifies the project as a transition project and the CoC ranks the new transition grant project on the New Project Listing in the CoC Priority Listing, HUD will consider this as CoC consent.

> **(b)** If HUD determines a new project submitted as a transition grant does not qualify, but meets all other new project requirements, HUD may award the project as a new non-transition grant project. If this occurs, the new project operating start date will be reflected in the grant agreement .

> **(c)** YHDP Renewal grants are not eligible to use the transition grant process. YHDP Renewal grants must submit a YHDP Replacement application to change component types.

> **(d)** Grants with DV Renewal funding are not eligible to use the transition grant process.

**(31)** *Trust Land.* For purposes of this Notice, trust lands are a type of formula area as delineated under HUD's IHBG program at 24 CFR 1000.302.

**(32)** *YHDP Replacement Process.* The Consolidated Appropriations Act, 2024, permits the replacement of renewing YHDP projects under the CoC Program. The YHDP Replacement process occurs when: (1) a CoC reallocates a YHDP Renewal project to create one or more new YHDP project(s) that has the same recipient referred to as YHDP Replacement in this NOFO; (2) a CoC is reallocating a YHDP Renewal project to create one or more new projects with a new recipient referred to as YHDP Reallocation in this NOFO; or (3) a CoC is reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process. For more information on YHDP Reallocation, see sections I.B.3.e and III.B.4.a.(5) of this NOFO.

**c. FY 2024 - FY 2025 CoC Program Competition NOFO Requirements.** All requirements for submitting applications for projects eligible for FY 2024 CoC and YHDP funding, including requirements for the entire Consolidated Application, are contained in this NOFO. This NOFO also includes requirements for submitting applications for FY 2025 funding, including FY 2025 reallocation project applications. Subject to the FY 2025 HUD Appropriation, HUD may amend this NOFO if FY 2025 appropriations authorize HUD to solicit applications for funding not currently covered under this NOFO.

Applicants should read this information carefully and respond to all submission requirements and deadlines as described.

The 8:00 PM EDT application submission deadline on October 30, 2024, applies to the following (see Section IV.G of this NOFO for more information):

- FY 2024 - 2025 CoC Application;

Page 22 of 128

**Suppl. App. 110**

- FY 2024 Project Applications; and
- FY 2024 Priority Listing, including a signed HUD-2991.

Collaborative Applicants complete one CoC Application for the FY 2024 and FY 2025 funding, and it must be submitted in e-snaps by the 8:00 PM EDT Application Submission deadline on October 30, 2024. CoC Applications will not be accepted during the FY 2025 Application submission phase, but the Collaborative Applicant must still submit an application for FY 2025 funding. Applicants that are designated Unified Funding Agencies (UFAs) or High Performing Communities (HPCs) by HUD during the FY 2024 CoC Program Registration process will maintain their UFA and/or HPC designation for the FY 2025 Funding Process.

Collaborative Applicants and UFAs with CoC (including DV Renewal) and YHDP Renewal grants with an expiration date in CY 2026, that were not awarded FY 2024 CoC and YHDP funding and applications for new grants created through CoC Reallocation, or DV Reallocation, or YHDP Replacements which includes YHDP Reallocation must submit their applications for FY 2025 funding no later than 8:00 PM EDT on August 29, 2025. Projects that are awarded FY 2024 funds may be eligible for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds.

Collaborative Applicants and UFAs will be required, at a minimum, to submit the following as part of their application to apply for FY 2025 funding:

- FY 2025 Renewal project applications for grants that were not funded in FY 2024 that have an expiration date in CY 2026 (between January 1, 2026, and December 31, 2026).
- Applications for projects created through the reallocation of eligible CoC renewal (including DV Renewal) grants and through the replacement of eligible YHDP renewal grants which also includes YHDP Reallocation;
- FY 2025 Project Listing that includes all projects approved by the CoC to apply for FY 2025 funding; and,
- A signed HUD-2991. This form will be included as part of the FY 2024 - FY 2025 Consolidated Application and is not required to include projects that were awarded FY 2024 funding and are continuing in FY 2025.

Collaborative Applicants, and project applicants should read this NOFO in its entirety in conjunction with the Rule to ensure a comprehensive understanding of and compliance with all CoC Program requirements. This NOFO frequently references citations from the Rule.

**(1)** CoCs should consider the policy priorities established in this NOFO in conjunction with local priorities to determine the ranking of new and renewal project application requests. See section I.A.4 of this NOFO for more information on HUD's homelessness policy priorities and program highlights.

**(2)** HUD will conduct threshold reviews of project applicants, subrecipients, and project applications for all CoC Consolidated Applications submitted by the FY 2024 and FY 2025 application submission deadlines as described in section IV.G.

**(3)** HUD may issue more than one conditional funding announcement, including for instances where a CoC has been affected by a disaster and for which HUD has extended the deadline for application submission.

**(4)** HUD will score the FY 2024 - 2025 CoC Application portion of the Consolidated Application in accordance with the criteria set forth in section V.B of this NOFO.

**(5)** CoC Planning and UFA Costs project applications are not ranked and will be selected, provided they pass project eligibility and project quality threshold review.

**(6)** HUD selects the following projects that pass project eligibility, project quality threshold, and if applicable, project renewal threshold, using the Tier 1 and Tier 2 ranking process described in sections I.B.3.h of this NOFO for FY 2024 funding.

**(a)** CoC Bonus projects.
**(b)** CoC Renewal projects (including DV Renewal projects).
**(c)** New CoC Reallocation projects.
**(d)** New DV Reallocation projects.

Projects with a ranked position in Tier 1 will be selected based on requirements in section I.B.3.h.(1) of this NOFO and Projects with a ranked position in Tier 2 will be selected based on the CoC Application score and the project application score outlined in section I.B.3.h.(2) of this NOFO.

**(7)** YHDP Renewal projects and YHDP Replacement projects including YHDP Reallocation projects are non-competitive YHDP projects and must not be ranked by CoCs. HUD will select YHDP projects for funding if they pass project eligibility and project quality threshold review, and for YHDP project renewal threshold; as explained in section III.C.4.c. of this NOFO. HUD will not reject YHDP Replacement project applications which includes YHDP Reallocation projects during quality threshold review; however, HUD may require YHDP Replacement grant recipients to correct or revise information submitted after the final CoC Program Competition award announcement.

**(8)** HUD may select new DV Bonus project applications that pass project eligibility and project quality threshold with:

>**(a)** DV Bonus funds based on the CoC Application score, how the CoC collaborates with victim service providers, the need for the project, and how the provider will involve survivors with lived experience/expertise in the policy and program development [section I.B.3.j of this NOFO]. HUD will remove DV Bonus project applications selected with DV Bonus funds from the Tier 1 and Tier 2 ranking process; or

>**(b)** CoC Bonus or reallocated funds where the project application retains its ranked position in Tier 1 or Tier 2 and may be selected by HUD as outlined in sections I.B.3.h.(1) or (2) of this NOFO.

**(9)** DV Reallocation Projects submitted for FY 2024 CoC and YHDP funding must be ranked in either Tier 1 or Tier 2 and may be selected for award as outlined in sections I.B.3.h.(1) or (2) of this NOFO.

**c. Establishing and Operating the CoC.** 24 CFR 578.5 and 24 CFR 578.7 detail the requirements for the establishment of a CoC and its responsibilities.

**d. CoC Geographic Area.** 24 CFR 578.5 requires representatives from relevant organizations within a geographic area to establish a CoC to carry out the duties within the geographic area. The boundaries of identified CoC geographic areas cannot overlap, and any overlapping

**Suppl. App. 112**

geographies are considered Competing CoCs. HUD follows the process at 24 CFR 578.35(d) to determine which CoC HUD will fund in the case of CoC geographic areas that overlap.

**e. Planning Duties of the CoC.** Planning duties for CoCs are detailed in 24 CFR 578.7.

**f. Centralized or Coordinated Assessment System (Coordinated Entry).** In general, 24 CFR 578.23(c)(9) and (11) requires all CoC program recipients and subrecipients to use the centralized or coordinated assessment system established by CoCs. The definition of Centralized or Coordinated Assessment (also known as Coordinated Entry) is found at 24 CFR 578.3. 24 CFR 578.7(a)(8) details the responsibilities of the CoC to establish and operate this required system. In addition to the definition and responsibilities established in the Rule, HUD posted on its website, CPD-17-01: *Notice Establishing Additional Requirements for a Continuum of Care Centralized or Coordinated Assessment System*, establishing additional requirements related to the development and use of a centralized or coordinated entry assessment system. These systems help communities assess the needs of program participants and effectively match individuals and families experiencing homelessness with the most appropriate resources available to address their supportive service and housing needs. CoCs may use planning costs to design and plan for the implementation of a Coordinated Entry system; however, once the system is established and operating, the costs of operating it are not eligible planning costs. CoCs must operate the system with CoC Program funds, other funds, or a combination of the two. Section 578.23(c)(9) of the CoC Program Rule exempts victim service providers from using the CoC's coordinated entry process if victim service providers use a coordinated entry process that otherwise meets HUD's requirements.

**g. CoC Program Components.** 24 CFR 578.37 states CoC funds may be used to create and operate projects under five program components: PH (including PSH and RRH); TH; SSO; HMIS; and in some cases, homelessness prevention. Only CoCs designated by HUD as HPCs during the CoC Registration process may carry out homelessness prevention activities through the CoC Program. In the FY 2017 CoC Program Competition and Registration Notice, HUD introduced a new Joint TH and PH-RRH component type that CoCs could apply for. The only types of projects that will be funded in the FY 2024 – FY 2025 CoC Program Competition are:

> **(1)** PH (PSH and RRH);
> **(2)** TH;
> **(3)** Joint TH and PH-RRH;
> **(4)** SSO; and
> **(5)** HMIS.

**h. Collaborative Applicant.** The Collaborative Applicant is the single applicant designated by the CoC to compile all parts of the FY 2024 - 2025 CoC Consolidated Application, including the CoC Application, the CoC Priority Listing, and all project applications that the CoC has recommended for funding within the geographic area (24 CFR 578.9(a)(3)). HUD will only review CoC Consolidated Applications submitted by the CoC designated Collaborative Applicant. When FY 2025 funds become available, the FY 2025 CoC Priority Listing and FY 2025 project applications submitted by the CoC become part of the FY 2024 - 2025 CoC Consolidated Application.

Additionally, the Collaborative Applicant is the only entity eligible to apply to HUD for CoC Planning costs and if designated as a UFA by HUD, for UFA Costs (24 CFR 578.3).

Page 25 of 128

**3. CoC Program Provisions.**

The following list highlights important information that applicants should consider as they are preparing the FY 2024 - 2025 CoC Application and project applications(s). This is not an exhaustive list of considerations or requirements; therefore, all applicants should carefully review the Rule for comprehensive information.

**a. Performance-Based Decisions.** Consistent with the requirements of the Consolidated Appropriations Act, 2024:

> **(1)** Requests for new CoC project applications , except for new projects created through reallocation, are not allowed, unless the CoC evaluates and competitively ranks projects based on how they improve the CoC's system performance as outlined in section V.B.2.b of this NOFO; and

> **(2)** HUD will prioritize funding for CoCs that have demonstrated the capacity to reallocate funding from lower to higher performing projects.

**b. Indian Tribes or Tribally Designated Housing Entities (TDHEs).** The Consolidated Appropriations Act, 2021 amended Title IV of the Act by adding Section 435 so designated Indian Tribes or TDHEs (as defined in Section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) may:

> **(1)** create a CoC;
> **(2)** be a Collaborative Applicant;
> **(3)** be an eligible project applicant; or
> **(4)** receive grant amounts from another entity that receives a grant directly from HUD (i.e. be a CoC grant subrecipient).

However, under 42 U.S.C. 11383(g) only States, Units of General Local Government, nonprofit organizations, and Public Housing Agencies may administer permanent housing rental assistance.

**c. Coordination with Housing and Healthcare.** The Consolidated Appropriations Act, 2024 directs HUD to provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid rehousing services. In the FY 2024 - 2025 CoC Program Competition, CoCs may receive up to 14 points on the CoC Application if the FY 2024 CoC Priority Listing includes new project applications created through reallocation or the CoC Bonus that utilizes housing vouchers and healthcare provided through an array of healthcare services providers. See section V.B.6 of this NOFO for additional details.

**d. Consolidation Project.** Project applicants can consolidate two but no more than ten eligible renewal projects during the application process. The projects being combined during a grant consolidation will continue uninterrupted. To be eligible for consolidation, the projects must have the same recipient (as evidenced by recipient's Unique Entity Identifier) and be for the same component. Additionally, YHDP projects cannot consolidate with non-YHDP projects. See section III.B.4.a.(7) of this NOFO for additional information.

**Suppl. App. 114**

**e. Youth Homeless Demonstration Program (YHDP).** Consistent with the requirements of the Consolidated Appropriations Act, 2024, funding for the CoC Program may be used to competitively or non-competitively renew or replace grants for YHDP projects.

HUD will non-competitively renew and replace YHDP projects which includes new YHPD projects created from the reallocation of YHDP renewal grants; however, these project applications will be reviewed for compliance with project eligibility, project quality, and if applicable, project renewal thresholds. See sections III.B.4.a.(5), III.B.4.b.(5) and I.B.2.k.(4) of this NOFO for additional information.

While YHDP projects can use the replacement process to consolidate projects as outlined in section III.B.4.a.(7) of this NOFO, these projects cannot consolidate with non-YHDP projects. YHDP Renewal projects may also apply to expand its current project through the YHDP Replacement process. See section III.B.4.a.(6)(c) for more information. Unified Funding Agencies (UFAs) are prohibited from moving funds out of or into YHDP-funded projects and mix funding from any other non-YHDP funded project. UFAs may replace eligible YHDP renewal projects.

All YHDP Renewal, YHDP Replacement and YHDP Reallocation projects are subject to the following provisions of the Rule, as may be amended from time to time, except where they conflict with the NOFO requirements, with the special YHDP activities identified in section III.B.4.b.(5) of this NOFO, or the requirement that grant funds may only be used to serve homeless youth, age 24 and younger: 24 CFR 578.3, 578.15, 578.23(a), 578.25, 578.27, 578.29, 578.37, 578.43, 578.45, 578.47, 578.49, 578.51, 578.53, 578.55, 578.57, 578.59, 578.61, 578.63, 578.73(c), 578.75, 578.77, 578.79, 578.81, 578.83, 578.85, 578.87, 578.89, 578.89, 578.91, 578.93, 578.95, 578.97, 578.99, 578.103(a)(3) - (18) and (b) – (e), 578.105, 578.107 and 578.109. The requirements of 2 CFR 200.306, as may be amended from time to time, with the exception of 200.306(b)(5) apply. All YHDP Renewal, YHDP Replacement and new YHDP Reallocation projects must comply with 24 CFR 578.93, except that in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located. Federal fair housing and nondiscrimination requirements cannot be waived.

YHDP projects eligible to renew in the CoC Program Competition for the first time in FY 2025 must submit their renewal or replacement application by August 29, 2025 and will be selected by HUD non-competitively for a grant term of 1 year, subject to the FY 2025 HUD Appropriations. YHDP projects renewing in FY 2025 for the first time may not be reallocated.

**f. Adjustments for Ineligible Projects.** If an ineligible renewal project is submitted in this Competition or used in the reallocation process; or an ineligible YHDP Renewal or YHDP Replacement project is submitted, HUD will remove the ineligible project when calculating the final ARD amount for the CoC. To be eligible for renewal, reallocation, or replacement in the FY 2024 CoC and YHDP Funding Process, a project must have an expiration date in Calendar Year (CY) 2025 (between January 1, 2025, and December 31, 2025). Subject to the FY 2025 HUD Appropriation, to be eligible for renewal, reallocation, or replacement in the FY 2025 CoC and YHDP Funding Process, a project must have an expiration date in Calendar Year (CY) 2026 (between January 1, 2026, and December 31, 2026).

**g. Homeless Management Information System (HMIS).** As directed by Congress, HUD must provide an annual estimate of all individuals and families experiencing homelessness nationwide

and within the territories. Therefore, all CoCs must have an HMIS that has the capacity to collect un-duplicated counts of individuals and families experiencing homelessness and provide information to project subrecipients and applicants for needs analysis and funding priorities. Additionally, CoC and Emergency Solutions Grants (ESG) Program recipients must participate in the local HMIS; unless a recipient is a victim service provider or legal service provider, in which case these recipients must use a comparable database and provide de-identified information to the CoC. For many communities, the inclusion of ESG recipients and subrecipients and other HUD federal partners (e.g., the Department of Health and Human Services and Department of Veterans Affairs) that require their programs to use the CoC's HMIS, results in an increase in users that the HMIS must be able to accommodate. HUD expects communities to be able to use the HMIS information as well as aggregate data from comparable databases to review performance for the entire CoC geographic area, not just at the project level. The HMIS Lead should continue to consider any unique needs that the HMIS might be required to address to accommodate emergency shelter, street outreach, homelessness prevention, and other federal programs.

**h. HUD Funding Process.** CoCs and applicants should ensure there is a thorough understanding of the information provided in this NOFO. HUD has a two-tier funding selection process for FY 2024 funding. HUD will establish Tier 1 and Tier 2 amounts for each CoC, based on each CoC's Annual Renewal Demand. HUD will post a report that lists the available amounts for each CoC's PPRN, estimated ARD, Tier 1, CoC Planning, estimated CoC Bonus amounts, and estimated DV Bonus amounts on HUD's website. The GIWs are also posted on HUD's website.

Applications for YHDP Renewal, YHDP Replacement, CoC Planning, and if applicable, UFA Costs projects are not competitively ranked, and therefore must be excluded from CoC ranking. These non-competitive applications are also excluded from the Tier 1 and Tier 2 selection process.

The selection process described in this section of the NOFO will also be used for CoC Collaborative Applicants designated as UFAs. Section V. of this NOFO provides additional information regarding project selection.

Note that Tier 1 and Tier 2 selection process takes place after the initial DV Bonus selection process has occurred.

**(1) *Tier 1*.** Tier 1 is equal to 90 percent of the CoC's Annual Renewal Demand (ARD) as described in section I.B.2.b.(1) of this NOFO minus the sum of all ARAs of non-competitive YHDP Renewal and YHDP Replacement projects. HUD will conditionally select project applications in Tier 1 from the highest scoring CoC application to the lowest scoring CoC application and according to the rank assigned by the CoC on the CoC Priority listing, provided the project applications pass both project eligibility and project quality threshold review, and if applicable, project renewal threshold.

The following project applications can be placed in Tier 1:

**(a)** new CoC projects created through CoC Reallocation;
**(b)** new CoC Bonus projects;
**(c)** new DV Bonus projects;
**(d)** new DV Reallocation projects created through the reallocation of a DV Renewal

Page 28 of 128

**Suppl. App. 116**

grant;

**(e)** CoC Renewal projects (including DV Renewal projects)

If a DV Bonus project ranked in Tier 1 is selected with DV Bonus funds, HUD will remove the project from the FY 2024 Priority Listing and move the projects below it up one rank position. However, if HUD does not select a new DV Bonus project in the initial DV Bonus selection, the project will retain its ranked position in the Tier 1 selection process. If the DV Bonus project is not selected through the initial DV Bonus selection process but is selected as a Tier 1 or Tier 2 project, it will be funded using CoC funds and not the funds set aside for "new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking." Reallocated DV projects must follow the same requirements as DV Bonus projects; however, reallocated DV projects are only selected in the Tier 1 and Tier 2 selection process. For more on the initial DV Bonus selection process, see [I.B.3.j].

In the event insufficient funding is available to award all Tier 1 projects, Tier 1 will be reduced proportionately, which could result in some Tier 1 projects falling into Tier 2. Therefore, CoCs should carefully determine the priority and ranking for all project applications in Tier 1 as well as Tier 2, which is described below.

**(2)** *Tier 2*. Tier 2 is the difference between Tier 1 and the maximum amount of CoC Renewal (including DV Renewal), CoC Reallocation, DV Bonus, DV Reallocation, and CoC Bonus funds that a CoC applies for.

If HUD selected a DV Bonus project during the initial DV Bonus selection process, HUD will remove that project from the CoC's Priority Listing ranking and move the projects below it up in rank position. See section I.B.3.j of this NOFO. HUD will assess project applications placed in Tier 2 for project eligibility and project quality threshold requirements and project renewal threshold requirements, if applicable; and HUD will determine funding using the CoC Application score as well as the factors listed in section I.B.3.h of this NOFO.

HUD will award a point value to each ranked new and renewal project application that is in Tier 2 using a 100-point scale, and conditionally select applications in Tier 2 using this point value from the highest scoring project application to the lowest:

**(a)** CoC Score. Up to 50 points in direct proportion to the score received on the CoC Application, e.g., if a CoC received 100 out of 200 points on the CoC Application, the project application would receive 25 out of 50 points for this criterion.

**(b)** CoC Project Ranking. Up to 40 points for the CoC's ranking of the project application(s). To consider the CoCs ranking of projects, HUD will assign point values directly related to the CoCs' ranking of project applications. The calculation of point values will be 40 times the quantity (1-x) where x is the ratio of the cumulative funding requests for all projects or portions of projects ranked higher by the CoC in Tier 2 plus one half of the funding of the project of interest to the total amount of funding available in Tier 2 for the CoC. For example, if a CoC is eligible to apply for projects totaling $500,000 in Tier 2 and applies for 5 projects ranked in Tier 2 of $100,000 each: the

highest-ranked project would receive 36 points, and then the subsequently ranked projects would receive 28, 20, 12, and 4 points.

**(c)** Commitment to Housing First. Up to 10 points based on the project application's commitment to follow a Housing First approach as defined in section I.B.2.b.(15) of this NOFO. Dedicated HMIS projects and supportive service only for coordinated entry (SSO-CE) projects will automatically receive 10 points.

**(3)** *Projects Straddling Tiers.* If a project application straddles the Tier 1 and Tier 2 funding line, HUD will conditionally select the project up to the amount of funding that falls within Tier 1. Using the CoC score, and other factors described in section I.B.3.h of this NOFO, HUD may fund the Tier 2 portion of the project. If HUD does not fund the Tier 2 portion of the project, HUD may award the project at the reduced amount based on the amount of funding that falls within Tier 1, provided the project is still feasible with the reduced funding (e.g., is able to continue serving homeless program participants effectively).

**i. CoC Planning and UFA Costs Projects.** CoCs may only submit one project application for CoC Planning costs and, if applicable, one project application for UFA Costs. The Collaborative Applicant listed on the CoC Applicant Profile in e-snaps is the only eligible applicant that may apply for CoC Planning and UFA Costs projects. Collaborative Applicants are not required to submit applications for FY 2025 CoC Planning and UFA Costs projects. HUD will award FY 2025 CoC Planning and UFA Costs projects using FY 2024 application submissions.

**j. Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus).** The Consolidated Appropriations Act, 2024 provides $52 million for "new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking." See section I.B.2.b.(6) of this NOFO for additional information.

CoCs must rank all new DV Bonus project applications on the New Project Listing of the CoC Priority Listing with a unique number ranking and when the project is part of an expansion, the corresponding renewal project application must be on the Renewal Project Listing with a unique rank number. HUD will only select a new DV Bonus project that expands an existing renewal project if HUD conditionally selects the renewal project in Tier 1 or 2. If HUD selects the renewal project application for conditional award with CoC Program funds and the new DV Bonus expansion project is approved for selection, HUD will select the new DV Bonus project with DV Bonus funds and remove the new DV Bonus project from the New Project Listing. All subsequent project applications ranked below the new DV Bonus project application will move up one rank position.

In cases where a new DV Bonus project is selected using the selection process noted in this section, it will be funded from funds made available for "new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking." To be eligible to receive a new DV Bonus project, the CoC must demonstrate it ranks projects based on how they improve system performance as outlined in section V.B.2.b of this NOFO. Additionally, to be eligible to receive a DV Bonus

project for PH-RRH or Joint TH/PH-RRH component, all projects funded through the DV Bonus must adopt a Housing First approach.

Each CoC may only submit one new SSO-CE DV Bonus project; however, there is no limit on the number of PH-RRH and Joint TH/PH-RRH DV Bonus projects CoCs may submit, provided that each application is for at least $50,000. A project applicant may also apply to expand an existing renewal project, including one that was previously awarded with DV Bonus funding, in accordance with section I.B.2.b.(6) of this NOFO; however, only the new project application for the expansion will be considered for DV Bonus funds through this process. DV Bonus funding may be used to expand an existing renewal project that is not dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act [see section III.B.4.a.(6)], so long as the DV Bonus funds for expansion are solely for additional units, beds, or services dedicated to persons eligible to be served with DV Bonus funding.

For new projects the CoC requests to be considered as part of the DV Bonus, HUD will award a point value to each project application using the following 100-point scale, including points based on FY 2024 - 2025 CoC Application score and responses to the domestic violence bonus specific questions in the FY 2024 - 2025 CoC Application [see (1), (2) and (3) below]:

**(1)** Rapid Rehousing (PH-RRH) and Joint Transitional Housing and Permanent Housing-Rapid Rehousing (Joint TH/PH-RRH) component projects:

**(a)** CoC Score. Up to 50 points in direct proportion to the score received on the CoC Application.

**(b)** CoC Collaboration with Victim Service Providers. Up to 10 points in direct proportion to the score received on the following rating factors in the CoC application: section V.B.1.e, section V.B.2.c, and section V.B.3.b.

**(c)** Need for the Project. Up to 10 points based on the extent the CoC quantifies the need for the project in its portfolio, the extent of need, and how the project will fill that gap.

**(d)** Quality of the Project Applicant Experience. Up to 15 points based on the previous performance of the applicant in serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and their ability to house survivors and meet safety outcomes.

**(e)** Demonstration of inclusion of victim-centered practices. Up to 8 points based on the quality of the project's plan to address the housing and safety needs of survivors by adopting victim-centered practices (e.g., Housing First, Trauma-Informed Care, Confidentiality) in operating their project. Full points will be awarded to project applicants that can demonstrate they are already adopting victim-centered practices.

**(f)** Demonstration of plan to include survivors with lived expertise. Up to 7 points based on the project's ability to demonstrate its plan to involve survivors in policy and program development throughout the project's operation.

Page 31 of 128

**Suppl. App. 119**

**(2)** PH-RRH and Joint TH/PH-RRH component projects must follow a housing-first approach.

**(3)** Supportive Services Only Coordinated Entry (SSO-CE) to implement policies, procedures, and practices that equip the CoC's coordinated entry to better meet the needs of people experiencing homelessness who are experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking (e.g., to implement policies and procedures that are trauma-informed, client-centered or to better coordinate referrals between the CoC's coordinated entry and the victim service providers coordinated entry system where they are different):

**(a)** CoC Score. Up to 50 points in direct proportion to the score received on the CoC Application.

**(b)** CoC Collaboration with Victim Service Providers. Up to 10 points in direct proportion to the score received on the following rating factors in the CoC application: section V.B.1.e, section V.B.2.c, and section V.B.3.b.

**(c)** Need for the Project. Up to 25 points based on the extent to which the CoC demonstrates the need for a coordinated entry system that better meets the needs of individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and how the project will fill this need.

**(d)** Demonstration of plan to include survivors with lived expertise. Up to 15 points based on the project's ability to demonstrate its plan to involve survivors in policy and program development throughout the project's operation.

**k. Participant Eligibility.** Projects funded through this NOFO must have the following eligibility criteria for program participants. All references to paragraphs of the definition of homeless that are found throughout this NOFO refer to the paragraphs listed under the definition of "homeless" in 24 CFR 578.3 and include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All specific references to the definition of "homeless" under paragraph (4) of 24 CFR 578.3 that are found throughout this NOFO also include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All projects must participate in coordinated entry, and the selection of program participants must be consistent with the CoC's coordinated entry process. As provided by the Consolidated Appropriations Act, 2024, youth aged 24 and under must not be required to provide third-party documentation that they meet the homeless definition in 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act as a condition for receiving services funded under this NOFO. Additionally, any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under or families headed by youth aged 24 and under who are living in unsafe situations. HUD interprets "youth-serving provider" as a private nonprofit organization whose primary mission is to provide services to youth aged 24 and under and families headed by youth aged 24 and under. HUD interprets "living in unsafe situations" as having an unsafe primary nighttime residence and no safe alternative to that residence. These youth-related requirements supersede any conflicting requirements under this NOFO or the Rule.

Page 32 of 128

**Suppl. App. 120**

CoC, DV and YHDP Renewal projects must serve the same population of individuals or families as indicated in the expiring grant agreement.

Participants eligible to be served by New Projects, are as follows:

**(1)** New PH-PSH projects awarded CoC funds must serve one of the following:

**(a)** persons eligible to be served by DedicatedPLUS projects as described in section I.B.2.b.(5) of this NOFO in which case all units funded by the project must be used to serve program participants who meet the qualifications for DedicatedPLUS; or

**(b)** persons who are experiencing chronic homelessness [see 24 CFR 578.3 definition of Chronically Homeless] at the time they initially enroll in the project.

**(2)** New PH-RRH, Joint TH/PH-RRH, and SSO-CE projects awarded CoC funds must serve persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3, Section 103(b) of the McKinney-Vento Homeless Assistance Act, or persons who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**(3)** New DV Bonus and DV Reallocation projects (RRH, Joint TH/PH-RRH, and SSO-CE) must serve individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act. Additionally, these projects may serve individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**(4)** New YHDP Replacement projects including YHDP Reallocation must serve youth aged 24 or younger, including unaccompanied and pregnant or parenting youth who:

**(a)** qualify as homeless under paragraphs (1), (2), or (4) of the homeless definition in 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act;

**(b)** have an unsafe primary nighttime residence and no safe alternative to that residence; or

**(c)** qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

# II. AWARD INFORMATION

# A. Available Funds

Funding of approximately $3,524,000,000 is available through this NOFO. Subject to appropriations, HUD reserves the right to award fiscal year 2025 funds based on this NOFO competition.

Additional funds may become available for award under this NOFO consistent with Section VI.A.2.e., Adjustments to Funding. Use of these funds is subject to statutory constraints. All awards are subject to the funding restrictions contained in this NOFO.

Funding includes approximately $188,000,000 for the non-competitive renewal and replacement of expiring YHDP grants. $52,000,000 is available for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in sections I.B.3.j and I.B.2.b.(6) of this NOFO.

## III. ELIGIBILITY INFORMATION

## A. Eligible Applicants

**1.** HUD does not award grants to individuals. HUD will also not evaluate applications from ineligible applicants.

### 2. Faith-based organizations

a. Faith-based organizations may apply for this award on the same basis as any other organization, as set forth at 24 CFR 5.109, and subject to the protections and requirements of 42 U.S.C. § 2000bb et seq. HUD will not, in the selection of recipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

b. A faith-based organization that participates in this program will retain its independence and may continue to carry out its mission consistent with religious freedom and conscience protections in Federal law, including the Free Speech and Free Exercise Clauses of the Constitution, 42 U.S.C. § 2000bb et seq., 42 U.S.C. § 238n, 42 U.S.C. § 18113, 42 U.S.C. §§ 2000e-1(a) and 2000e-2(e), 42 U.S.C. § 12113(d), and the Weldon Amendment, among others. Religious accommodations may also be sought under many of these religious freedom and conscience protection laws, particularly under the Religious Freedom Restoration Act.

c. A faith-based organization may not use direct financial assistance from HUD to support or engage in any explicitly religious activities except where consistent with the Establishment Clause and any other applicable requirements. Such an organization also may not, in providing services funded by HUD, discriminate against a beneficiary or prospective program beneficiary on the basis of religion, religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

### 3. Cost Sharing or Matching

This Program requires cost sharing or matching as described below.

24 CFR 578.73 of the Rule requires that recipients must match all grant funds, except for leasing funds, with no less than 25 percent of funds or in-kind contributions from other sources. 24 CFR 578.73.

Project applicants that intend to use program income as a match must provide an estimate of how much program income will be used for the match. HUD will not require YHDP Renewal or replacement projects to meet the 25 percent match requirement if the applicant is able to demonstrate it has taken reasonable steps to maximize resources available for youth experiencing homelessness.

### 4. Eligible Project Applicants (McKinney-Vento Act, 24 CFR 578.15, 24 CFR 5.100)

Eligible project applicants for the CoC Program Competition are found at 24 CFR 578.15 and in the Act and include nonprofit organizations, states, local governments, instrumentalities of state

Page 34 of 128

**Suppl. App. 122**

and local governments, Indian Tribes and TDHE [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)]. Public housing agencies, as such term is defined in 24 CFR 5.100, are eligible without limitation or exclusion. For-profit entities are ineligible to apply for grants and are prohibited from being subrecipients of CoC Program grant funds.

**5. Indian Tribes and Tribally Designated Housing Entities (TDHE)**

The Consolidated Appropriations Act, 2021 (Public Law 116-260, approved December 27, 2020) amended Title IV to add Section 435 of the Act to allow Indian Tribes and Tribally Designated Housing Entities (TDHE) to be Collaborative Applicants, eligible entities, or subrecipients of the CoC Program in addition to amending Title IV Section 401 to add the terms "Formula Area" and "Indian Tribe." These amendments mean that not only may Tribes and TDHEs apply for grants through other CoCs, but that formula areas, as that term is defined in the Indian Housing Block Grant program at 24 CFR 1000.302, are eligible to be added to the geographic areas of existing CoCs or may be included in newly formed CoCs through the CoC registration process (see Notice CPD-22-02).

Any applicant that is not a Tribe or TDHE proposing to site a project on a reservation or trust land must include a Tribal resolution from the Tribe authorizing the applicant to do so or a letter from an official or principal of the Indian Tribe or TDHE who is authorized to act on behalf of the Indian Tribe or TDHE. Tribes do not need to include a Tribal resolution to site a project on their own reservation or trust land.

**6. Collaborative Applicants**

Only CoCs with a valid e-snaps registration for the FY 2024 – FY 2025 CoC Program and YHDP Competition will have access to the FY 2024 – FY 2025 CoC Consolidated Application in e-snaps, which includes the CoC Application, CoC Priority Listing, and the project application(s). CoCs should not attempt to change Collaborative Applicants during the FY 2024 – FY 2025 CoC Program and YHDP Competition without prior HUD approval unless HUD replaces the CoC's designated Collaborative Applicant under the authority of Section 402(c) of the Act. HUD will approve Collaborative Applicant changes outside the annual CoC Program Registration process under the following circumstances:

**a.** the Collaborative Applicant made an error when entering the Collaborative Applicant name in the CoC Applicant Profile;
**b.** the CoC-designated Collaborative Applicant is no longer in business;
**c.** the CoC designates a new Collaborative Applicant; or
**d.** HUD designated a new Collaborative Applicant as a remedial action under Section 402(c) of the Act.

In cases where the CoC changes its designated Collaborative Applicant during the CoC Program Registration process, the CoC must notify the local HUD CPD field office, in writing, stating the reason for the Collaborative Applicant change. The notice to HUD must provide documentation of the CoC's approval of the change (e.g., a copy of the meeting minutes to include the date and attendees).

## B. Rules and Regulations Applicable to HUD NOFOs

Applicants must comply with these rules to apply.

**1. Eligibility Requirements for Applicants of HUD's Financial Assistance Programs**

The following requirements affect applicant eligibility. Detailed information on each requirement is found in the "Eligibility Requirements for Applicants of HUD's Competitive Programs" document on HUD's Funding Opportunities page. Applicants who fail to meet any of these eligibility requirements are deemed ineligible to receive HUD funding.

1. Universal Identifier and System for Award Management (SAM.gov) Requirements
2. Outstanding Delinquent Federal Debts
3. Debarments or Suspensions, or both
4. Mandatory Disclosure Requirement
5. Pre-selection Review of Performance
6. Sufficiency of Financial Management System
7. False Statements
8. Failure to conducting Business in Accordance with Ethical Standards/Code of Conduct
9. Prohibition Against Lobbying Activities

In addition, each applicant under this NOFO must have the necessary processes and systems in place to comply with the Award Term in Appendix A of 24 CFR part 170 if the applicant receives an award, unless an exception applies as provided in 2 CFR170.110.

**2. Resolution of Civil Rights Matters**

Applicants who fail to meet any of the following threshold eligibility requirements are deemed ineligible. Applications from ineligible applicants are not rated or ranked and will not receive HUD funding.

Outstanding civil rights matters must be resolved before the application submission deadline. Project applicants, who after review are confirmed to have civil rights matters unresolved at the application submission deadline, will be deemed ineligible. Their applications will receive no further review, will not be rated and ranked, and will not receive funding.

a. An applicant is ineligible for funding if the applicant has any of the charges, cause determinations, lawsuits, or letters of findings referenced in subparagraphs (1) – (5) that are not resolved to HUD's satisfaction before or on the application deadline date for this NOFO.

(1) Charges from HUD concerning a systemic violation of the Fair Housing Act or receipt of a cause determination from a substantially equivalent state or local fair housing agency concerning a systemic violation of a substantially equivalent state or local fair housing law proscribing discrimination because of race, color, religion, sex (including sexual orientation and gender identity), national origin, disability or familial status;

(2) Status as a defendant in a Fair Housing Act lawsuit filed by the United States alleging a pattern or practice of discrimination or denial of rights to a group of persons raising an issue of general public importance under 42 U.S.C. § 3614(a);

(3) Status as a defendant in any other lawsuit filed or joined by the Department of Justice, or in which the Department of Justice has intervened, or filed an amicus brief or statement of interest, alleging a pattern or practice or systemic violation of Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, the Americans with Disabilities Act, Violence Against Women Act,

**Suppl. App. 124**

or a claim under the False Claims Act related to fair housing, non-discrimination, or civil rights generally including an alleged failure to affirmatively further fair housing;

(4) Receipt of a letter of findings identifying systemic non-compliance with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974; Violence Against Women Act; or the Americans with Disabilities Act; or

(5) Receipt of a cause determination from a substantially equivalent state or local fair housing agency concerning a systemic violation of provisions of a state or local law prohibiting discrimination in housing based on sexual orientation, gender identity, or lawful source of income.

b. HUD will determine whether actions to resolve the charge, cause determination, lawsuit, or letter of findings taken before the application deadline date will resolve the matter. Examples of actions that may be sufficient to resolve the matter include, but are not limited to:

(1) Current compliance with a voluntary compliance agreement signed by all the parties;

(2) Current compliance with a HUD-approved conciliation agreement signed by all the parties;

(3) Current compliance with a conciliation agreement signed by all the parties and approved by the state governmental or local administrative agency with jurisdiction over the matter;

(4) Current compliance with a consent order or consent decree;

(5) Current compliance with a final judicial ruling or administrative ruling or decision; or

(6) Dismissal of charges.

**3. Program-Specific Requirements**

a. **Advancing Racial Equity**. In accordance with Executive Order 13985, Executive Order 14091, *Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government,* and Federal fair housing and civil rights laws, HUD is emphasizing rating factors regarding CoC evaluation of racial disparities as well as system and program changes to address racial equity within CoCs. Responses to preventing and ending homelessness should address racial inequities to ensure successful outcomes for all persons experiencing homelessness using proven approaches, such as: developing a coordinated community response created in partnership with a racially diverse set of stakeholders and people experiencing homelessness and partnering with organizations with experience serving underserved populations. CoCs should review local policies, procedures, and processes with attention to identifying barriers that result in racial disparities, and taking steps to eliminate barriers to improve racial equity and to address disparities. Note that any actions taken in furtherance of this section must be consistent with Federal nondiscrimination requirements.

In Rating Factors V.B.1.p. and V.B.2.e, Collaborative Applicants must demonstrate how the CoC addresses racial inequities, including identifying and eliminating barriers that result in racial disparities. In particular, Collaborative Applicants must demonstrate how the CoC's project selection will address racial inequities.

b. **Affirmative Marketing and Outreach**. You must submit a narrative demonstrating that the housing, services, outreach, or other benefits provided under this grant will be affirmatively

Page 37 of 128

**Suppl. App. 125**

conducted broadly throughout the local area and nearby areas and targeted to reach any eligible persons in demographic groups that would be unlikely or least likely to be aware of the benefits of a HUD award absent such efforts, or entities that serve such groups. Such demographic groups may include, for example, Black and Brown persons or communities, individuals with limited English proficiency, individuals with disabilities, or families with children. Strategies for affirmative marketing or outreach include outreach through community contacts or service providers or at community centers serving the target population; and marketing on websites, social media channels, television, radio, and print media serving local members of the targeted group. You must describe the affirmative marketing/outreach activities that will be conducted if you are selected for a HUD award.

Collaborative Applicants must demonstrate via narrative response to rating factor V.B.1.j that the housing, services, outreach, or other benefits provided by the CoC are affirmatively conducted broadly throughout the local area and nearby areas and targeted to reach any eligible persons in demographic groups that would be unlikely or least likely to be aware of the benefits of a HUD award absent such efforts. At minimum, the narrative response must demonstrate: (1) how your CoC's street outreach efforts, including the methods it uses to ensure all persons experiencing unsheltered homelessness are identified and engaged; (2) how your CoC tailored its street outreach to persons experiencing homelessness who are least likely to request assistance; (3) that your CoC conducts street outreach throughout their entire geographic areas in a way that allows for quick identification and engagement of people experiencing unsheltered homelessness; (4) your CoC's street outreach methods provide effective communications for persons with disabilities including large print, sign-language interpreters, Braille, and other formats; and (5) how your CoC's street outreach methods provide access for persons with limited English proficiency. 2,500 character maximum.

c. **Experience Promoting Racial Equity**

In accordance with Executive Order 13985, Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, Executive Order 14091, Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, and Federal fair housing and civil rights law, your application must demonstrate that you have the experience and the resources to effectively address the needs of underserved communities, particularly Black and Brown communities, who are substantially overrepresented in the homeless population. This may include experience successfully working directly with such groups, experience designing or operating programs that equitably benefit such groups, or experience successfully advancing racial equity in other ways. This may also include experience soliciting, obtaining, and applying input from such groups when designing, planning, or implementing programs and activities.

Collaborative Applicants must provide a narrative response, in the CoC Application, which addresses the requirement outlined in the paragraph above. This narrative will be evaluated for sufficiency. If the narrative is deemed insufficient, it will be a "Curable Deficiency" that will be communicated to the Collaborative Applicant for correction. 2,500 character maximum.

d. **Affirmatively Furthering Fair Housing**

With some exceptions for Federally recognized Indian tribes and their instrumentalities, the application must discuss how the applicant will carry out the proposed activities in a manner that

Page 38 of 128

**Suppl. App. 126**

affirmatively furthers fair housing in compliance with the Fair Housing Act and its implementing regulations, and how applicants will meet the requirements of the definition of AFFH at 24 CFR 5.151. Applicants may propose activities that are consistent with their jurisdiction's Analysis of Impediments (AI), an Assessment of Fair Housing (AFH), or other means of fair housing planning that meaningfully supports their AFFH certification.

If the applicant will carry out proposed activities in a jurisdiction with an AFH, the proposed activities should be consistent with the AFH's fair housing goals and with fair housing strategies specified in the jurisdiction's Consolidated Plan or Public Housing Agency Plan.

In response to Rating Factor V.B.1.o, Collaborative Applicants must describe how their proposed NOFO activities, including selection of projects, are aligned with AFFH requirements, as specified at 24 CFR 578.93(c) of the Rule.

**4. Criteria for Applicants**

**a. Eligible Project Applications.** In addition to eligible renewal project applications, the following types of project applications will be eligible for completion and submission under this NOFO. Ineligible project applications will not be reviewed.

> **(1) *CoC Planning projects.*** All Collaborative Applicants are eligible and encouraged to apply for CoC Planning funds which they may use according to 24 CFR 578.39. CoC Planning project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. Collaborative Applicants must not rank Planning project applications in the FY 2024 - 2025 CoC Program Competition. Planning projects will not affect a CoC's available amount for new and renewal project applications because it is not included in the CoC's ARD calculation.

> **(2) *UFA Costs projects*.** Only those CoC-designated Collaborative Applicants approved for UFA designation by HUD are eligible to apply for UFA Costs project funds as described in 24 CFR 578.41. UFA Costs project application must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. Collaborative Applicants must not rank UFA Costs projects in the FY 2024 - 2025 CoC Program Competition. UFA Costs projects will not affect a CoC's available amount for new and renewal project applications as it is not included in the CoC's ARD calculation.

> **(3) *New Projects Created Through the CoC Reallocation or CoC Bonus processes*.** CoCs may apply for the following types of new CoC projects through reallocation or the CoC Bonus process:

>> **(a)** PH-PSH projects.

>> **(b)** PH-RRH projects.

>> **(c)** Joint TH/PH-RRH component projects.

>> **(d)** Dedicated HMIS project for the costs at 24 CFR 578.37(a)(4) that may only be carried out by the HMIS Lead, which is the recipient or subrecipient of an HMIS grant and is listed on the HMIS Lead form in the CoC Applicant Profile in e-snaps.

Additionally, if the CoC has organizations within its geographic area that are victim service providers, the HMIS Lead, or subrecipient, may request HMIS funds for a comparable database. Victim service providers may also request HMIS funds in their project application budgets to enter data into a comparable database.

**(e)** SSO-CE project to develop or operate a Coordinated Entry system.

Prior to completing a new project application created through the reallocation process or Bonus processes, project applicants should consult with the CoC to determine which of these options will be available in the local CoC competition.

If HUD determines that a CoC Bonus or CoC Reallocation project applicant or a Collaborative Applicant incorrectly classified one or more new projects as reallocation or CoC Bonus, HUD may reclassify the project(s) as either reallocation or CoC Bonus if the CoC exceeded either its reallocation or CoC Bonus amounts. For example, if a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, and there are CoC Bonus funds available, HUD may reclassify the new project application as CoC Bonus during its review. If a project applicant uses both reallocation and CoC Bonus amounts to create a single new project but did not have enough available from either source, HUD will reduce the project to the amount available, if any.

A new CoC project may only use reallocated funds from eligible CoC renewal project(s) that have previously been renewed under the CoC Program and have a current grant agreement.

For new projects created through the CoC Bonus process, HUD must determine the CoC has demonstrated that the projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**(4)** ***New Projects Created Through DV Bonus or DV Reallocation processes.*** To be considered for DV Bonus or DV Reallocation, new projects must be:

**(a)** PH-RRH projects dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking that are defined as homeless under 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act;

**(b)** Joint TH/PH-RRH component projects defined in section I.B.2.b.(18) of this NOFO dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who are defined as homeless under 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act; or

**(c)** SSO-CE project to implement policies, procedures, and practices that equip the CoC's coordinated entry to better meet the needs of individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking.

Where a new project may be eligible for the DV Bonus, CoC Bonus or reallocation process, if HUD determines that a project applicant incorrectly classified one or more new projects as a DV Bonus or DV Reallocation, HUD may reclassify the project(s). For example, if the

Page 40 of 128

**Suppl. App. 128**

proposed project does not propose it is dedicated to serve individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, HUD may condition the project to ensure the required population is served or HUD may reclassify the project(s) as either CoC reallocation or CoC Bonus if the project(s) are eligible. If a project does not have enough funding available from CoC Bonus or reallocation sources, HUD will reduce the project to the amount available, if any, and determine if the project is feasible at the reduced rate.

For new projects created through DV Bonus, HUD must determine if the CoC has demonstrated that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**(5)** *New YHDP Projects Created through YHDP Replacement processes.* In general, CoCs may replace renewing YHDP project(s) to create one or more new YHDP Replacement projects. The YHDP Replacement process occurs when: (1) a CoC replaces a YHDP Renewal project to create one or more new YHDP project(s) that has the same recipient (referred to as YHDP Replacement in this NOFO); (2) a CoC is reallocating a YHDP Renewal project to create one or more new projects with a new recipient (referred to as YHDP Reallocation in this NOFO).); or (3) a CoC is reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process.

> **(a)** YHDP Renewal project applicants may submit renewal applications [see section III.B.4.c)] for minor changes to a project, including adding or modifying select Special YHDP Activities under section III.B.4.b.(5); however, if a renewing YHDP project applicant chooses to modify the current project in a way that does not meet the definition of renewal project found at III.B.4.c of this NOFO, it must submit a YHDP Replacement project application.

> **(b)** A YHDP Renewal project applicant may apply to expand its current project through the YHDP Replacement process. See section III.B.4.a.(6)(c) for more information.

> **(c)** If an eligible YHDP Renewal project applicant submits a YHDP Replacement project application instead of submitting a renewal project application, it must:

>> (i.) include the grant number from the YHDP Renewal project(s) being replaced with the YHDP Replacement project application. The CoC's Collaborative Applicant is responsible for ensuring that only a renewal YHDP or replacement YHDP project application is submitted through the CoC Priority Listing. If the Collaborative Applicant submits both a renewal and replacement YHDP project application for the same project, HUD will only select the renewal YHDP project application;

>> (ii.) include a letter of support from the Youth Action Board; and

>> (iii.) show that the project is consistent with the CoC's most recent Coordinated Community Plan.

> **(d)** HUD will only fund new YHDP Replacement projects which includes YHDP Reallocation projects as described below and in sections I.B.3.e and III.B.4.b.(5) of this NOFO:

>> (i.) Permanent Housing, including PH-PSH and PH-RRH projects.

**Suppl. App. 129**

(ii.) Joint TH/PH-RRH Component.

(iii.) TH or Crisis Residential Transitional Housing which is a form of transitional housing that is short-term, low-barrier, using a congregate living setting, and provides access to the following supportive services in particular: family engagement and unification, case management, emergency triage services and other supportive services whose purpose is to move youth rapidly into stable housing.

(iv.) SSO, including, but not limited to, housing search and placement services, case management, drop-in centers which are a physical location that offers a variety of services to individuals and families experiencing homelessness that can be funded through the drop-in center grant or through another grant, legal services, or street outreach.

(v.) SSO-CE.

(vi.) SSO - Host Home and Kinship Care. A model in which a family agrees to permit a youth to reside with them. Recognizing that the addition of another person in the home may increase costs to the family, HUD will entertain applications that propose to house youth with families and to subsidize the additional costs attributable to housing the youth. The residence is in a community-based setting. The family could be related to the youth and the length of stay may be time-limited or without time limits. YHDP funds may be used to subsidize the increased costs to the family that are attributable to housing the youth. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination by the recipient for HUD review upon request.
(vii.) HMIS.

(viii.) The inclusion of TH and SSO that are not SSO-CE are only available to YHDP Replacement project applications which includes YHDP Reallocation projects. No other project applicant is allowed to submit new project applications with these components; and if received, will be rejected.

(ix.) HUD will review new YHDP Reallocation and YHDP Replacement project applications to ensure the activities requested are eligible and the amounts requested do not exceed the amounts available for YHDP reallocation or, in the case of YHDP Replacements, the ARA of the renewal project(s) being replaced. HUD will not reject YHDP projects applications; however, HUD may require YHDP grant recipients to correct or revise information submitted after the final award announcement, prior to executing the grant agreement.

(x.) New YHDP Reallocation projects or projects created through the YHDP Replacement processes must include at least as many housing units and at least as much funding for the combination of Rental Assistance, Operating Costs, and Leasing as the grant being reallocated or replaced unless the YHDP Community demonstrates that a majority of their YHDP funding is being used for the combination of Rental Assistance, Operating Costs, and Leasing.

**(6)** *Expansion Project.* HUD will allow project applicants to apply for new expansion projects to expand existing projects to increase the number of units, persons served, services provided to existing program participants, or to add additional activities to HMIS and SSO-CE projects. [see section I.B.2.b.(9) of this NOFO]

CoC Bonus, DV Bonus, CoC Reallocation, and DV Reallocation funds may only be used to expand eligible CoC and DV Renewal projects. Applications to expand YHDP Renewal projects through the YHDP Replacement process can only be funded with funding reallocated from another YHDP Renewal project.

The new expansion project applications must meet the project eligibility and project quality thresholds in sections III.C.4.a. and b. of this NOFO and must be for the same component as the project being expanded. If the new expansion project exceeds the amount of funding available under the reallocation or Bonus processes, HUD will reduce the funding request to the available amount, which could affect the activities of the new expansion project. If both the new expansion project and the renewal project it expands are conditionally selected for funding, one grant agreement incorporating both approved project applications will be executed. To apply for an expansion grant with CoC Bonus, DV Bonus, DV Reallocation, or CoC Reallocation funding, project applicants must submit separate new and renewal project applications and both projects must be ranked by the CoC with unique rank numbers. In the case of YHDP Replacement applications to expand existing YHDP Renewal projects, applicants must submit a YHDP Replacement and a YHDP Reallocation application separately and each project must be included in the CoC's Priority Listing; however, these projects must not be ranked.

If a project application does not meet the following requirements, or if the renewal project the new project application is proposing to expand is not selected for award, HUD will review the new project and will consider it as a standalone project during the selection process provided that the project is feasible on its own with its requested funding and provided it passes project eligibility and project quality threshold requirements.

    **(a)** The following limitations apply to expansion grant applications:

        (i.) HUD will not fund expansion applications that include requests for capital costs (i.e., new constructions, rehabilitation, or acquisition) and will only allow 1-year funding requests.

        (ii.) CoC Bonus, CoC Reallocation, DV Bonus or DV Reallocation funding cannot be used to expand a YHDP renewal project.

        (iii.) If CoC Bonus, DV Bonus or CoC Reallocation funding is used to expand a DV Renewal project, the entire expanded project must be 100 percent dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraph (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

        (iv.) When DV Reallocation funding is used to expand another project, the entire expansion project must meet all the requirements of a DV Bonus project.

(v.) New YHDP projects created with reallocated YHDP funding may be used to expand an existing YHDP renewal project through the YHDP Replacement process. The expansion YHDP project must meet the requirements of a new YHDP Replacement application.

**(b)** Project applicants expanding an eligible CoC Renewal, or DV Renewal project must:

(i.) submit the renewal project application that will be expanded and a new project application with expansion information;

(ii.) in the new project application, enter the grant number of the eligible renewal project proposed for expansion;

(iii.) indicate how the new project application will expand units, beds, services, persons served, or services provided to existing program participants, or in the case of HMIS or SSO-CE projects, how the current activities will be expanded for the CoC's geographic area;

(iv.) ensure the funding request for the expansion grant is within the funding parameters allowed under CoC Reallocation, CoC Bonus, DV Bonus, or DV Reallocation amounts available.

**(c)** Project applicants expanding an eligible YHDP Renewal project through the YHDP Replacement process must:

(i.) submit a YHDP Renewal project application and a new YHDP Reallocation project application with the expansion information through the YHDP Replacement process, including the grant number of the YHDP Renewal project being expanded.

(ii.) indicate how the expansion project application will expand units, beds, services, persons served, or services provided to existing program participants

(iii.) ensure the funding request for the YHDP Reallocation application to expand the YHDP Renewal project is within the funding parameters allowed under the YHDP Reallocation amount available.

(iv.) ensure the YHDP Renewal and YHDP Reallocation project applications meet the requirements in sections I.B.3.e and III.B.4.b.(5) of this NOFO

**(d)** DV Bonus and DV Reallocation Expansion Applications.

(i.) DV Bonus and DV Reallocation funds can only be used for an application to expand an existing renewal project if the new expansion project is dedicated to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

(ii.) Project applicants may use DV Bonus funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of

Page 44 of 128

**Suppl. App. 132**

this population; however, only the new project application for the expansion will be considered for DV Bonus funds. Only the new project application for the expansion will be considered for DV Bonus funds and HUD will use the DV Bonus selection process described in I.B.3.j.

(iii.) If an applicant proposes to use DV Reallocation funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population, the entire project, including the renewal project being expanded, must serve 100 percent individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. In the case of DV Reallocation Projects, HUD will use the Tier 1 and Tier 2 selection process described in section I.B.3.h of this NOFO.

(iv.) For expansion applications created with new DV Bonus or DV Reallocation funds, if the application does not meet the above requirements for an expansion project or the renewal portion is not selected, HUD will review the new project and will consider it as a standalone DV Bonus or DV Reallocation project during the selection process provided that the project is feasible on its own with its requested funding and provided it passes project eligibility and project quality threshold requirements.

**(7)** *Consolidation Project.* Applicants intending to use the consolidation process to combine two or more, but no more than 10, eligible renewal projects (including renewing YHDP projects), may do so through the renewal project application.

**(a)** For renewal projects consolidating during the FY 2024 Funding Process, the current period of performance and budget period must have end dates in CY 2025. For renewal projects consolidating during the FY 2025 Funding Process, the period of performance and budget period of the expiring grant must have end dates in CY 2026. Applicants intending to use the consolidation process must ensure:

(i.) Budget Line Items (BLIs) for the consolidated project application submitted, exactly match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended;

(ii.) inclusion of the expiring grant numbers with period of performance and budget period start and end dates for the projects that are consolidating;

(iii.) are in good standing with HUD, meaning none of the projects have:

    i. outstanding audit or monitoring findings,
    ii. outstanding obligation to HUD that is in arrears,
    iii. unresolved construction delays,
    iv. a history of poor financial management/drawdown issues,
    v. history of low occupancy levels, or lack experience in administering the

**Suppl. App. 133**

project type, or
vi. other capacity issues.

(iv.) the projects have the same recipient and are for the same component.

**(b)** YHDP Renewal projects that wish to consolidate may establish a single YHDP Replacement grant to replace multiple YHDP Renewal grants.

**(c)** The following projects cannot be consolidated and if a project application meeting these characteristics attempts to consolidate, HUD will not consider the consolidation, but rather select the projects individually in their ranked position (if applicable) provided they pass project eligibility and project quality threshold requirements:

(i.) a DV Renewal project cannot consolidate with a CoC Renewal project (a project not dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act) or a YHDP Renewal project;

(ii.) a YHDP Renewal project cannot consolidate with a CoC Renewal project or a DV Renewal project;

(iii.) a TH and a PH project cannot consolidate to form a Joint TH/PH-RRH component project; and

(iv.) transition grants cannot consolidate with any other project.

**(d)** To request the consolidation of eligible renewal projects, project applicants must submit renewal projects for the individual projects to be included in the consolidation and each project application must identify the grant number that will survive which must be the grant number with the earliest start date in CY 2025 for FY 2024 consolidations or CY 2026 for consolidations that occur during the FY 2025 Funding process. Project applications for the grants that are proposed to be part of the consolidation must be ranked with a unique rank number for each project, and if all those grants are selected, HUD will conditionally award the single surviving grant based on its ranked position to include the amount of funding of all grants included in the consolidation. All other project applications included in the surviving grant will be removed from the CoC's ranking resulting in project applications below to slide up one ranked position. Project applicants must not submit a consolidated project application that contains two different components (e.g., PH and TH).

**(e)** The start date for the consolidated grant, if conditionally awarded, will be the day after the expiration date of the eligible renewal project with the earliest expiration date. HUD will calculate the expiration date for the consolidated grant by averaging the expiration dates for all expiring grants included in the consolidated grant weighted by the size of each expiring grant. If that date falls on the first through the fifteenth of a month, then the expiration date will be the last day of the previous month. If the date falls on the sixteenth through the end of the month, then the expiration date will be the last day of the month.

**Suppl. App. 134**

HUD will calculate the expiration date for the consolidated grant as follows: It will be 'X' months after the end of the 12th month after the start date for the consolidated grant with 'X' determined by calculating the sum for all grants of the total award times the number of months after the expiration of the first expiring grant that the grant expires and dividing that sum by the total award for the consolidated grant. If the calculation of 'X' results in a partial month, if it is less than 0.5, then the consolidated grant will expire on the last day of the previous month, and if it is 0.5 or more, then the consolidated grant will expire on the last day of the calculated month.

**(f)** Collaborative Applicants designated by HUD as UFAs have more flexibility in how they manage their CoC Program-funded projects, making the consolidation of projects during the CoC Program competition unnecessary. A Collaborative Applicant with UFA designation can consolidate projects during the grant term, so long as the consolidations are not combining different component types and the projects are funded under the same grant (e.g., projects are currently funded under the same renewal grant). If a UFA-designated Collaborative Applicant consolidates projects during the grant term, it can apply to renew them during the CoC Program Competition as consolidated projects.

**b. Eligible Costs.** Except as otherwise stated below, 24 CFR 578.37 through 578.63 identify the eligible costs that applicants may request under the CoC Program.

**(1)** Eligible costs for YHDP projects originally funded under the YHDP Competition are also eligible YHDP Renewal project costs under this NOFO. Additionally, YHDP Renewal projects may include the YHDP Special Activities described in section III.B.4.b.(5) subject to requirements in sections III.B.4.c. including III.B.4.c.(7)(b) of this NOFO. YHDP Replacement project applications under this NOFO may include requests for eligible CoC Program Costs, the YHDP activities described in section III.B.4.a.(5) and the YHDP Special Activities in section III.B.4.s.(6) of this NOFO. HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

**(2)** Section 605(a)(2) of VAWA 2022 amended section 423(a) of the McKinney-Vento Homeless Assistance Act to add the following eligible activity to the CoC program: "Facilitating and coordinating activities to ensure compliance with the emergency transfer plan requirement in [34 U.S.C. 12491(e)] and monitoring compliance with the confidentiality protections in [34 U.S.C. 12491(c)(4)]."

HUD has determined that eligible activities paid for under the VAWA costs category are not subject to the CoC program's spending caps on administrative costs under section 423(a)(10), (11), and (12). This activity may be included in new project applications, added to eligible renewal projects through expansion or added to eligible renewal projects by shifting up to 10 percent of funds from one eligible activity to the VAWA costs line item.

**(a)** Examples of eligible costs for emergency transfer facilitation include the costs of assessing, coordinating, approving, denying and implementing a survivor's emergency transfer which includes:

(i.) Assistance with moving costs. Reasonable moving costs to move survivors for an emergency transfer.

Page 47 of 128

**Suppl. App. 135**

(ii.) Assistance with travel costs. Reasonable travel costs for survivors and their families to travel for an emergency transfer.

(iii.) Security Deposits. Grant funds can be used to pay for security deposits of the safe units the survivor is transferring to via an emergency transfer.

(iv.) Utilities. Grant funds can be used to pay for costs of establishing utility assistance in the safe unit the survivor is transferring to.

(v.) Housing Fees. Fees associated with getting survivor into a safe unit via emergency transfer, includes but not limited to application fees, broker fees, holding fees, trash fees, pet fees where the person believes they need their pet to be safe, etc.

(vi.) Case management. Grant funds can be used to pay staff time necessary to assess, coordinate and implement emergency transfers.

(vii.) Housing navigation. Grant funds can be used to pay staff time necessary to identify safe units and facilitate moves into housing for survivors through emergency transfers.

(viii.) Technology to make an available unit safe. Grant funds can be used to pay for technology that the individual believes is needed to make the unit safe, including but not limited to doorbell cameras, security systems, phone and internet service when necessary to support security systems for the unit, etc.

**(b)** Examples of eligible costs for monitoring compliance with the VAWA confidentiality requirements include the costs of ensuring compliance with the VAWA confidentiality requirements which includes:

(i.) Monitoring and evaluating compliance with VAWA confidentiality requirements.

(ii.) Developing and implementing strategies for corrective actions and remedies.

(iii.) Program evaluation of confidentiality policies, practices and procedures.

(iv.) Training on compliance with VAWA confidentiality requirements.

(v.) Reporting to Collaborative Applicant, HUD and other interested parties on compliance with VAWA confidentiality requirements.

(vi.) Costs for establishing methodology to protect survivor information.

(vii.) Staff time associated with maintaining adherence to confidentiality requirements.

**(3)** Section 5707 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (PL 117-263, December 23, 2022, 136 Stat 2395) amended section 423(a) of the McKinney-Vento Homeless Assistance Act to allow projects in rural areas [as defined in section I.B.2.b.(26) of this NOFO] to use program funds to pay for the following eligible Continuum of Care Program activities:

**(a)** Payment of short-term emergency lodging, including in motels or shelters, directly or through vouchers.

Page 48 of 128

**Suppl. App. 136**

**(b)** Repairs to units in which individuals and families experiencing homelessness will be housed; or are currently not fit for human habitation.

**(c)** Staff training, professional development, skill development, and staff retention activities.

HUD has determined that eligible activities paid for under the Rural costs category may be included in new project applications or added to eligible renewal projects through expansion.

HUD will publish a list of CoCs located in rural areas as defined in section I.B.2.b.(26) of this NOFO.

**(4) *Indirect Costs.*** Indirect cost rules under 2 CFR part 200, as may be amended from time to time, apply. Project applicants that intend to charge indirect costs to the award must clearly state in the project application(s) the rate and distribution base the recipient intends to use, and if applicable, the rate and distribution base to be used by any subrecipient(s). If the rate is a Federally negotiated indirect cost rate, the project application must include the corresponding negotiated indirect cost rate agreement signed by the cognizant agency. A government department or agency unit that receives no more than $35 million in direct federal funding per year and has developed and maintains an indirect cost rate proposal and supporting documentation in accordance with 2 CFR part 200, appendix VII, may use the rate and distribution base specified in that indirect cost rate proposal, unless the cognizant agency requires the proposal to be submitted for negotiation.

For each applicant or intended subrecipient that meets the conditions for using the de minimis rate under 2 CFR 200.414(f) and will use that rate to charge indirect costs, the project application must clearly state the intended use of the de minimis rate. As described in 2 CFR 200.403, costs must be consistently charged as either indirect or direct costs but must not be double charged or inconsistently charged as both. Once an organization elects to use the de minimis rate, the organization must apply this methodology consistently for all Federal awards until the organization chooses to negotiate for a rate, which the organization may apply to do at any time. Documentation of the decision to use the de minimis rate must be retained on file for audit.

**(5) *Special YHDP Activities.*** YHDP Renewal and YHDP Replacement including YHDP Reallocation projects may submit applications that include the following special YHDP activities, which are ineligible under the CoC Program, subject to the conditions specified in this section:

**(a)** Recipients may carry out the activities below with written notice to the Deputy Assistant Secretary for Special Needs, subject to the requirements governing grant agreement amendments at 24 CFR 578.105. HUD will consider the inclusion of these activities in the project application as notification to the Deputy Assistance Secretary for Special Needs.

(i.) Housing projects may have leases for a minimum term of 1 month plus 1 day under rental assistance budget line items.

(ii.) Projects may use leasing, sponsor-based rental assistance, and project-based rental assistance in RRH projects.

(iii.) In addition to the eligible costs listed in 24 CFR 578.59(a), recipients may use project administration funds to support costs of involving youth with lived experience in project implementation, execution, and improvement.

(iv.) Recipient may use project administrative funds to attend conferences and trainings that are not HUD-sponsored or HUD-approved, provided that the subject matter is relevant to youth homelessness.

(v.) Projects may employ youth who are receiving services, or housing assistance, from the recipient organization. Recipients that use this special YHDP activity must maintain documentation that discloses the nature of work that the youth performs, and that the youth is not in a position that creates a conflict of interest.

(vi.) Projects may use habitability standards in 24 CFR 576.403(c) rather than Housing Quality Standards in 24 CFR 578.75 for short- or medium-term (up to 24 months) housing assistance. Recipients implementing this special YHDP activity must keep documentation of which standards they apply to the units and proof that the units complied with standards before assistance is provided for every unit funded.

(vii.) Recipients may provide moving expenses to a program participant more than once.

(viii.) Recipients may provide payments of up to $500 per month for families that provide housing under a host home and kinship care model to offset the increased costs associated with having youth housed in the unit.

(ix.) YHDP recipients may continue providing supportive services to program participants for up to 12 months after the program participant exits homelessness, transitional housing or after the end of housing assistance.

(x.) Recipients may use grant funds for the following if they are necessary to assist program participants to obtain and maintain housing. Recipients and subrecipients must maintain records establishing how it was determined that paying the costs was necessary for the program participant to obtain and retain housing and must also conduct an annual assessment of the needs of the program participants and adjust costs accordingly:

>  i. Security deposits for units in an amount not to exceed 2 months of rent.

>  ii. The costs to pay for any damage to housing due to the action of program participants, which may be paid while the youth continues to reside in the unit. The total costs paid for damage per program participant may not exceed the cost of 2 months' rent.

>  iii. The costs of providing household cleaning supplies to program participants.

>  iv. Housing start-up expenses for program participants, including furniture, pots and pans, linens, toiletries, and other household goods, not to exceed $300 in value per program participant.

>  v. The one-time cost of purchasing a cellular phone and service for program participant use, provided access to a cellular phone is necessary to obtain or

Page 50 of 128

**Suppl. App. 138**

maintain housing and the costs of the phone and services are reasonable per 2 CFR 200.404.

vi. The cost of internet in program participants' units if the costs of the service is reasonable per 2 CFR 200.404.

vii. Payment of rental arrears consisting of a one-time payment for up to 6 months of rent in arrears, including any late fees on those arrears.

viii. Payment of utility arrears of up to 6 months per utility.

ix. Up to 3 months of utilities for a program participant, based on the utility costs schedule for the unit size and location.

x. In addition to transportation costs eligible in 24 CFR 578.53(e)(15), recipients may pay gas and mileage costs for a program participant's personal vehicle for trips to and from medical care, employment, childcare, or other services eligible under this section.

xi. Legal fees, including court fees, bail bonds, and required courses and equipment.

xii. Program participant's past driving fines and fees that are blocking a young person from being able to obtain or renew a driver's license and impacting their ability to obtain or maintain housing. Additionally, recipients may pay for program participants' costs for insurance and registration for personal vehicles, if the personal vehicle is necessary to reach medical care, employment, childcare, or other services eligible under this section.

**(b)** Under the conditions specified below, recipients may make use of the following built-in exceptions to this NOFO's requirements, subject to approval by the Deputy Assistance Secretary for Special Needs and requirements governing grant agreement amendments at 24 CFR 578.105. To expedite grant agreement processing, applicants should include as much information as possible as part of their project application to demonstrate they meet the conditions specified below.

(i.) Projects may provide up to 36 months of RRH rental assistance to program participants if the recipient demonstrates: (1) the method it will use to determine which youth need rental assistance beyond 24 months and (2) the services and resources that will be offered to ensure youth are able to sustain their housing at the end of the 36 months of assistance.

(ii.) Projects may continue providing supportive services to program participants for up to 24 months after a program participant exits homelessness, transitional housing or after the end of housing assistance if the recipient demonstrates: (1) the proposed length of extended services to be provided; (2) the method it will use to determine whether services are still necessary; and (3) how those services will result in self-sufficiency and ensure stable housing for program participants.

(iii.) Projects may continue providing supportive services to program participants for up to 36 months after program participants exit homelessness, if the services are in connection with housing assistance, such as the Foster Youth to Independence

Page 51 of 128

**Suppl. App. 139**

initiative, or if the recipient can demonstrate that extended supportive services ensures continuity of caseworkers for program participants.

(iv.) Rental assistance may be combined with leasing or operating funds in the same unit, provided that the recipient submits a project plan that includes safeguards to ensure that no part of the project would receive a double subsidy.

(v.) Projects may provide payments of up to $1,000 per month for families that provide housing under a host home and kinship care model, provided that the recipient can show that the additional cost is necessary to recruit hosts to the program.

(vi.) YHDP recipients may pay for short-term (up to three months) emergency lodging in motels or shelters as the transitional housing component in a Joint transitional housing-rapid rehousing (TH-RRH) project, provided that the recipient can demonstrate that use of the hotel or motel room is accessible to supportive services.

**(c)** In addition to the specific activities authorized above or in 24 CFR part 578, other **innovative activities** to reduce youth homelessness may be carried out in a YHDP project, subject to approval by the Deputy Assistant Secretary for Special Needs and requirements governing grant agreement amendments at 24 CFR 578.105. Requests to carry out YHDP innovative activities are permitted to be requested in any YHDP application. YHDP Replacement applicant must demonstrate to HUD that the activity meets the following criteria; and to expedite grant agreement processing, must include as much information as possible as part of their project application.

**(d)** YHDP Renewal or YHDP Replacement applications requesting to carryout Special YHDP Activities must demonstrate the following:

(i.) The activity is approved by both the Youth Action Board (YAB) which is a group of at least 4 youth with voting power on policy decisions of the CoC, particularly on policies that relate to preventing and ending youth homelessness. Each YAB member must be age 24 or younger, and at least two-thirds of the YAB members must have lived experience/expertise of homelessness and should be representative of the youth and young adult population experiencing homelessness in the community, and must be a formal committee within the CoC, as evidenced by letters of support from each organization;

(ii.) That activity will be testing or likely to achieve a positive outcome in at least one of the four core outcomes for youth experiencing homelessness (stable housing, permanent connections, education/employment, and well-being);

(iii.) The activity is cost-effective; and

(iv.) The activity is not in conflict with fair housing, civil rights, or environmental regulations.

**c. Renewal Project Requirements.** As set forth in 24 CFR 578.33, projects may renew under the FY 2024 – FY 2025 CoC Program Competition NOFO to continue ongoing leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs.

**Suppl. App. 140**

Awards HUD made under the CoC Program and YHDP are eligible for renewal with FY 2024 CoC Program funds if they are currently operating and have an expiration date in CY 2025 (the period from January 1, 2025, through December 31, 2025). Therefore, project applications for grants previously awarded 1 year of funding, including projects awarded funding under the FY 2023 CoC Program Competition NOFO, are renewable for the FY 2024 CoC Program funding opportunity if they are currently operating and have an expiration date in CY 2025.

Awards made under the CoC Program and YHDP will be eligible for renewal with FY 2025 CoC Program funding subject to the FY 2025 HUD Appropriation and if they have a signed grant agreement with HUD that will expire in CY 2026 (January 1, 2026, and ending December 31, 2026). For awards made in FY 2024, HUD will make FY 2025 awards using the FY 2024 application, subject to any FMR and Cost of Living adjustments and FY 2025 appropriations. Projects that did not meet the eligibility criteria to renew in FY 2024 but are eligible for FY 2025 renewal funding must submit a renewal application by the FY 2025 application submission deadline established in this NOFO.

**(1)** Renewal project applications must be submitted by the same recipient that signed the executed grant agreement for the grant being renewed, or entity that became the recipient through a grant agreement transfer amendment. To be eligible as a renewal project, the application must (1) be for the same amount of funding before any adjustments described in this NOFO (e.g. FMR adjustments), or the amount reduced due to reallocation ; (2) be for the same program component; (3) in the case of CoC renewal projects, must continue to serve program participants who are enrolled in the project under the project's current grant agreement; and (4) in the case of DV Bonus renewal projects and YHDP Renewal projects, must continue to serve the same subpopulation.

**(2)** If HUD conditionally selects a renewal grant during the FY 2024 or FY 2025 funding process that does not have an expiration date that meets the renewal eligibility requirements prescribed by this NOFO, HUD will withdraw any funds conditionally selected for award.

**(3)** Projects that were eligible under predecessor programs, specifically Safe Haven projects, will continue to be eligible under the CoC Program and will continue to be eligible for renewal of leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs under 24 CFR 578.33(d)(1) so long as the project continues to serve the same population and the same number of program participants or units in the same type of housing as identified in their most recent grant agreement, amended grant agreement, signed before August 31, 2012. No new Safe Haven projects will be funded; however, existing Safe Haven projects may be renewed to continue to carry out activities that are eligible costs under Subpart D of the Rule.

**(4)** The total request for each renewing project, including non-competitive YHDP Renewal and YHDP Replacement projects, is limited to a project's ARA. Additionally, where two or more eligible projects are being consolidated through the project application, the total ARA of the consolidation project must be equal to or less than the sum of the original renewal projects before consolidation. Because funds for acquisition, new construction, and rehabilitation are not renewable, grants being renewed whose original expiring award included acquisition, new construction, and rehabilitation funds may only renew leasing, supportive services, rental assistance, operating, and HMIS costs and must not exceed 10 percent in administrative costs.

Page 53 of 128

**Suppl. App. 141**

**(5)** HUD will recapture grant funds remaining unspent at the end of the previous grant period when it renews a grant.

**(6)** HUD encourages the consolidation of eligible renewal grants as provided in section I.B.3.d of this NOFO. This does not apply to CoCs that HUD designates as UFAs, because UFAs enter into a single renewal grant agreement with HUD for the CoC's entire geographic area. If applicable, HUD issues a separate UFA grant agreement that only includes YHDP grants.

**(7)** Subject to HUD approval and the terms of the NOFO, the following requests may be included in a renewal application:

**(a)** CoC renewal project applications may include non-significant changes including shifting up to 10 percent of funds from one approved eligible activity to another.

**(b)** YHDP Renewal project applications from any round may include non-significant changes including adding select Special YHDP Activities in section III.B.4.b.(5) and shifting up to 10 percent of funds from one approved eligible activity to another.

**(c)** DV Renewal project applications may include non-significant changes including shifting up to 10 percent of funds from one approved eligible activity to another.

Renewing DV Bonus projects must continue to serve individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act. YHDP renewal projects must serve youth, age 24 or younger, who qualify as homeless under paragraph (1), (2), and (4) of 578.3, including unaccompanied, pregnant and parenting youth, where no member of the household is older than 24. Additionally, these projects may serve youth aged 24 and under who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**(d)** Renewal applications that include requests to shift more than 10 percent of funds from one approved eligible activity to another and other significant changes as defined at 24 CFR 578.105 will not be considered during the CoC Program Competition by HUD. If an application includes a budget shift that exceeds 10 percent, HUD will correct the project budget to reflect the previously awarded budget amounts.

**(e)** CoC renewal project applicants may also apply to transition an eligible renewal project from one program component to another eligible new component through reallocation and use those funds to create a single, new transition grant [see section I.B.2.b.(30) of this NOFO]. YHDP Renewal project applicants are not permitted to utilize the transition grant application process. YHDP applicants must submit a YHDP Replacement application to change program components.

**(f)** YHDP Replacement projects cannot request capital costs (i.e., new construction, acquisition, or rehabilitation).

**(8)** *Actual Per Unit Cost – Renewal Grants.* Applicants requesting renewal of grants for rental assistance may request a per-unit amount less than the Fair Market Rent (FMR) if the

actual rent per unit under lease is less than the FMR. This will help reduce the number of projects receiving rental assistance that have large balances of unspent funds remaining at the end of the operating year. Renewal project applicants must ensure the amount requested will be sufficient to cover all eligible costs as HUD cannot provide funds beyond the amount awarded through the FY 2024 – 2025 CoC Program Competition. Project applications for rental assistance cannot request more than 100 percent of the published FMR. **New project applications must adhere to 24 CFR 578.51(f) and must request the full FMR amount per unit.** See section V.D of this NOFO for additional information regarding FMR adjustments for projects receiving funds for rental assistance.

**(9)** *Renewal and Replacement Grant Terms.* CoC Program renewal, YHDP Renewal, and YHDP Replacement project applications submitted during the FY 2024 and FY 2025 CoC and YHDP Funding Processes are limited to a 1-year grant term with 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309.

Any renewal PH project that receives project-based rental assistance or operating costs may request up to a 15-year grant term; however, project applicants may only request 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309. Project applicants must apply for the additional funds as a renewal project application prior to the anniversary of the first expenditure of grant funds by which date grant funds should have been expended; or, if HUD extends the date that funds must be expended, the date the extension expires. HUD does not guarantee CoC Program funds past the 1 year of renewal funding.

The first year of funding for YHDP Replacement projects will be based on the 1-year renewal amount of the current YHDP project being replaced. The YHDP Replacement project's operating start date will be the day after the end of the previous grant term for the project being replaced.

**d. New Project Requirements.** CoCs may submit new projects created through DV Bonus, CoC Bonus, CoC Reallocation, DV Reallocation, YHDP Replacement including YHDP Reallocation, or a combination of reallocation and CoC Bonus. A CoC designated Collaborative Applicant may submit a new CoC Planning project application, and if applicable, a UFA Costs project application.

To expend funds within statutorily required deadlines, applicants funded for sponsor-based and project-based rental assistance must execute the grant agreement and begin providing rental assistance within 2 years. However, HUD strongly encourages all rental assistance to begin within 12 months of award. Applicants that are unable to begin rental assistance within the 12-month period should consult with the local HUD CPD field office.

**(1)** HUD will review project subrecipient eligibility as part of the project quality threshold review process. Project applicants must submit documentation of the subrecipient's eligibility with the project application.

**(2)** Any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under (or families headed by youth aged 24 and under, including pregnant or parenting youth) who have an unsafe primary nighttime residence and no safe alternative to that residence.

**Suppl. App. 143**

**(3)** Per the Consolidated Appropriations Act, 2024, to receive funding for a new CoC project, except those created through reallocation, HUD must determine the CoC has demonstrated that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance [See more information on System Performance in sections I.A.4.b.(4) and V.B.2.b of this NOFO].

**(4)** *New Project Grant Terms.* The initial grant term for new project applications may be 1-year, 2-years, 3-years, 4-years, 5-years, or 15-years. HUD may extend the grant consistent with 2 CFR 200.308 and 2 CFR 200.309. New projects awarded 1-year grants under the FY 2024 funding process will be eligible for renewal with FY 2025 CoC Program funds if they have a signed grant agreement with HUD that will expire in CY 2026 (January 1, 2026, and ending December 31, 2026). HUD will make FY 2025 awards using the FY 2024 application, subject to any FMR adjustments and FY 2025 appropriations. If a HUD conditionally selects a FY 2024 grant for renewal in FY 2025 that does not have an expiration date in CY 2026, HUD will withdraw any award conditionally selected for FY 2025 renewal funding. The following exceptions apply:

**(a)** HUD will allow new projects to request 1 year of funding with a longer initial grant term not to exceed 18 months. HUD has determined that most new projects requesting 1 year of funding normally take approximately 3 to 6 months to begin fully operating the new project (e.g., hiring staff, developing partnerships with landowners if leasing or renting). Therefore, a new project requesting 1 year of funding may request a grant term of 12 months to 18 months that will allow for the additional start-up process. Any new projects requesting capital costs (i.e., new construction, acquisition, or rehabilitation) are not eligible for 1-year funding requests. See (g) below for more information on new projects requesting capital costs. Transition grant applications cannot request 18-month grant terms.

**(b)** Any new expansion project submitted to expand an eligible renewal CoC Program-funded project may only request a 1-year grant term, regardless of the project type.

**(c)** Any new project that requests tenant-based rental assistance may request a 1-year, 2-year, 3-year, 4-year, or 5-year grant term.

**(d)** Any new project that requests leasing costs - either leasing costs only or leasing costs plus other costs (e.g., supportive services, HMIS) - may request up to a 3-year grant term.

**(e)** Any new project that requests project-based rental assistance or sponsor-based rental assistance, or operating costs may request up to a 15-year grant term; however, the project applicant may only request up to 5 years of funds. Funding for the remainder of the term is subject to availability. Applicants must apply for additional funds through a renewal project application in the competition held in the calendar year prior to the anniversary of the first expenditure of grant funds, or if HUD has extended the grant term, the date the extension expires. HUD does not guarantee CoC Program funds past the initial 5-year grant term, if conditionally awarded.

**(f)** Any new project that requests operating costs, supportive services only, HMIS, and project administrative costs may request 1-year, 2-year, 3-year, 4-year, or 5-year grant terms with funding for the same number of years.

**Suppl. App. 144**

**(g)** Any new project conditionally selected by HUD that requests new construction, acquisition, or rehabilitation costs (capital costs) must request a minimum of a 3-year grant term and may request up to a 5-year grant term. Any new projects requesting capital costs are not eligible for 1-year funding requests. If a new project requests 1 year of funding with capital costs, HUD will increase the grant term to 3-years and the new project must spend the funds requested over a 3-year period.

If an applicant requests funds for new construction, acquisition, or rehabilitation in addition to requesting funds for operating, supportive services, or HMIS, the funding will be for the 3-years to 5-years requested, and the grant term will be 3-years to 5-years plus the time necessary to acquire the property, complete construction, and begin operating the project. HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

**(h)** All new CoC Planning or UFA Costs project applications are limited to 1-year grant terms and 1 year of funding.

    (i.) The maximum amount for one year of funding to spend on administrative costs associated with the CoC planning activities listed at 24 CFR 578.39 is 5 percent of FPRN, up to a maximum of $1,500,000, or $50,000 whichever is greater.

    (ii.) The maximum amount for one year of funding to spend on administrative costs associated with the UFA costs described at 42 USC 11360(g) is up to 3 percent of FPRN or $1,250,000 per fiscal year; whichever is less.

    (iii.) CoC Planning and UFA Costs grants are not renewable; however, if a FY 2024 CoC Planning or UFA Costs application is selected for award, HUD will fund a FY 2025 CoC Planning and, if applicable, a UFA Costs grant based on the FY 2024 application and subject to FY 2025 appropriations.

**(i)** Any new project that is requesting consideration under the DV Bonus or DV Reallocation processes [see sections I.B.3.j, I.A.3.c and I.B.2.b.(6) of this NOFO] may only request 1 year of funding, but may request a longer initial grant term not to exceed 18 months regardless of project application component type.

## C. Rules that Affect How HUD Evaluates Applications

**1. Assessing Applicant Risk**

In evaluating risks posed by applicants, HUD may use a risk-based approach and may consider any items such as the following:

a. Financial stability;

b. Quality of management systems and ability to meet the management standards prescribed in 2 CFR part 200;

c. History of performance. The applicant's record in managing Federal awards, if it is a prior recipient of Federal awards, including timeliness of compliance with applicable reporting requirements, failing to make significant progress in a timely manner, failing to meet planned activities in a timely manner, conformance to the terms and conditions of previous Federal awards, and, if applicable, the extent to which any previously awarded amounts will be expended prior to future awards;

d. Reports and findings from audits performed under Subpart F—Audit Requirements of 2 CFR part 200 or the reports and findings of any other available audits; and

e. The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on non-Federal entities.

**2. Past Performance**

In evaluating applications for funding, HUD will consider an applicant's past performance in managing funds. Items HUD will consider include, but are not limited to:

The ability to account for funds in compliance with applicable reporting and record keeping requirements

Timely use of funds received from HUD

Timely submission and quality of reports submitted to HUD

Meeting program requirements

Meeting performance targets as established in the grant agreement

The applicant's organizational capacity, including staffing structures and capabilities

Timely completion of activities and receipt and expenditure of promised matching or leveraged funds

The number of persons served or targeted for assistance

Promoting self-sufficiency and economic independence

Producing positive outcomes and results

OMB-designated repositories of government-wide data, as noted in 2 CFR 200.206(a)

HUD may reduce cores based on the past performance review, as specified under Section V.A. Review Criteria. Whenever possible, HUD will obtain and review past performance information. If this review results in an adverse finding related to integrity of performance, HUD reserves the right to take any of the remedies provided in the Pre-Selection Review of Performance section of the *Eligibility Requirements for Applicants of HUD Financial Assistance Programs*.

**3. Statutory and Regulatory Requirements**

To be eligible for funding under the FY 2024 - 2025 CoC Program and YHDP Competition NOFO, project applicants must meet all statutory and regulatory requirements in the Act and the Rule. The non-competitive renewal and replacement of YHDP grants are administered under the Consolidated Appropriations Act, 2024 which permits YHDP projects to be renewed or replaced competitively or non-competitively through the CoC Program [see section I.B.3.e of this NOFO]. The Consolidated Appropriations Act, 2024 provides that none of the FY 2024 funds made

Page 58 of 128

**Suppl. App. 146**

available under this NOFO shall be available to provide funding for new projects, except for projects created through reallocation, unless the Secretary determines that the continuum of care has demonstrated that projects are evaluated and ranked based on the degree to which they improve the continuum of care's system performance.

Project applicants can obtain a copy of the Act and the Rule on HUD's website or by contacting the NOFO Information Center at 1-800-483-8929. Individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities may visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs for more information on how to make an accessible telephone call to HUD.

**4. Threshold Requirements**

Applicants who fail to meet any of the following threshold eligibility requirements are deemed ineligible. Applications from ineligible applicants are not rated or ranked and will not receive HUD funding.

**a. Project Eligibility Threshold.** HUD will review all projects to determine if they meet the following project eligibility threshold requirements on a pass/fail standard. If HUD determines the applicable standards are not met for a project, HUD will reject the project. HUD will consider any project requesting renewal funding as having met these requirements through its previously approved grant application unless HUD receives information to the contrary (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient routinely does not draw down funds from eLOCCS at least once per quarter, consistently late Annual Performance Report (APR) submissions). Approval of new and renewal projects is not a determination by HUD that a recipient is compliant with applicable fair housing and civil rights requirements.

> **(1)** Project applicants and potential subrecipients must meet the eligibility requirements of the CoC Program as described in the Act and the Rule and provide evidence of eligibility required in the application (e.g., nonprofit documentation).
> **(2)** Project applicants and subrecipients must demonstrate the financial and management capacity and experience to carry out the project as detailed in the project application and the capacity to administer federal funds. Demonstrating capacity may include a description of the applicant and subrecipient experience with similar projects and with successful administration of SHP, S+C, or CoC Program funds or other federal funds.
> **(3)** Project applicants must submit the required certifications specified in this NOFO.
> **(4)** The population to be served must meet program eligibility requirements as described in the Act, the Rule, and section I.B.3.k of this NOFO.
> **(5)** Project applicants, except Collaborative Applicants that only receive awards for CoC Planning costs and, if applicable, UFA Costs, must agree to participate in a local HMIS system. However, in accordance with Section 407 of the Act, any victim service provider that is a recipient or subrecipient must not disclose, for purposes of HMIS, any personally identifying information about any client. Victim service providers must use a comparable database that meets the needs of the local HMIS.

**b. Project Quality Threshold.**

**Suppl. App. 147**

HUD will review all new project applications to determine if they meet the following project quality threshold requirements. HUD will not award funds to a new project unless the project was created through reallocation, or the CoC has demonstrated to HUD's satisfaction that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance. HUD will consider any project requesting renewal funding, including renewing YHDP, as having met project quality threshold requirements through its previously approved grant application unless HUD receives information to the contrary (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient routinely does not draw down funds from eLOCCS at least once per quarter, consistently late APR submissions) and/or if the renewal project has compliance issues which results in the project not operating in accordance with the Rule. If awarded, a recipient must meet all the criteria listed in the criteria column for its component. Additionally, the housing and services proposed must be appropriate to the needs of the program participants and the community. A determination that a project meets the project quality threshold is not a determination by HUD that a recipient is compliant with applicable fair housing and civil rights requirements.

HUD will consider YHDP Replacement project applications including applications for new YHDP projects created through YHDP reallocation as having met project quality threshold requirements if the project application activities and costs are eligible under this NOFO. If a YHDP Replacement (including YHDP Reallocation) project application is not for activities and costs that are eligible under this NOFO, HUD will not reject the project under this project quality threshold, but HUD will require the project applicant to correct or revise information submitted after the final CoC Program award announcement but before executing the grant agreement.

| Permanent Housing: Permanent Supportive Housing or Rapid Rehousing | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Permanent Housing projects must receive at least 4 out of the 5 points available for this project type. New Permanent Housing projects that do not | 1 | The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants. |
| | 1 | The type of supportive services that will be offered to program participants will ensure successful retention in or help to obtain permanent housing, including all supportive services regardless of funding source. |
| | 1 | The proposed project has a specific plan for ensuring program participants will be individually assisted to obtain the benefits of mainstream health, social, and employment programs for which they are eligible to apply meets the needs of program participants (e.g., Medicare, Medicaid, |

**Suppl. App. 148**

| | | SSI, Food Stamps, local Workforce office, early childhood education). |
|---|---|---|
| receive at least 4 points will be rejected. | 1 | Program participants are assisted to obtain and remain in permanent housing in a manner that fits their needs (e.g., provides the participant with some type of transportation to access needed services, safety planning, case management, additional assistance to ensure retention of permanent housing). |
| | 1 | The average cost per household served is reasonable, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| **Joint TH/PH-RRH** | | |
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Joint TH/PH-RRH component project applications must receive at least 6 out of 8 points available for this project type. New Joint TH/PH-RRH component projects that do not receive at least 6 points will be rejected. | 1 | The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants (e.g., two or more bedrooms for families.) |
| | 2 | The proposed project will provide enough rapid rehousing assistance to ensure that at any given time a program participant may move from transitional housing to permanent housing. This may be demonstrated by identifying a budget that has twice as many resources for the RRH portion of the project than the TH portion, by having twice as many PH-RRH units at a point in time as TH units, or by demonstrating that the budget and units are appropriate for the population being served by the project. |
| | 1 | The type of supportive services that will be offered to program participants will ensure successful retention or help to obtain permanent housing, including all supportive services regardless of funding source. |
| | 1 | The proposed project has a specific plan for ensuring program participants will be individually assisted to obtain the benefits of mainstream health, social, and employment programs for which they are eligible to apply, and which meets |

Page 61 of 128

| | | the needs of program participants (e.g., Medicare, Medicaid, SSI, Food Stamps, local Workforce office, early childhood education). |
|---|---|---|
| | 1 | Program participants are assisted to obtain and remain in permanent housing in a manner that fits their needs (e.g., provides the participant with some type of transportation to access needed services, safety planning, case management, additional assistance to ensure retention of permanent housing). |
| | 1 | The project adheres to a Housing First model as defined in section I.B.2.b.(15) of this NOFO. |
| | 1 | The average cost per household served is reasonable, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| **SSO-Coordinated Entry** | | |
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New SSO-CE project applications (also known as centralized or coordinated assessment) must receive at least 2 out of the 4 points available for this project type. New SSO-CE projects that do not receive at least 2 points will be rejected. | 1 | The Coordinated Entry system is easily available/reachable for all persons within the CoC's geographic area who are seeking homelessness assistance. The system must also be accessible for persons with disabilities within the CoC's geographic area. |
| | 1 | There is a strategy for advertising that is designed specifically to reach households experiencing homelessness with the highest needs and who are disproportionately represented within the CoC's homelessness response system. |
| | 1 | There is a standardized assessment process. |
| | 1 | Ensures program participants, taking into account those who are from historically underserved population through the CoC's prioritization process, are directed to appropriate housing and services that fit their needs. |

Page 62 of 128

**Suppl. App. 150**

**HMIS**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New HMIS project applications must receive at least 3 out of the 4 points available for this project type. New HMIS projects that do not receive at least 3 points will be rejected. | 1 | How the HMIS funds will be expended in a way that is consistent with the CoC's funding strategy for the HMIS and furthers the CoC's HMIS implementation. |
| | 1 | The HMIS collects all Universal Data Elements as set forth in the HMIS Data Standards. |
| | 1 | The ability of the HMIS to un-duplicate client records. |
| | 1 | The HMIS produces all HUD-required reports and provides data as needed for HUD reporting (e.g., APR, quarterly reports, data for CAPER/ESG reporting) and other reports required by other federal partners. |

**CoC Planning – Collaborative Applicants Only**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New CoC Planning projects, submitted only by the CoC's designated Collaborative Applicant, must receive at least 3 out of the 5 points available for | 1 | Governance and Operations-The CoC conducts meetings of the entire CoC membership that are inclusive and open to members and demonstrates the CoC has a written governance charter in place that includes CoC policies. |
| | 1 | CoC Committees-The CoC has CoC-wide planning committees, subcommittees, or workgroups to address the needs of persons experiencing homelessness in the CoC's geographic area that recommends and sets policy priorities for the CoC. |
| | 2 | The proposed planning project that will be carried out by the CoC with Planning grant funds are compliant with the provisions of 24 CFR 578.7. |

Page 63 of 128

| this project type. CoC Planning projects that do not receive at least 3 points will be rejected. | 1 | The funds requested will improve the CoC's ability to evaluate the outcome of both CoC Program-funded and ESG-funded projects. |
|---|---|---|

HUD will review the UFA Costs submitted by the UFA designated Collaborative Applicant to ensure appropriate match and eligibility of costs requested. HUD will also assess all new project applications (i.e. reallocations, DV Bonus, CoC Bonus, and YHDP replacement projects) for the following minimum project eligibility, capacity, timeliness, and performance standards. For HUD to consider projects as meeting project quality threshold, all new projects must meet all the following criteria:

**(1)** project applicants and potential subrecipients must have satisfactory capacity, drawdowns, and performance for existing grant(s) funded under the CoC Program, as evidenced by timely reimbursement of subrecipients, regular drawdowns, and timely resolution of any monitoring findings; however, this does not apply to project applicants who have never received a CoC Program funded project;

**(2)** for expansion project applications, project applicants must describe the part of the project that is being expanded and demonstrate the project is not replacing other funding sources; and

**(3)** project applicants must demonstrate their ability to meet all timeliness standards per 24 CFR 578.85. Project applicants with existing projects must demonstrate they met all renewal project threshold requirements of this NOFO. HUD reserves the right to deny a funding request for a new project, if the request is made by an existing recipient that HUD finds to have significant issues related to capacity, performance, unresolved audit, or monitoring findings related to one or more existing grants; or does not routinely draw down funds from eLOCCS at least once per quarter. HUD also reserves the right to withdraw funds if no APR is submitted on the prior grant.

**c. Project Renewal Threshold.**
CoCs must consider the need to continue funding for projects expiring in CY 2025 (January 1, 2025 to December 31, 2025) when applying for FY 2024 CoC and YHDP funding and CY 2026 (January 1, 2026 to December 31, 2026) when applying for FY 2025 CoC and YHDP funding. Renewal projects must meet the minimum project eligibility, capacity, timeliness, and performance standards identified in this NOFO or they will be rejected from consideration for funding:

**Suppl. App. 152**

**(1)** When considering renewal projects for award; HUD will review information in eLOCCS, APRs, and information provided from the local HUD CPD field office; including monitoring reports and audit reports as applicable, and performance standards on prior grants, and will assess projects using the following criteria on a pass/fail basis:

**(a)** whether the project applicant's performance met the plans and goals established in the initial application, or grant as amended;

**(b)** whether the project applicant demonstrated all timeliness standards for grants being renewed have been met, including those standards for the expenditure of grant funds;

**(c)** the project applicant's performance in assisting program participants to achieve and maintain independent living and records of success, except dedicated HMIS projects are not required to meet this standard; and

**(d)** evidence of unwillingness of project applicants to accept technical assistance, a history of inadequate financial accounting practices, indications of project mismanagement, a drastic reduction in the population served, program changes have been made without prior HUD approval, or the loss of project site control.

**(2)** HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons:

**(a)** outstanding obligation to HUD that is in arrears or for which a payment schedule has not been agreed upon;

**(b)** audit finding(s) for which a response is overdue or unsatisfactory;

**(c)** history of inadequate financial management accounting practices;

**(d)** evidence of untimely expenditures on prior award;

**(e)** history of other major capacity issues that have significantly affected the operation of the project and its performance;

**(f)** history of not reimbursing subrecipients for eligible costs in a timely manner, or at least quarterly; and

**(g)** history of serving ineligible program participants, expending funds on ineligible costs, or failing to expend funds within statutorily established timeframes.

### 5. Certification of Consistency with the Consolidated Plan.

Each project applicant must submit a certification by the jurisdiction in which the proposed project(s) will be located that the applicant's project application for funding is consistent with the

jurisdiction's HUD-approved consolidated plan. The certification must be made in accordance with the provisions of the consolidated plan regulations at 24 CFR part 91, subpart F. Form HUD-2991 must be completed and dated between May 1, 2024 and August 29, 2025. Additionally, applicants that propose to locate a project on a reservation or trust land must include a tribal resolution from the tribe authorizing the applicant to do so or a letter from an official or principal of the Indian Tribe or TDHE who is authorized to act on behalf of the Indian Tribe or TDHE. Tribes do not need to include a tribal resolution to site a project on their own reservation or trust land. A tribal resolution is the formal manner in which the tribal government expresses its legislative will in accordance with its organic documents. In the absence of such organic documents, a written expression adopted pursuant to tribal practices will be acceptable.

For project applications submitted for FY 2024 funding, the Certification of Consistency with the Consolidated Plan Form HUD-2991 must be completed and dated between May 1, 2024 and October 30, 2024.

If project applicants are eligible to apply for FY 2025 funding, but aren't included on the HUD-2991 submitted during the FY 2024 funding process, the CoC must submit a certification by the jurisdiction in which the proposed project(s) will be located and the certification must be made in accordance with the provisions of the consolidated plan regulations at 24 CFR part 91, subpart F. The FY 2025 Form HUD-2991 must be completed and dated between November 1, 2024 and August 29, 2025.

All project applications submitted and listed on the CoC Project Listings by Collaborative Applicants must be included in the certification either by submitting one correctly signed and dated HUD-2991 from the appropriate jurisdiction that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction. See section IV.F.3.e for more information.

**6. Participative Planning and Implementation.**

Applicants must identify the steps they will take to ensure that traditionally underserved populations (such as Black, Latino, and Indigenous and Native American persons; Asian American persons, Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons who live in rural areas, persons with disabilities, and others adversely affected by persistent poverty or inequality) will be able to meaningfully participate in the planning process. The applicant must identify the specific populations that it will include, identify community organizations that represent these populations, and describe how these populations will be included in the planning process. For capital investment projects, recipients should commit to and demonstrate plans to employ low- and very low-income persons and/or use Section 3 businesses at levels beyond those required by Section 3.

In accordance with Section 504 of the Rehabilitation Act of 1973 (29 U.S.C.§ 794) and HUD's implementing regulations at 24 CFR Part 8, and Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131-12134) and the implementing regulation at 28 CFR Part 35, the programs services, and activities funded through this NOFO must be accessible to and usable by persons with disabilities. Applicants and recipients must ensure meetings are held in facilities that are physically accessible to persons with disabilities and ensure effective communication for

Suppl. App. 154

individuals with disabilities. Auxiliary aids or services and reasonable accommodations must be provided, when necessary, to ensure equal participation by individuals with disabilities.

In addition, applicants and recipients must take reasonable steps to ensure meaningful language access for persons with limited English proficiency (LEP) pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d and Executive Order 13166. For assistance in ensuring meaningful access for individuals with limited English proficiency, recipients and subrecipients should consult HUD's Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons (HUD's LEP Guidance) published in the Federal Register on January 22, 2007 (72 Fed. Reg. 2732).

# IV. APPLICATION AND SUBMISSION INFORMATION

## A. Application Package

**1. Authoritative Versions of HUD NOFOs.** The version of these NOFOs as posted on Grants.gov are the official documents HUD uses to solicit applications. While the CoC Program NOFO is officially posted on Grants.gov, this program uses *e-snaps*, an electronic application system. HUD does not accept faxed applications or supportive documents.

**2. Exemptions.** Parties that believe the requirements of the NOFO would impose a substantial burden on the exercise of their religion should seek an exemption under the Religious Freedom Restoration Act (RFRA).

# B. System for Award Management (SAM) and Unique Entity Identifier (UEI)

### 1. SAM Registration Requirement

You must register with www.sam.gov/ before submitting your application. You must maintain current information in SAM on immediate and highest-level owners and subsidiaries, as well as on all predecessors that have been awarded a federal contract or grant within the last three years, if applicable. Information in SAM must be current for all times during which you have an active Federal award or an application or plan under consideration by HUD.

### 2. UEI Requirement

All entities doing business with the Federal government must use the UEI created in SAM.gov. Your application must include a valid UEI that is registered and active at www.sam.gov.

For projects conditionally selected for award, HUD verifies that your organization has an active SAM registration prior to release of awarded funds and will withhold processing funds if your organization's SAM registration has expired or isn't consistent with the information provided on the SAM.gov website. A UEI discrepancy may also occur if HUD approves a grant to be amended to a new recipient (see section VI.4 of this NOFO).

UEI discrepancies are a curable deficiency that may be corrected by the applicant with timely action. If a UEI discrepancy isn't resolved within the timeframe prescribed by the Notification of Curable Deficiency the applicant receives from HUD, HUD may reject the project and award funds to project(s) on the CoC's Priority Listing that were reduced due to insufficient funding

**Suppl. App. 155**

availability; or HUD may select another eligible project(s) according to the project's rank on the CoC's Priority Listing.

## C. Other Guidance and Notifications

**1. Federalism.**

E.O. 13132 prohibits, to the extent practicable and permitted by law, an agency from promulgating policies that have federalism implications and either impose substantial direct compliance costs on state and local governments and are not required by statute, or preempt state law, unless the relevant requirements of Section 6 of the executive order are met. This notice does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the executive order.

**2. Section 102 of the HUD Reform Act.**

Section 102 of the Department of Housing and Urban Development Reform Act of 1989 (HUD Reform Act) (42 U.S.C. 3545) and the regulations codified at 24 CFR 4, subpart A, contain several requirements that are designed to ensure greater accountability and integrity in the provision of certain types of assistance administered by HUD. On January 14, 1992, HUD published a notice that also provides information on the implementation of Section 102 (57 FR 1942). The documentation, public access, and disclosure requirements of Section 102 applies to assistance awarded under NOFOs published as described below:

**a. Documentation, Public Access, and Disclosure Requirements.** HUD will ensure that documentation and other information regarding each application submitted pursuant to a FY 2024 - 2025 CoC and YHDP NOFO are sufficient to indicate the basis upon which assistance was provided or denied. This material, including any letters of support, will be made available for public inspection for a 5-year period beginning not less than 30 days after the award of the assistance. Material will be made available in accordance with the FOIA and HUD's implementing regulations at 24 CFR 15.

**b. Form HUD 2880, "Applicant/Recipient Disclosure/Update Report".** HUD will also make available to the public for a period of 5 years all applicant disclosure reports (form HUD 2880) submitted in connection with a FY 2024 - 2025 CoC and YHDP NOFO. Updated reports (also reported on form HUD 2880) will be made available along with the applicant disclosure reports, but in no case for a period of less than 3 years. All reports will be made available in accordance with the FOIA and HUD's implementing regulations.

**c. Publication of Recipients of Funding.** HUD's regulations at 24 CFR part 4 provide that HUD will publish a notice in the Federal Register to notify the public of all funding decisions made by HUD to provide:

**(1)** Assistance subject to Section 102(a) of the HUD Reform Act; and
**(2)** Assistance provided through grants or cooperative agreements on a discretionary (non-formula, non-demand) non-competitive basis.

**3. Section 103 of the HUD Reform Act.**

Section 103 of the HUD Reform Act, codified at 24 CFR part 4, subpart B, applies to this funding competition until the announcement of selection of successful applicants. HUD's employees involved in the review of applications and in the making of funding decisions are

Page 68 of 128

**Suppl. App. 156**

prohibited by the regulations from providing advance information to any person (other than an authorized HUD employee) concerning funding decisions or from otherwise giving any applicant an unfair competitive advantage. Persons who apply for assistance must confine their inquiries to the subject areas HUD's employees are permitted to answer under 24 CFR part 4. Applicants who have ethics-related questions may contact HUD's Ethics Law Division at 202-708-3815 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

**4. Digital Signatures and Recordkeeping.**

HUD is increasing electronic recordkeeping where feasible. HUD plans to use digital signatures on grant award and modification documents to expedite awards and modification. HUD will manage email records in an electronic format. Recipients need not print emails and file them if their email system and procedures meet records management and litigation requirements (e.g., identifying, retrieving, and retaining the records for as long as they are needed).

# D. Application Verification

Applicants should compare their application submission with the requirements in the CoC Program NOFO. The FY 2024 – 2025 CoC Program Competition NOFO located on Grants.gov is HUD's official NOFO. If a discrepancy in the CoC Program NOFO posted on Grants.gov or other information provided in any other version or supporting documentation is found, please, notify HUD immediately as indicated in section VIII of this NOFO. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

HUD will post any corrections or amendments to a CoC Program NOFO on Grants.gov.

# E. Content and Form of Application Submission

**1. CoC Registration.**

HUD required Collaborative Applicants to complete the CoC Program Registration in accordance with Notice CPD-22-02: Continuum of Care Program Registration. If a Collaborative Applicant did not complete the CoC Program Registration, HUD moved the previous year's registration forward with no changes. Collaborative Applicants and UFAs that completed their CoC Program Registration by March 7, 2024 are not required to reapply during the FY 2025 funding year. If changes to a CoC's Registration information is required during the FY 2025 funding year, CoCs must follow the Registration submission requirements in Notice CPD-22-02: Continuum of Care Program Registration for FY 2025.

**2. CoC Project Review and Ranking.**

The CoC must review each project application submitted to the CoC for inclusion on the FY 2024 CoC Priority Listing as part of the CoC Consolidated Application and either approve and rank or reject project application submissions. All project applications approved by the CoC must be listed on the CoC Priority Listing in rank order. YHDP Renewal, and YHDP

**Suppl. App. 157**

Replacement projects which includes YHDP Reallocation projects are not competitively awarded and must not be ranked.

Higher ranked projects will be assigned to Tier 1 and lower ranked projects will be assigned to Tier 2 as described in sections I.B.3.h.(1) and (2) of this NOFO. This two-tiered approach for CoCs notifies HUD which projects are prioritized for funding based on local needs and gaps.

**3. CoC Consolidated Application Submission.**

Collaborative Applicants, including any HUD-designated UFAs, must submit the CoC Consolidated Application in e-snaps on behalf of the CoC. For more information on the CoC Consolidated Application, see section IV.F of this NOFO. The CoC Consolidated Application for funds under this NOFO includes the following:

**a. FY 2024 - 2025 CoC Application.** The Collaborative Applicant must provide information about the CoC planning body, governance structure, overall performance, and the strategic planning process. The CoC Application describes the CoC's plan for ending homelessness, its system-level performance, and addresses the selection criteria specified in section V of this NOFO. HUD scores this part of the application with all charts and narratives completed (as applicable) and all required attachments to determine the order in which competitively ranked CoC projects are funded.

**b. Project Applications.** Project applications must include the population(s) and subpopulation(s) they will serve, the type of housing and services they will provide, and the budget activities they are requesting. Collaborative Applicants applying for CoC Planning and UFA Costs (if designated as a UFA by HUD) must provide a description of the activities that will be carried out with CoC Program grant funds. For more information on project applications, see section IV.F.2 of this NOFO. Additionally, all project applicants must ensure their organization has a Code of Conduct that complies with the requirements of 2 CFR part 200, as may be amended from time to time, and is included on HUD's website. If the organization's Code of Conduct does not appear on HUD's website, the project applicant must attach its Code of Conduct that includes all required information to its Project Applicant Profile in e-snaps.

**c. FY 2024 and FY 2025 CoC Priority Listings**. The CoC Priority Listing in e-snaps must include the following completed forms, certifications and attachment (see section IV.F.3):

> **(1) *Project Reallocation Form (if applicable).*** Indicates the eligible renewal projects that are being reallocated in whole or part to create new project applications;

> **(2) *CoC New Project Listing (including DV Reallocation and DV Bonus projects);***

> **(3) *CoC Renewal Project Listing (including DV Renewal projects);***

> **(4) *UFA Costs Project Listing;***

> **(5) *CoC Planning Project Listing;***

> **(6) *YHDP Renewal Project Listing;***

> **(7) *YHDP Reallocation and YHDP Replacement Project Listing; and***

> **(8) *Form HUD-2991, Certification of Consistency with the Consolidated Plan.***

CoCs are required to submit a FY 2025 CoC Priority Listing by August 29, 2025 if they are submitting applications for eligible CoC or YHDP renewal projects that were not awarded FY 2024 funding or new projects created through CoC, DV Reallocation, or YHDP Reallocation under YHDP Replacement.

Funding for FY 2025 awards are subject to FY 2025 HUD Appropriations and HUD reserves the right to amend this NOFO if additional funding is made available.

**4. CoC Review of Project Applications Prior to Submission to HUD.**

HUD expects CoCs to implement a thorough review and oversight process at the local level for both new and renewal project applications to be submitted to HUD in the FY 2024 – 2025 CoC Program Competition. HUD's experience is that many project applications contain information resulting in conditions on the grant; or for more serious infractions, HUD rejecting a project application. Deficient project applications prolong HUD's review process, which results in delayed funding announcements, lost funding for CoCs due to HUD rejecting projects, and delays accessing project funds to house and assist individuals and families experiencing homelessness. HUD expects CoCs to closely review the information provided in each project application, including Renewal, Replacement, or Reallocation projects, to ensure:

**a.** all proposed program participants will be eligible for the program component type selected;

**b.** the information provided in the project application and proposed activities are:

   **(1)** eligible and consistent with program requirements in the Rule;

   **(2)** eligible and consistent with DV Renewal, DV Reallocation and DV Bonus requirements in sections I.B.3.j and III.B.4.a.(4) of this NOFO; or

   **(3)** eligible and consistent with YHDP Renewal and YHDP Replacement project requirements which includes YHDP Reallocation provided in sections I.B.3.e and III.B.4.b.(5) of this NOFO;

**c.** each project narrative is fully responsive to the question being asked and that it meets all the criteria for that question as required by this NOFO;

**d.** the data provided in various parts of the project application are consistent; and

**e.** all required attachments correspond to the list of attachments in e-snaps, must contain accurate and complete information and must be dated between May 1, 2024 and October 30, 2024 for FY 2024 applications and November 1, 2024 and August 29, 2025 for FY 2025 applications.

**5. Electronic Submission in e-snaps.**

The submission summary in e-snaps provides the list of elements required to complete each type of project application. Collaborative Applicants will not be able to submit their Consolidated Application to HUD until all required parts are completed, including the project-level review and either accepting and ranking or rejecting the project applications. Once available, the CoC Application, Project Application, and CoC Priority Listing can be accessed at https://esnaps.hud.gov/.

**6. Timely Submission of Applications**

Page 71 of 128

Applications submitted after the deadline stated within this NOFO that do not meet the requirements of the grace period policy are marked late. Late applications are ineligible and are not considered for funding. See Section IV.G., Submission Dates and Times.

Applicants should review and follow the steps as outlined below to ensure applications are complete and submitted by the deadlines established in this NOFO. Documents referenced in this section can be found on the CoC Program page of HUD's website: https://www.hud.gov/program_offices/comm_planning/coc.

## F. CoC Consolidated Application

The CoC-designated Collaborative Applicant, including any HUD-designated UFAs, must submit the CoC Consolidated Application in e-snaps on behalf of their CoC. The Consolidated Application includes the parts listed below (for more information see the e-snaps Navigational Guides and the project application, CoC Application, and CoC Priority Listing detailed instructions located on HUD's website).

**1. The FY 2024 – 2025 CoC Application includes the following:**

**a. CoC Review, Score, and Ranking Procedures.** The CoC's written procedures that are publicly posted for all interested stakeholders and applicants that clearly describe the project-level review and ranking process that is used by the CoC to determine how CoC Program project applications submitted to the CoC are reviewed, scored, and ranked.

**b. CoC Public Notice.** A screenshot(s) from the CoC's, or a partner website, that includes the date the CoC notified the public of its local competition process, the due date for project applications, and the full CoC Application and CoC Priority Listing that includes all Project Listings of project applications submitted to HUD as accepted (in the case of non-competitive CoC Planning, UFA Costs and YHDP projects), approved and ranked or rejected.

**c. CoC Review and Ranking Process.** Documents the process used by the CoC in the local competition to review, assess, and score new and renewal project applications, a copy of one scored project application form used by most renewal project applicants that includes the objective criteria and system performance criteria and their respective maximum point values and the actual points your CoC awarded to the project applicant; and the local competition selection results for new and renewal project applications.

**d. Notification to Project Applicants of projects rejected or reduced.** The notification of the action (rejection or reduction) that must be sent to the project applicant at least 15-days prior to the HUD application submission deadline, if a new or renewal project application was submitted to the CoC in the local competition and the CoC rejected it or reduced its funding request as part of the CoC's local process.

**e. Public Notification of Ranked Project Applications.** The notification of action that all project applicants who submitted new and renewal project applications in the local CoC competition are notified at least 15-days prior to the HUD application submission deadline of the CoC's acceptance that includes the ranked position of the project applications. This notification may be posted publicly or sent via email to individual project applicants.

**f. PHA Administrative Plan.** If the CoC is seeking points under section V.B.1.g of this NOFO, a copy or the relevant excerpt from the local PHA(s) administrative planning document(s), or

**Suppl. App. 160**

other written policy developed between the CoC and the PHA(s) that describes the PHA(s) preference for persons experiencing homelessness. Instead of a relevant excerpt from the written plan, a letter from the PHA(s) that describes the PHA(s) preference for persons experiencing homelessness may be attached.

**g. Lived Experience Support Letter Comprised of Persons with Lived Experience of Homelessness.** The letter must be signed by either (1) at least three members involved in the working group (e.g., advisory committee, subcommittee) comprised of individuals with lived experience or (2) an authorized representative of the workgroup (e.g., a working chair) along with evidence that the person is authorized to represent the group, **or** (3) individual letters signed by three individuals who are involved on different committees; and the letter must demonstrate support of the priorities for serving individuals and families experiencing homelessness with severe service needs in the CoC's geographic area. Persons with lived experience may sign letters using pseudonyms to protect their privacy.

**h. Leveraging Housing Resources.** A written commitment, contract, or other formal written documents that demonstrate the number of subsidies or units being provided.

**i. Leveraging Healthcare Resources.** A written commitment from a health care organization with the value of the commitment and the date(s) healthcare resources will be provided.

**j. Housing First Evaluation.** An example of an actual evaluation of at least one project, conducted outside of your CoC local competition process.

**k. Projects to Serve Persons Defined as Homeless under paragraph (3) of 24 CFR 578.3.** If the CoC is seeking to serve persons defined as homeless under paragraph (3) of the homeless definition, a list of projects that will serve persons defined as homeless under paragraph (3) of the homeless definition.

**l. The FY 2024 HDX Competition Report.** The FY 2024 HDX Competition Report contains data submitted to HUD via HUD's Homelessness Data Exchange (HDX), including HIC, PIT count, and system performance data.

**2. Project Application(s), including for each project application:**

**a.** Charts, narrative responses, and attachments.

**b. Documentation of Applicant and Subrecipient Eligibility.** All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

**c. HUD required forms.** The following HUD required forms are built into e-snaps and must be fully completed and electronically signed before project applicants have access to the project application:

    **(1)** SF-424 Application for Federal Assistance (OMB Number: 4040-0004);

    **(2)** Form HUD-2880, Applicant/Recipient Update/Disclosure (OMB Number: 2501-0017);

    **(3)** Form HUD-424-B, HUD Applicant and Recipient Assurances and Certifications (OMB Number: 2501-0017);

**Suppl. App. 161**

**(4)** SF-LLL, Disclosure of Lobbying Activities (if applicable) (OMB Number: 4040-0013);

**(5)** Form HUD-50070, Certification for Drug-Free Workplace;

**(6)** SF-424B*: Assurances for Non-Construction Programs (OMB Number: 4040-0007);

*The SF-424B form must be completed as part of your SAM.gov registration. If an applicant fails to complete the SF-424B during their sam.gov registration or renewal, we will issue a curable deficiency notice.

**3. The CoC Priority Listing, including:**

**a. Project Reallocation Form.** Reallocation forms allow CoCs to indicate which eligible renewal projects, if any, will be reduced or eliminated through the reallocation process.

**b. CoC Project Listings.** CoC Project listing forms require all the following project applications to be ranked, with unique numbers, in order of priority and any project applications the CoC rejected must be identified:

**(1)** CoC New project applications (including CoC Reallocation, DV Reallocation, CoC Bonus, and DV Bonus applications), and

**(2)** CoC Renewal project applications (including DV Renewal Projects).

**c. YHDP Project Listings.** YHDP Project listing forms include the following non-ranked YHDP project applications:

**(1)** YHDP Renewal project applications, and

**(2)** YHDP Replacement project applications which includes YHDP Reallocation.

**d. CoC Planning and UFA Costs Project Listings.** These project listing forms include the following non-ranked project applications:

**(1)** CoC Planning project applications, and

**(2)** UFA Costs project applications (if applicable).

Collaborative Applicants must ensure the CoC only submits one project application for CoC Planning, and if the CoC's Collaborative Applicant is a HUD-designated UFA, one UFA Costs project application.

**e. Certification of Consistency with the Consolidated Plan Form HUD-2991.**

**(1)** For project applications submitted for FY 2024 funding, the Certification of Consistency with the Consolidated Plan Form HUD-2991 must be completed and dated between May 1, 2024 and October 30, 2024. This FY 2024 HUD-2991 submission certifies that projects awarded in FY 2024 and subsequently renewed in FY 2025 are consistent with the jurisdiction's HUD-approved consolidated plan.

**(2)** If a CoC includes any new or renewal projects on the FY 2025 CoC project listing that were not included on the FY 2024 HUD-2991 submission, CoCs must submit a new HUD-2991 that includes the FY 2025 new and renewal project applications to certify consistency with the jurisdiction's HUD-approved consolidated plan. The FY 2025 Form HUD-2991 must be completed and dated between November 1, 2024 and August 29, 2025.

**(3)** CoCs that propose to locate a project on a reservation or trust land were required to obtain authorization from the Tribe or TDHE, documented by a Tribal resolution or a letter from an official or principal of the Indian Tribe or TDHE who is authorized to act on behalf of the Indian Tribe or TDHE. CoCs were required to attach Tribal Resolutions or approval letters to the CoC's Registration submission in March. Tribes were not required to include a Tribal resolution or a letter from an official of the Indian Tribe or TDHE to site a project on their own reservation or trust land. A Tribal resolution is the formal manner in which the Tribal government expresses its legislative will in accordance with its organic documents. In the absence of such organic documents, a written expression adopted pursuant to Tribal practices is acceptable.

**(4)** Collaborative Applicants must certify there is a demonstrated need for all ranked (PH) renewal projects and these projects comply with program requirements and appropriate standards of housing quality and habitability on the Renewal Project Listing.

### 4. Solo Applicants.

Eligible project applicants that attempted to participate in the CoC planning process in the geographic area in which they operate, that believe they were denied the right to participate in a reasonable manner, may submit a solo project application to HUD by following the procedure found in 24 CFR 578.35. If HUD finds in favor of the solo applicant, HUD may award grant funds. Solo applicants requesting FY 2024 funding must submit their solo project application in e-snaps to HUD by 8:00 PM EDT, on October 30, 2024. If Congressional Appropriations authorize HUD to solicit applications for new FY 2025 CoC and YHDP Funding, solo applicants requesting FY 2025 funding must submit their solo project application in e-snaps to HUD by 8:00 PM EDT, on August 29, 2025. See section VII.C of this NOFO for additional information regarding the Solo Applicant appeal process.

## G. Submission Dates and Times

**1.** Completed applications for FY 2024 CoC and YHDP funding must be submitted to HUD on or before October 30, 2024, by 8:00 PM EDT. Applications for new and renewal projects applying for FY 2025 CoC and YHDP funding must be submitted by the application submission deadline at 8:00 PM EDT on August 29, 2025.

**2.** 24 CFR 578.9 requires CoCs to design, operate, and follow a collaborative process for the development of an application in response to a NOFO issued by HUD (which, under this NOFO includes applications for non-competitive YHDP Renewal and YHDP Replacement projects). As part of this collaborative process, CoCs must implement internal competition deadlines to ensure transparency and fairness at the local level. The implementation of deadlines that meet the standards outlined below for FY 2024 and FY 2025 CoC Program project applications are part of the scoring criteria as detailed in section V.B.2.g of this NOFO.

**a. Project Application.** All project applications must be submitted to the CoC no later than 30 days before HUD's CoC Program application submission deadline of 8:00 PM EDT on October 30, 2024 for FY 2024 CoC and YHDP funding and 8:00 PM EDT on August 29, 2025 for FY 2025 CoC and YHDP funding. CoCs that fail to establish this deadline for local project application(s) will receive 0 points under section V.B.2.g of this NOFO.

**b. CoC Notification to Project Applicants.** The CoC is required to notify, in writing outside of e-snaps, all project applicants who submitted their project applications to the CoC by the local CoC-established deadline whether their project application(s) will be accepted and ranked on the CoC Priority Listing, rejected, or reduced by the CoC no later than 15 days of the CoC Program application submission deadline of each FY funding opportunity.

Where a project application is being rejected or reduced, the CoC must provide the project applicant with the reason(s) for the rejection or reduction. CoCs failing to provide this information to a project applicant that submits its project application by the local competition deadline will receive 0 points under section V.B.2.g of this NOFO.

**3.** For the FY 2024 CoC and YHDP funding, HUD will consider the CoC Consolidated Application properly submitted for review when the Collaborative Applicant submits the FY 2024 – FY 2025 CoC Application, the FY 2024 CoC Priority Listing, and all FY 2024 project applications on behalf of the CoC by the FY 2024 Application Submission deadline. The "Submit" button will not be available on the Submission Summary of the FY 2024 – FY 2025 CoC Application and FY 2024 CoC Priority Listing until all required sections of the application and all parts of the listings, including accepting and ranking with a unique rank number or rejecting project applications have been completed. Collaborative Applicants should review the Submission Summary form carefully to ensure no sections state "Please Complete."

The FY 2024 - FY 2025 CoC Application and the FY 2024 CoC Priority Listing are separate submissions in e-snaps; therefore, Collaborative Applicants must ensure both the CoC Application and the CoC Priority Listing, that includes all project applications either approved and ranked or rejected, are submitted in e-snaps prior to the CoC Program application submission deadline.

The CoC Consolidated Application is considered complete at the FY 2025 Application Submission deadline. If a CoC has projects eligible to apply for renewal in FY 2025 that were not awarded FY 2024 funding; or the CoC is submitting applications for new grants through reallocation or the availability of new Congressional Appropriations in FY 2025, the Collaborative Applicant must submit a FY 2025 CoC Priority Listing and all FY 2025 project applications on behalf of the CoC to be included as part of the CoC Consolidated Application by the FY 2025 Application Submission deadline. If a CoC is not submitting applications for FY 2025 CoC and YHDP funding, the CoC is not required to submit a FY 2025 CoC Priority Listing.

**4.** Collaborative Applicants should export a PDF copy of the Submission Summary form from the FY 2024 – FY 2025 CoC Application and the FY 2024 CoC Priority Listing after they have been submitted to HUD and before closing their internet browser. This is the Collaborative Applicant's receipt of submission and proof of compliance with the FY 2024 application deadline. CoCs that are submitting new and renewal applications for FY 2025 CoC and YHDP funding should also print the Submission Summary form for the FY 2025 CoC Priority Listing for proof of compliance with the FY 2025 application deadline. HUD will not give funding consideration to any Collaborative Applicant whose FY 2024 – FY 2025 CoC Application or CoC Priority Listings are determined to be late and are unable to provide HUD with a record of submission that verifies the CoC Consolidated Application was submitted prior to the application deadlines date and time.

Page 76 of 128

**Suppl. App. 164**

**5.** HUD strongly suggests that applicants use the "Export to PDF" functionality in e-snaps to save a hard copy of all submission documents for their records. This can be completed prior to or after submission.

**6.** As stated in section IV.G.1 of this NOFO, it is imperative that all Collaborative Applicants meet the FY 2024 and FY 2025 application submission deadlines. HUD will not fund applications that are not received on time. Also, failure to submit a complete CoC Consolidated Application may result in HUD finding that the CoC does not meet the requirements of the Act or its implementing regulations under 24 CFR 578.13. If the Secretary makes that finding, HUD may take remedial action to ensure fair distribution of grant funds to eligible entities within the CoC's geographic area, which includes the possibility that HUD will designate another eligible applicant to be the Collaborative Applicant for the CoC. In addition to the remedial actions listed in 24 CFR 578.13(a), HUD may also impose another remedial action, such as requiring the CoC to create new policies and procedures to ensure that the Collaborative Applicant performs its duties.

**7.** CoC and project applicants experiencing technical difficulty with any part of the Consolidated Application should notify HUD immediately for assistance and document all attempts to obtain assistance. Notification of technical difficulties are to be sent to CoCNOFO@hud.gov. HUD will not provide assistance directly related to content, only to troubleshoot submission issues.

**8.** If after notice and reasonable opportunity to be heard, HUD finds pursuant to 24 CFR 578.13, that one or more CoCs have failed to comply with the requirements of the Act and the Rule, HUD may, solely at its discretion and only if sufficient funds become available by recapture, publish a new NOFO for eligible applicants in CoCs that HUD determined do not meet the requirements of the Act and program regulations.

## H. Intergovernmental Review

This program is not subject to Executive Order 12372, Intergovernmental Review of Federal Programs.

## I. Funding Restrictions

Not Applicable.

## J. Other Submission Requirements

**1. Standard Application, Assurances, Certifications and Disclosures**

**a. Standard Form 424 (SF-424) Application for Federal Assistance.** The SF-424 is the government-wide form required to apply for Federal assistance programs, discretionary Federal grants, and other forms of financial assistance programs. You must complete and submit the form with the other required forms and information as directed in this NOFO.

By signing the forms in the SF-424 either through electronic submission or in paper copy submission (for those granted a waiver), you and the signing authorized organization representative affirm that you both have reviewed the certifications and assurances associated with the application for Federal assistance and (1) are aware the submission of the SF-424 is an assertion that the relevant certifications and assurances are established and (2) acknowledge that the truthfulness of the certifications and assurances are material representations upon which

HUD will rely when making an award to the applicant. If it is later determined the signing authorized organization representative to the application made a false certification or assurance, caused the submission of a false certification or assurance, or did not have the authority to make a legally binding commitment for the applicant, the applicant and the individual who signed the application may be subject to administrative, civil, or criminal action. Additionally, HUD may terminate the award to the applicant organization or pursue other available remedies. Each applicant is responsible for including the correct certifications and assurances with its application submission, including those applicable to all applicants, those applicable only to Federally recognized Indian tribes, or Alaskan native villages and those applicable to applicants other than Federally recognized Indian tribes, or Alaskan native villages.

**b. Assurances (HUD 424-B).** By submitting your application, you provide assurances that, if selected to receive an award, you will comply with U.S. statutory and other requirements, including, but not limited to civil rights requirements. All recipients and subrecipients of the award are required to submit assurances of compliance with federal civil rights requirements. *See, e.g.,* Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments Act of 1972, Section 504 of the Rehabilitation Act of 1973, Violence Against Women Act, and the Age Discrimination Act of 1975; *see also* 24 C.F.R. §§ 1.5; 3.115; 8.50; and 146.25. HUD accepts these assurances in the form of the HUD 424-B, which also require compliance with HUD Reform Act requirements and all general federal nondiscrimination requirements in the administration of the federal assistance award.

**c. Applicant Disclosure Report Form 2880 (HUD 2880)**. The form HUD 2880 is required if you are applying for assistance within the jurisdiction of HUD to any project subject to Section 102(d) of the HUD Reform Act. Assistance is provided directly by HUD to any person or entity, but not to subrecipients. It includes assistance for the acquisition, rehabilitation, operation, conversion, modernization, renovation, or demolition of any property containing five or more dwelling units that is to be used primarily for residential purposes. It includes assistance to independent group residences, board and care facilities, group homes and transitional housing but does not include primarily nonresidential facilities such as intermediate care facilities, nursing homes and hospitals. It also includes any change requested by a recipient in the amount of assistance previously provided, except changes resulting from annual adjustments in Section 8 rents under Section 8(c)(2)(A) of the United States Housing Act of 1937 (42 U.S.C. 1437f). See HUD Reform Act regulation for additional information.

**d. Code of Conduct.** Both you, as the award recipient, and all subrecipients must have a code of conduct (or written standards of conduct). The code of conduct must comply with the requirements included in the "Conducting Business in Accordance with Ethical Standards" section of the Administrative, National and Department Policy Requirements and Terms for HUD Financial Assistance Awards--2024, as well as any program-specific requirements. These requirements include ethical standards related to conflicts of interest for procurements in 2 CFR 200.318(c) and 2 CFR 200.317, as well as HUD-specific conflict of interest standards. HUD maintains a list of organizations that have previously submitted written standards of conduct on its Code of Conduct for HUD Grant Programs webpage. But it is your responsibility to ensure that the standards are compliant with the noted requirements and that HUD has the latest version of the written standards. Updated written standards should be submitted with the application. Any updates to your written standards, after the application period, should be submitted as directed by the HUD program contact for this NOFO.

**Suppl. App. 166**

### e. Lobbying Activities

Applicants are subject to the provisions of Section 319 of Public Law 101-121, 31 U.S.C. 1352, (the Byrd Amendment), and 24 CFR part 87, which prohibit recipients of federal awards from using appropriated funds for lobbying the executive or legislative branches of the Federal government in connection with a Federal award. All applicants must submit with their application the signed certification regarding lobbying included in the Application download from Grants.gov. In addition, applicants must disclose, using Standard Form LLL (SF-LLL), "Disclosure of Lobbying Activities," any funds, other than federally appropriated funds, that will be or have been used to influence federal employees, members of Congress, or congressional staff regarding specific awards. Federally recognized Indian tribes and tribally designated housing entities (TDHEs) established by Federally recognized Indian tribes as a result of the exercise of the tribe's sovereign power are excluded from coverage of the Byrd Amendment, but state-recognized Indian tribes and TDHEs established only under state law shall comply with this requirement.

### f. False Statements

Applicant understands that providing false or misleading information during any part of the application, award, or performance phase of an award may result in criminal, civil or administrative sanctions, including but not limited to: fines, restitution, and/or imprisonment under 18 USC 1001, 18 USC 1012, or 18 USC 287; treble damages and civil penalties under the False Claims Act, 31 USC 3729 et seq.; double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 USC 3801 et seq.; civil recovery of award funds; suspension and/or debarment from all federal procurement and non-procurement transactions, FAR part 9.4 or 2 CFR part 180; and other remedies including termination of active HUD award.

### 2. Other Program-Specific Requirements

### Waiver of Electronic Submission Requirements.

The regulatory framework of HUD's electronic submission requirement is the final rule established in 24 CFR 5.1005. CoCs seeking a waiver of the electronic submission requirement must request a waiver in accordance with 24 CFR 5.1005. HUD regulations allow for a waiver of the electronic submission requirement for good cause. For this NOFO, HUD defines good cause as:

**a.** there are no computers that could be used by applicants or the Collaborative Applicant that are newer than 5 years old anywhere within the CoC's geographic area; or

**b.** there are no computers that could be used by applicants or the Collaborative Applicant anywhere within the CoC's geographic area; or

**c.** there is no internet access that could be used by applicants or the Collaborative Applicant anywhere within the CoC's geographic area.

HUD will grant waivers only at the CoC level and not at the individual project applicant level, and only to CoCs that were approved by HUD during the required CoC Registration process.

If HUD grants the waiver, the Office of Special Needs Assistance Programs' response will include instructions on how many copies of the paper application must be submitted, as well as where to submit them. If HUD grants CoCs a waiver of the electronic submission requirement,

**Suppl. App. 167**

such CoCs will not receive additional time to submit their applications. Therefore, Collaborative Applicants seeking a waiver of the electronic submission requirement on behalf of the CoC must submit their waiver request with sufficient time to allow HUD to process and respond to the request. Collaborative Applicants should also allow themselves sufficient time to submit the application on behalf of the CoC so that HUD receives the application by the established CoC Program Application submission deadline date. For this reason, if a Collaborative Applicant finds it cannot submit its application electronically and must seek a waiver of the electronic grant submission requirement, its request must be postmarked no later than 60 days after the publication date of this NOFO. To expedite the receipt and review of each request, Collaborative Applicants may email their written requests to Norm Suchar, Director, Office of Special Needs Assistance Program at CoCNOFO@hud.gov. If HUD does not have sufficient time to process the waiver request, HUD will not grant a waiver. HUD will not consider paper applications received without a prior approved waiver or after the established deadline.

# V. APPLICATION REVIEW INFORMATION

HUD encourages activities in support of the Secretary's Initiatives for any of the policy preferences: Climate Change, Environmental Justice, Promise Zones, Historically Black Colleges and Universities (HBCU), Minority-Serving Institutions, and Rural Partners Network Community Networks; however, this NOFO does not include preference points. Rather, Section V.B.6 provides the information and points associated with the Consolidated Appropriations Act, 2024 and the requirement to provide incentives to create projects that coordinate housing providers and healthcare organizations to provide permanent supportive housing and rapid rehousing services.

## A. Criteria

HUD will assess CoC Consolidated Applications on a 200-point scale. No Collaborative Applicants have exercised the authority under 422(j) of the Act; therefore, no selection criteria based on section 427(b)(1)(A)(viii) is included in this NOFO. Additionally, for purposes of the requirements of section 427 (b)(1)(B)(iv)(I) of the Act. HUD considers "all relevant subpopulations" to mean families with children, youth, veterans, persons fleeing domestic violence, dating violence, sexual assault, and stalking, persons who are unsheltered, and individuals and families experiencing chronic homelessness.

**1. Major Disaster Areas.**

If a major disaster impacts a CoC's geographic area, as declared by the President under the Stafford Act, during the CoC Program application process that will impact local competition deadlines as outlined in section IV.G.2 of this NOFO, the CoC's Collaborative Applicant must send written notification to Norm Suchar, Director, Office of Special Needs Assistance Program at CoCDisaster@hud.gov. The email must include:

**a.** the nature of the disaster, date(s) the major disaster occurred, how the major disaster affected the Collaborative Applicant, the CoC, or its project(s);
**b.** the duration, and the impact on the Collaborative Applicant, the project applicants, or the CoC to meet the local competition deadline; and

**Suppl. App. 168**

**c.** the anticipated amount of time the CoC is requesting for an extension (e.g., number of days, weeks, or months). This does not mean HUD will allow the full amount of time requested.

Based on the timing and the extent of the major disaster, HUD may extend the application deadline for the affected CoC(s). All requests received will be confirmed via the Federal Emergency Management Agency (FEMA) website, https://www.fema.gov/disasters.

**2. Housing Inventory Count (HIC) and Point-in-Time (PIT) Count Data.**

CoCs were required to submit the 2024 HIC and PIT count data directly to the HUD HDX 2.0 website by May 10, 2024 by 8:00 PM EDT. CoCs that did not meet the established deadline for HIC and PIT count data submission and did not receive an extension from HUD will not receive the maximum number of points available as described in sections V.B.3 and V.B.4 of this NOFO.

**3. Capital Costs.**

For a CoC to receive maximum points if a project applicant(s) requests CoC Program funds for construction or rehabilitation, it must include information describing the actions that will be taken by project applicants to comply with Section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u) (Section 3) and HUD's implementing rules at 24 CFR part 75 to provide employment and training opportunities for low- and very low-income persons, as well as contracting and other economic opportunities for business that provide economic opportunities to low- and very low-income persons. This does not affect applicants' existing responsibilities to provide training, employment, and other economic opportunities pursuant to Section 3 that result from their receipt of other HUD funding. YHDP Replacement project applications cannot include capital costs. Grants to Indian Tribes are subject to Indian Preference under Section 7(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5307(b)) and are not subject to Section 3 requirements.

Any project that requests funding for capital costs (acquisition, new construction, or rehabilitation costs) must comply with the accessibility and civil rights requirements in Section 24 CFR 578.93(d) of the Rule.

## B. CoC Application Scoring

The following chart describes the CoC Application criteria that will be used to establish CoC scores:

**1. CoC Coordination and Engagement.** HUD will award up to 84 points to CoCs that demonstrate coordination with other systems of care that serve homeless individuals and families, including sources of funding other than the CoC Program; an inclusive and outcome-oriented community process, including an organization structure(s) and decision-making process for developing and implementing a CoC strategy that is inclusive of representatives from both the private and public sectors, has a fair and impartial project review and selection process; and has created, maintained, and built upon a community-wide inventory of housing for homeless individuals and families.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| | | |

**Suppl. App. 169**

| *a. Inclusive Structure and Participation.* | | |
|---|---|---|
| (1) Has an inclusive membership of a variety of stakeholders within the geographic area. | **2** | Collaborative Applicants must demonstrate their CoC has participation from a broad array of stakeholders, not limited to organizations listed in 24 CFR 578.5(a), within the geographic area, including at a minimum:<br><br>• victim service organizations (e.g. organizations that serve survivors of domestic and intimate partner violence, sexual assault, and human trafficking).<br>• youth service providers;<br>• individuals who are experiencing homelessness or were formerly experiencing homelessness;<br>• organizations led by and serving culturally specific communities experiencing homelessness in the geographic area to address equity (e.g., Black, Latino, Indigenous, LGBTQ+, or persons with disabilities); and<br>• Tribal organizations for CoCs where a Tribal organization is present. |
| (2) Has an invitation process for new members to join. | **1** | Collaborative Applicants must demonstrate:<br><br>• their CoC's transparent, accessible process (e.g., communicated to the public on the CoC's website) is in place to invite new members to join and includes an invitation process for new members to join that is publicly available within the geographic area at least annually; and<br>• how their CoC invites organizations serving culturally specific communities experiencing homelessness in the geographic area to addresses equity (e.g., Black, Latino, Indigenous, LGBTQ+, and persons with disabilities). |
| (3) Solicits and considers opinions from knowledgeable individuals and organizations. | **1** | Collaborative Applicants must demonstrate their CoC has a transparent, accessible process (e.g., communicated in a public manner on the CoC's website) in place to solicit and consider opinions from individuals and organizations with knowledge of homelessness in the |

Page 82 of 128

|  |  | geographic area or an interest in preventing or ending homelessness in the geographic area. |
|---|---|---|
| (4) Accepts and considers proposals from organizations that have not previously received CoC Program funding. | **1** | Collaborative Applicants must demonstrate their CoC has a transparent and accessible process (e.g., communicated in a public manner on the CoC's website) in place to accept and consider proposals from organizations that have not previously received CoC Program funding. |
| ***b. Coordination with Federal, State, Local, Private, and Other Organizations.*** Coordinates with other organizations that serve individuals, families, unaccompanied youth, and persons fleeing domestic violence, dating violence, sexual assault, or stalking who are experiencing or at risk of homelessness. | **2** | Collaborative Applicants must indicate their CoCs: <br><br>• coordinate with other federal, state, and local governments, private, and other organizations that are included in the planning or operation of projects; <br>• consult with ESG recipients within the CoC's geographic area in the planning and allocation of ESG funds; <br>• participate in the Consolidated Plan jurisdictions' process(s) by providing PIT and HIC data; <br>• ensure local homelessness information is communicated and addressed in the Consolidated Plan updates; and <br>• coordinate with ESG recipients in reporting on and evaluating the performance of ESG recipients and subrecipients. |
| ***c. Ensuring Families are not Separated.*** Ensure projects do not deny admission to or separate family members. | **2** | Collaborative Applicants must indicate that emergency shelters, TH projects, and PH projects within their CoC do not deny admission to or separate family members when they enter shelter or housing, including serving all family members together and in accordance with each family member's self-reported sexual orientation and gender identity. |
| ***d. CoC Collaboration Related to Children and Youth.*** Demonstrate the CoC coordinates to provide education services to families with children between the ages of 0-5; and | **3** | Collaborative Applicants must: <br><br>• indicate written agreements are in place between their CoC or its HUD-funded projects and educational supports and services for children ages 0-5, such as Public Pre-K, Head Start, Child Care (Child Care and Development Fund), and |

Page 83 of 128

Suppl. App. 171

| collaborates with education providers, local educational authorities, and school districts. | | home visiting (including Maternal, Infant and Early Childhood Home and Visiting or MIECHV); <br>• identify the formal partnerships their CoC has with youth education providers, local educational authorities, or school districts; and <br>• describe policies and procedures their CoC adopted to inform individuals and families who have recently begun experiencing homelessness of their eligibility for educational services. |
| ---------- | --- | --------- |
| **e. Addressing the Needs of Victims of Domestic Violence, Dating Violence, Sexual Assault, and Stalking.** Addressing the Needs of Survivors of Domestic Violence, Dating Violence, Sexual Assault, and Stalking. Coordinate with survivors and people with lived experience, victim service providers, and operators of coordinated entry to address the unique needs for housing and safety that prioritize housing defined as safe by survivors. The CoC must identify the current efforts to increase access to housing and services defined as safe by survivors of domestic violence, dating violence, sexual assault, and stalking, adopting survivor-centered practices that maximum client choice while | 5 | Collaborative Applicants must demonstrate their CoC: <br><br>• regularly collaborates with victim service providers, state domestic violence coalitions, state sexual assault coalitions, anti-trafficking service providers and other organizations who help provide housing and services to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking including those funded by HUD's CoC and ESG Programs, U.S. Department of Justice, and U.S. Department of Health and Human Services to update CoC-wide policies and ensure all housing and services provided in the CoC are trauma-informed and able to meet the needs of survivors; <br>• implemented safety planning and confidentiality protocols in its coordinated assessment and provides annual training to CoC providers and operators of Coordinated Entry that addresses best practices in serving survivors of domestic violence, dating violence, sexual assault, and stalking; <br>• implemented policies and procedures that ensure all individuals and families receiving and seeking CoC Program assistance are made aware of the CoC's |

Page 84 of 128

| | | |
|---|---|---|
| maintaining safety and confidentiality. | | emergency transfer plan, the process for requesting an emergency transfer and the CoCs plan for responding to an emergency transfer once a survivor requests it;<br><br>• ensures individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking have access to all housing and services available within the CoC's geographic area;<br><br>• reviews the CoC's systems to proactively identify and remove barriers specific to survivors to ensure safe access to all CoC Programs/services; |
| ***f. Addressing the Needs of LGBTQ+ Individuals.*** Demonstrates efforts to address the needs of Lesbian, Gay, Bisexual, Transgender, and Queer (LGBTQ+) individuals and their families experiencing homelessness. | **6** | Collaborative Applicants must demonstrate their CoC:<br><br>• includes LGBTQ+ serving organizations or advocacy groups in the CoC membership;<br><br>• annually conducts training to providers about how to effectively implement the Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity Rule, and the Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs Rule;<br><br>• implemented and trained providers on a CoC-wide, anti-discrimination policy ensuring that LGBTQ+ individuals and families receive supportive services, shelter, and housing free from discrimination;<br><br>• regularly collaborates with LGBTQ+ and other organizations to update their CoC-wide, anti-discrimination policy, as necessary to ensure all housing and services provided in the CoC are trauma-informed and able to meet the needs of LGBTQ+ individuals and families; |

Page 85 of 128

| | | |
|---|---|---|
| | | • assisted providers in developing project level anti-discrimination policies that are consistent with the CoC-wide anti-discrimination policy; and<br>• has a process for evaluating compliance with their CoC's anti-discrimination policies and addresses any non-compliance with those policies. |
| ***g. Public Housing Agencies.*** Coordinates with the Public Housing Agencies (PHAs) located in their geographic area that resulted in admission preferences for households experiencing homelessness, including move-on strategy-which is a partnership between the CoC and one or more PHAs who have an admission preference for program participants in PH-PSH who are able and want to move out of supportive housing with a rental subsidy. | **10** | Collaborative Applicants must demonstrate how their CoC works with the PHA(s) in their CoC's geographic area to:<br><br>• coordinate with a PHA to apply for or implement Housing Choice Voucher funding that is statutorily dedicated to people experiencing homelessness (e.g. Emergency Housing Vouchers)<br>• coordinate with a PHA to apply for or implement existing funding (e.g. Mainstream vouchers, FUP, or other programs) for people experiencing homelessness (coordination must have occurred within the past 3 years);<br>• establish PHA(s) admission preferences for households experiencing homelessness which may include a preference for households who previously experienced homelessness residing in units of housing for persons experiencing homelessness (e.g., Move-on Program), or project-basing vouchers for households experiencing homelessness;<br>• ensure at least 20 percent of new PHA admissions were individuals or families experiencing homelessness at admission; and<br>• include PHA(s)-funded units described above in the CoC's coordinated entry system. |
| ***h. Preventing People Transitioning from Public Systems from Experiencing Homelessness.*** Coordinates with and | **2** | Collaborative Applicants must indicate their CoC coordinates with state or local planning efforts to prevent homelessness among people transitioning from public systems (prisons, jails, |

| | | |
|---|---|---|
| assists in state or local planning efforts to prevent people transitioning from public systems (e.g., reentry from prisons and jails, health care or residential care, and foster care) from experiencing homelessness. | | health care facilities, residential care facilities, and foster care.).<br><br>This may include:<br><br>• Supporting state and local efforts to identify people who are at-risk of experiencing homelessness from these settings and to assist them to secure stable, accessible, and affordable housing (including reunifying with family members where appropriate);<br>• Data and information sharing, education and training on such areas as assess housing needs and homelessness risk, housing problem-solving, family reunification, housing navigation and landlord engagement, housing quality, and housing case management; and<br>• Encouraging state and local partners to leverage mainstream health care, corrections, child welfare, and other resources to meet housing needs where possible. |
| ***i. Housing First.*** Projects in the CoC use a Housing First approach and the CoC assesses fidelity to the Housing First approach. Any housing project application that is awarded FY 2024 or FY 2025 CoC Program funding that indicates it will use a Housing First approach, will be required to do so. | **10** | Collaborative Applicants must:<br><br>• Demonstrate at least 75 percent of all project applications that include housing activities (e.g., permanent housing, safe haven) their CoC submitted under this NOFO are using the Housing First approach by providing low barrier projects that do not require preconditions to accessing housing nor participation in supportive services for continued tenancy, occupancy, or participation in the project, and prioritize rapid placement and stabilization in permanent housing. This means the projects allow entry to program participants regardless of their income, current or past substance use, history of victimization (e.g., domestic violence, sexual assault, childhood abuse), and criminal record–except restrictions |

| | | |
|---|---|---|
| | | imposed by federal, state, or local law or ordinance (e.g., restrictions on serving people who are listed on sex offender registries).<br>• Describe tools and methods their CoC used outside of the local CoC competition rating and ranking process to regularly evaluate and ensure all projects that commit to following a Housing First approach in their project applications are maintaining fidelity to a Housing First approach in project implementation. Collaborative Applicants must attach an example of such an evaluation.<br>• Describe the steps their CoC is taking to improve fidelity to Housing First approaches in the projects that the CoC identifies as using a Housing First model during and outside of the CoC Program competition. |
| ***j. Street Outreach.*** Has implemented outreach procedures to ensure all persons experiencing homelessness are aware of the housing and services providers within the CoC's geographic area. | **3** | Collaborative Applicants must:<br><br>• demonstrate that between FY 2022 and FY 2023 their CoC increased the rate at which persons exiting street outreach projects exit to positive housing destinations as reported in HDX (1 of 3 points); and<br>• describe how street outreach is tailored to reach those that are least likely to request assistance (2 of 3 points). |
| ***k. Criminalization.*** Implement specific strategies to prevent the criminalization of homelessness within the CoC's geographic area. | **2** | Collaborative Applicants must indicate their CoC's specific strategies to:<br>(1) increase utilization of co-responder responses or social services-led responses over law enforcement responses to people experiencing homelessness,<br>(2) minimize use of law enforcement to enforce bans on public sleeping, public camping, or carrying out basic life functions in public places, and<br>(3) avoid the imposition of criminal sanctions, including fines, fees, and carceral punishment for public sleeping, |

**Suppl. App. 176**

| | | |
|---|---|---|
| | | public camping, and carrying out basic life functions in public places.<br><br>This can include the adoption and implementation of community-wide laws or ordinances, policies, and practices for addressing unsheltered homelessness that prioritize the health, safety, and civil rights of unsheltered people. |
| ***l. Rapid Rehousing.*** Demonstrate an increase, in the number of rapid rehousing beds available as recorded on the 2024 HIC data submitted to HUD, or that an increase is not needed. | **9** | Collaborative Applicants must demonstrate an increase in the number of rapid rehousing beds in their CoC's geographic area as reported in the 2024 HIC submitted in HDX 2.0;<br><br>**OR**<br><br>clearly demonstrate the number of rapid rehousing beds in the CoC's geographic area sufficiently meeting the needs for this type of housing, which will be verified against information in the most recent PIT and HIC data reported in HDX 2.0;<br><br>**OR**<br><br>demonstrate using Annual Performance Report or other longitudinal data from HMIS or a comparable database that more households entered permanent housing through RRH programs (including have a recorded move-in date for the RRH program) in the most recent 12-month period covered by the Annual Performance Reports or other longitudinal data from HMIS compared to the previous 12-month period. |
| ***m. Mainstream Benefits and Other Assistance.*** The CoC provides information and training to CoC Program-funded projects to supplement CoC Program funds with resources from other public and private | **2** | Collaborative Applicants must demonstrate:<br><br>• that at least once a year, their CoC provides training to program staff and trains program staff regarding the following mainstream resources available for program participants within the geographic area: |

Page 89 of 128

**Suppl. App. 177**

| | | |
|---|---|---|
| sources, including programs that assist program participants in applying for and receiving mainstream benefits or gaining employment. | | <ul><li>○ Food Stamps</li><li>○ SSI</li><li>○ SSDI</li><li>○ TANF</li><li>○ Substance Use Disorder Programs</li><li>○ Employment Assistance Programs</li></ul><ul><li>how their CoC works with projects to collaborate with healthcare organizations, including those that provide substance use disorder treatment and mental health treatment, to assist program participants with receiving healthcare services, including Medicaid; and</li><li>how their CoC promotes SOAR certification among program staff, unless the CoC is in a U.S. Territory where SSI/SSDI benefits are federally prohibited.</li></ul> |
| ***n. Partnerships with Public Health Agencies.*** The CoC coordinates with state and local public health agencies to respond to and prevent infectious disease outbreaks among people experiencing homelessness. | **5** | Collaborative Applicants must demonstrate their CoC:<br><br><ul><li>effectively collaborates with state and local public health agencies to develop CoC-wide policies and procedures to respond to and prevent infectious disease outbreaks among people experiencing homelessness; and</li><li>effectively shares information related to public health measures and homelessness; and</li><li>facilitates communication between public health agencies and homeless service providers to ensure street outreach providers and shelter and housing providers are equipped to prevent or limit infectious disease outbreaks among program participants.</li></ul> |
| ***o. Coordinated Entry System and Affirmatively Furthering Fair Housing (AFFH).*** The CoC has an effective coordinated entry system | **6** | Collaborative Applicants must demonstrate their CoCs' coordinated entry system:<br><br><ul><li>can serve everybody in the CoC's geographic area regardless of where they are located;</li></ul> |

Page 90 of 128

**Suppl. App. 178**

| and has implemented affirmative marketing procedures to ensure all persons seeking assistance are informed of their rights and remedies under federal, state, and local fair housing and civil rights laws. | | • affirmatively markets housing and services available within the CoC's geographic area and ensures it reaches all persons experiencing homelessness and specifically seeking out historically underserved populations;<br>• reaches people who are least likely to apply in the absence of special outreach;<br>• informs each program participant of their rights and remedies available under federal, State and local fair housing and civil rights laws.<br>• reports any conditions or actions that impede fair housing choice for current or prospective program participants to the jurisdiction that provided the Certification of Consistency with the Consolidated Plan;<br>• uses a standardized assessment process and assessment tool and collects personal information in a trauma informed way;<br>• prioritizes persons most in need of assistance and ensures that permanent housing is rapidly obtained consistent with participants' needs and preferences;<br>• takes steps to reduce burdens on people utilizing coordinated entry, including any invasive questions or complexity in the assessment processes;<br>• engages with a broad range of organizations (e.g., local government, law enforcement, CDBG/HOME/ESG entitlement jurisdictions, affordable housing developers, early childhood programs, education authorities, mental health organizations.) that participate in the coordinated entry system and provide data or guidance for the community's chosen prioritization process; and<br>• is updated at least annually using feedback received from participating projects and households that participated in coordinated entry. |
|---|---|---|
| ***p. Advancing Racial Equity in Homelessness.*** | **6** | Collaborative Applicants must describe: |

Suppl. App. 179

| | | |
|---|---|---|
| The CoC has assessed racial disparities in the provision or outcome of homeless assistance and taken the necessary steps to address such disparities. | | • how their CoC analyzed data to determine whether any racial disparities are present in the provision or outcomes of homeless assistance;<br>• the data (qualitative or quantitative) their CoC used to analyze whether any racial disparities are present in the provision or outcomes of homeless assistance;<br>• their CoC's targeted strategies and resources identified in the provision or outcomes of homeless assistance;<br>• their CoC's plans for ongoing evaluation of system-level processes, policies, and procedures; and<br>• their CoC's plan for continuous evaluation of racial disparities to effectively track progress on preventing or eliminating disparities in the provision or outcomes of homeless assistance.<br><br>Any actions taken must be consistent with federal nondiscrimination requirements |
| *q. Involving Individuals with Lived Experience of Homelessness in Service Delivery and Decision-Making and Provide Professional Development and Employment Opportunities.* The CoC has included persons with lived experience are of homelessness in the CoC's decision-making process, and the CoC encourages CoC members to provide professional development and employment opportunities to people experiencing homelessness. | 5 | Collaborative Applicants must demonstrate:<br><br>• their CoC's outreach efforts (e.g., social media announcements, targeted outreach) to engage those with lived experience of homelessness in leadership roles and decision-making processes;<br>• individuals with lived experience of homelessness participate in their CoC's committees, subcommittees, or workgroups;<br>• individuals with lived experience of homelessness are routinely included in decision-making processes of their CoC related to addressing homelessness (e.g. minutes from CoC or CoC Subcommittee meetings show people with lived experience are involved in decision-making);<br>• individuals with lived experience of homelessness are included in the |

<table>
<tr><td></td><td></td><td>

development, or revision, of their CoC's local competition rating factors;

- individuals with lived experience of homelessness are included in the development of their CoC's coordinated entry process.
- professional development (e.g. internships, continuing education, skill-based training) and employment opportunities are provided to individuals with lived experience of homelessness either within their CoC or by CoC's membership organizations;
- feedback is routinely gathered from people experiencing homelessness and people who have received assistance through their CoC or ESG program on their experience receiving assistance and the steps their CoC takes to address challenges raised by people with lived experience of homelessness.
- a lived experience support letter signed by either (1) at least three members involved in a working group (e.g., advisory committee, subcommittee) comprised of individuals with lived experience **or** (2) an authorized representative of the workgroup (e.g., a working chair) along with evidence that the person is authorized to represent the group, **or** (3) individual letters signed by three individuals who are involved on different committees; and the letter must demonstrate support of the priorities for serving individuals and families experiencing homelessness with severe service needs in the CoC's geographic area—persons with lived experience may sign letters using pseudonyms to protect their privacy; and
- persons with lived experience must have current knowledge of homeless crisis response systems (this can be experience and/or professional understanding).

</td></tr>
</table>

Page 93 of 128

| | | Full points are available if there is more than one person with lived experience of homelessness engaged in local CoC planning and at least one person with lived experience came from an unsheltered situation. |
|---|---|---|
| **r. Section 3 Requirements for CoCs.** CoCs submitting new project applications that include funding requests for new construction or rehabilitation activities must complete a series of questions that address the actions taken by project applicants to comply with Section 3 as described in the "To Receive Maximum Points" column. HUD will deduct 2 points from a CoC's overall score if the information provided is insufficient to meet the required criteria.<br><br>If a CoC does not have new project applications that include new construction or rehabilitation, these criteria do not apply.<br><br>Grants to Indian Tribes are subject to Indian Preference under Section 7(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5307(b)) and are not subject to Section 3 requirements. | **-2** | For project applicants that plan to use funding for construction or rehabilitation, HUD will deduct 2 points from the CoC's overall score, unless the Collaborative Applicant includes information that describes the actions that will be taken by project applicants that receive CoC Program funding to comply with section 3 of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701u) (Section 3) and HUD's implementing rules at 24 CFR part 75 to:<br><br><ul><li>provide employment opportunities for low- and very low-income persons (Section 3 residents);</li><li>training opportunities for low- and very low-income persons (Section 3 residents); and</li><li>and to award contracts to businesses that are owned by or substantially employ those persons (Section 3 businesses).</li></ul><br>Self-certified Section 3 businesses in your locality may be found at www.hud.gov/sec3biz. This does not affect the applicants' existing responsibilities to provide training, employment, and other economic opportunities pursuant to Section 3 that result from their receipt of other HUD funding. |
| **s. Increasing Affordable Housing Supply.** The | **1** | Collaborative Applicants must describe at least two steps their CoC has taken in the past 12 |

| CoC has taken steps to work with jurisdictions within their geographic area to reduce barriers to housing development and increase the supply of affordable housing. | | months to engage city, county, or state governments within their geographic area regarding:<br>• reforming zoning and land use policies to permit more housing development; or<br>• reducing regulatory barriers to housing development. |
|---|---|---|

**2. Project Capacity, Review, and Ranking.** HUD will award up to 28 points to CoCs that demonstrate the existence of a single coordinated, inclusive, and outcome-oriented community process for the solicitation, objective review, ranking, and selection of project applications, that includes reviewing and a process by which renewal projects, except expiring YHDP Renewals and YHDP Replacements, are reviewed for performance and compliance with 24 CFR part 578. HUD will award maximum points for the Ranking and Selection Process in this section to CoCs with the project(s) that have been covered by a major disaster, as declared by the President under Title IV of the Robert T. Stafford Act, that occurred in the 12 months prior to the application deadline for the FY 2024 – FY 2025 CoC Consolidated Application. To receive consideration for such a major disaster, the Collaborative Applicant must notify HUD in writing before the application deadline and must include information about how the disaster affected the Collaborative Applicant's ability to meet the criteria in 2.g below. The notification must be sent to Norm Suchar, Director, Office of Special Needs Assistance Programs, at CoCDisaster@hud.gov.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| ***a. Objective Criteria.*** Demonstrate the use of objective criteria to review project applications requesting CoC Program funding. | **4** | Collaborative Applicants must demonstrate their CoC publicly notified applicants in advance and used objective criteria to evaluate applications in the local competition:<br>• up to 1 of the 4 points for attaching their CoC's local scoring and rating criteria, including point values, that was publicly posted at the time the CoC notified the public it was accepting applications.<br>• up to 1 of the 4 points based on their CoC's use of objective criteria (e.g., cost-effectiveness, type of population served, type of housing proposed; commitment to Housing First);<br>• up to 1 of the 4 points where their CoC used objective criteria that accounted for at least 33 percent of the total points available for project applications; and |

Page 95 of 128

| | | |
|---|---|---|
| | | • up to 1 of the 4 points for use of more than one objective criterion.<br><br>CoCs may receive full points for this criterion if they only use system performance measures to meet the objective criteria for rating, selection, and ranking project applications provided it accounts for 33 percent of the total points available for project applications. |
| **b. Using System Performance Measures.** Demonstrate the use of CoC Program required system performance measures to review project applications requesting CoC Program funding. | **9** | Collaborative Applicants must demonstrate their CoC publicly notified applicants in advance of the local competition and used criteria based on system performance measures:<br><br>• up to 2 of the 9 points for attaching their CoCs' local scoring and rating criteria, including point values, that included outcome measures related to CoC system performance measures;<br>• up to 3 of the 9 points based on their CoC's use of system performance measures s (e.g., returns to homelessness, jobs and income growth, etc.) in their local review, selection, rating process;<br>• up to 2 of the 9 points where their CoC used system performance measures to account for at least 20 percent of the total points available for project applications; and<br>• up to 2 of the 9 points if their CoCs used more than one system performance measure. |
| **c. Comparable Databases to Evaluate Domestic Violence Providers.** Victim service providers are required to use comparable databases in lieu of HMIS to collect the required Universal Data Elements and CoC Program system performance measures. | **1** | Collaborative Applicants must demonstrate their CoC requires organizations serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to submit performance data, including comparable database data if the provider is a victim service provider. |

**Suppl. App. 184**

| | | |
|---|---|---|
| ***d. Rapid Return to Permanent Housing and Severity of Barriers Experienced by Program Participants.*** The CoC collects and analyzes data on program participants in permanent housing and uses data on the severity of barriers experienced by a project's program participants when ranking project performance related to obtaining and maintaining permanent housing. | **4** | Collaborative Applicants must:<br><br>• explain how their CoC collects and analyzes data regarding each project that has successfully housed program participants in permanent housing;<br>• explain how their CoC analyzes data regarding how long it takes to house people in permanent housing;<br>• explain how their CoC considers the severity of barriers (e.g., substance use, history of domestic violence, criminal history), experienced by program participants preventing rapid placement in permanent housing or the ability to maintain permanent housing when rating, selecting, and ranking projects; and<br>• list the severe barriers their CoCs considered. |
| ***e. Advance Racial Equity in the local CoC Process.*** Demonstrate how the CoC is advancing racial equity when reviewing applications. Any actions taken must be consistent with federal nondiscrimination requirements. | **4** | Collaborative Applicants must demonstrate their CoC's:<br><br>• efforts to obtain input and include persons of different races and ethnicities, particularly those over-represented in the local homelessness population, have impacted how their CoC has determined the rating factors used to review project applications;<br>• inclusion of persons of different races and ethnicities, particularly those over-represented in the local homelessness population, in the review, selection, and ranking process; and<br>• process for rating and ranking projects based on the degree the projects identified any barriers to participation (e.g., lack of outreach) faced by persons of different races and ethnicities, particularly those over-represented in the local homelessness population, and has taken or will take steps to eliminate the identified barriers. |

Page 97 of 128

| f. Reallocating Projects. Demonstrate that the CoC either reallocates funding from lower performing projects to create new higher performing projects or has a process to review the performance of existing projects and reallocate funding from lower performing projects to higher performing projects. | 3 | Collaborative Applicants must demonstrate:<br><br>• their CoC actively reviews the performance of existing CoC Program-funded projects and have a standard process for reallocating funding from lower performing projects to create new high performing projects;<br><br>**OR**<br><br>• they have cumulatively reallocated at least 20 percent of their CoC's ARD between the FY 2019 and FY 2024 CoC Program Competitions. |
| g. Ranking and Selection Process. Demonstrate the use of an objective ranking and selection process for project applications that is publicly announced by the CoC. | 3 | Collaborative Applicants must:<br><br>• demonstrate a post to their CoC's websites or a CoC member organization's website of the 30-day deadline for project applications that is no later than 30 days before the FY 2024 CoC Program Funding Opportunity submission deadline of October 30, 2024—the posting and the deadline(s) must be on a landing page;<br>• attach a listing of all projects submitted to HUD from their CoC's local competition that includes all projects their CoC considered during their local competition: (1) the final score, (2) project rank, (3) accepted or rejected status, (4) funding amounts, (5) reallocated funds added to or subtracted from projects listed;<br>• demonstrate it sent email notifications outside of *e-snaps*, to project applicants that submitted their project applications to their CoC by the CoC-established deadline, whether their project application(s) will be accepted and ranked, rejected, or reduced on the CoC Priority Listing no later than 15 days before the FY 2024 CoC Program Funding Opportunity application submission deadline, and where a project |

Page 98 of 128

| | | application is being rejected or reduced, the CoC must indicate the reason(s) for the rejection or reduction; and <br>• demonstrate a post on their CoC's website, or a CoC member organization's website, at least 2 days before the FY 2024 CoC Program Funding Opportunity application submission deadline, the CoC Application, including the attachments, and the Priority Listings, and <br>• demonstrate it sent email notifications to CoC's members and key stakeholders that the CoC Consolidated Application is available—the evidence submitted must include a visible list of all CoC members and stakeholders the email is sent to. |
|---|---|---|

**3. Homeless Management Information System.** HUD will award up to 9 points to CoCs that demonstrate the existence of a functioning HMIS, and that victim service providers use comparable databases, that facilitate the collection of information on homelessness using residential and other homeless services and stores that data in an electronic format. Collaborative Applicants must attach their CoC's FY 2024 HDX Competition Report as evidence of when they submitted data in HDX and what data was submitted. HUD will rely on data in HDX to validate those responses and data.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **a. Housing Inventory Count (HIC).** Submit complete HIC data in a timely manner. | **1** | Submitted 2024 HIC data in HDX 2.0 by the submission deadline of 8:00 PM EDT on May 10, 2024 or an alternate date approved by HUD. |
| **b. Comparable Database for DV Providers.** Have in place, developing, or coordinating a comparable database with victim service providers to collect required data elements for reporting de-identified information to the CoC. | **2** | Collaborative Applicants must demonstrate the actions their CoC and HMIS Lead are taking to directly support victim service providers to collect data in a database that meets HUD's comparable database requirements, including the FY 2024 HMIS Data Standards. |
| **c. Bed Coverage.** The bed coverage rate for the housing types within the | **4** | Collaborative Applicants must demonstrate at least 85 percent of the beds in their CoC's geographic area are covered in HMIS and |

Suppl. App. 187

| | | |
|---|---|---|
| CoC that includes emergency shelter, Safe Haven, transitional housing, rapid rehousing, and permanent supportive housing. | | comparable databases. The bed coverage rate is the number of HMIS and comparable database participating beds divided by the number of year-round beds dedicated to persons experiencing homelessness in the geographic area covered by the CoC.<br><br>To receive partial credit, if the bed coverage rate is below 85 percent, Collaborative Applicants must provide clear steps on how their CoC intends to increase this percentage over the next 12 months.<br><br>CoCs that merged between the FY 2023 CoC Program Registration process and the FY 2024 CoC Program Registration process will have their bed coverage rates calculated based on the higher of:<br><br>the bed coverage rate reported by the combined, newly merged CoC in the 2023 or 2024 HIC;<br><br>**OR**<br><br>the highest bed coverage rate reported by one of the merged CoCs as constituted before the merger in the FY 2023 CoC Program Competition.<br><br>To receive consideration as a merged CoC, new CoCs must contain all the geographic area of at least two CoCs that were awarded funds under the FY 2022 CoC Program Competition and submitted separate applications in the FY 2023 CoC Program Competition. |
| ***d. Longitudinal Systems Analysis (LSA) Submission.*** Submit usable 2023 LSA data in a complete and timely manner. | **2** | Collaborative Applicants must demonstrate their CoC submitted their LSA data in HDX 2.0 by the submission deadline of January 24, 2024, 11:59 PM EST, or an alternate date approved by HUD; and HUD determined that there were at least 2 usable files. |

**4. Point-in-Time Count.** HUD will award up to 5 points to CoCs that collect, use, and submit data from the 2024 PIT count. Collaborative Applicants must attach their CoC's FY 2024 HDX Competition Report as evidence of when they submitted data in HDX and what data was submitted. HUD will rely on data in HDX to validate those responses and data.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| *a. PIT Count and Data Submission.* Conduct a PIT count and report the data in HDX. | 3 | Collaborative Applicants must demonstrate their CoCs conducted a sheltered and unsheltered PIT counts during the last 10 days in January 2024, or if an exception was provided by HUD, during the time period agreed upon by the CoC and HUD; and<br><br>Submitted the 2024 PIT count data in HDX 2.0 by May 10, 2024, 8:00 PM EDT, or an alternate date approved by HUD. |
| *b. Effectively Count Youth.* Implement specific measures to identify youth in the CoC's PIT count. | 2 | Collaborative Applicants must demonstrate that during the planning process for the 2024 PIT count, their CoC:<br><br>• Engaged stakeholders that serve youth experiencing homelessness (including unaccompanied youth);<br>• involved youth experiencing homelessness in the actual count; and<br>• worked with stakeholders to select locations where youth experiencing homelessness are most likely to be identified. |

**5. System Performance.** HUD will award up to 60 points to CoCs for system-wide performance related to reducing homelessness. Collaborative Applicants must attach their CoC's FY 2024 HDX Competition Report as evidence of when they submitted data in HDX and what data was submitted. HUD will rely on data in HDX to validate those responses and data.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| *a. Reducing the Number of Homeless Individuals and Families.* Up to 1 point to CoCs that demonstrate an overall reduction of at least 5 | 12 | • Up to 2 of the 12 points for demonstrating a decrease of at least 5 percent in the number of sheltered homeless individuals and families in the 2024 PIT count compared to the 2023 PIT count as recorded in HDX, excluding |

Page 101 of 128

**Suppl. App. 189**

| | | |
|---|---|---|
| percent in the number of individuals and families who experience homelessness. | | emergency shelter beds added for a Presidentially declared disaster and recorded as such in HDX;<br>• Up to 7 of the 12 points for demonstrating a decrease of at least 5 percent in the number of unsheltered homeless individuals and families in the 2024 PIT compared to the 2023 PIT count (or most recent unsheltered PIT count submitted) as recorded in HDX; and<br>• Up to 3 of the 12 points for demonstrating a decrease of at least 5 percent in the combined number of sheltered and unsheltered homeless individuals and families in the 2024 PIT compared to the 2023 PIT count (or most recent PIT count submitted with both sheltered and unsheltered data) as recorded in HDX.<br><br>HUD will consider the impact of persons displaced by natural disasters (including displaced in the CoC's geographic area) and displaced persons seeking short-term shelter or housing assistance who recently arrived in your CoCs' geographic area <u>if the CoC demonstrates that those factors affected their performance on this rating factor.</u> |
| ***b. Reduction in the Number of First-Time Homeless.*** Demonstrate how the CoC works to reduce the number of individuals and families who become homeless for the first time. | **3** | Collaborative Applicants must demonstrate that between FY 2022 and FY 2023 their CoC reduced the number of first-time homeless as reported in HDX (1 of the 3 points);<br><br>HUD will consider the impact of persons displaced by natural disasters (including displaced in the CoC's geographic area) and displaced persons seeking short-term shelter or housing assistance who recently arrived in your CoCs' geographic area if the CoC demonstrates that those factors affected their performance on this rating factor.<br><br>Collaborative Applicants must: |

Page 102 of 128

**Suppl. App. 190**

| | | |
|---|---|---|
| | | • identify the process by which risk factors are identified in its community for becoming homeless for the first time;<br>• describe the strategies in place to address individuals and families at risk of becoming homeless; and<br>• identify the organization or position that is responsible for overseeing the CoC strategy to reduce or end the number of people experiencing homelessness for the first time. |
| ***c. Length of Time Homeless.*** Reduce the length of time individuals and families remain homeless and describe how they will reduce the length of time individuals and families remain homeless in the future. | **13** | Collaborative Applicants must:<br><br>• demonstrate that between FY 2022 and FY 2023 their CoC reduced the average length of time individuals and families remained homeless in their CoC's geographic area of at least 5 percent or that the CoC's average length of time homeless was 90 days or less as reported in HDX (8 of 13 points);<br>• describe their CoC's strategy to reduce the length of time individuals and families remain homeless;<br>• describe how their CoC identifies and houses individuals and families with the longest length of time homeless; and<br>• identify the organization or position that is responsible for overseeing their CoC's strategy to reduce the length of time individuals and families remain homeless. |
| ***d. Successful Permanent Housing Placement or Retention.*** Demonstrate an increase in the rate in which individuals and families move to permanent housing destinations or continue to reside in PH projects and describe how the CoC will improve their rate of | **13** | Collaborative Applicants must:<br><br>• demonstrate that between FY 2022 and FY 2023 their CoC increased the rate at which persons exiting emergency shelter, TH, Safe Haven, and RRH projects exit to permanent housing destinations by at least 2 percentage points (e.g. from 36% to 38%) or that the rate of exits to permanent housing destinations was 50 |

Page 103 of 128

**Suppl. App. 191**

| permanent housing placement. | | percent or higher as reported in HDX (up to 6 of the 13 points); <br>• demonstrate that between FY 2022 and FY 2023 their CoC increased the rate at which persons residing in permanent supportive housing or other permanent housing, excluding rapid rehousing, exited to permanent housing destinations by at least 1 percentage point (e.g. from 92% to 93%) or that rate of retention of or exits to permanent housing destinations was 96 percent or higher as reported in HDX (up to 3 of the 13 points); <br>• describe the strategy their CoC is taking to improve permanent housing placement and retention; and <br>• identify the organization or position that is responsible for overseeing their CoC's strategy to increase permanent housing placements or retain housing for individuals and families residing in permanent housing. |
|---|---|---|
| **e. Returns to Homelessness.** Reduce the extent to which individuals and families leaving homelessness experience additional spells of homelessness and describe how the number of individuals and families who return to homelessness will be reduced in the community. | **8** | Collaborative Applicants must: <br><br>• demonstrate that between FY 2022 and FY 2023 their CoC reduced the rate at which persons who exited to permanent housing destinations experienced additional spells of homelessness within 6 months of exit by at least 1 percentage point (e.g., from 10% to 9%) or that the CoC's rate of return in 6 months was 5 percent or less as reported in HDX (up to 3 of the 8 points): <br>• demonstrate that between FY 2022 and FY 2023 their CoC reduced the rate at which persons who exited to permanent housing destinations experienced additional spells of homelessness within 12 months by at least 1 percentage point (e.g., from 15% to 14%) or that the CoC's rate of return in 12 months was 10 percent or less as reported in HDX (up to 3 of the 8 points): |

Page 104 of 128

| | | |
|---|---|---|
| | | <ul><li>describe the strategy their CoC implemented to identify individuals and families who return to homelessness;</li><li>describe the strategy that will reduce returns to homelessness; and</li><li>identify the organization or position that is responsible for overseeing the CoC's strategy to reduce returns to homelessness.</li></ul> |
| **f. Jobs and Income Growth.** Increase program participants' incomes from employment and non-employment cash sources and describe specific strategies to assist program participants' incomes. | 7 | Collaborative Applicants must:<br><br><ul><li>demonstrate that between FY 2022 and FY 2023 their CoC increased the percentage of CoC Program participants who had an increase in income from employment or that the rate of income from employment in the CoC was 20 percent or higher as reported in HDX (2 of the 7 points);</li><li>demonstrate that between FY 2022 and FY 2023 their CoC increased the percentage of CoC Program participants who had increased income from non-employment cash sources for persons served in CoC Program-funded projects or that the rate of income from non-employment cash sources in the CoC was 50 percent or higher as reported in HDX (2 of the 7 points);</li><li>describe the strategy their CoCs implemented to access employment and non-employment cash sources;</li><li>describe how their CoCs are working with mainstream employment organizations to help individuals and families experiencing homelessness increase their cash income; and</li><li>identify the organization or position that is responsible for overseeing their CoC's strategy to increase jobs and income growth from employment and non-employment cash sources, including mainstream employment organizations.</li></ul> |

Page 105 of 128

**Suppl. App. 193**

| g. HMIS Performance Measures. Submit data quality report that describes the data quality for system performance | 4 | Collaborative Applicants must demonstrate their CoC submitted FY 2023 System Performance Measures data in HDX 2.0 by the submission deadline of 6:00 PM EDT on March 13, 2024, or an alternate date approved by HUD. |

**6. Coordination with Housing and Healthcare.** As stated in section I.B.3.c of this NOFO, HUD will award up to 14 points to CoCs that submit new PSH and RRH project applications demonstrating coordination with housing providers and healthcare organizations.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| a. Leveraging Housing Resources. These points are available for CoCs that apply for at least one new PSH or RRH project that utilizes housing subsidies or subsidized housing units not funded through the CoC or ESG programs. Housing subsidies or subsidized housing units may be funded through any of the following sources:<br><br>• Private organizations;<br>• State or local government, including through the use of HOME funding provided through the American Rescue Plan;<br>• Public Housing Agencies, including through the use of a general or limited preference;<br>• Faith-based organizations; or | 7 | CoC's will receive full points by demonstrating that they have applied for at least one PSH or RRH project that utilizes housing subsidies or subsidized housing units not funded through the CoC or ESG programs. Collaborative Applicants must demonstrate that these housing units will:<br><br>1. in the case of a PSH project, provide at least 25 percent of the units included in the project; or<br>2. in the case of a RRH project, serve at least 25 percent of the program participants anticipated to be served by the project.<br><br>CoCs must attach letters of commitment, contracts, or other formal written documents that demonstrate the number of subsidies or units being provided to support the project.<br><br>CoCs can receive less than full points for demonstrating commitments less than the threshold described above. |

Page 106 of 128

| | | |
|---|---|---|
| Federal programs other than the CoC or ESG programs. | | |
| ***b. Leveraging Healthcare Resources.*** These points are available for CoCs that apply for at least one PSH or RRH project that utilizes healthcare resources to help individuals and families experiencing homelessness. Sources of health care resources include:<br><br>• Direct contributions from a public or private health insurance provider to the project (e.g., Medicaid), and<br>• Provision of health care services by a private or public organization (e.g., Ryan White funded organization) tailored to the program participants of the project.<br><br>Eligibility for the project must comply with HUD program and fair housing requirements. Eligibility criteria cannot be restricted by the eligibility requirements of the health care service provider. | 7 | Collaborative Applicants must demonstrate through a written commitment from a health care organization that:<br><br>1. in the case of a substance use disorder treatment or recovery provider, it will provide access to treatment or recovery services for all program participants who quality and choose those services; or<br>2. the value of assistance being provided is at least an amount that is equivalent to 25 percent of the funding being requested for the project, which will be covered by the healthcare organization.<br><br>Acceptable forms of commitment are formal written agreements and must include:<br><br>• value of the commitment, and<br>• dates the healthcare resources will be provided.<br><br>In-kind resources must be valued at the local rates consistent with the amount paid for services not supported by grant funds.<br><br>CoCs can receive less than full points for demonstrating commitments less than the threshold described above. |

**7. CoC Merger Bonus Points.** As stated in section I.B.2.b.(4) of this NOFO, HUD will award up to a possible 25 bonus points to CoCs that merged in the period between FY 2023 and FY 2024 CoC Program Registration deadlines based on the following structure. The minimum number of bonus points a merged CoC may receive is 5 with the maximum number of points available at 25.

**Suppl. App. 195**

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **a. Merged CoCs between FY 2023 CoC Program Registration and FY 2024 CoC Program Registration.** | **5** | Merged CoCs - all CoCs that merged will receive this minimum number of points. |
| **b. CoC Application score in FY 2022 or FY 2023.** | **10** | One or more of the merged CoCs had a CoC Application score of 140 points or below in the FY 2022 or FY 2023 CoC Program Competitions. HUD will review the FY 2022 and FY 2023 CoC Applications and award 10 bonus points if at least one of the merged CoCs meet this criterion. |
| **c. Point in Time Counts** | **10** | Collaborative Applicants must demonstrate that the results of their Point-in-Time counts reported in the Homelessness Data Exchange (HDX) were affected by changes in methodology that resulted from the merger in a way that would affect their CoC score. To receive these bonus points for mergers, the CoC will need to demonstrate that the merger impacted the CoC's methodology or PIT count implementation. |

# C. Project Review and Selection Process

In addition to the selection criteria rating for the overall CoC Application, described in section V.B. of this NOFO, HUD will conduct a project eligibility and project quality threshold review for FY 2024 and FY 2025 project applicants and project applications. Funding for FY 2025 awards are subject to FY 2025 HUD Appropriations and HUD reserves the right to amend this NOFO to revise the selection and review criteria for FY 2025 funding. For new project applications, HUD will consider project applicant and subrecipient eligibility and capacity, project eligibility, and project quality as part of the threshold review, see sections III.C.4.a. and b. of this NOFO. HUD's renewal project application threshold review will consider project applicant and subrecipient capacity and eligibility as explained in section III.C.4.c of this NOFO. Section III of this NOFO covers eligible project applicants and section IV covers eligible project applications.

HUD may employ rating panels to review and rate all or part of the CoC Applications according to the rating criteria in section V of this NOFO.

**1. Threshold Review.** Project applicant and subrecipient eligibility, capacity, and quality. HUD will review project applications to determine whether project applicants and subrecipients meet the applicant eligibility in section III.A.4, and whether the project applications meet the project eligibility and project quality thresholds detailed in sections III.C.4.a. and b. of this NOFO. HUD

Page 108 of 128

will review renewal projects to determine if project applicants and subrecipients meet the project quality threshold requirements detailed in section III.C.4.c of this NOFO. If HUD determines these standards are not met, HUD will reject the project application, unless otherwise provided in this NOFO. If a new project application passes the project eligibility threshold review in section III.C.4.a. and receives enough points to pass the project quality threshold review in section III.C.4.a. of this NOFO but does not receive all the points available for its project type, HUD may place conditions on the grant award that must be satisfied before HUD will execute a grant agreement with the applicant for the project. If an applicant is unable to satisfy the condition(s) within the timeframe specified by HUD, HUD reserves the right to withdraw the conditionally awarded funds.

**2. Conditional Selection and Adjustments to Funding.** HUD Headquarters will conditionally select project applications for funding using the following process:

**a.** As authorized under the Consolidated Appropriations Act, 2017 (Public Law 115-31; 131 Stat. 135) for fiscal year 2017 and hereafter, HUD will conditionally select a renewal grant that exceeds $10 million that was originally awarded pursuant to the matter under the heading "Department of Housing and Urban Development–Permanent Supportive Housing" in chapter 6 of title III of the Supplemental Appropriations Act, 2008 (Public Law 110-252; 122 Stat. 2351).

**b**. *CoC Planning projects.* HUD will conditionally select every CoC Planning project that passes project eligibility and project quality threshold review. Only one CoC Planning project application can be submitted per CoC.

**c.** *UFA Costs projects.* HUD will conditionally select every UFA Costs project submitted by UFA-designated Collaborative Applicants that pass project eligibility and project quality threshold review. Only one UFA Costs project application may be submitted per UFA-designated Collaborative Applicant.

**d. YHDP Renewal projects, and YHDP Replacement projects including YHDP projects created through YHDP Reallocation.** HUD will conditionally select all renewal, and replacement YHDP projects (including those projects created through reallocation) that pass project eligibility and project quality threshold review. YHDP projects that do not meet quality threshold will be conditionally selected with conditions that the recipient correct any project quality threshold failures prior to executing a grant agreement.

**e.** *DV Bonus.* HUD will conditionally select new DV Bonus projects (including new DV Bonus projects that are part of an expansion) that pass project eligibility and project quality threshold in accordance with the criteria established in this NOFO [see section I.B.3.j of this NOFO].

**f.** *Project applications fully in Tier 1.* HUD will conditionally select CoC Renewal, CoC Reallocation, DV Renewal, DV Reallocation, and CoC Bonus project applications that are fully within Tier 1 and pass project eligibility, project quality, and if applicable, project renewal threshold review. HUD will select projects based on CoC score, beginning with the highest scoring CoC to the lowest scoring CoC. As stated in section I.B.3.h.(1) of this NOFO, if the available funding under this NOFO is reduced, a reduction will be made to all CoCs' Tier 1 amount proportionately which would result in lower ranked Tier 1 project applications falling into Tier 2.

**g.** *Projects in Tier 2.* HUD will conditionally select CoC Renewal, CoC Reallocation, DV Renewal, DV Reallocation, and CoC Bonus project applications that pass project eligibility, project quality, and if applicable, project renewal threshold review in Tier 2 using the criteria in section I.B.3.h.(2) of this NOFO. HUD will select projects in order of point value until there are no more funds available. In the case of a tie, HUD will fund the projects in the order of CoC application score. In case there is still a tie, HUD will select the project from the CoC that has the highest score on the rating factors described in section I.B.3.h.(2) of this NOFO.

**h.** *Projects that are partially in Tier 1.* If a project application straddles the Tier 1 and Tier 2 funding line, HUD will conditionally select the project application up to the amount of funding that falls within Tier 1. Using the CoC score, and other factors described in section I.B.3.h of this NOFO, HUD may then fund the Tier 2 portion of the project. If HUD does not fund the Tier 2 portion of the project, HUD may award the project at the reduced amount, provided the project is still feasible with the reduced funding (e.g., is able to continue serving homeless program participants effectively).

**i.** *Funding Additional Projects.* Funding for FY 2025 awards are subject to FY 2025 HUD Appropriations and HUD reserves the right to amend this NOFO if additional funding is made available.

**3. Environmental Justice.** HUD may consider environmental justice in evaluating applications. Under E.O.12898, each Federal agency is directed to identify and address disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations. Click here to view E.O. 12898.

**4. Conflict of Interest of Consultants or Technical Experts Assisting HUD.** Consultants and technical experts who assist HUD in rating and ranking applications for funding under published FY 2024 Program NOFOs are subject to 18 U.S.C. 208, the Federal criminal conflict-of-interest statute, and the Standards of Ethical Conduct for Employees of the Executive Branch regulation published at 5 CFR 2635. Therefore, consultants and technical experts who have assisted or plan to assist applicants with preparing applications for FY 2024 Program NOFOs are prohibited from serving on a selection panel or serving as a technical advisor to HUD. Anyone involved in rating and ranking FY 2024 Program NOFO applications, including departmental staff, experts, and consultants, must avoid conflicts of interest or the appearance of such conflicts. These individuals must also disclose to HUD's Office of General Counsel Ethics Law Division the following information, if applicable:

**a.** How the selection or non-selection of any applicant under a FY Program NOFO will affect the individual's financial interests, as provided in 18 U.S.C. 208, or

**b.** How the application process involves a party with whom the individual has a covered relationship under 5 CFR 2635.502.

The consultant or technical expert assisting HUD must disclose this information before participating in any matter regarding a program NOFO. Applicants with questions regarding these provisions or concerning a conflict of interest should call the Office of General Counsel Ethics Law Division, at (202)708-3815 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible

Page 110 of 128

**Suppl. App. 198**

telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

## D. Adjustments to Projects

HUD may adjust the selection of competitive projects as follows:

**1. CoC Maximum Award and FMR Adjustments.** The process for determining a CoC's maximum award amount is detailed in 24 CFR 578.17(b). HUD must adjust awards for leasing, operating, and rental assistance BLIs based on changes to the Fair Market Rents (FMR). HUD will make all adjustments for each fiscal year appropriation prior to award announcement. HUD will make these adjustments as follows:

**a.** Funds awarded for rental assistance will be adjusted in one of two ways:

**(1)** Funds awarded for rental assistance in all new and renewal projects requesting the FMR will be adjusted by applying the FMR in effect at the time of application submission to HUD, including instances where the FMR for a specific area has decreased from the previous year.

**(2)** Funds awarded for rental assistance for renewal projects that request less than FMR, that is, a per-unit amount based on the actual rent costs per unit (section III.4.c.(7)), will be increased based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. If the FMR for a specific area decreased from the previous year, the award will not exceed the FMR after adjustment. If the FMR for the project applicant's entire area decreased from the previous year, the project will be awarded the lesser amount of the per-unit amount requested by the project applicant, based on the actual rent costs per unit, or the FMR after adjustment.

**b.** HUD will increase funds awarded for operating and leasing in PH projects based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. Because leasing and operating costs do not decrease relative to rent amounts for specific units (e.g., operating costs for 10 units that have rents of $500 are likely the same as for 10 units that have rents that are $450) HUD will not decrease leasing and operating BLIs if FMRs decrease in the geographic area. The operating and leasing BLIs in these projects will remain the same as in the most recent grant agreement or grant agreement amendment.

**2. Cost of Living Adjustment Factor.** HUD will adjust amounts for the supportive services and HMIS Costs budget lines for renewing projects by the following factor:

Most recent three-year average of changes in State Quarterly Census of Employment and Wages (QCEW) for the category Social Assistance (NAICS 624). Data can be found at: https://www.bls.gov/cew/data.htm

**3. Geographic Diversity.** HUD has determined that geographic diversity is an appropriate consideration in selecting homeless assistance projects in the CoC Program Competition. HUD believes that geographic diversity can be achieved best by awarding grants to as many CoCs as possible. To this end, in instances where any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Northern Mariana Islands, the Virgin Islands, and American Samoa do not have at least one funded CoC, HUD reserves the right to fund eligible project(s) with the highest total score in the CoC.

**4. Funding Diversity.** HUD reserves the right to reduce the amount of a grant, if necessary, to ensure that no more than 10 percent of assistance made available under this NOFO will be awarded for projects located within any one unit of general local government or within the geographic area covered by any one CoC.

**5. Tie-breaking Rules.** In the case of a tie, HUD will fund the projects in the order of CoC Application score. In case there is still a tie, HUD will select the project from the CoC that has the highest score on the rating factors described in section V.B.1 of this NOFO. If HUD exercises a right it has reserved under this NOFO, that right will be exercised uniformly across all applications received in response to this NOFO.

## E. Corrections to Deficient Applications

Deficiency is information missing or omitted within a submitted application. Deficiencies typically involve missing documents, information on a form, or some other type of unsatisfied information requirement (e.g., an unsigned form, unchecked box, expansion grant application errors, etc.). As described in section I.B.1 of this NOFO, deficiencies may be either curable or non-curable. Correction of technical deficiencies must be received by HUD within 7 calendar days after notification is received by the applicant from HUD via email. The start of the cure period will be the date stamp on the email HUD sends to the authorized representative as noted in the Project Applicant Profile in *e-snaps*; therefore, it is critical the project applicant's authorized representative's information is accurate. Additionally, HUD reserves the right to respond to unanticipated system defects, ambiguities, and technical difficulties in application submissions in *e-snaps* through a flexible implementation of its authority to cure application deficiencies through written inquires seeking clarification and additional information (also known as callbacks). Upon proper publication in the Federal Register, HUD reserves the right to extend the Competition deadline for good cause.

## F. Other Federal Statutes

CoCs may request approval, in the FY 2024 - 2025 CoC Application, for up to 10 percent of funding for each fiscal year awarded under this NOFO, to serve homeless households with children and youth defined as homeless under other federal statutes who are unstably housed (paragraph 3 of the definition of homeless found at 24 CFR 578.3). Approved CoCs are limited to using only up to 10 percent of the total amount awarded for each fiscal year appropriation to the CoC to serve this population and must determine which project(s) HUD will allow to use some or all their funding for this purpose. The only project types that will be funded in this Competition to serve this population are Transitional Housing, Supportive Services Only, and the Joint TH/PH-RRH component projects.

To be approved to serve this population, CoCs making this request must demonstrate serving this population is of equal or greater priority, which means that it is equally or more cost-effective in meeting the overall goals and objectives of the plan submitted under Section 427(b)(1)(B) of the Act, especially with respect to children and unaccompanied youth, than serving the homeless as defined under paragraphs (1), (2), and (4) of the definition of homeless in 24 CFR 578.3. CoCs must thoroughly describe how the requirements described in Section 427(b)(1)(F) of the Act will

**Suppl. App. 200**

be met. Some examples of how a CoC can demonstrate that serving this population is of equal or greater priority than serving those defined as homeless under paragraphs (1), (2), and (4) of the definition of homeless in 24 CFR 578.3 include:

- Evidence that the CoC has adequate resources to house all individuals and families defined as homeless under paragraphs (1) and (4) at 578.3 in their geographic area.
- An analysis that demonstrates that the net public cost (including mainstream resources, resources dedicated to preventing and ending homelessness, such as CoC Program funds, and other municipal funds, such as public works) is reduced if the CoC is able to use CoC Program funds to provide housing and supportive services to those individuals defined as homeless under paragraph (3) at 578.3.
- Evidence that the length of time individuals and families in the CoC's geographic area is low (e.g., less than 30 days) and the CoC has adequate resources to house all people who experience homelessness under paragraphs (1) and (4) at 578.3 within 30 days.

CoCs must identify the specific project(s) that will use funding for this purpose (up to 10 percent of the CoC's total award) by submitting an attachment to the CoC Application in *e-snaps* that must include the following:

- project name(s) as listed on the CoC Priority Listing; and
- amount of funding in the project or per project that will be used for this purpose.

See 24 CFR 578.89 for more information about this limitation.

# VI. AWARD ADMINISTRATION INFORMATION

## A. Award Notices

Following the evaluation process, HUD will notify successful applicants of their selection for funding. HUD will also notify other applicants whose applications were received by the deadline but were not chosen for award. Notifications will be sent by email to the person listed as the Authorized Organizational Representative (AOR) in the applicant profile in *e-snaps*.

### 1. Final Award

After HUD has made selections, HUD will finalize specific terms of the award and budget in consultation with the conditionally selected applicant. HUD may subsequently request conditionally selected applications to submit additional project information which may include documentation to show the project is financially feasible; documentation of firm commitments for match; documentation showing site control; information necessary for HUD to perform an environmental review, where HUD determines to do so in accordance with 24 CFR 58.11(d); a copy of the organization's Code of Conduct; and such other documentation as specified by HUD in writing that confirms or clarifies information provided in the application. HUD will require the submission of the additional project information no later than 30 days after the date of the letter, except as otherwise provided in 24 CFR 578.21(c). If HUD and the conditionally selected applicant do not finalize the terms and conditions of the award in a timely manner, or the conditionally selected applicant fails to provide the requested information within 90 days, an award will not be made to that applicant. In this case, HUD Headquarters may select another eligible applicant. HUD may also impose specific conditions on an award as provided under 2 CFR 200.208.

Page 113 of 128

**Suppl. App. 201**

- Based on HUD's review of the applicant's risk under 2 CFR 200.206;
- When the applicant or recipient has a history of failure to comply with the general or specific terms and conditions of a Federal award;
- When the applicant or recipient fails to meet expected performance goals contained in a Federal award; or
- When the applicant or recipient is not otherwise responsible.

**2. Adjustments to Funding**

To ensure fair distribution of funds and enable the purposes or requirements of a specific program to be met, HUD reserves the right to fund less than the amount requested in an application.

a. HUD will fund no portion of an application that:

   (1) Is ineligible for funding under applicable statutory or regulatory requirements;

   (2) Fails, in whole or in part, to meet the requirements of this notice; or

   (3) Duplicates activities funded by other Federal awards.

b. HUD may adjust the funding for an application to ensure funding diversity, geographic diversity, and alignment with HUD administrative priorities.

c. If an applicant turns down an award offer, or if HUD and an applicant do not finalize the terms and conditions of the award in a timely manner, HUD Headquarters may withdraw the award offer and make an offer of funding to another eligible application.

d. If funds remain after all selections have been made, remaining funds may be made available within the current FY for other competitions within the program area, or be held for future competitions (if allowable in accordance with the applicable appropriation or authorizing statute), or be used as otherwise provided by authorizing statute or appropriation.

e. If, after announcement of awards made under the current NOFO, additional funds become available either through the current appropriations, a supplemental appropriation, other appropriations, or recapture of funds, HUD may, in accordance with the appropriation, use the additional funds to provide additional funding to an applicant awarded less than the requested amount of funds to make the full (or nearer to full) award, and/or to fund additional applicants that were eligible to receive an award but for which there were no funds available.

f. If funds are available after funding the highest-ranking application, HUD Headquarters may fund all or part of another eligible fundable application.

**3. Funding Errors**

If HUD commits an error that, when corrected, would cause selection of an applicant during the funding round of a Program NOFO, HUD may select that applicant for funding, subject to the availability of funds. If funding is not available to award in the current fiscal year, HUD may make an award to this applicant during the next fiscal year if funding is available.

**4. Approval from HUD Headquarters is required before a grant awarded under this NOFO may be transferred.**

Page 114 of 128

**Suppl. App. 202**

Under this NOFO, HUD will treat the change of project applicant as a curable deficiency. This occurs when a Recipient of a FY 2023 CoC grant award applies to renew their award under this NOFO and during the period between applying and before HUD announces awards, with HUD approval a grant transfer of the FY 2023 grant is executed with a New Recipient. This grant transfer results in a FY 2024 CoC renewal application that does not reflect the New Recipient as the applicant. In this type of situation, HUD will treat the change of project applicant as a curable deficiency.

## B. Administrative, National and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs

Unless otherwise specified, the following requirements apply and are detailed on HUD's Funding Opportunity page in the document titled, "Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2024."  You must review each requirement to ensure compliance is considered when preparing your application materials (staff, budget, timeline). Failure to comply with these requirements may impact your ability to receive or retain a financial assistance award from HUD.

1. Compliance with The Fair Housing Act (42 U.S.C. 3601-3619) and implementing regulations at 24 CFR part 100 et seq

2. Compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d-2000d-4)(Nondiscrimination in Federally Assisted Programs) and implementing regulations at 24 CFR part 1

3. Compliance with the Age Discrimination Act of 1975 (42 U.S.C. 6101-6107) and implementing regulations at 24 CFR part 146

4. Compliance with Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at 24 CFR part 8

5. Compliance with the Americans with Disabilities Act, 42 U.S.C. 12101 et seq

6. Compliance with Affirmatively Furthering Fair Housing (AFFH) requirements, including 24 CFR 5.150 et seq

7. Compliance with Economic Opportunities for Low-and Very Low-income Persons (12 U.S.C. 1701u) requirements, including those listed at 24 CFR part 75

8. Compliance with Improving Access to Services for Persons with Limited English Proficiency (LEP) requirements, including those listed within Federal Register Notice, FR-4878-N-02 (also see HUD's webpage)

9. Compliance with Accessible Technology requirements, including those listed in HUD's Policy on Section 508 of the Rehabilitation Act and Accessible Technology

10. Compliance with Equal Access Requirements (e.g., 24 CFR 5.105(a)(2) and 5.106)

11. Compliance with Ensuring the Participation of Small Disadvantaged Business, and Women-Owned Business requirements at 2 CFR 200.321

**Suppl. App. 203**

12. Compliance with Energy Efficient and Sustainable by Design

13. Compliance with Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 USC 4601 et seq.) (URA) requirements, 49 CFR part 24, and applicable program regulations

14. Compliance with Participation in HUD-Sponsored Program Evaluation

15. Compliance with OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR part 200). Awards made from this NOFO will conform with the updated 2 CFR 200 regulations that go into effect on October 1, 2024.

16. Compliance with Drug-Free Workplace requirements (2 CFR part 2429)

17. Compliance with the requirements related to safeguarding resident/client files (e.g., 2 CFR 200.303(e))

18. Compliance with the Federal Funding Accountability and Transparency Act of 2006 (2 CFR part 170) (FFATA), as amended

19. Compliance with Eminent Domain

20. Compliance with Accessibility for Persons with Disabilities requirements, including 24 CFR parts 8 and 100; 28 CFR part 35

21. Compliance with applicable Violence Against Women Act requirements in the Housing Chapter of VAWA, 34 U.S.C. 12491-12496, 24 CFR part 5, subpart L, and program-specific regulations, if applicable

22. Compliance with Conducting Business in Accordance with Ethical Standards/Code of Conduct, including 2 CFR 200.317, 2 CFR 200.318(c) and other applicable conflicts of interest requirements

23. Compliance with the Build America, Buy America (BABA) Act procurement requirements

24. Compliance with System for Award Management and Universal Identifier Requirements at 2 CFR part 25

25. Compliance with section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)) and implementing regulations at 2 CFR part 175 (Award Term for Trafficking in Persons)

26. Compliance with Award Term and Condition for Recipient Integrity and Performance Matters (see Appendix XII to 2 CFR part 200)

27. Compliance with Suspension and Debarment regulations (2 CFR part 2424 and 2 CFR part 180)

28. Compliance with environmental justice requirements that apply in accordance with Executive Orders 12898 and 14008, and OMB Memorandum M-21-28, which implements the *Justice40 Initiative*, section 223 of Executive Order 14008.

29. Compliance with HUD Secretary Fudge's April 12, 2022 memorandum "Eliminating Barriers That May Unnecessarily Prevent Individuals with Criminal Histories from Participation in HUD Programs"

**Suppl. App. 204**

30. Compliance with equity requirements, including racial equity and underserved communities and LGBTQ+ requirements that apply in accordance with Executive Orders 13985, 13988, and 14091.

31. Compliance with 41 U.S.C. § 4712, which includes informing your employees in writing of their rights and remedies, in the predominant native language of the workforce. Under 41 U.S.C. § 4712, employees of a contractor, subcontractor, grantee, subgrantee, and personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant. (See Federal Contractor or Grantee Protections | Office of Inspector General, Department of Housing and Urban Development (hudoig.gov).

32. Compliance with 2 CFR 200.216, Prohibition on Certain Telecommunication and Video Surveillance Services or Equipment and Executive Orders 14091 and 14110, which include prohibition on the use of HUD funds to purchase or fund any form of facial or biometric recognition technology for the purpose of surveillance or any other use that may adversely impact equitable access to housing.

## C. Environmental Review

Notwithstanding 24 CFR 578.31 and 24 CFR 578.99(a) of the Rule, and in accordance with Section 100261(3) of MAP-21 (Pub. L. 112-141, 126 Stat. 405), activities under this NOFO are subject to environmental review by a responsible entity under HUD regulations at 24 CFR part 58.

1. All HUD assisted activities, even projects that only involve exempt activities, require some level of environmental review. Two types of projects are Categorically Excluded from review under the National Environmental Policy Act (NEPA) and not subject to compliance with the laws and authorities listed under 24 CFR 58.5 (CENST): All scattered-site projects where program participants choose their own unit and are not restricted to units within a pre-determined specific project site or sites are categorized in 24 CFR 58.35(b)(1) as CENST. This includes both tenant-based rental assistance and tenant-based leasing projects where program participants choose their own unit and do not involve any physical work or impacts beyond routine maintenance as defined by Notice CPD-16-02: Guidance for Categorizing an Activity as Maintenance for Compliance with HUD Environmental Regulations. The Exempt/CENST environmental review form is only required for each project, not every unit.

2. For activities under a grant to a recipient other than a state or unit of general local government that generally would be subject to review under 24 CFR part 58, HUD may make a finding in accordance with 24 CFR 58.11(d) and may itself perform the environmental review under the provisions of 24 CFR part 50 if the recipient objects in writing to the responsible entity's performing the review under part 24 CFR part 58.

Page 117 of 128

**Suppl. App. 205**

3. Irrespective of whether the responsible entity in accordance with 24 CFR part 58 (or HUD in accordance with 24 CFR part 50) performs the environmental review, the recipient must supply all available, relevant information necessary for the responsible entity (or HUD, if applicable) to perform for each property any required environmental review. The recipient also must carry out mitigating measures required by the responsible entity (or HUD, if applicable) or select alternative property.

4. The recipient, its project partners, and their contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct property for a project under this NOFO, or commit or expend HUD or non-HUD funds for such eligible activities under this NOFO, until the responsible entity (as defined by 24 CFR 58.2(a)(7)) has completed the environmental review procedures required by 24 CFR part 58 and the environmental certification and Request for Release of Funds (RROF) have been approved or HUD has performed an environmental review under 24 CFR part 50 and the recipient has received HUD approval of the project. HUD will not release grant funds if the recipient or any other party commits grant funds (i.e., incurs any costs or expenditures to be paid or reimbursed with such funds) before the recipient submits and HUD approves its RROF (where such submission is required).

## D. Lead-Based Paint Requirements

When providing housing assistance funding for purchase, lease, support services, operation, or work that may disturb painted surfaces of pre-1978 housing, you must comply with the lead-based paint evaluation and hazard reduction requirements of HUD's lead-based paint rules (Lead Disclosure; and Lead Safe Housing (24 CFR part 35)); and EPA's lead-based paint rules (e.g., Repair, Renovation and Painting; Pre-Renovation Education; and Lead Training and Certification (40 CFR part 745)).

## E. Remedies for Noncompliance

HUD may apply the remedies at 2 CFR 200.339 or impose additional conditions to remedy noncompliance with any Federal, State, or local statutes, regulations, or terms and conditions of the financial assistance award.  If noncompliance cannot be remedied, HUD may terminate a Federal award, in whole or in part, for any of the reasons specified in 2 CFR 200.340, Termination.

For more information on CoC Program sanctions and remedies for noncompliance see 24 CFR 578.107.

## F. Reporting

HUD requires recipients to submit performance and financial reports under OMB guidance and program instructions.

### 1. Recipient Integrity and Performance Matters

Applicants should be aware that if the total Federal share of their Federal award includes more than $500,000 over the period of performance, the award will be subject to post award reporting requirements reflected in Appendix XII to 2 CFR part 200, Award Terms and Conditions for Recipient Integrity and Performance Matters.

**2. Race, Ethnicity and Other Data Reporting**

HUD requires recipients that provide HUD-funded program benefits to individuals or families to report data on the race, color, religion, sex, national origin, age, disability, and family characteristics of persons and households who are applicants for, participants in, or beneficiaries or potential beneficiaries of HUD programs in order to carry out the Department's responsibilities under the Fair Housing Act, Executive Order 11063, Title VI of the Civil Rights Act of 1964, and Section 562 of the Housing and Community Development Act of 1987. These authorities prohibit discrimination in housing and in programs receiving financial assistance from the Department and direct the Secretary to administer the Department's programs and activities in a manner affirmatively to further these policies and to collect certain data to assess the extent of compliance with these policies. Each recipient shall keep such records and submit to the Department timely, complete, and accurate compliance reports at such times, and in such form and containing such information, as the Department may determine to be necessary to enable it to ascertain whether the recipient has complied or is complying with 24 CFR parts 1 and 121. In general, recipients should have available for the Department data showing the demographics of beneficiaries of Federally-assisted programs.

**3. Compliance with the Federal Funding Accountability and Transparency Act of 2006 (Pub. L. 109-282) as amended (FFATA)**

FFATA requires information on Federal awards be made available to the public via a single, searchable website, which is www.USASpending.gov. Accordingly, each award HUD makes under this NOFO will be subject to the requirements provided by the Award Term in Appendix A to 2 CFR part 170, "REPORTINGSUBAWARD AND EXECUTIVE COMPENSATION INFORMATION," unless the Federal funding for the award (including funding that may be added through amendments) is not expected to equal or exceed $30,000. Requirements under this Award Term include filing subaward information in the Federal Funding Accountability and Transparency Act (FFATA) Sub-award Reporting System (FSRS.gov) by the end of the month following the month in which the recipient awards any sub-award equal to or greater than $30,000.

**4. Program-Specific Reporting Requirements**

**a.** In accordance with program regulations at 24 CFR 578.103, project recipients must maintain records within the timeframe required, make any reports, including those pertaining to race, ethnicity, gender, and disability status that HUD may require. Project recipients may report the data as part of their APR submission to HUD. Also, project recipients who expend $750,000 or more in 1 year in federal awards must have a single or program-specific audit for that year in accordance with the provisions of 2 CFR part 200, subpart F.

**b.** Section 3 Reporting Regulations. Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. See HUD's Section 3 website for additional information including annual reporting requirements.

**c.** Award notices may also include requirements for sub-award reporting in compliance with the requirements of the Federal Financial Assistance Accountability and Transparency Act of 2006 (Pub. L. 109-282) (FFATA) and Section 872 of the Duncan Hunter National Defense

Page 119 of 128

**Suppl. App. 207**

Authorization Act for Fiscal Year 2009 (Pub. L. 110-417), referred to as "Section 872." See the General Section for further information.

**d.** An estimate of the reporting and recordkeeping burden of the CoC Program can be found in the Federal Register Publication of the Rule.

## G. Debriefing

For a period of at least 120 calendar days, beginning 30 calendar days after the final public announcement of awards under this NOFO, if requested, HUD will provide the Collaborative Applicants a debriefing related to their application. A request for debriefing must be submitted via mail or email by the person listed as the AOR in the Collaborative Applicant Profile in *e-snaps* or by his or her successor in office and be submitted to the POC in Section VIII Agency Contact(s) of this NOFO. Information provided during a debriefing may include the Collaborative Applicant's final score for each rating factor, final evaluator comments for each rating factor, and the final assessment indicating the basis upon which funding was approved or denied.

## H. Administrative and Other Program Requirements.

Federal agencies are required to measure the performance of their programs. HUD captures this information not only from monitoring visits and APRs, but also from the data gathered in annual Competitions. HUD's homeless assistance programs are being measured in FY 2024 by the objective to reduce the overall number of people experiencing homelessness and reduce the length of time homeless; measured based on system performance and the ability of CoCs that have the capacity to reallocate funds from lower performing projects to higher performing projects.

## I. Timeliness Standards.

All conditional funds awarded under the FY 2024 CoC Program Funding Opportunity must be obligated by HUD by September 30, 2026 and the obligation deadline for any FY 2025 funds is expected to be September 30, 2027. FY 2024 obligated funds remain available for expenditure until September 30, 2031 and the expenditure deadline for any FY 2025 funds is expected to be September 30, 2032. HUD reserves the right to require an earlier expenditure deadline under a grant agreement. The project applicant is expected to initiate the approved projects promptly in accordance with the requirements of this section of this NOFO. Grant terms, and associated grant operations, may not extend beyond the availability of funds. Project applicants must plan accordingly and only submit project applications that can start operations in a timely manner with sufficient time to complete the post award process within the awarded grant term. Additionally, HUD will take action if the recipient fails to satisfy the timeliness standards found in 24 CFR 578.85.

## VII. APPEALS

**Suppl. App. 208**

## A. Description

24 CFR 578.35 provides the appeal process options. Sections 578.35(b)(3), (b)(4), (c)(1), and (d)(2) authorize HUD to establish requirements for the form and manner of submissions for appeals by Solo Applicants, applicants with denied or decreased funding, and from competing CoCs. For HUD to consider an appeal under 24 CFR 578.35(b) or (c), the solo project applicant must follow the applicable application process set forth in this NOFO. This NOFO also provides guidance to CoCs and applicants regarding appeals of a jurisdiction's refusal to sign the Consolidated Plan certification for a project under 24 CFR 578.35(c).

Additionally, HUD is clarifying the impact that Solo Applicant appeals will have on HUD signing grant agreements for funds awarded under this NOFO. If HUD receives one or more Solo Applicant appeals from a CoC, HUD will determine the amount of funding the Solo Applicant(s) have requested which may delay signing grant agreements for the awarded project(s) listed at the bottom of the CoC's Priority Listing that has requested funding under this NOFO equal to double the amount requested by the Solo Applicant(s). Refer to the Solo Applicant appeal process in section VII.C of this NOFO for additional information about the Solo Application appeal process.

Finally, for the purposes of the appeals identified in this NOFO where 24 CFR 578.35 requires that all evidence be sent to the CoC and that the CoC respond to evidence, this means that correspondence to the CoC should be addressed to the CoC-designated Collaborative Applicant and all correspondence to HUD from the CoC should be addressed from the CoC's designated Collaborative Applicant. If the CoC has authorized another entity other than the Collaborative Applicant to respond to the appeals identified in this NOFO on its behalf, it should notify HUD by sending an email to [snapsappeals@hud.gov](mailto:snapsappeals@hud.gov).

## B. Types of Appeals

The provision at 24 CFR part 578 set forth the following types of appeals:

**1. Solo Applicants.** A process for eligible project applicants that attempted to participate in their CoC planning process and believe they were denied the right to participate in a reasonable manner.

**2. Denied or Decreased Funding.** A process for eligible applicants that are denied funds by HUD or that requested more funds than HUD awarded to them.

**3. Consolidated Plan Certification.** A process for eligible applicants whose jurisdiction refused to provide a Certification of Consistency with the Consolidated Plan (form HUD-2990).

**4. Competing CoCs.** A process when more than one CoC selects the same geographic area, for eligible applicants of lower-scoring CoCs, to appeal to HUD's decision to fund the competing CoC. Should two or more CoCs select the same geographic codes associated with formula areas during the CoC Program Registration process, HUD will use the competing CoC process

**Suppl. App. 209**

provided by 24 CFR 578.35(d).

## C. Solo Applicant

Per the Act, "A solo applicant may submit an application to the Secretary for a grant under subsection (a) and be awarded such grant on the same basis as such grants are awarded to other applicants based on the criteria described in section 427, but only if the Secretary determines that the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner. The Secretary may award such grants directly to such applicants in a manner determined to be appropriate by the Secretary."

To apply as a solo applicant, the project applicant must submit a Solo Applicant Project Application in *e-snaps* by the application submission deadline of October 30, 2024 at 8:00 PM EDT. Additionally, the solo applicant, Collaborative Applicant, and HUD must take the following steps (See 24 CFR 578.35 for more information):

**1.** Written Notice of Intent to Appeal. The solo applicant must submit a written notice of intent to appeal, with a copy to the CoC, with their funding application.

**2.** No later than 30 days after the date that HUD announces the awards, the solo applicant shall submit in writing, with a copy to the Collaborative Applicant, all relevant evidence supporting its claim. The submission shall be emailed to snapsappeals@hud.gov.

**3.** The CoC has 30 days from the date of its receipt of the solo applicant's evidence to respond to HUD in writing, with a copy to the solo applicant. The submission must be emailed to snapsappeals@hud.gov.

**4.** HUD will notify the solo applicant and the CoC of its decision within 60 days of receipt of the CoC's response.

**5.** If HUD finds that the solo applicant was not permitted to participate in the Continuum of Care planning process in a reasonable manner, then HUD may award a grant to the solo applicant when funds next become available and may direct the Continuum of Care to take remedial steps to ensure reasonable participation in the future. HUD may also reduce the award to the Continuum's applicant(s).

## D. Denied or Decreased Funding

Eligible applicants, including project applicants and Collaborative Applicants, that submitted an application to HUD in response to this NOFO, that were either not awarded funds by HUD, or that requested more funds than HUD awarded, may appeal HUD's decision within 45 days after the final funding announcement. HUD will only consider for funding or additional funding applicants the CoC ranked within the CoC's maximum amount available. Collaborative Applicants that submitted CoC planning, and if applicable, UFA Costs project applications can appeal decreased funding if they can demonstrate HUD decreased the submitted project application's funding request to less than 5 percent of the CoC's FPRN or $1,250,000; whichever is less. To appeal HUD's decision, the applicant must submit a written appeal to HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant. The written appeal must include evidence demonstrating HUD error and follow the instructions in this section.

**Suppl. App. 210**

The applicant must submit its written appeal by email to snapsappeals@hud.gov, from the organization's email address on the organization's letterhead and signed by the authorized representative–electronic signatures are acceptable.

**1. Denied Funding.** To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in Section VII.F of this NOFO within 45 days of the date of the funding announcement of the conditional awards from HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant.

**a.** Projects, including projects for CoC Planning funds and Unified Funding Agency (UFA) costs, could have been rejected by HUD because:

**(1)** the individual project application failed to meet project eligibility, project quality, and project renewal thresholds set forth in this NOFO;

**(2)** the individual project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO, but was ranked in a position where a portion of the grant funds was outside the CoC's maximum award amount, and after HUD reduced its funding to fit within the CoC's maximum award amount, HUD determined that the project was no longer feasible; or

**(3)** HUD did not have sufficient funding to fund all eligible projects ranked within the CoC's maximum award amount.

**b.** For applicants that were fully denied funding for a grant, the applicant must provide evidence that demonstrates HUD error in not awarding the grant. Documentation submitted by the applicant must include:

**(1)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(2)** evidence from the project application supporting the applicant's claim that the project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO; and

**(3)** evidence that the applicant believes HUD failed to follow its selection priorities set forth in this NOFO which resulted in the project not being funded (e.g., selecting a lower-scored project within the CoC or a similar project from another CoC).

**c.** For applicants that were denied funding due to the individual project's funding being decreased to such a level that the project was no longer feasible, documentation submitted by the applicant must include:

**(1)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(2)** evidence from the project application supporting the applicant's claim that the project application met project eligibility and project quality thresholds set forth in this NOFO;

**(3)** evidence that the applicant believes HUD failed to follow its selection priorities set forth in this NOFO which resulted in the project not being funded (e.g., selecting a lower-scored project within the CoC or a similar project from another CoC); and

**(4)** the evidence in section IV.E.4 of this NOFO as well as evidence for decreased funding in section VII.D.2 of this NOFO.

**d.** For CoCs that were denied funding due to the score of the CoC Application or the score of the project application not being high enough to result in the funding of project(s) within the CoC, and the lower score for one or both application types was the result of HUD error, the CoC may appeal the CoC or project application score and request funding for affected projects. Documentation submitted by the Collaborative Applicant on behalf of the CoC must include evidence of HUD error when calculating the CoC Application or project application score.

**Note: HUD can only consider information submitted with the CoC Application. HUD will not consider additional information in support of the CoC Application.**

**2. Decreased Funding.** To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in section VII.F of this NOFO within 45 days of the date of the final funding announcement of the conditional awards from HUD, with a copy to the authorized representative of the CoC's designated Collaborative Applicant.
Documentation submitted by the applicant must include evidence of the HUD error the applicant believes was made.

**3. HUD Decision and Notification of Decision.** Where HUD determines that HUD error occurred, and the applicant should have been awarded additional funding, HUD will provide funding from the next available funds and make necessary adjustments by amending the award. HUD will reverse a decision only when the applicant can show that HUD error caused the denial or decrease.

## E. Consolidated Plan Certification

An applicant may appeal to HUD a jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan. The appeals process is as follows:

**1. Written Appeal.** With the project application that is submitted by the application deadline, the applicant must submit a written appeal. Project applicants may submit its appeal in e-snaps with its project application. When submitted with the project application in e-snaps, the applicant must also email a copy of this appeal to the jurisdiction that denied the Certification of Consistency with the Consolidated Plan and should send a copy to the authorized representative from the CoC's designated Collaborative Applicant, unless it is the Collaborative Applicant that is filing the appeal. Otherwise, the project applicant or Collaborative Applicant may submit the appeal to HUD using one of the methods in section VII.F of this NOFO. The written appeal must include the following information:

**a.** a copy of the applicant's request to the jurisdiction for the Certification of Consistency with the Consolidated Plan;

**b.** a copy of the jurisdiction's response stating the reasons for denial, including the reasons the proposed project is not consistent with the jurisdiction's Consolidated Plan in accordance with 24 CFR 91.510(c); and

**c.** a statement of the reasons why the applicant believes its project is consistent with the jurisdiction's Consolidated Plan.

Page 124 of 128

**Suppl. App. 212**

The appeal may include additional information the applicant believes supports its appeal, including:

**(1)** any additional communication between the applicant and the jurisdiction regarding the request for certification of consistency; and

**(2)** documentation that identifies to whom within the jurisdiction the evidence was sent and the date on which it was sent.

**2. Jurisdiction Response.** The jurisdiction will have 10 days after the receipt of the applicant's written appeal to submit a written response to HUD. The response must be sent by email to snapsappeals@hud.gov on the organization's letterhead, with a copy to the project applicant and the authorized representative of the CoC's designated Collaborative Applicant. The response must include the following information:

**a.** an explanation of the reasons originally given for refusing to provide the Certification of Consistency with the Consolidated Plan; and

**b.** written rebuttal to any claims made by the applicant in the written appeal.

**3. HUD Decision and Notification of Decision.**

**a.** HUD will review the submissions and will provide written notification, by email, of its decision to the applicant and the jurisdiction, with a copy to the authorized representative from the CoC's designated Collaborative Applicant within 45 days of the date of the receipt of the jurisdiction's response. In making its decision, HUD will consider whether the applicant submitted the request to the appropriate certifying jurisdiction and the reasonableness of the jurisdiction's refusal to provide the certificate.

**b.** If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was reasonable, then HUD will automatically reject the project application. If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was not reasonable, then HUD will consider the project application for funding in the respective FY CoC Program Competition in accordance with the review standards set forth in this NOFO.

**c.** If the jurisdiction failed to provide written reasons for refusal, including the reasons why the project is not consistent with the jurisdiction's Consolidated Plan in its initial response to the applicant's request for a certification, HUD will find for the applicant without further inquiry or response from the political jurisdiction.

**d.** HUD will provide written notification of its decision within 45 days of the date of HUD's receipt of the jurisdiction's response. Where the jurisdiction failed to provide a written response, HUD will provide written notification of its decision within 55 days of the date of HUD's receipt of the project applicant's response.

## F. Appeals Submission

**1. Submission of Appeals by Email.** Appeals must be submitted via email to snapsappeals@hud.gov. The subject line of your email must include the CoC Number, "Appeal Notice," and type of appeal, i.e., Participation, HUD Error, or Consolidated Plan Certification. A

sample email Subject Line is, Subject: XX-500 – Appeal Notice–Consolidated Plan Certification.

**2. HUD Response.** HUD will respond to all appeals via email. HUD will not consider any requests to reconsider funding except for those appeals outlined in this NOFO.

# VIII. AGENCY CONTACT

### A. For Further Information

Recipients and individuals can use the locator on HUD's website to find contact information for the local HUD CPD Field Office serving the CoC's geographic area. Individuals who are deaf or hard of hearing, as well as individuals with speech and communication disabilities may use any relay service to reach the local HUD CPD Field Office. To learn more about how to make an accessible telephone call, visit the webpage for the Federal Communications Commission. Note that HUD staff cannot assist applicants in preparing their applications.

### B. For Technical Assistance

HUD will make appropriate resources available for technical assistance related to *e-snaps*, the electronic CoC program application and grants management system. Local HUD CPD Field Office staff will also be available to help citizens identify organizations in the community that are involved in developing the CoC system. All of HUD's responses to *e-snaps* technical assistance and other questions received will be made publicly available for review by any applicant or potential applicant. HUD staff and HUD contractors are prohibited from providing CoCs, Collaborative Applicants, and project applicants with guidance that will result in a competitive advantage for any CoC or project application.

Following conditional selection of applications, HUD staff will be available to assist conditionally awarded applicants in clarifying or confirming information that is a prerequisite to the offer of a grant agreement by HUD. However, between the application deadline and the announcement of conditional selections, HUD is prohibited from and will not accept any information that would improve the substantive quality of a CoC's application pertinent to HUD's funding decision.

# C. General Clarification.

HUD staff will be available to provide general clarification on the content of this NOFO; however, HUD staff are prohibited from assisting any applicant in preparing the application(s) in *e-snaps*.

**1. Local HUD Community Planning Development (CPD) Office.** Questions regarding specific program requirements should be directed to the local HUD CPD field office, a directory of which can be found at https://www.hud.gov/program_offices/field_policy_mgt/localoffices.

**2. Training and Resources.** Collaborative Applicants and project applicants that need assistance completing the applications in *e-snaps* or understanding the program requirements under the CoC Program may access the Rule, training materials, and program resources via https://www.hud.gov/program_offices/comm_planning/coc.

Page 126 of 128

**Suppl. App. 214**

**3. Questions.** CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in *e-snaps* may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions up to the deadline of 8:00 PM EDT on October 30, 2024. Applicants experiencing technical difficulty should contact CoCNOFO@hud.gov immediately for assistance and document their attempts to obtain assistance.

# IX. OTHER INFORMATION

**1. Compliance of this NOFO with the National Environmental Policy Act (NEPA)**

A Finding of No Significant Impact (FONSI) with respect to the environment has been made for this NOFO in accordance with HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C.4332(2)(C)). The FONSI is available for inspection at HUD's Funding Opportunities web page.

**2. Web Resources**

- **Affirmatively Furthering Fair Housing (See 24 CFR 578.93(c) for specific Affirmatively Furthering Fair Housing requirements that apply to the CoC program.)**
- **Assistance Listing(formerly CFDA)**
- **Climate Action Plan**
- **Climate and Economic Justice Screening Tool (CEJST)**
- **Code of Conduct Requirements and E-Library**
- **Environmental Review**
- **Equal Participation of Faith-Based Organizations**
- **Fair Housing Rights and Obligations**
- **Federal Awardee Performance and Integrity Information System**
- **Federal Funding Accountability and Transparency Act (FFATA) Subaward Reporting System**
- **Grants.gov**
- **Healthy Homes Strategic Plan**
- **Healthy Housing Reference Manual**
- **Historically Black Colleges and Universities (HBCUs)**
- **HUD Grants**
- **HUD Reform Act**
- **HUD Reform Act: HUD Implementing Regulations**
- **HUD's Disability Overview**
- **HUD's Strategic Plan**
- **Limited English Proficiency (LEP)**
- **NOFO Webcasts**
- **Procurement of Recovered Materials**
- **Promise Zones**

- **Real Estate Acquisition and Relocation**
- **Section 3**
- **State Point of Contact List**
- **System for Award Management (SAM)**
- **Unique Entity Identifier**
- **USA Spending**

# Appendix

**Suppl. App. 216**

# Exhibit 3

**Suppl. App. 217**



U.S. Department of Housing
and Urban Development

# FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO

FR-6900-N-25

Applications are due by 8:00 PM EST Eastern Time on 01/14/2026.

Community Planning and Development

**Suppl. App. 218**

# TABLE OF CONTENTS

Suppl. App. 219

I. BASIC INFORMATION...........................................5

A. Summary..............................................................5

B. Agency Contact(s) ................................................7

II. ELIGIBILITY............................................................9

A. Eligible Applicants................................................9

B. Cost Sharing or Matching ..................................10

III. PROGRAM DESCRIPTION ...............................12

A. Purpose...............................................................12

B. Goals and Objectives.........................................12

C. Authority..............................................................14

D. Unallowable Costs..............................................14

E. Indirect Costs......................................................14

F. Program History ..................................................15

G. Other Information................................................16

IV. APPLICATION CONTENTS AND FORMAT.....24

A. Standard Forms, Assurances, and Certifications24

B. Budget.................................................................26

C. Narratives and Other Attachments .....................34

D. Other Application Content ..................................34

V. APPLICATION REVIEW INFORMATION..........51

A. Threshold Review ...............................................51

B. Merit Review .......................................................66

C. Risk Review.........................................................89

D. Selection Process...............................................90

E. Award Notices.....................................................95

VI. SUBMISSION REQUIREMENTS AND

DEADLINES............................................................98

A. Deadlines............................................................98

B. Submission Methods...........................................99

C. Other Submissions ...........................................104

D. False Statements..............................................105

VII. POST-AWARD REQUIREMENTS AND

ADMINISTRATION ...............................................107

A. Administrative, National and Departmental Policy

Requirements, and General Terms and Conditions

...............................................................107

B. Environmental Requirements ...........................109

C. Remedies for Noncompliance ..........................110

D. Reporting ..........................................................111

VIII. CONTACT AND SUPPORT .........................115

A. Agency Contact .................................................115

B. esnaps.hud.gov ................................................116

C. SAM.gov ...........................................................116

D. Debriefing and Appeals ....................................116

E. Applicant Experience Survey............................121

F. Other Online Resources....................................121

APPENDIX.............................................................123

Appendix I. Definitions .........................................123

# BEFORE YOU BEGIN

If you believe you are a good candidate for this funding opportunity, register in the appropriate systems now and review the application package. If you are already registered, make sure your registration is active and up-to-date.

## SAM.gov Registration

You must have an active and up-to-date account with SAM.gov, at the time of application and throughout the life of any award.

To register, go to SAM.gov Entity Registration and click Get Started. From the same page, you can also click on the Entity Registration Checklist for the information you will need to register.

It can take several weeks to register in SAM.gov, so please get started now if you are planning to apply. SAM.gov also provides each organization with a unique entity identifier (UEI). A valid UEI is required to apply for funding.

## esnaps.hud.gov Registration

You must have an active esnaps.hud.gov account to submit your application. See step-by-step instructions at the CoC Registration and Competition home page.

See Section VI.B. Submission Methods.

## Find the Application Package

Use the Grants Search at Grants.gov and search for opportunity number FR-6900-N-25 . The application package has all the online forms you need to apply. You also need to access the Download Instructions link and review the content before you apply.

If you have other technical difficulties using Grants.gov, access the Support Center on Grants.gov for assistance.

To get updates on changes to this notice of funding opportunity (NOFO), click Subscribe from the View Grant Opportunity page for this NOFO on Grants.gov.

---

**Application Deadline**
Applications are due by 8:00 PM EST Eastern Time on 01/14/2026.
See Section VI.A. of this NOFO.

**HUD Listserv**
If you are interested in email notices about upcoming funding opportunities, subscribe to HUD's Funding Opportunities listserv.
**Note**: To help you find what you need, this NOFO uses internal links. In Adobe Reader, you can go back to where you were by pressing Alt + Left Arrow (Windows) or Command + Left Arrow (Mac) on your keyboard.

---

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 5 of 129 PageID #: 359

# I. BASIC INFORMATION

I.  Basic Information

    A.  Summary

B.  Agency Contact(s)

TABLE OF CONTENTS

**Suppl. App. 221**

Case 1:25-cv-00626-MSM-AEM Document 12-3 Filed 11/25/25 Page 6 of 129 PageID #: 360

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# I. BASIC INFORMATION

See Contact and Support section of this NOFO.

## A. Summary

**Federal Agency Name:**
United States Department of Housing and Urban Development (HUD)

**HUD Program Office:**

Community Planning and Development

**Announcement Type:**

Initial

**Program Type:**

Discretionary

**Paperwork Reduction Act Information:**

2501-0044, 2506-0044, 2506-0112, 2506-0182, 2506-0145

**Due Date for Intergovernmental Review:**

See Section VI.C.1.

---

**Key Facts**

**Opportunity Name:**
FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO
**Opportunity Number:**
FR-6900-N-25
**Federal Assistance Listing:**
14.267

**Key Dates**

**Application Due Date: 8PM Eastern Time on**:
01/14/2026
**Anticipated Award Date:**
05/01/2026
**Estimated Performance Period Start Date:**
05/01/2026
**Estimated Performance Period End Date:**
12/31/2027

---

### 1. NOFO Summary

The Continuum of Care (CoC) Program is designed to:

- promote a community-wide commitment to the goal of ending homelessness;
- provide funding for efforts by nonprofit providers, States, Indian Tribes or Tribally Designated Housing Entities [as defined in section 4 of the Native American Housing

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 7 of 129 PageID #: 361

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)], and local governments to quickly rehouse individuals and families experiencing homelessness, persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, and youth experiencing homelessness while minimizing the trauma and dislocation caused by homelessness;

- promote access to, and effective utilization of, mainstream programs and programs funded with State or local resources; and

- optimize self-sufficiency among individuals and families experiencing homelessness.

The goal of the Youth Homelessness Demonstration Program (YHDP) is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness and sharing that experience with and mobilizing communities around the country toward the same end. The population to be served by the demonstration program is youth ages 24 and younger who are experiencing homelessness, including unaccompanied and pregnant or parenting youth.

The CoC Program does not require intergovernmental review.

## 2. Funding Details

### Type of Funding Instrument

G (Grant)

### Available Funds

Funding of approximately **$3,918,000,000** is available through this NOFO.

Additional funds may become available for award. Use of these funds is subject to statutory constraints. All awards are subject to the selection process contained in this NOFO.

On March 15, 2025, the President signed H.R. 1968 authorizing the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4) which makes approximately the same amount of CoC Program funding available for FY 2025 as the Consolidated Appropriations Act, 2024 (Public Law 118-42, approved March 9, 2024). Pursuant to the Full-Year Continuing Appropriations and Extensions Act, 2025, HUD will repurpose $100,000,000 in funds previously outlined in paragraph (5) of the Consolidated Appropriations Act, 2024, under the heading 'Department of Housing and Urban Development—Community Planning and Development—Homeless Assistance Grants', to supplement the FY 2025 CoC Program Competition. Approximately $294,000,000 in amounts available pursuant to section 231 of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94, division H, title II, section 231; 42 U.S.C. 11364a) is also being made available as part of this Notice.

Of the $3,918,000,000 HUD is making available:

- Approximately $52,000,000 in funding is available for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in sections IV.D.1.e and IV.D.1.f of this NOFO.

- Approximately $129,000,000 for the renewal of projects originally awarded as part of

the Unsheltered and Rural Homelessness Supplemental NOFO.

- Approximately $228,000,000 for the competitive renewal and replacement of expiring YHDP grants.

All requirements in the FY 2025 application process, including requirements for the entire CoC Consolidated Application, and the total amount of funds available are included in this NOFO.

**Number of Awards**

HUD expects to make approximately 7000 awards from the funds available under this NOFO.

**Length of Performance Period:**

12-month project period and budget period

18-month project period and budget period

24-month project period and budget period

36-month project period and budget period

42-month project period and budget period

48-month project period and budget period

60-month project period and budget period

Length of Periods Explanation:

## B. Agency Contact(s)

See Contact and Support section of this NOFO.

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 9 of 129 PageID #: 363

# II. ELIGIBILITY

II. Eligibility

A. Eligible Applicants

B. Cost Sharing or Matching

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 10 of 129 PageID #: 364

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# II. ELIGIBILITY

You are invited to apply if your organization is an eligible entity type and meets the funding conditions included in the NOFO. HUD will review applications from eligible applicants using the criteria in Section V. of this NOFO.

## A. Eligible Applicants

### 1. Eligible Entity Types:

00 (State governments)

01 (County governments)

02 (City or township governments)

04 (Special district governments)

07 (Native American tribal governments (Federally recognized))

08 (Public housing authorities/Indian housing authorities)

11 (Native American tribal organizations (other than Federally recognized tribal governments))

12 (Nonprofits having a 501(c)(3) status with the IRS, other than institutions of higher education)

25 (Others (see text field entitled "Additional Information on Eligibility" for clarification))

Additional Information on Eligibility

Faith-based organizations may apply on the same basis as any other organization. HUD does not engage in any unlawful and improper conduct, policies, or practices that target faith-based organizations.

Individuals are ineligible applicants.

To be eligible for funding under the FY 2025 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO, project applicants must meet all statutory and regulatory requirements in the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act) and the CoC Program Rule found in 24 CFR part 578 (the Rule). For more information on Applicant eligibility see Section V.A.1 of this NOFO.

Project applicants can obtain a copy of the Act and the Rule on HUD's website or by contacting the NOFO Information Center at 1-800-483-8929. Individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities may visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs for more information on how to make an accessible telephone call to HUD.

### 2. Restrictions

### a. Statutory and Regulatory Requirements Affecting Eligibility

You must comply with the current General Statutory and Regulatory Requirements Affecting Eligibility for HUD's Competitive Programs. HUD will review your eligibility before issuing an

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 11 of 129 PageID #: 365

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

award. As part of this review, HUD uses SAM.gov and Department of Treasury data.

### b. Application Eligibility

Your application is considered for funding if it satisfies the application review requirements in Section V. of this NOFO.

For-profit entities are not eligible to apply for grants or to be subrecipients of grant funds.

## B. Cost Sharing or Matching

This Program requires cost sharing or matching, as described below.

24 CFR 578.73 of the Rule requires that recipients must match all grant funds, except for leasing funds, with no less than 25 percent of funds or in-kind contributions from other sources. 24 CFR 578.73.

Project applicants that intend to use program income as a match must provide an estimate of how much program income will be used for the match. HUD will not require YHDP Renewal or replacement projects to meet the 25 percent match requirement if the applicant is able to demonstrate it has taken reasonable steps to maximize resources available for youth experiencing homelessness.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 12 of 129 PageID #: 366

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# III. PROGRAM DESCRIPTION

III. Program Description

A. Purpose

B. Goals and Objectives

C. Authority

D. Unallowable Costs

E. Indirect Costs

F. Program History

G. Other Information

TABLE OF CONTENTS

**Suppl. App. 228**

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 13 of 129 PageID #: 367

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# III. PROGRAM DESCRIPTION

## A. Purpose

The Continuum of Care (CoC) Program (24 CFR part 578) is designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, states, local governments and Indian Tribes or tribally designated housing entities (as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)) to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs and programs funded with State or local resources; and to optimize self-sufficiency among those experiencing homelessness.

The FY 2025 CoC Program NOFO funds the renewal of existing CoC grants, including DV Renewal projects and projects originally funded under the Special NOFO to Address Unsheltered and Rural Homelessness, and the competitive renewal or replacement of existing YHDP grants that are expiring in Calendar Year 2026. This NOFO also provides funding for new projects, including those created with DV Bonus, CoC Bonus, and the reallocation of existing renewal projects.

For FY 2025, HUD requires Collaborative Applicants to rank all project applications, except for CoC Planning, and if applicable, UFA Costs project applications.

## B. Goals and Objectives

This section provides context to help applicants better understand how the merit criteria found in section V.B of this NOFO supports HUD's goal of ending homelessness. These goals are consistent with national policy objectives which must be incorporated into the awarding of funds (2 CFR 200.211(c)(1)(ii).

### 1. Ending the Crisis of Homelessness on Our Streets

The number of people experiencing unsheltered homelessness is at an all-time high. People living on the streets and in encampments have high rates of substance use disorder and mental illness. According to a nationwide study, 75% of people experiencing unsheltered homelessness report a substance use disorder and 78% report a mental health condition. The study found that substance use disorder contributed to the loss of housing for 50% of the unsheltered population, and mental health conditions contributed to loss of housing for 51% of the population.

CoCs should direct resources towards outreach, intervention, and assistance that helps people regain self-sufficiency. Consistent with Executive Order 14321 "Ending Crime and Disorder on America's Streets," CoCs should work with law enforcement, first responders, and their state and local governments to reduce encampments, public camping, and public drug use in order to address barriers to maintaining housing and increasing self-sufficiency.

### 2. Prioritizing Treatment and Recovery.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 14 of 129 PageID #: 368

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

CoCs should prioritize projects that provide the treatment and services people need to recover and regain self-sufficiency including on-site behavioral health treatment, robust wraparound supportive services, and participation requirements. This NOFO devotes resources to Transitional Housing programs and Supportive Service Only projects with the goal of improving health and long-term economic independence for the homeless. HUD encourages CoCs to utilize the full array of mainstream programs and local and private resources to provide housing and healthcare needed to maintain safe and stable housing.

### 3. Advancing Public Safety

Safety and security for all members of the public, especially those living unsheltered, is essential to promoting a community-wide commitment to the goal of ending homelessness. CoCs should cooperate with law enforcement to advance public safety for the entire community impacted by homelessness. No one should sleep outside on the street or in dangerous encampments, and everyone should be able to enjoy public spaces safely. HUD encourages CoCs to assist in preventing and minimizing the trauma associated with living on the streets or in encampments, especially for women and youth that are the victims of sexual assault and trafficking. Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

First responders are critical partners in engaging people into treatment and services and protecting public order and vulnerable individuals experiencing homelessness. In *Grants Pass v. Johnson,* the Supreme Court of the United States upheld the authority of local governments to prohibit public camping.

### 4. Promoting Self-Sufficiency.

One of the primary purposes of the CoC Program is to optimize self-sufficiency. CoCs should partner with workforce development centers, employers, childcare, and other supportive service providers to increase employment and employment income for program participants. CoCs should prioritize projects that help lead to long-term economic independence for individuals and families to exit homelessness and prevent future returns to homelessness.

### 5. Improving Outcomes.

CoCs should review all projects eligible for renewal under this NOFO to determine their effectiveness in reducing homelessness and increasing self-sufficiency. CoCs should prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

This NOFO includes several options to help CoCs improve their effectiveness, including reallocation, expansion, and transition grants, and CoC's should take advantage of these options to expand the pool of providers, including faith-based providers, and improve the overall performance of the CoC.

### 6. Minimizing Trauma.

One of the purposes of the CoC program is to minimize the trauma associated with homelessness. CoCs should encourage providers to provide trauma informed care and ensure participant safety in programs, especially for youth and survivors of domestic violence, dating violence, sexual assault, and stalking. Women experiencing homelessness or domestic violence should have access to safe, single-sex spaces and other considerations

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 15 of 129 PageID #: 369

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

for personal privacy (24 CFR 578.93(b).

## C. Authority

The CoC Program is authorized by subtitle C of title IV of the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act), and the CoC Program rule found in 24 CFR part 578 (the Rule). Pursuant to 42 U.S.C 11386a(a) and 42 U.S.C 11386a(b)(1)(G), the Secretary can establish criteria for the awarding of funds including factors deemed appropriate to carry out the CoC Program in an effective and efficient manner.

FY 2025 funding for CoC Program Competition NOFO, including the competitive or noncompetitive renewal or replacements of YHDP grants under the CoC program, is authorized by the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025). Under this NOFO, HUD will competitively renew or replace YHDP grants under the CoC Program.

HUD is including up to $294,000,000 in funding under Section 231(a)(1) and 231(a)(3) of the 2020 Consolidated Appropriations Act.

HUD is also utilizing authority under the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025) to enable HUD to repurpose $100 million made available for Permanent Supportive Housing to fund CoC projects under this NOFO.

## D. Unallowable Costs

HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## E. Indirect Costs

If you expect to charge indirect costs to the award, submit the Indirect Cost Rate Certification form (HUD-426) with your application.

The HUD-426 form is built into the *e-snaps* Project Applicant Profile where you will complete the information if requesting indirect costs, and you will also see the information transferred within your project application.

Indirect cost rules under 2 CFR part 200, as may be amended from time to time, apply. Project applicants that intend to charge indirect costs to the award must clearly state in the project application(s) the rate and distribution base the recipient intends to use, and if applicable, the rate and distribution base to be used by any subrecipient(s). If the rate is a Federally negotiated indirect cost rate, the project application must include the corresponding negotiated indirect cost rate agreement signed by the cognizant agency. A government department or agency unit that receives no more than $35 million in direct federal funding per year and has developed and maintains an indirect cost rate proposal and supporting documentation in accordance with 2 CFR part 200, appendix VII, may use the rate and distribution base specified in that indirect cost rate proposal. These governmental departments or agencies are not required to submit their proposals unless they are specifically requested to do so by an awarding Federal agency. The Federal agency's review should be limited to ensuring the proposal is consistent with the principles of this part.

For each applicant or intended subrecipient that meets the conditions for using the de minimis

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 16 of 129 PageID
#: 370

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

rate under 2 CFR 200.414(f) and will use that rate to charge indirect costs, the project application must clearly state the intended use of the de minimis rate. As described in 2 CFR 200.403, costs must be consistently charged as either indirect or direct costs but must not be double charged or inconsistently charged as both. Once an organization elects to use the de minimis rate, the organization must apply this methodology consistently for all Federal awards until the organization chooses to negotiate for a rate, which the organization may apply to do at any time. Documentation of the decision to use the de minimis rate must be retained on file for audit.

## F. Program History

FY 2025 CoC awards will be made through this NOFO. This NOFO rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024, and includes several changes.

### 1. FY 2025 CoC Consolidated Application.

All CoCs must complete and submit the FY 2025 CoC Consolidated Application that includes the CoC Application and CoC Priority Lising with all submitted projects ranked or rejected based on the criteria set forth in this NOFO.

### 2. Increase in Competition.

The Continuum of Care program is a national competition (42 U.S.C. 11386a). Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD).

### 3. Investment in Transitional Housing and Supportive Service Only Projects.

In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects.

### 4. Program Components that are eligible under this NOFO.

Provisions at 24 CFR 578.37 provide that CoC funds may be used for projects under five program components: transitional housing, supportive services only, HMIS, permanent housing (including rapid re-housing and permanent supportive housing), and in some cases, homelessness prevention. This NOFO is different than prior years in that applicants may apply for Transitional Housing (TH) and Supportive Services Only (SSO) projects including street outreach. Only designated High Performing Communities (HPC), may carry out homelessness prevention activities through the CoC program and there are currently no HPCs. Therefore, the four components that will be funded through this CoC Program Competition are: (a). Transitional Housing; (b). Supportive Services Only; (c). Permanent Housing; and (d). HMIS. Additionally:

**a.** HUD will allow renewal project applications for Joint T/PH-RRH component projects, which combine two existing program components in a single project (see section III.G.4of this NOFO for more information). No new Joint TH/PH-RRH component project applications will be allowed.

**b.** Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. These projects must meet the project quality threshold criteria in section V.A.4.b.(5)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in section V.A.4.b.(5)(b) of this NOFO.

The components are fully described at 24 CFR 578.37.

### 5. Special CoC NOFO grants.

Grants originally awarded funding under the Special NOFO to Address Unsheltered and Rural Homelessness, that are expiring in Calendar year 2026 are eligible to renew under this NOFO.

### 6. Reallocation.

CoCs may reallocate funding from any eligible renewal grant, including grants that have not previously renewed under the CoC Program, so long as the project has an executed grant agreement with an expiration date in Calendar Year 2026. For more information on Reallocation requirements see section III.G.3 of this NOFO.

### 7. Competitive Renewal or Replacement of YHDP Grants.

HUD will competitively renew or replace YHDP projects. Additionally, YHDP projects may be reallocated by CoCs to create new YHDP grants. If significant changes to a renewing YHDP project are needed the YHDP project may replace its current project with a new YHDP Replacement project, that may wholly or in part include activities ineligible under the CoC Program as outlined in section IV.D.1.h of this NOFO.

## G. Other Information

### 1. CoC Program NOFO Requirements.

All requirements for submitting the entire CoC Consolidated Application, including applications for projects eligible for FY 2025 CoC and YHDP funding and the total amount of funds available, are contained in this NOFO. Applicants should read this information carefully and respond to all submission requirements and deadlines as described.

**a.** CoCs should consider the Goals and Objects established in Section III.B of this NOFO in conjunction with local priorities to determine the ranking of new and renewal project application requests.

**b.** Collaborative Applicants that are designated Unified Funding Agencies (UFAs) or High Performing Communities (HPCs) by HUD during the FY 2024 CoC Program Registration process will maintain their UFA and/or HPC designation for the FY 2025 CoC Program Competition.

**c.** HUD will conduct threshold reviews of project applicants, and project applications for all CoC Consolidated Applications that are submitted by the application submission deadline as described in section V.A.4.

**d.** HUD may issue more than one conditional funding announcement, including for instances where a CoC has been affected by a disaster and for which HUD has extended

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 18 of 129 PageID
#: 372

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

the deadline for application submission.

**e.** HUD will score the FY 2025 CoC Application portion of the Consolidated Application in accordance with the criteria set forth in section V.B of this NOFO.

**f.** With the exception of CoC Planning and, if applicable, UFA Cost applications, CoCs must rank all project applications. This includes CoC Bonus, DV Bonus, CoC Renewal (including DV Renewal projects), New CoC Reallocation, New DV Reallocation, and YHDP Renewal and YHDP Reallocation projects. CoC Planning and, if applicable, UFA Costs project applications are not ranked and will be selected provided they pass project eligibility and project quality threshold review.

## 2. Eligible Renewal Project.

YHDP and CoC projects originally funded in FY 2024 or earlier, including projects originally funded under the Special NOFO or DV Bonus are eligible to renew under this NOFO, provided the projects have an expiration date in CY 2026 (between January 1, 2026, and December 31, 2026). Renewal project applications must be submitted by the recipient currently under grant agreement to operate the project. See section IV.D.2 for more information on renewal project requirements.

In cases where an expiring grant agreement is amended to have a new recipient after a renewal application is submitted, the new recipient will be eligible to receive the renewal award (Section V.D.8).

## 3. Reallocation.

Reallocation is a process CoCs use to shift funds in whole or in part from existing eligible CoC renewal projects to create one or more new projects without decreasing the CoC's ARD. CoCs may only reallocate eligible renewal projects so long as the renewal project being reduced or eliminated has a current grant agreement with an expiration date in CY 2026. Additionally, new projects created through reallocation must meet the project eligibility and project quality thresholds established in sections V.A.4.a and V.A.4.b of this NOFO. For more information on the requirements for projects created through reallocation, see sections IV.D.1.e and IV.D.1.f (DV Reallocation), IV.D.1.g (CoC Reallocation), and IV.D.1.i (YHDP Reallocation) of this NOFO.

To create a Transition Grant through the reallocation process, the CoC must wholly eliminate one or more projects and use those funds to create the single, new transition grant [see section IV.D.1.l of this NOFO].

## 4. Joint TH/PH-RRH Component Project.

The Joint TH/PH-RRH component project combines two existing program components – Transitional Housing and Permanent Housing-Rapid Rehousing – in a single project to serve individuals and families experiencing homelessness.

If funded, HUD will limit eligible costs as follows, in addition to other limitations found in the Rule:

**a.** leasing of a structure or units, and operating costs to provide transitional housing;

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 19 of 129 PageID #: 373

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**b.** short- and medium-term tenant-based rental assistance on behalf of program participants to pay for the RRH portion of the project;

**c.** supportive services;

**d.** costs of contributing data to the HMIS; and

**e.** project administrative costs.

Renewal project applicants must include details in the project description of how TH and PH-RRH assistance will be provided. Additionally, if CoC Program funds are not being requested for both TH and PH-RRH units, the renewal project application must describe and include the number of the project's TH units and PH-RRH units that will be paid for from another funding source. Applicants may only use CoC Program Leasing funds or non-CoC Program Funds to pay for the cost of housing program participants enrolled in the TH portion of the project.

When a program participant is enrolled in a Joint TH/PH-RRH component project, the recipient or subrecipient must be able to provide both components, including the units supported by the TH component and the tenant-based rental assistance and services provided through the PH-RRH component, to all participants. A program participant may choose to receive only the assistance provided through the TH portion of the project or the assistance provided through the PH-RRH component, but the recipient or subrecipient must make both types of assistance available.

### 5. Supportive Services Only (SSO) projects not dedicated to Coordinated Entry.

Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. Projects that are primarily providing these outreach services and identify themselves as such in the project application, must meet the project quality threshold criteria in Section V.A.4.b.(5)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in Section V.A.4.b.(5)(b) of this NOFO.

### 6. Centralized or Coordinated Assessment System (Coordinated Entry).

In general, 24 CFR 578.23(c)(9) and (11) requires all CoC program recipients and subrecipients to use the centralized or coordinated assessment system established by CoCs. The definition of Centralized or Coordinated Assessment (also known as Coordinated Entry) is found at 24 CFR 578.3. 24 CFR 578.7(a)(8) details the responsibilities of the CoC to establish and operate this required system. In addition to the definition and responsibilities established in the Rule, HUD posted on its website, *CPD-17-01: Notice Establishing Additional Requirements for a Continuum of Care Centralized or Coordinated Assessment System*, establishing additional requirements related to the development and use of a centralized or coordinated entry assessment system. These systems help communities assess the needs of program participants and effectively match individuals and families experiencing homelessness with the most appropriate resources available to address their supportive service and housing needs. CoCs may use planning costs to design and plan for the implementation of a Coordinated Entry system; however, once the system is established and operating, the costs of operating it are not eligible planning costs. CoCs must operate the system with CoC Program funds, other funds, or a combination of the two. Section

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 20 of 129 PageID #: 374

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

578.23(c)(9) of the CoC Program Rule exempts victim service providers from using the CoC's coordinated entry process if victim service providers use a coordinated entry process that otherwise meets HUD's requirements.

### 7. Non-Dedicated Permanent Supportive Housing Beds.

A Permanent Supportive Housing bed within a CoC's geographic area that is not currently classified as dedicated for use by chronically homeless individuals and families or as DedicatedPLUS.

### 8. Beds Dedicated to Chronically Homeless Individuals and Families.

A Permanent Supportive Housing bed that is dedicated specifically for use by individuals and families experiencing chronic homelessness [see 24 CFR 578.3 definition of Chronically Homeless] within a CoC's geographic area, as reported in the CoC's housing inventory count (HIC) and permanent housing (PH) project applications.

### 9. DedicatedPLUS Project.

**a.** A PSH project where 100 percent of the beds are dedicated to serve individuals, households with children, and unaccompanied youth (including pregnant and parenting youth) that at intake meet one of the following categories:

**(1)** experiencing chronic homelessness, meaning they qualify as "chronically homeless" as defined in 24 CFR 578.3;

**(2)** residing in a TH project that will be eliminated and meets the definition of chronically homeless in effect at the time in which the individual or family entered the TH project;

**(3)** residing in a place not meant for human habitation, emergency shelter, or Safe Haven and had been admitted and enrolled in a PH project within the last year but were unable to maintain a housing placement and met the definition of chronically homeless as defined by 24 CFR 578.3 prior to entering the project;

**(4)** residing in transitional housing funded by a Joint TH/PH-RRH component project and who were experiencing chronic homelessness as defined by 24 CFR 578.3;

**(5)** residing and has resided in a place not meant for human habitation, Safe Haven, or emergency shelter for at least 12 months in the last three years, but has not done so on four separate occasions and the individual or head of household meet the definition of 'homeless individual with a disability; or

**(6)** receiving assistance through a Department of Veterans Affairs (VA)-funded homeless assistance program and met one of the above criteria at initial intake to the VA's homeless assistance system.

**b.** A renewal project where 100 percent of the beds were dedicated to individuals and families experiencing chronic homelessness may either be reallocated to create a DedicatedPLUS project or may continue as a renewal project dedicating 100 percent of its beds to individuals and families experiencing chronic homelessness. If the project is reallocated as a DedicatedPLUS project, the project must adhere to all fair housing requirements at 24 CFR 578.9.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 21 of 129 PageID #: 375

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**c.** Projects HUD awarded as DedicatedPLUS in a previous CoC Program Competition must continue to include households with children to qualify as a DedicatedPLUS project in the FY 2025 CoC Program Competition.

## 10. Participant Eligibility.

Projects funded through this NOFO must have the following eligibility criteria for program participants. All references to paragraphs of the definition of homeless that are found throughout this NOFO refer to the paragraphs listed under the definition of "homeless" in 24 CFR 578.3 and include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All specific references to the definition of "homeless" under paragraph (4) of 24 CFR 578.3 that are found throughout this NOFO also include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All projects must participate in coordinated entry, and the selection of program participants must be consistent with the CoC's coordinated entry process. As provided by the Consolidated Appropriations Act, 2025, youth aged 24 and under must not be required to provide third-party documentation that they meet the homeless definition in 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act as a condition for receiving services funded under this NOFO. Additionally, any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under or families headed by youth aged 24 and under who are living in unsafe situations. HUD interprets "youth-serving provider" as a private nonprofit organization whose primary mission is to provide services to youth aged 24 and under and families headed by youth aged 24 and under. HUD interprets "living in unsafe situations" as having an unsafe primary nighttime residence and no safe alternative to that residence. These youth-related requirements supersede any conflicting requirements under this NOFO or the Rule.

Participants eligible to be served by projects funded under this NOFO, are as follows:

**a.** PH-PSH projects awarded CoC funds must serve one of the following:

**(1)** persons eligible to be served by DedicatedPLUS projects as described in section III.G.9 of this NOFO in which case all units funded by the project must be used to serve program participants who meet the qualifications for DedicatedPLUS;

(2) persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act; or

**(3)** for renewal projects, the same population of individuals and families indicated in the expiring grant agreement (e.g., PSH projects originally awarded under the Special NOFO Competition projects through the Unsheltered Set Aside must serve individuals and families who qualify under paragraph (1) or (4) of the definition of homeless).

**b.** TH, PH-RRH, Joint TH/PH-RRH, SSO projects awarded CoC funds must serve persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act with the following exception:

PH-RRH, TH, Joint TH/PH-RRH, SSO- may serve persons who qualify as homeless

**Suppl. App. 237**

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 22 of 129 PageID #: 376

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**c.** DV Bonus, DV Renewal and DV Reallocation projects must serve individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 with the following exception:

PH-RRH, Joint TH/PH-RRH, SSO- projects may serve individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**d.** YHDP Renewal and Replacement projects including YHDP projects created through reallocation must serve youth aged 24 or younger, including unaccompanied and pregnant or parenting youth who:

**(1)** qualify as homeless under paragraphs (1), (2), or (4) of the homeless definition in 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act;

**(2)** have an unsafe primary night-time residence and no safe alternative to that residence; or

**(3)** qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

### 11. Performance-Based Decisions.

**a.** The CoC must review each project application submitted to the CoC for inclusion on the FY 2025 CoC Priority Listing as part of the CoC Consolidated Application and either approve and rank or reject project application submissions. All project applications approved by the CoC must be listed on the CoC Priority Listing in rank order.

Higher ranked projects will be assigned to Tier 1 and lower ranked projects will be assigned to Tier 2 as described in sections V.D.3.a and V.D.3.b of this NOFO. This two-tiered approach for CoCs notifies HUD which projects are prioritized for funding based on project performance, local needs, and gaps.

**b.** Consistent with the requirements of the Consolidated Appropriations Act, 2024:

**(1)** Requests for new CoC project applications are allowed if the CoC evaluates and competitively ranks projects based on how they improve the CoC's system performance as outlined in section V.B.1.a.(1) of this NOFO; and

**(2)** HUD will prioritize funding for CoCs that have demonstrated the capacity to reallocate funding from lower to higher performing projects.

### 12. Coordination with Housing and Healthcare.

The Consolidated Appropriations Act, 2024 directs HUD to provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid rehousing services. In the 2025 CoC Program Competition, CoCs may receive up to 4 points on the CoC Application if the FY 2025 CoC

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 23 of 129 PageID #: 377

Priority Listing includes new TH, PH-PSH or PH-RRH project applications created through reallocation or CoC Bonus that utilizes housing resources and healthcare provided through an array of healthcare services and housing providers. See section V.B.1.c of this NOFO for additional details.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 24 of 129 PageID #: 378

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# IV. APPLICATION CONTENTS AND FORMAT

IV.  Application Contents and Forms

A. Standard Forms, Assurances, and Certifications

B. Budget

C. Narratives and Non-Form Attachments

D.  Other Application Content

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 25 of 129 PageID
#: 379

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# IV. APPLICATION CONTENTS AND FORMAT

Applications must include three main elements: a) standard forms, assurances, and certifications; b) budget; and c) narratives and other attachments. The content, forms, and format for each element are included in this section.

You may use this section as a checklist to ensure you submit a complete application.

If you don't provide the required documents in the correct format, your application is incomplete.

Do not submit password protected or encrypted files.

While the CoC Program NOFO is officially posted on Grants.gov, the standard forms, assurances, certifications, budgets, narrative responses, and the ability to include attachments are built into e-snaps, an electronic application system.

HUD does not accept faxed applications or supportive documents.

There are two types of applications under this NOFO that are part of the CoC Consolidated Application;

- CoC Application that includes the CoC responses to the rating factors in Section V.B of this NOFO; and

- Project applications that must be approved by CoCs to be included as part of the CoC Consolidated Application. See Sections IV.D.1 and V.A.4 of this NOFO for information on eligible project applications and submission requirements.

## A. Standard Forms, Assurances, and Certifications

You must properly complete and submit with your application the standard forms, assurances, and certifications identified below. You can find all forms in the application package or review them and their instructions at Grants.gov Forms. You can also read more about standard forms on HUD's Funding Opportunities page.

The identified forms below are included in the project applicant profile in e-snaps and must be completed by the project applicant before gaining access to the application.

| Forms/Assurances/Certifications | Submission Requirement |
|---|---|
| **Application for Federal Assistance (SF-424)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Applicant and Recipient Assurances and Certifications (HUD-424B)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Applicant/Recipient Disclosure/Update Report (HUD-2880)** | Required with the application and completed in e-snaps via the information from the Project |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 26 of 129 PageID #: 380

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| Forms/Assurances/Certifications | Submission Requirement |
|---|---|
|  | Applicant Profile. |
| **Certification Regarding Lobbying** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Disclosure of Lobbying Activities (SF-LLL)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification for a Drug-Free Workplace (HUD-50070)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Assurances for Construction Programs (SF-424D)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification of Need and Compliance with Housing Quality and Habitability Standards.** | If applicable, required with the application and included in e-snaps. Collaborative Applicants must certify there is a demonstrated need for all PH renewal projects included in the Renewal Project Listing. Additionally, Collaborative Applicants must certify these projects comply with program requirements and appropriate standards of housing quality and habitability on the Renewal Project Listing. |
| **Certification for Opportunity Zone Preference Points (HUD 2996)** | If applicable. The HUD-2996 form is not built into e-snaps and must be submitted as an attachment to the CoC application in e-snaps on the Attachment screen if the CoC is requesting Opportunity Zone Preference Points. |
| **Indirect Cost Rate Certification (HUD-426)** | If applicable, required with the application and included in e-snaps. |

Attachment of the forms that are built into e-snaps, as indicated above, is not required. These forms must be completed before you will have access to the e-snaps application screens.

**The following forms are not built into e-snaps but are required to be submitted by**

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 27 of 129 PageID #: 381

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**Collaborative applicants with the CoC Priority listing:**

**1. Certification of Consistency with the Consolidated Plan Form HUD-2991.**

The standard form, Certification of Consistency with the Consolidated Plan (form HUD-2991), in which a state or local official certifies that the proposed activities or projects are consistent with the jurisdiction's Consolidated Plan and, if the project applicant is a state or unit of local government, that the jurisdiction is following its Consolidated Plan per the requirement of 24 CFR part 91. Collaborative Applicants must download a new HUD-2991 and complete it for all project applications submitted and listed on the CoC Project Listings either by submitting one correctly signed and dated HUD-2991 form from the appropriate jurisdiction(s) that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction.

The FY 2025 Form HUD-2991 must be completed and dated between November 1, 2024 and January 14, 2026 and attached to the FY 2025 CoC Priority Listing.

**2. Tribal Resolution for Projects on Trust Land or Reservations, if applicable.**

Any applicant that is not a Tribe or TDHE proposing to site a project on a reservation or trust land must include a Tribal resolution or a letter from an official or principal of the Indian Tribe or TDHE, who is authorized to act on behalf of the Indian Tribe or TDHE. Tribes do not need to include a Tribal resolution to site a project on their own reservation or trust land. A Tribal resolution is the formal manner in which the Tribal government expresses its legislative will in accordance with its organic documents. In the absence of such organic documents, a written expression adopted pursuant to Tribal practices is acceptable.

A CoC that is not a Tribe or TDHE that proposes to locate a new project on a reservation or trust land that is not currently included in the CoC's approved geographic service areas, identified during the CoC Registration process, are required to obtain a Tribal Resolution from the Tribe or TDHE and attach it to the CoC Priority Listing.

## B. Budget

You must submit a budget with your application to support your project narrative.

At a minimum, your budget must indicate direct and any indirect costs.

You must also submit form HUD-426, based on the requirements in Section III.E. of this NOFO.

The project application in e-snaps includes the budget forms available under this NOFO. Project applicants will select the appropriate budget form(s) based on the requested activities and must be completed for the proposed project. Additionally, there is a section to capture indirect cost rate and the HUD-426 form, if applicable.

**Eligible Costs.**

Except as otherwise stated below, 24 CFR 578.37 through 578.63 identifies the eligible costs that applicants may request under the CoC Program.

**1. YHDP Costs.**

Eligible costs for YHDP projects originally funded under the YHDP Competition are also

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 28 of 129 PageID #: 382

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

eligible YHDP Renewal project costs under this NOFO (see section IV.D.1.h of this NOFO). Additionally, YHDP Renewal projects may include the YHDP Special Activities described in IV.B.2 below, subject to Renewal project requirements in sections IV.D.2 including IV.D.2.f.(2) of this NOFO. YHDP Replacement including YHDP Reallocation project applications under this NOFO may include requests for eligible CoC Program Costs, the YHDP activities described in section IV.D.1.i and the YHDP Special Activities in section IV.B.2 below. HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## 2. Special YHDP Activities.

YHDP Renewal and YHDP Replacement including YHDP Reallocation projects may submit applications that include the following special YHDP activities, which are ineligible under the CoC Program, subject to the conditions specified in this section:

**a.** Recipients may carry out the activities below with written notice to the Director of HUD's Office of Special Needs Assistance Programs (SNAPS), subject to the requirements governing grant agreement amendments at 24 CFR 578.105. HUD will consider the inclusion of these activities in the project application as notification to the Director of SNAPS.

**(1)** Housing projects may have leases for a minimum term of 1 month plus 1 day under rental assistance budget line items.

**(2)** Projects may use leasing, sponsor-based rental assistance, and project-based rental assistance in RRH projects.

**(3)** In addition to the eligible costs listed in 24 CFR 578.59(a), recipients may use project administration funds to support costs of involving youth with lived experience in project implementation, execution, and improvement.

**(4)** Recipient may use project administrative funds to attend conferences and trainings that are not HUD-sponsored or HUD-approved, provided that the subject matter is relevant to youth homelessness.

**(5)** Projects may employ youth who are receiving services, or housing assistance, from the recipient organization. Recipients that use this special YHDP activity must maintain documentation that discloses the nature of work that the youth performs, and that the youth is not in a position that creates a conflict of interest.

**(6)** Projects may use habitability standards in 24 CFR 576.403(c) rather than the housing standards in 24 CFR 578.75 for short- or medium-term (up to 24 months) housing assistance. Recipients implementing this special YHDP activity must keep documentation of which standards they apply to the units and proof that the units complied with standards before assistance is provided for every unit funded.

**(7)** Recipients may provide moving expenses to a program participant more than once.

**(8)** Recipients may provide payments of up to $500 per month for families that provide housing under a host home and kinship care model to offset the increased costs associated with having youth housed in the unit.

**(9)** YHDP recipients may continue providing supportive services to program participants for up to 12 months after the program participant exits homelessness,

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 29 of 129 PageID #: 383

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

transitional housing or after the end of housing assistance.

**(10)** Projects using grant leasing funds may pay above the Fair Market Rent (FMR) for individual units as long as the amount paid is consistent with the reasonable rent standards at 24 CFR 578.51(g).

**(11)** Recipients may use grant funds for the following if they are necessary to assist program participants to obtain and maintain housing. Recipients and subrecipients must maintain records establishing how it was determined that paying the costs was necessary for the program participant to obtain and retain housing and must also conduct an annual assessment of the needs of the program participants and adjust costs accordingly:

**(a)** Security deposits for units in an amount not to exceed 2 months of rent.

**(b)** The costs to pay for any damage to housing due to the action of program participants, which may be paid while the youth continues to reside in the unit. The total costs paid for damage per program participant may not exceed the cost of 2 months' rent.

**(c)** The costs of providing household cleaning supplies to program participants.

**(d)** Housing start-up expenses for program participants, including furniture, pots and pans, linens, toiletries, and other household goods, not to exceed $300 in value per program participant.

**(e)** The one-time cost of purchasing a cellular phone and service for program participant use, provided access to a cellular phone is necessary to obtain or maintain housing and the costs of the phone and services are reasonable per 2 CFR 200.404.

**(f)** The cost of internet in program participants' units if the costs of the service is reasonable per 2 CFR 200.404.

**(g)** Payment of rental arrears consisting of a one-time payment for up to 6 months of rent in arrears, including any late fees on those arrears.

**(h)** Payment of utility arrears of up to 6 months per utility.

**(i)** Up to 3 months of utilities for a program participant, based on the utility costs schedule for the unit size and location.

**(j)** In addition to transportation costs eligible in 24 CFR 578.53(e)(15), recipients may pay gas and mileage costs for a program participant's personal vehicle for trips to and from medical care, employment, childcare, or other services eligible under this section.

**(k)** Legal fees, including court fees, bail bonds, and required courses and equipment.

**(l)** Program participant's past driving fines and fees that are blocking a young person from being able to obtain or renew a driver's license and impacting their ability to obtain or maintain housing. Additionally, recipients may pay for program participants' costs for insurance and registration for personal vehicles, if the

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 30 of 129 PageID #: 384

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

personal vehicle is necessary to reach medical care, employment, childcare, or other services eligible under this section.

**(12)** Recipients of housing projects (RRH, TH, TH-RRH, and PSH) may use YHDP funds to pay for owner incentive and retention payments before occupancy of the unit, or at any point thereafter, provided that the overall amount paid with program funds per unit occupied by the program participant does not exceed three times the rent charged for the unit. These payments may include signing bonuses (a payment offered to an owner as an incentive for leasing a unit to be occupied by a program participant), repairs to bring the unit into compliance with program requirements, or holding fees to reserve a unit for an individual or family experiencing homelessness.

**b.** *YHDP Exceptions.* Under the conditions specified below, recipients may make use of the following built-in exceptions to this NOFO's requirements, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. To expedite grant agreement processing, applicants should include as much information as possible as part of their project application to demonstrate they meet the conditions specified below.

**(1)** Projects may provide up to 36 months of RRH rental assistance to program participants if the recipient demonstrates: (1) the method it will use to determine which youth need rental assistance beyond 24 months and (2) the services and resources that will be offered to ensure youth are able to sustain their housing at the end of the 36 months of assistance.

**(2)** Projects may continue providing supportive services to program participants for up to 24 months after a program participant exits homelessness, transitional housing or after housing assistance ends if the recipient demonstrates: (1) the proposed length of extended services to be provided; (2) the method it will use to determine whether services are still necessary; and (3) how those services will result in self-sufficiency and ensure stable housing for program participants.

**(3)** Projects may continue providing supportive services to program participants for up to 36 months after program participants exit homelessness, if the services are in connection with housing assistance, such as the Foster Youth to Independence initiative, or if the recipient can demonstrate that extended supportive services ensures continuity of caseworkers for program participants.

**(4)** Rental assistance may be combined with leasing or operating funds in the same unit, provided that the recipient submits a project plan that includes safeguards to ensure that no part of the project would receive a double subsidy.

**(5)** Projects may provide payments of up to $1,000 per month for families that provide housing under a host home and kinship care model, provided that the recipient can show that the additional cost is necessary to recruit hosts to the program.

**(6)** YHDP recipients may pay for short-term (up to three months) emergency lodging in motels or shelters as the transitional housing component in a Joint transitional housing-rapid rehousing (TH-RRH) project, provided that the recipient can demonstrate that use of the hotel or motel room is accessible to supportive services.

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 31 of 129 PageID #: 385

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**c. *Innovative Activities*.** In addition to the specific activities authorized above or in 24 CFR part 578, other innovative activities to reduce youth homelessness may be carried out in a YHDP project, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. Requests to carry out YHDP innovative activities are permitted to be requested in any YHDP application. YHDP Replacement applicant must demonstrate to HUD that the activity meets the following criteria; and to expedite grant agreement processing, must include as much information as possible as part of their project application.

YHDP Renewal or YHDP Replacement applications requesting to carry out Innovative Special YHDP Activities must demonstrate the following:

**(1)** The activity is approved by both the Youth Action Board (YAB) and the CoC, as evidenced by letters of support from each organization. For purposes of this section, a YAB is defined as a group of at least 4 youth – aged 24 or younger - with voting power on policy decisions of the CoC (particularly on policies that relate to preventing and ending youth homelessness, and where at least two-thirds of the members have lived experience/expertise of homelessness. The YAB must be a formal committee of the CoC. The YAB should be representative of the youth and young adult population experiencing homelessness in the community;

**(2)** That activity will be testing or likely to achieve a positive outcome in at least one of the four core outcomes for youth experiencing homelessness (stable housing, permanent connections, education/employment, and well-being);

**(3)** The activity is cost-effective; and

**(4)** The activity is not in conflict with fair housing, civil rights, or environmental regulations.

## 3. Rural Costs for Projects Originally Awarded Under the Rural Set Aside of the Special CoC NOFO Competition.

Projects originally awarded under the Rural Set Aside through the Special CoC NOFO Competition may submit applications that include the following costs (Note: CoC Projects not originally funded under the Rural Set Aside of the Special NOFO Competition are not permitted to request funding under this cost category):

**a.** Rent or utility assistance after 2 months of nonpayment of rent or utilities to prevent eviction or loss of utility service. Funds may be used to pay rent or utility arrear payments up to 6 months on behalf of program participants residing in permanent housing.

**b.** Repairs, (such as insulation, window repair, door repair, roof repair, and repairs) that are necessary to make housing habitable to be used for transitional or permanent housing by people experiencing homelessness. The total cost of repairs may not exceed $10,000 per structure.

**c. *Capacity building activities.*** Capacity building activities are those activities that maintain or improve the skills of recipients. Eligible capacity building activities include employee education, job training, staff retention activities such as financial incentives to staff, paying for continuing education opportunities, cross-training within an organization,

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 32 of 129 PageID #: 386

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

staff training and professional licensing or certification, and other professional development activities. An applicant may apply for up to 20% of funds requested as part of the project, including project administrative costs, for capacity building activities.

**d.** *Emergency food and clothing assistance.* The cost of providing meals or groceries and clothing to program participants are eligible costs.

**e.** Costs associated with making use of Federal Inventory property programs to house individuals and families experiencing homelessness. Federal Inventory property programs means the Use of Federal Real Property to Assist the Homeless program authorized by title V of the Act, and implemented by 24 CFR part 581, and the Single Family Property Disposition Program authorized by section 204(g) of the National Housing Act (12. U.S.C. 1710(g)) and implemented at 24 CFR part 291 Eligible costs are: preparing and submitting applications to obtain ownership of the real property; transfer taxes; recording fees; closing costs; building permit and zoning fees; attorney's fees; rehabilitation of buildings and structures on the property necessary to bring them into compliance with local building codes and to convert them to the intended homeless assistance use; water, sanitation, sewer and utility hook-up fees and deposits and bringing lines to the property; wells; septic systems; and improving access to the real property from public roads.

## 4. VAWA Costs Information.

Section 605(a)(2) of VAWA 2022 amended section 423(a) of the McKinney-Vento Homeless Assistance Act to add the following eligible activity to the CoC program: "Facilitating and coordinating activities to ensure compliance with the emergency transfer plan requirement in [34 U.S.C. 12491(e)] and monitoring compliance with the confidentiality protections in [34 U.S.C. 12491(c)(4)]."

HUD has determined that eligible activities paid for under the VAWA costs category are not subject to the CoC program's spending caps on administrative costs under section 423(a)(10), (11), and (12). This activity may be included in new project applications, added to eligible renewal projects through expansion or added to eligible renewal projects by shifting up to 10 percent of funds from one eligible activity to the VAWA costs line item.

**a.** Examples of eligible costs for emergency transfer facilitation include the costs of assessing, coordinating, approving, denying and implementing a survivor's emergency transfer which includes:

**(1)** Assistance with moving costs. Reasonable moving costs to move survivors for an emergency transfer.

**(2)** Assistance with travel costs. Reasonable travel costs for survivors and their families to travel for an emergency transfer.

**(3)** Security Deposits. Grant funds can be used to pay for security deposits of the safe units the survivor is transferring to via an emergency transfer.

**(4)** Utilities. Grant funds can be used to pay for costs of establishing utility assistance in the safe unit the survivor is transferring to.

**(5)** Housing Fees. Fees associated with getting survivors into a safe unit via emergency transfer, includes but not limited to application fees, broker fees, holding

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 33 of 129 PageID #: 387

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

fees, trash fees, pet fees where the person believes they need their pet to be safe, etc.

**(6)** Case management. Grant funds can be used to pay staff time necessary to assess, coordinate and implement emergency transfers.

**(7)** Housing navigation. Grant funds can be used to pay staff time necessary to identify safe units and facilitate moves into housing for survivors through emergency transfers.

**(8)** Technology to make an available unit safe. Grant funds can be used to pay for technology that the individual believes is needed to make the unit safe, including but not limited to doorbell cameras, security systems, phone and internet service when necessary to support security systems for the unit, etc.

**b.** Examples of eligible costs for monitoring compliance with the VAWA confidentiality requirements include the costs of ensuring compliance with the VAWA confidentiality requirements which includes:

**(1)** Monitoring and evaluating compliance with VAWA confidentiality requirements.

**(2)** Developing and implementing strategies for corrective actions and remedies.

**(3)** Program evaluation of confidentiality policies, practices and procedures.

**(4)** Training on compliance with VAWA confidentiality requirements.

**(5)** Reporting to Collaborative Applicant, HUD and other interested parties on compliance with VAWA confidentiality requirements.

**(6)** Costs for establishing methodology to protect survivor information.

**(7)** Staff time associated with maintaining adherence to confidentiality requirements.

### 5. Rural Costs Information.

Section 5707 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (PL 117-263, December 23, 2022, 136 Stat 2395) amended section 423(a) of the McKinney-Vento Homeless Assistance Act to allow projects in rural areas [as defined in section 2.b.(9) of the Appendix] to use program funds to pay for the following eligible activities:

**a.** Payment of short-term emergency lodging, including in motels or shelters, directly or through vouchers.

**b.** Repairs to units in which individuals and families experiencing homelessness will be housed; or are currently not fit for human habitation.

**c.** Staff training, professional development, skill development, and staff retention activities.

HUD has determined that eligible activities paid for under the rural costs category may be included in new project applications or added to eligible renewal projects through expansion. This rural cost category does not apply to projects originally awarded under the Rural Set Aside through the Special NOFO.

HUD published a list of CoCs located in rural areas on the CoC Program page on the HUD.gov website.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 34 of 129 PageID #: 388

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|
| Budget Information for Non-Construction Programs (SF-424A) | If applicable with the application | Page limit: Not Applicable<br><br>File name: SF-424A |
| Budget Information for Construction Programs (SF-424C) | If applicable, required with the application | Page limit: Not applicable<br><br>File name: SF-424C |
| Grant Application Derailed Budget (HUD-424-CB) | Required with the application | Page limit: Not applicable<br><br>File name: HUD-424CB<br><br>Form location: download instruction |
| Grant Application Detailed Budget Worksheet (HUD-424-CBW) | Required with the application | Page limit: Not applicable<br><br>File name: HUD-424CBW<br><br>Form location: download instructions |
| Indirect Cost Information Certification (HUD-426) | If applicable, this document is required with the application and after award | Page limit: Not applicable<br><br>File name: ICR Doc.<br><br>Form location: download instructions |

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|
| Budget Information for Non-Construction Programs (SF-424A) | If applicable with the application | Page limit: Not Applicable<br><br>File name: SF-424A |
| Budget Information for Construction Programs (SF-424C) | If applicable, required with the application | Page limit: Not applicable<br><br>File name: SF-424C |
| Grant Application Derailed Budget (HUD-424-CB) | Required with the application | Page limit: Not applicable<br><br>File name: HUD-424CB<br><br>Form location: download instruction |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 35 of 129 PageID #: 389

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|
| Grant Application Detailed Budget Worksheet (HUD-424-CBW) | Required with the application | Page limit: Not applicable<br><br>File name: HUD-424CBW<br><br>Form location: download instructions |
| Indirect Cost Information Certification (HUD-426) | If applicable, this document is required with the application and after award | Page limit: Not applicable<br><br>File name: ICR Doc.<br><br>Form location: download instructions |

## C. Narratives and Other Attachments

If applicable, you must upload narrative and non-form attachments in e-snaps.hud.gov. When adding the attachments to the form, you can upload PDF, Word or Excel formats.

Collaborative Applicants will provide narrative responses about the CoC planning body, governance structure, overall performance, and the strategic planning processes in esnaps. The CoC Application describes the CoC's plan for ending homelessness and increasing self-sufficiency and recovery, its system-level performance, and addresses the merit criteria specified in section V.B of this NOFO. HUD scores this part of the application with all charts and narratives completed (as applicable) and all required attachments to determine the order in which competitively ranked CoC projects are funded.

Project applicants will provide narrative responses to questions in e-snaps that demonstrate their ability to meet project eligibility and project quality threshold requirements.

## D. Other Application Content

### 1. Eligible Project Applications.

The following types of project applications will be eligible for completion and submission under this NOFO.

**a. *CoC Planning projects.*** All Collaborative Applicants are eligible and encouraged to apply for CoC Planning funds which they may use according to 24 CFR 578.39. CoC Planning project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. Planning projects will not affect a CoC's available amount for new and renewal project applications because it is not included in the CoC's ARD calculation.

**b. *UFA Costs projects.*** Only those CoC-designated Collaborative Applicants approved for UFA designation by HUD are eligible to apply for UFA Costs project funds as described in 24 CFR 578.41. UFA Costs project application must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 36 of 129 PageID #: 390

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. UFA Costs projects will not affect a CoC's available amount for new and renewal project applications as it is not included in the CoC's ARD calculation.

**c. *CoC Bonus Project.*** The CoC Bonus allows CoCs to use up to 20 percent of their Final Pro Rata Need (FPRN) to create one or more new project applications. New projects created through the CoC Bonus must meet the project eligibility and project quality threshold requirements established by HUD in sections V.A.4.a and V.A.4.b of this NOFO. To be eligible to receive a CoC Bonus project, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.1.a.(1) of this NOFO.

**d. *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Renewal Projects (DV Renewal Projects).*** Are eligible renewal projects that were previously funded, in whole or in part, with DV Bonus funding or were at some point expanded using DV Bonus funding to continue serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraphs (1) or (4) of the definition of homelessness at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

**e. *Domestic Violence, Dating Violence, Sexual Assault, and Stalking New Projects (DV Bonus and DV Reallocation Projects).*** A new project that is dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under the paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. As described in section 2.b.(5) of the Appendix , survivors of human trafficking may also qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act because they are often also victims of domestic violence, dating violence, sexual assault, or stalking, however a DV Bonus project may not exclusively serve people fleeing or attempting to flee human trafficking. CoCs may apply for DV Bonus projects where the total amount for one year of funding for all DV Bonus applications is up to 10 percent of its Preliminary Pro Rata Need (PPRN); however, this amount is limited to:

- A minimum of $50,000 if 10 percent of the CoC's PPRN is less than $50,000; or
- A maximum of $5 million if 10 percent of the CoC's PPRN is more than $5 million.

See sections V.A.4.b and V.D.3.d of this NOFO for project application requirements and how DV Bonus projects will be reviewed and selected.

**(1)** To be eligible to receive DV Bonus projects, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.1.a.(1) of this NOFO.

**(2)** CoCs may reallocate eligible DV Renewal to create new DV Reallocation projects that are dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraphs (1) or (4) of the definition of homelessness act. DV Bonus funding and funding made available from the reallocation of expiring DV Renewal projects may be used for "new rapid re-housing projects and supportive service projects providing

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 37 of 129 PageID #: 391

coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking."

**(3)** New projects or expansion projects created with DV Bonus or DV Reallocation funding, must meet DV Bonus and DV Reallocation project requirements. Additionally, the sum of all DV Reallocation applications must be for the same amount of funding made available from the DV Renewal funding being reallocated. If a CoC reallocates funding from a DV Renewal grant and does not use those funds for new project(s) that are 100 percent dedicated to the eligible population established in this section, HUD may condition the project applications to ensure the projects are serving the required subpopulation. If an applicant does not resolve the condition placed on the project, HUD may withdraw the award. To avoid any potential delays in funding or a loss in ARD, CoCs should review the FY 2025 GIW provided by HUD to determine which renewal projects were originally awarded DV Bonus or DV Reallocation funds, including CoC projects that were expanded with DV Bonus or DV Reallocation funding in a prior year competition.

The following restrictions apply to the DV Reallocation process:

**(a)** DV Renewal projects that have a SSO-CE component cannot be reallocated.

**(b)** Reallocated DV Renewal funding cannot be used to expand a CoC or YHDP Renewal grant.

**(c)** DV Renewal projects cannot be reallocated to create new non-DV CoC projects. If HUD determines that a project applicant incorrectly classified one or more new projects as a DV Reallocation, HUD may reclassify the project(s). For example, if the proposed project is not dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, HUD may condition the project to ensure the required population is served.

**(d)** If a project does not have enough funding available from reallocation sources, HUD will reduce the project to the amount available, if any, and determine if the project is feasible at the reduced rate.

**f.** *New Projects Created Through DV Bonus or DV Reallocation Processes.*

**(1)** DV Bonus and DV Reallocation may only be used to create new SSO-Coordinated Entry, Rapid Re-housing (PH-RRH), and Transitional Housing (TH) projects.

**(2)** For PH-RRH and TH projects, the application must demonstrate:

**(a)** The project applicant's experience serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and their ability to house survivors and meet safety outcomes.

**(b)** The project's inclusion of victim-centered practices.

**(c)** Demonstration of plan to include survivors with lived expertise.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 38 of 129 PageID #: 392

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(3)** Supportive Services Only Coordinated Entry (SSO-CE) must be designed to implement policies, procedures, and practices that equip the CoC's coordinated entry to better meet the needs of people experiencing homelessness who are experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking (e.g., to implement policies and procedures that are trauma-informed, client-centered or to better coordinate referrals between the CoC's coordinated entry and the victim service providers coordinated entry system where they are different). SSO-CE project applications created with DV Bonus and DV Reallocation funding must also demonstrate its plan to involve survivors in policy and program development throughout the project's operation.

**g.** *New Projects Created with CoC Bonus or Through the CoC Reallocation process.* CoCs may apply for the following types of new CoC projects through the CoC Bonus or CoC Reallocation processes:

**(1)** SSO projects.

**(2)** TH projects.

**(3)** PH-PSH projects.

**(4)** PH-RRH projects.

**(5)** Dedicated HMIS project for the costs at 24 CFR 578.37(a)(4) that may only be carried out by the HMIS Lead, which is the recipient or subrecipient of an HMIS grant and is listed on the HMIS Lead form in the CoC Applicant Profile in e-snaps. Additionally, if the CoC has organizations within its geographic area that are victim service providers, the HMIS Lead, or subrecipient, may request HMIS funds for a comparable database. Victim service providers may also request HMIS funds in their project application budgets to enter data into a comparable database.

**(6)** SSO-CE project to develop or operate a Coordinated Entry system.

Prior to completing a new project application created using CoC Bonus funds or through the reallocation process, project applicants should consult with the CoC to determine which of these options is available to be locally selected as part of the CoC.

If HUD determines that a CoC Bonus or CoC Reallocation project applicant or a Collaborative Applicant incorrectly classified one or more new projects as reallocation or CoC Bonus, HUD may reclassify the project(s) as either reallocation or CoC Bonus if the CoC exceeded either its reallocation or CoC Bonus amounts. For example, if a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, and there are CoC Bonus funds available, HUD may reclassify the new project application as CoC Bonus during its review. If a project applicant uses both reallocation and CoC Bonus amounts to create a single new project but did not have enough available from either source, HUD will reduce the project to the amount available, if any.

If a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, HUD may reduce the funding amount or reject the new project application during its review.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 39 of 129 PageID #: 393

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

For new projects created through the CoC Bonus process, HUD must determine the CoC has demonstrated that the projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**h. *Youth Homeless Demonstration Program (YHDP).*** Consistent with the requirements of the Consolidated Appropriations Act, 2024, funding for the CoC Program may be used to competitively or non-competitively renew or replace grants for YHDP projects.

In order to ensure the best use of federal dollars, HUD will competitively award all YHDP projects, including renewal and replacement YHDP projects. CoCs seeking to reallocate YHDP projects may only reallocate to other youth projects. See section IV.D.1.i below of this NOFO for additional information.

While YHDP projects can use the replacement process to consolidate projects as outlined in section IV.D.1.i and IV.D.1.k below, these projects cannot consolidate with non-YHDP projects. YHDP Renewal projects may apply to expand its current project through the YHDP Replacement process. Unified Funding Agencies (UFAs) are prohibited from moving funds out of or into YHDP-funded projects and mixing funding from any other non-YHDP funded project. UFAs may replace eligible YHDP renewal projects.

All YHDP Renewal and YHDP Replacement projects, including YHDP reallocation, are subject to the following provisions of the Rule, as may be amended from time to time, except where they conflict with the NOFO requirements, with the Special YHDP Activities identified in section IV.B.2 of this NOFO, or the requirement that grant funds may only be used to serve homeless youth, age 24 and younger: 24 CFR 578.3, 578.15, 578.23, 578.25, 578.27, 578.29, 578.37, 578.43, 578.45, 578.47, 578.49, 578.51, 578.53, 578.55, 578.57, 578.59, 578.61, 578.63, 578.73, 578.75, 578.77, 578.79, 578.81, 578.83, 578.85, 578.87, 578.89, 578.91, 578.93 except in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located, 578.95, 578.97, 578.99, 578.103(a)(3) - (18) and (b) – (e), 578.105, 578.107 and 578.109. The requirements of 2 CFR 200.306, as may be amended from time to time, with the exception of 200.306(b)(5) apply. All YHDP Renewal, YHDP Replacement and new YHDP Reallocation projects must comply with 24 CFR 578.93, except that in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located. Federal fair housing and nondiscrimination requirements cannot be waived.

**i. *New YHDP Projects Created through YHDP Replacement processes.*** CoCs may replace renewing YHDP project(s) to create one or more new YHDP Replacement projects, including YHDP Reallocation (see section 2.b.(12) of the Appendix for more information).

**(1)** YHDP Renewal project applicants may submit renewal applications for minor changes to a project, including adding or modifying select Special YHDP Activities under section IV.B.2; however, if a renewing YHDP project applicant chooses to modify the current project in a way that does not meet the definition of renewal project found at IV.D.2 of this NOFO, it must submit a YHDP Replacement project application.

**(2)** A YHDP Renewal project applicant may apply to expand its current project through the YHDP Replacement process. See section IV.D.1.j.(3) for more information.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 40 of 129 PageID #: 394

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(3)** A YHDP Replacement project application must:

**(a)** demonstrate that the project is consistent with the CoC's most recent Coordinated Community Plan; and

**(b)** For YHDP replacement projects that are not reallocations, include the grant number from the YHDP Renewal project(s) being replaced with the YHDP Replacement project application. The CoC's Collaborative Applicant is responsible for ensuring that only a renewal YHDP or replacement YHDP project application is submitted through the CoC Project Priority Listing. If the Collaborative Applicant submits both a renewal and replacement YHDP project application for the same project, HUD will only select the renewal YHDP project application;

**(4)** HUD will only fund new YHDP Reallocation projects through the YHDP Replacement process as described below and in sections IV.D.1.h and IV.B.2 of this NOFO:

**(a)** TH or Crisis Residential Transitional Housing which is a form of transitional housing that is short-term, low-barrier, using a congregate living setting, and provides access to the following supportive services in particular: family engagement and unification, case management, emergency triage services and other supportive services whose purpose is to move youth rapidly into stable housing.

**(b)** SSO, including, but not limited to, housing search and placement services, case management, or street outreach.

**(c)** SSO-CE.

**(d)** SSO - Host Home and Kinship Care. A model in which a family agrees to permit a youth to reside with them. Recognizing that the addition of another person in the home may increase costs to the family, HUD will entertain applications that propose to house youth with families and to subsidize the additional costs attributable to housing the youth. The residence is in a community-based setting. The family could be related to the youth and the length of stay may be time-limited or without time limits. YHDP funds may be used to subsidize the increased costs to the family that are attributable to housing the youth. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination by the recipient for HUD review upon request.

**(e)** HMIS.

**(5)** HUD will review new YHDP Reallocation and YHDP Replacement project applications to ensure the activities requested are eligible and the amounts requested do not exceed the amounts available for YHDP reallocation or, in the case of YHDP Replacements, the ARA of the renewal project(s) being replaced. HUD will not reject YHDP project applications; however, HUD may require YHDP grant recipients to correct or revise information submitted after the final award announcement, prior to executing the grant agreement.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 41 of 129 PageID #: 395

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**j.** ***Expansion Project.*** The process used by eligible renewal project applicants to add funds to an existing CoC Renewal, DV Renewal or YHDP Renewal project to expand its current operations either through reallocation, DV Bonus or a CoC Bonus project application. The new funding being added to the existing renewal must be submitted as a new project in e-snaps. This portion of the project is known as new expansion project.

HUD will allow project applicants to apply for new expansion projects to expand existing projects to increase the number of units, persons served, services provided to existing program participants, or to add additional activities to HMIS and SSO-CE projects.

The new expansion project applications must meet the project eligibility and project quality thresholds in V.A.4.a and V.A.4.b of this NOFO and must be for the same component as the project being expanded. Additionally, the renewal project being expanded must have an expiration date in CY 2026.

In the case of YHDP Replacement applications to expand existing YHDP Renewal projects, applicants must submit a YHDP Replacement and a YHDP Reallocation application separately and each project must be included in the CoC's Priority Listing.

If a project application does not meet the following requirements, or if the renewal project the new project application is proposing to expand is not selected for award, HUD will review the new expansion project and will consider it as a standalone project during the selection process provided that the project is feasible on its own with its requested funding and provided it passes project eligibility and project quality threshold requirements.

If both the new expansion project and the renewal project it expands are conditionally selected for funding, one grant agreement incorporating both approved project applications will be executed.

**(1)** The following limitations apply to expansion grant applications:

**(a)** If the new expansion project exceeds the amount of funding available to the CoC under the reallocation or Bonus processes, HUD will reduce the funding request for the new expansion project to the available amount, which could affect the activities of the new expansion project.

**(b)** HUD will not fund expansion applications that include requests for capital costs (i.e., new constructions, rehabilitation, or acquisition) and will only allow 1-year funding requests.

**(c)** Recipients cannot apply to expand a project included in a grant consolidation during the same funding year. If an applicant applies to expand a project included in a grant consolidation, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(d)** CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding cannot be used to expand a YHDP renewal project.

**(e)** If CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding is used to expand a DV Renewal project, the entire expanded project must be 100 percent dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 42 of 129 PageID #: 396

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

under paragraph (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and the project must meet all the DV project requirements in sections IV.D.1.e and IV.D.1.f of this NOFO.

**(f)** New YHDP projects created with reallocated YHDP funding may be used to expand an existing YHDP renewal project through the YHDP Replacement process. The expansion YHDP project must meet the requirements of a new YHDP Replacement application.

**(2)** Project applicants expanding an eligible CoC Renewal or DV Renewal project must:

**(a)** submit a separate renewal project application and the new project application with expansion information (both projects must be ranked by the CoC with unique rank numbers);

**(b)** in the new project application, enter the grant number of the eligible renewal project proposed for expansion;

**(c)** indicate how the new project application will expand units, beds, services, persons served, or services provided to existing program participants, or in the case of HMIS or SSO-CE projects, how the current activities will be expanded for the CoC's geographic area; and

**(d)** ensure the funding request for the expansion grant is within the funding parameters allowed under CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation amounts available.

**(3)** Project applicants expanding an eligible YHDP Renewal project through the YHDP Replacement process must:

**(a)** submit a new YHDP Reallocation project application with the expansion information through the YHDP Replacement process, including the grant number of the YHDP Renewal project being expanded.

**(b)** indicate how the expansion project application will expand units, beds, services, persons served, or services provided to existing program participants.

**(c)** ensure the funding request for the YHDP Reallocation application to expand the YHDP Renewal project is within the funding parameters allowed under the YHDP Reallocation amount available.

**(d)** ensure the YHDP Renewal and YHDP Reallocation project applications meet the requirements in sections IV.D.1.h and IV.D.1.i of this NOFO.

**(4)** DV Bonus and DV Reallocation Expansion Applications.

**(a)** DV Bonus and DV Reallocation funds can only be used for an application to expand an existing renewal project if the new expansion project is dedicated to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 43 of 129 PageID
#: 397

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(b)** Project applicants may use DV Bonus funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population; however, only the new project application for the expansion will be considered for DV Bonus funds.

**(c)** If an applicant proposes to use DV Reallocation funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population, the entire project, including the renewal project being expanded, must serve 100 percent individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. In the case of DV Reallocation Projects, HUD will use the Tier 1 and Tier 2 selection process described in sections V.D.3.a, V.D.3.b and V.D.3.c of this NOFO.

**k.** *Consolidation Project.* Applicants intending to use the consolidation process to combine two or more, but no more than 10, eligible renewal projects (including renewing YHDP projects and renewal Special CoC NOFO Competition projects), may do so through the renewal project application. The projects being combined during a grant consolidation will continue uninterrupted. To be eligible for consolidation, the projects must have the same recipient and be for the same component.

**(1)** The period of performance and budget period of the expiring grants must have end dates in CY 2026. Applicants intending to use the consolidation process must ensure:

**(a)** Budget Line Items (BLIs) for the consolidated project application submitted, exactly match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended;

**(b)** inclusion of the expiring grant numbers with period of performance and budget period start and end dates for the projects that are consolidating;

**(c)** are in good standing with HUD, meaning none of the projects have:

i. outstanding audit or monitoring findings,
ii. outstanding obligation to HUD that is in arrears,
iii. unresolved construction delays,
iv. a history of poor financial management/drawdown issues,
v. history of low occupancy levels, or lack experience in administering the project type, or
vi. other capacity issues.

**(d)** the projects have the same recipient and are for the same component.

Case 1:25-cv-00626-MSM-AEM Document 12-3 Filed 11/25/25 Page 44 of 129 PageID #: 398

**(2)** YHDP Renewal projects that wish to consolidate may establish a single YHDP Replacement grant to replace multiple YHDP Renewal grants.

**(3)** The following projects cannot be consolidated and if a project application meeting these characteristics attempts to consolidate, HUD will not consider the consolidation, but rather select the projects individually provided they pass project eligibility and project quality threshold requirements:

**(a)** a DV Renewal project cannot consolidate with a CoC Renewal project (a project not dedicated to serving individuals and families who meet the eligibility criteria in Section III.G.10.(c) of this NOFO, including a project originally funded under the Special NOFO Competition, and a YHDP Renewal project), or a project originally funded under the Special CoC NOFO Competition;

**(b)** a YHDP Renewal project cannot consolidate with a CoC Renewal project (including those projects originally funded **under the Special CoC NOFO Competition) or a DV Renewal project;**

**(c)** a project originally funded under the Special CoC NOFO Competition through the Rural Set Aside cannot consolidate with any other type of project (e.g., a project originally funded with DV Bonus or a project originally funded through the Unsheltered Set Aside in the Special NOFO Competition) except another project originally funded through the Rural Set Aside. This means, a project originally funded under the Special NOFO through the Rural Set Aside can only consolidate with another Special CoC NOFO Competition project originally funded through the Rural Set Aside;

**(d)** a TH and a PH project cannot consolidate to form a Joint TH/PH-RRH component project;

**(e)** transition grants cannot consolidate with any other project; and

**(f)** recipients cannot apply to consolidate projects and apply to expand the consolidated project during the same funding year. If an applicant applies to expand projects that are involved in a consolidation of grants, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(4)** To request the consolidation of eligible renewal projects, project applicants must submit renewal projects for the individual projects to be included in the consolidation and each project application must identify the grant number that will survive which must be the grant number with the earliest start date CY 2026. Project applications for the grants that are proposed to be part of the consolidation must be ranked with a unique rank number for each project, and if all those grants are selected, HUD will conditionally award the single surviving grant based on its ranked position to include the amount of funding of all grants included in the consolidation. All other project applications included in the surviving grant will be removed from the CoC's ranking resulting in project applications below to slide up one ranked position. Project applicants must not submit a consolidated project application that contains two different components (e.g., PH and TH).

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 45 of 129 PageID #: 399

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(5)** The start date for the consolidated grant, if conditionally awarded, will be the day after the expiration date of the eligible renewal project with the earliest expiration date. HUD will calculate the expiration date for the consolidated grant by averaging the expiration dates for all expiring grants included in the consolidated grant weighted by the size of each expiring grant. If that date falls on the first through the fifteenth of a month, then the expiration date will be the last day of the previous month. If the date falls on the sixteenth through the end of the month, then the expiration date will be the last day of the month.

**(6)** HUD will calculate the expiration date for the consolidated grant as follows: It will be 'X' months after the end of the 12th month after the start date for the consolidated grant with 'X' determined by calculating the sum for all grants of the total award times the number of months after the expiration of the first expiring grant that the grant expires and dividing that sum by the total award for the consolidated grant. If the calculation of 'X' results in a partial month, if it is less than 0.5, then the consolidated grant will expire on the last day of the previous month, and if it is 0.5 or more, then the consolidated grant will expire on the last day of the calculated month.

**(7)** Collaborative Applicants designated by HUD as UFAs have more flexibility in how they manage their CoC Program-funded projects, making the consolidation of projects during the CoC Program competition unnecessary. A Collaborative Applicant with UFA designation can consolidate projects during the grant term, so long as the consolidations are not combining different component types and the projects are funded under the same grant (e.g., projects are currently funded under the same renewal grant). If a UFA-designated Collaborative Applicant consolidates projects during the grant term, it can apply to renew them during the CoC Program Competition as consolidated projects.

**I. *Transition Grant.*** A Transition grant is an application to fund a new CoC project through the reallocation process to transition an eligible CoC renewal project (including a Special NOFO project or DV Renewal project) from one program component to another eligible component over a 1-year period. The renewal project transitioning to a new component must be fully eliminated through reallocation. Transition grant applications awarded FY 2025 funds must fully transition to the new component by the end of the 1-year grant term and may only apply for renewal in the next CoC Program Competition under the component to which it transitioned.

**(1)** Renewal Grants expiring in CY 2026 may submit a FY 2025 transition grant application to request a component type change. The transition grant's operating start date will be the day after the end of the previous grant term for the expiring component. For transition grants reallocated from more than one project, the operating start date of the transition grant will be the day after the end of the earliest expiring grant term. The grant term may be extended consistent with 2 CFR 200.308 and 2 CFR 200.309.

**(2)** Applicants wishing to apply for a transition grant must have the consent of its Continuum of Care; and the new project application must meet project eligibility and project quality thresholds established by HUD in sections V.A.4.a and V.A.4.b of this NOFO. If the project application identifies the project as a transition grant and the CoC

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 46 of 129 PageID #: 400

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

accepts the new transition grant project on the New Project Application Project Listing in the CoC Priority Listing, HUD will consider this as CoC consent.

**(3)** For a new project to be considered a transition grant, the new project applicant must be the recipient listed on the current grant agreement for the eligible renewal grant(s) being eliminated and must include the grant number(s) of the project(s) being eliminated to create the new project and attach a copy of the most recently awarded project application. For example, expiring FY 2024 grants applying to transition to a new component during the FY 2025 funding process will attach a copy of the FY 2024 CoC Program Competition project application.

**(4)** Transition Grant Restrictions:

**(a)** YHDP Renewal grants are not eligible to use the transition grant process. YHDP Renewal grants must submit a YHDP Replacement application to change component types.

**(b)** Grants with DV Renewal funding are not eligible to use the transition grant process.

If HUD determines a new project submitted as a transition grant does not qualify, but meets all other new project requirements, HUD may award the project as a new non-transition grant project. If this occurs, the new project operating start date will be reflected in the grant agreement.

**2. Renewal Project Requirements.**

As set forth in 24 CFR 578.33, projects may renew under the CoC Program NOFO to continue ongoing leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs.

Awards HUD made under the CoC Program (including projects awarded 1-year of funding under the FY 2024 CoC Program funding opportunity), projects originally awarded under the Special NOFO, and YHDP projects are eligible for renewal with FY 2025 CoC Program funds if they are currently operating and have an expiration date in CY 2026 (the period from January 1, 2026, through December 31, 2026).

**a.** Renewal project applications must be submitted by the same recipient that signed the executed grant agreement for the grant being renewed, or entity that became the recipient through a grant agreement transfer amendment. To be eligible as a renewal project, the application must (1) be for the same amount of funding before any adjustments described in this NOFO (e.g. FMR adjustments), or the amount reduced due to reallocation ; (2) be for the same program component; and (3) in the case of DV Renewal projects and YHDP Renewal projects, must continue to serve the same subpopulation.

**b.** If HUD conditionally selects a renewal grant for funding that does not have an expiration date that meets the renewal eligibility requirements prescribed by this NOFO, HUD will withdraw any funds conditionally selected for award.

**c.** Projects that were eligible under predecessor programs, specifically Safe Haven projects, will continue to be eligible under the CoC Program and will continue to be eligible for renewal of leasing, operating, supportive services, rental assistance, HMIS, and

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 47 of 129 PageID #: 401

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

project administrative costs under 24 CFR 578.33(d)(1) so long as the project continues to serve the same population and the same number of program participants or units in the same type of housing as identified in their most recent grant agreement, amended grant agreement, signed before August 31, 2012. No new Safe Haven projects will be funded; however, existing Safe Haven projects may be renewed to continue to carry out activities that are eligible costs under Subpart D of the Rule.

**d.** The total request for each renewing project, including YHDP Renewal and YHDP Replacement projects, is limited to a project's ARA. Additionally, where two or more eligible projects are being consolidated through the project application, the total ARA of the consolidation project must be equal to or less than the sum of the original ARA of the renewal projects before consolidation. Because funds for acquisition, new construction, and rehabilitation are not renewable, grants being renewed whose original expiring award included acquisition, new construction, and rehabilitation funds may only renew leasing, supportive services, rental assistance, operating, and HMIS costs and must not exceed 10 percent in administrative costs.

**e.** HUD will recapture grant funds remaining unspent at the end of the previous grant period when it renews a grant.

**f.** HUD encourages the consolidation of eligible renewal grants as provided in Section IV.D.1.k of this NOFO. This does not apply to CoCs that HUD designates as UFAs, because UFAs enter into a single renewal grant agreement with HUD for the CoC's entire geographic area. If applicable, HUD issues a separate UFA grant agreement that only includes YHDP grants.

**g.** Subject to HUD approval and the terms of the NOFO, the following requests may be included in a renewal application:

**(1)** CoC renewal project applications (including DV Renewal projects and projects originally funded under the Special NOFO) may include non-significant changes including shifting up to 10 percent of funds from one approved eligible activity to another.

**(2)** YHDP Renewal project applications from any round may include non-significant changes including adding select Special YHDP Activities in section IV.B.2 and shifting up to 10 percent of funds from one approved eligible activity to another.

**(3)** Renewal applications that include requests to shift more than 10 percent of funds from one approved eligible activity to another and other significant changes as defined at 24 CFR 578.105 will not be considered during the CoC Program Competition by HUD. If an application includes a budget shift that exceeds 10 percent, HUD will correct the project budget to reflect the previously awarded budget amounts. Applicants seeking to make significant changes to their grant, such as shifting more than 10 percent of funds from an approved eligible activity, should contact their Field Office and request a grant agreement amendment.

**(4)** CoC renewal project applicants may also apply to transition an eligible renewal project from one program component to another eligible new component through reallocation and use those funds to create a single, new transition grant (see section

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 48 of 129 PageID #: 402

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

IV.D.1.l of this NOFO). YHDP Renewal project applicants are not permitted to utilize the transition grant application process. YHDP applicants must submit a YHDP Replacement application to change program components.

**(5)** YHDP Replacement projects cannot request capital costs (i.e., new construction, acquisition, or rehabilitation).

**h.** *Actual Per Unit Cost – Renewal Grants.* Applicants requesting renewal of grants for rental assistance may request a per-unit amount less than the Fair Market Rent (FMR) if the actual rent per unit under lease is less than the FMR. This will help reduce the number of projects receiving rental assistance that have large balances of unspent funds remaining at the end of the operating year. Renewal project applicants must ensure the amount requested will be sufficient to cover all eligible costs as HUD cannot provide funds beyond the amount awarded through the FY 2025 CoC Program funding process. Project applications for rental assistance cannot request more than 100 percent of the published FMR. New project applications must adhere to 24 CFR 578.51(f) and must request the full FMR amount per unit. See section V.D.5.a of this NOFO for additional information regarding FMR adjustments for projects receiving funds for rental assistance.

**i.** *Renewal Project Grant Terms.* Renewal project applications are limited to a 1-year grant term with 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309.

Any renewal PH project that receives project-based rental assistance or operating costs may request up to a 15-year grant term; however, project applicants may only request 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309. Project applicants must apply for the additional funds as a renewal project application prior to the anniversary of the first expenditure of grant funds by which date grant funds should have been expended; or, if HUD extends the date that funds must be expended, the date the extension expires. HUD does not guarantee CoC Program funds past the 1 year of renewal funding.

### 3. New Project Requirements.

CoCs are encouraged to submit new projects created through CoC Bonus, DV Bonus, CoC Reallocation, DV Reallocation or YHDP Replacement including YHDP Reallocation. A CoC designated Collaborative Applicant may submit a new CoC Planning project application, and if applicable, a UFA Costs project application in FY 2025.

To expend funds within statutorily required deadlines, applicants funded for sponsor-based and project-based rental assistance must execute the grant agreement and begin providing rental assistance within 2 years. However, HUD strongly encourages all rental assistance to begin within 12 months of award. Applicants that are unable to begin rental assistance within the 12-month period should consult with the local HUD CPD field office.

**a.** HUD will review project subrecipient eligibility as part of the project quality threshold review process. Project applicants must submit documentation of the subrecipient's eligibility with the project application.

**b.** Any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under (or families headed by youth aged 24 and under, including pregnant or

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 49 of 129 PageID #: 403

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

parenting youth) who have an unsafe primary nighttime residence and no safe alternative to that residence.

**c.** Per the Consolidated Appropriations Act, 2024, to receive funding for a new CoC project, except those created through reallocation, HUD must determine the CoC has demonstrated that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance (See more information on System Performance in sections III.B.6 and V.B.1.a.(1) of this NOFO).

**d.** *New Project Grant Terms.* The initial grant term for new project applications may be 1-year, 2-years, 3-years, 4-years, 5-years, or 15-years. HUD may extend the grant consistent with 2 CFR 200.308 and 2 CFR 200.309. The following exceptions apply:

**(1)** HUD will allow new projects to request 1 year of funding with a longer initial grant term not to exceed 18 months. HUD has determined that most new projects requesting 1 year of funding normally take approximately 3 to 6 months to begin fully operating the new project (e.g., hiring staff, developing partnerships with landowners if leasing or renting). Therefore, a new project requesting 1 year of funding may request a grant term of 12 months to 18 months that will allow for the additional start-up process. Any new projects requesting capital costs (i.e., new construction, acquisition, or rehabilitation) are not eligible for 1-year funding requests. See (7) below for more information on new projects requesting capital costs. Transition grant applications cannot request 18-month grant terms.

**(2)** Any new expansion project submitted to expand an eligible renewal CoC Program-funded project may only request a 1-year grant term, regardless of the project type.

**(3)** Any new project that requests tenant-based rental assistance may request a 1-year, 2-year, 3-year, 4-year, or 5-year grant term.

**(4)** Any new project that requests leasing costs - either leasing costs only or leasing costs plus other costs (e.g., supportive services, HMIS) - may request up to a 3-year grant term.

**(5)** The first year of funding for YHDP Replacement projects will be based on the 1-year renewal amount of the current YHDP project being replaced. The YHDP Replacement project's operating start date will be the day after the end of the previous grant term for the project being replaced.

**(6)** Any new project that requests project-based rental assistance or sponsor-based rental assistance, or operating costs may request up to a 15-year grant term; however, the project applicant may only request up to 5 years of funds. Funding for the remainder of the term is subject to availability. Applicants must apply for additional funds through a renewal project application in the competition held in the calendar year prior to the anniversary of the first expenditure of grant funds, or if HUD has extended the grant term, the date the extension expires. HUD does not guarantee CoC Program funds past the initial 5-year grant term, if conditionally awarded.

**(7)** Any new project that requests operating costs, supportive services only, HMIS, and project administrative costs may request 1-year, 2-year, 3-year, 4-year, or 5-year grant terms with funding for the same number of years.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 50 of 129 PageID #: 404

**(8)** Any new project conditionally selected by HUD that requests new construction, acquisition, or rehabilitation costs (capital costs) must request a minimum of a 3-year grant term and may request up to a 5-year grant term. Any new projects requesting capital costs are not eligible for 1-year funding requests. If a new project requests 1 year of funding with capital costs, HUD will increase the grant term to 3-years and the new project must spend the funds requested over a 3-year period.

If an applicant requests funds for new construction, acquisition, or rehabilitation in addition to requesting funds for operating, supportive services, or HMIS, the funding will be for the 3-years to 5-years requested, and the grant term will be 3-years to 5-years plus the time necessary to acquire the property, complete construction, and begin operating the project. HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

**(9)** All new CoC Planning or UFA Costs project applications are limited to 1-year grant terms and 1 year of funding.

> **(a)** The maximum amount for one year of funding to spend on administrative costs associated with the CoC planning activities listed at 24 CFR 578.39 is 5 percent of FPRN, up to a maximum of $1,500,000, or $50,000 whichever is greater.

> **(b)** The maximum amount for one year of funding to spend on administrative costs associated with the UFA costs described at 42 USC 11360(g) is up to 3 percent of FPRN or $1,250,000 per fiscal year; whichever is less.

> **(c)** CoC Planning and UFA Costs grants are not renewable.

**(10)** Any new project that is requesting consideration under the DV Bonus or DV Reallocation process may only request 1 year of funding, but may request a longer initial grant term not to exceed 18 months regardless of project application component type.

# V. APPLICATION REVIEW INFORMATION

V. Application Review Information

A. Threshold Review

B. Merit Review

C. Risk Review

D. Selection Process

E. Award Notices

TABLE OF CONTENTS

**Suppl. App. 267**

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 52 of 129 PageID #: 406

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# V. APPLICATION REVIEW INFORMATION

## A. Threshold Review

HUD reviews each application to make sure it meets the following threshold requirements. If you meet all threshold requirements, your application will advance to a merit review. If you fail to meet one or more threshold requirements, your application is not eligible for HUD funding.

### 1. Eligible Applicant

You must meet the applicant eligibility criteria in this NOFO. Applications from ineligible applicants are not rated or ranked and will not receive HUD funding.

**a.** *Eligible Project Applicants (McKinney-Vento Act, 24 CFR 578.15, 24 CFR 5.100).* Eligible project applicants for the CoC Program Competition are found at 24 CFR 578.15 and in the Act and include nonprofit organizations, states, local governments, instrumentalities of state and local governments, Indian Tribes and TDHE [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)]. Public housing agencies, as such term is defined in 24 CFR 5.100, are eligible without limitation or exclusion. For-profit entities are ineligible to apply for grants and are prohibited from being subrecipients of CoC Program grant funds.

**b.** *Collaborative Applicants.* Only CoCs with a valid FY 2025 e-snaps registration will have access to the FY 2025 CoC Program and YHDP Funding Opportunity in e-snaps, which includes the Consolidated Application (i.e., the CoC Application, the CoC Priority Listing and the project application(s). CoCs should not attempt to change Collaborative Applicants during the FY 2025 CoC Program and YHDP Funding Opportunity without prior HUD approval unless HUD replaces the CoC's designated Collaborative Applicant under the authority of Section 402(c) of the Act. HUD will approve Collaborative Applicant changes outside the annual CoC Program Registration process under the following circumstances:

- the Collaborative Applicant made an error when entering the Collaborative Applicant name in the CoC Applicant Profile;
- the CoC-designated Collaborative Applicant is no longer in business;
- the CoC designates a new Collaborative Applicant; or
- HUD designated a new Collaborative Applicant as a remedial action under Section 402(c) of the Act.

In cases where the CoC changes its designated Collaborative Applicant during the CoC Program Registration process, the CoC must notify the local HUD CPD field office, in writing, stating the reason for the Collaborative Applicant change. The notice to HUD must provide documentation of the CoC's approval of the change (e.g., a copy of the meeting minutes to include the date and attendees).

**c.** *Indian Tribes and Tribally Designated Housing Entities (TDHE).* The Consolidated Appropriations Act, 2021 (Public Law 116-260, approved December 27, 2020) amended Title IV to add Section 435 of the Act to allow Indian Tribes and Tribally Designated Housing Entities (TDHE) to be Collaborative Applicants, eligible entities, or subrecipients of the CoC Program in addition to amending Title IV Section 401 to add the terms

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 53 of 129 PageID #: 407

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

"Formula Area" and "Indian Tribe." These amendments mean that not only may Tribes and TDHEs apply for grants through other CoCs, but that formula areas, as that term is defined in the Indian Housing Block Grant program at 24 CFR 1000.302, are eligible to be added to the geographic areas of existing CoCs or may be included in newly formed CoCs through the CoC registration process (see Notice CPD-22-02).

Indian Tribes and TDHEs may:

**(1)** create a CoC;
**(2)** be a Collaborative Applicant;
**(3)** be an eligible project applicant; or
**(4)** receive grant amounts from another entity that receives a grant directly from HUD (i.e. be a CoC grant subrecipient).

However, under 42 U.S.C. 11383(g) only States, Units of General Local Government, nonprofit organizations, and Public Housing Agencies may administer permanent housing rental assistance.

**d. _Solo Applicants._** Eligible project applicants that attempted to participate in the CoC planning process in the geographic area in which they operate that believe they were denied the right to participate in a reasonable manner, may submit a solo project application to HUD by following the procedure found in 24 CFR 578.35. If HUD finds in favor of the solo applicant, HUD may award grant funds. Solo applicants requesting FY 2025 funding must submit their solo project application in e-snaps to HUD by 8:00 PM EST, on January 14, 2026. See section VIII.D.4 of this NOFO for additional information regarding the Solo Applicant appeal process.

## 2. Resolution of Civil Rights Matters

Applicants with outstanding, unresolved judgments against them for violations of civil rights laws must resolve those judgments before the application submission deadline or the applicant will be deemed ineligible.

a. An applicant is ineligible for funding if the applicant has received notice of a judgment imposed against them for violations of:

1.  the Fair Housing Act or a substantially equivalent state or local fair housing law for discrimination because of race, color, religion, sex, national origin, disability or familial status; or

2.  Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, the Americans with Disabilities Act, or the Violence Against Women Act or substantially equivalent state or local laws.

b. HUD will determine if actions to resolve the judgment taken before the application deadline date will resolve the matter. Examples of actions that may be sufficient to resolve the matter include, but are not limited to:

1.  Current compliance with a voluntary compliance agreement signed by all the parties;

2.  Current compliance with a HUD-approved conciliation agreement signed by all the parties;

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 54 of 129 PageID #: 408

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

3. Current compliance with a conciliation agreement signed by all the parties and approved by the state governmental or local administrative agency with jurisdiction over the matter;

4. Current compliance with a consent order or consent decree; or

5. Current compliance with a final judicial ruling or administrative ruling or decision.

## 3. Timely Submission of Applications

Late applications are not eligible for funding. See deadlines in Section VI of this NOFO.

Applicants should review and follow the steps outlined below to ensure applications are complete and submitted by the deadlines established in this NOFO. Documents referenced in this section can be found on the CoC Program page of HUD's website: https://www.hud.gov/program_offices/comm_planning/coc.

4. Threshold Criteria.

Applicants who fail to meet the following threshold eligibility requirements are ineligible.

**a. *Project Eligibility Threshold.*** HUD will review all projects to determine if they meet the following project eligibility threshold requirements on a pass/fail standard. If HUD determines the applicable standards are not met for a project, HUD will reject the project. HUD will consider any project requesting renewal funding as having met these requirements through its previously approved grant application unless HUD receives information to the contrary (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient routinely does not draw down funds from eLOCCS at least once per quarter, consistently late Annual Performance Report (APR) submissions). Approval of new and renewal projects is not a determination by HUD that a recipient is compliant with applicable fair housing and civil rights requirements.

**(1)** Project applicants and potential subrecipients must meet the eligibility requirements of the CoC Program as described in the Act and the Rule and provide evidence of eligibility required in the application (e.g., nonprofit documentation).

**(2)** Project applicants and subrecipients must demonstrate the financial and management capacity and experience to carry out the project as detailed in the project application and the capacity to administer federal funds. Demonstrating capacity may include a description of the applicant and subrecipient experience with similar projects and with successful administration of SHP, S+C, or CoC Program funds or other federal, state, local, or private resources.

**(3)** Project applicants must submit the required certifications specified in this NOFO.

**(4)** The population to be served must meet program eligibility requirements as described in the Act, the Rule, and section III.G.10 of this NOFO.

**(5)** Project applicants, except Collaborative Applicants that only receive awards for CoC Planning costs and, if applicable, UFA Costs, must agree to participate in a local HMIS system. However, in accordance with Section 407 of the Act, any victim service provider that is a recipient or subrecipient must not disclose, for purposes of HMIS, any personally identifying information about any client. Victim service providers must

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 55 of 129 PageID #: 409

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

use a comparable database that meets the needs of the local HMIS.

**(6)** Project applicants must certify affirmatively to the following:

| | |
|---|---|
| The project applicant will not engage in racial preferences or other forms of illegal discrimination. | |
| The project applicant will not operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of "harm reduction." | |

**b. *Project Quality Threshold.*** HUD will review all new project applications to determine if they meet the following project quality threshold requirements HUD will not award funds to a new project unless the project was created through reallocation, or the CoC has demonstrated to HUD's satisfaction that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**(1)** HUD will consider any project requesting renewal funding, including renewing YHDP and renewing Special NOFO projects, as having met project quality threshold requirements through its previously approved grant application unless HUD receives information to the contrary or if the renewal project has compliance issues which results in the project not operating in accordance with the Rule.

**(2)** HUD will consider YHDP Replacement project applications including applications for new YHDP projects created through YHDP reallocation as having met project quality threshold requirements if the project application activities and costs are eligible under this NOFO. If a YHDP Replacement (including YHDP Reallocation) project application is not for activities and costs that are eligible under this NOFO, HUD will not reject the project under this project quality threshold, but HUD will require the project applicant to correct or revise information submitted after the final CoC Program award announcement but before executing the grant agreement.

**(3)** HUD will review the UFA Costs submitted by the UFA designated Collaborative Applicant to ensure appropriate match and eligibility of costs requested.

**(4)** HUD will assess all new project applications for the following minimum project eligibility, capacity, timeliness, and performance standards.

**(a)** project applicants must have satisfactory capacity, drawdowns, and performance for existing grant(s) funded under the CoC Program, as evidenced by timely reimbursement of subrecipients, regular drawdowns, and timely resolution of any monitoring findings; however, this does not apply to project applicants who have never received a CoC Program funded project;

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 56 of 129 PageID #: 410

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(b)** for expansion project applications, project applicants must describe the part of the project that is being expanded and demonstrate the project is not replacing other funding sources; and

**(c)** project applicants must demonstrate their ability to meet all timeliness standards per 24 CFR 578.85. HUD reserves the right to deny a funding request for a new project, if the request is made by an existing recipient that HUD finds to have significant issues related to capacity, performance, unresolved audit, or monitoring findings related to one or more existing grants; or does not routinely draw down funds from eLOCCS at least once per quarter. HUD also reserves the right to withdraw funds if no APR is submitted on the prior grant.

**(5)** HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons:

**(a)** evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans.

**(b)** evidence that the project operates drug injection sites or "safe consumption sites," knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of "harm reduction."

**(6)** Additionally, for HUD to consider new projects as meeting project quality threshold, each new project must meet the following criteria as applicable. If awarded, a recipient must meet all the criteria listed in the criteria column for its component.

| (a) Transitional Housing (TH) | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Transitional Housing projects must receive at least 7 out of 10 points available for this project type. New TH projects that do not receive at least 7 points will be rejected. | 2 | Demonstrate that the project will provide and/or partner with other organizations to provide eligible supportive services that are necessary to assist program participants to obtain and maintain housing. |
| | 1 | The applicant has prior experience operating transitional housing or other projects that have successfully helped homeless individuals |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 57 of 129 PageID #: 411

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | and families exit homelessness within 24 months. |
|---|---|---|
| | 1 | The applicant has previously operated or currently operates transitional housing or another homelessness project, or has a plan in place to ensure, that at least 50 percent of participants exit to permanent housing within 24 months and at least 50 percent of participants exit with employment income as reflected in HMIS or another data system used by the applicant. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment, etc) in line with 24 CFR 578.75(h) by attaching a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 2 | Demonstrate that the proposed project will provide 40 hours per week of customized services for each |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 58 of 129 PageID #: 412

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | participant (e.g. case management, employment training, substance use treatment, etc.). |
| | | The 40 hours per week may be reduced proportionately for participants who are employed. |
| | | The 40 hours per week does not apply to participants over age 62 or who have a physical disability/impairment or a developmental disability (24 CFR 582.5) not including substance use disorder. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable, consistent with 2 CFR 200.404. |

## (b) Supportive Services Only (SSO) Standalone

| New Project Application Rating Factors | Points Available | Criteria |
| --- | --- | --- |
| New SSO – Standalone project applications must receive at least 4 out of the 5 points available for this project type. New SSO standalone projects that do not receive at least 4 points will be rejected. | 1 | The Supportive Services project is necessary to assist people in exiting homelessness and increasing self-sufficiency and the Recipient will conduct an annual assessment of the service needs of the program participants. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 59 of 129 PageID #: 413

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | traditionally engage with supportive services. |
|---|---|---|
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 1 | The services provided are cost-effective consistent with 2 CFR 200.404. |

**(c) Supportive Services Only (SSO) Street Outreach**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO project applications that focus on street outreach and indicate so in their project application must receive at least 5 out of the 6 points available for this project type. Projects that do not receive at least 5 points will be rejected. | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |
| | 1 | Demonstrate that the applicant has a history of partnering with first responders and law enforcement to engage people |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 60 of 129 PageID #: 414

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | |
|---|---|---|
| | | living in places not meant for human habitation to access emergency shelter, treatment programs, reunification with family, transitional housing or independent living. The applicant must cooperate, assist, and not interfere or impede with law enforcement to enforce local laws such as public camping and public drug use laws. |
| | 1 | The applicant has experience providing outreach services consistent with the activity description at 24 CFR 578.53(e)(13) and has demonstrated effectiveness at helping people successfully exit from places not meant for human habitation to emergency shelter, treatment programs, transitional housing or permanent housing programs. |
| | 1 | The services provided are cost-effective consistent with 2 CFR 200.404. |

**(d) SSO-Coordinated Entry (SSO-CE)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO-CE project applications (also known as centralized or coordinated assessment) must receive at least 3 out of the 4 points available for this project type. New SSO-CE projects that do not receive at least 3 points | 1 | The Coordinated Entry system is easily available and reachable for all persons within the CoC's geographic area who are seeking homelessness assistance. The system must also be accessible for persons with disabilities within the CoC's |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 61 of 129 PageID #: 415

V. Application Review Information

| will be rejected. | | geographic area. |
|---|---|---|
| | 1 | There is a strategy for advertising that is designed specifically to reach households experiencing homelessness with the highest needs. |
| | 1 | There is a standardized assessment process. |
| | 1 | The project will ensure program participants are directed to appropriate housing and services that fit their needs. |

**(e) Permanent Housing: Permanent Supportive Housing (PH-PSH)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New Permanent Housing projects must receive at least 4 out of the 6 points available for this project type. New Permanent Housing projects that do not receive at least 4 points will be rejected. | 1 | The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants. |
| | 1 | The type of supportive services and assistance that will be offered to program participants will ensure that the participant is able to successfully obtain and retain permanent housing and in a manner that fits their needs (e.g. transportation, safety planning, enhanced case management). If the applicant is proposing to expand an existing PH project, it must demonstrate how they are expanding supportive services to program participants, |

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 62 of 129 PageID #: 416

| | | |
|---|---|---|
| | | including where appropriate, on-site supportive services. |
| | 1 | The project will be designed to serve elderly individuals and/or individuals with a physical disability/impairment or a developmental disability (24 CFR 582.5) not including substance use disorder. The units will prioritize these populations. |
| | 1 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, life skills, substance use treatment) in line with 24 CFR 578.75(h) by attaching a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 1 | The average cost per household served is reasonable, consistent with 2 CFR 200.404, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

Case 1:25-cv-00626-MSM-AEM Document 12-3 Filed 11/25/25 Page 63 of 129 PageID #: 417

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| **(e) Permanent Housing: Rapid Rehousing (PH-RRH)** | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Permanent Housing projects must receive at least 6 out of the 8 points available for this project type. New Permanent Housing projects that do not receive at least 4 points will be rejected. | 1 | The provision of tenant-based rental assistance will help individuals and families achieve self-sufficiency within 3 months or up to 24 months. |
| | 2 | The type of supportive services and assistance that will be offered to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance) will ensure that the participant is able to successfully obtain self-sufficiency and exit homelessness. |
| | 2 | The applicant has previously operated homelessness projects where outcomes for employment income were improved compared to the average project in the CoC. |
| | 1 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment) in line with 24 CFR 578.75(h) by attaching a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |

Case 1:25-cv-00626-MSM-AEM Document 12-3 Filed 11/25/25 Page 64 of 129 PageID #: 418

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | 1 | The average cost per household served is reasonable, consistent with 2 CFR 200.404, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
|---|---|---|
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

**(g) Homeless Management Information System (HMIS)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New HMIS project applications must receive at least 3 out of the 4 points available for this project type. New HMIS projects that do not receive at least 3 points will be rejected. | 1 | How the HMIS funds will be expended in a way that furthers the CoC's HMIS implementation and ability to use HMIS as a proactive case management tool to promote treatment and recovery. |
| | 1 | The HMIS collects all Universal Data Elements as set forth in the HMIS Data Standards. |
| | 1 | The ability of the HMIS to un-duplicate client records. |
| | 1 | The HMIS produces all HUD-required reports and provides data as needed for HUD reporting (e.g., APR, quarterly reports, data for CAPER/ESG |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 65 of 129 PageID #: 419

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | reporting) and other reports required by other federal partners. |
|---|---|---|

| **(h) CoC Planning – Collaborative Applicants Only** | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New CoC Planning projects, submitted only by the CoC's designated Collaborative Applicant, must receive at least 3 out of the 5 points available for this project type. CoC Planning projects that do not receive at least 3 points will be rejected. | 1 | Governance and Operations-The CoC conducts meetings of the entire CoC membership that are inclusive and open to members and demonstrates the CoC has a written governance charter in place that includes CoC policies. |
| | 1 | CoC Committees-The CoC has CoC-wide planning committees, subcommittees, or workgroups to address the needs of persons experiencing homelessness in the CoC's geographic area that recommends and sets policy priorities for the CoC. |
| | 2 | The proposed planning project that will be carried out by the CoC with Planning grant funds are compliant with the provisions of 24 CFR 578.7. |
| | 1 | The funds requested will improve the CoC's ability to evaluate the outcome of both CoC Program-funded and ESG-funded projects. |

**c. *Project Renewal Threshold.*** CoCs must consider the need to continue funding for projects expiring in CY 2026 (January 1, 2026 to December 31, 2026) when applying for FY 2025 CoC and YHDP funding. Renewal projects must meet the minimum project eligibility, capacity, timeliness, and performance standards identified in this NOFO or they will be rejected from consideration for funding:

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 66 of 129 PageID #: 420

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(1)** When considering renewal projects for award; HUD will review information in eLOCCS, APRs, and information provided from the local HUD CPD field office; including monitoring reports and audit reports as applicable, and performance standards on prior grants, and will assess projects using the following criteria on a pass/fail basis:

**(a)** whether the project applicant's performance met the plans and goals established in the initial application, or grant as amended;

**(b)** whether the project applicant demonstrated all timeliness standards for grants being renewed have been met, including those standards for the expenditure of grant funds;

**(c)** the project applicant's performance in assisting program participants to achieve and maintain self-sufficiency and independent living and records of success, except dedicated HMIS projects are not required to meet this standard; and

**(d)** evidence of unwillingness of project applicants to accept technical assistance, a history of inadequate financial accounting practices, indications of project mismanagement, a drastic reduction in the population served, program changes have been made without prior HUD approval, or the loss of project site control.

**(2)** HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons:

**(a)** outstanding obligation to HUD that is in arrears or for which a payment schedule has not been agreed upon;

**(b)** audit finding(s) for which a response is overdue or unsatisfactory;

**(c)** history of inadequate financial management accounting practices;

**(d)** evidence of untimely expenditures on prior award;

**(e)** history of other major capacity issues that have significantly affected the operation of the project and its performance;

**(f)** history of not reimbursing subrecipients for eligible costs in a timely manner, or at least quarterly; and

**(g)** history of serving ineligible program participants, expending funds on ineligible costs, or failing to expend funds within statutorily established timeframes.

**(h)** evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans.

**(i)** evidence that the project operates drug injection sites or "safe consumption sites," knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of "harm reduction."

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 67 of 129 PageID #: 421

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

## B. Merit Review

HUD expects to evaluate and score your application using the following merit criteria and process. Merit reviewers evaluate and score all applications that pass the threshold review. Merit reviewers may include Federal and non-Federal persons. Reviewers receive a copy of your application to evaluate and score each application separately.

**Merit Review Summary**

| Merit Review Summary | |
| --- | --- |
| **Criterion** | **Maximum number of points = 130** |
| **a. Project Capacity, Review, and Ranking.** | 9 |
| **b. System Performance.** | 40 |
| **c. CoC Coordination and Engagement.** | 81 |
| **Bonus Points** | |
| **CoC Merger Bonus (V.B.1.e)** | 15 |
| **Policy Initiative Preference Points (V.B.2)** | 4 |

## 1. Rating Factors

Your application must include a response to the following criteria.

HUD will use all of the factors outlined in this section to establish the CoC's score for the FY 2025 CoC Program Competition.

**Rating Factors Details**

**a. *Project Capacity, Review, and Ranking.*** HUD will award up to 9 points to CoCs that demonstrate the existence of a coordinated, inclusive, and outcome-oriented community process for the solicitation, objective review, ranking, and selection of project applications.

| Rating Factor | Maximum Points | To Receive Maximum Points |
| --- | --- | --- |
| **(1) *Objective Criteria and System Performance.*** | 6 | The CoC must attach the written process or tool it used to review, rate, and rank project applications for this NOFO. This written process or tool must: <br><br>Demonstrate it used objective criteria (e.g., cost-effectiveness, performance data, type of population served) to review, rate, and rank project applications and that these factors account for at least 50% of the total available points (up to 1 |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 68 of 129 PageID #: 422

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | point). |
|---|---|---|
| | | Demonstrate that at least 25% of the total points available account for the following: |
| | | • Returns to homelessness performance measure (up to 1 point); |
| | | • Employment income performance measure (up to 1 point); and |
| | | • Supportive service participation requirements (up to 3 points). |
| **(2)** *Ranking and Selection Process.* | 2 | The CoC must: |
| | | • Invite new proposals from entities that have not previously received funding; |
| | | • Prior to the application deadline, post on their website all parts of the Consolidated Application, and notify community members and key stakeholders. CoCs that do not have a website must post this information to a partner website within the CoC (e.g., a city or county website); |
| | | • Attach a listing of all projects submitted to HUD from their CoC's local competition that includes all projects their CoC considered during their local competition: (1) the |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 69 of 129 PageID #: 423

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

---

| | | final score, (2) project rank, (3) accepted or rejected status, (4) funding amounts, (5) reallocated funds added to or subtracted from projects listed; and |
|---|---|---|
| | | • Notify project applicants, in writing outside of *e-snaps*, who submitted their project applications to the CoC by the CoC-established deadline, whether their project application(s) will be accepted and ranked, rejected, or reduced on the CoC Priority Listing no later than 15 days before the NOFO application submission deadline, and where a project application is being rejected or reduced, the CoC must indicate the reason(s) for the rejection or reduction. |
| **(3) *Reallocation.*** | 1 | The CoC must show: <br><br> • Their CoC actively reviews the performance of existing CoC Program funded projects and have a standard process for reallocating funding from lower performing projects to create new high performing projects; <br><br> OR <br><br> • They have cumulatively |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 70 of 129 PageID
#: 424

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| reallocated at least 20 percent of their CoC's ARD between the FY 2021 and the FY 2025 CoC Program Competitions. |

**b.** *System Performance.* HUD will award up to 40 points to CoCs that have a CoC system-wide performance measurement process related to reducing homelessness.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1)** *Reducing the Number of Homeless Individuals and Families.* | 17 | The CoC will receive:<br><br>• Up to 5 points for demonstrating a decrease of at least 20 percent in the number of unsheltered homeless individuals and families in the 2025 PIT compared to the prior year's data.<br><br>• Up to 4 points for demonstrating decreases in the number of unsheltered homeless individuals and families between the 2023 and 2024 PIT Counts AND the 2024 and 2025 PIT Counts.<br><br>• Up to 3 points for demonstrating a decrease in the number of unsheltered homeless individuals and families between the 2023 and 2025 PIT Counts.<br><br>• Up to 3 points for demonstrating a 5% decrease in the number of individuals and |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 71 of 129 PageID #: 425

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

|  |  | families experiencing chronic homelessness between the 2024 and 2025 PIT Counts. |
|---|---|---|
|  |  | • Up to 2 points for demonstrating a decrease of at least 20 percent in the combined number of sheltered and unsheltered individuals and families in the 2025 PIT compared to the prior year's data. |
| **(2) *Reduce First Time Homelessness.*** | 1 | The CoC must:<br><br>• Demonstrate a reduction in the number of first-time homeless of at least 20% as reported in HDX;<br><br>• Identify the strategies (including funding sources and timeframes) in place to address individuals and families at risk of becoming homeless; and<br><br>• Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce or end the number of persons experiencing homelessness for the first time. |
| **(3) *Length of Time Homeless.*** | 1 | The CoC must:<br><br>• Demonstrate a reduction in the length-of-time homeless |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 72 of 129 PageID #: 426

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

## V. Application Review Information

| | | | compared to the prior year's data as reported in HDX; |
|---|---|---|---|
| | | | • Identify the strategies (including funding sources and timeframes) in place to address individuals and families at risk of becoming homeless; and |
| | | | • Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce the length of time individuals and families remain homeless. |
| **(4) *Successful Permanent Housing Placement.*** | | 5 | The CoC must:<br><br>• Demonstrate that the rate of successful exit from ES, TH, and RRH is at least 50% (up to 2 points);<br><br>• Demonstrate that at least 20% of program participant exits from TH/RRH/PSH collectively are to unsubsidized housing using HMIS data (up to 2 points).<br><br>• Indicate the strategy (including funding sources and timeframes) the CoC is taking to improve permanent housing placement and stability including how the CoC connects participants to |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 73 of 129 PageID #: 427

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

---

| | | |
|---|---|---|
| | | non-subsidized housing and furthers successful transitions from CoC-funded projects to other housing options; and<br><br>• Identify the organization or position that is responsible for overseeing the CoC's strategy to increase the rate at which persons exit to permanent housing destinations (up to 1 point). |
| **(5) *Returns to Homelessness.*** | 7 | The CoC must:<br><br>• Demonstrate the rate at which persons who exited to permanent housing destinations experienced additional spells of homelessness over a 12- month and 24-month period as reported in HDX:<br><br>Is less than 8% over 24 months (3 points, or 1 point if less than 16% over 24 months).<br><br>Is less than 7% over 12 months (3 points, or 1 point if less than 11% over 12 months).<br><br>• Indicate a strategy to account for returns to homelessness that occur outside of the geographic area to the extent practicable (i.e., statewide HMIS sharing, long-term follow-up with clients.)<br><br>• Indicate the strategy |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 74 of 129 PageID #: 428

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | |
|---|---|---|
| | | that will reduce returns to homelessness over the long term. Additionally, identify the funding sources that will be used to accomplish specific tasks within the strategy and the timeframes for completing specific tasks within the strategy; and<br><br>• Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce returns to homelessness. |
| **(6) *Jobs and Income Growth.*** | 7 | The CoC must:<br><br>• Demonstrate that the percentage of program participants who had an increase in income from employment (not government assistance) in the CoC was 20 percent or higher as reported in HDX (up to 3 points);<br><br>• Demonstrate that at least 25 percent of people leaving programs in the CoC had an increase in income from employment (up to 3 points);<br><br>• Identify the strategy (including funding sources and timeframes) that has |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 75 of 129 PageID #: 429

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

---

| | | been implemented to increase employment and non-employment cash sources, including through employment training;<br><br>• Identify how the CoC works with child care organizations to facilitate employment for parents experiencing homelessness; and<br><br>• Identify the organization or position that is responsible for overseeing the CoC's strategy to increase jobs and income from employment and non-employment cash sources. |
|---|---|---|
| **(7)** *Timely Submission of Data.* The CoC collected and submitted data in a timely manner. | 1 | The CoC must demonstrate it:<br><br>• Conducted a Housing Inventory (HIC) and Point-in-Time (PIT) count during the last 10 days in January 2025, or if an exception was provided by HUD, during the time period agreed upon by the CoC and HUD;<br><br>• Submitted both the 2025 HIC and PIT count data in HDX 2.0 by June 13, 2025, 8:00 PM EDT, or an alternate date approved by HUD;<br><br>• Submitted their |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 76 of 129 PageID #: 430

| | | Longitudinal System Analysis (LSA) data in HDX 2.0 by the submission deadline of January 9, 2025, 11:59 PM EST, or an alternate date approved by HUD; and HUD determined that there were at least 2 usable files; and<br><br>• Submitted FY 2024 System Performance Measures data in HDX 2.0 by the submission deadline of 8:00 PM EDT on April 11, 2025, or an alternate date approved by HUD. |
|---|---|---|
| **(8) HMIS and Comparable Database Participation** | 1 | The CoC must demonstrate at least 85 percent of the beds in their CoC's geographic area are covered in HMIS and comparable databases. The bed coverage rate is the number of HMIS and comparable database participating beds divided by the number of year-round beds dedicated to persons experiencing homelessness in the geographic area covered by the CoC. |

**c. *CoC Coordination and Engagement.*** HUD will award up to 81 points to CoCs that demonstrate coordination with other systems of care that serve homeless individuals and families.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) *Accountable Structure and Participation.*** | | |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 77 of 129 PageID #: 431

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | |
|---|---|---|
| **(a)** has a membership of a variety of stakeholders within the geographic area and considers the needs of all relevant subpopulations; | 0.5 | The CoC must demonstrate it has participation from a broad array of stakeholders, not limited to organizations listed in 24 CFR 578.5(a), within the geographic area:<br><br>Relevant organizations include nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies including CCBHCs and CMHCs, hospitals, universities, affordable housing developers, law enforcement, and organizations that serve veterans and homeless and formerly homeless individuals. |
| **(b)** has a governance board representative of the community | 4 | The CoC must demonstrate it has a decision-making governance board that includes:<br><br>• at least 1 person with a former experience of homelessness;<br><br>• at least 3 elected public officials;<br><br>• at least 1 representative of the business community;<br><br>• at least 2 representatives of law enforcement. |
| **(c)** has an invitation process for new members | 0.5 | The CoC must demonstrate it has a transparent process |

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 78 of 129 PageID #: 432

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

V. Application Review Information

| | | |
|---|---|---|
| to join; | | (e.g., communicated in a public manner such as on the CoC's website) in place to invite new members to join and the invitation process is publicly available within the CoC's geographic area at least annually. |
| **(d)** solicits and considers opinions from knowledgeable individuals and organizations; and | 0.5 | The CoC must demonstrate a transparent process (e.g., communicated in a public manner such as on the CoC's website) is in place to solicit and consider opinions regarding the CoC's general performance, strategies, and priority setting process from individuals and organizations with knowledge of homelessness in the geographic area or an interest in preventing or ending homelessness in the geographic area. |
| **(e)** accepts and considers proposals from organizations that have not previously received CoC Program funding. | 0.5 | The CoC must demonstrate it has a transparent process is in place to accept and consider proposals from organizations that have not previously received CoC Program funding including faith-based organizations. |
| **(2)** *Availability of Treatment and Recovery Services.* | 16 | The CoC must demonstrate:<br>• Substance use treatment is available on-site for at least 30% of projects (attach agreements or letters of commitment);<br>• The creation or current existence of projects |

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 79 of 129 PageID #: 433

| | | with the purpose of providing substance abuse treatment services for people experiencing homelessness in which program participants are required to take part in such services as a condition of continued participation in the program (attach contracts or occupancy agreements); |
| | | Provide a list of the beds/projects and occupancy agreements demonstrating the purpose of the project and the requirement for participation in substance abuse treatment. |
| | | -For geographic areas with a population greater than 2,500,000, demonstrate at least 500 beds. |
| | | -For geographic areas with a population between 1,000,000 and 2,499,999, demonstrate at least 250 beds. |
| | | -For geographic areas with a population between 500,000 and 999,999, demonstrate at least 100 beds. |
| | | -For geographic areas with a population between 100,000 and 499,999, demonstrates at least 50 beds. |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 80 of 129 PageID #: 434

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

---

## V. Application Review Information

| | | -For geographic areas with less than 100,000, demonstrate 25 beds. |
|---|---|---|
| | | The bed count described above may include CoC-funded per diem beds located outside the geographic area of the CoC. Provide a list of the beds/projects and occupancy agreements demonstrating the purpose of the project and the requirement for participation in substance abuse treatment. |
| | | • There is 24/7 access to detox or inpatient treatment within the geographic area of the CoC; |
| | | • Formal partnership with a Certified Community Behavioral Health Clinic (CCBHC) or Community Mental Health Center (CMHC) or a similar facility if no CCBHCs or CMHCs are located in the geographic area; |
| | | • The availability or proposed creation of sober housing for people in recovery in accordance with 24 CFR 578.93(b)(5); and |
| | | • They are investing adequately in supportive services by showing either: |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 81 of 129 PageID #: 435

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

---

| | | |
|---|---|---|
| | | o through proposed CoC funding, leveraging, match, and other formal partnerships, the CoC is providing supportive services with a value of 50% of the CoC's Annual Renewal Demand; or<br><br>o 30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand. |
| **(3)** *Participation Requirements for Supportive Services.* | 10 | The CoC must demonstrate that projects require program participants to take part in supportive services (e.g. case management, employment training, substance use disorder treatment) in line with 24 CFR 578.75(h) by attaching supportive service agreements (contract, occupancy agreement, lease, or equivalent).<br><br>• 100% of CoC projects have participation requirements (10 points).<br><br>• 50% of CoC projects have participation requirements (5 of the 10 points). |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 82 of 129 PageID #: 436

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | |
|---|---|---|
| **(4)** *Reduce encampments.* | 10 | The CoC must demonstrate a reduction in the number of encampments or the number of people residing in encampments by at least 20%. |
| **(5)** *Coordination with Federal, State, Local, Private, and Other Organizations.* | 2 | The CoC must:<br><br>• Demonstrate coordination with other federal, state, local, private, and other organizations in the planning and operation of projects; and<br><br>• Describe how they have and plan to continue to consult with ESG recipients in the planning and allocation of ESG funds; and Describe how they have or will share PIT, HIC, HMIS, and System Performance data with state and local government as permitted by law. |
| **(6)** *Discharge Planning.* | 2 | The CoC must coordinate with state or local planning efforts to prevent homelessness among people transitioning from public systems (prisons, jails, health care facilities, residential care facilities, and foster care.) |
| **(7)** *Collaboration Related to Children and Youth.* | 2 | The CoC must:<br><br>• Indicate written agreements are in place between their CoC or its HUD-funded |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 83 of 129 PageID #: 437

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | |
|---|---|---|
| | | projects and educational supports and services for children ages 0-5, such as Public Pre-K, Head Start, Child Care (including Child Care and Development Fund), or home visiting (including Maternal, Infant and Early Childhood Home and Visiting or MIECHV); • Identify formal partnerships the CoC has with youth education providers, local educational authorities, or school districts; and • Show policies and procedures that have been adopted to inform individuals and families who become homeless of their eligibility for educational services. |
| **(8) *Coordination with Veteran Organizations.*** | 6 | The CoC must indicate that they partner with the Department of Veterans Affairs or other Veteran Serving Organizations to do the following: • Refer veterans identified by the CoC to VA or other Veteran Serving Organizations for assistance; • Coordinate the provision of emergency shelter, supportive services, and housing; |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 84 of 129 PageID #: 438

| | | and |
| | | • Identify and fill service gaps for veterans. |
| **(9)** *Addressing the Needs of Survivors of Domestic Violence, Dating Violence, Sexual Assault, and Stalking* | 2 | The CoC must partner with victim service providers, state domestic violence coalitions, state sexual assault coalitions, anti-trafficking service providers or other organizations who help provide shelter, housing, and services to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking. |
| **(10)** *Street Outreach.* | 6 | The CoC must show that: <br> • An increasing number of people exit street outreach to a positive destination; and <br> • Street Outreach projects partner with first responders and law enforcement to increase housing and service engagement. |
| **(11)** *Partnering with Public Housing Agencies.* | 2 | The CoC must: <br> • Show they have an agreement in place with one or more of their public housing agencies to enable participants to transition from Transitional Housing, Rapid Re-Housing, and Permanent Supportive |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 85 of 129 PageID #: 439

---

| | | | Housing to HUD assisted housing; and |
| | | | • Describe the strategy for helping participants who are able to live independently move from homelessness assistance to permanent housing taking into account employment and economic stability. |
| **(12) _Leveraging housing and healthcare resources._** These points are available for CoCs that apply for at least one new TH, PSH or RRH project that that utilizes housing and healthcare resources not funded through the CoC or ESG Programs. Examples of housing and healthcare resources include those provided by:<br><br>• Private organizations<br><br>• State or local government sources<br><br>• Public housing agencies<br><br>• Faith-based organizations | 4 | | • The CoC must demonstrate that:<br><br>   o In the case of housing subsidies for PSH or TH projects, the leveraged resources provide at least 25 percent of the units included in the project;<br><br>   o In the case of housing subsidies for a RRH project, the leveraged resources serve at least 25 percent of the program participants included in the project.<br><br>• The CoC must attach letters of commitment, contracts, or other formal documents that demonstrate the commitment. CoCs can |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 86 of 129 PageID #: 440

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

---

| | | receive less than full points for demonstrating commitments less than the threshold above. |
| | | • The CoC must demonstrate that: |
| | |     o In the case of an organization that provides substance use disorder treatment or recovery services, the leveraged resource provides access to all participants who qualify for those services; or |
| | |     o In the case of healthcare or behavioral health resources, the value of assistance being provided is at least an amount that is equivalent to 25 percent of the funding being requested by the project. |
| | | The CoC must attach letters of commitment, contracts, or other formal documents that demonstrate that commitment. CoCs can receive less than full points for demonstrating commitments less than the |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 87 of 129 PageID #: 441

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | | thresholds described above. |
|---|---|---|---|
| **(13) Protecting Public Safety.**<br><br>HUD encourages the most effective use of funding for efforts to end homelessness, quickly rehouse individuals, and minimize trauma (42 U.S.C 11381). Law enforcement and public safety protections play a critical role in accomplishing these purposes. | | 13 | CoCs must:<br><br>• Cite state or local law(s) that cover the CoC's entire geographic area (up to 2 point) that:<br><br>    o Prohibits public illicit drug use; and<br><br>    o Prohibits public camping or loitering.<br><br>• Indicate that state or local government that covers the CoC's entire geographic area has a protocol (up to 2 point) that:<br><br>    o Enforces a prohibition on public illicit drug use; and<br><br>    o Enforces a prohibition on public camping or loitering.<br><br>• Demonstrate utilization of standards that address individuals experiencing homelessness who are a danger to themselves or others including involuntary commitment; (up to 3 points point)<br><br>• Indicate that the state substantially implements and is compliant with the |

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 88 of 129 PageID #: 442

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

---

V. Application Review Information

| | | registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); (up to 3 points)<br><br>• Indicate (up to 3 points) that the CoC:<br><br>    ○ When asked by law enforcement, assists in adequately mapping and checking the location of homeless sex offenders; and<br><br>    ○ Cooperates, assists, and does not interfere or impede with law enforcement or co-response to connect violators of public camping or drug use laws with services. |
|---|---|---|

**d.** ***CoC Merger Bonus Points.*** As stated in section 2.b.(2) in the Appendix of this NOFO, HUD will award up to a possible 5 bonus points to CoCs that merged after the FY 2024 CoC Program Registration deadline. To receive consideration as a merged CoC, new CoCs must contain all the geographic area of at least two CoCs that were considered completely separate CoCs in prior CoC Program competitions.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **Merged CoCs after the FY 2024 CoC Program Registration CoC Program** | 15 | Merged CoCs - all CoCs that merged will receive this minimum number of points. |

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 89 of 129 PageID #: 443

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| Registration deadline. | | |
|---|---|---|

## 2. Policy Initiative Preference Points

This NOFO supports the following policy initiatives, for which a maximum of four (4) preference points may be awarded.

Preference points are added to your overall application score. You do not need to address the policy initiatives in this section to receive an award. If you choose to address a policy initiative in your application, you must adhere to the information with any award.

### a. Opportunity Zones

You may receive up to four (4) points (but no more than 4 policy preference points total) if your proposed activities are within an Opportunity Zone. To receive points, you must complete and submit form HUD-2996, Certification for Opportunity Zone Preference Points. If you expect to use less than 50% of the award in Opportunity Zones, you won't receive preference points.

### b. Verification of Immigration Status

You may receive up to four (4) points (but not more than 4 policy preference points total) if you can demonstrate that all CoC projects that are non-profit charitable organizations voluntarily, thoroughly, and demonstrably facilitate immigration status verification before distribution of benefits to all recipients using SAVE directly or in coordination with a governmental entity. The purpose of verification of immigration status is to remove any incentive for illegal immigration provided by the availability of public benefits and to assure that the public benefits system, including the provision of assistance for homeless Americans, is not burdened by illegal immigration (8 U.S.C 1601).

## 3. Other Factors

### a. Budget

The panel will review but not approve the budget. The panel will assess whether the budget aligns with planned program activities and objectives. Panel members will consider whether the budget and the requested performance period are fully justified and reasonable in relation to the proposed project.

The budget information will be reviewed to ensure:

- The requested costs are eligible under the CoC Program and this NOFO.
- The total amount of funding is within the amount of funding available to the CoC as described in Section I.A.2 of this NOFO.
- If funds are requested for project administrative costs, the amount requested is no more than 10 of the total funding requested.

### b. Certification of Consistency with the Consolidated Plan

You must make sure your application activities are consistent with your local Consolidated

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 90 of 129 PageID #: 444

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Plan.

All project applications submitted and listed on the CoC Priority Listing by Collaborative Applicants must be included in the certification either by submitting one correctly signed and dated HUD-2991 from the appropriate jurisdiction that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction. See section IV.A.1 for more information.

## C. Risk Review

Before making an award, HUD will evaluate each applicant's likelihood of successfully implementing an award based on the following criteria.

- OMB-designated repositories of governmentwide data, as noted in 2 CFR 200.206(a)

- Other public sources such as newspapers, Inspector General or Government Accountability Office reports or findings, or other complaints that have been proven to have merit

- Financial stability

- Quality of management systems and ability to meet the management standards prescribed in 2 CFR part 200

- History of performance. The applicant's record in managing Federal awards, if it is a prior recipient of Federal awards, including timeliness of compliance with applicable reporting requirements, failing to make significant progress in a timely manner, failing to meet planned activities in a timely manner, conformance to the terms and conditions of previous Federal awards, and, if applicable, the extent to which any previously awarded amounts will be expended prior to future awards

- Reports and findings from audits performed under 2 CFR part 200, subpart F—Audit Requirements or the reports and findings of any other available audits

- The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on non-Federal entities

- Capacity of the applicant, including staffing structures and capabilities

- History of timely completion of activities and receipt and expenditure of promised matching or leveraged funds

- Ability to promote self-sufficiency and economic independence

- Ability to produce positive outcomes and results

- History of subsidizing or facilitating activities that conflict with the purposes of this NOFO.

HUD may use the results of the risk review to make funding decisions and to apply award conditions.

This assessment helps identify risks that may affect the advancement toward or the achievement of a project's goals and objectives. 2 C.F.R. 200.206(b)(1).

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 91 of 129 PageID #: 445

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

## D. Selection Process

When making funding decisions, HUD will consider:

- Eligibility requirements, including threshold review results.

- Merit review results.

- Risk review results.

To the extent allowed by law, HUD may:

- Fund applications in whole or in part.

- Fund applications at a lower amount than requested.

- Choose to fund no applications under this NOFO.

- Adjust funding for an application, to ensure funding or geographic dispersion, and alignment with program or administrative priorities.

- Withdraw an award offer and make an offer of funding to another eligible application, if terms and conditions are not finalized or met.

- Use additional funds made available after NOFO publication to either fully fund an application or fund additional applications.

- Correct HUD review and selection errors. If HUD commits an error that causes an applicant not to be selected, HUD may make an award to that applicant when and if funding is available.

- Release another NOFO, if funding is available and if HUD does not receive applications of merit.

**1. Threshold Review.**

HUD will conduct a project eligibility and project quality threshold review on all project applicants.

HUD will review new project applications to determine whether applicants meet the applicant eligibility in section V.A.1, and whether the project applications meet the project eligibility and project quality thresholds detailed in sections V.A.4.a and V.A.4.b of this NOFO. HUD will review renewal projects to determine if project applicants and subrecipients meet the renewal project threshold requirements detailed in section V.A.4.c of this NOFO. If HUD determines these standards are not met, HUD will reject the project application, unless otherwise provided in this NOFO.

If a new project application passes the project eligibility threshold review in section V.A.4.a and receives enough points to pass the project quality threshold review in section V.A.4.b of this NOFO but does not receive all the points available for its project type, HUD may place conditions on the grant award that must be satisfied before HUD will execute a grant agreement with the applicant for the project. If an applicant is unable to satisfy the condition(s) within the timeframe specified by HUD, HUD reserves the right to withdraw the conditionally awarded funds.

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 92 of 129 PageID #: 446

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

## 2. Conditional Selection and Adjustments to Funding.

HUD Headquarters will conditionally select project applications for funding using the following process:

> **a. *HUD Funding Process.*** All project applications, including YHDP renewal and replacement projects, must be competitively ranked, except for CoC Planning and, if applicable, UFA Costs Applications. HUD will select projects in the following order:
>
>> (1) HUD will select all CoC Planning and UFA Costs applications that meet project quality threshold requirements. Only one CoC Planning and one UFA Costs (if applicable) project application can be submitted per CoC.
>>
>> (2) HUD will then select all projects in Tier 1 that pass project quality and project eligibility thresholds as described in section V.D.3.a below.
>>
>> (3) HUD will then select projects that meet project quality and project eligibility thresholds that are ranked in Tier 2 in the order of project score as described in Section V.D.3.b below:
>>
>>> (a) If at any point, HUD selects Permanent Housing projects in an amount more than 30 percent of a CoC's Annual Renewal Demand (ARD), HUD will remove all remaining unselected Permanent Housing projects from that CoC's priority listing, recalculate their Tier 2 project score, and continue selection.
>>
>> (4) HUD will then review DV Bonus projects already selected for funding through the above process and determine whether $52,000,000 has been awarded to DV Bonus projects:
>>
>>> (a) If at least $52,000,000 has been selected for conditional award no further action is needed.
>>>
>>> (b) If $52,000,000 has not been selected for conditional award – continue down the list and fund additional DV Bonus projects by project-level score until at least $52 million has been selected.

> **b.** As authorized under the Consolidated Appropriations Act, 2017 (Public Law 115-31; 131 Stat. 135) for fiscal year 2017 and hereafter, HUD will conditionally select a renewal grant that exceeds $10 million that was originally awarded pursuant to the matter under the heading "Department of Housing and Urban Development–Permanent Supportive Housing" in chapter 6 of title III of the Supplemental Appropriations Act, 2008 (Public Law 110-252; 122 Stat. 2351).

> **c.** If an ineligible renewal project submitted under this NOFO is used in the reallocation process; or an ineligible YHDP Renewal or YHDP Replacement project is submitted, HUD will remove the ineligible project when calculating the final ARD amount for the CoC. To be eligible for renewal, reallocation, or replacement in the FY 2025 CoC and YHDP Funding Process, a project must have an expiration date in Calendar Year (CY) 2026 (between January 1, 2026, and December 31, 2026).

## 3. HUD Funding Process.

CoCs and applicants should ensure there is a thorough understanding of the information

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 93 of 129 PageID #: 447

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

provided in this NOFO. HUD has a two-tier funding selection process for FY 2025 funding. HUD will establish Tier 1 and Tier 2 amounts for each CoC, based on each CoC's Annual Renewal Demand. HUD will post a report that lists the available amounts for each CoC's PPRN, estimated ARD, Tier 1, CoC Planning, estimated CoC Bonus amounts, and estimated DV Bonus amounts on HUD's website.

The maximum amount a CoC may apply for is the sum of the CoC's ARD, eligible CoC Bonus amounts, eligible DV Bonus amounts, eligible CoC planning amounts and if applicable, eligible UFA costs amounts.

The selection process described in this section of the NOFO will also be used for CoC Collaborative Applicants designated as UFAs.

Note that for FY 2025, DV Bonus and YHDP projects will be selected using the Tier 1 and Tier 2 selection process.

a. *Tier 1.* Tier 1 is equal to 30 percent of the CoC's Annual Renewal Demand (ARD). HUD will conditionally select project applications in Tier 1 from the highest scoring CoC application to the lowest scoring CoC application and according to the rank assigned by the CoC on the CoC Priority listing, provided the project applications pass both project eligibility and project quality threshold review, and if applicable, project renewal threshold.

Any competitively ranked project may be placed in Tier 1 according to the CoC's local rating and ranking process and based on local needs and priorities.

b. *Tier 2.* Tier 2 is the difference between Tier 1 and the sum of each CoC's ARD, CoC Bonus, and DV Bonus.

HUD will evaluate project applications placed in Tier 2 for project eligibility and project quality threshold requirements and project renewal threshold requirements, if applicable; and HUD will determine funding using the CoC Application score as well as the CoC project ranking.

HUD will award a point value to each ranked new and renewal project application that is in Tier 2 using a 100-point scale, and conditionally select applications in Tier 2 using this point value from the highest scoring project application to the lowest:

**(1)** *CoC Score.* Up to 50 points in direct proportion to the score received on the CoC Application, e.g., if a CoC received 65 out of 130 points on the CoC Application, the project application would receive 25 out of 50 points for this criterion.

**(2)** *CoC Project Ranking.* Up to 40 points for the CoC's ranking of the project application(s). To consider the CoCs ranking of projects, HUD will assign point values directly related to the CoCs' ranking of project applications. The calculation of point values will be 40 times the quantity (1-x) where x is the ratio of the cumulative funding requests for all projects or portions of projects ranked higher by the CoC in Tier 2 plus one half of the funding of the project of interest to the total amount of funding available in Tier 2 for the CoC.

**(3)** *Service Participation.* Up to 10 points for projects that have or will incorporate supportive service participation requirements in their program design, based on individual need and evidenced in an occupancy agreement or equivalent document.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 94 of 129 PageID #: 448

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**c.** *Projects Straddling Tiers.* If a project application straddles the Tier 1 and Tier 2 funding line, HUD will conditionally select the project up to the amount of funding that falls within Tier 1. Using selection criteria in section V.D.3.b above, HUD may fund the Tier 2 portion of the project. If HUD does not fund the Tier 2 portion of the project, HUD may award the project at the reduced amount based on the amount of funding that falls within Tier 1, provided the project is still feasible with the reduced funding (e.g., is able to continue serving homeless program participants effectively).

**d.** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus).* This NOFO provides approximately $52 million for "rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking." In this NOFO, Transitional Housing is an eligible activity determined critical to assist survivors of domestic violence, dating violence, sexual assault, or stalking.

Each CoC may only submit one new SSO-CE DV Bonus project; however, there is no limit to the number of TH projects and PH-RRH projects CoCs may apply for, provided each application is for at least $50,000. A project applicant may also apply to expand an existing renewal project, including one that was previously awarded with DV Bonus funding, in accordance with section IV.D.1.j.(4) of this NOFO; however, only the new project application for the expansion will be considered for DV Bonus funds through this process. DV Bonus funding may be used to expand an existing renewal project that is not dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act so long as the DV Bonus funds for expansion are solely for additional units, beds, or services dedicated to persons eligible to be served with DV Bonus funding.

CoCs must rank all new DV Bonus project applications on the New Project Listing of the CoC Priority Listing with a unique number ranking and when the project is part of an expansion, the corresponding renewal project application must be on the Renewal Project Listing with a unique rank number as well. HUD will only select a new DV Bonus project that expands an existing renewal project if HUD conditionally selects the existing renewal project for funding.

## 4. Conflict of Interest of Consultants or Technical Experts Assisting HUD.

Consultants and technical experts who assist HUD in evaluating applications for funding under published CoC Program NOFOs are subject to 18 U.S.C. 208, the Federal criminal conflict-of-interest statute, and the Standards of Ethical Conduct for Employees of the Executive Branch regulation published at 5 CFR 2635. Therefore, consultants and technical experts who have assisted or plan to assist applicants with preparing applications for CoC Program NOFOs are prohibited from serving on a selection panel or serving as a technical advisor to HUD. Anyone involved in reviewing CoC Program NOFO applications, including departmental staff, experts, and consultants, must avoid conflicts of interest or the appearance of such conflicts. These individuals must also disclose to HUD's Office of General Counsel Ethics Law Division the following information, if applicable:

**a.** How the selection or non-selection of any applicant under a CoC Program NOFO will affect the individual's financial interests, as provided in 18 U.S.C. 208, or

**b.** How the application process involves a party with whom the individual has a covered relationship under 5 CFR 2635.502.

The consultant or technical expert assisting HUD must disclose this information before participating in any matter regarding a program NOFO. Applicants with questions regarding these provisions or concerning a conflict of interest should call the Office of General Counsel Ethics Law Division, at (202)708-3815 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

### 5. Adjustments to Projects.

HUD may adjust the selection of competitive projects as follows:

**a.** *CoC Maximum Award and FMR Adjustments.* The process for determining a CoC's maximum award amount is detailed in 24 CFR 578.17(b). HUD must adjust awards for leasing, operating, and rental assistance BLIs based on changes to the Fair Market Rents (FMR). 24 CFR 578.51(f) requires that HUD will determine the award amount for Rental Assistance projects by multiplying the number and size of units proposed by the FMR of each unit on the date the application is submitted to HUD.

HUD will make these adjustments as follows:

**(1)** Funds awarded for rental assistance will be adjusted in one of two ways:

**(a)** Funds awarded for rental assistance requesting the FMR will be adjusted by applying the FMR in effect at the time applications are due, including instances where the FMR for a specific area has decreased from the project award year.

**(b)** Funds awarded for rental assistance for renewal projects that request less than FMR, that is, a per-unit amount based on the actual rent costs per unit (section IV.D.2.h), will be increased based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. If the FMR for a specific area had a net decrease from the project award year, the award will not exceed the FMR after adjustment. If the FMR for the project applicant's entire area decreased from the project award year, the project will be awarded the lesser amount of the per-unit amount requested by the project applicant, based on the actual rent costs per unit, or the FMR after adjustment.

**(2)** HUD will increase funds awarded for operating and leasing in PH projects based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. Because leasing and operating costs do not decrease relative to rent amounts for specific units (e.g., operating costs for 10 units that have rents of $500 are likely the same as for 10 units that have rents that are $450) HUD will not decrease leasing and operating BLIs if FMRs decrease in the geographic area. The operating and leasing BLIs in these projects will remain the same as in the most recent grant agreement or grant agreement amendment.

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 96 of 129 PageID #: 450

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**b.** *Cost of Living Adjustment Factor.* HUD will adjust amounts for the supportive services and HMIS Costs budget lines for renewing projects by the following factor: Most recent three-year average of changes in State Quarterly Census of Employment and Wages (QCEW) for the category Social Assistance (NAICS 624). Data can be found at: https://www.bls.gov/cew/data.htm.

## 6. Geographic Diversity.

HUD has determined that geographic diversity is an appropriate consideration in selecting homeless assistance projects in the CoC Program Competition. HUD believes that geographic diversity can be achieved best by awarding grants to as many CoCs as possible. To this end, in instances where any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Northern Mariana Islands, the Virgin Islands, and American Samoa do not have at least one funded CoC, HUD reserves the right to fund eligible project(s) with the highest total score in the CoC.

## 7. Funding Diversity.

HUD reserves the right to reduce the amount of a grant, if necessary, to ensure that no more than 10 percent of assistance made available under this NOFO will be awarded for projects located within any one unit of general local government or within the geographic area covered by any one CoC.

## 8. Approval from HUD Headquarters is required before a grant awarded under this NOFO may be transferred.

Under this NOFO, HUD will treat the change of project applicant as a curable deficiency. This occurs when a Recipient of an expiring grant awarded under a prior FY CoC or YHDP competition NOFO applies to renew their award under this NOFO and during the period between applying for FY 2025 funds and before HUD announces FY 2025 awards, HUD executes a grant agreement amendment to transfer the expiring grant to a New Recipient. This grant transfer results in a FY 2025 CoC renewal application that does not reflect the New Recipient as the applicant. In this type of situation, HUD will treat the change of project applicant as a curable deficiency.

## 9. Use of unawarded funds.

In the case that funding remains available under this NOFO after HUD follows the selection process described in V.D.2 and V.D.3 above and any subsequent appeals process as described in VII.D below, HUD reserves the right to issue a supplemental NOFO.

**10.** If any part or provision of the grant Agreement or terms of this Notice have been or are enjoined or held to be void or unenforceable by a federal court, they shall be ineffective only to the extent of such court's authority and only as to such prohibition or enjoinment and shall not invalidate or affect the legality or enforceability of the remaining provisions and applications of the Agreement and Notice. In the event the enjoinment of such provisions is stayed, dissolved or reversed, the full terms of the grant agreement and Notice, including such provisions, will automatically become effective.

## E. Award Notices

If you are successful, HUD will email an award notice to the authorized official representative

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 97 of 129 PageID #: 451

from the SF-424. HUD will also notify unsuccessful applicants.

The award notice communicates the amount of the award, important dates, and the terms and conditions you need to follow. HUD may impose specific conditions on an award as provided under 2 CFR 200.208.

You agree to the award terms and conditions by either drawing funds from HUD's payment system or signing the agreement with HUD. If you do not agree to the award terms and conditions, HUD may select another eligible applicant.

Under 2 CFR 200.458 pre-award costs are allowable with written approval from HUD if such costs: a) are consistent with 2 CFR 200.458; and b) would be allowable as a post-award cost; and c) do not exceed 10 percent of the total funds obligated to this award. However, HUD will not consider eligibility for pre-award costs until after the date of the HUD selection notice. Additionally, the incurrence of pre-award costs in anticipation of an award imposes no obligation on HUD either to make the award, or to increase the amount of the approved budget, if the award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred.

For selected projects, HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

If the award includes funds for acquisition, HUD may allow recipients to draw down acquisition funds before recording the Declaration of Restrictive Covenant if the HUD Field Office confirms that the escrow agent has received the Declaration of Restrictive Covenant and the recording instructions. The recipient or subrecipient may not draw down any funds other than acquisition funds until HUD Field Counsel has confirmed the Declaration of Restrictive Covenants has been recorded.

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

VI. Submissions Requirements and Deadlines

A.  Deadlines

B.  Submission Methods

C.  Other Submissions

D.  False Statements

TABLE OF CONTENTS

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

You must apply electronically. See Find the Application Package to make sure you have everything you need to apply online. See Application Waiver if you qualify to submit a paper application.

Make sure you are current with SAM.gov and UEI requirements before applying for the award. See the Before You Begin section of this NOFO.

## A. Deadlines

### 1. Application submission deadline:

The application deadline is 8 PM Eastern time on:

01/14/2026

HUD must receive your application by the deadline. Applications received after the deadline are late. Late applications are not eligible for HUD funding.

If HUD receives more than one application from you, HUD will review only the last submission.

HUD may extend an application due date based on emergency situations such as Presidentially-declared natural disasters. Improper or expired registration and password issues are not causes to allow HUD to accept applications after the deadline date.

Applicants must complete and submit their applications in *e-snaps* at **https://esnaps.hud.gov/**. The deadline to submit applications for FY 2025 funding is 8:00 PM EST on January 14, 2026

24 CFR 578.9 requires CoCs to design, operate, and follow a collaborative process for the development of an application in response to a NOFO issued by HUD. As part of this collaborative process, CoCs must implement internal deadlines to ensure transparency and fairness at the local level. The implementation of deadlines that meet the standards outlined below for FY 2025 CoC Program project applications are part of the scoring criteria as detailed in section V.B.1.a of this NOFO.

> **a.** *Project Application.* All project applications must be submitted to the CoC no later than 30 days before HUD's CoC Program application submission deadline of 8:00 PM EST on January 14, 2026. CoCs that fail to establish this deadline for local project application(s) will receive 0 points under section V.B.1.a.(2) of this NOFO.

> **b.** *CoC Notification to Project Applicants.* The CoC is required to notify, in writing outside of e-snaps, all project applicants who submitted their project applications to the CoC by the local CoC-established deadline whether their project application(s) will be accepted and ranked on the CoC Priority Listing, rejected, or reduced by the CoC no later than 15 days of the FY 2025 CoC Program application submission deadline.

> Where a project application is being rejected or reduced, the CoC must provide the project applicant with the reason(s) for the rejection or reduction. CoCs failing to provide this information to a project applicant that submits its project application by the local competition deadline will receive 0 points under section V.B.1.a.(2) of this NOFO.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 100 of 129
PageID #: 454

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

2. Major Disaster Areas.

If a major disaster impacts a CoC's geographic area, as declared by the President under the Stafford Act, during the CoC Program application process that will impact the submission of the CoC Priority Listing and FY 2025 project applications, the CoC's Collaborative Applicant must send written notification to Norm Suchar, Director, Office of Special Needs Assistance Program (SNAPS) at CoCDisaster@hud.gov. The email must include:

**a.** the nature of the disaster, date(s) the major disaster occurred, how the major disaster affected the Collaborative Applicant, the CoC, or its project(s);

**b.** the duration, and the impact on the Collaborative Applicant, the project applicants, or the CoC to meet the local competition deadline; and

**c.** the anticipated amount of time the CoC is requesting for an extension (e.g., number of days, weeks, or months). This does not mean HUD will allow the full amount of time requested.

Based on the timing and the extent of the major disaster, HUD may extend the application deadline for the affected CoC(s). All requests received will be confirmed via the Federal Emergency Management Agency (FEMA) website, https://www.fema.gov/disaster.

## B. Submission Methods

### 1. Electronic Submission

The official documents HUD uses to solicit applications for this NOFO are posted on Grants.gov; however, you must register and submit your application through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

### 1. Electronic Submission

You must register and submit your application through Grants.gov. See Before You Begin.

For instructions on how to submit in Grants.gov, see the Quick Start Guide for Applicants. Make sure that your application passes the Grants.gov validation checks or we may not get it.

Grants.gov will record the date and time of your application submission. HUD will use this information to determine timely applications.

**a.** *CoC Registration.* Collaborative Applicants that Registered their CoCs in FY 2024 were not required to register again for FY 2025 funding. HUD moved all FY 2024 CoC Program Registrations forward for FY 2025 on behalf of all existing Collaborative Applicants in accordance with Notice CPD-22-02: Continuum of Care Program Registration. Collaborative Applicants that were designated by HUD as UFAs during the FY 2024 Registration were not required to reapply during the FY 2025 funding year.

**b.** *CoC Review of Project Applications Prior to Submission to HUD.* HUD expects CoCs to implement a thorough review and oversight process at the local level for both new and renewal project applications to be submitted to HUD for the FY 2025 CoC Program Competition. HUD's experience is that many project applications contain

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 101 of 129
PageID #: 455

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

information resulting in conditions on the grant; or for more serious infractions, HUD rejecting a project application. Deficient project applications prolong HUD's review process, which results in delayed funding announcements, lost funding for CoCs due to HUD rejecting projects, and delays accessing project funds to house and assist individuals and families experiencing homelessness. HUD expects CoCs to closely review the information provided in each project application, including Renewal, Replacement, or Reallocation projects, to ensure:

**(1)** all proposed program participants will be eligible for the program component type selected;

**(2)** the information provided in the project application and proposed activities are:

**(a)** eligible and consistent with program requirements in the Rule;
**(b)** eligible and consistent with DV Renewal, DV Reallocation and DV Bonus requirements in sections IV.D.1.d, and IV.D.1.e, and I.D.1.f of this NOFO; or
**(c)** eligible and consistent with YHDP Renewal and YHDP Replacement project requirements which includes YHDP Reallocation provided in sections IV.D.1.h and IV.D.1.i of this NOFO;

**(3)** each project narrative is fully responsive to the question being asked and that it meets all the criteria for that question as required by this NOFO;

**(4)** the data provided in various parts of the project application are consistent; and

**(5)** all required attachments correspond to the list of attachments in e-snaps, must contain accurate and complete information and must be dated between November 1, 2024 and January , 2026.

**c.** *Collaborative Applicant Submission Requirements*. Collaborative Applicants must submit the FY 2025 Consolidated application by the FY 2025 application submission deadline. HUD will consider the CoC Consolidated Application properly submitted for review when the Collaborative Applicant submits the FY 2025 CoC Application, the FY 2025 CoC Priority Listing, and all FY 2025 project applications on behalf of the CoC.

The FY 2025 CoC Application and the FY 2025 CoC Priority Listing are separate submissions in e-snaps; therefore, Collaborative Applicants must ensure both the CoC Application and the CoC Priority Listing, that includes all project applications either approved and ranked or rejected, are submitted in e-snaps prior to the CoC Program application submission deadline.

The "Submit" button will not be available on the Submission Summary of the FY 2025 CoC Application and FY 2025 CoC Priority Listing until all required sections of the application and all parts of the listings have been completed. Collaborative Applicants should review the Submission Summary form carefully to ensure no sections state "Please Complete."

Collaborative Applicants should export a PDF copy of the Submission Summary form from the FY 2025 CoC Application and the FY 2025 CoC Priority Listing after they have been submitted to HUD and before closing their internet browser. This is the Collaborative Applicant's receipt of submission and proof of compliance with the FY 2025 application deadline.

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 102 of 129 PageID #: 455

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

The CoC Consolidated Application includes the following:

**(1) FY 2025 CoC Application which includes the following:**

**(a) CoC Review, Score, and Ranking Procedures.** The CoC's written procedures that are publicly posted for all interested stakeholders and applicants that clearly describe the project-level review and ranking process that is used by the CoC to determine how CoC Program project applications submitted to the CoC are reviewed, scored, and ranked.

**(b) CoC Public Notice.** A screenshot(s) from the CoC's, or a partner website, that includes the date the CoC notified the public of its local competition process, the due date for project applications, and the full CoC Application and CoC Priority Listing that includes all Project Listings of project applications submitted to HUD as accepted (in the case of non-competitive CoC Planning and UFA costs), approved and ranked or rejected.

**(c) CoC Review and Ranking Process.** Documents the process used by the CoC in the local competition to review, assess, and score new and renewal project applications, a copy of one scored project application form used by most renewal project applicants that includes the objective criteria and system performance criteria and their respective maximum point values and the actual points your CoC awarded to the project applicant; and the local competition selection results for new and renewal project applications.

**(d) Notification to Project Applicants of projects rejected or reduced.** The notification of the action (rejection or reduction) that must be sent to the project applicant at least 15-days prior to the HUD application submission deadline, if a new or renewal project application was submitted to the CoC in the local competition and the CoC rejected it or reduced its funding request as part of the CoC's local process.

**(e) Public Notification of Ranked Project Applications.** The notification of action that all project applicants who submitted new and renewal project applications in the local CoC competition are notified at least 15-days prior to the HUD application submission deadline of the CoC's acceptance that includes the ranked position of the project applications. This notification may be posted publicly or sent via email to individual project applicants.

**(f) PHA Administrative Plan.** If the CoC is seeking points under section V.B.1.c.(11) of this NOFO, a copy or the relevant excerpt from the local PHA(s) administrative planning document(s), or other written policy developed between the CoC and the PHA(s) that describes the PHA(s) preference for persons experiencing homelessness. Instead of a relevant excerpt from the written plan, a letter from the PHA(s) that describes the PHA(s) preference for persons experiencing homelessness may be attached.

**(g) Leveraging Housing and Healthcare Resources.** If the CoC is seeking points under section V.B.1.c.(12) and (13) written commitment(s), contract(s), or other formal written documents that demonstrate the number of housing subsidies,

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 103 of 129 PageID #: 457

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

housing units, and healthcare resources that will be provided.

**(h) Projects to Serve Persons Defined as Homeless under paragraph (3) of 24 CFR 578.3.** If the CoC is seeking to serve persons defined as homeless under paragraph (3) of the homeless definition, a list of projects that will serve persons defined as homeless under paragraph (3) of the homeless definition.

**(i) The FY 2025 HDX Competition Report.** The FY 2025 HDX Competition Report contains data submitted to HUD via HUD's Homelessness Data Exchange (HDX), including HIC, PIT count, and system performance data.

**(2) FY 2025 Project Application(s), including for each project application:**

**(a) Charts, narrative responses, and attachments.**

**(b) Documentation of Applicant and subrecipient Eligibility.** All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

**(c) HUD required forms.** The following HUD required forms are built into e-snaps and must be fully completed and electronically signed before project applicants have access to the project application (see section IV.F.A of this NOFO).

**(3) FY 2025 CoC Priority Listing, including.** The CoC Priority Listing in e-snaps must include the following completed forms, certifications and attachments:

**(a) Project Reallocation Form.** The Reallocation form allows CoCs to indicate which eligible new projects, if any, will be reduced or eliminated through the reallocation process.

**(b) CoC and YHDP Project Listings.** The CoC project listing forms require the following project applications to be ranked, with unique rank numbers, in order of priority. Any project not ranked with a unique rank number must be rejected. The forms under this requirement include:

**i.** CoC New Projects (including CoC Bonus and CoC Reallocation projects;
**ii.** CoC Renewal Projects (including DV Renewal and Special NOFO Renewal projects);
**iii.** DV Bonus Projects;
**iv.** DV Reallocation Projects;

**v.** YHDP Renewal Projects;

**vi.** YHDP Replacement Projects (including YHDP Reallocation projects).

**(c)** CoC Planning and UFA Costs Project Application Listings. These project listing forms include the following non-ranked project applications:

**i.** CoC Planning Project Listing; and
**ii.** UFA Costs Project Listing, if applicable.

Collaborative Applicants must ensure the CoC only submits one project application for CoC Planning, and if the CoC's Collaborative Applicant is a HUD-designated

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 104 of 129
PageID #: 468

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

UFA, one UFA Costs project application.

**(d)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(e)** Tribal Resolution, if applicable (See section IV.1.2 of this NOFO).

## d. Project Application Submissions.

Project applications must include the population(s) and subpopulation(s) they will serve, the type of housing and services they will provide, and the budget activities they are requesting. Project applicants must also provide documentation of applicant and subrecipient eligibility. All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

Collaborative Applicants applying for CoC Planning and UFA Costs (if designated as a UFA by HUD) must provide a description of the activities that will be carried out with CoC Program grant funds.

Additionally, all project applicants must ensure their organization has a Code of Conduct that complies with the requirements of 2 CFR part 200, as may be amended from time to time, and is included on HUD's website. If the organization's Code of Conduct does not appear on HUD's website, the project applicant must attach its Code of Conduct that includes all required information to its Project Applicant Profile in e-snaps.

For more information on project applications, see section IV.D of this NOFO.

## e. Timely Submissions.

HUD will not fund applications that are not received on time. Also, failure to submit a complete CoC Consolidated Application may result in HUD finding that the CoC does not meet the requirements of the Act or its implementing regulations under 24 CFR 578.13. If the Secretary makes that finding, HUD may take remedial action to ensure fair distribution of grant funds to eligible entities within the CoC's geographic area, which includes the possibility that HUD will designate another eligible applicant to be the Collaborative Applicant for the CoC. In addition to the remedial actions listed in 24 CFR 578.13(a), HUD may also impose another remedial action, such as requiring the CoC to create new policies and procedures to ensure that the Collaborative Applicant performs its duties.

## f. Resolving Technical Difficulties.

CoC and project applicants experiencing technical difficulty with any part of the Application should notify HUD immediately for assistance and document all attempts to obtain assistance. Notification of technical difficulties are to be sent to CoCNOFO@hud.gov. HUD will not provide assistance directly related to content, only to troubleshoot submission issues.

CoCs that are submitting new and renewal applications for FY 2025 CoC and YHDP funding should print the Submission Summary form for the FY 2025 CoC Priority Listing for proof of compliance with the FY 2025 application deadline. HUD will not give funding consideration to any Collaborative Applicant whose FY 2025 CoC Priority Listing is determined to be late and the Collaborative Applicant is unable to provide HUD with a record of submission that verifies the CoC Consolidated Application was submitted prior to the application deadline date and

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 105 of 129
PageID #: 459

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

time.

HUD strongly suggests that applicants use the "Export to PDF" functionality in e-snaps to save a hard copy of all submission documents for their records. This can be completed prior to or after submission.

If after notice and reasonable opportunity to be heard, HUD finds pursuant to 24 CFR 578.13, that one or more CoCs have failed to comply with the requirements of the Act and the Rule, HUD may, solely at its discretion and only if sufficient funds become available by recapture, publish a new NOFO for eligible applicants in CoCs that HUD determined do not meet the requirements of the Act and program regulations.

**Need Help?** See the Contact and Support section of this NOFO.

## 2. Electronic Submission Application Waiver

You may request a waiver from the requirement to submit your application electronically. The request must show good cause and detail why you are technologically unable to submit electronically. An example of good cause may include: a valid power or internet service disruption in the area of your business office. Lack of SAM.gov registration is not good cause.

Use the information in the Contact and Support section of this NOFO to submit a written request to HUD. You must **submit your waiver request at least 15 calendar days before the application deadline**.

The regulatory framework of HUD's electronic submission requirement is the final rule established in 24 CFR 5.1005. CoCs seeking a waiver of the electronic submission requirement must request a waiver in accordance with 24 CFR 5.1005. If a Collaborative Applicant finds it cannot submit its application electronically and must seek a waiver of the electronic grant submission requirement, its request must be postmarked no later than 60 days after the publication date of this NOFO. To expedite the receipt and review of each request, Collaborative Applicants may email their written requests to Norm Suchar, Director, Office of Special Needs Assistance Program (SNAPS) at CoCNOFO@hud.gov. If HUD does not have sufficient time to process the waiver request, HUD will not grant a waiver. HUD will not consider paper applications received without a prior approved waiver or after the established deadline.

## C. Other Submissions

### 1. Intergovernmental Review

This NOFO is not subject to Executive Order 12372. No action is needed.

### 2. Technical Application Errors

HUD may contact you to fix a technical error with your timely application after the due date. Technical errors that you may fix are not submitted to satisfy merit review criteria. And you may not fix technical errors related to threshold review except eligibility entity documentation. Examples of technical errors include: inconsistencies in funding requests; improper signature on a form; a missing or incomplete form; and nonprofit status documentation.

HUD will send notice to the authorized organization representative from the SF-424 to fix a technical error.

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 106 of 129
PageID #: 460

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Your application is not eligible for funding, if you fail to fix the error to HUD's satisfaction and by the due date in HUD's notice. HUD will not review information submitted after the application due date in HUD's notice.

Applicants should compare their application submission with the requirements in the CoC Program NOFO. The FY 2025 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO located on Grants.gov is HUD's official NOFO. If a discrepancy in the CoC Program NOFO posted on Grants.gov or other information provided in any other version or supporting documentation is found, please notify HUD immediately as indicated in section VIII of this NOFO. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

HUD will post any corrections or amendments to a CoC Program NOFO on Grants.gov.

For projects conditionally selected for award, HUD verifies that your organization has an active SAM registration prior to release of awarded funds and will withhold processing funds if your organization's SAM registration has expired or isn't consistent with the information provided on the SAM.gov website. A UEI discrepancy may also occur if HUD approves a grant to be amended to a new recipient (see section V.D.7 of this NOFO).

UEI discrepancies are a curable deficiency that may be corrected by the applicant with timely action. If a UEI discrepancy isn't resolved within the timeframe prescribed by the Notification of Curable Deficiency the applicant receives from HUD, HUD may reject the project.

### a. Fix Errors in Electronic Applications

To fix an error in response to a HUD notice, you must email the corrections to HUD at CoCNOFO@hud.gov.

HUD allows 7 calendar days from the date of the HUD notice to fix an error. If the due date to fix an error falls on a Saturday, Sunday, Federal holiday, or on a day when HUD's Headquarters office in Washington, DC is closed, then the due date is the next business day.

### b. Fix Errors in Paper Applications

You must fix an error in your paper application, in accordance with HUD's notice. If your paper application includes an incorrect UEI, HUD will request you supply the correct UEI.

## D. False Statements

By submitting an application, you acknowledge your understanding that providing false or misleading information during any part of the application, award, or performance phase of an award may result in criminal, civil or administrative sanctions, including but not limited to: fines, restitution, and/or imprisonment under 18 USC 1001, 18 USC 1012, 18 USC 1010, 18 USC 1014, or 18 USC 287; treble damages and civil penalties under the False Claims Act, 31 USC 3729 et seq.; double damages and civil penalties under the Administrative False Claims Act, 31 USC Sections 3801-3812; civil recovery of award funds; suspension and/or debarment from all federal procurement and non-procurement transactions, FAR Part 9.4 or 2 CFR Part 180; and other remedies including termination of active HUD award.

# VII. POST - AWARD REQUIREMENTS AND ADMINISTRATION

VII. Post-Award Requirements and Administration

A. Administrative, National and Departmental Policy Requirements and General Terms and Conditions

B. Environmental Requirements

C. Remedies for Noncompliance

D. Reporting

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 108 of 129
PageID #: 462

I. Basic Information    II. Eligibility    III. Program Description    IV. Application Contents and Format    V. Application Review Information    VI. Submission Requirements and Deadlines    VII. Post-Award Requirements and Administration    VIII. Contact and Support    Appendix

# VII. POST-AWARD REQUIREMENTS AND ADMINISTRATION

## A. Administrative, National and Departmental Policy Requirements, and General Terms and Conditions

You must follow the applicable provisions in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2025. You must comply with these applicable provisions:

1. The Fair Housing Act (42 USC 3601-3619) and Civil Rights laws which encompass the Fair Housing Act and related authorities (24 CFR 5.105(a))

2. Affirmatively Furthering Fair Housing (AFFH) requirements, (42 USC § 3608(e)(5)) and implementing regulations at 24 CFR 5.150 et seq.as amended by 90 FR 11020.

3. Economic Opportunities for Low-and Very Low-income Persons (12 USC 1701u) requirements, including those listed at 24 CFR part 75

4. Compliance with Immigration Requirements (8 U.S.C. 1601-1646; Executive Order 14218)

5. Accessible Technology requirements, (29 USC § 794d, 29 USC 794, 42 USC 12131-12165) and implementing regulations at 36 CFR part 1194 (Section 508 regulations),24 CFR § 8.6 (Section 504 effective communication regulations), 28 CFR part 35, subpart H (DOJ Web Access Rule), and 28 CFR part 35, subpart E (DOJ's Title II communications regulations)

6. Ensuring, when possible, small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms receive consideration consistent with 2 CFR 200.321

7. Equal Participation of Faith-based Organizations in HUD Programs and Activities consistent with 42 U.S.C. 2000bb et seq.; 42 U.S.C. 2000d et seq.; 24 CFR 5.109; and Executive Orders 14202, *Eradicating Anti-Christian Bias* and EO 14205, *Establishment of the White House Faith Office.*

8. Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 USC § 4601 et seq.) (URA) requirements, 49 CFR part 24, and applicable program regulations

9. Participation in HUD-Sponsored Program Evaluation (12 USC 1701z-1; 12 USC 1702z-2; 24 CFR part 60; and FR-6278-N-01)

10. OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR part 200)

11. Drug-Free Workplace requirements (2 CFR part 2429)

12. HUD requirements related to safeguarding resident/client files (e.g., 2 CFR 200.303(e))

13. The Federal Funding Accountability and Transparency Act of 2006 (2 CFR part 170) (FFATA), as amended

15. Accessibility for Persons with Disabilities requirements (29 USC § 794) and implementing

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 109 of 129
PageID #: 463

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

regulations at 24 CFR parts 8 and 100; 28 CFR part 35

16. Applicable Violence Against Women Act requirements in the Housing Chapter of VAWA (34 USC § 12491-12496) 24 CFR part 5, subpart L, and program-specific regulations.

17. Conducting Business in Accordance with Ethical Standards/Code of Conduct, including 2 CFR 200.317, 2 CFR 200.318(c) and other applicable conflicts of interest requirements

18. Build America, Buy America (BABA) Act procurement purchase requirements

20. Environmental requirements that apply in accordance with 24 CFR part 50 or part 58

22. Unless prohibited by law and to the extent permitted under the Freedom of Information Act (FOIA), your application and post-award content may be released to the public in response to FOIA requests, except to the extent that certain information may be withheld under a FOIA exemption (5 USC § 552(b); 24 CFR 15.107(b)). HUD may also share your information within HUD or with other Federal agencies if HUD determines that sharing is relevant to the respective program's objectives.

23. Waste, Fraud, Abuse, and Whistleblower Protections. 41 USC § 4712, which includes informing your employees in writing of their rights and remedies, in the predominant native language of the workforce. Under 41 U.S.C. § 4712, employees of a contractor, subcontractor, grantee, subgrantee, and personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant. (See Federal Contractor or Grantee Protections | Office of Inspector General, Department of Housing and Urban Development (hudoig.gov))

24. Implementing Presidential Executive Actions affecting federal financial assistance programs, as advised by the Department, unless otherwise restricted by law: Executive Order (EO) 14219 (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative); 14218 (Ending Taxpayer Subsidization of Open Borders); guidance resulting from the White House Task Force established by 14202 (Eradicating Anti-Christian Bias) and the Senior Advisor to the White House Faith Office assigned by 14205 (Establishment of the White House Faith Office); 14182 (Enforcing the Hyde Amendment); 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity); 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government); 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing); and 14148 (Initial Rescissions of Harmful Executive Orders and Actions)

In addition:

1. Awards made under this NOFO will not be used to conduct activities that subsidize or facilitate racial preferences or other forms of illegal discrimination, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation; or conduct activities that rely on or otherwise use a definition of sex as other than binary in humans 14332 (Improving Oversight of

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 110 of 129    PageID #: 464

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Federal Grantmaking).

2. Awards made under this NOFO will not be used to fund, promote, encourage, subsidize or facilitate the use of illicit drugs.

3. Awards made under this NOFO will not be used to fund any project, service provider, or organization that operates drug injection sites or "safe consumption sites," knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of "harm reduction." 14321 (Ending Crime and Disorder on America's Streets).

4. All agreements or contracts made with subrecipients under this NOFO must contain the identical terms and conditions as those in the grant agreement issued by HUD. Any additional or conflicting terms and conditions must be approved by HUD.

## B. Environmental Requirements

### 1. Environmental Review

You must follow these environmental review requirements, including regulations at:

24 CFR part 50

24 CFR part 58

Notwithstanding 24 CFR 578.31 and 24 CFR 578.99(a) of the Rule, and in accordance with Section 100261(3) of MAP-21 (Pub. L. 112-141, 126 Stat. 405), activities under this NOFO are subject to environmental review by a responsible entity under HUD regulations at 24 CFR part 58 or by HUD under 24 CFR part 50.

a. All HUD assisted activities, even projects that only involve exempt activities, require some level of environmental review. Two types of projects are Categorically Excluded from review under the National Environmental Policy Act (NEPA) and not subject to compliance with the laws and authorities listed under 24 CFR 58.5 (CENST): All scattered-site projects where program participants choose their own unit and are not restricted to units within a pre-determined specific project site or sites are categorized in 24 CFR 58.35(b)(1) as CENST. This includes both tenant-based rental assistance and tenant-based leasing projects where program participants choose their own unit and do not involve any physical work or impacts beyond routine maintenance as defined by Notice CPD-16-02: Guidance for Categorizing an Activity as Maintenance for Compliance with HUD Environmental Regulations. The Exempt/CENST environmental review form is only required for each project, not every unit.

b. For activities under a grant to a recipient other than a state or unit of general local government that generally would be subject to review under 24 CFR part 58, HUD may make a finding in accordance with 24 CFR 58.11(d) and may itself perform the environmental review under the provisions of 24 CFR part 50 if the recipient objects in writing to the responsible entity's performing the review under part 24 CFR part 58.

c. Irrespective of whether the responsible entity in accordance with 24 CFR part 58 (or HUD in accordance with 24 CFR part 50) performs the environmental review, the recipient

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 111 of 129
PageID #: 465

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

must supply all available, relevant information necessary for the responsible entity (or HUD, if applicable) to perform for each property any required environmental review. The recipient also must carry out mitigating measures required by the responsible entity (or HUD, if applicable) or select alternative property.

**d.** The recipient, its project partners, and their contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct property for a project under this NOFO, or commit or expend HUD or non-HUD funds for such eligible activities under this NOFO, until the responsible entity (as defined by 24 CFR 58.2(a)(7)) has completed the environmental review procedures required by 24 CFR part 58 and the environmental certification and Request for Release of Funds (RROF) have been approved or HUD has performed an environmental review under 24 CFR part 50 and the recipient has received HUD approval of the project. HUD will not release grant funds if the recipient or any other party commits grant funds (i.e., incurs any costs or expenditures to be paid or reimbursed with such funds) before the recipient submits and HUD approves its RROF (where such submission is required).

## 2. NOFO Impact Determination Related to the Environment

This NOFO has no significant impact related to the environment. HUD has made a Finding of No Significant Impact (FONSI) as required by HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 USC § 4332(2)(c)). To learn more about this FONSI, go to HUD's Funding Opportunities web page.

## 3. Lead-Based Paint Requirements

You must follow the lead-based paint rules below if you fund any work on pre-1978 housing. This includes buying, leasing, support services, operating, or work that disturbs painted surfaces.

- HUD's rules (Lead Disclosure Rule; and Lead Safe Housing Rule).

- EPA's rules (Renovation, Repair and Painting Rule, and Lead Abatement, Inspection and Risk Assessment Rule).

You must discuss the Lead Disclosure Rule if you fund education or counseling on buying or renting housing that may have been built before 1978. You must also discuss the Lead Safe Housing Rule if the education or counseling focuses on buying or renting HUD-assisted pre-1978 housing.

## C. Remedies for Noncompliance

HUD may terminate all or a part of your award as described under 2 CFR 200.340 through 200.343 pursuant to the terms and conditions of your award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. HUD may also impose specific conditions on your award or take other remedies as described by 2 CFR 200.339 through 200.343, if you do not comply with your award terms and conditions.

For more information on CoC Program sanctions and remedies for noncompliance see 24

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 112 of 129
PageID #: 466

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

CFR 578.107.

## D. Reporting

HUD requires recipients to submit the performance, financial, and program reports as outlined below. You must comply with these reporting requirements to remain eligible for HUD funding. See Section VII.C. of this NOFO.

HUD is implementing new grants management and reporting tools, which will be rolled out for your use in the near term. As a grantee, you will be required to report on grant performance and financial activities (including vendor and cash disbursement supporting details for yourself and your sub-recipients) using these new tools when they are released. HUD will work with you to support your transition to this new reporting environment. Once implemented, timely reporting in this new environment will be mandatory. HUD reserves the right to exercise all available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include requiring 100% review or stopping future disbursements altogether if reporting is not timely submitted.

| Report | Description | When |
|---|---|---|
| Federal Funding Accountability and Transparency Act (FFATA) | • Awards equal to or greater than $30,000<br>• Data on executive compensation and first-tier subawards<br>• See Public Law 109-282 and 2 CFR part 170<br>• HUD reports initial prime recipient data to usaspending.gov<br>• Submit via SAM.gov | See 2 CFR Appendix A to Part 170(a)(2)(ii) |
| Reporting on Recipient Integrity and Performance Matters | • Total value of all current Federal awards exceed $10,000,000 for any period of time during the period of performance of this Federal award<br>• See Appendix XII to 2 CFR 200<br>• Submit via SAM.gov | See 2 CFR Appendix-XII to Part 200 I.(d) |

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 113 of 129 PageID #: 467

| Report | Description | When |
|---|---|---|
| Annual Performance Report (APR) | • Collect and report data use of funds annually.<br>• Projects receiving funds for acquisition, new construction, or rehabilitation must submit APRs for 15 years from the date of initial occupancy or the date of initial service provision. | See 24 CFR 578.103(e) |
| Federal Financial Report, SF-425 | • Summary of key financial data<br>• See 2 CFR 200.328 | See 2 CFR 200.328 or award terms |
| Race, Ethnicity, and Other Data Reporting | Recipients that provide HUD-funded program benefits to individuals or families, report data on the race, color, religion, sex, national origin, age, disability, and family characteristics of persons and households funded by this program. | Annually through the Homeless Data Exchange submission. |
| Audited financial statement | Recipient's organizational structure, any sub-grantees or sub-recipients, and how each disbursement of grant funds was applied to an eligible cost throughout the life of the grant to receive disbursements of Federal funds. | No less than annually. |

**1. Program Specific Reporting Requirements.**

**a.** In accordance with program regulations at 24 CFR 578.103, project recipients must maintain records within the timeframe required and make any reports that HUD may require. Project recipients may report the data as part of their APR submission to HUD. Also, project recipients who expend $750,000 or more in 1 year in federal awards must have a single or program-specific audit for that year in accordance with the provisions of 2

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 114 of 129 PageID #: 468

## VII. Post-Award Requirements and Administration

CFR part 200, subpart F.

**b. Section 3 Reporting Regulations.** Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. See HUD's Section 3 website for additional information including annual reporting requirements.

**c.** Award notices may also include requirements for sub-award reporting in compliance with the requirements of the Federal Financial Assistance Accountability and Transparency Act of 2006 (Pub. L. 109-282) (FFATA) and Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417), referred to as "Section 872." See the General Section for further information.

**e.** An estimate of the reporting and recordkeeping burden of the CoC Program can be found in the Federal Register Publication of the Rule.

## 2. Administrative and Other Program Requirements.

Federal agencies are required to measure the performance of their programs. HUD captures this information from monitoring visits and APRs

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 115 of 129 PageID #: 469

# VIII. CONTACT AND SUPPORT

VIII. Contact and Support

A.   Agency Contact

B.   Grants.gov

C.   Sam.gov

D.   Debriefing

E.   Applicant Experience Survey

F.   Other Online Resources

TABLE OF CONTENTS

**Suppl. App. 331**

Case 1:25-cv-00626-MSM-AEM Document 12-3 Filed 11/25/25 Page 116 of 129 PageID #: 470

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# VIII. CONTACT AND SUPPORT

Individuals who are deaf or hard of hearing, as well as individuals who have speech or communication disabilities may use a relay service. To learn more about how to make an accessible telephone call, visit the webpage for the Federal Communications Commission.

## A. Agency Contact

### 1. Program and Application Requirements

Name: HUD Office of Community Planning and Development

Phone: 800-347-3735

Email: CoCNOFO@hud.gov

Note: HUD's assistance is limited by the standards at 24 CFR 4.26.

HUD staff will be available to provide general clarification on the content of this NOFO; however, HUD staff are prohibited from assisting any applicant in preparing the application(s) in e-snaps.

**a. Local HUD Community Planning Development (CPD) Office.** Questions regarding specific program requirements should be directed to the local HUD CPD field office, a directory of which can be found at https://www.hud.gov/program_offices/field_policy_mgt/localoffices.

**b. Training and Resources.** Collaborative Applicants and project applicants that need assistance completing the applications in e-snaps or understanding the program requirements under the CoC Program may access the Rule, training materials, and program resources via https://www.hud.gov/hud-partners/community-coc.

**c. Questions.** CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions up to the deadline of 8:00 PM EST on January 14, 2026. Applicants experiencing technical difficulty should contact CoCNOFO@hud.gov immediately for assistance and document their attempts to obtain assistance.

### 2. Paper Application Waiver Request

Name: HUD Office of Community Planning and Development

Email: CoCNOFO@hud.gov

Phone: (202) 708-4300

HUD Organization: Community Planning and Development

Street: 451 7th Street SW

City: Washington

DC DISTRICT OF COLUMBIA

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 117 of 129
PageID #: 471

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

20410

**HUD Reform Act.** HUD is prohibited from disclosing covered selection information during the selection process. The selection process includes NOFO development and publication, and concludes with the announcement of selected recipients of financial assistance. HUD will not assist you with completing your application.

HUD will only return calls related to paper application requests. All other calls will not be returned.

All other requests or questions regarding this NOFO must be sent via email to CoCNOFO@hud.gov

## B. esnaps.hud.gov

CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions

## C. SAM.gov

If you need help, you can call 866-606-8220 or live chat with the Federal Service Desk.

## D. Debriefing and Appeals

1. After public announcement of awards, HUD will debrief the Collaborative Applicant upon your written request. Submit your written request to the agency contact for program and application requirements in this NOFO. HUD may limit the information provided to protect the integrity of the competition.

2. You may appeal an application decision or a HUD funding decision. Email your appeal to snapsappeals@hud.gov. The subject line of your email must include the CoC Number, "Appeal Notice," and type of appeal, i.e., Participation, HUD Error, or Consolidated Plan Certification. A sample email Subject Line is, Subject: XX-500 – Appeal Notice–Consolidated Plan Certification.

24 CFR 578.35 provides the appeal process options. Sections 578.35(b)(3), (b)(4), (c)(1), and (d)(2) authorize HUD to establish requirements for the form and manner of submissions for appeals by Solo Applicants, applicants with denied or decreased funding, and from competing CoCs. For HUD to consider an appeal under 24 CFR 578.35(b) or (c), the solo project applicant must follow the applicable application process set forth in this NOFO. This NOFO also provides guidance to CoCs and applicants regarding appeals of a jurisdiction's refusal to sign the Consolidated Plan certification for a project under 24 CFR 578.35(c).

Additionally, HUD is clarifying the impact that Solo Applicant appeals will have on HUD signing grant agreements for funds awarded under this NOFO. If HUD receives one or more Solo Applicant appeals from a CoC, HUD will determine the amount of funding the Solo Applicant(s) have requested which may delay signing grant agreements for the awarded project(s) listed at the bottom of the CoC's Priority Listing that has requested funding under this NOFO equal to double the amount requested by the Solo Applicant(s). Refer to the Solo Applicant appeal process in section VIII.D.4 of this NOFO for additional information about the

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 118 of 129 PageID #: 472

Solo Application appeal process.

Finally, for the purposes of the appeals identified in this NOFO where 24 CFR 578.35 requires that all evidence be sent to the CoC and that the CoC respond to evidence, this means that correspondence to the CoC should be addressed to the CoC-designated Collaborative Applicant and all correspondence to HUD from the CoC should be addressed from the CoC's designated Collaborative Applicant. If the CoC has authorized another entity other than the Collaborative Applicant to respond to the appeals identified in this NOFO on its behalf, it should notify HUD by sending an email to snapsappeals@hud.gov.

### 3. Types of Appeals.

The provision at 24 CFR part 578 sets forth the following types of appeals:

    **a. *Solo Applicants.*** A process for eligible project applicants that attempted to participate in their CoC planning process and believe they were denied the right to participate in a reasonable manner.

    **b. *Denied or Decreased Funding.*** A process for eligible applicants that are denied funds by HUD or that requested more funds than HUD awarded to them.

    **c. *Consolidated Plan Certification.*** A process for eligible applicants whose jurisdiction refused to provide a Certification of Consistency with the Consolidated Plan (form HUD-2990).

    **d. *Competing CoCs*.** A process when more than one CoC selects the same geographic area, for eligible applicants of lower-scoring CoCs, to appeal to HUD's decision to fund the competing CoC. Should two or more CoCs select the same geographic codes associated with formula areas during the CoC Program Registration process, HUD will use the competing CoC process provided by 24 CFR 578.35(d).

### 4. Solo Applicant.

Per the Act, "A solo applicant may submit an application to the Secretary for a grant under subsection (a) and be awarded such grant on the same basis as such grants are awarded to other applicants based on the criteria described in section 427, but only if the Secretary determines that the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner. The Secretary may award such grants directly to such applicants in a manner determined to be appropriate by the Secretary."

To apply as a solo applicant, the project applicant must submit a Solo Applicant Project Application in e-snaps by the application submission deadline of January 14, 2026 at 8:00 PM EST. Additionally, the solo applicant, Collaborative Applicant, and HUD must take the following steps (See 24 CFR 578.35 for more information):

    **a. *Written Notice of Intent to Appeal.*** The solo applicant must submit a written notice of intent to appeal, with a copy to the CoC, with their funding application.

    **b.** No later than 30 days after the date that HUD announces the awards, the solo applicant shall submit in writing, with a copy to the Collaborative Applicant, all relevant evidence supporting its claim. The submission shall be emailed to

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 119 of 129
PageID #: 473

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

snapsappeals@hud.gov.

**c.** The CoC has 30 days from the date of its receipt of the solo applicant's evidence to respond to HUD in writing, with a copy to the solo applicant. The submission must be emailed to snapsappeals@hud.gov.

**d.** HUD will notify the solo applicant and the CoC of its decision within 60 days of receipt of the CoC's response.

**e.** If HUD finds that the solo applicant was not permitted to participate in the Continuum of Care planning process in a reasonable manner, then HUD may award a grant to the solo applicant when funds next become available and may direct the Continuum of Care to take remedial steps to ensure reasonable participation in the future. HUD may also reduce the award to the Continuum's applicant(s).

## 5. Denied or Decreased Funding.

Eligible applicants, including project applicants and Collaborative Applicants, that submitted an application to HUD in response to this NOFO, that were either not awarded funds by HUD, or that requested more funds than HUD awarded, may appeal HUD's decision within 45 days after the final funding announcement. HUD will only consider for funding or additional funding applicants the CoC ranked within the CoC's maximum amount available. Collaborative Applicants that submitted CoC planning, and if applicable, UFA Costs project applications can appeal decreased funding if they can demonstrate HUD decreased the submitted project application's funding request to less than 5 percent of the CoC's FPRN or $1,250,000; whichever is less. To appeal HUD's decision, the applicant must submit a written appeal to HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant. The written appeal must include evidence demonstrating HUD error and follow the instructions in this section.

The applicant must submit its written appeal by email to snapsappeals@hud.gov, from the organization's email address on the organization's letterhead and signed by the authorized representative–electronic signatures are acceptable.

**a.** *Denied Funding.* To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in Section VIII.D.6 of this NOFO within 45 days of the date of the funding announcement of the conditional awards from HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant.

**(1)** Projects, including projects for CoC Planning funds and Unified Funding Agency (UFA) costs, could have been rejected by HUD because:

**(a)** the individual project application failed to meet project eligibility, project quality, and project renewal thresholds set forth in this NOFO;

**(b)** the individual project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO, but was ranked in a position where a portion of the grant funds was outside the CoC's maximum award amount, and after HUD reduced its funding to fit within the CoC's maximum award amount, HUD determined that the project was no longer feasible; or

**(c)** HUD did not have sufficient funding to fund all eligible projects ranked within

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 120 of 129 PageID #: 474

the CoC's maximum award amount.

**(2)** For applicants that were fully denied funding for a grant, the applicant must provide evidence that demonstrates HUD error in not awarding the grant. Documentation submitted by the applicant must include:

**(a)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(b)** evidence from the project application supporting the applicant's claim that the project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO; and

**(c)** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO, which resulted in the project not being funded.

**(3)** For applicants that were denied funding due to the individual project's funding being decreased to such a level that the project was no longer feasible, documentation submitted by the applicant must include:

**(a)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(b)** evidence from the project application supporting the applicant's claim that the project application met project eligibility and project quality thresholds set forth in this NOFO;

**(c)** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO which resulted in the project not being funded (e.g., selecting a lower-scored project within the CoC or a similar project from another CoC); and

**(d)** the evidence in section VI.B.1.b of this NOFO as well as evidence for decreased funding in section VIII.D.5.b of this NOFO.

**(4)** For CoCs that were denied funding due to the score of the CoC Application or the score of the project application not being high enough to result in the funding of project(s) within the CoC, and the lower score for one or both application types was the result of HUD error, the CoC may appeal the CoC or project application score and request funding for affected projects. Documentation submitted by the Collaborative Applicant on behalf of the CoC must include evidence of HUD error when calculating the Coc Application or project application score.

**b.** *Decreased Funding.* To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in section VIII.D.2 of this NOFO within 45 days of the date of the final funding announcement of the conditional awards from HUD, with a copy to the authorized representative of the CoC's designated Collaborative Applicant. Documentation submitted by the applicant must include evidence of the HUD error the applicant believes was made.

occurred, and the applicant should have been awarded additional funding, HUD will provide funding from the next available funds and make necessary adjustments by amending the award. HUD will reverse a decision only when the applicant can show that HUD error caused

**Suppl. App. 336**

Case 1:25-cv-00626-MSM-AEM Document 12-3 Filed 11/25/25 Page 121 of 129 PageID #: 475

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

the denial or decrease.

## 6. Written Appeal.

An applicant may appeal to HUD a jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan. The appeals process is as follows:

With the project application that is submitted by the application deadline, the applicant must submit a written appeal. Project applicants may submit its appeal in e-snaps with its project application. When submitted with the project application in e-snaps, the applicant must also email a copy of this appeal to the jurisdiction that denied the Certification of Consistency with the Consolidated Plan and should send a copy to the authorized representative from the CoC's designated Collaborative Applicant, unless it is the Collaborative Applicant that is filing the appeal. Otherwise, the project applicant or Collaborative Applicant may submit the appeal to HUD using one of the methods in section VIII.D of this NOFO. The written appeal must include the following information:

**a.** a copy of the applicant's request to the jurisdiction for the Certification of Consistency with the Consolidated Plan;

**b.** a copy of the jurisdiction's response stating the reasons for denial, including the reasons the proposed project is not consistent with the jurisdiction's Consolidated Plan in accordance with 24 CFR 91.510(c); and

**c.** a statement of the reasons why the applicant believes its project is consistent with the jurisdiction's Consolidated Plan.

The appeal may include additional information the applicant believes supports its appeal, including:

**(1)** any additional communication between the applicant and the jurisdiction regarding the request for certification of consistency; and

**(2)** documentation that identifies to whom within the jurisdiction the evidence was sent and the date on which it was sent.

**d.** *Jurisdiction Response.* The jurisdiction will have 10 days after the receipt of the applicant's written appeal to submit a written response to HUD. The response must be sent by email to snapsappeals@hud.gov on the organization's letterhead, with a copy to the project applicant and the authorized representative of the CoC's designated Collaborative Applicant. The response must include the following information:

**(1)** an explanation of the reasons originally given for refusing to provide the Certification of Consistency with the Consolidated Plan; and

**(2)** written rebuttal to any claims made by the applicant in the written appeal.

**e.** *HUD Decision and Notification of Decision.*

**(1)** HUD will review the submissions and will provide written notification, by email, of its decision to the applicant and the jurisdiction, with a copy to the authorized representative from the CoC's designated Collaborative Applicant within 45 days of the date of the receipt of the jurisdiction's response. In making its decision, HUD will consider whether the applicant submitted the request to the appropriate certifying

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 122 of 129 PageID #: 476

jurisdiction and the reasonableness of the jurisdiction's refusal to provide the certificate.

**(2)** If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was reasonable, then HUD will automatically reject the project application. If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was not reasonable, then HUD will consider the project application for funding in the respective FY CoC Program Competition in accordance with the review standards set forth in this NOFO.

**(3)** If the jurisdiction failed to provide written reasons for refusal, including the reasons why the project is not consistent with the jurisdiction's Consolidated Plan in its initial response to the applicant's request for a certification, HUD will find for the applicant without further inquiry or response from the political jurisdiction.

**(4)** HUD will provide written notification of its decision within 45 days of the date of HUD's receipt of the jurisdiction's response. Where the jurisdiction failed to provide a written response, HUD will provide written notification of its decision within 55 days of the date of HUD's receipt of the project applicant's response.

## E. Applicant Experience Survey

You are encouraged to provide feedback on your application experience by completing our Applicant Experience Survey. Your feedback is optional; you are not required to provide personal information. HUD may use your feedback to improve future NOFOs. Your feedback has no impact on funding decisions.

## F. Other Online Resources

You are encouraged to review the online resources for context on some of the NOFO requirements.

# APPENDIX

Appendix

Appendix I Definitions

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 124 of 129 PageID #: 478

# APPENDIX

## Appendix I. Definitions

### 1. Standard Definitions

For standard definitions not listed below, refer to 2 CFR 200.1.

**Affirmatively Furthering Fair Housing (AFFH)** - statutory obligation to affirmatively further the purposes and policies of the Fair Housing Act (see also 24 CFR 5.151, as amended by 90 FR 11020).

**Authorized Organization Representative (AOR)** is the official within your organization with the legal authority to: give assurances, make commitments, submit your application to HUD, enter into agreements, and execute such documents on behalf of your organization. The AOR is not necessarily the Project Director. The AOR has defined privileges within Grants.gov.

**Consolidated Plan** has the same meaning as defined at 24 CFR part 91.

**Eligibility requirements** are mandatory requirements for an application to be considered for funding.

**Grants.gov** is the website serving as the Federal government's central portal for searching and applying for federal financial assistance.

**Opportunity Zone (OZs)** are defined in 26 U.S.C. 1400Z-1. In general, OZs are census tracts located in low-income communities where new investments, under certain conditions, may be eligible for preferential tax treatment.

**Primary Point of Contact (PPOC)** is the person HUD may contact with questions about the application submitted. The PPOC is listed in item 8F on the SF-424.

**System for Award Management (SAM)** has the same meaning as 2 CFR 25.100(b).

**Threshold Requirements** are eligibility requirements you must meet before HUD advances to a merit review of your application.

**Unique Entity Identifier (UEI)** has the same meaning as 2 CFR 25.100(a).

### 2. Program Definitions.

Regulatory citations are provided below so applicants can refer to specific areas of the Rule. Projects awarded CoC Program funds are subject to the program regulations as they may be amended from time to time. However, YHDP Renewal and YHDP Replacement projects and awards are subject to CoC Program regulations except as otherwise provided in this NOFO.

The definitions and concepts contained in this section include terms that are important for all applicants to understand in order to operate projects under this NOFO.

> **a.** *The following terms are defined in 24 CFR 578.* Applicants must refer to the Rule for the definitions contained in this section.
>
> **(1)** Annual Renewal Amount (ARA)
> **(2)** Applicant

I. Basic Information   II. Eligibility   III. Program Description   IV. Application Contents and Format   V. Application Review Information   VI. Submission Requirements and Deadlines   VII. Post-Award Requirements and Administration   VIII. Contact and Support   Appendix

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 125 of 129 PageID #: 479

**(3)** Centralized or Coordinated Assessment System
**(4)** Chronically Homeless
**(5)** Collaborative Applicant
**(6)** Continuum of Care
**(7)** Consolidated Plan
**(8)** Establishing and Operating the CoC. -24 CFR 578.5 and 24 CFR 578.7 detail the requirements for the establishment of a CoC and its responsibilities.
**(9)** Final Pro Rata Need (FPRN)
**(10)** High Performing Community (HPC)
**(11)** Homeless Management Information System (HMIS)
**(12)** HMIS Lead
**(13)** Homeless. - Although not reflected in the regulation, section 605 of Violence Against Women Act Reauthorization Act of 2022 amended Section 103(b) of the Act and requires HUD to consider certain individuals and families as homeless. This amendment took effect on October 1, 2022. Notwithstanding anything to the contrary contained elsewhere in this NOFO, where 578.3 paragraph (4) is referenced,
**(14)** Permanent Housing
**(15)** Permanent Supportive Housing
**(16)** Preliminary Pro Rata Need (PPRN)
**(17)** Private Nonprofit Organization
**(18)** Program Participant
**(19)** Project
**(20)** Rapid Rehousing (RRH).
**(21)** Recipient
**(22)** Subrecipient
**(23)** Transitional Housing
**(24)** Unified Funding Agency
**(25)** Victim Service Provider

**b.** ***CoC Program NOFO Terms***. The following terms may be used during the administration of CoC Program grants. The definitions and specific concepts pertaining to these terms are further explained below:

> **(1) Annual Renewal Demand (ARD) (24 CFR 578.17(b)(2)).** The total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items (BLIs) based on FMR changes. HUD will calculate the ARD by combining the total amount of funds requested by eligible renewal projects in each FY funding opportunity, including:

>> **(a)** renewal projects approved and ranked on the Renewal Project Listing;
>> **(b)** renewal project amount(s) that were reallocated as recorded on the reduced or eliminated reallocation forms of the CoC Project Listing;
>> **(c)** YHDP renewal projects on the YHDP Renewal Project Listing; and
>> **(d)** YHDP Replacement projects, including YHDP Reallocation projects, on the YHDP Reallocation and Replacement Project Listing. YHDP Replacement projects are eligible for funding through the replacement of YHDP Renewal projects. The YHDP Replacement application must request the same amount of funding that is

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 126 of 129
PageID #: 480

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

eligible for YHDP Renewal.

**(2) CoC Merger.** The CoC merger is a process where two or more CoCs voluntarily agree to merge the entire geographic area of all CoCs into one larger CoC. HUD strongly encourages CoCs that struggle with capacity to merge with a neighboring CoC or Balance of State CoC during each fiscal year's CoC Program Registration process. To encourage CoC mergers and mitigate the potential adverse scoring implications that may occur when a high performing CoC merges with one or more lower-performing CoC(s), HUD will award 5 bonus points to the FY 2025 CoC Application Score for CoCs that registered as a merged after the FY 2024 CoC Program Registration deadline.

**(3) Formula Area**. Defined in the Indian Housing Block Grant Program at 24 CFR 1000.302.

**(4) CoC Geographic Area.** 24 CFR 578.5 requires representatives from relevant organizations within a geographic area to establish a CoC to carry out the duties within the geographic area. The boundaries of identified CoC geographic areas cannot overlap, and any overlapping geographies are considered Competing CoCs. HUD follows the process at 24 CFR 578.35(d) to determine which CoC HUD will fund in the case of CoC geographic areas that overlap.

**(5) Homelessness and Human Trafficking.** HUD is clarifying that persons who are fleeing or attempting to flee human trafficking may qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and may be eligible for certain forms of homeless assistance under the CoC Program, subject to other restrictions that may apply. HUD considers human trafficking, including sex trafficking, to be "other dangerous or life-threatening conditions that relate to violence against the individual or family member" under paragraphs (1) and (4) of the definition of homeless at 24 CFR 578.3 and "other dangerous, traumatic, or life-threatening conditions related to the violence against the individual or a family member in the individual's or family's current housing situation" under section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(6) Host Home and Kinship Care.** Host Home and Kinship Care is limited to YHDP Renewal and replacement grants. This is a model of housing where a family agrees to permit a youth program participant to reside with them. Recognizing the addition of another person in the home may increase costs to the family, HUD will consider YHDP Replacement project applications that propose to house youth with families and subsidize the additional costs attributable to housing the youth, including recruitment of hosts. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination for HUD review upon request. The residence is in a community-based setting and the family may be related to youth program participants with a time-limited or unlimited length of stay.

**(7) Housing Inventory Count (HIC).** A complete listing of the CoC's HUD and non-

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 127 of 129 PageID #: 481

HUD funded beds dedicated to individuals and families experiencing homelessness in the CoC's geographic area.

**(8) Reservation and Trust Land.** For purposes of this Notice, Reservations and Trust Land are types of formula areas as specifically delineated under HUD's IHBG program at 24 CFR 1000.302.

**(9) Rural Area.** For this competition a rural area is a county which:

**(a)** has no part of it within an area designated as a standard metropolitan statistical area by the Office of Management and Budget;

**(b)** is within an area designated as a metropolitan statistical area or considered as part of a metropolitan statistical area and at least 75 percent of its population is local on U.S. Census blocks classified as non-urban; or

**(c)** is located in a state that has a population density of less than 30 persons per square mile (as reported in the most recent decennial census), and of which at least 1.25 percent of the total acreage of such State is under Federal jurisdiction, provided that no metropolitan city in such State is the sole beneficiary of the grant amounts awarded under this NOFO. A metropolitan city means a city that was classified as a metropolitan city under section 102(a) of the Housing and Community Development Act of 1974 (42. U.S.C. 5302(a)) for the fiscal year immediately preceding the fiscal year for which Emergency Solutions Grants program funds are made available.

**(10) Shared Housing.** YHDP Renewal, YHDP Replacement and YHDP Reallocation grants may provide rental assistance for shared housing where youth may reside with family or another unrelated person. The youth leases from the property owner and shares the unit with the family or unrelated person. The unit may be a house or an apartment.

**(a)** YHDP rental assistance cannot be provided to a youth to reside in a unit occupied by an immediate family member. For this NOFO "immediate family member" includes parents, grandparents, and legal guardians.

**(b)** YHDP rental assistance cannot be provided to a youth in a shared housing unit if the landlord is an immediate family member of the youth.

**(c)** YHDP rental assistance may only be provided to a youth if the youth can enter into a valid, binding, and enforceable lease under applicable state or local law. This includes a legally appointed guardian executing a lease on behalf of a youth or an emancipated youth entering into a lease.

**(d)** YHDP Renewal and replacement grants may provide a shared housing option for youth program participants who are not part of a household but are interested in sharing a housing unit with a roommate unrelated to the program participant.

**(11) Special NOFO.** A competition administered under the Continuum of Care Supplemental to Address Unsheltered and Rural Homelessness designed to target efforts to reduce unsheltered homelessness in communities with very high levels of unsheltered homelessness and homelessness in rural areas. Funding through this

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 12-3    Filed 11/25/25    Page 128 of 129 PageID #: 482

Competition was awarded through either the Unsheltered Set Aside or the Rural Set Aside.

**(12) YHDP Replacement Process, including YHDP Reallocation.** The YHDP Replacement process occurs when: (1) a CoC reallocates a YHDP Renewal project to create one or more new YHDP project(s) that has the same recipient referred to as YHDP Replacement in this NOFO; (2) a CoC is reallocating a YHDP Renewal project to create one or more new projects with a new recipient referred to as YHDP Reallocation in this NOFO; or (3) a CoC is reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process. For more information on YHDP Reallocation, see sections IV.D.1.i of this NOFO.

Appendix 2: Funding Opportunity Goals

The CoC Program is designed to promote a community-wide commitment to the goal of ending homelessness and to provide funding for efforts by nonprofit providers, States, Indian Tribes or Tribally Designated Housing Entities, and local governments to quickly rehouse individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma caused by homelessness. The CoC Program promotes access to and the effective utilization of mainstream programs by homeless individuals and families to optimize self-sufficiency among those experiencing homelessness. HUD hopes to accomplish the following goals through the collaborative efforts of applicants for CoC Program funding and local CoC stakeholders:

## 1. Ending the Crisis of Homelessness on Our Streets

The number of people experiencing unsheltered homelessness is at an all-time high. People living on the streets and in encampments have high rates of substance use disorder and mental illness. According to a nationwide study, 75% of people experiencing unsheltered homelessness report a substance use disorder and 78% report a mental health condition. The study found that substance use disorder contributed to the loss of housing for 50% of the unsheltered population, and mental health conditions contributed to loss of housing for 51% of the population.

CoCs should direct resources towards outreach, intervention, and assistance that helps people regain self-sufficiency. Consistent with Executive Order 14321 "Ending Crime and Disorder on America's Streets," CoCs should work with law enforcement, first responders, and their state and local governments to reduce encampments, public camping, and public drug use in order to address barriers to maintaining housing and increasing self-sufficiency.

## 2. Prioritizing Treatment and Recovery.

CoCs should prioritize projects that provide the treatment and services people need to recover and regain self-sufficiency including on-site behavioral health treatment, robust wraparound supportive services, and participation requirements. This NOFO devotes resources to Transitional Housing programs and Supportive Service Only projects with the goal of improving health and long-term economic independence for the homeless. HUD encourages CoCs to utilize the full array of mainstream programs and local and private resources to provide housing and healthcare needed to maintain safe and stable housing.

## 3. Advancing Public Safety

Case 1:25-cv-00626-MSM-AEM   Document 12-3   Filed 11/25/25   Page 129 of 129 PageID #: 483

Safety and security for all members of the public, especially those living unsheltered, is essential to promoting a community-wide commitment to the goal of ending homelessness. CoCs should cooperate with law enforcement to advance public safety for the entire community impacted by homelessness. No one should sleep outside on the street or in dangerous encampments, and everyone should be able to enjoy public spaces safely. HUD encourages CoCs to assist in preventing and minimizing the trauma associated with living on the streets or in encampments, especially for women and youth that are the victims of sexual assault and trafficking. Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

First responders are critical partners in engaging people into treatment and services and protecting public order and vulnerable individuals experiencing homelessness. In *Grants Pass v. Johnson,* the Supreme Court of the United States upheld the authority of local governments to prohibit public camping.

### 4. Promoting Self-Sufficiency.

One of the primary purposes of the CoC Program is to optimize self-sufficiency. CoCs should partner with workforce development centers, employers, childcare, and other supportive service providers to increase employment and employment income for program participants. CoCs should prioritize projects that help lead to long-term economic independence for individuals and families to exit homelessness and prevent future returns to homelessness.

### 5. Improving Outcomes.

CoCs should review all projects eligible for renewal under this NOFO to determine their effectiveness in reducing homelessness and increasing self-sufficiency. CoCs should prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

This NOFO includes several options to help CoCs improve their effectiveness, including reallocation, expansion, and transition grants, and CoC's should take advantage of these options to expand the pool of providers, including faith-based providers, and improve the overall performance of the CoC.

### 6. Minimizing Trauma.

One of the purposes of the CoC program is to minimize the trauma associated with homelessness. CoCs should encourage providers to provide trauma informed care and ensure participant safety in programs, especially for survivors of domestic violence, dating violence, sexual assault, and stalking. Women experiencing homelessness or domestic violence should have access to safe, single-sex spaces.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF RACHEL STUCKER |
| Defendants. | |

1

## DECLARATION OF RACHEL STUCKER

I, Rachel Stucker, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Executive Director at Housing Alliance Delaware, Inc., a statewide nonprofit in Delaware.

2.      I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Housing Alliance Delaware (HAD) and CoC Grantee staff, or from my review of relevant documents and information.

3.      Housing Alliance Delaware, Inc. is the Collaborative Applicant for the Delaware Continuum of Care (CoC).

4.      Through a memorandum of understanding with the Delaware Continuum of Care, Housing Alliance Delaware, serves as the Collaborative Applicant and is responsible for coordinating and completing the submission of the HUD CoC funding application on behalf of the Delaware CoC and the nonprofits in Delaware that receive CoC funding to operate homeless assistance programs.

5.      The Delaware CoC is a statewide group that has a governance charter that outlines the responsibilities of its members.

        a.      The Delaware CoC has a volunteer Board made up of 20 members. Board members include representatives from state government, county government, public housing authorities, nonprofit homeless services providers, educational institutions, community development organizations, legal aid, domestic violence serving organizations, the local VA medical center, and housing developers and managers. In addition, the CoC has a total of 238 general

**Suppl. App. 347**

members, 32 voting members, 4 subcommittees, a funding committee that recommends local CoC funding decisions to the CoC Board.

6. Currently there are 5 members of the CoC funding committee. They volunteer many hours of time to review project applications and make funding recommendations, meeting multiple times. Currently there are 17 CoC Board members who are "non-conflicted" and who participate in several meetings to finalize the Delaware CoC's CoC funding request from HUD and consolidated application. Currently there are 11 nonprofit organizations (including Housing Alliance DE) that receive CoC funding from HUD to operate a total of 27 Joint Transitional Rapid Re-housing, Rapid Re-housing, Permanent Supportive Housing, HMIS, Coordinated Entry and planning programs in DE.

7. In order to apply for CoC funding each of these applicants: tracks program outcomes in a data system throughout the year and reports them to the CoC, conducts data clean-up activities in HMIS, completes project applications for their programs and submits them to the CoC, completes ESNAPS project applications and submits them to HUD, attends technical assistance meetings with HAD staff, complies with HUD regulations regarding eligible costs and activities, grant draws, and grant agreements throughout the year, and are evaluated on their program outcomes by the funding committee and the CoC Board. This process usually begins each year in/around May, and concludes in/around October.

8. As the Collaborative Applicant, HAD's role includes: Reviewing project outcomes data, developing and providing renewal project applicants with applications, developing and providing the public with new project applications through the release of an RFP, hosting a public funding meeting for interested providers, providing all project application materials and details to the CoC funding committee and Board, hosting and facilitating meetings of the CoC funding

**Suppl. App. 348**

committee and Board, contracting with a consultant to support the technical, compliance, and strategic components of the process, drafting all responses to the consolidated application, managing all project submissions in HUD's online portal "ESNAPS," which includes reviewing all project applications, ranking them, providing agencies with technical assistance, and submitting them according to HUD's requirements.

9. Throughout the year, HAD also hosts and facilitates no less than 15 CoC Board, member and committee meetings, manages the membership and ensures compliance with the Delaware CoC Charter, conducts the annual Point in Time Count of Homelessness in DE, hosts various trainings for homeless service provider staff, and manages Delaware's HMIS (Homeless Management Information System) which is used by all HUD CoC funded projects for data collection and performance monitoring.

10. Housing Alliance Delaware, formerly known as the Homeless Planning Council of Delaware, has played this role for the statewide Delaware CoC for more than 15 years. HAD's current Executive Director has been directly involved in the CoC funding process since 2016, and HAD's Associate Director has been directly involved in the CoC funding process since 2020.

11. HAD's role as Collaborative Applicant is one of the many things the organization does. HAD staff, CoC funding committee and Board members, and CoC grantees (other nonprofits that apply for and receive the HUD CoC funds) plan their agency's activities assuming a fairly consistent and timely funding process. The ability for CoC grantees to provide services to the people and families they help relies on a fairly consistent process. For example, in Delaware there is a grantee whose current grants ends in January 2026. Normally, they can reasonably expect another grant award, and can therefor float the costs of operation until their next grant agreement with HUD, and then reimburse themselves for expenses. Without the reasonable expectation of

**Suppl. App. 349**

another grant award, this grantee has already reduced the number of people with disabilities that they are providing housing and services to.

12.     I understand that the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, represents a significant departure from recent past practices and will cause serious harm here in Delaware.

13.     This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

14.     "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

   a.     This means that 70% of the DE CoC's anticipated funding amount is at risk of being lost – a total of approximately $8million in funding that is currently paying for direct client assistance, including rental assistance for more than 400 households, and case management staff who provide direct services to clients.

   b.     In the past, only 5 – 15% of a CoC's anticipated award was at risk of being lost.

   c.     This change will mean that many organizations will have to stop providing services to people and families within the next 4-8 weeks to prepare for a loss of funds. More specifically, organizations that enter into 12-month leases with landlords on behalf of clients are considering having to not renew leases. These clients will lose their current housing. Other organizations that provide rental subsidies to people and families will have to stop providing that help, causing people and families to be immediately at risk of eviction, displacement, and returning to homelessness.

**Suppl. App. 350**

15.     "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Pg. 15.

    a.    Currently the Delaware CoC's HUD funding award includes approx. $11million in permanent housing projects, as defined above. This new rule means that approx. $8million that support the operations of current projects will be lost.

    b.    In the past, when HUD made changes in policy priorities or funding priorities, they provided advanced notice to communities, and in some cases technical assistance, to allow communities to strategically and intentionally make changes to meet new priorities. This current NOFO automatically de-funds the majority of the CoC programs that are currently operating in Delaware.

    c.    Nonprofit applicants will lose hundreds of thousands, and sometimes, millions of dollars very suddenly. This will cause direct harm to the clients that they serve. People and families with histories of homelessness and disabilities will lose their housing. CoC-funded organizations will have to lay off staff. There will be no time to ensure that clients have a smooth transition to alternative housing opportunities or services due to the loss of funding to retain critical direct service staff. Many people are very likely to end up back on the streets or in homeless shelters. Additionally, private landlords who relied on these dollars to support their tenants are likely to be forced to file evictions and face a loss in income as a result.

**Suppl. App. 351**

16.     HUD's new gender ideology provisions are highly problematic for a number of reasons. From a compliance perspective, it is not possible for projects to comply with new requirements if those requirements include a look back. In other words, if a project applicant complied with prior HUD expectations and rules regarding gender identity, they would be punished in this NOFO even if they agreed to the new terms. Importantly, this NOFO asks projects to operate in a manner that clearly violates HUD's current and existing Equal Access rule. Furthermore, housing projects that operate in Delaware must comply with Delaware's fair housing laws, which directly contradicts with what is outlined in this NOFO, as Delaware's fair housing law includes protections against discrimination based on gender identity.

a.     "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." Pg. 55

b.     "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons … (h) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." Pg. 65.

c.     "Awards made under this NOFO will not be used to … conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." Pg. 108

**Suppl. App. 352**

d.  "You must comply with these applicable provisions … Implementing Presidential Executive Actions" like EO "14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government") Pg. 108

17.  This NOFO includes additional terms related to policing that put Delaware's projects, nonprofits, and the clients being served at risk. For example, HUD is making funding decisions based on the extent to which Delaware has specific statewide drug use and vagrancy laws, as well as enforcement mechanisms, that are out of the control of the CoC, HAD and the providers.

18.  Even if these conditions were not themselves problematic, immediate compliance with dramatically different conditions will require a complete overhaul of our processes, those of our applicants, and coordination with other entities in Delaware that will require time, money, and effort to comply. This is not feasible to do by Jan. 14.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 22nd day of November 2025 in Wilmington, Delaware.

/s/ *Rachel Stucker*
Rachel Stucker
Executive Director
Housing Alliance Delaware, Inc.

8

**Suppl. App. 353**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF WINIFRED KAYE SMITH |
| Defendants. | |

1

## <u>DECLARATION OF WINIFRED (WENDY) KAYE SMITH</u>

I, Winifred (Wendy) Kaye Smith, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Deputy Executive Director of Housing Programs at Kentucky Housing Corporation (KHC) for the Commonwealth of Kentucky.

2.      I have 29 years' experience in affordable housing and community development. I joined KHC in 2013, first serving as a contractor performing strategic planning, policy development, program and process improvement, and special projects management. I became KHC's Deputy Executive Director of Housing Programs in 2018. Prior to joining KHC, I worked as a freelance consultant providing technical assistance and training for U.S. Department of Housing and Urban Development (HUD) Community Planning and Development programs, led a community development corporation in Dayton, Ohio, and worked as a community organizer in Cincinnati, Ohio. I earned a bachelor's degree in interdisciplinary studies focused on urban studies and social work from Miami University in Ohio and a master's in community planning from the University of Cincinnati.

3.      KHC's overall role in Kentucky: KHC serves as Kentucky's state housing finance agency. KRS 198A.040. KHC was created by legislation in 1972 as a de jure municipal corporation and political subdivision of the Commonwealth of Kentucky "to perform essential governmental and public functions and purposes in improving and otherwise promoting the health and general welfare of the people by the production of residential housing in Kentucky." KRS 198A.030(2). Under KRS 198A.040(31), KHC is authorized "to perform the following activities for lenders, holders, housing finance agencies, or other third-party entities, who are located within or without the boundaries of the Commonwealth: (a) Service mortgage loans; (b) Administer federal or state

**Suppl. App. 355**

program contracts; and (c) Perform other housing activities to facilitate the delivery or preservation of affordable housing."

4.     KHC is governed by a board of directors whose appointed members are all appointed by the Governor. KRS 198A.030(3). The Governor also designates one of his appointments to be the chairman of the board of directors. KRS 198A.030(7).

5.     KHC's programs first focused on mortgages for first-time and lower income homebuyers and has expanded to include rental development, rental assistance, homeownership repair and development, homelessness programs, home weatherization, programs to help homeowners in the aftermath of the 2008 housing crisis and Great Recession, and programs to help homeowners, renters, and homeless Kentuckians during the Covid-19 pandemic.

6.     I am familiar with the information in the statements set forth below either through personal knowledge, consultation with KHC staff, or from my review of relevant documents and information. Specifically, I am the executive leader over KHC's Homelessness Programs which include but are not limited to the U.S. Department of Housing and Urban Development ("HUD") Continuum of Care ("CoC") Program. I work regularly with KHC's department managing director, assistant director, managers, and technical staff who administer and implement CoC grants.

7.     In my role as Deputy Executive Director of Housing Programs, I lead a broad range of federal and state housing programs including affordable multifamily rental development, rent assistance for roughly 26,000 households each month, homeownership opportunities, and housing solutions for homeless Kentuckians. Federal programs under my purview include the following: The HUD Continuum of Care Program, HUD Emergency Solutions Grant Program ("ESG"), HUD HOME Investment Partnership ("HOME") Program, HUD HOME American Rescue Plan Program ("HOME-ARP"), HUD Housing for Persons with AIDS, Housing Trust Fund, Low-

3                                                          **Suppl. App. 356**

Income Housing Tax Credits, Tax-Exempt Bond Multifamily Financing, the U.S. Department of Energy ("DOE") Weatherization Assistance Program, the U. S. Department of Health and Human Services ("HHS") Low Income Home Energy Assistance Program ("LIHEAP"), HUD Section 8 Housing Choice Voucher Program, HUD Section 8 Project-Based Rental Assistance Program, HUD 811 Rental Assistance Program, and the HUD Preservation and Reinvestment Initiative for Community Enhancement program. State programs under my leadership include the Kentucky Affordable Housing Trust Fund and the Kentucky Rural Housing Trust Fund. In addition, I oversee compliance, asset management, and loan servicing for KHC's affordable multifamily housing portfolio. During the Covid-19 pandemic, I led KHC's deployment of more than $300M in new, one-time relief funds from Treasury and HUD.

8. The impacted CoC is the Kentucky Balance of State Continuum of Care (KY BoS CoC) - CoC#: KY-500. KHC's roles in the CoC include collaborative applicant, planning agency, HMIS lead, and direct grantee of 33 project grants eligible to apply for renewal under the FY 2025 CoC Notice of Funding Opportunity ("NOFO"). In addition to these direct roles with the CoC, KHC marshals its other programs to align with the work of the CoC, including the Emergency Solutions Grant Program, Section 8 Housing Choice Voucher Program, HOME-ARP Program, Low-Income Housing Tax Credits, and a modest amount of discretionary grant and match funds.

9. The KY BoS CoC's geographic area includes 118 of Kentucky's 120 counties. Kentucky's two most populated counties (Fayette and Jefferson) each have their own CoC and are not included in the KY BoS CoC. Based on 2024 annual estimates of population published by the U.S. Census Bureau, the 118-county BoS has a population of approximately 3.4 million. Fayette and Jefferson Counties, by comparison, have a combined population estimate of approximately 1.1 million. One hundred (100) of the 118 counties comprising the KY BoS CoC meet the

**Suppl. App. 357**

definition of a "rural area" for purposes of the FY 2025 CoC Competition as defined in the FY 2025 CoC NOFO. The geographic area covered by the KY BoS CoC includes mid-sized counties near universities and colleges, supportive services, and hospitals, while many are in geographically isolated areas where access to employment, health care, and services is limited. The KY BoS CoC includes five of Kentucky's six congressional districts.

10.     The membership of the KY BoS CoC is comprised of community stakeholders working to or interested in working to prevent and end homelessness across the CoC's geographic area. Membership includes individuals and organizations such as non-profit emergency shelter and housing assistance providers, victim service providers, veteran service organizations, school systems, health care providers, such as public health departments and community mental health centers, faith-based organizations, and people with lived experience of homelessness. Membership includes both CoC-funded and non-funded organizations. Examples of membership organizations includes, but is not limited to, several Community Action agencies, Salvation Army agencies, Volunteers of America organizations, victim service providers funded by the Violence Against Women Act (VAWA) and the Victims of Crime Act (VOCA), and substance use treatment and recovery programs. Member organizations serve people experiencing or at risk of homelessness, including individuals, families with children, and unaccompanied youth; people with disabilities including physical, mental, and behavioral; people who are experiencing homelessness for the first time as well as people considered chronically homeless; people who are fleeing or attempting to flee domestic violence; and veterans. Members elect regional representatives annually to serve on the CoC's Advisory Board. The CoC Advisory Board also includes elected at-large members representing a broad cross section of community interests. The KY BoS CoC currently has 71 projects eligible for renewal through the FY 2025 CoC competition. These projects include: 33

**Suppl. App. 358**

Permanent Supportive Housing (PSH) projects; 14 Rapid Rehousing (RRH) projects; 3 Joint Transitional Housing (TH)-RRH projects; 3 TH projects including one for victims of domestic violence and two for youth between the ages of 18-24; 16 Supportive Services Only (SSO) projects including those dedicated to street outreach or coordinated entry; and 2 grants for HMIS. Fifty-nine (59) of these seventy-one (71) projects were funded under the FY 2024 and FY 2025 NOFO through a highly competitive process and have grant terms of one year. The remaining twelve (12) projects were funded through the 2022 CoC Supplemental to Address Unsheltered and Rural Homelessness ("Special NOFO" or "SNOFO"). These NOFO projects were also awarded by HUD through a highly competitive national competition and have an initial grant term of 3 years. These 12 projects are eligible for renewal for a 12-month grant term through the FY 2025 funding round. In addition, the CoC has 8 SNOFO-funded projects (2 PSH, 1 RRH, 4 SSO, and 1 HMIS) that will be eligible for renewal in FY 2026.

11.     The current award amount for the seventy-one (71) projects eligible to renew through the FY 2025 funding round is $21,511,505. This amount is considered the CoC's Annual Renewal Demand (ARD) for FY 2025. PSH, which is housing and supportive services for high-need persons experiencing homeless with disabilities accounts for $7,973,676 (37%) of the FY 2025 ARD. RRH, which is tenant-based rental assistance limited, just like TH, to no more than 24 months coupled with supportive services, accounts for $7,439,260 (35%) of the FY 2025 ARD. Joint TH-RRH projects, which combine the TH and RRH components into the same project comprise $2,456,703 (11%) of the FY 2025 ARD followed by $558,667 for TH (3%), $2,658,497 (12%) for SSO projects, and $424,702 (2%) for HMIS projects.

12.     The following are examples of CoC-funded projects:

**Suppl. App. 359**

- *Welcome House PSH*—a PSH project providing tenant-based rental assistance and supportive services to approximately eleven (11) households at a time in the Northern Kentucky area. One member of each household must have a disability to be eligible. Individuals and families experiencing chronic homelessness are prioritized. Rental assistance and services are not time limited;

- *ZeroV DV Bonus RRH*—a RRH project providing rental assistance and supportive services to victims of domestic violence and their families. While defined as "permanent housing" by the HEARTH Act and the CoC Interim Rule, assistance is limited to 24 months. However, the intent is to help the household maintain their housing by tapering down CoC-funded assistance while the household works to increase their share of the rent payment so that by the end of the 24-month term, they are able to maintain the housing permanently. The project can serve approximately 96 households at any given time in any of the 118-counties comprising the KY BoS CoC; and

- *KCEOC-COC YHDP TH-Ryan's Place Project*—a TH project serving unaccompanied youth experiencing homelessness between the ages of 18-24 in Knox County, KY—a county with the 4th highest poverty rate in the state and the highest rate of homelessness in the entire state. The site-based project can serve 8 youth at any given time in shared housing.

13.    The KY BoS CoC has built a system that is able to move people experiencing homelessness quickly into permanent housing and to provide the services necessary in a client-centered and housing-focused manner to reduce the number of households returning to homelessness. While the need continues to outpace available resources, the CoC has expanded its ability to provide tenant-based rental assistance and related services in more counties across the

7                                                                                        **Suppl. App. 360**

CoC. CoC's are required to collect client-level data in its HMIS. This data is reported to HUD as part of the System Performance Measures collected and evaluated for all CoCs. Measure *7b.1: Permanent Housing Destinations or Retention* measures the retention of or positive exit from PSH into other non-CoC funded permanent housing. During the 12-month reporting period between 10/1/2023 and 9/30/2024, 98.4% (964 people) retained their PSH or exited to other permanent housing destinations. *Measure 2: Returns to Homelessness* measures clients who exit CoC programs to a permanent housing destination to determine how many return to homelessness at any point up to two-years after leaving the program. Of those who exited permanent housing programs (e.g., PSH or RRH) to other permanent housing during the same 12-month reporting period, only 9% returned to homelessness after two years. This is compared to a return rate of 16% for those who exited from emergency shelters.

14.    CoC renewal project applicants must complete detailed applications for CoC funding using HUD's online application platform called e-snaps. Projects seeking renewal funding must update information on project descriptions, agency capacity, detailed budgets, match sources and documentation, and complete and attach numerous standard federal forms relating to program compliance and regulations. New project applicants must also complete detailed applications in e-snaps describing the entire project design, budget, implementation plan, and all required forms and attachments. Prior to submitting applications to HUD, applicants must also complete various steps as part of the HUD-mandated local CoC competition. The KY BoS CoC requests numerous pieces of information outside of e-snaps, including quantitative data generated from HMIS to evaluate client level outcomes as well as various narrative responses explaining how the project has or will meet various expectations of HUD and the CoC. Applicants must respond within the timeframe designated by the KY BoS CoC, which is determined based on HUD's final submission deadline

**Suppl. App. 361**

for CoCs as set forth in the NOFO. HUD requires that CoCs set local competition deadlines no less than 30 days prior to the HUD final submission deadline.

15.    For reference, the FY 2024 NOFO was released by HUD on July 31, 2024. During the next three months, KHC facilitated meetings of the CoC Scoring and Ranking Committee; facilitated a special CoC board meeting to review and approve application guidelines for local competitions; provided technical assistance to local applicants; received, reviewed, and scored multi-faceted project applications; combined all applications into a consolidated application; and submitted the consolidated application to HUD on October 30, 2024. In contrast, the FY 2025 CoC NOFO was published by HUD on November 13, 2025 and has set the final submission deadline to HUD as January 14, 2026. This significantly reduces the timeline for development of a competitive application and will require project applicants to submit all parts of their applications to the CoC no later than December 15, 2025.

16.    Although some previous NOFOs have required as few as 60 days to respond in the past, the FY 2025 NOFO differs significantly in some critical ways. Firstly, the issuance of the NOFO was not expected, given the indications in the FY 2024 NOFO that the FY 2025 process would be focused on renewals. The timing of the NOFO also presents major challenges, with the preparation and response period occurring during a major holiday season, when organizations that apply for funding, including faith-based organizations, are typically extremely busy. As of November 21, 2025, the "Project Application Detailed Instructions," as well as the actual project application documents, are not available in the HUD CoC Program Application and Grants Management system ("*e-snaps*"), which provide critical information necessary to complete the applications. The information provided through *e-snaps* is used by applicants to complete the application to the CoC, which under the FY 2025 NOFO is due on December 15, 2025.

**Suppl. App. 362**

17. Additionally, the terms of the FY 2025 NOFO represent the most significant philosophical and programmatic changes since the CoC program took effect in its current form in 2012. These changes present the challenge of not only preparing and submitting an application on a compressed timeline, but also re-designing existing projects in a matter of weeks when organizations were expecting to have their projects renewed.

18. With regard to KHC's role in the KY BoS CoC, the roles and responsibilities of all CoCs are codified by the HEARTH Act and enumerated in the CoC Interim Rule (24 CFR Part 578). CoCs must designate an agency to serve as its "collaborative applicant" responsible for submitting the Consolidated Application to HUD for CoC Program funding on behalf of the entire CoC. The Consolidated Application includes various elements required by HUD including individual project applications and a comprehensive application detailing the CoC's system-level outcomes and ongoing plans to advance the goals of the HEARTH Act. The collaborative applicant is the only agency allowed to apply for CoC Planning funds, which are used to carry out the responsibilities of the CoC as outlined in the CoC Interim Rule. KHC is the collaborative applicant for the KY BoS CoC as designated by the membership of the CoC.

19. In this role, KHC coordinates and oversees the local application process for CoC funding and submits the Consolidated Application on behalf of the CoC to HUD in accordance with HUD's NOFO requirements. As the collaborative applicant, KHC also provides one-on-one and group technical assistance to CoC member agencies preparing project applications in designing their projects, determining project types, budgets, and staffing needs, as well as understanding HUD regulations and other requirements of federally funded agencies. The process is labor intensive, detail heavy, and time consuming. In addition to working with current grantees, KHC conducts outreach to potential applicants and typically holds webinars and "office hours" for

**Suppl. App. 363**

applicants applying for the first time. Since the KY BoS CoC covers such a large geographic area, under typical circumstances KHC consults with partners across the CoC to propose new projects where gaps in services exist or to make modifications to existing projects to be more effective in meeting the CoC's expectations.

20.     KHC is also the recipient of CoC Planning Grant funding on behalf of the full CoC. Through a memorandum of understanding (MOU) between the KY BoS CoC Advisory Board and KHC, KHC is the designated lead planning agency for the CoC responsible for ensuring all parts of the CoC's statutory and regulatory obligations as well as its related strategic vision are implemented. In addition to its responsibilities as collaborative applicant, the planning responsibilities of the CoC as overseen by KHC include, but are not limited to, the following: facilitating the operation of the CoC Advisory Board, which is the governing body required to guide the direction of the CoC; conducting meetings of the full CoC membership to promote community collaboration in addressing homelessness; establishing and operating a Coordinated Entry System as required by HUD to facilitate the assessment and referral of people experiencing homelessness to CoC, ESG, and other federally funded resources; coordinating an annual Point-In-Time (PIT) Count of people experiencing homelessness and reporting results to HUD; conducting gap analyses; monitoring and evaluating CoC and ESG project recipient performance and taking corrective action as needed; tracking system-level performance to determine how the homeless response system is functioning collectively and making strategic modifications as needed; and collaborating with partners across other systems such as schools, health care, victim service providers, veteran service organizations, faith-based organizations, and local and state governments to maximize resources and advance common goals that reduce homelessness.

**Suppl. App. 364**

21.    In addition to receiving the CoC Planning Grant, KHC also serves as the recipient (i.e., direct grantee) of thirty-three (33) CoC grants for projects that are eligible to apply for renewal through the FY 2025 CoC Competition. KHC directly administers 4 grants eligible for renewal in FY 2025 including two for the Homeless Management Information System (HMIS), one for the CoC's CoC-wide Coordinated Entry System, and one for a Permanent Supportive Housing (PSH) project. The remaining twenty-nine (29) CoC grants are sub-awarded by KHC to non-profit partner organizations across the KY BoS CoC to implement PSH, Rapid Rehousing (RRH), Transitional Housing (TH), and Supportive Services Only (SSO) projects. While these non-profits are responsible for carrying out the day-to-day operations of these projects in their local communities, KHC serves as the overall administrator of the grants providing financial oversight, interfacing with HUD on draw requests and monitoring, and providing technical assistance to grantees.

22.    KHC also serves as the lead agency ("HMIS Lead") for the implementation of the KY BoS CoC's Homelessness Management Information System (HMIS). Per the CoC Interim Rule, each CoC must operate a single HMIS for its geographic area and designate an agency to serve as lead of its implementation. The HMIS is the electronic platform CoC-funded agencies as well as other federally-funded projects such as the ESG Program, the U.S. Department of Veterans Affairs (VA) Supportive Services for Veterans Families (SSVF) program, and the HHS Runaway and Homeless Youth (RHY) program use to enter client-level data on characteristics (e.g., demographics, income, length of time homelessness) and outcomes (e.g., exit destinations and change in income) that can be evaluated on an individual, project, and system level. Responsibilities of KHC as the HMIS Lead include but are not limited to the following: establishing, reviewing, and updating as needed policies and procedures for data entry,

**Suppl. App. 365**

timelessness, and quality; providing training and technical support to system users; overseeing the reporting process for the CoC, providing data to HUD and community stakeholders as required or requested; and analyzing data to determine the effectiveness of individual projects and the system as a whole.

23. In its role as collaborative applicant for the KY BoS CoC, KHC is responsible for overseeing all parts of the CoC application process, including: coordinating the local competition which involves developing application guidelines; preparing detailed instructions and required documents to be completed by applicants; setting policy priorities; providing ongoing technical assistance to new and renewal project applicants; creating scoring criteria and tools to use to score and rank projects as required by HUD; reviewing all project applications for completeness and compliance with all requirements; and submitting all parts of the CoC Consolidated Application to HUD on behalf of the CoC. The Consolidated Application includes all individual project applications (70+), the CoC Application which responds to questions on behalf of the full CoC and is used by HUD to score CoCs in the national competition (this is completed by KHC), and the Project Ranking of Projects based on local scoring criteria. To facilitate all aspects of the application process, KHC must work closely with the CoC's Scoring and Ranking Committee, which is comprised of representatives from agencies not funded by CoC as well the CoC Advisory Board. The Committee and the Advisory Board must approve the competition policies and scoring criteria as well as the ranking of projects based on the approved criteria. This requires numerous meetings including public meetings of the CoC Advisory Board as well as advance planning and coordination with various community stakeholders.

24. KHC has served as the CoC's collaborative applicant since the CoC Interim Rule went into effect in 2012. Prior to 2012, the CoC operated under different federal guidelines where

**Suppl. App. 366**

the term "collaborative applicant" did not exist. CoCs were still required to designate an agency to compile and submit all parts of the CoC application. KHC served in that capacity from the mid-1990s until its current role beginning in 2012.

25.     CoC regulations define Permanent Housing as "community-based housing, the purpose of which is to provide housing *without a designated length of stay."* 24 CFR 578.37(a)(1). HUD has structured CoC competitions since FY 2012 to help ensure CoCs can support an ongoing commitment to recipients of permanent housing supports. While local KY BoS CoC funding competitions may lead to reductions in funding or complete reallocations for under-performing or under-spending projects, the national CoC award cycle as administered before FY 2025 generally allowed projects meeting performance standards to plan for renewal. This was a result of HUD's prior commitment to place at least an average of 93.6% of a CoC's Annual Renewal Demand in Tier 1 across all CoC competitions since FY 2012. Projects that a Continuum of Care's local funding competition ranked in Tier 1 were guaranteed to be conditionally committed awards. Although there have been delays in release of funds to CoC projects due to government shutdowns in the past, renewal awardees knew that they could continue services because costs incurred during a program year prior to grant execution are eligible costs for reimbursement. Maintaining such a large Tier 1 percentage is especially valuable to Permanent Housing grantees because they feel comfortable housing clients with lease terms that may extend into another program year and feel safe making a commitment to *permanent* housing for their clients. It also helps grantees build long term relationships with landlords who can rely on CoC rental or leasing payments.

26.     HUD has been using this model since FY 2012 to support the expansion of permanent supportive housing projects, yet the FY 2025 CoC NOFO turns this model upside down. The NOFO allows only 30% of a CoC's ARD to be included in Tier 1 and places a 30% cap on

**Suppl. App. 367**

Permanent Housing. This essentially removes the ability of current, high performing Permanent Housing awardees effectively plan for ongoing program operations. Even if they have an application that scores well, there is still a strong chance it could be placed in Tier 2 and subject to the national competition, where it could be defunded by a HUD "merit review" for compliance with Presidential policy priorities even if it scored high in the national competition.

27.    It is my understanding that the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, represents a significant departure from past practices and will cause serious harm.

28.    This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

a.    The FY 2025 Continuum of Care (CoC) NOFO released on November 13, 2025 — which rescinds and fully replaces the congressionally aligned FY 2024/FY 2025 CoC Competition and YHDP Renewal/Replacement NOFO published on July 31, 2024 — fundamentally alters both the timeline and eligibility structure for CoC funding. Under the July 31, 2024, NOFO, CoCs were promised that if they were awarded funds through the FY 2024-FY 2025 CoC Competition for FY 2024 funds, they would be eligible to receive FY 2025 funds through a renewal process for another 12-year grant term without having to go through a new competitive process, allowing for stable planning, strategic investment, and continuity across local homeless response systems; the reissued NOFO abruptly withdraws that framework, forcing CoCs into immediate uncertainty. As a result, communities now face destabilizing risks to system-level and project-level planning, imminent service disruptions, rental and service funding gaps, and the need to rapidly

reconfigure programs to comply with federal directives that run counter to more than a decade of evidence-based CoC system design. The sudden policy reversal threatens stranded projects, severe cash-flow challenges, and a weakened capacity to address and end homelessness.

b.        The shift to a one-year FY 2025 CoC NOFO — issued abruptly and in direct conflict with the two-year structure promised in the July 31, 2024, NOFO — introduces immediate and far-reaching instability to KHC and the KY BoS CoC in the implementation of the CoC Program, which impacts the entire homelessness response system. The FY 2025 CoC NOFO effectively reneges on the promise of housing and supportive services permanency that direct service providers, the KY BoS CoC, and HUD made to persons with disabilities experiencing homelessness. KHC and the KY BoS CoC will be required to spend significant time and resources responding to a NOFO and re-applying for competitive funding that we understood had already been awarded to the KY BoS CoC.

c.        For project applicants and direct service providers, the compressed timeline and reconfigured funding priorities create acute operational challenges: organizations must rapidly rewrite new project applications, redesign budgets, and pivot program models with little notice nor guidance from HUD, all while bracing for rental assistance cuts, staffing disruptions and losses, broken landlord partnerships, and contract losses. Meanwhile, CoC lead agencies like KHC face an unprecedented administrative burden as they are forced to unwind two-year planning cycles, realign local priorities, reinterpret new federal rules, and manage community-wide financial and programmatic fallout — all within a dramatically shortened timeframe. In addition, the proposed new award announcement date of May 2026 means that providers who have existing funded programs that were anticipating a

**Suppl. App. 369**

renewal in early 2026 will have one or more months during which their program will not be funded, even if they receive an award under the new one-year FY 2025 CoC NOFO. Many of these providers will not be able to bridge that gap in funding for any significant length of time. Collectively, these impacts will destabilize local systems, erode trust between federal partners and communities, and ultimately place the highly vulnerable households with disabilities currently served by 959 permanent housing units in the KY BoS CoC at significantly heightened risk of returning to homelessness — triggering a surge in unsheltered homelessness, particularly in rural and distressed communities that lack local infrastructure beyond the CoC Program, including already weak or nonexistent emergency shelter system capacity.

29.     The FY 2025 NOFO states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

a.  HUD has required CoCs to rank projects into two tiers for over 10 years at least. Projects ranked in Tier 1 at the CoC level are selected for funding by HUD so long as the projects meet the minimum required thresholds established by HUD, thereby ensuring continuity of services and outcomes. Projects in Tier 2 must compete against all other projects in Tier 2 from all other CoCs using scoring criteria established by HUD. Tier 1 projects are significantly more likely to be funded by HUD than Tier 2 projects. This has allowed local communities to prioritize high performing projects and those that serve the most vulnerable populations, such as the chronically homeless and those projects serving people with multiple disabling conditions. Projects must still compete at the local level to determine Tier placement. Allowing a larger portion of the CoC's ARD to be placed in Tier 1 has allowed for more effective and efficient planning

17

for communities to be able to continue to provide housing and supportive services for people in need of permanent housing assistance, especially those in PSH projects. The FY 2025 CoC NOFO reduces the Tier 1 portion from 90% to 30%. Because the scoring used by HUD to evaluate Tier 2 projects favors larger metropolitan areas, the vast majority of the KY BoS CoC's funding is at risk of being reallocated by HUD to other communities that meet their new expectations.

b.   Historically, the majority of funds have been allowed to be placed in Tier 1 using local scoring and ranking criteria developed by local communities. In FY 2024, Tier 1 was set at 90% of a CoC's ARD. The least amount allowed in Tier by HUD in the past 10 years was 85% in the 2015 CoC competition.

c.   The KY BoS CoC's FY 2025 Annual Renewal Demand is $21,511,505. At 30%, Tier 1 will equal $6,453,451. The remaining $15,058,054 must be placed in Tier 2, regardless of project type or how effective the project has been for the community. Because the Tier 2 scoring criteria favors larger metropolitan areas, and the KY BoS CoC has a larger percentage of rural areas than other CoC's, the KY BoS CoC is at a higher risk of losing 70% of its current funding – more than $15 million – in a matter of months.

d.   The KY BoS CoC currently has approximately $17.8 million in permanent housing projects. Even if the CoC placed only PH projects in Tier 1, excluding from Tier 1 any project types, the CoC would still have to place $11.4 million worth of PH projects in Tier 2, putting these projects at significant risk of being cut entirely by HUD. This means nearly 700 households are at-risk of becoming homeless quickly, including families with children and elderly with disabilities. Approximately 1,200 people would

**Suppl. App. 371**

lose their current housing over the next 12 months. Without the PH assistance available in the CoC, people who become homeless for the first time in the coming months and years, as well as those who are facing chronic homelessness, will not have a pathway to housing stability that the KY BoS CoC currently provides. This will lead to both more people experiencing unsheltered homelessness and increased overcrowding and lengths of stay in emergency shelters in Kentucky.

30.    The FY 25 NOFO states that "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." (FY 2025 NOFO, p. 15.)

a.    The restriction limiting CoCs to funding no more than 30 percent of their Annual Renewal Demand (ARD) for Permanent Housing (PH) projects – including PH-Permanent Supportive Housing (PSH), PH-Rapid Re-Housing (RRH), and Joint Transitional Housing (TH) and PH-RRH projects – will have profound and immediate negative consequences for the KY BoS CoC and the individuals and families it serves. Funding dedicated for renewal of existing permanent housing programs will face abrupt shortfalls, forcing them to either reduce or eliminate essential housing subsidies and supportive services. This directly destabilizes programs that currently house individuals with disabilities, chronic homelessness histories, and other high-needs populations including homeless youth and survivors of domestic violence, undermining years of system-level planning and investment in housing stability. For clients, the consequences are dire: the loss of permanent housing subsidies will result in

**Suppl. App. 372**

involuntary exits to unsheltered homelessness, heightened exposure to health risks, and, for the most vulnerable populations, increased risk of mortality. The policy de-prioritizes evidence-based permanent housing programs, erodes the hard-won stability of CoC systems, and threatens the safety and lives of the individuals these programs were designed to protect. This cap will cause the KY BoS CoC to lose $11,416,187, totaling 64% of permanent housing renewals. Although the exact number of households and units impacted by this loss of renewal resources cannot be precisely predicted at this time, a 64% reduction from the number in currently supported by CoC PH grants could result in as many as 668 families who are at serious risk of homelessness losing their rent assistance in the Kentucky Balance of State.

b. Historically, the CoC Program has prioritized the development and renewal of permanent housing projects, including Permanent Supportive Housing (PH-PSH) and Rapid Re-Housing (PH-RRH), as the cornerstone of an evidence-based strategy to end homelessness. In past CoC competitions, there were no arbitrary caps limiting the proportion of Annual Renewal Demand (ARD) that could be allocated to permanent housing, allowing CoCs to maintain and expand successful permanent housing programs based solely on targeted local needs and performance outcomes. The FY 2025 NOFO's restriction, which limits permanent housing projects to no more than 30% of a CoC's ARD, represents a stark departure from this precedent and undermines the core purpose of the program. By capping funding for permanent housing, the NOFO effectively shifts resources away from proven solutions and redirects them to transitional housing or supportive service-only projects that do not provide long-term housing stability and undermine the prospect of achieving self-sufficiency. This

20

**Suppl. App. 373**

approach contradicts the evidence-based design of the CoC Program, which was intentionally created to prioritize permanent housing solutions as the most effective means of reducing homelessness, improving health and public safety outcomes, and reducing reliance on emergency systems. HUD's policy shift will destabilize CoC systems, erode hard-won housing gains achieved via highly competitive locally driven process, and place thousands of Kentucky's most vulnerable disabled individuals and families at heightened risk of returning to homelessness. If the 30% limit is implemented, in Kentucky's BoS CoC, approximately 1,220 vulnerable individuals, including children and a minimum of 641 persons with disabilities, have a high likelihood of returning to unsheltered homelessness due to the incredibly weak and under-resourced emergency shelter capacity across the state. The FY 2025 NOFO and policy differ from past CoC competitions by effectively forcing CoCs to implement a "one-size-fits-all" approach, imposing restrictive, time-limited supports that fail to account for local variations in housing markets, service gaps, and the complex, long-term needs of clients. This approach undermines the KY BoS CoC's ability to tailor interventions to promote stability and self-sufficiency, leaving vulnerable individuals and families (including homeless youth and survivors of domestic violence) – particularly those with disabilities or histories of chronic homelessness – at heightened risk of program failure, housing loss, and a return to homelessness.

c.   The FY 2025 NOFO's cap on permanent housing funding marks a shift toward time-limited, less stable interventions and will have the most devastating impact on people currently living in CoC-funded permanent housing. Individuals with disabilities, chronic health conditions, or long histories of homelessness rely on long-

term rental subsidies and intensive supportive services to maintain stability. If the 30% cap on permanent housing subsidy is implemented, many of these residents will lose their housing because their programs cannot be renewed at current funding levels, forcing them into involuntary exits. Additionally, current PH-assisted clients will not be eligible to access Transitional Housing projects the NOFO aims to create given HUD definition of homelessness. This will result in a dramatic increase in returns to homelessness, including unsheltered homelessness, where exposure to violence, weather, untreated medical conditions, and lack of care significantly raise the risk of injury, hospitalization, and death. For these households, the removal of permanent housing is not merely a service reduction – it is a life-threatening disruption that reverses years of progress to stability and self-sufficiency. Project applicants and housing/service providers will face immediate operational and financial crises. Projects that were designed, funded, and staffed around evidence-based permanent housing models will be forced either to downsize, convert to entirely different interventions, such as costly or infeasible transitional housing, or close altogether. Providers will be required to rapidly rework budgets, reassign staff, and make difficult decisions about which households to evict due to reduced capacity. Many communities have built their homeless response systems around permanent supportive housing and rapid rehousing as the backbone of stability; this sudden shift guts that foundation. The result will be cascading program instability — contract losses, staff layoffs, increased administrative burden, and the unraveling of coordinated crisis response networks that depend on these permanent housing beds to prevent severe harm. Local economies and housing markets will also see negative impacts. KHC, as CoC lead, will be responsible for managing

**Suppl. App. 375**

systemwide upheaval with very little time, resources, or policy flexibility. KHC will need to unwind multiyear planning cycles, rewrite consolidated applications under extreme time pressure, and referee difficult local decisions about which permanent housing programs will lose funding and ultimately close. KHC will also bear the responsibility for communicating these devastating changes to partners, local governments, and residents, all while attempting to maintain system coordination amid contracting capacity and rising homelessness. The administrative strain will be immense: increased grievance filings, loss of community trust, heightened conflict among providers, and the collapse of long-standing planning frameworks that were built on long-standing federal guidance prioritizing permanent housing. The shift effectively destabilizes the entire CoC governance structure and erodes the credibility of federal-local partnerships that communities have relied upon for more than a decade.

d.  A loss of $11,416,187 (64%) of permanent housing renewals will have a profound impact on the people, places, and programs supported by the KY BoS CoC. First and foremost, it will cause residents in roughly 1,575 units to lose their permanent housing subsidy and supportive services and will lead to returns to homelessness for a great number of currently assisted households. This rapid increase in homelessness will overwhelm an already under resourced emergency shelter system in the KY BoS CoC. As the Emergency Solutions Grants (ESG) recipient for the KY BoS receiving $2,566,609 in FFY 2025 funding, KHC was only able to assist 27 emergency shelters, 10 of which only serve survivors of intimate partner violence. It is likely that many of these shelters will lack the capacity to respond to a significant increase in local homelessness.

**Suppl. App. 376**

e.   Regardless of funding source, 81 counties in the 118-county BoS lack year-round emergency shelter, placing responsibility for homeless response on emergency responders, most often local police. In communities without any or sufficient emergency shelter, the loss of permanent housing will lead to an increase in unsheltered homelessness, which is largely illegal in Kentucky. Under the SAFER Kentucky Act, local governments are legally obligated to arrest and criminally charge persons experiencing unsheltered homelessness who sleep in public places. A loss of permanent housing solutions for homeless Kentuckians will further divert criminal justice resources away from other public safety priorities, increasing local law enforcement, jail, court, and public defender costs.

f.   The loss of CoC permanent housing will place increased demand on other subsidized housing programs that do not have the capacity to meet the need. KHC allocated approximately $1 million of ESG funding to 19 subrecipient agencies to provide Rapid Re-Housing, far less than the $8.95 million in CoC PH funding that could be lost. Much of KHC's ESG funding is already committed to continuing existing client assistance. KHC also serves as a Public Housing Authority (PHA), providing Housing Choice Vouchers (HCVs) in 87 counties, but does not have the voucher capacity to meet the housing needs of households losing housing due to FY 2025 NOFO restrictions.

g.   Due to HCV funding shortfalls, in June 2024 KHC stopped taking applications to be added to the HCV waitlist. Currently 6,734 households are on KHC's HCV waitlist. Other PHAs statewide face similar constraints. The loss of CoC permanent housing will increase demand for PHA subsidies, placing higher need persons with disability

**Suppl. App. 377**

with a history of homelessness in competition with other low-income Kentuckians in need of housing support, ultimately lengthening the time all households must wait to receive a voucher.

h.   The 30% permanent housing cap will also cause assisted households to lose the supportive services provided with their CoC-funded permanent housing subsidy. The provision of optional supportive services along with permanent housing subsidy is why the KY BoS CoC has seen assisted households either retain or successfully exit from Permanent Supportive Housing at such high rates, with an average success rate of 95.4% over the last 5 years per KY BoS CoC System Performance Measures. The loss of these services will cause formerly assisted persons to depend on costly emergency services for medical and mental health care, increasing charity costs for hospitals and Medicaid costs for the Commonwealth. Formerly assisted households will also likely lose access to mainstream social services accessed via referrals from their housing case manager. These services cuts will also lead CoC grantees and subgrantees to lay off skilled social services workers, including case managers and peer support specialists, thus inhibiting the homeless services system's ability to help clients obtain and sustain housing.

i.   Further, these CoC cuts to permanent housing will also impact landlords throughout the Commonwealth, taking millions of dollars from the pockets of small businesses. It will also harm relationships they have established with homeless services agencies providing CoC vouchers, potentially causing landlords to refuse to again accept a housing voucher due to the promise of permanency being broken by the CoC program.

**Suppl. App. 378**

31.    The FY 2025 NOFO includes the following language: "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." (FY 2025 NOFO, p. 55.) In addition, it states that "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons … (h) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." (*Id.* , p. 65.) "Awards made under this NOFO will not be used to … conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." Pg. 108. "You must comply with these applicable provisions … Implementing Presidential Executive Actions" like EO "14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"). (*Id.*, p. 108.)

a.    These provisions appear to conflict with the following federal laws and regulations: *Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs Final Rule* FR 5863-F-02, Effective 10/21/2016; *Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity Final Rule* FR 5359–F–02, Effective 3/5/2012; and *Bostock v. Clayton Ctyounty*, 590 U.S. 200 (2020). These regulations are still in effect and have not been revoked via the rulemaking process under the Administrative Procedure Act. Legally, any agency receiving funding from HUD's Office of Community Planning and Development (CPD) must continue to comply with the Equal Access Rule. Additionally, these NOFO provisions conflict with the

**Suppl. App. 379**

following State and local laws: fairness ordinances that have been adopted by local Kentucky jurisdictions, as well as Kentucky Executive Order 2020-554 that prohibits discrimination in the workplace or in the provision of public services because of race, color, religion, sex, national origin, sexual orientation, gender identity or expression, ancestry, age, pregnancy, marital or familial status, disability or veteran status.

b.      This provision will also make CoC grantees and subgrantees ineligible for renewal funding because they have complied with prior HUD directives to ensure and promote LGBTQ+ equal access, including those issued via the FY 2024 CoC NOFO governing funding currently in use, as illustrated in the clauses copied below. Language mandating engagement with and protection of LGBTQ+ persons also exists in the FY 2023, FY 2022, FY 2021, FY 2018, FY 2017, and FY 2016 CoC NOFOs, such as the following:

> *"(7) Improving Assistance to LGBTQ+ Individuals. Discrimination on the basis of gender identity or sexual orientation manifests differently for different individuals and often overlaps with other forms of prohibited discrimination. CoCs should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes. Additionally, when considering which projects to select in their local competition to be included in their application to HUD, CoCs should ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation. CoCs should also partner with organizations with expertise in serving LGBTQ+ populations." (FY 2024 CoC NOFO p. 9)*

**Suppl. App. 380**

*"Applicants must identify the steps they will take to ensure that traditionally underserved populations (such as Black, Latino, and Indigenous and Native American persons; Asian American persons, Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons who live in rural areas, persons with disabilities, and others adversely affected by persistent poverty or inequality) will be able to meaningfully participate in the planning process"* (FY 2024 CoC NOFO, p. 67).

*"f. Addressing the Needs of LGBTQ+ Individuals. Demonstrates efforts to address the needs of Lesbian, Gay, Bisexual, Transgender, and Queer (LGBTQ+) individuals and their families experiencing homelessness. Collaborative Applicants must demonstrate their CoC: includes LGBTQ+ serving organizations or advocacy groups in the CoC membership; annually conducts training to providers about how to effectively implement the Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity Rule, and the Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs Rule; implemented and trained providers on a CoC-wide, anti-discrimination policy ensuring that LGBTQ+ individuals and families receive supportive services, shelter, and housing free from discrimination; regularly collaborates with LGBTQ+ and other organizations to update their*

**Suppl. App. 381**

*CoC-wide, anti-discrimination policy, as necessary to ensure all housing and services provided in the CoC are trauma-informed and able to meet the needs of LGBTQ+ individuals and families; assisted providers in developing project level anti-discrimination policies that are consistent with the CoC-wide anti-discrimination policy; and has a process for evaluating compliance with their CoC's anti-discrimination policies and addresses any non-compliance with those policies.* (FY 2024 CoC NOFO, pp. 85-86).

c.      Finally, compliance with the Equal Access rule is essential to ensure that persons who identify as LBGTQ+ have safe access to services. Research has demonstrated that LBGTQ+ persons disproportionately experience homelessness and encounter barriers in receiving services, especially those who are transgender: 22% of LGBT adults say they have ever experienced homelessness – twice as many as non-LGBT (11%); 30% of respondents to the 2022 US Transgender Survey had experienced homelessness in their lifetimes; 8.3% of transgender adults recently experienced homelessness as compared to 2.5% of cisgender/genderqueer sexual minorities, and 1.4% of cisgender straight adults. (UCLA Williams Institute *Homelessness among LGBT Adults in the US);* LGBTQ youth have a 120% higher risk of experiencing some form of homelessness compared to non-LGBTQ youth (Chapin Hall); LGBTQ youth who reported experiencing homelessness or housing instability had higher rates of victimization, being in foster care, and food insecurity, compared to their stably housed LGBTQ peers. (Trevor Project); and the 2016 Equal Access Rule states "HUD has learned through its review that all individuals, including transgender persons and other gender nonconforming persons, can be safely

**Suppl. App. 382**

accommodated in shelters and other buildings and facilities in accordance with their gender identity."

d.      Transgender persons are a small, but not insignificant, portion of the population served by the KY BoS CoC. In 2022, 107 persons who were served by the KY BoS CoC self-identified as transgender, with 69 in 2023, and 81 in 2024, per HMIS reports. The FY 2025 CoC NOFO eliminates their ability to receive homeless services in a safe and self-affirming manner in compliance with federal law and punishes those agencies seeking to provide client-centered services to transgender persons.

32.      Even if these terms and provisions within the FY 2025 NOFO were not themselves severely catastrophic, compliance with dramatically different conditions will require a complete overhaul of KHC, KY BoS CoC, and applicant processes. Compliance with these new requirements will require more time, resources, funds, and effort to comply, and is not feasible to do by the January 14, 2026 application deadline the FY 2025 NOFO issued in mid-November 2025.

33.      KHC is hearing urgent and widespread concern from KY BoS CoC-funded agencies throughout the Commonwealth regarding funding gaps that are all but inevitable because of the late and rushed issuance of the FY 2025 NOFO. Some FY 2024 project grant terms are scheduled to end as early as March 2026, yet the FY 2025 NOFO indicates that HUD will not make funding determinations *until* May 2026. Even if award announcements are made in May 2026, funds cannot be released until grant agreements are executed, which will take additional time. This creates a critical multi-month period during which programs will lack clarity on their funding status even if those projects are awarded under the new FY 2025 NOFO, leaving agencies unable to plan or implement bridge measures to pay landlords, maintain staff, or continue essential supports for

30

tenants. Any interruption in funding during this period could force some CoC-funded agencies to permanently close, immediately terminating housing and services for highly vulnerable disabled program participants. For participants, this is not merely a temporary disruption — it represents sudden loss of safe, stable housing, supportive services, and continuity of care, placing already vulnerable individuals and families at immediate risk of returning to homelessness, crisis, and life-threatening conditions.

34.    Additionally, CoC-funded agencies have raised urgent concerns regarding the health, well-being, and housing stability of the participants they serve. The combination of delayed funding, drastic cuts to permanent housing resources, and abrupt policy shifts threatens to destabilize the very programs that safeguard these individuals' basic needs. For the people served – many of whom have disabilities, chronic health conditions, or histories of prolonged homelessness – interruptions in housing and supportive services are not minor setbacks; instead, they are preventable declines in physical and mental health, disruptions in critical care, and, in the most severe cases, premature death. Furthermore, several KY BoS CoC permanent housing projects provide housing assistance to victims of domestic violence, including children. The primary cause of homelessness for these households was due to domestic violence and the housing assistance, and the trauma-informed customized services provided to these households is vital to their immediate safety and long-term stability. Abrupt loss of such support services could be detrimental. These funding and policy changes place participants at extreme risk, eroding the hard-won stability that the KY BoS and CoC programs have provided for years and undermining the life-saving work of dedicated providers across Kentucky.

35.    If the FY 2025 NOFO remains in place, the KY BoS CoC faces a catastrophic blow to its homeless response system and the potential collapse of nonprofit CoC grantees in rural areas.

**Suppl. App. 384**

The unprecedented 30% cap on permanent housing renewals, combined with draconian restrictions on the use of remaining funds and abrupt policy shifts, will force the termination and drastic reduction of critical Permanent Supportive Housing and Rapid Re-Housing programs – the very programs that keep the most vulnerable disabled Kentuckians housed. Agencies will be confronted with difficult decisions: thousands of people with disabilities, chronic illnesses, and histories of long-term homelessness will be displaced from safe, stable housing and abruptly returned to unsheltered homelessness.

36.    The human toll will be immediate and severe. Exposure to extreme winter weather, predatory violence, untreated medical and behavioral health conditions, and lack of supportive services will place lives in jeopardy. Projections suggest that at least 1,220 Kentuckians in the Balance of State, including children and at least 641 people with disabilities, could be forcibly displaced, facing conditions that dramatically increase the risk of injury, illness, and preventable death. Mandatory compliance requirements in alternative program models – including coerced substance use or mental health treatment – will strip participants of autonomy, trigger re-traumatization, and accelerate housing loss.

37.    Beyond the human cost, the systemic consequences are equally dire. CoC-funded agencies will face months of funding uncertainty, administrative overload, and, in many cases, permanent closure. The KY BoS CoC will lose the infrastructure it has painstakingly built over decades, dismantling coordinated housing and supportive services across 118 counties – a geography already challenged by rural isolation, scarce resources, and minimal alternative services. State systems, including emergency healthcare, psychiatric services, law enforcement, and social services, will be overwhelmed as the displaced population floods crisis response systems that are ill-equipped to absorb them.

38. Additionally, communities and local economies across Kentucky will face severe consequences due to the FY 2025 NOFO. Hundreds of landlords who currently rely on CoC-funded rent payments will stop receiving them, placing many housing units at risk of foreclosure and further exacerbating the Commonwealth's already critical housing supply shortage. Preserving these units is essential not only for individual stability but also for sustaining local economic growth and community development. Moreover, the NOFO's policies will push thousands of people back into unsheltered homelessness, creating widespread safety risks, straining public services, and undermining the vitality of communities across the state. This destabilization may also discourage business investment and economic engagement, as companies are less likely to locate in areas facing heightened homelessness and community instability.

39. If the FY 2025 NOFO is implemented as written, the KY BoS CoC risks the collapse of its evidence-based, permanent housing framework, a dramatic increase in unsheltered homelessness, avoidable suffering and death, a devastating reversal of years of progress in ending homelessness in the Commonwealth, and risks deterioration of an already strained housing market as well a stall or deter local economic development. The human, societal, and financial costs will be profound, immediate, and would be preventable without the FY 2025 NOFO.

40. The NOFO's cap on permanent housing funding and its forced shift toward time-limited, less stable interventions will inflict the most severe and immediate harm on individuals currently living in CoC-funded permanent housing. These residents are not simply "program participants" – they are people with significant disabilities, chronic and often life-limiting health conditions, traumatic histories, victims of domestic violence, and long patterns of homelessness who have finally achieved stability through long-term rental subsidies and wrap-around supportive services. Permanent Supportive Housing and long-term rental assistance are not interchangeable

with shorter-term models; they are medically necessary, evidence-based interventions that allow people with complex needs to remain safely housed in the community.

41.     Under this policy, many residents will lose their homes because renewal programs will no longer be fundable at the levels required to sustain them. Providers will be forced to discharge tenants who are stable only because they have a permanent housing subsidy and ongoing support. These are individuals who cannot simply "transition" into short-term programs or time-limited assistance. The result will be widespread involuntary exits from housing, pushing people back onto the streets, into cars, abandoned buildings, encampments, and other places not meant for human habitation – conditions that are dangerous, risk public safety, traumatizing, and incompatible with basic survival for many disabled households.

42.     Compounding this harm, the alternative models prioritized by the NOFO often require participants to comply with rigid, coerced treatment plans – including mandatory substance use treatment, mental health programming, and intrusive case management directives I – to remain eligible for housing. For people with disabilities, trauma histories, or complex behavioral health conditions, these requirements strip away personal autonomy and dignity, forcing individuals to engage in services that may not be clinically appropriate, wanted, or effective. Many will be removed from programs for "noncompliance," not because they pose a risk or have failed in housing, but because the program's model demands obedience to predetermined service paths rather than supporting self-directed recovery. These punitive and medically unsound mandates will lead directly to further housing loss, re-traumatization, and disengagement from care, pushing individuals into crisis, hospitalization, incarceration, or back onto the streets.

43.     The return to unsheltered homelessness carries catastrophic consequences: exposure to extreme weather events;; life-threatening infections; unmanaged chronic illnesses;

**Suppl. App. 387**

predatory violence; sexual assault; and the escalation of behavioral health crises. Research consistently shows that mortality rates among people experiencing unsheltered homelessness are several times higher than for housed populations; for individuals with disabilities who lose permanent housing, the risk of premature death increases dramatically within months. This policy shift will not only erase years of progress in stabilizing the most vulnerable people in our communities; it will also directly result in avoidable medical crises, suffering, and preventable loss of life.

44.    For these households, eliminating or capping permanent housing is not a mere procedural change or budget adjustment. It is the removal of the only intervention that has kept them alive. This abrupt reversal is not just destabilizing — it is deeply inhumane, disregarding the lived realities, clinical needs, and personal autonomy of the very people the CoC Program was fundamentally created to protect.

45.    Terminating programs that rely on CoC grants will not only destabilize the Kentucky Balance of State homeless response system but will also dramatically increase burdens on state health, safety, and human service infrastructures. When permanent housing programs close or downsize due to the FY2025 NOFO's restrictive funding cap, the individuals and families they serve – many with significant disabilities, unmanaged medical conditions, and complex behavioral health needs – do not simply disappear; they are displaced into systems that are already strained to their limits. State Medicaid programs, emergency departments, psychiatric facilities, jails, crisis-response teams, adult protective services, and child welfare agencies will experience immediate surges in demand as people lose the housing stability that prevents crises in the first place.

46.    Emergency rooms and inpatient hospital units will likely see rising admissions from untreated conditions that were previously stabilized through supportive housing. Law enforcement

and jails will likely face increased encounters with people experiencing psychiatric distress or survival-related offenses, diverting public safety resources away from community priorities. State-funded detox, mental health, and crisis-stabilization programs – already over capacity – will likely be forced to absorb individuals whose needs could have been effectively managed through housing rather than costly and under-resourced institutional interventions.

47.    Moreover, shelters in many Kentucky Balance of State communities either do not exist or could not meet basic accessibility, safety, or medical accommodation standards, pushing displaced individuals into unsheltered environments where risks of injury, victimization, and death sharply increase. As homelessness rises, so too does the demand on public sanitation, transportation systems, courts, and local governments attempting to respond without adequate housing resources. In short, dismantling CoC-funded permanent housing programs shifts the burden from a targeted, evidence-based federal housing system onto the broadest and most expensive state systems – creating higher costs, worse outcomes, and avoidable human suffering. Moreover, the KY BoS CoC depends entirely on CoC funding to sustain its homeless response system and critical, life-saving interventions, including Permanent Housing programs. The Commonwealth does not allocate dedicated state funds in its annual budget to address homelessness, making CoC resources an essential source of support for these essential services and housing subsidies.

48.    The FY 2025 Continuum of Care (CoC) NOFO represents a dramatic and unprecedented shift in federal homeless policy that will profoundly destabilize the KY BoS CoC and undermine the Commonwealth's proven efforts to address homelessness with evidence-based, humane, and permanent solutions. By capping permanent housing (PH) funding at just 30% of the KY BoS CoC's Annual Renewal Demand and severely restricting the allowable use of remaining

funds, the NOFO will terminate or downsize essential Permanent Supportive Housing (PH-PSH) and Rapid Re-Housing (PH-RRH) programs, which are the backbone of Kentucky's approach to addressing and solving homelessness. These programs have been specifically designed to house individuals with disabilities, chronic health conditions, and long histories of homelessness – populations for whom long-term rental subsidies and supportive services are not optional, but life-saving interventions.

49.    The abrupt defunding of these programs will have catastrophic impacts on program participants. Hundreds of thousands of highly vulnerable residents across the country risk involuntary exits from stable housing, forcing them into unsheltered homelessness, encampments, or institutional settings. Specifically, KHC projects upwards of 1,220 people currently living in permanent housing in the Balance of State will be impacted. Exposure to extreme weather, predatory violence, untreated medical and behavioral health conditions, and lack of supports will sharply increase risks of injury, hospitalization, and preventable death. Compounding this harm, the NOFO's push toward restrictive, time-limited programs will mandate compliance with treatment and service plans that may be clinically inappropriate, coercive, or entirely unwanted, stripping participants of autonomy and dignity while triggering further housing instability and re-traumatization. Additionally, access to these services is extremely limited, and in many cases nonexistent, across the vast majority of the predominantly rural and severely under-resourced communities across the 118-county KY BoS CoC.

50.    For KY BoS CoC-funded projects and providers, the policies required under the FY2025 NOFO would likely force immediate operational crises. CoC agencies will be required to downsize or close programs, reallocate limited staff and resources, and make ethically impossible decisions about who will remain housed. This will erode program stability, disrupt long-term

partnerships with landlords and service networks, and undercut years of system-level planning designed to coordinate housing, outreach, and supportive services across rural communities in Kentucky.

51.     The CoC lead agency, KHC and the KY BoS CoC, will likely face unprecedented administrative and system-level burdens, including reprogramming local funding allocations, managing community-wide programmatic fallout, and mitigating the consequences of program terminations, all while attempting to uphold the integrity of a system designed to make homelessness rare, brief, and non-recurring. The FY 2025 NOFO's arbitrary funding restrictions effectively dismantle the CoC's evidence-based, housing framework and undermine Kentucky's statewide homelessness goals.

52.     The combined effects of terminating permanent housing programs, redirecting funds to less stable interventions, and enforcing harshly restrictive uses of remaining funding will not only reverse decades of progress in ending homelessness in Kentucky but will actively jeopardize the lives of the most vulnerable residents, dismantle the KY BoS CoC's local governance infrastructure, and undermine the Commonwealth's commitment to addressing homelessness with humanity, dignity, and permanent solutions.

53.     In conclusion, HUD's FY 2025 NOFO will damage the KHC, the KY BoS CoC, individual CoC agencies, and Kentuckians of have, are or will experience homelessness in the 118-county CoC. The NOFO upends decades of federal policy focused on ensuring homeless Kentuckians have access to permanent housing and supportive services. The FY 2025 NOFO takes away local decision-making authority, no longer allowing localities to determine the split of funds between permanent housing and temporary housing. By limiting the amount of funds local communities can use for permanent housing to just 30%, the NOFO threatens loss of housing for

**Suppl. App. 391**

an estimated 2,610 formerly homeless Kentuckians across the Commonwealth, including 1,220 in the Balance of State, thereby increasing homelessness. People currently experiencing homelessness or those who become homeless in the future will not have access to the permanent housing programs that have intentionally been a part of the CoC's homeless response system for many years. This will strain housing nonprofits, private landlords, and properties developed alongside CoC assistance and services.

54. With Kentucky's current housing supply shortage, rising housing costs, and increasing homelessness, the Commonwealth cannot afford to reverse affordable housing gains and push Kentuckians back into homelessness.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  24th  day of November 2025.

Winifred (Wendy) K. Smith
Deputy Executive Director, Housing Programs
Kentucky Housing Corporation

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF GREG PAYNE |
| Defendants. | |

1

**Suppl. App. 393**

<u>**DECLARATION OF GREG PAYNE**</u>

I, Greg Payne, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Senior Advisor on Housing Policy in the Maine Governor's Office of Policy Innovation and the Future ("GOPIF"). I am also the Chair of the Maine Continuum of Care Board of Directors.

2.      Prior to joining GOPIF, I was the director of the Maine Affordable Housing Coalition, a diverse association of private and public sector organizations committed to ensuring that all Mainers are adequately and affordably housed. Before that, I served as a development officer for over fourteen years with Avesta Housing, a nonprofit organization focused on developing and operating affordable homes. I have also served as Board Chair for the National Low Income Housing Coalition and have worked for the Atlanta Task Force for the Homeless and the Massachusetts Coalition of the Homeless.

3.      I have a B.A. in Economics from the College of the Holy Cross, and a J.D. from Northeastern University School of Law. After graduation from law school, I practiced real estate law, specializing in affordable housing.

4.      I am familiar with the information in the statements set forth below either through personal knowledge, consultation with staff at GOPIF and other state and quasi-state agencies, or from my review of relevant documents and information.

5.      The Maine Continuum of Care ("Maine CoC") is a group of service providers and other interested parties who work together in a collaborative planning process to develop programs that address ending homelessness.

6.      Continuums of Care represent specific geographic areas. The Maine CoC's geographic area is the entire State of Maine.

2

**Suppl. App. 394**

7.    State agencies, local governments, and nonprofit organizations submit applications to Maine CoC in order to receive funds from the United States Department of Housing and Urban Development ("HUD") to support programs designed to address homelessness.

8.    Maine CoC reviews and scores those applications, and then submits a consolidated application to HUD, through its Collaborative Applicant (the Maine State Housing Authority).

9.    Each year, the Notice of Funding Opportunity ("NOFO") Committee of the Maine CoC reviews and analyzes the NOFO and responds to the questions in the CoC-level application. Individual project-level applications are reviewed, scored, and ranked by a Selection Committee made up of individuals who do not have a conflict of interest regarding any of the applications. The Selection Committee uses scoring tools developed and approved by the Maine CoC and makes a recommendation to the Maine CoC Board of Directors.  The Board may accept or modify the recommendation based on protocols established by the Maine CoC.

10.    For FY 2024, the Maine CoC submitted 31 project-level applications from 16 different agencies.  Of those, 20 projects (from 11 agencies) were approved for funding by HUD.

11.    Fourteen of the 20 funded projects were for, or included a component for, permanent housing. These funded projects included those providing permanent supportive housing and rapid rehousing.

12.    The majority of permanent housing provided through the Maine CoC is permanent supportive housing.  Residents must qualify both as homeless at time of entry, and as having a documented disability.  Many were chronically homeless before securing this housing.  Permanent supportive housing provides stability, safety, and an array of services to help residents remain successfully housed.  Without the combination of housing and services, many would become homeless again, likely returning to emergency shelter or the streets.

13.    As a result of Maine CoC's application, HUD awarded $22,658,059 to eleven entities to fund twenty projects.  Of this amount, $20,543,675 was awarded to fund fourteen

3

projects providing permanent housing. This enabled the projects to provide homes for approximately 1,797 persons who were formerly unhoused.

14. While the CoC funding process has always been recognized as a competition, at both the local and federal levels, previous NOFOs were structured to allow CoCs to prioritize funding for projects that address the highest needs of their communities. For the Maine CoC and our partner agencies, that priority has always been ensuring the long-term safety and stability of our most vulnerable citizens though permanent housing. Until now, that was also a priority built into the NOFO itself, to the point where, according to the National Alliance to End Homelessness, 87% of all CoC funding nationwide goes to initiatives that provide permanent housing. The predictability and consistency of the CoC program is critical because of the large number of people whose housing status relies on this funding source and the large number of service providers who support the housing stability of those individuals. Significant changes in policy or approach have the potential to jeopardize the health and stability of thousands of Maine people, and increase costs to local and state government, unless care is taken to ensure that such changes are undertaken on a reasonable timeframe.

15. I have reviewed the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025 and have concluded that it will cause serious harm. Most significantly, it will dramatically reduce the ability to provide permanent housing to people in Maine.

16. The November 13, 2025 NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

17. The NOFO issued on July 31, 2024 was for FY 2024 and FY 2025, as a result of Congress authorizing HUD to issue two-year NOFOs.

**Suppl. App. 396**

18.     In 2024, the CoC NOFO was designed to shift from an annual process to a two-year funding cycle, covering both FY 2024 and FY 2025.  The NOFO application process requires a tremendous amount of time that providers would otherwise spend working with clients or programs, or even on other aspects of CoC-related efforts.  The Maine CoC, in anticipation of not having a full NOFO process in 2025, took the opportunity to make significant changes at a local level, including the hiring of an Executive Director, dissolving and reestablishing our Board of Directors with only 5 returning members, finding a new HMIS lead agency to oversee our data collection and reporting, restructuring each of our committees, and rewriting our governance and by-laws to incorporate all of these changes. Now, in the midst of these changes, we are faced with not just another NOFO, but a radically different and potentially harmful NOFO. Injecting this unexpected, complicated and time-consuming task, with a much more rapid turnaround than is typically provided to stakeholders in the federal CoC NOFO process, has harmed Maine's ability to prepare the strongest possible application and has compromised our governance transition.

19.     My understanding is that the November 13, 2025 NOFO is intended to essentially negate the FY 2025 award, and we must now reapply for FY 2025 funds.

20.     Negating the previously announced FY 2025 award and requiring that the Maine CoC reapply for FY 2025 funds within nine weeks with a significantly different approach than in the past is likely to negatively impact the Maine CoC's efforts to address homelessness in Maine. The organizations that had expected to receive funding for the coming year now have their staffing plans and budgets thrown into doubt, and there is significant risk that the Maine CoC will be unable to submit an application by January 14, 2026 that adequately supports the housing needs of vulnerable Maine residents.

21.     The November 13, 2025 NOFO sets a cap on permanent housing funds - only 30% of funding can be used for providing permanent housing.  Currently, under the FY 2024 Maine CoC award, approximately 91 % of funds are being used to provide or support permanent housing.

**Suppl. App. 397**

22.    The 30% cap on permanent housing will have an extraordinarily large and negative impact on Maine people and communities because there is unlikely to be backup support enabling them to retain their housing.  The people served by such programs have a very high risk of becoming homeless again if they lose the support provided through the current CoC grants.  Not only would such a loss of housing security likely create trauma and suffering for those affected, but it would also likely shift many of the costs associated with their return to homelessness to the state and local communities, especially through new shelter beds and General Assistance, much of which is funded by the State.

23.    The CoC application process is two-tiered. Projects included in Tier 1 are not subject to national competition, though they are subject to a degree of intra-state competition because HUD typically only allows approximately 90% of annual renewal project demand to be included in Tier 1.  Thus, the CoC has to choose which of its renewal projects to allocate to Tier 1, as those projects have a greater chance of funding than the ones allocated to Tier 2.  However, the November 13, 2025 NOFO deviates significantly from this past practice in that only 30% of annual renewal project demand can be put into Tier 1, subjecting the 70% balance of annual renewal project demand to the national competition and making it less likely to be funded.  Given that the vast majority of existing Maine CoC funds are used to help keep people in their homes, this 30% provision puts the housing security of those people at additional risk.

24.    Practitioners in Maine have learned over the past 25 years that conditioning permanent housing on receipt of substance use treatment services leads to poor outcomes. Permanent supportive housing providers in Maine's CoC grant believe that the vast majority of people would refuse those services and thus be prohibited from entering permanent supportive housing, or be forced to leave the permanent supportive housing they currently have.  As a result, the individuals with the most complex needs would be left homeless.  The prioritization in the November 13, 2025 NOFO for programs that require receipt of such services would thus

**Suppl. App. 398**

disadvantage states like Maine that base their programs on established best practices. Were we to abandon that approach in favor of gaining the points awarded in the new NOFO, it would harm the state by returning stably housed people to the street and barring currently homeless individuals from gaining the housing security they need to achieve stability.

25. The above-referenced concern about abandoning long-established best practices applies as well to incentives requiring people to accept support services more generally. The experience of Maine practitioners is that individuals are more likely to take advantage of services after they have been housed. Were we to create such requirements, our projects would fare worse, and more people would become or remain homeless.

26. The priority included in the November 13, 2025 NOFO regarding anti-camping laws puts the Maine CoC at a disadvantage because no such statewide anti-camping law exists in Maine, nor does the Maine CoC have the ability to create such a law.

27. Regardless of the validity of the various priorities and threshold requirements included in the November 13, 2025 NOFO, the volume and complexity of the changes require a significant amount of process changes for both project applicants and the Maine CoC, making it problematic for the Maine CoC to submit a competitive application by January 14, 2026.

28. The Maine CoC is receiving significant feedback from participant organizations that the November 13, 2025 NOFO contains new provisions that create obstacles to their ability to comply, based on conflicts with state requirements that those organizations are already subject to. More broadly, there is enormous concern that the nature of the new NOFO will, by definition, eliminate funding for successful programs.

29. The termination of existing funding for permanent housing that is necessitated by the new NOFO is likely to result in increased public health and public safety costs as a result of the increased homelessness that it will cause. It is well documented in Maine and in other jurisdictions that when people experience homelessness, they have more contacts with law

**Suppl. App. 399**

enforcement, get sicker, and are more likely to utilize expensive ambulance services and hospital emergency rooms. The increase in homelessness also makes it more likely that affected individuals will be forced to live outside in encampments, one of the very outcomes that the new NOFO appears to be seeking to avoid.

30. The Continuum of Care Program is one of the most important resources that Maine has to address homelessness. It is currently used successfully in Maine to provide permanent housing and services to over 1,800 vulnerable people. That stability is paramount to the well-being of the individuals served as well as the communities in which they live. Unfortunately, the new NOFO includes provisions that threaten that stability at great human and community cost.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of November 2025.

Greg Payne
Senior Advisor on Housing Policy
Governor's Office of Policy Innovation and the Future

**Suppl. App. 400**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No.1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF SARAH SQUIRRELL |
| Defendants. | |

1

## <u>DECLARATION OF SARAH SQUIRRELL</u>

I, Sarah Squirrell, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Director of the Office of Behavioral Health (Office) within the Department of Health and Human Services for the State of Maine.

2. As part of my duties as Director, I am responsible for, and oversee, the administration of the Office, its programs, and its services.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Office staff, or from my review of relevant documents and information.

4. The Office's Permanent Supportive Housing (PSH) program is federally funded by the U.S Office of Housing and Urban Development (HUD) through the Continuum of Care (CoC) Program.

5. The Office is a recipient of Permanent Supportive Housing (PSH) Continuum of Care (CoC) funds and a long-standing member of the Maine Continuum of Care (MCoC), including through participation at both the CoC Board and committee level.

6. The Office's PSH program operates statewide and is designed to meet the needs of the State of Maine's most vulnerable people with disabilities and mental health and substance use conditions. The program provides rental assistance and supportive services to assist households with at least one member (adult or child) with a disability in achieving housing stability. The program is designed to promote HUD's community-wide commitment to ending homelessness; quickly rehouse homeless individuals and families while minimizing trauma and dislocation; promote access to and utilization of mainstream resources and treatment services and supports;

**Suppl. App. 402**

and optimize self-sufficiency among individuals and families experiencing homelessness. The Office and a subrecipient of the grant administer the program statewide by utilizing a network of local non-profit community-based agencies.

7.      The Office's PSH program serves chronically and literally homeless individuals with a serious mental illness, substance use disorder, or HIV/AIDS or a related disease. The program prioritizes vulnerable subpopulations to be served, including veterans; persons fleeing domestic violence; families; and eligible homeless youths.

8.      In the FY23 Continuum of Care Competition, the PSH program successfully consolidated nine separate PSH CoC grants and was awarded $12,256,655.00 to administer the program. From February 2024 –July 2025, the program served 1511 individuals, of whom 72% experienced a primary diagnosis of severe mental illness, and 57% reported living with co-occurring disabilities. The data suggests that the stability offered by the program has led to positive outcomes for the vulnerable populations it serves, for example, of those served, 51% of adults either gained, maintained, or increased personal income, 1279 individuals were actively enrolled in health insurance, 77% of all adults received supplemental income assistance through state and federal programs, and 785 individuals participated in supportive services.

9.      Most recently, in the FY24-FY25 Continuum of Care Program Competition, the Office was awarded $13,862,639.00 to administer the program. The program currently serves 1270 individuals, including 271 children, located across all sixteen counties in the State of Maine, with 384 individuals coming from the longest temporary living situations and/or chronic homelessness. In addition to the 1270 individuals currently served by the program, there are an additional 117 PSH resources that had previously been made available through the Maine Coordinated Entry

**Suppl. App. 403**

System and are currently available for individuals to be prioritized to through Maine's coordinated entry process.

10. The Office begins planning for the CoC NOFO Competition long before the NOFO announcement is made, including in projecting future program budgets, analyzing program goals and accomplishments, completing CoC registration, and reviewing the project's Grant Inventory Worksheet (GIW). To apply for PSH funding, the Office completes a detailed project level application, inclusive of the following: applicant profile, standard forms, assurances, certifications, project description, subrecipient information, housing service and HMIS information, a detailed budget, and various attachments and certifications necessary for submission. In addition to the project level application, the Office also contributes to the drafting of the application submitted by the collaborative applicant on behalf of the MCoC. MCoC membership and grantees collaborate extensively, frequently on a weekly basis, to craft responses to the collaborative application narrative prompts.

11. The Office and its subrecipient have operated the PSH program in different capacities via numerous grants from HUD since the 1990s. The program was formerly funded under the Shelter + Care (S+C) program until the enactment of the HEARTH Act, which prompted the reauthorization and consolidation of S+C into the Continuum of Care program.

12. The Office relies on predictable and consistent NOFOs to run the statewide PSH program in Maine. The stability of the program allows the Office to establish and strengthen partnerships with the subrecipient of the grant, the CoC, and coordinated entry to create a cohesive system of support for Maine people experiencing homelessness. The security of consistent NOFOs has given the Office confidence to successively award (via competitive procurement) PSH funding to a subrecipient who, in turn, has relied on the grant's stability to invest in substantial program

**Suppl. App. 404**

infrastructure to ensure stable housing for recipients. Their investments include a comprehensive statewide subsidy and rent management system essential to the effective functioning of such a dynamic program, as well as program management and training for regional sub-contractor agencies. Most importantly, however, is the security that consistent NOFOs offer to program participants: the ongoing rental and services support keeps them on the path to self-sufficiency and recovery in alignment with HUD's programmatic goals.

13.    I understand that the HUD Continuum of Care Notice of Funding Opportunity (NOFO) released on November 13, 2025 represents a significant departure from past practices in **timing, funding caps and allocations, scope of competition, scoring criteria and weight, limitations on new projects, and risk review**, and will cause serious, irreparable,  and long term harm to the people this grant is intended to serve and the State of Maine's homeless response system.

14.    This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." This recission comes four months into the first year of the previously awarded two-year PSH grant to the Office, substantially truncating the program year and introducing uncertainty into a housing system that has, by definition, been established to promote permanency and support. Planned investments in program enhancements, particularly in Maine as it relates to health and treatment navigation services, are now slowed, to the detriment of the population this grant serves.

15.    The stability of the PSH grant has meant that the Office and Maine's homeless response system have been able to withstand any historical HUD delays in awarding, processing, and releasing funds between grant years. The prior FY24 NOFO extended the competition period

**Suppl. App. 405**

to two years and this helped provide additional stability in the system, alleviate financial strain, and reduce administrative burdens, particularly among the network of non-profit local providers who deliver the PSH program in Maine. This new NOFO states that awards will be announced in May 2026, which is only three months prior to the end of the Office's first program year. This is an infeasibly short window of time in which to pivot a statewide program with multiple contracted agencies and to potentially relocate participants to safe, secure, and available housing. If HUD is delayed again in announcing the new award, the timeline would be further compressed, pressure on local agencies compounded, and distress among an already vulnerable population further elevated resulting in more individuals unhoused and on the streets.

16.     Whereas in the two-year FY24 NOFO there was no cap on project component types, this new NOFO now states that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing (PH) projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Prior to this NOFO, the Office's statewide PSH program was awarded $13,862,639 – 85% of all PSH funding in the state – to help 839 formerly homeless households on the path to self-sufficiency and recovery. The FY25 NOFO's introduction of a cap means that the current $20.5m in permanent housing projects currently funded through the Maine CoC must be squeezed into a $6.8m cap going forward. This will profoundly destabilize Maine's homeless response system: even if all the MCoC's Permanent Housing funds under the 30% cap were allocated to the Office's PSH program, it would result in a 50% cut to existing funding, while funding cuts distributed evenly across all projects would result in a 70% cut. Under these scenarios, potentially half to 70% of the 1270 men, women, and children housed through the program could return to the streets.

**Suppl. App. 406**

17.     The PSH program and the Housing First principles that underlie it have worked well for years to support incredibly vulnerable people, the vast majority of whom are disabled. Research over decades of work in the field has conclusively demonstrated that supportive services are a crucial component of lasting success and preventing a return to homelessness. Until now, the federal administration has acknowledged the overwhelming research into these approaches and has shaped its program policies and priorities accordingly. The FY25 NOFO represents a sharp reversal of decades-long policy, putting vulnerable Mainers at risk and shifting their care and much of the costs associated with their return to homelessness to the state and local communities, through new shelters and General Assistance. The Office does not have the resources to absorb the effects of this shift in federal policy.

18.     This new NOFO also changes the proportion of CoC projects subject to competitive scoring. In the FY24 NOFO, 90% of projects could be ranked in the non-competitive Tier 1; in the FY25 NOFO, Tier 1 can comprise only 30% of projects. Currently, $20,543,675 or approximately 91% of CoC funds awarded to the MCoC are dedicated to permanent housing projects. This is the most significant structural change in a decade and affects the Office's PSH program directly. Our PSH project has historically been in Tier 1 and has consistently scored very well against established performance criteria. Now, however, the drastic reduction of projects protected in Tier 1 means that the Office's PSH program will face significantly greater competition with other projects in Tier 1. In other words, the Office's program is subject to an estimated 50-70% cut based on the 30% cap to PSH (as described above) *as well as* to a 30% cap on Tier 1; this compound compression means that the Office's PSH Tier 1 funding will likely be slashed *in excess of* 70% even before scoring takes place. Any reduction in funding translates directly into a reduction in services to formerly unhoused Mainers and an increase in individuals returning to homelessness.

**Suppl. App. 407**

19.     The Office's PSH program scored highly for many years against consistent and transparent scoring criteria because, in partnership with partner agencies, we invested in infrastructure and programming designed to meet the federal priorities of the time. The FY25 NOFO upends those long-held priorities and establishes new priorities for which the Office must pivot an extensive statewide program in a short time frame on reduced funding. Additionally and notably, the FY 2025 NOFO introduces new scoring criteria based on past performance – performance that was guided and shaped by prior, now-discarded federal priorities. For example, the new FY25 NOFO awards bonus points to projects that mandate participants to engage in services, whereas the prior NOFO encouraged voluntary participation in services. In other words, the FY25 NOFO contains a deep, and possibly deliberate, mismatch that will tip many CoC Tier 2 projects, including as much as 70% or more of the Office's PSH program, towards a low overall score. This puts any Tier 2 portion of the Office's program, and the Mainers that portion supports, at particular risk.

20.     The Office's PSH program is additionally at-risk based on the new NOFO's Merit Review process, which replaces prior CoC scoring and shifts weighting. Separate from individual project review and scoring, the Merit Review evaluates the entire CoC as a collective. In this new NOFO, HUD elevates "public safety" as a major scoring factor: CoCs must show laws prohibiting camping and illicit drug use, enforcement protocols, cooperation with law enforcement, use of involuntary commitment standards, and SORNA implementation across the entire geographic area of the CoC. Maine's CoC is statewide and many of these statewide laws and frameworks do not exist nor, based on the legislative process, could they be implemented if desired within the compressed timing of the competition. This means that Maine's CoC as a whole will likely score lower than other CoC jurisdictions and hence receive less or no funding at all, putting the entirety

**Suppl. App. 408**

of the Office's PSH project at risk. It has been suggested that the Merit Review is deliberately constructed to facilitate a shift in federal homelessness funding from "blue states" to "red states."

21.    The Office is exploring how it might create programs under the new NOFO to keep PSH program participants from being turned out of their safe, stable homes to the streets. Unfortunately, the new NOFO's project quality and eligibility thresholds create significant barriers to a trauma-informed transfer of participants from permanent to transitional housing. Participants cannot enter new transitional programs except if they are deemed homeless; this means that the Office would have to force vulnerable Mainers into homelessness as part of the transition. Similarly, the Office would have to move participants who currently access supportive services voluntarily into 40 hours of mandatory customized services per week and, to earn bonus points in scoring, subject them to "voluntary" immigration verification. These are not trauma-informed best practices for addressing the behavioral health needs of the homeless population. Indeed, these approaches contradict the stated FY25 policy priority wherein "CoCs should encourage the use of trauma informed care [and] ensure safety of program participants."

22.    Finally, HUD's review of applications has always included an assessment of risk and past performance. In the FY25 NOFO, this risk review incorporates the same criteria (financial controls, effective management systems, results of audits) but adds two new criteria: (a) "[o]ther public sources such as newspapers, Inspector General or Government Accountability Office reports or findings, or other complaints that have been proven to have merit" and (b) a "[h]istory of subsidizing of facilitating activities that conflict with the purpose of this

**Suppl. App. 409**

NOFO." These conditions are highly subjective and could disqualify any project, including the Office's PSH program, based on a process that is not transparent, standardized, or protected from partiality.

23.    Current vulnerable PSH participants are scared and confused. One gentleman wrote to my office: "I feel alone abandoned by the government. I don't even have a car that I can live in. And I know being alone wolf on the street there's no way I Will survive or stay sober. I really need any and all assistance available." PSH participants are our north star as we navigate the challenges this NOFO presents and at the heart of our concerns expressed in this declaration.

24.    In summary, the new FY25 NOFO puts the Office's long-standing HUD-funded PSH program in existential peril and, with it, the success, recovery, and self-sufficiency of Maine's most vulnerable people.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st  day of November 2025.

*Sarah Squirrell*
_____
Sarah Squirrell
Director
Office of Behavioral Health, Department of Health
and Human Services

**Suppl. App. 410**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF DANIELLE MEISTER |
| Defendants. | |

1

## <u>DECLARATION OF DANIELLE MEISTER</u>

I, Danielle Meister, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am the Assistant Secretary for the Division of Homeless Solutions at the Department of Housing and Community Development (DHCD) for the State of Maryland. I make this declaration based on personal knowledge and information obtained in my official capacity.

2.    I started this position in January 2024 and have held several leadership roles in homeless services at DHCD since January 2020. Since starting at DHCD, I have directly overseen the management of over $550 million in federally-funded grant programs through the U.S. Treasury, U.S. Department of Health and Human Services, and U.S. Department of Housing and Urban Development.  Prior to my employment at DHCD, I worked in senior leadership positions at anti-poverty and homeless services in local government and nonprofit organizations for 15 years. I have a Master's in Public Affairs from Indiana University Bloomington.

3.    I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DHCD staff, or from my review of relevant documents and information.

4.    DHCD is the CoC Collaborative Applicant and HMIS Lead Agency for the Maryland Balance of State Continuum of Care (MD-514).  Additionally, we provide state funding and technical assistance for homeless services to all 10 Continuums of Care in Maryland, manage the state's Homeless Services Data Warehouse, lead the Maryland Interagency Council on Homelessness, and oversee the state's strategy to prevent and end homelessness.

5.    As the Assistant Secretary for the Division of Homeless Solutions, I provide executive leadership and decision making on homeless response strategy, ensure successful and

2

<b>Suppl. App. 412</b>

compliant management of all federal and state grant funding to address homelessness, and oversee implementation of the Maryland Balance of State CoC programs in alignment with federal statute and HUD program regulations.  As the CoC Collaborative Applicant and HMIS Lead, our division is responsible for applying for federal funding through the annual HUD CoC Program funding competition, monitoring HUD CoC- and ESG- funded programs for compliance, implementing written standards and procedures for program services and Coordinated Entry, operating the Homeless Management Information System which collects homeless data and tracks programmatic outcomes, and facilitating the Continuum of Care Board which is responsible for the overall governance of the CoC.

6.      The Maryland Balance of State CoC (MD-514) organizes and governs the homeless services system for 9 rural and suburban counties in Maryland, over a third of the State.  The CoC geographic coverage area includes Allegany, Calvert, Cecil, Charles, Frederick, Harford, Garrett, St. Mary's, and Washington counties.

      a.      The members of the CoC include nonprofit and local government entities providing direct homeless services such as street outreach, shelter, and permanent housing, healthcare and benefits systems leaders, community stakeholders, people with lived experience of homelessness, faith leaders, and partner organizations addressing poverty and homelessness in the local community.

      b.      In 2024, HUD awarded a total of $8,663,478 in grant funding under the CoC competition to the Maryland Balance of State CoC.  Of this award, $6,802,605 was allocated to permanent supportive housing, $684,083 to rapid re-housing, $424,656 to joint transitional-rapid re-housing, $341,920 to supportive

**Suppl. App. 413**

services, and $410,214 for planning and HMIS grants used to meet HUD grant administrative and compliance requirements.  The permanent supportive housing (PSH) projects funded under the CoC program, by federal statute, require participants to have a permanent disability and experience homelessness in an unsheltered setting, emergency shelter, or transitional housing prior to receiving assistance.  Additionally, HUD regulations and funding requirements require the CoC to prioritize all new PSH openings for people who are chronically homeless and have been homeless for at least 12 months in a three-year period and further prioritize people with the longest length of homelessness.  For rapid re-housing (RRH) and joint transitional-rapid re-housing (Joint TH-RRH) projects, participants are not required to have a disability for eligibility, but HUD does require the CoC to prioritize those who are chronically homeless for openings, and a participant must have a permanent disability to meet the HUD chronic homeless definition.  All of the housing projects funded by the CoC program, by nature of HUD-issued eligibility and prioritization requirements, serve the most vulnerable, high acuity, medically fragile, and elderly people experiencing homelessness within our CoC and State.

c.  This prioritization strategy and a strong focus on permanent housing outcomes has led to a 54 percent reduction in unsheltered homelessness and 41 percent reduction in overall homelessness for the Maryland Balance of State CoC over the last 10 years (2015-2024).  Statewide, across all 10 Maryland Continuums

**Suppl. App. 414**

of Care, these practices have also led to a 42 percent reduction in unsheltered homelessness and 28 percent reduction in overall homelessness..

7.    Each year, the HUD CoC funding competition requires DHCD and other CoC Collaborative Applicants across Maryland to conduct an intensive and fast-paced open local funding competition to solicit new and renewal projects that align with HUD's stated policy, funding, and scoring priorities outlined in the NOFO.  DHCD and other Collaborative Applicants must also prepare a lengthy and detailed CoC application, which consists of scored questions on our CoC homeless data, performance outcomes, system-level strategy for addressing homelessness, and governance practices.  Finally, DHCD and other Collaborative Applicants must score and rank all projects selected for inclusion in the CoC's application for funds and align them into a Tier 1 and Tier 2 according to HUD's thresholds. The application for funds also requires Collaborative Applicants to sign legal certifications that the information submitted in the application is accurate and that the projects chosen to receive awards will fully comply with statute and HUD policy.  The CoC funding application process is time-consuming, extensive, and must be carefully executed in order to meet the tight deadlines that HUD establishes for project applicants, notification requirements for accepted/rejected projects, and the overall NOFO submission.

8.    DHCD has been the Collaborative Applicant for the Maryland Balance of State CoC since January 2020, when the CoC was created through the merger of 5 separate Continuums of Care.  The CoC subsequently expanded through two additional mergers.  The 2025 CoC Competition will be the sixth competition that DHCD has led.

9.    The majority of projects funded by the CoC NOFO receive 12-month grants which renew on an annual basis.  These grants fund monthly rental assistance payments on behalf of

**Suppl. App. 415**

program participants to private landlords, pay leasing costs to owners of single-site housing, and provide supportive services and administrative funds for staff payroll, operations, and financial management and oversight. The majority of costs associated with operating a CoC-funded projects are mandatory routine monthly or biweekly costs. Receiving an award or payment from HUD even one week late means that program staff may not be paid for work completed, rents may not be paid to landlords and program participants will face eviction, or that a nonprofit may have to pay interest on a line of credit if they have to borrow funds to meet these obligations. Under a normal year, HUD typically releases the NOFO in the summer and requires applications to be submitted in the fall. It takes HUD several months to score applications, make award determinations, and publicly announce those determinations. Prior year award announcements have been released in January or February. It takes an additional several months for local HUD field offices to issue actual grant agreements and enable projects to draw down funds for services provided. Projects funded under the CoC competition that have grant expiration dates in the first half of the calendar year routinely receive award notices and grant agreements after their awards have already expired and they are operating projects un-funded.

10.     I understand that the HUD Continuum of Care Notice of Funding Opportunity was released on November 13, 2025, over four months later than normal. The due date for CoC application submissions is January 14, 2026. This late NOFO release and submission will already cause significant harm. The NOFO also noted the expected date of award would be May 1, 2026. Considering that it takes several months for grant agreements to be issued, it will now be extremely difficult, if not impossible, that any CoC renewal projects with grant expiration dates before July 1, 2026 will have a legally executed grant agreement in place before their current funds run out. For example, 31 projects totaling $20,803,765 in CoC awards across Maryland have grants that

**Suppl. App. 416**

will expire between January 1, 2026 and June 30, 2026. These projects provide permanent housing to 1,250 households and 2,224 people.

11.     This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." This change is in direct conflict with the statutory permission Congress gave HUD to conduct a biannual competition instead of an annual competition in 2025.  CoCs did not know and were not prepared to submit an annual funding application in 2025, as the next competition would have been in 2026.

12.     "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

    a.     This change will put 70 percent of the CoC's project portfolio at risk of being cut, by requiring the CoC to put these projects in "Tier 2".  HUD scores Tier 2 projects independently using their own criteria stated in the NOFO, and makes them compete for funding with Tier 2 projects in other communities. Historically, Tier 1 thresholds have been set at 90 to 95 percent, which allowed the CoC to put the majority of its highest-performing projects serving the most vulnerable clients, typically permanent supportive housing, in Tier 1.  This gave CoCs assurances that those clients enrolled in those projects would likely not be impacted by any losses of funding or HUD cuts.  Having a project in Tier 1 gave the funding recipient affirmation that even in the case of a late award, the funding was likely to be awarded and the project should continue to serve clients even if it had not received a renewal notice yet because it would

**Suppl. App. 417**

eventually receive HUD reimbursement for services – critical for ensuring the stability of housing.

b.    Changing the Tier 1 threshold to 30 percent puts significantly more projects "at-risk" of funding cuts and creates unpredictability for organizations providing the direct services. Communities that do not score as well as others on the overall application, and those that do not submit high-barrier transitional housing projects in Tier 2, are likely to lose funds permanently.  This change is likely also to make renewal projects unwilling to continue providing services unreimbursed without an award notice or grant agreements, which could cause a disruption in housing and services.

13.    "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Pg. 15.

a.    The Maryland Balance of State CoC has $7,911,344 in renewal permanent housing projects in its portfolio.  The 30 percent cap on permanent housing would require the CoC to cut $5,418,016 in funding to local projects, ending permanent housing assistance for 466 households, 821 people, and 355 children.  The majority of projects impacted would be permanent supportive housing, which would have a direct and disparate impact on people with disabilities and the elderly.  The majority of program participants only receive disability or social security income, and are unable to afford fair market rental housing without a subsidy.

b. Statewide, the 30 percent cap will result in a $45,927,091 cut to permanent housing projects, ending housing assistance for 2,399 households, 4,305 people, and over 1,900 children.

c. Previously, the CoC competition did not have a cap on permanent housing assistance – in fact, it explicitly has required and prioritized funding permanent housing since 2013 over transitional housing and other interventions. This allowed CoCs to allocate funds according to local needs – by strategically funding projects for PSH, RRH, and Joint TH-RRH to match the local households experiencing homelessness and their level of acuity and need.

d. The CoC and State do not have alternative permanent housing resources, such as vouchers or affordable housing, to be able to transition the impacted program participants to another subsidized program. Additionally, there are insufficient shelter beds to provide impacted households if they cannot afford to maintain housing independently when their HUD-funded subsidy ends. During the last HUD Point-in-Time Count, the shelter bed vacancy rate was less than 3 percent. These households are highly likely to become unsheltered, return to abusive or dangerous family/friends, or forced into an institutional setting.

e. The reduction of permanent housing will have lasting and severed economic impacts to local governments, the state, and broader community. The immediate and increased unsheltered homelessness will result in an increase of $230 million in costs statewide in the form of costs to emergency services such as Fire, EMS, and law enforcement, emergency department use, Medicaid,

**Suppl. App. 419**

healthcare systems, and correctional systems. These costs are borne by the state and local governments and municipalities.

14. Mandatory Supportive Services for New Transitional Housing Projects. HUD's newly introduced threshold requirements demand that a new transitional housing project require participants to take part in supportive services such as substance use treatment. Additionally, they require programs to provide 40 hours per week of customized services for each participant. HUD notes that only participants who are working, elderly, or have a physical or development disability can be exempted from these requirements. This is discriminatory towards people on the basis of their type of disability. People with mental health, substance use, or chronic disease are not afforded the same exemptions. Both the statute and governing HUD regulations employ a more expansive concept of "disability" that encompasses a broad range of qualifying conditions. *See* 42 U.S.C. § 11360(10)(A); *id.* § 15002(8); 24 C.F.R. § 578.3.

15. Even if these conditions were not themselves problematic, compliance with dramatically different conditions will require a complete overhaul of our processes and those of our applicants. This will require more time, money, and effort to comply, and is not feasible to do by January 14.

16. Projects have reported that they do not have sufficient time to design and submit new transitional housing project applications, considering these have not been eligible under the HUD competition for many years. Most transitional housing programs are single-site complexes – unless a project applicant already has secured a building that meets HUD Housing Quality Standards, they would not be able to apply and meet threshold. Additionally, all CoC project applications require a 25 percent cash or in-kind match as a threshold requirement. As project applicants are required to submit applications to their CoC by December 14 (30 days ahead of the

10

**Suppl. App. 420**

HUD deadline), 3 weeks is insufficient time to fundraise or enter into a legal Memorandum of Understanding that has a fiscal commitment.

17.     The requirement to provide 40 hours of customized services per week per participant in new transitional housing projects is substantially different than current program models.  This will require programs to hire additional full-time staff, increasing the cost to deliver housing assistance dramatically.

18.     Terminating programs that rely on CoC grants will interfere with our state's homelessness goals and DHCD's ability to accomplish its mission and objectives. Governor Moore's State Plan sets a goal to end chronic homelessness in the state by 2035.  In State Fiscal Year 2025, 2,900 people experienced chronic homelessness. Cutting permanent housing assistance by $45 million and returning an additional 4,300 people to homelessness immediately will more than double the number of people experiencing homelessness in just one year.  This singular action by HUD would reverse more than a decade of progress in addressing homelessness in our state and have rippling economic impacts to the state, local governments, landlords and property owners, eviction courts, and jobs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _24th_ day of November 2025.

_____
Danielle Meister
Assistant Secretary, Division of Homeless Solutions
Maryland Department of Housing and Community
Development

**Suppl. App. 421**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| | C.A. No. 1:25-cv-00626-MSM-AEM |
| v. | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF KAREN R. BYRON |
| Defendants. | |

1

**Suppl. App. 422**

## <u>DECLARATION OF KAREN R. BYRON</u>

I, Karen R. Byron, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am the Balance of State (BoS) Continuum of Care (CoC) Supervisor at the Executive Office of Housing and Livable Communities (EOHLC) for the Commonwealth of Massachusetts. I have held this position since 2021. As more fully described below, my primary duties and responsibilities in this role include overseeing and managing a portfolio of community informed programs providing permanent and temporary housing and related support services for extremely vulnerable Massachusetts families and individuals living with disabilities and suffering from persistent and recurrent homelessness. I have been working in United States Department of Housing and Urban Development (HUD) funded low-income housing and homeless programs since 1995 and CoC programs since 2008.

2.    I am familiar with the information in the statements set forth below either through personal knowledge, consultation with EOHLC staff, or from my review of relevant documents and information.

**<u>Overview of Massachusetts CoC Programs</u>**

3.    There are 11 CoC programs that operate in the Commonwealth pursuant to the federal McKinney-Vento Homeless Assistance Act, as amended. 42 U.S.C. § 11301, et seq.

4.    As required by this statute and its implementing regulations at 24 C.F.R. Part 578, the CoC program is designed to:

    a.  Promote communitywide commitment to the goal of ending homelessness;

    b.  Provide funding for efforts by non-profit providers, States, and local governments to quickly rehouse homeless individuals (including youth) and

2

<b>Suppl. App. 423</b>

families, while minimizing the trauma and dislocation caused to homeless individuals, families, and communities by homelessness;

c.  Promote access to and effective utilization of mainstream programs by homeless individuals and families; and

d.  Optimize self-sufficiency among individuals and families experiencing homelessness.

5.  In total, the 11 CoC programs in Massachusetts receive over $136 million in funding each year from HUD to support housing and supportive service programs for nearly 4,000 chronically homeless, homeless, and disabled families and individuals in the Commonwealth. The population served includes veterans, elders, people living with HIV and AIDS, runaway youth, domestic violence survivors, children, and families. The myriad problems created by poverty and marginalization are compounded when combined with disabilities, including severe mental illnesses. It is no overstatement to say that the CoC programs serve the most vulnerable members of our communities.

**EOHLC's Role Overseeing the BoS CoC**

6.  EOHLC is the state agency which oversees the Massachusetts BoS CoC (one of the 11 CoC program grantees in the Commonwealth). In this capacity, EOHLC applies for and receives grant funding directly from HUD to administer and fund eligible CoC program activities as carried out by its subrecipients, which consist of supportive service and housing providers. EOHLC is responsible for preparing and submitting the consolidated CoC Program Competition application to HUD for the CoC program it administers, including subrecipient project applications.

7.  I manage a team of six people at EOHLC who work on the BoS CoC. We ensure the BoS CoC projects operate in accordance with the regulations at 24 C.F.R. Part 578, including

3

**Suppl. App. 424**

ensuring a community-wide process involving the coordination of various providers to develop strategies for ending homelessness and identifying resources available to meet that goal. My team's work includes: providing project oversight and working with subrecipients to address challenges and ensuring effective and efficient use of CoC funding; managing invoices for funding and developing contracts with subrecipients; undertaking a full annual monitoring as well as a quarterly review process to ensure projects are on target for spending and contract compliance; performing governance tasks including committee development (e.g., the Project Evaluation Committee, which assists in rating applications from potential subrecipients); coordinating with our Advisory Board (which makes a final decision regarding the content of the CoC's application to HUD); preparing for the funding competition; ensuring participation in the annual Point in Time (PIT) count (an annual survey conducted by COCs to gather concrete data on homeless populations); partnering with Emergency Solutions Grants (ESG) recipients; and participating in the consolidated planning process within the BoS CoC jurisdiction. Once the notice of funding (NOFO) is released, we immediately review it, develop a calendar, and plan for ensuring participation by our community members. Planning initiatives include developing new project applications, posting all information to our own webpage and partner webpages, meeting with the Project Evaluation Committee to rank projects, meeting with the Advisory Board to approve project ranking, and developing the BoS CoC application.

8. The BoS CoC covers 115 communities in the northeastern region of Massachusetts. Its membership includes representatives from nonprofit homeless providers, municipal governments, law enforcement entities, advocate organizations, faith-based organizations, and other groups as well as persons with lived experience of homelessness. The BoS CoC provides funding for CoC program components including Supportive Services (SS or SSO for Supportive

**Suppl. App. 425**

Services Only), Transitional Housing (TH), Rapid Rehousing (RH), Joint Component Transitional Housing-Rapid Rehousing (TH-RRH), Permanent Supportive Housing (PSH), Youth Homelessness Demonstration Program (YHDP), and the administration of Homeless Management Information System (HMIS) and Coordinated Entry (CE). For fiscal year (FY) 2024, the BoS CoC was awarded $33,131,265, of which $20,880,538 (roughly 63 percent of the total funding) has been obligated for PSH; $2,812,025 for RRH; and $3,576,093 for joint TH-RRH (inclusive of YHDP).

9.      Combined with the HUD grant assistance provided through the McKinney Vento Homeless Assistance Act and required matching funds, including but not limited to state funds, the BoS CoC received the following amounts:

    a.  FY 2022:      $42,760,190.00

    b.  FY 2023:      $36,630,514.75

    c.  FY 2024:      $37,989,851.25

10.     The BoS CoC's subrecipients use CoC funding to carry out important programs serving the most vulnerable people in the Commonwealth, including those who are chronically homeless, households with children, elders, veterans, those with multiple disabilities, and youth and young adults between the ages 18 and 24. ACTION, Inc. is one such subrecipient. Since 2012, ACTION has operated Welcome Home 1 Expansion (WH1) in Gloucester as the first program implementing Housing First principles in their area of the state. WH1 provides 57 units of PSH. Households entering WH1 are chronically homeless. Many have spent years on the street prior to being housed, have numerous behavioral and physical health challenges, and many are unable to attain employment due to their disabilities, including substance abuse disorders. All receive case management along with a plethora of supportive services at the agency and throughout the

community. In the last year there were no exits to homelessness; and nearly all participants maintained housing or exited to their own permanent housing.

11.     Typically when HUD releases a new NOFO for the CoC program, EOHLC schedules a meeting with the full CoC membership (which includes both funded and non-funded entities, those that would like to apply for funding, persons with lived experience of homelessness and other stakeholders) to provide a schedule and invite new project applicants and project ideas. We also typically raise and discuss changes in the NOFO, Tiering criteria (i.e., which projects will be in Tier 1 as opposed to Tier 2, as Tier 1 projects are fully funded before any Tier 2 projects are funded), and any other relevant information related to the NOFO. The BoS CoC Project Evaluation Committee also meets to review our ranking tool and any new priorities identified in the NOFO.

12.     The BoS CoC staff support subrecipients in their application processes, including technical support in the utilization of the federal E-SNAPS system.

13.     We provide training for all applicants (new and renewal) and make ourselves available for their questions and assist them if they are struggling with E-SNAPS.

14.     We review the project applications for completeness, accuracy, and eligibility, amending them when necessary until they are finalized.

15.     We create review teams who score project applications and submit scores for review by the Project Evaluation Committee, which reviews scores and develops at least two options for the Advisory Board to vote on to determine the Priority Listing.

16.     The Advisory Board then meets and evaluates the Project Evaluation Committee suggestions to determine the Tier 1 and Tier 2 rankings for the CoC, which are then put into the Priority Listing. Their vote is binding.

**Suppl. App. 427**

17.    While project applications are being developed and reviewed, the EOHLC CoC staff work to address subrecipient and potential subrecipient questions, reaching out to leveraging and partnering organizations (including Public Housing Authorities across the CoC) to most effectively and accurately respond. Staff also work to gather and develop required attachments, review CoC and partner webpage postings, and include all CoC members and new organizations who wish to be part of the CoC or apply for funding.

18.    BoS CoC grants have historically been used to provide funding for housing and services via new projects and renewals for successful projects. This mix ensured ongoing service provision that minimizes displacement and re-traumatization while supporting stability and long-term success of formerly homeless families and individuals.

19.    Our subrecipients plan their budgets, including staffing and program capacity, well in advance of the NOFOs. Knowing when the NOFO is likely to be published, and knowing what will be required to demonstrate a successful project that is seeking renewal, allows subrecipients to provide ongoing support to those being served.

20.    Federal regulations require subrecipients to make one-year commitments; but without the expectation that successful projects can anticipate renewal, those agencies are at risk if they enter into one-year leases at any point during the contract period beyond month one. Subrecipients are likely to stop admitting new households in order to preserve funding for existing obligations due to this uncertainty. Fewer households experiencing homelessness will be able to access housing as a direct result.

21.    EOHLC and subrecipient service providers have been operating with the understanding that CoC NOFOs would be reasonably predictable and consistent with those from prior years—as indicated by the past decade or so of NOFOs, and HUD's indication of a two-year

**Suppl. App. 428**

funding cycle in the last NOFO. Subrecipients must make programmatic decisions between NOFOs, including whether to renew leases or admit new program participants. They make those decisions in reliance on successive NOFOs aligning with applicable law, HUD's own guidance, and prior NOFOs.

22.    The vast majority of federal CoC funding made available to Massachusetts in a given federal FY has historically been used to provide permanent housing for the most vulnerable homeless individuals and families.

23.    To be effective, EOHLC's internal assessment tool for BoS CoC project applications must be aligned with HUD's priorities. Any disruption or change in HUD's process or goals requires substantial planning to re-tailor the tool. This is usually done well in advance, which was not possible this year without advance notice of the dramatic shifts in the FY 2025 NOFO.

24.    EOHLC is also responsible for the development and submission of the Commonwealth's 5-year Consolidated Plan. A Consolidated Plan is a HUD-approved plan developed in accordance with HUD regulations at 24 C.F.R. Part 91. As part of the BoS CoC funding application, EOHLC must certify that its proposed CoC programs are consistent with the Consolidated Plan and the community planning and development program goals.

25.    The fundamental goal of the community planning and development programs, including the CoC program, is to develop viable urban communities by providing decent housing and a suitable living environment and expanding economic opportunities principally for low-and moderate-income persons. As set forth in the HUD regulations, "[t]he primary means towards this end is to extend and strengthen partnerships among all levels of government and the private sector, including for-profit and non-profit organizations, in the production and operation of affordable

housing." 24 C.F.R. § 91.1 (a)(1). Under the regulations, 'providing decent housing' expressly includes 'assisting homeless persons to obtain appropriate housing' and 'increasing the supply of supportive housing.' 24 CFR § 91.1(a)(1)(i).

26.     Pursuant to HUD regulations, this Consolidated Plan requires the jurisdiction to state in one document its plan to pursue these goals for all the community planning and development programs, as well as for housing programs.

27.     EOHLC recently submitted Commonwealth's five-year Consolidated Plan in June 2025.

28.     A core component of our Consolidated Plan is dedicated to homelessness planning, including addressing the interrelationship between stakeholders, projects, and funding that contribute to a cohesive strategy confronting this multi-faceted problem. Large-scale and sudden changes to the CoC program disrupt the entire landscape and undermine EOHLC's ability to certify that its CoC programs are consistent with and further the goals set forth in its Consolidated Plan as required by the CoC regulations at 24 C.F.R. § 578.27.

**The FY 2025 CoC NOFO**

29.     HUD issued last year's NOFO for FY 2024-2025 as a transition from one-year to two-year application cycles for the CoC program. The BoS CoC spent months preparing its FY 2024-2025 consolidated application, anticipated not needing to submit one this year, and had planned accordingly with respect to staff capacity and communications within the CoC membership, subrecipients, and potential subrecipients.

30.     The HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, purports to "rescind[] and supersede[] any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or

**Suppl. App. 430**

Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." It represents a significant departure from past practices and will cause serious harm to and throughout Massachusetts.

31.     The substantive changes in the FY 2025 NOFO require more effort to address than prior NOFOs. The BoS CoC process for navigating annual NOFOs, described above, is structured under the reasonable expectation that NOFOs released by HUD align with HUD's own five-year strategic plan and will be relatively consistent year-to-year. For example, HUD's current strategic plan for FY 2022-2026 emphasizes that HUD will "implement a Housing First approach to reducing homelessness."

32.     The FY 2025 NOFO includes a substantial shift from PSH projects towards TH and SSO projects. As a result, the BoS CoC must now change its processes to prepare the consolidated application to account for that shift. As new TH and SSO projects (except for coordinated entry and homeless management information system SSO) have not been a possibility in CoC NOFOs for several years, they are not addressed as part of the BoS CoC's ranking tool.

33.     Further preventing timely amendments to the ranking tool, HUD provided no advance notice of this change beyond an email sent on July 3, 2025, which stated in relevant part, "the NOFO will seek to provide opportunities for new types of projects including . . . transitional housing programs." The BoS CoC was not provided any relevant detail enabling us to begin to amend our ranking tool to account for this change until the NOFO was released, 62 days before the due date for consolidated applications. Applications for potential subrecipients must be sent to the BoS CoC in advance of this due date to allow time for the BoS CoC to rank the subrecipients according to our rating tool, at least 30 days before consolidated applications are due per the NOFO. This dynamic creates significant pressure for the BoS CoC to dramatically change our

**Suppl. App. 431**

ranking tool in the immediate future to enable potential subrecipients a fair opportunity to understand our ranking criteria and tailor their plans and applications appropriately.

34.    Normally the process of developing a tool can take time as the Committee (comprised of community members and subrecipients) will carefully identify metrics and scoring weight and test the tool. Time spent on this detracts from time we can spend on the CoC application and ensure we are addressing all of the other requirements in the FY 2025 NOFO.

35.    The lack of notice for these changes, and their significant departure from past NOFOs, has prevented the BoS CoC from engaging in more thorough outreach for new projects that may be responsive to the new NOFO.

36.    Additionally, the FY 2025 NOFO states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)."

37.    Tier 1 projects receive funding before any Tier 2 projects. Tier 1 represents the projects the CoC has ranked as being most important for funding and typically represent the highest performing projects in terms of funding expenditures and housing the number of households committed to in the application, as well as CoC strategic priorities.

38.    In previous NOFOs, Tier 1 was typically set between 90 and 98 percent of ARD and projects that passed thresholds consistent with the regulations and statute could anticipate funding so long as they meet eligibility thresholds.

39.    The FY 2025 NOFO also includes new terms regarding project eligibility, discussed further below, which purport to give HUD significant discretion to deem projects ineligible for a variety of reasons. As such, even projects that are allocated to Tier 1 face significant uncertainty and may not receive funding.

**Suppl. App. 432**

40.     To maximize the amount of funding available to serve those in need, the BoS CoC may need to put required infrastructure (CE and HMIS) in Tier 2, creating substantial risk that those components will not receive funding. This could impact our ability to perform the annual Point in Time Count and provide relevant reports to Congress.

41.     Separately, the FY 2025 NOFO includes a section titled "Investment in Transitional Housing and Supportive Service Only Projects." It provides that, "[i]n order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects."

42.     New TH projects have not been contemplated under recent NOFOs, as acknowledged in a July 3, 2025, email from HUD alerting CoCs to anticipate a NOFO for FY 2025: "the NOFO will seek to provide opportunities for new types of projects including . . . transitional housing programs."

43.     It is unclear how this change will impact existing participants in PSH. For example, if funding for a PSH project is reallocated to create a TH project, it is not clear whether the tenants of the PSH project will retain housing for two years in the new project. This is because TH must serve program participants that meet the definition of "homeless" under the CoC regulations. HUD has indicated in a response to a question posed by the BoS CoC on April 23, 2025, that once a household is placed in a PSH project, they will no longer treat the household as homeless. HUD provided no further guidance on this in the NOFO.

44.     Further, existing PSH projects may lose 70 percent of their CoC funding in the FY 2025 competition. These projects likely have current contracts using FY 2024 funding. Such subrecipients may be unable to fulfill their commitments under their FY 2024 awards due to

12

uncertainty as to whether and to what extent they may receive future CoC awards that can be used for PSH. These subrecipients may be unable to agree to full year leases under their current awards, may need to stop accepting referrals to preserve funding under their FY 2024 award, or be forced to take other similar actions.

45.    The FY 2025 NOFO includes, "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." In addition, pursuant to the FY 2025 NOFO, "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons, [including] evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans."

46.    These terms are a sharp deviation from how HUD has operated the CoC program in the past as memorialized in prior NOFOs, the 2016 Equal Access rule, and other HUD publications and trainings. For example, the FY 2024-2025 NOFO included scoring criteria that provided an advantage for CoCs that "[serve] all family members together and in accordance with each family member's self-reported sexual orientation and gender identity" and "annually [conduct] training to providers about how to effectively implement the Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity Rule, and the Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs Rule."

**Suppl. App. 434**

47.    The BoS CoC, its subrecipients, and potential future subrecipients have taken actions in-line with historic HUD requirements and guidance regarding gender identity and sexual orientation which HUD may now use to deem project applications ineligible for funding or otherwise negatively impact their scores during the competition.

48.    Pursuant to the FY 2025 NOFO, "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition" based on "evidence that the project operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction.'"

49.    Some subrecipients receiving CoC funds through the BoS CoC use funding through the Massachusetts Department of Public Health's (DPH) Bureau of Substance Addiction Services (BSAS) as match. BSAS contracts require harm reduction models of care. Not only would the new NOFO terms prevent the use of these additional funds at subrecipient projects, requiring other sources of match at a minimum, they also may render these subrecipients ineligible for funding.

50.    Some subrecipients receiving CoC funds for PSH and TH through the BoS CoC also receive funding through DPH-contracted Syringe Service Programs. Not only would the relevant new NOFO terms prevent the use of these additional funds at subrecipient projects, they also may render these subrecipients ineligible for funding.

51.    Some subrecipients receiving CoC funds through the BoS CoC engage in harm reduction models of care independently from requirements associated with funding they receive, including the distribution of Narcan to reduce the risk of opioid related deaths. The new NOFO terms may render these subrecipients ineligible for funding.

**Suppl. App. 435**

52.    The FY 2025 NOFO includes new related terms that provide a scoring advantage for applicants who can cite to certain types of state or local laws or protocols that "cover the CoC's entire geographic area" regarding prohibitions on "illicit drug use" and "public camping or loitering" and other associated terms.

53.    I am unaware of any applicable laws or protocols that "cover the CoC's entire geographic area" that are likely to qualify for points under these terms. The BoS CoC covers a wide swath of the state, with different municipal governments, governmental structures, and laws. The BoS CoC, its subrecipients, and potential subrecipients have no control over such laws and protocols, or state laws and protocols, on illicit drug use and public camping or loitering. A portion or all of the project applications in the BoS CoC's consolidated application will be penalized in scoring under this NOFO accordingly.

54.    Given that 70 percent of the funding made available by this NOFO is necessarily allocated to Tier 2 projects, the scoring criteria in the NOFO will have a significantly greater impact on determining which projects are awarded funded as compared to prior years.

55.    As discussed above regarding the impact the NOFOs emphasis on TH over PSH on the BoS CoC in developing its consolidated application, these changes likewise create drastically different conditions and will require a complete overhaul of our processes and those of our subrecipients and potential subrecipients moving forward. Responding to the new and unexpected demands of the FY 2025 NOFO will take an extraordinary amount of time and work, and it is unrealistic for HUD to expect CoCs (including EOHLC) to accomplish this by the date consolidated applications are due to HUD on January 14, 2026. As of the date of this declaration, project applications and the CoC application are still not available in relevant online portals.

**Additional Harms to Massachusetts**

**Suppl. App. 436**

56.     Already as a result of the FY 2025 NOFO, some BoS CoC subrecipients are not accepting new referrals as they are concerned they will not be able to comply with leasing requirements. Subrecipients are further concerned about the viability of the organization as a whole if they enter into contracts they cannot fulfill because funding is not awarded even if they are placed in Tier 1.

57.     If the NOFO for FY 2025 is implemented as it stands, the BoS CoC and its subrecipients may not receive funding necessary for the continued operation of our programs. Long-term projects that have successfully housed the most vulnerable people in the Commonwealth, who otherwise are at the highest risk of experiencing chronic homelessness, may need to stop.

58.     The consequences of any program closures for current participants will most likely be severe. Beyond the re-traumatization and destabilization the NOFO's knock-on effects will have on impacted individuals and families, people may end up on the streets, as nighttime temperatures in the BoS CoC's geographic area fall below freezing on most nights. Others—like survivors of domestic violence—may face the impossible choice of returning to an abuser or enduring unsheltered homelessness.

59.     The Commonwealth has adopted an Olmstead Plan, a comprehensive, effective working plan for expanding access to community-based services for qualified persons with disabilities in long-term care facilities or at risk of entering such facilities. Access to affordable accessible housing for people with disabilities is a core pillar of this plan, and addressing homelessness through CoC funded PSH is an integral part of the Commonwealth's efforts to ensure individuals with disabilities are able to receive services in the most integrated setting. A reduction

Suppl. App. 437

in funding for COC/PSH would undermine these efforts and weaken the Commonwealth's ability to meet its Olmstead goals.

60.     Terminating programs that rely on BoS CoC grants will also interfere with the Commonwealth's broader homelessness goals. EOHLC, on behalf of Massachusetts, submitted a new five-year Consolidated Plan to HUD in June 2025 for Federal FYs 2025-2029 alongside a corresponding annual action plan for Federal FY 2025.[1] These plans are required by HUD as related to several of its funding streams, including Community Development Block Grants (CDBG), HOME Investment Partnerships (HOME), ESGs, and others. These plans are the product of extensive planning and substantial citizen participation. Among the objectives described in the Commonwealth's current HUD-approved, Consolidated Plan[2] is the goal to "[r]educe chronic and family homelessness through a housing-based approach, with a long-term goal of ending homelessness." The plan was drafted in reliance on stable CoC funding from HUD for PSH and repeatedly cites the continued need for investment in and expansion of permanent supportive housing, including as provided through the CoC program. The plan details the interrelationship of CoC PSH funding with other state and federal programs that rely on one another to implement this strategy. For example, other state agencies, such as the Executive Office of Health and Human Services and its constituent departments, provide crucial supportive services to several CoC projects throughout the Commonwealth that are likely to be disrupted as a result of the FY 2025 NOFO. The FY 2025 NOFO's substantial departure from how the program has been run in prior years will necessitate significant re-evaluation of these strategies and programs.

---

[1] *Five Year Consolidated Plan 2025-2029* (June 2025), *available at* https://www.mass.gov/doc/final-fy2025-2029-five-year-consolidated-plan/download.
[2] *Statewide Housing Needs Assessment* (Feb. 2025), *available at* https://www.mass.gov/doc/statewide-housing-needs-assessment/download.

Suppl. App. 438

61.    In addition to the harms to EOHLC as the entity responsible for administering the BoS CoC, the changes in the FY 2025 NOFO and potential loss of funding to other CoCs in the Commonwealth will have a dramatic impact on the tightly woven fabric of homelessness prevention strategy statewide with substantial ramifications for other state services.

62.    If the other Massachusetts CoCs are unable to satisfy the new and unexpected demands of this NOFO, they may need to close their programs. Losing those programs may result in a statewide increase in homelessness, especially among families and individuals living with disabilities and suffering from persistent and recurrent homelessness (e.g., the most vulnerable populations served by CoC-funded programs). This could place additional strain on other state-funded systems of care.

63.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this   22nd   day of November 2025.


*Karen R. Byron*

Karen R. Byron
Balance of State Continuum of Care Supervisor
Massachusetts Executive Office of Housing and
Livable Communities

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF SARAH RENNIE |
| Defendants. | |

1

## <u>DECLARATION OF MICHIGAN COALITION AGAINST HOMELESSNESS</u>

I, Sarah Rennie, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  I am the Senior Director of Advocacy and Engagement and in-house counsel for the Michigan Coalition Against Homelessness, State of Michigan.

2.  I am a 1998 graduate of the University of Toledo, College of Law, and I have been admitted to the State Bar of Michigan, the Eastern District of Michigan, and the Sixth Circuit Court of Appeals. I have twenty-five years of experience litigating cases for people in poverty, including fifteen years as a legal aid attorney representing the chronically homeless. I have obtained several published legal opinions, including *Moldowan* v. City of Warren 578 F.3d 351 (6th Cir. 2009)—a case of first impression won on interlocutory appeal. I was elected twice as Secretary of the Monroe County Continuum of Care and authored the City of Adrian Rental Ordinance. Additionally, I have four years of experience as Executive Director of Blue Water Safe Horizons, a homeless service delivery program that included a shelter and served as the Housing Access Assessment and Resource Agency. While there, I also chaired the St. Clair County Continuum of Care/Local Planning Body. I have served as an elected member of the Detroit Continuum of Care and as a member of the Michigan Homeless Policy Council, where I was appointed Chair of the Training Committee. I was appointed twice to the Governor's Task Force on Sexual Assault. I have participated in the State Bar of Michigan Access to Justice Committee for persons in poverty, chaired the State of Michigan's Standing Committee on Domestic Violence, and am currently appointed to the State of Michigan Committee on Juvenile Justice. Over the past decade, I have focused on issues related to domestic violence, poverty, and homelessness, and was a lead author of a white paper on inequities within the VI-SPDAT. I currently serve as the Senior Director of

2

**Suppl. App. 441**

Advocacy and Engagement for the Michigan Coalition Against Homelessness (MCAH) and as MCAH's in-house counsel. MCAH is a statewide coalition of over 92 member agencies affected by the 2025 HUD CoC NOFO.

3.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with MCAH staff, or from my review of relevant documents and information.

4.  MCAH is a statewide coalition that includes over 92 homeless service providers, along with representatives from 14 of Michigan's 20 Continuums of Care (CoC), the Michigan Coalition to End Domestic and Sexual Violence (which encompasses more than 73 domestic violence agencies), and the Michigan Veterans Foundation. MCAH members explicitly authorize it to advocate on their behalf. Its goal is to foster collaboration among Michigan's homeless service providers to pool resources for training and advocacy. MCAH's mission is to end homelessness in Michigan through statewide advocacy, public awareness, and support services that empower communities and service agencies. It aims to influence policy and improve access to resources by connecting government, nonprofits, and concerned citizens to drive systemic change and ensure no one is left behind. All MCAH members are entities affected by the 2025 HUD CoC NOFO Competition, either as direct recipients of the Continuum of Care, subrecipients under that grant, or as historical individual beneficiaries of a CoC award.

5.  MCAH supports its members in preparing applications for the 2024 HUD CoC NOFO Competition. MCAH membership is Statewide. Last year, HUD awarded Michigan CoCs $107,737,734 through the 2024 CoC NOFO Competition, providing critical, much-needed funding for the statewide homelessness service delivery system. The 2024 HUD CoC grants adopted a housing-first model that positively impacted thousands of lives. For a brief snapshot of the

3

**Suppl. App. 442**

outcome, among persons in permanent supportive housing (PSH) and rapid rehousing (RRH) funded by this allocation, the 1-year housing retention or discharge rate was over 90%. (29,729 persons participated in PSH/RRH in Michigan in CY2024.) In comparison, the 2025 HUD CoC NOFO emphasizes, among other models, transitional housing, which has a 65% housing discharge rate. Significantly, the timing and major scope shift of the 2025 HUD CoC NOFO will lead to the following effects:

a. The issuance of the 2025 HUD CoC NOFO was much later in the year than in previous years. Over the past decade, CoCs have been notified of HUD's intent to award grants and the amounts by November or December. Some CoCs have subrecipient grant awards ending in February 2026. The 2025 NOFO grantees will not be announced until May, with at least another 60 days typically passing before HUD executes contracts and begins payments. As a result, nearly all of the CoC's subrecipient projects will face a funding gap. Many subrecipients hold lease agreements with their clients, so not only will thousands of Michiganders be deprived of rental assistance, but the delay in grant awards will also push many grantees into breach of contract with landlords.

b. Similarly, the 2025 HUD CoC NOFO limits renewal grants for permanent housing to 30%, rejects the housing-first model, requires new projects to offer 40 hours of supportive services per participant without extra operational funding, and restricts new PSH projects eligibility to physical or developmental disabilities. Across Michigan, the average CoC request for renewal grants exceeds 90%; all follow a housing-first approach, and all rural CoCs report they cannot afford the additional operational costs of supportive services. Michigan depends on PSH projects to provide the least restrictive options for persons with mental health disabilities. Typically, CoCs spend a full quarter year planning their HUD

4

**Suppl. App. 443**

CoC NOFO application and dedicate at least 120 hours to structure and planning. The 2025 HUD CoC NOFO application demands MCAH members to shorten their competition and review time by several months, develop new supportive services, shift to a treatment-first approach, and figure out how to transition individuals with severe mental health disabilities from critical programs within six weeks. CoCs and MCAH members have relied on consistent NOFOs aligned with best practices for over ten years. This change risks causing irreparable harm to CoCs, MCAH members, homeless services, and all low-income individuals with mental health disabilities who depend on PSH and Community Mental Health to live integrated lives.

6. I understand that the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, represents a significant departure from past practices and will cause serious harm.

7. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." Michigan CoCs and Subrecipients have already relied on the FY 2025 awards published on July 31, 2025, to plan, prepare, provide services, enter contracts, and budget to serve the homeless in their communities. It is estimated that this retraction will force at least over 8,000 persons (including over 2,500 families with children) into homelessness. It will cause CoCs and subcontractors to breach contracts, including lease agreements with private landlords, affecting the local economy. This shift is also expected to result in statewide layoffs, impact HMIS data integrity due to staff attrition, and ultimately dismantle the existing homeless service delivery infrastructure, which represents over two decades of work, evaluation, and implementation.

**Suppl. App. 444**

8. The implementation of HUD's gender ideology provisions creates a specific hardship for service providers in Michigan. That provision states in relevant part: "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." Michigan's Elliott-Larsen Civil Rights Act (ELCRA) was amended in 2023 to include explicit protections against discrimination based on sexual orientation and gender identity in housing, employment, and public accommodations. HUD provides no indication that this limitation only applies when using HUD CoC funding, and, in fact, new HMIS data requirements seem to mandate that agencies recognize only a sex binary. However, HUD cannot, through NOFO language alone, relieve housing service providers of their obligation to comply with ELCRA. Similarly, the 2025 HUD CoC NOFO introduces a new data requirement asking service providers to have participants identify their religion. Such a request may also violate ELCRA, which traditionally has explicitly prohibited asking persons seeking housing about their religious beliefs. The conflict between the 2025 HUD CoC NOFO and Michigan law places MCAH's members at a significant competitive disadvantage and forces members to weigh the risk of non-compliance with the NOFO against the potential legal harm of being sued under ELCRA.

9. Until 2025, CoC grantees were required to follow a promulgated equal access rule, which mandated that all housing programs be open to individuals and families regardless of family composition, sexual orientation, gender identity, or marital status. HUD also required that CoC and MCAH subrecipient members be trained in and implement policies that promote Housing First, Diversity, Equity, and Inclusion, along with Racial Justice and Disability Rights (including serving persons with mental health disabilities and providing trauma-informed care for substance

6

**Suppl. App. 445**

users). In the 2025 HUD CoC NOFO, "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons … (h) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." The implementation of this provision will unfairly prejudice every CoC in Michigan, as they were compliant with HUD's prior and directly contrary directives until the change in the administration.

10. The 2025 HUD CoC NOFO provides a bonus for using the SAVE system. This will unfairly prejudice Michigan non-profit service providers, as there are no additional dollars for the SAVE system. In addition, as a practical matter, persons experiencing homelessness do not have documentation and often do not know their Social Security numbers. In addition, the SAVE system can take up to four days to respond, which will force service providers in climates such as Michigan to choose between complying with SAVE and allowing a person to wait on the Street in below-zero weather conditions or shelter individuals in defiance of this provision because of life-threatening climate conditions

11.    The 2025 HUD CoC NOFO's requirement that the entire geography of the CoC have a camping ban will make many CoCs unable to be competitive in this NOFO. Michigan does not have a statewide camping ban. Counties in Michigan can only legislate areas not covered by municipalities. This means that for many CoCs to score points under this section, they would be required to ask every city, village, and township to ban camping individually. Because the timing is so short, even if MCAH members wanted a camping ban, there is no time to implement it, which prevents MCAH members from obtaining full points in this section.

7

**Suppl. App. 446**

12.  Involuntary commitment under Michigan law requires that a person be adjudicated a danger to themselves or others. Michigan lacks the mental health and judicial system resources to implement involuntary commitment as a service delivery model.

13. Michigan is compliant with SORNA, but CoCs have never been part of that compliance framework. CoCs lack the infrastructure, funding, and resources to map the location of homeless sex offenders.

14. Even if all the above conditions were not themselves problematic, compliance with dramatically different service delivery provision would require a complete overhaul of MCAH CoC membership and its applicants. Moreover, even for the CoCs that are the most agile and capable of such an overhaul,  because the majority of scoring requires new services to be in place or scoring is based on past performance, the **best score** that any Michigan CoC could achieve is 75/130- historically too low a score to be funded  For the first time, HUD has reserved the right to issue a supplemental CoC NOFO should there be insufficient applications with high enough scores. Based on this, MCAH believes that few, if any, Michigan CoCs will receive any of the historic $107,737,744 in CoC funding for Michigan, dramatically affecting CoCs and subrecipients' ability to serve members, rendering many Michiganders homeless, forcing extensive layoffs, and devastating Michigan's economy.

15. Through over thirty-five years of operation and expertise, MCAH has never encountered a threat as devastating and extreme to persons in poverty. Not only will this application fracture the homeless service delivery infrastructure, which has taken decades to build, but lives will be lost. MCAH manages the Michigan Statewide Homeless Management Information System (SMHMIS) and can attest that Housing First works, with an over 90% housing discharge or retention rate. Homeless rates in Michigan continue to rise, not because of a failure in the current homeless

**Suppl. App. 447**

service delivery system, but because Michigan faces an affordable housing crisis—recent estimates show the state is short by over 298,000 affordable housing units. Additionally, real wages remain stagnant, and inflation is rising. The radical shift in services and the lack of time for agencies to adapt will turn Michigan's housing crisis into a housing catastrophe. Furthermore, CoCs relied on the two-year funding award in FY 2024. If HUD insists on this ill-advised change in service delivery, it must provide sufficient time for CoCs to adapt and implement these changes in the 2026 HUD CoC NOFO Competition.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 22nd day of November 2025.

*Sarah Rennie*

Sarah Prout Rennie
Senior Director of Advocacy
Michigan Coalition Against Homelessness

**Suppl. App. 448**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF JENNIFER LEIMAILE HO |
| Defendants. | |

1

## <u>DECLARATION OF JENNIFER LEIMAILE HO</u>

I, Jennifer Leimaile Ho, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Commissioner at the Minnesota Housing Finance Agency ("Minnesota Housing") for the State of Minnesota. The State created Minnesota Housing as a state agency in 1971, acknowledging that "[a]n adequate supply of housing of a variety of housing types serving persons and families of all income levels and properly planned and related to public transportation, public facilities, public utilities and sources of employment and service is essential to the . . . prosperity of the state and its communities." Minn. Stat. § 462A.02, subd. 2.

2.      Minnesota Housing is a government agency within the state of Minnesota's executive branch.  The agency has statutory authority to finance all aspects of housing for low- and moderate-income Minnesotans.

3.      Minnesota Housing also provides resources to stabilize families who are experiencing or at risk of homelessness and provides capacity building funds for local agencies that support and assist families.

4.      Before joining Minnesota Housing, I served as the Senior Advisor for Housing and Services at the U.S. Department of Housing and Urban Development, where I managed the Department's work to connect housing with health and social services. I have also served as the deputy director of the U.S. Interagency Council on Homelessness, where I shepherded the development of Opening Doors, the nation's first comprehensive federal plan to prevent and end homelessness.

**Suppl. App. 450**

5.    I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Minnesota Housing staff, or from my review of relevant documents and information.

6.    I was appointed as the Commissioner of Minnesota Housing in December 2018.

7.    Minnesota Housing funds permanent supportive housing projects and administers multiple grant programs that intersect with Continuum of Care ("CoC") funded activities. Diminished funds for CoCs in Minnesota would negatively impact the viability of those projects and the efficient administration of these programs, endangering housing stability and the opportunity to enter housing for people experiencing barriers to housing across the state.

8.    Minnesota Housing funds permanent supportive housing projects that provide affordable housing and supportive services for persons with disabilities as well as people experiencing other significant barriers to housing. Funding takes multiple forms, such as deferred or forgivable loans, and comes from a variety of sources, such as federal Low-Income Housing Tax Credits and state Housing Infrastructure Bond proceeds. These permanent supportive housing projects typically also secure funding from multiple sources, including CoC-administered grant funds. At least 52 permanent supportive housing properties in Minnesota have secured Minnesota Housing and CoC funds and rely on both sources to provide affordable housing and supportive services. Loss of CoC-administered funding could lead to evictions, lost affordable housing units, and destabilization of the operations and financial viability of properties housing and serving extremely vulnerable populations in Minnesota.

9.    Minnesota Housing has invested several other federal resources, including the HOME Investment Partnerships Program ("HOME") and the National Housing Trust Fund ("NHTF"), in permanent supportive housing projects funded with CoC dollars. Loss of CoC

3                                                           **Suppl. App. 451**

operational dollars mean HOME- and NHTF-supported units are at risk of loss, and funding restrictions from those programs means Minnesota is unlikely to be able to reallocate those dollars to new projects. Moreover, if a property is unable to meet its compliance obligations associated with its funding sources, the property may fall into default. Loss of one federal housing program has cascading effects that make other federal funding sources less efficient, and in some cases, unusable.

10.    Minnesota Housing also has multiple state grant programs that fund organizations serving people experiencing, or at risk of, homelessness that would be significantly affected by the diminished capacity of CoCs in Minnesota. Minnesota Housing's Family Homeless Prevention and Assistance Program, Homework Starts with Home, and Housing Trust Fund use state funds to work with qualifying organizations to provide rental assistance, utility assistance, housing navigation services, rapid rehousing, and other forms of housing-related assistance to people experiencing, or at risk of, homelessness in Minnesota. Each program requires that participating organizations use the CoC-administered coordinated entry system to connect with people in need of assistance.

11.    Decreased capacity of the CoCs in Minnesota to administer the coordinated entry system would lead to delays in, or loss of, assistance for people who need help now. If CoCs in Minnesota lose, or are forced to shift funding, this could negatively impact their ability to administer the coordinated entry system. This could lead to increased evictions, loss of housing opportunities, and generally greater housing instability for vulnerable populations across Minnesota.

12.    Minnesota Housing staff consult and plan with CoC coordinators regarding regional needs, capacity, and funding-specific requirements as part of Minnesota Housing's

**Suppl. App. 452**

feasibility and post-funding selection process for the projects it funds. Minnesota Housing staff also provide technical assistance to CoCs coordinators on state policies and requirements for various reasons, including completion of HUD applications, which Minnesota Housing has done since CoCs were created under the HEARTH Act in 2012.

13. Consistency in funding from all sources in permanent supportive housing is key to financial, building, and resident stability.

14. I understand that the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, represents a significant departure from past practices and will cause serious harm.

15. This NOFO for FY 2025 "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

a. We take this to mean that any awards or assurances of funds under the 2024 NOFO are no longer effective. This will have a severe negative impact for recipients relying on these funds based on the results of the 2024 NOFO. Permanent supportive housing projects may lose access to expected funds if CoCs score lower under the new criteria and, even if funds are still available, there will be a funding gap for any projects with expiring grant contracts.

b. Developers can invest years securing funding commitments for new permanent supportive housing projects, typically based on the requirement that additional funding will also be secured from other sources to make a project viable. If expected funding from one source is jeopardized, as it would be if CoC funding for these projects was no longer available, this would affect the viability of all

**Suppl. App. 453**

permanent supportive housing projects in Minnesota that partially relied on this funding.

c. Even if a project is funded under this NOFO, there will still be a funding gap for projects with expiring grant contracts as awards under this NOFO will not even be announced until May 2026. This is likely to be the case for at least 34 projects across the state of Minnesota. Loss of, or gaps in, funding will severely limit the ability of affected permanent supportive housing projects to staff the property, provide services, or even continue to provide housing to people experiencing or at risk of homelessness. Even if these projects are able to maintain the same level of service they would have otherwise provided, they will have to find another source of funds in the interim, which is unlikely due to the scarcity of options.

d. For Minnesota Housing, this could mean an increase in requests for emergency funds or potentially defaulting on funding obligations. For people experiencing or at risk of homelessness, this could mean increased evictions, loss of opportunity for housing, and a general increase in housing instability.

16. "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

a. This would make the majority of CoC's ARD subject to Tier 2, which is scored and awarded differently than Tier 1. Tier 1 funds are more equally distributed among the CoCs and awarded based on CoC project rankings. Award of Tier 2 funds is based on relative application scores under the current NOFO.

6

**Suppl. App. 454**

b.    This differs significantly from the breakdown in the 2024 NOFO, in which Tier 1 was 90 percent of ARD and Tier 2 was 10 percent. This puts significantly more emphasis on scoring in order for applicants to be awarded funds.

c.    Minnesota CoCs are unlikely to score competitively based on criteria under this NOFO. This NOFO indicates applicants will receive points for projects requiring participants to take part in services, reductions in the number of encampments or the number of people living in encampments, utilization of standards for involuntary commitment, and assisting law enforcement with mapping and checking the location of homeless sex offenders. These factors differ from Minnesota Housing and the Minnesota CoCs historical approach in using data-driven and person-centered strategies to assist people experiencing or at risk of homelessness.

d.    Additionally, the scoring criteria in this NOFO indicate points will be given for factors outside the control of the CoCs, such as state or local laws prohibiting public drug use or public camping, the enforcement of those laws by that state or locality, and implementation by the state of the Sex Offender Registry Notification Act. Minnesota CoCs would score lower and receive substantially less funding under the new breakdown, based only on whether certain laws have been adopted, for which they do not control.

17.    "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Pg. 15.

**Suppl. App. 455**

a.    It is our understanding that a cap of 30 percent of a CoC's ARD for Permanent Housing projects will severely limit the ability of CoCs to fund new, and support existing, long-term affordable housing for people experiencing, or at risk of, homelessness.

b.    Capping Permanent Housing funding at 30 percent of the CoC's ARD significantly differs from past practices. The 2024 NOFO did not limit the percentage of a CoC's ARD that could be used for Permanent Housing, both permanent supportive housing and rapid rehousing.

c.    Limiting the amount of funding a CoC can use on Permanent Housing will harm the viability of proposed projects, the ability of CoCs to support existing permanent housing, and the ability of CoCs and their partners to keep pace with the increasing need for long-term housing for vulnerable populations in Minnesota.

d.    For Minnesota Housing's investments in existing permanent housing, this could mean increased requests for emergency funding, requests to reduce the number of housing units, reduce or discontinue services, or loss of permanent supportive housing units to standard low-income units. If permanent supportive housing properties struggle to maintain viability and can no longer maintain operations, there will ultimately be loan defaults and federal Low-Income Housing Tax Credit recaptured.  In addition, Minnesota Housing is likely to see an increased demand in funding from limited state resources for new permanent supportive housing projects. For people experiencing or at risk of homelessness, this could mean increased evictions, loss of new housing opportunities, and an overall

**Suppl. App. 456**

increase in housing instability if permanent supportive housing properties are unable to operate and construction of new properties is less likely to keep pace with increasing demand.

18.    Geographic Discrimination/"Public Safety" terms

    a.    Bonus points for… (Pg. 86-87):

        i.    Prohibiting public illicit drug use, which shifts scoring focus away from programs providing housing to policing substance use and gives points for the existence and enforcement of state and local laws CoCs have no control over.

        ii.    Prohibiting public camping or loitering, which gives points for the existence and enforcement of state and local laws for which CoCs have no control over.

        iii.    Involuntary commitment, which is not related to providing affordable housing by CoC-supported programs and would be inappropriate for a program to participate in a separate civil matter unrelated to providing housing.

        iv.    Implementing SORNA registration and notification and mapping location of homeless sex offenders, which is outside the purview of CoCs-supported programs. Whether a state implements SORNA is outside a CoC's control and tracking the location of sex offenders for law enforcement does not affect a program's ability to provide housing.

v.   Cooperating with law enforcement to connect violators with services, which does not score based on outcomes or success in connecting people with services, but rather an unrelated relationship with law enforcement.

19.   "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons (a) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans; (b) evidence that the project operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction.'" Pg. 55.

a.   These "past performance" provisions appear to give HUD discretion to disqualify any and all renewals for projects currently receiving CoC funds. Such projects are subject to existing laws, HUD guidance, and grant documents that require or encourage activities that this NOFO would deem disqualifying.

20.   "The CoC must demonstrate that projects require program participants to take part in supportive services (e.g. case management, employment training, substance use disorder treatment) in line with 24 CFR 578.75(h) by attaching supportive service agreements (contract, occupancy agreement, lease, or equivalent)." Pg. 80.

a.   This new requirement is a departure from 24 CFR 578.75(h), which currently gives housing providers the option of requiring participation in certain supportive services mandatory for their residents. The flexibility under existing

**Suppl. App. 458**

regulations is essential for allowing CoC-funded housing providers to comply with local and state licensing laws and for giving these housing providers the ability to combine limited CoC funds with other federal and state funding sources. By requiring providers to mandate services, the NOFO makes CoC funding incompatible with other federal funding frequently used in combination with CoC grants. For example, HUD's Section 811 program prohibits service mandates for residents, requiring that supportive services must be voluntary and not a condition of residency. HUD Section 8 rent assistance programs also prohibit mandated services. In addition, requiring all CoC providers to mandate services interferes with state licensing powers and landlord-tenant law. The current CoC regulations recognize the need for compatibility with state requirements, providing that "Services provided with assistance under this part must be provided in compliance with all applicable State and local requirements, including licensing requirements." 24 CFR part 578.75(a)(2).

21.    Even if these conditions were not themselves problematic, compliance with dramatically different conditions will require a complete overhaul of our processes and those of applicants. This will require more time, money, and effort to comply, and is not feasible to do by January 14.

22.    At this time, CoCs are required to submit their project prioritizations by December 15, only one month after the NOFO was released. This gives them three weeks to send out requests for proposals for projects, review and score applications, and then develop a Tier 1/Tier 2 prioritization strategy before moving on to developing their own applications. The tightness of this timeline means that projects that might ordinarily apply for funding are unable to do so, leading to

**Suppl. App. 459**

both less competition and transparency in the overall CoC application process. As a result, some Minnesota CoCs will be unable to develop or submit their prioritizations on time – leading to not only total loss of funding for certain CoCs, but unequal access to CoC resources throughout the State.

23. Minnesota Housing has heard from several applicants who rely on CoC grants that they are worried, fearful, and concerned about their inability to comply with the NOFO. Concerns expressed include that providers will have to stop working with households that do not meet the eligibility criteria of elderly/physically disabled in permanent supportive housing units, inability to quicky flip from supportive housing to transitional housing due to other funding and federal Low-Income Housing Tax Credit restrictions, and the inability to comply with service requirements due to conflict with other federal funding sources. We have heard from applicants that inability to comply may also lead to closing doors and buildings. If the NOFO prevails, applicants will not receive funding they were counting on and projects that have been in operation for a long time will be derailed. The result would be existing housing being lost.

24. Permanent housing projects that were selected or on track to be selected for capital funding resources, including federal Low-Income Housing Tax Credits, will likely end. As a result, the predevelopment funds invested by the developer would likely be lost, significantly reducing the developer's ability to pursue new projects. Additionally, funds returned to Minnesota Housing may expire before they can be reallocated to other projects.

25. Consequences for program participants will be severe. Program participants are among the most vulnerable people in our State and often face other challenges in addition to being without a home, in particular in Minnesota's cold winter months where the risk of mortality is high for people who are unhoused. Another concern expressed to us is that people who are currently

**Suppl. App. 460**

housed in permanent supportive housing would no longer be considered homeless, and therefore not eligible for transitional housing, which would ironically lead to homelessness.

26.     Terminating programs that rely on CoC grants will interfere with our State's homelessness goals. The Minnesota Interagency Council on Homelessness is responsible for implementation of the statewide strategic plan on homelessness. This plan is implemented in partnership with cities, counties, Tribes, and CoCs throughout Minnesota. The goals of the plan are to prevent homelessness, create a crisis response geared toward housing outcomes, create access to housing that people can afford, and connect people to services for long-term stability. One of the plan's key strategies in reducing homelessness is permanent supportive housing. Permanent supportive housing is an important part of the housing continuum and plays a critical role in housing vulnerable populations and ending homelessness. The 30 percent cap on permanent housing in this NOFO would reduce the availability of permanent housing, which will increase homelessness in Minnesota.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24 day of November 2025.

Jennifer Leimaile Ho
Commissioner
Minnesota Housing Finance Agency

**Suppl. App. 461**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| | C.A. No.1:25-cv-000626-MSM-AEM |
| v. | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF RUBY DHILLON-WILLIAMS |
| Defendants. | |

1

**Suppl. App. 462**

## DECLARATION OF RUBY DHILLON-WILLIAMS

I, Ruby Dhillon-Williams, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am the Director of the Arizona Department of Housing (ADOH).

2.     As Director of ADOH, I oversee the ADOH staff that administers funding for a variety of state and federal programs, including the Housing and Community Development Division, managed by an Assistant Deputy Director. Within that Division is the Special Needs Housing program. The Special Needs Division was developed to enable the agency to address the housing needs of populations that require a more comprehensive approach to housing stability beyond basic, affordable housing opportunities. These populations have been identified as those living with HIV/AIDS, individuals experiencing serious mental illness, those with chronic substance abuse issues, persons and families who are homeless, and victims of domestic violence. Part of this work involves ADOH's status as the United Funding Agency, Collaborative Applicant, and Homeless Management Information System (HMIS) lead agency for the Continuum of Care for the 13 non-metro counties in the State.

3.     I am familiar with the information in the statements set forth below through consultation with ADOH staff or from my review of relevant documents and information.

4.     ADOH acts as both a United Funding Agency (UFA) and Collaborative Applicant for the Arizona Balance of State Continuum of Care (AZ BoS CoC).

5.     The purpose of the AZ BoS CoC is to plan and implement strategies and services to end homelessness. What makes ADOH unique from Maricopa's and Pima's collaborative applicants is that ADOH is also the recipient of the project funds awarded for the AZ BoS CoC. ADOH then contracts with sub-recipients for project implementation throughout the State.

2

**Suppl. App. 463**

ADOH's responsibilities as UFA include: overall management and coordination of CoC activities; fiduciary responsibility for funds awarded to the AZ BoS CoC; executing contracts with sub-recipients for projects that provide housing and services to support ending homelessness in the AZ BoS CoC geographic area; monitoring sub-recipient performance; overall coordination for annual point in time count; submission of all required HUD reports; and ensuring that the CoC is operating in compliance with the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009 (HEARTH Act of 2009).

6.      I oversee the Assistant Deputy Director, who manages all staff who carry out the work of the AZ BoS CoC activities, including review and direction of the response to the U.S. Department of Housing and Urban Development's (HUD) Notice of Funding Opportunity (NOFO).

7.      A Continuum of Care is a community planning process to organize and deliver housing and services to meet the specific needs of people experiencing homelessness as they move to stable housing and maximum self-sufficiency. The Continuum of Care process was established by HUD to enable localities to apply to the federal government for McKinney-Vento Homeless Assistance Act competitive grant programs. This process brings together local governments, community businesses, faith-based organizations, nonprofits, and current and/or formerly homeless persons to develop local solutions to end homelessness.

8.      A BoS CoC typically covers a large geographic area, sometimes rural and non-contiguous jurisdictions. The AZ BoS CoC covers 13 of Arizona's 15 counties: Apache, Cochise, Coconino, Gila, Graham, Greenlee, La Paz, Mohave, Navajo, Pinal, Santa Cruz, Yavapai, and Yuma Counties. The two Arizona counties excluded from the AZ BoS COC are Maricopa County

**Suppl. App. 464**

(Phoenix metro area) and Pima County (Tucson metro area), where local community entities serve as CoC leads.

9.      Members of the AZ BoS CoC are representatives from all sectors that are directly or indirectly involved with addressing homelessness, including nonprofit homelessness providers, faith-based organizations, local and state government agencies, businesses, public housing agencies, social service providers, tribal nations, advocates, and people with lived experience of homelessness.

10.      In 2021, HUD awarded ADOH status as the UFA on behalf of the AZ BoS CoC. As a UFA, ADOH is responsible for fiscal and programmatic oversight of its subrecipients funded through the annual HUD NOFO process. Oversight includes processing of requests for reimbursement, program compliance and performance, and fiscal and programmatic monitoring. Programmatic and fiscal performance is also incorporated into annual NOFO funding priorities and decisions. ADOH also receives CoC Planning and UFA funds. These funds are awarded to the Collaborative Applicant and UFA for the purposes of strengthening the AZ BoS CoC system, providing required CoC programs and services (e.g.; HMIS, Coordinated Entry), and performing fiscal and programmatic oversight of the CoC and its subrecipients.

11.      The work of the AZ BoS CoC is governed collaboratively with a Governance Advisory Board. The Governance Advisory Board (GAB) is responsible for providing planning, coordination, guidance, and direction for the use of CoC resources.  The GAB has fifteen (15) members.  The following are permanent sector representatives nominated by the identified agency or entity:

> • The Special Needs Administrator from ADOH.  This individual is a Co-Chair for the
>
> GAB. At the Special Needs Administrator's discretion, the ADOH Continuum of Care

**Suppl. App. 465**

Coordinator, who manages community partnerships, assists with reporting functions, and offers a variety of other supports integral to the BoS CoC planning and operations, may act on behalf of the Special Needs Administrator as a Co-Chair. This representative is a permanent position and not subject to term limits.

• One (1) representative from the Arizona Department of Education's McKinney/Vento Homeless Liaison. This representative is a permanent position and not subject to term limits.

• One (1) representative from the Arizona Department of Economic Security, who has direct responsibility for the Emergency Solutions Grants Program (ESG) and Domestic Violence Services. This representative is a permanent position and not subject to term limits.

• One (1) representative from the Arizona Health Care Cost Containment System (AHCCCS), Arizona's Medicaid administrator overseeing integrated physical and behavioral health care. This representative is a permanent position and not subject to term limits.

• One (1) representative from the Arizona Housing Coalition. This representative is a permanent position and not subject to term limits.

• One (1) representative from the Arizona Coalition to End Sexual and Domestic Violence.  This representative is a permanent position and not subject to term limits.

The remaining nine members represent other key stakeholders including but not limited to:

• At least one (1) individual who has lived experience (homeless or formerly homeless). The individual(s) that are representative of this sector may represent other demographic groups or stakeholders.

**Suppl. App. 466**

• At least one (1) member or representative from one of the AZ BoS CoC's recognized Native American/American Indian tribal communities.

• A maximum of five (5) members can be CoC subrecipients in order to avoid potential conflicts of interest. No subrecipient agency can have more than one (1) person on the Governance Advisory Board by Charter.

12.    ADOH, as the Collaborative Applicant, is responsible for preparing the consolidated application. The consolidated application requests information ranging from CoC membership representation to adherence to federal priorities to coordination with healthcare partners and provision of services. Each nonprofit seeking funding through the CoC is required to attach a project application to the consolidated application. The project applications are reviewed and ranked in accordance with CoC policy. The ranking and reviewing are referred to as the "local competition." The project applications describe the population to be served, how services will be provided, and a programmatic budget. Most project applications include permanent housing, which includes both permanent supportive housing and tenant based rental assistance.

13.    As the Collaborative Applicant for the AZ BoS CoC, ADOH performs a variety of necessary functions, such as oversight of HMIS administration, conducting program monitoring, engagement and education of stakeholders, and submission of HUD funding applications.

14.    ADOH is also the state agency responsible for administering federal Emergency Solutions Grant (ESG) funds and state homeless program funds. In this role, ADOH works to align state and federal program requirements and ensure coordinated community planning across funding streams. ADOH's specific responsibilities include the following: staffing the GAB for the AZ BoS CoC; producing planning materials; collecting and reporting on performance data; monitoring program performance; coordinating resources, integrating activities, and facilitating

**Suppl. App. 467**

collaboration; preparing the Consolidated Application for CoC funds; recruiting stakeholders; and coordinating HMIS activities.

15.    ADOH is also responsible for the timely and accurate submission to HUD of the annual Consolidated CoC Program Application. ADOH provides CoC staff support for all tasks associated with completion of the annual CoC Consolidated Application. ADOH facilitates HMIS activities for HUD compliance in coordination with the HMIS administrator to ensure all HMIS activities are carried out in accordance with the HEARTH Act. All agencies within the AZ BoS CoC must comply with HMIS requirements for CoC funding, state homeless service funding, and any additional requirements outlined in HMIS policies and procedures.

16.    ADOH is responsible for submitting all required CoC reporting on behalf of the AZ BoS CoC. This includes managing and collecting data for the annual HUD Point in Time Count each January to count all persons experiencing unsheltered and sheltered persons within the CoC. The PIT also includes data collection and reporting on the Housing Inventory Count (HIC), an annual count of all available shelter and housing units in the CoC for persons experiencing homelessness. Other required reports include annual Longitudinal Systems Analysis (LSA) used to prepare the federal Annual Homeless Assessment Report (AHAR) and System Performance Measure (SPM) reporting. As a UFA, ADOH also is responsible for submitting Annual Performance Reporting (APR) and financial reporting in HUD's Sage system. Sage is a web-based reporting system used by recipients of funding through HUD's Office of Special Needs Assistance Programs (SNAPS). All HUD mandatory reporting is included and evaluated as part of the annual CoC NOFO process.

17.    All funding that is competitively awarded to the AZ BoS CoC is administered through direct contracts between HUD and the nonprofit. ADOH currently receives $516,509 for

**Suppl. App. 468**

planning and administrative (UFA) activities through a non-competitive grant and $6,632,503 from the competitive CoC NOFO. According to the National Alliance to End Homelessness, 85% of CoC funding nationwide is used for permanent housing (PH) or Permanent Supportive Housing (PSH)). In the AZ BoS CoC, that figure is 90% (not including the planning/UFA grants). This figure includes supportive services directly included and tied to PSH grants. Overall, AZ BoS CoC funding currently provides 353 PH units (282 PSH/71 Rapid Rehousing (RRH) – noting 40 Domestic Violence (DV) RRH beds are included in this figure). If the AZ BoS CoC loses 60% of PH above the current 30% threshold, these 13 rural counties across Arizona stand to lose around 210 PH units, including all RRH. These caps under the current NOFO are estimated to impact around 430 rural Arizonans.

18.    The AZ BoS CoC resources fund rental assistance for apartments in the community in which the program participant is the leaseholder. Rent is paid directly from the nonprofit to the landlord. A consistent NOFO ensures continuity for households in receipt of this rental assistance. Shifting priorities away from permanent housing would likely be destabilizing for tenants and creates volatility around rental assistance that will erode the confidence that local landlords have in the ability of the nonprofit to pay the rent consistently at a time when housing is scarce and finding units for households experiencing homelessness is already incredibly difficult. Tenants who also have a lease with the landlord and gaps in rental assistance will violate the lease, resulting in loss of stable housing and an increase in homelessness.

19.    Because services are connected to housing, a loss of permanent housing programs would likely equate to a loss of necessary services, like mental health and substance use, vital services for long-term stability. Additionally, without stable housing and supportive services, participants are more likely to experience worsening health conditions, like substance use disorders

**Suppl. App. 469**

and food insecurity. Loss of housing can also lead to unemployment, as participants may lack a stable place to live or work from. Most notably, participants would likely be at a higher risk of experiencing violence and other harms that are common for those experiencing homelessness.

20.    Through consultation with ADOH staff, I understand that the HUD CoC NOFO released on November 13, 2025, represents a significant departure from past practices and threatens unintended serious harm.

21.    This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

22.    There is significant strategic planning, system analysis, and policy work that takes place in preparation for the HUD NOFO. CoCs were previously informed that a NOFO would not be issued until 2026 and as such, through consultation with ADOH staff, it is my understanding that certain aspects of the planning work necessary to adequately prepare for the NOFO, as well as to prepare communities, tenants, and other stakeholders for the dramatic priority shifts, were not yet undertaken or prioritized.

23.    Nonprofits were not expecting that they would need to compete for funding until 2026. The sudden change to competing in 2025 will prevent programs from hiring staff and placing households in permanent housing, serving as a chilling effect for operational programs in the coming months.

24.    The cap on permanent supportive housing would likely also negatively impact other Arizona homeless programs, which include but are not limited to the Maricopa County CoC and Tucson Pima CoC and its affiliate programs. This change in the NOFO priorities impacts housed

**Suppl. App. 470**

individuals, private landlords, nonprofit service providers, local businesses and local emergency services if people are evicted because they no longer have rental assistance.

25.     On page 15 of the NOFO, HUD states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)."

a. During the NOFO process, CoCs must rank projects into two tiers. HUD selects projects for funding based on how they are ranked and whether they are in Tier 1 or 2. Depending on a CoC's overall score, a CoC could lose some or all of its projects ranked in Tier 2. This year, only 30% of existing projects are safe from potential cuts, making the competition significantly harder and jeopardizing housing stability for hundreds of households.

b. In FY2024, Tier 1 was set at 90%. In FY2023, Tier 1 was set at 93%. In FY2022, Tier 1 was set at 95%, and in FY2021, Tier 1 was set at 100%.

c. Tier 1 ranked projects and the service recipients for whom the rent is paid will not have to participate in the competitive funding round. This is especially important for those residing in units paid for by permanent supported housing programs, which are intended to pay for case management and rental assistance for chronically homeless households with a documented disability for as long as needed.

d. Because the requirements for a project ranked in Tier 2 differ so drastically from previous years and the requirements to qualify for funding are not in line with previous federal priorities, it is unlikely that many of our current grantees will be competitive enough to receive an award.

26.     Also on page 15 of the NOFO, HUD states that "[i]n order to promote balance and increase competition, no more than 30 percent of a CoC 's Annual Renewal Demand (ARD) under

**Suppl. App. 471**

this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects."

a.       As stated above, the AZ BoS CoC devotes approximately 90% of its competitive CoC funding to permanent housing. Previous NOFOs prioritized voluntary service participation and required housing first practices. However, this NOFO imposes supportive services requirements, which conflict with previous priorities that emphasized housing stability over support service participation. The 30% cap on permanent housing funding would limit the AZ BoS CoC to some 100 units of housing across the 13-county region, a loss of an estimated 240 units.

b. The service requirements in this NOFO state that projects should provide 40 hours of service per program participant per week. Not only will this require significant staffing, but it is not sustainable. Such a requirement is more in line with in-patient treatment versus housing. In addition, many of the providers within the AZ BoS CoC do not have the capability to quickly pivot to a transitional housing model in a matter of months. Typically, the physical structure and day-to-day operations of transitional housing are vastly different from permanent housing.

27.       The NOFO also states that the CoC must demonstrate it has a decision-making governance board that includes at least 1 person with a former experience of homelessness, at least 3 elected public officials, at least 1 representative of the business community and 2 representatives of law enforcement. A change to the governance structure will require not only significant outreach, but it also could force the removal of current governance board members and require a change to the AZ BoS CoC's governance charter. Again, this is a significant change that will likely require longer than two months to modify the governance charter, solicit new board members, vote

11

**Suppl. App. 472**

in board members, train new representatives on the function of a CoC, and with instances of local officials, may require other local approvals to join the AZ BoS CoC.

28.     If this NOFO remains operative, applicants will not receive funding they were counting on, and long-term projects will be derailed. This NOFO fails to address gaps in services for those projects that have contracts expiring before award announcements and also destabilizes the existing permanent housing projects with the restrictive cap. Nonprofit providers are vulnerable in continued operations.

29.     Consequences for program participants will be severe. Program participants are among the most vulnerable people across Arizona and often face other challenges in addition to being without a home.

30.     Terminating programs that rely on CoC grants will therefore increase burdens on other state health, safety and support services, and their associated costs.

31.     If ADOH cannot bridge the expected CoC funding gap with State Housing Trust Funds or another State resource, by October 2026, grantees will start experiencing financial hardship due to stalled reimbursements.

32.     This NOFO has created confusion and concern among CoCs, nonprofits, local governments, and the State of Arizona. The NOFO stands to severely disrupt services to tenants throughout Arizona. Since the release of the NOFO, ADOH has received numerous inquiries from CoCs and agencies that operate permanent supportive housing that were constructed with state funding but rely on CoC funds to support the rents and staffing, asking if they can convert to transitional housing. Pivoting to transitional housing would negatively impact tenants by imposing service agreements of up to 40 hours, generate fear and anxiety for tenants having to move in 24 months, and undermine housing stability across the CoC's geographic region.

**Suppl. App. 473**

33.     This NOFO would likely have unintended negative impacts on the communities covered under the AZ BoS CoC. The AZ BoS CoC has spent years developing stakeholder interest, programmatic partnerships, local government and community buy-in, landlord relationships, and developing real permanent housing solutions for homeless individuals in accordance with long-standing federal priorities. Prioritizing transitional housing over permanent housing would likely have the unintended consequence of eroding housing stability for current households in the program, likely resulting in households once again experiencing homelessness, creating disruption and uncertainty for those households, and jeopardizing the limited affordable housing relations that have been cultivated across the region.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of December 2025.

Ruby Dhillon-Williams
Director
Arizona Department of Housing

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>Defendants.<br><br>AND<br><br>NATIONAL ALLIANCE TO END HOMELESNESS, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>Defendants. | Case Nos. 25-cv-626<br>25-cv-636<br><br>District Judge Mary S. McElroy<br>Magistrate Judge Amy E. Moses |

**NOTICE OF WITHDRAWAL OF THE CHALLENGED 2025
NOTICE OF FUNDING OPPORTUNITY**

Defendants respectfully advise the Court that the Department of Housing and Urban Development (HUD) has withdrawn the challenged November 2025 HUD Continuum of Care Notice of Funding Opportunity (2025 NOFO). *See* Exhibit A; *see also* 2025 NOFO Withdrawal Notice, Exhibit B. HUD has withdrawn the 2025 NOFO in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO.

Because the December and January deadlines set by the 2025 NOFO are no longer operative, Plaintiffs' request for emergency, expedited relief via a Temporary Restraining

-1-

**Suppl. App. 475**

Order is now moot. *See, e.g., State of Washington v. HUD*, 25-cv-626, ECF No. 11 at 2 ("Plaintiff States seek expedited relief by December 12, 2025, in light of the January 14, 2026, NOFO application deadline and consequent local CoC application deadlines as early as Sunday, December 14, 2025."). Indeed, in light of HUD's withdrawal of the 2025 NOFO, Plaintiffs' pending requests for injunctive relief generally are now moot. *See Harris v. Univ. of Mass. Lowell*, 43 F.4th 187, 192 (1st Cir. 2022) ("Where, as here, challenged measures no longer adversely affect any plaintiff's primary conduct, injunctive relief is unavailable and the attendant claims become moot." (cleaned up)). At a minimum, Defendants maintain that the need for further relief—if any—should be briefed on a more orderly schedule.

DATE: December 8, 2025                          Respectfully submitted,

                                               BRETT A. SHUMATE
                                               Assistant Attorney General
                                               Civil Division

                                               YAAKOV M. ROTH
                                               Principal Deputy Assistant Attorney General
                                               Civil Division

                                               JOSEPH E. BORSON
                                               Assistant Branch Director

                                               PETER R. GOLDSTONE
                                               Trial Attorney

                                               */s/ Pardis Gheibi*
                                               PARDIS GHEIBI (D.C. Bar No. 90004767)
                                               Trial Attorney, U.S. Department of Justice
                                               Civil Division, Federal Programs Branch
                                               1100 L Street, N.W.
                                               Washington, D.C. 20005
                                               Tel.: (202) 305-3246
                                               Email: pardis.gheibi@usdoj.gov
                                               *Attorneys for Defendants*

-2-

**Suppl. App. 476**

**CERTIFICATE OF SERVICE**

I certify that on December 8, 2025, the above document was filed with the

CM/ECF filing system.

/s/ *Pardis Gheibi*

**Suppl. App. 477**

B

**Suppl. App. 478**



An official website of the United States Government  Here's how you know

Search

(/)

## U.S. Department of Housing and Urban Development

HUD Partners (/hud-partners)
/  Continuum of Care Program

# Continuum of Care Program

### FY 25 COC NOFO Update

The Department has withdrawn a Notice of Funding Opportunity (NOFO) with respect to the Continuum of Care (CoC) grant program. This withdrawal will allow the Department to make appropriate revisions to the NOFO, and the Department intends to do so. In the previous FY 24-25 NOFO, the Department reserved the right to make changes to the NOFO instead of processing renewals for a variety of reasons, including to accommodate a new CoC or Youth Homelessness Demonstration Program (YHDP) priority or new funding source. The Department still intends to exercise this discretion and make changes to the previously issued CoC NOFO to account for new priorities. HUD anticipates reissuing a modified NOFO well in advance of the deadline for obligation of available Fiscal Year 2025 funds.

### Overview

The Continuum of Care (CoC) Program (24 CFR part 578) (https://www.ecfr.gov/current/title-24/subtitle-B/chapter-V/subchapter-C/part-578) is designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, states, Indian Tribes or tribally designated housing entities (as defined in section 4 of the Native American Housing Assistance

**Website Feedback**

**Suppl. App. 479**

and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)), and local governments to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs by homeless individuals and families, and to optimize self-sufficiency among those experiencing homelessness.

## I Want To Review

- Electronic Special Needs Assistance Program System (e-snaps) Login Portal (https://esnaps.hud.gov/grantium/frontOffice.jsf)

- FY2024 CoC Program Competition Award Announcement

- FY2024 CoC Program Competition Debrief (/sites/dfiles/CPD/documents/CoC/CoC-2024-Program-Competition-Debrief.pdf)

- FY2024 CoC Program Competition and Funding Report - Updated March 26th for additional awards

- FY 2025 Continuum of Care Competition

- FY2025 Continuum of Care (CoC) Builds Notice of Funding Opportunity (NOFO)

## Resources

- CoC (https://www.hudexchange.info/programs/coc/)
  - McKinney-Vento Homeless Assistance Act (42 U.S.C. 11381-11389) (https://www.govinfo.gov/content/pkg/USCODE-2011-title42/pdf/USCODE-2011-title42-chap119-subchapIV-partC.pdf)
  - Program Requirements (https://www.hudexchange.info/programs/coc/coc-program-eligibility-requirements/)
  - CoC Programs Toolkit (https://www.hudexchange.info/programs/coc/toolkit/)
  - Planning & Reporting (https://www.hudexchange.info/programs/coc/coc-

**Website Feedback**

**Suppl. App. 480**

program-reports-program-data-
and-program-rents/)

- Homeless Management
  Information System (HMIS)
  (https://www.hudexchange.info/programs/hmis/)

- News & Announcements
  (https://www.hudexchange.info/news/?
  ct=%5B%22News%22%5D&tt=&topic=%5B%22CoC%3A+Continuum+of+Care+Progr

- Snaps Office Hours - Slides
  (/sites/dfiles/CPD/documents/CoC/SNAPS_Office_Hours_Slide_Deck.pdf)
  | Transcript
  (/sites/dfiles/CPD/documents/CoC/SNAPs_Office_Hours_Transcript.pdf)

Helping Americans (/helping-americans)

HUD Partners (/hud-partners)

Researchers (/researchers)

News (/news)

About (/aboutus)

Contact (/contactus)

**U.S. Department of
Housing and Urban Development**

451 7th Street, S.W., Washington, DC 20410

T: (202) 402-3815

Find a HUD office near you (/contactus/local)

**Website Feedback**

**Suppl. App. 481**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| | C.A. No.1:25-cv-000626-MSM-AEM |
| v. | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | SUPPLEMENTAL DECLARATION OF PASCALE LEONE |
| Defendants. | |

**Suppl. App. 482**

## SUPPLEMENTAL DECLARATION OF PASCALE LEONE

I, Pascale Leone, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Executive Director of the Supportive Housing Network of New York (the "Network"), a non-profit membership organization representing more than 200 non-profit organizations that operate and develop supportive housing in New York.  I have served in this role for the past three years, since 2022.

2.      I am familiar with the statements set forth herein based on either my personal knowledge, consultation with Network staff and service providers, or from my review of relevant documents and information.

3.      I submit this supplemental declaration in further support of Plaintiffs' motion for a preliminary injunction.

### Expiring Contracts

4.      Under the FY25 Continuum of Care (CoC) Notice of Funding Opportunity (NOFO), released on November 13, HUD had stated that awards would be made no sooner than May 2026. Due to the typical contracting process, funds would not start flowing in that instance until June or July 2026. Contracts begin to expire in January 2026 and continue expiring every month on a rolling basis. Across New York State, at least 2,878 households are living in CoC-funded housing that has a contract expiring on May 31, 2026, or before. The chart below shows the number of units in the state that are part of expiring contracts each month.

2

<strong>Suppl. App. 483</strong>



Units by Contract Expiration Date

5.      Without the housing assistance provided by the CoC, these households are at high risk of becoming homeless again, especially given the lack of available and affordable housing in New York.

6.      The rescindment of the NOFO on December 8 exacerbates the funding gap that already existed in its original timetable. HUD has stated that they plan to issue another NOFO for these funds at some point before the funds expire. With each passing month, there are hundreds more units statewide that will expire without knowing their renewal status. This level of uncertainty will cause programs to close, even before they officially lose funding. Nonprofits generally are unable to float funding for a project that may not be renewed.

7.      Irreparable harm is caused when housing assistance is lost and supportive housing programs close. Many CoC program participants are tenants with leases. After losing funding for rental assistance, they will be unable to pay their rent. Some will leave voluntarily. Others will stay and ultimately face eviction for nonpayment of rent. Landlords will re-rent apartments to new tenants. Meanwhile, nonprofits lay off staff and shut down the infrastructure required to run the programs.

8.      Even if funding is later restored, re-opening a program is not guaranteed and would take about six months. Scattered site programs would need to find new units to rent on the private market. If congregate sites have been repurposed or re-rented to new tenants, re-opening a supportive housing program there would not be viable.

9.      Original tenants may be difficult to locate. They may also be ineligible or deprioritized for the re-opened supportive housing program. Existing HUD regulations require the

**Suppl. App. 484**

prioritization of permanent supportive housing to chronically homeless people who meet very specific criteria. They also require the use of a Coordinated Entry system that prioritizes referrals based on additional specific criteria related to vulnerability that have been developed by each CoC.

**Compressed and Uncertain Timetable**

10.     The NOFO process requires each CoC to hold their own internal competition to rate and rank projects before submitting their full application to HUD. Project applications for this local competition must be submitted 30 days prior to the final deadline to HUD, per HUD's NOFO. As such, most CoCs' deadlines for project applications were on or before December 14. HUD has provided no guidance about whether or when CoCs should continue their internal competitions.

11.     The original timetable for the FY25 NOFO was already compressed. Providers and CoCs had rushed to do 12 weeks of work in an 8-week period, with Thanksgiving, Christmas and New Year holidays reducing business days.

12.     This work was also more intensive and difficult than typical years. Due to the dramatic policy changes, CoCs and providers were making impossible choices that would likely result in permanent housing programs closing and people becoming homeless.

**Lack of Certainty Around Reissuing NOFO**

13.     HUD stated they would reissue the FY25 CoC NOFO with their new priorities.

14.     CoCs and providers are completely unsure about when and how many times the new NOFO will be issued. They are concerned that a new timetable will be unworkable, but also unsure whether continuing to work on applications under the November 13 NOFO structure will be relevant or useful under a new NOFO.

15.     The CoC Builds NOFO was issued three times. The third time, there was a seven-day application period.

16.     The current state of affairs for CoCs and CoC-funded providers is chaos and confusion. The rescindment of the NOFO on December 8 provides no relief from that chaos and confusion, while the announcement that a new NOFO will be released at an unspecified time before the funding expires only adds more delays and uncertainty.

**Suppl. App. 485**

**Outstanding Materials and Questions**

17.    HUD never provided basic materials and information that applicants would need to respond to the NOFO.

18.    When the NOFO was rescinded on December 8, HUD had still not released the application in the official portal, known as *eSNAPS*. Typically, the application is released 6-8 weeks before the HUD deadline, to allow CoCs to fully prepare. Without the application, there are many details that cannot be prepared in advance.

19.    When the NOFO was rescinded on December 8, HUD had still not clarified outstanding questions about the new priorities and ranking structure. For example: Will Transition projects that were Permanent Supportive Housing and want to become Transitional Housing count toward the 30% cap on permanent housing?

20.    To the best of our knowledge, HUD has not answered any substantive questions submitted through their *Ask a Question (AAQ)* online portal. The AAQ portal is the mechanism that HUD traditionally uses to clarify any confusion that providers and CoCs have related to the NOFO and the application process.

**Communication with Tenants and Landlords**

21.    With no guidance and a ticking clock, CoCs and providers are making difficult decisions about when and how to notify tenants and landlords about imminent funding gaps and the potential loss of housing assistance and closure of programs.

22.    We estimate that more than 8,000 of the 13,861 CoC-funded households are located in scattered site programs, where nonprofit providers rent housing from landlords on the private market.

23.    Nonprofits have worked for decades to develop trust and positive working relationships with private landlords. Abrupt funding losses, and even communication about funding uncertainty, can damage those relationships and reduce the amount of housing available to these programs in the future.

24.    CoC-funded units are present in at least 110 buildings in New York that were publicly financed with state and local sources in order to serve as supportive and affordable housing. In this context, the CoC contracts provide rental assistance or operating funding, which anchor these mixed-finance developments that combine at least $1.46 billion in state and local capital subsidy, Low-Income Housing Tax Credits (LIHTC), and private investment. Specifically,

**Suppl. App. 486**

at least $511 million in equity is raised from LIHTC across these 110 buildings. Funding uncertainty shakes the equity market for LIHTC, as investors' confidence in the stability of government housing programs weakens. This threatens future development of affordable and supportive housing, which is completely reliant on this public-private partnership. Material loss of funding may also throw these buildings out of compliance and cause real financial injury to current investors.

25.   CoC program participants have all experienced homelessness or been at-risk of homelessness before. Communicating that their housing is at-risk could cause additional trauma. While providers want to limit that trauma, especially when the risk is uncertain, advance notice and planning may help the household prepare.

## Imminent Homelessness

26.   The most tangible and immediate impact of the timing flaws, chaos and uncertainty in the current CoC NOFO process in New York is a likely imminent return to homelessness for thousands of households.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of December 2025.

*/s/ Pascale Leone*

Pascale Leone
Executive Director
Supportive Housing Network of NY

6                                                    **Suppl. App. 487**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * *25-CV-636-MSM
*
NATIONAL ALLIANCE TO END          *
HOMELESSNESS, et al               *
              Plaintiffs,         *
                                  *
          VS.                     *
                                  *
UNITED STATE DEPARTMENT OF        *
HOUSING AND URBAN                 *DECEMBER 19, 2025
DEVELOPMENT, et al                *
              Defendants.         *
                                  *
* * * * * * * * * * * *           *
                                  *
STATE OF WASHINGTON, et al,       *
              Plaintiffs,         *
                                  *
          VS.                     *25-CV-626-MSM
                                  *
UNITED STATES DEPARTMENT OF       *
HOUSING AND URBAN                 *
DEVELOPMENT, et al                *
              Defendants.         *VIA VIDEO CONFERENCE
***************************** *PROVIDENCE, RI

BEFORE THE HONORABLE MARY S. McELROY

DISTRICT JUDGE

(MOTIONS FOR PRELIMINARY INJUNCTIONS)

Suppl. App. 488

**APPEARANCES:**

FOR THE PLAINTIFFS:

State of Washington   Zane Muller
             Washington State Attorney
             General's Office
             1125 Washington Street SE
             PO Box 40100
             Olympia, WA 98504-0100

National Alliance to   Kristin Bateman, Esq.
End Homelessness    Democracy Forward Foundation
             PO Box 34553
             Washington, DC 20043

FOR THE DEFENDANTS:

U.S. Department of Housing JOHN BAILEY,, DOJ-Civ
and Urban Development  U.S. Department of Justice,
             Civil Division
             950 Pennsylvania Avenue NW
             Washington, DC 20530


Court Reporter:    Denise P. Veitch, RPR
             One Exchange Terrace
             Providence, RI 02903

VIA VIDEO CONFERENCE

19 DECEMBER 2025 --

THE COURT: Good morning. We are going to go on the record in two civil actions combined, it's civil action 25-525, I'm sorry, 26, and 25-636, the United States -- National Alliance to End Homelessness versus the Department of Housing and Urban Development, and then the other case which we have titled the State of Washington versus the Department of Housing and Urban Development. And I want to make sure I said those numbers correctly because I didn't put my glasses on yet. It is 25-626 and 25-636.

So, good morning. We are on the record, so I just remind everybody that the stenographer is taking a transcript and so it's important that you remember that when you're speaking. I find that people tend to speak more quickly when they're on Zoom probably in part because they are reading some of what they're saying; so I would appreciate it and I think you will appreciate it if you slow down. I don't want to have to interrupt you to tell you to slow down; if I do it is not because I'm mad but just because the stenographer will need the time.

Okay. So who is appearing for the Plaintiffs at this hearing? Will you identify yourselves for the

record, please.

MS. BATEMAN: Kristin Bateman for the National Alliance to End Homelessness Plaintiffs.

THE COURT: Okay.

MR. MULLER: And Zane Muller on behalf of the Plaintiff States.

THE COURT: Okay. All right. Good morning.

And how about for the Defendants, the Department of Housing and Urban Development.

MR. BAILEY: Good morning, your Honor. John Bailey for the United States.

THE COURT: Okay. Great. Welcome. And I am going to ask everybody who is not speaking to mute themselves. I don't know, Ms. Bateman or Mr. Muller, if you are prepared to begin, so whenever you're ready we'll hear you on the preliminary injunction motions filed in both cases.

MS. BATEMAN: Thank you, your Honor, and good morning. Again, Kristin Bateman for the National Alliances Plaintiffs, and Mr. Muller and I will divide the argument, with the Court's permission. I can start with a brief overview and then address the Plaintiffs' likelihood of success on the merits of their challenges to the rescission of the fiscal year 24-25 NOFO and why that is sufficient for the relief that we're seeking.

And then Mr. Muller will address the likelihood of success of the merits of the challenges to the fiscal year 25 NOFO. And then each set of Plaintiffs will address their respective harms.

THE COURT: That's great. And I should have asked, Mr. Bailey, we have received an e-mail I believe from you or from somebody in your agency indicating that a new NOFO might go out before this hearing. We checked this morning; I'm assuming nothing has been issued. Is that correct?

MR. BAILEY: Yes, your Honor. I spoke with agency counsel this morning, and they told me that their expectation is that the new NOFO will be published by close of business today, at which point we will immediately file a notice with the court with the new NOFO. We've been working diligently to do so. We tried to give the Court as much notice as possible; and that's my understanding, that it will be filed or published by close of business today.

THE COURT: Okay. Thank you.

And Ms. Bateman, just so that we can, so I can sort of put this in some sort of an organizational format for myself, the issues here are not just the new NOFO which Mr. Muller will speak to, but also the rescission of the previously issued 24-25 NOFO. Is

that correct?

MS. BATEMAN: That's right, your Honor.

THE COURT: Okay. I'll hear you.

MS. BATEMAN: Thank you.

The Continuum of Care Program is the program Congress created to be the primary federal response to homelessness, and permanent housing is a cornerstone of that program. And of course when you're talking about permanent housing, you're talking about homes that people live in, so, of course, stability and continuity is crucial for that. For that reason, Congress in the statute prioritized renewals of successful projects on a timely basis.

On November 13th HUD threw all of that into chaos. It rescinded the two-year fiscal year 24-25 NOFO that it had issued before to govern the awards for both fiscal year 24 and fiscal year 25 funds. It did this just weeks before renewal awards for fiscal year 25 would have been going out, and it did it just weeks before people's existing grants would begin expiring in January. This very-late rescission guaranteed that there will be funding gaps because, as HUD itself said, the best it could do would be to make awards in May and that's already very aggressive.

This is causing serious, serious harm to

Plaintiffs and their ability to carry out their missions. They are providing housing to people. Gaps in funding means they can't provide that housing anymore, and that means that individuals, families with children, veterans, victims of domestic violence are going to lose their housing in the middle of winter. We need relief as soon as possible to mitigate this harm. It's already too late to fully prevent the irreparable harm that this very late stage rescission has caused, but we do seek relief that will minimize it.

In particular, we're asking for three things: We're asking that the Court stay the rescission of the fiscal year 24-25 NOFO. We are asking that the Court enjoin the Defendants from taking a new agency action that would rescind it or replace it all over again; and third, we are asking that the Court order the Defendants to begin taking the steps necessary to process renewals under the fiscal year 24-25 NOFO, short of obligating the funds, but the purpose of doing that is so that if and when the Court grants us the final judgment we're seeking -- which will be an order requiring the Defendants to award the renewals under the old NOFO -- that there won't then be a further lag while HUD undertakes the administrative processes that

it needs to undertake to actually get those grants awards out. So what we're asking now is just for them to begin that process so there isn't a lag at the end of the day if and when we win final judgment.

So with that, I can turn to our likelihood of success on the merits of the challenge to the rescission of that old fiscal year 24-25 NOFO. The very late-stage rescission of that NOFO is unlawful and must be set aside under the APA for two independent reasons. First, it is contrary to law and in excess of the agency's statutory authority; and second, it is arbitrary and capricious. And I can through the merits of both of those claims before briefly addressing the Defendants' nonmerits challenges to that.

So first there's the statutory problem. Under 42 USC 11382, Congress set a deadline. Congress said HUD has to issue a NOFO for awards under the CoC Program within three months of an appropriation. The fiscal year appropriation happened on March 15th, 2025, which means that three-month deadline was June 15th. June 15th came and went; they had not done a new NOFO. There was already obviously this new existing NOFO in place, the fiscal year 24 -25 NOFO, so once the deadline came and passed, they no longer had authority to issue a new NOFO.

HUD has two responses to this. First they say that an agency doesn't usually lose authority to do something once its deadline passes. And that is certainly true in many circumstances, but not in the circumstances here. The key difference is that HUD had already taken the required action. So normally if Congress says Hey, agency, you have to take some action and you have to do it by this date, and the agency blows the deadline, it doesn't mean they lose authority to take the action. Congress really wanted them to take the action and so it wouldn't make sense to say Oh, you're off the hook, agency, because you were too slow and missed the deadline.

That is not the circumstance we have here because the agency had taken the action. It had issued the NOFO, the fiscal year 24-25 NOFO that covered the fiscal year 25 funds. So once that date, deadline came, that was the deadline. They couldn't then go back on what they had done and keep doing it over and over again after that. If that were the case, the deadline would have no meaning.

THE COURT: What they could have done had they wanted to in March when the appropriations bill was being put forth by Congress? What could Congress have done to give the agency either more time or more

authority?

MS. BATEMAN: Congress could have done any number of things. Congress could have said -- could have changed the deadline. Congress could have said, you know, you don't get to use the old NOFO; you have to do a new NOFO. There's any number of things Congress could have done, of course didn't do those things, and so what we have is a statute that Congress did enact, which are these statutes saying there is a three-month deadline. There's a statute that Congress enacted saying Hey, HUD, you can do a two-year NOFO. HUD did that two-year NOFO. And so that is the sort of scenario we're looking at.

THE COURT: And so when Congress acts but fails to change sort of this part of the analysis, how does the Court look at it. I mean officially didn't change it, or if it was some sort of oversight by Congress?

MS. BATEMAN: You certainly would not look at it as if it were an oversight by Congress. You look at, we look at the laws that Congress enacted, and the laws that Congress enacted here are both the deadline of the three-month deadline, and there's also the law that Congress enacted that authorized the two-year NOFO. So given that and given that there was authorization to do a two-year NOFO, which HUD then did do, to give the

deadline that Congress enacted effect, the agency had to meet it.

THE COURT: Okay. And your argument is whatever the fiscal act that allowed the 24-25 NOFO, about a two-year NOFO, HUD acted under that two-year NOFO and had the HUD decided that we don't want to have that same policy going forward, it was incumbent on them to either go to Congress and get more time or more direction or to change in the guiding principles, for lack of a better word; or for them to issue a NOFO within the deadline that set forth different criteria but that were, that were consistent with the law but also allowed that to change the policy.

Is that your argument essentially? That the time to do something about it passed in June, and certainly in March they had an opportunity that they didn't take?

MS. BATEMAN: Yes, your Honor, that's right.

And one argument the Defendants make in response that I will, that I can address now is they sort of make an argument that Oh, actually there wasn't a fiscal year 24-25 NOFO in place, once the deadline came in June. And they say that's the case because in January they closed the FY24-25 NOFO on Grants.gov. But that is not a rescission. They did not say that

was a rescission. No one understood that as a rescission. It is entirely typical for HUD to close a grant opportunity on Grants.gov -- excuse me -- after awards had been made, as they had been; and HUD, again, when it issued the 25 NOFO said this NOFO is rescinding the old NOFO. So it's clear that the rescission had not happened until November.

And there's a second reason why the rescission is unlawful, and that is because it is arbitrary and capricious. It came so late that HUD needed to consider the implications of that, the impact of that on the communities, on the providers. It needed to consider that making such a late-in-the-game change would mean that people would experience funding gaps, that that would mean they could not continue supporting housing for people who were formerly homeless; did not consider that that would mean people would be displaced back into homelessness in the middle of winter. It did not consider the impacts that would have on their health and safety progress they had made in substance use treatment, things like that. It didn't consider the reliance interests of the CoCs, of the service providers, and of the people who are in that housing. And sort of less life and death, but didn't consider the administrative burdens that this would place on the

CoCs, who would then have to run a new competition, when the whole point or a large part of the point of having a two-year NOFO was so that people wouldn't have to run this competition two years in a row. It's a huge burden on the CoCs.

The Defendants essentially say that this is a policy-driven choice and there was a change in administration so of course they should be able to do this. But the fact that there's a change in administration and a change in policy preference is not free rein to make whatever changes you want.

THE COURT: So can we just clarify this because I think I've said this approximately a hundred times: It's not about the policy. It's about the methodology.

Is that -- I mean I understand you may have disagreements with the policy. That's not the Court's purview. This Administration is entitled to its policies. It's not entitled to its own processes. Is that essentially the argument?

MS. BATEMAN: That's right, your Honor. I think I would add sort of an additional point on that which is that in these particular facts and circumstances and given the amount of time that has passed, it is no longer reasonable for them to take an action that would be rescinding this old NOFO.

(Overlapping speech)

THE COURT: Right, but because the deadline passed, not because somehow the policy is flawed. Is that -- because they didn't do what they needed to do within a time frame that had been set forth by Congress; correct?

MS. BATEMAN: That is correct. I think there is an additional reason. Say there were no statutory deadline, say Congress had remained silent on that, which of course is not the case, but just say hypothetically. I think it would still be substantively unreasonable, substantively arbitrary and capricious at this point in time to rescind the old NOFO because of the serious harms that would work on the communities that the Congress passed the statute to protect.

It's not to say that they don't have a right to their own policies to the extent that they can effectuate those policies within the confines of the statute. But even if they could do that, which is, you know, a question we may be litigating at some point; but even if they could do that, there's a separate point that at this point for fiscal year 25 funding it is just too late. It is too late to make that shift.

THE COURT: And it wasn't too late in March to

go to Congress and say we would like to change the policy and here's how we would like to change it, and we'd do X, Y, and Z with the funding appropriation or with the statute that's already in place. But that isn't November or December; it was in March.

MS. BATEMAN: Right, your Honor.

THE COURT: Thank you. Continue.

MS. BATEMAN: Okay. And just briefly on the sort of nonmerits arguments that the Defendants raise, they raise three of them, saying that the Court doesn't even have power to consider the merits challenges to the rescission.

First they say that the rescission is a final agency action, and for two reasons they say. They say it's actually not a discrete action because we did these things that sort of foreshadowed or people should have known it was coming. That's ridiculous. And, you know, the agency doesn't get out of review of its actions by sort of drawing it out.

They also say that the rescission does not produce legal consequences; but, of course, it does. Under the fiscal year 24-25 NOFO grants would be awarded under certain criteria and conditions, and those are no longer the criteria and conditions under which grants will be awarded. That produces legal

consequences and is final agency action.

They also say that we don't have standing to challenge the NOFO because the relief that the Court could grant in their view doesn't redress the harms that we're facing in not having the funding. But that is not a standing question. That is a merits question, you know, *Steel Co.* and other cases that we cite in our brief make clear that is a not jurisdictional standing question; it's a merits question.

And then the third point they make is that this is committed to agency discretion by law. That is a rare and narrow exception to when judicial review is available. That exception exists only when there are no meaningful standards against which to judge the agency's exercise of discretion, you know, when there is no law to apply.

And there is certainly law to apply here. There's, of course, the statutory deadline, but then there's also the CoC statute and everything the CoC statute says about the criteria HUD should be considering when awarding funds, everything the CoC statute says about how renewals are important and how stability is important. So those provide meaningful standards against which the Court can judge HUD's exercise of discretion.

On the requested relief, we've asked for three things, as I mentioned: A stay of the rescission, an injunction barring the Defendants from taking a new agency action to rescind the NOFO all over again; and third, an order requiring them to begin processing the renewal so that there isn't further delay if and when we win final judgment.

THE COURT: Tell me the third one. Where does the Court have the authority to order them process those renewals?

MS. BATEMAN: So you would have both inherent equitable authority, you know, injunctive, to grant that injunctive relief. And the APA also recognizes the Court's equitable authority to do that in 5 USC 703 and also in 5 USC 705 which authorizes the Court to issue necessary or appropriate process to preserve status or rights. Of course, the status or rights that we are seeking to preserve here are people's eligibility for funding, for renewal funding under the old fiscal year 24-25 NOFO. If that fiscal year 24-25 NOFO were in place, HUD would be processing renewals under that; so that's the sort of status quo ante that we are trying to preserve here is status quo ante in which HUD would be taking those steps. And so that sort of answers the Defendants' objections about the

Court not having authority to issue the these types of injunctive relief.

I will briefly also mention that they characterize that request for an order requiring them to start processing, they characterize that as a mandatory injunction that the Court can't issue.  So there are a couple problems with that: (1) The First Circuit has said that that doesn't actually count as a mandatory injunction because it's just preserving the status quo, for the reasons I was just saying.  But also even if it were properly characterized as a mandatory injunction, that doesn't make a difference.  As the First Circuit said in *Braintree Labs* the standard is the same, you know, of course the court shouldn't be granting injunction unless the circumstances require it; but the same four-factor test that we look at as for any type of injunction, and here --

THE COURT:  I'm sorry; go ahead.

MS. BATEMAN:  I was just going to say that the exigencies of the circumstances certainly demand it.  We're facing funding gaps, funding gaps starting in January.  People need awards to be able to continue providing housing to people, and the delays are just causing harm.

THE COURT: And if the Court were to, say, have the authority to enjoin the rescission of the NOFO and enjoin -- and preclude the agency from issuing a new NOFO, the effect of not being able to order the processing of the current, for the current NOFO, the 24-25 NOFO would be that the agency would then be not able to spend the money that Congress had appropriated and directed them to spend for housing. Is that essentially --

MS. BATEMAN: I apologize; could you say that one more time.

THE COURT: So looking at the three things that you're asking for, you're asking for me to enjoin the rescission of the 24-25 NOFO; and then, if you're successful on that, for the Court to then preclude the agency from issuing a subsequent NOFO. And then if the Court has the authority to do those two things, the argument the Court has the -- no authority to do the third thing then puts the agency in a position where they would be not spending funds that Congress had directed them to spend. Is that essentially sort of the equitable argument, for lack of a better word?

MS. BATEMAN: That is not quite the equitable argument we're making. The argument we're making is that the irreparable harm that we're facing is not

being able to get these funds and not being able to get these funds in time to keep people in the housing that they're relying on. And so it's really a timing problem, and the reason we're asking for the order requiring them to start the process of making those renewals is to ensure that if and when we get final judgment, say final judgment is in February, that people then can get their awards in February, as opposed to two months later as they engage and HUD has to go through all the steps it needs to actually make the awards.

And with that, unless the Court has further questions for me, I will turn it over to Mr. Muller to address the challenges to the 25 NOFO.

THE COURT: Did we sufficiently address mootness? The government is arguing it's moot because they withdrew the NOFO.

MS. BATEMAN: I will address that briefly before turning over to Mr. Muller. The mootness argument I think does not apply to our claims challenging the fiscal year -- challenging the rescission of the fiscal year 24-25 NOFO.

THE COURT: I see.

MS. BATEMAN: I don't think there is any dispute that that has still been rescinded. The rescission is

still in place. HUD is standing by that rescission, so that is still very straightforwardly a live controversy; and I think Mr. Muller will also address why the challenges to not withdrawn 24-25 NOFO are not moot.

THE COURT: Okay. Thank you.

MR. MULLER: Thank you, your Honor. Zane Muller with the Washington State Attorney General's Office on behalf of the Plaintiff States. I want to touch briefly on a timing argument that's in our brief and then turn to mootness.

Defendants argue that the June 15th deadline is a mere technicality, but that reading is not compatible with any coherent reading of the McKinney-Vento Act, and that's because the timing provision of the statute has to be read together with the renewal provision of the statute, and that's basic of canon of harmonious construction. Under 42 USC 11382(b), HUD is required that it shall release a NOFO for grants not later than three months after the enactment of the Act making the relevant appropriation.

Reading that in conjunction with the renewal provision of the statute, which is 11386(c), Congress directed that HUD make -- that the funds shall be available for renewal contracts in successive one-year

terms. So that language is mandatory, shall be available in successive one-year terms.

The idea that HUD can sort of indefinitely delay renewals to whenever it gets around to publishing a NOFO that it likes, to read the word "successive" out of the statute, that the statute doesn't permit those funding gaps; and in the 20 years that this program has been operative, you know, HUD points to one or two, you know, delays when the NOFO may have (indecipherable). They don't point to any situations where their extent is funding gaps; and that's the problem here, your Honor. That's the harm that's really affecting the Plaintiff States.

I want to turn to mootness. And your Honor is correct that, you know, elections have consequences. A new Administration is entitled to enact policy priorities, but they have to do so within that guardrails that are set by Congress, and that's the problem in addition to the timing piece that we're challenging with the 2025 NOFO, why we're asking the Court to enjoin that NOFO, not just its rescission, the 24-25 NOFO, but also the substantive conditions that are within them.

HUD's comment here is sort of a classic case of voluntary cessation. You know, rather than defend the

substance of the 2025 NOFO, Defendants withdrew it one hour before the hearing on its contents. Defendants have more or less admitted that they intend to rehash the conditions in that NOFO in their forthcoming NOFO. If you look to Footnote 3 in Defendants' opposition brief, Defendants do not maintain that the forthcoming NOFO will not include any of the same or similar conditions that appeared in the withdrawn 2025 NOFO. In the meantime, CoCs across the country have to pause their intake of homeless people because they don't know if they have funding next year, they don't know what those conditions are going to be; and it's the uncertainty leading to these funding gaps that is the critical harm that the Plaintiff States are facing in this case.

This is precisely the situation that the voluntary cessation doctrine exists. There's already been enough waste of judicial and administrative and state resources with this sort of, you know, withdrawn NOFO, forthcoming NOFO, all well outside the statutory time frame.

In a recent case in this court, your Honor, Judge Smith faced similar conduct from FEMA. This is the *Illinois v. FEMA* case. He found that FEMA had not met its formidable burden of showing that the conduct

was not reasonably expected to recur. The conduct there, very similar to what we're seeing here, FEMA announced grant funding conditions tied to immigration enforcement -- so unrelated to the statute -- tried to walk them back after Plaintiff States challenged those conditions, and Judge Smith found that those conditions were not mooted by the withdrawal.

*New York v. Trump*, a similar case, Chief Judge McConnell of this court, similar gamesmanship by the Office of Management and Budget where you're having the White House coming out and saying, well, we withdrew the memorandum but not policy, following a challenge by the plaintiff states. And it's this haphazard approach, your Honor, that's really the reason that we think mootness is not something that the government should be entitled to, and it's why we're asking your Honor to enjoin not just the rescission of the 24 NOFO, but also the substance of the 25 NOFO.

Unless your Honor has any questions about the sort of arguments that we made about the substance of the NOFO, we would note that the Court is entitled to treat those arguments as conceded. There's no response to them in the Defendants' opposition brief. Unless your Honor has questions, I'm happy to move on to irreparable harm.

THE COURT: No, I think they weren't addressed in the reply brief, so I'm assuming the government is conceding those arguments.

MR. MULLER: Thank you. So turning to irreparable harm, your Honor, I think it's just important, again, to sort of reframe the stakes in the case. We're talking about families with children, veterans, people with disabilities, survivors of domestic violence; and for whoever at HUD is sort of making these decisions to, you know, indefinitely delay the ability of providers and states to serve these people, the fact that, you know, we're looking at evictions in wintertime in CoCs across the country is, frankly, breathtaking.

So there's the immediate harm, the administrative harms that we've talked about, your Honor, and that's the sort of confusion and chaos imposed by an overnight change from decades of practice. Very similar to the *New York v. DOJ* case in front of your Honor, the uncertainty isn't just a matter of, you know, additional paperwork. It's causing real harm. It's derailing the operation of the CoCs, providers. You know, many of these providers, they rely on various sources of funding, and the fact that they're not able to have even the assurance of

funding the way they have previously under the sort of normal practice of HUD, the sort of renewal structure that Congress dictated, means they're not able to get other sources of funding. Many CoCs, as we pointed out in the Byron Declaration from the state of Massachusetts CoC Office, there are people sleeping outside today who would not otherwise be sleeping outside, because CoCs are having to pause intake because they don't know whether they're going to have the shelter beds that they thought they were going to, that they relied on in the CoC Program.

As my colleague pointed out, grants are starting to expire as early as January, and we're going to see mass evictions on a rolling basis, and each month of delay is going to be more harms. You know, in California 43,000 people are housed as a result of CoC funding. In New York City, as many as 10,000 people. We have declarations that we put in to supplement, your Honor, this is the Leone (phonetic) Declaration from New York that shows that each month of delay without certainty and without funding, there are hundreds of units of expiring housing, and hundreds of individuals, hundreds of families are being thrown out into the cold in wintertime because HUD cannot get its act together.

With respect to state-specific harms to the

state agencies, we've touched on those briefly, your Honor, with the sort of the administrative gap and the harm. But I want to point out also the burden to state emergency health care education systems that would result if HUD is, you know, this policy is not to proceed. In Maryland, this is Meister Declaration, those costs are estimated at $230 million sort of burdens additional to other state services. You know, there's a lot of evidence that housing first and sort of getting folks in housing, keeping them housed reduces state expenditures on urgent emergency care and is sort of consensus in the field.

You know, HUD's conduct is jeopardizing state loans to providers who have gotten CoC funds and state funds and now may not be able to, you know, continue their operations, and it risks capital investment the states have made in housing projects. This is talked about as something Illinois is facing in particular.

So with that, I know there are other harms. Unless your Honor has any further questions on these points, I'd like to turn it back to colleague, Ms. Bateman.

THE COURT: Okay.

MR. MULLER: Thank you.

MS. BATEMAN: Yes, your Honor. The harms to the

National Alliance Plaintiffs are very similar and they're, again, facing funding gaps that means they're not going to be able to keep people in housing. The Department of Justice -- excuse me. The Department of Housing and Urban Development does not do much to dispute those harms. What it does is Oh, you're focusing so much on the harms to the people who are going to be displaced into homelessness, that's not a harm to you. But actually, that's not true.

As this court, the District of Rhode Island has recognized and other courts have recognized, harms to an organization's mission is harm, irreparable harm to the organization, and when people who they are serving -- to help them get out of homelessness -- have to be forced back into homelessness, that is a harm to their mission. And as my colleague was discussing, the chaos and confusion is also harm to them.

THE COURT: Is there anything else you wish to add?

MS. BATEMAN: Nothing further from me, your Honor, unless you have further questions, or Mr. Muller has anything.

THE COURT: No, I don't.

Mr. Muller, did you want to add anything?

MR. MULLER: Nothing further for Plaintiff

States, your Honor. Thank you.

THE COURT: Thank you.

Mr. Bailey.

MR. BAILEY: Good morning, your Honor.

THE COURT: Good morning.

MR. BAILEY: The heart of the claims currently before the Court concern the 2024 NOFO rescission and the appropriate remedy for that rescission if the Court finds the rescission violated the APA. I'm happy to go through any particular questions the Court has now, by my plan was to start with the merits of the contrary to law and arbitrary and capricious claims with respect to the 2024 rescission.

THE COURT: Well, I'd take to talk about -- and maybe you can do it within the contrary to law and arbitrary and capricious. The timing of this seems that the agency is basically changing HUD's longstanding HUD policy or is that what they're seeking to do, changing longstanding HUD policy of housing first, which I think has been a policy of HUD's for about 20 years.

That is a policy decision that the agency may seek to change. The question is how are they seeking to change it, and did they go to Congress in March and say we would like you to change this statute or we'd

like you to change the appropriations statute. Or is this something that sort of somebody thought of in, you know, the summer or whatever and then went ahead in this sort of chaotic manner and tried to do it after the fact. It feels like the time to do this is maybe in the next appropriations bill, in the next congressional session, which I think is still the same congressional session, the two-year session.

But the concern I have is that we keep getting this agency action that is happening after an opportunity to go to Congress and have the agency action, the law changed consistent with what the agency would like to do, but the agency's failure to seek the proper mechanism. So I don't know if you can address that or if you're going to address that in the contrary to law part; but it's concerning to the Court that we sort of keep having these cases where the agency issues these, you know, orders or memos or changes in policy, but they haven't done the work to get that policy through; and so it sort of begs the question are they really intending to change the policy, or is the chaos the point.

MR. BAILEY: Yes, your Honor, I'm happy to address that as I go into the contrary to law section. The first thing that I'd like to say is the way that

HUD is able to change the way the program works is through changing the NOFOs.  It can change the requirements.  It can --

THE COURT:  Within the confines of what Congress has -- this is where I think that we're talking past each other, Mr. Bailey.  And I don't want to interrupt you, I'm going to let you make your argument, but I think that you need to address the fact that Congress has set forth parameters within the statutes, within the funding appropriations bill that was just passed during this Administration in March; and those things the Administration either didn't seek to change or decided that that was too difficult and they wanted to do it in this other way that appears to be contrary to the statutes.  So, respectfully, that's not the only mechanism.  HUD can't decide tomorrow that they don't want to house homeless people, that they've decided they're going to house, you know, homeless animals instead; I know that's flip, and I don't mean to be flip.

So there are parameters set forth by Congress.  That's sort of how our system works and you have to follow them, just like I do.

MR. BAILEY:  I apologize if I misunderstood, your Honor.  I absolutely agree that there are

parameters set by Congress that bind (indecipherable).

I'm talking from the process perspective my understanding is that, you know, the Continuum of Care Program is not the exact same year after year. It's not the exact same program. I mean there are going to be at least changes on the margins, response to evolving circumstances. And so at least to an extent. The Continuum of Care Program can be changed by the Secretary through the NOFO, understanding that there were substantive guardrails in the statute, too.

But process-wise I don't think it's the case that HUD has to go to Congress whenever it wants to make any kind of change. And so when we look at timing, there's a -- all agree there's a statutory in the organic act, a three-year deadline for -- I'm sorry.

THE COURT: Three months; right?

MR. BAILEY: Thank you, your Honor.

THE COURT: No, no; that's okay.

MR. BAILEY: Three months after appropriations are enacted.

So I heard my friend on the other side said that we pointed out one or two times that the NOFO was late, and I think this is very important context and not just context but would show that Plaintiffs' argument just

can't be right.

The NOFO that Plaintiffs ask this Court to restore, it was issued past the three-month deadline. It was issued four months and three weeks after. The fiscal year 2023 NOFO, that was a full six months after. 2022, four months and two weeks. 2021, seven months and three weeks.

THE COURT: And what happened in the meantime?

MR. BAILEY: Well --

THE COURT: Because now we're six months past the deadline, a little more than six months past the deadline. Even when you issued, it was five months past deadline. So those examples that you're giving us going back to 20 -- I forget what you just said, 2017? -- the NOFOs, what happened to the existing NOFOs at the time that those NOFOs were delayed?

MR. BAILEY: Yes, your Honor. So my understanding is that at least in the past decade the NOFOs have all been yearly and only authorized to operate for one year. So in the ordinary course there is an annual NOFO that sets the Continuum of Care essentially program requirements for the following fiscal year. So each year the Secretary issues a NOFO and that is at least to some degree a macedon (phonetic) to change how a program operates whether you

have, you know, priorities, new applicants, projects.

So my point of this context is that I don't think it's the case that when the agency misses its deadline they just totally lose the ability to change the program because every year the NOFO I would assume at least on the margin changes something. It's a $3.7 billion program this year. I would expect that there's something to change.

So that said, this is why -- before I get to why I don't think Plaintiffs' rule would work in practice, I'd just like to start with the basic tenets, and I think at least the National Alliance Plaintiffs agree the presumption administrative law is that if the statute doesn't specify a consequence for non-compliance with the deadline, the federal courts are not going to impose a coercive sanction unless, unless that's in the statute. And the idea being that when Congress puts the guideline in the statute, unless it says the agency is going to be divested of its power, it would rather it be late than never; and there's no consequence specified here.

So I'll also back up and say this is a question of statutory interpretation because a three-month deadline is inorganic that which 18 USC 11382(c), I believe. So it's a question of statutory construction,

does that deadline essentially -- is it essentially jurisdictional such that it's going to divest the agency of authority.

And going back to my point about how these NOFOs are primarily, they only operate for one year. They don't contemplate projecting into a second year. So let's take -- let's go back to 2015 where the NOFO was nine months after appropriations. If that had been challenged and then it was found that, you know, it was unlawfully delayed, it missed a deadline, the agency just has no power to enact one, it would essentially, it would essentially mean that the agency couldn't operate the Continuum of Care programming.

THE COURT: Let me ask you a question. So that was nine months after the deadline, so it was a full year after the appropriations though. Is that what you're saying?

MR. BAILEY: No, your Honor. Nine months after the enactment of appropriations.

THE COURT: So six months after the deadline.

MR. BAILEY: Yes, your Honor.

THE COURT: In 2015 was it so late with the appropriations by Congress that we were facing, that the agencies were facing and the states were facing a funding gap or was funding continued? That's the part

that nobody -- that you can't seem to answer, is what happened at that point.  Did people just not get funding?  Did they continue the same funding?  Was the appropriations bill passed like in October when or September when we expect it to be passed?  And were we talking about being, you know, 18 months before or 15 months before funding was going to lapse?

MR. BAILEY:  Your Honor, I think the key here, and this is why I backed up to talk about being a matter of statutory construction, is that this isn't a fact and circumstances balancing test where a court says, well, in this situation should the agency lose the ability to do the thing that Congress asked it to do.  But the question is does the statute make that deadline and fact jurisdictional.

THE COURT:  Okay.  We can get to my questions when we get to the APA, arbitrary and capricious and then, of course, irreparable harm.

But if you don't know the answer you can just say I don't know.

MR. BAILEY:  Your Honor, I don't have additional context, so that's why (indecipherable).

THE COURT:  For any of the other years you cited?

MR. BAILEY:  Except that they were past the

three-month deadline and there was no suggestion that the agency just couldn't administer the program that year. Again, it wouldn't have been another one from the year before to just spring back into life. The Plaintiffs' argument, it could only be plausible because there's this 2024 NOFO that contemplated going in 2025 and so they --

THE COURT: It's a two-year NOFO. Was there anything in the statute that prevented HUD from issuing the two-year NOFO?

MR. BAILEY: No, your Honor. That's not the point. I'm just saying that the Plaintiffs' argument can only work because there is a two-year NOFO. If there was a five-year NOFO it would be that the agency just like couldn't (indecipherable) the Continuum of Care Program.

THE COURT: Right. But that's not where we are. We're with the two-year NOFO.

MR. BAILEY: I understand that, your Honor. And I used that hypothetical because I think it informs the statutory construction. But I think I understand the Court's position, so I'm happy to move on.

I guess -- unless you have more granular questions I would like to at least address the statutory renewal point that the State Plaintiffs

raised.

THE COURT: You need to slow down; I'm sorry, I just got a message that you're speaking too quickly for the stenographer. I apologize. Just slow down a little bit; and as I said it's not a criticism, it's just we tend to do that when we're on Zoom, everybody does it, so --.

MR. BAILEY: Thank you, your Honor. Please just let me know if I'm going too quick.

THE COURT: I will try.

MR. BAILEY: So I would just like to briefly address the statutory renewal argument, and this is based on, again, the organic act; they claim that renewals are essentially mandated when conditions are met. And I don't think that the Court actually needs to decide that. Whether or not the statute requires renewal of certain awards, I don't think that means the deadline's fatal to HUD that they would issue a NOFO. And this, again, goes back to my prior argument. If we looked at this deadline as jurisdictional, the consequences would just be (indecipherable).

And the last point on this, I think the closest case the national -- the closest case that I recall seeing in the reply briefs as to why such a drastic sanction would be appropriate is the First Circuit's

decision in *Castañeda v. Souza* in 2015, and that concerned a provision of the I.A. that barred the A.G. from releasing criminal aliens on bond after they had been placed in immigration custody, and the court found that essentially this was one of the exceptional circumstances and that as a matter of statutory construction that they found the deadline to essentially be jurisdictional.

And I'd just like to point out the important differences here. That timing deadline, it appeared -- and I'm quoting: Appeared within an express exception to a grant of authority.

The court went on, again I'm quoting: Itself makes clear what consequence would follow if such time limit is not met.

And the final thing that I think is key here is the court noted that the A.G. still retained the broad discretion to decide whether to assume and maintain *Castañeda.*

And for all the reasons I just said, that would be the exact opposite result here if this deadline was treated as a fatal possibility to issue a NOFO.

So at this point, your Honor, I'd like to move on to the arbitrary and capricious claim.

THE COURT: Please.

MR. BAILEY: So your Honor, our basic position here is that the decision to rescind the NOFO was reasonable because the government acts reasonably when it rescinds something that relies on several since-rescinded legal directives. And what I'm talking about here is that the 2024-2025 NOFO, it was based off of -- I shouldn't say based off of. It's requirements were informed by several Executive Orders, you know, for instance, one relating to environmental justice, other --

THE COURT: Which ones, and issued by whom and when?

MR. BAILEY: Your Honor, my understanding is that these were issued in the Biden Administration, but I would not -- I would have to check exactly. But these were at the time that the 2024 NOFO was promulgated, these Executive Orders were on the books. They were legal directives to agencies. They informed how the NOFO requirements came out. We discussed in our briefing that requirement that agency focus on environmental justice. There was a very similar provision in the NOFO.

And so now this Administration, President Trump has rescinded at least three Executive Orders that informed that 2024 NOFO.

THE COURT: Which one? Which ones?

MR. BAILEY: Your Honor, I know Executive Order 12,898 -- I'd have to look back at my briefing to give you the exact Executive Orders. But we identify, we identify three there that have been rescinded and that those directives directly inform the requirements of the NOFO; we cite the 2024 NOFO.

And I understand that this is, this might be a difficult position, but the government is basic that when you have these rescinded legal directives, the government is acting reasonably when it comes out with a new policy.

THE COURT: You're calling them legal directives, and let's just say what they're. They're policy directives.

MR. BAILEY: Yes, your Honor.

THE COURT: Okay. So they're not legal; a lawyer didn't issue them. The Presidents issue them -- some of the Presidents have been lawyers, but not all of them, and they're not necessarily legal directives.

So what I think the concern here is, is that you can't just -- agencies have different rules that they have to follow, and this is something that we seem to be coming up against quite a bit. And as you noted, Judge Smith had a case -- or maybe the Plaintiffs

noted that there were cases I've had, there were cases that Judge McConnell had, Chief Judge McConnell had; and they're all sort of coming up against the fact that just because you say you have this policy doesn't mean that policy is automatically enacted. There are things that have to happen. And we have an Administrative Procedures Act. Now, you may not like it, I may not like it having had to deal with it; but the fact of the matter is Congress set forth a mechanism for putting policy into action, which is what Congress is supposed to do; right? So it's not about Executive Orders and legal directives. That's -- if there were legal directives the Court could review the Executive Order. They're not legal directives. What they are is policy directives; correct?

MR. BAILEY: Well, your Honor, I don't think those things are mutually exclusive. I think that Executive Orders can function as legal directives to agencies in certain circumstances depending on the phrasing.

I think what's important here is -- I don't believe there's any dispute that the rescission of the Executive Orders is not an APA problem; there's -- we're not talking about that; right? So whatever process problem might there be with that, we're not

looking at that, so --

THE COURT: Correct. But they can issue whatever Executive Orders they want. I mean Presidents have issued I think, I had read something the other day that FDR has the record or at least the modern record. So you can issue Executive Orders.

What we're talking about is the legal framework within which those policies can be effectuated, and I think that conflating those two and calling Executive Orders legal directives, it is misleading to the public who doesn't understand necessarily the law surrounding how these things are effectuated.

Do you know what I'm saying?

MR. BAILEY: Your Honor, I appreciate your position. The government has a different view that Executive Orders certainly are legal directives. I mean there are certainly, as you're well familiar, many challenges to these Executive Orders. If they were not functioning in legal directives to agencies, I'm not even sure any of those challenges could get off the ground.

THE COURT: They're policy directives to agencies, and what's challenged is the agency action before the Court; isn't that right? I mean Executive Orders themselves are not -- nobody is challenging the

President's right to issue Executive Orders. The question is how the policy set forth in those orders are effectuated by the agencies. Am I wrong about that? If I'm wrong, tell me.

MR. BAILEY: Your Honor, I've personally litigated cases where the relief is asking to enjoin Executive Orders, so I can't say that --

THE COURT: Okay.

MR. BAILEY: But I (indecipherable) that. The processing analysis is at the agency level as assigned by the APA.

THE COURT: Go ahead. I didn't mean to take you off track, so take a minute to get back where you were. I apologize.

MR. BAILEY: I appreciate the Court's questions. I just, I want to wrap up on this part of the arbitrary and capricious point before I move on to reliance, at the risk of repeating myself. And I think that it is a unique situation when you have rescinded Executive Orders that no one doubts that action was fine. And so when the legal framework and the policy framework, again, not mutually exclusive; but when both of those things change I think it is reasonable for the government to issue a new policy, and I submit that it would be arbitrary and capricious if the government

didn't because it stuck with the program that was based off of laws or Executive Orders, policy directives that weren't --

THE COURT: Different, different laws versus policy directives. Those are two different things. That's where you're like, I think that's where we're conflating things and that's where the public misperception is. The policy directives are separate from the law that Congress has enacted.

MR. BAILEY: I understand, your Honor. At this point I think I'd like to talk about reliance, unnecessary you had more questions.

THE COURT: No. That would be good. Great.

MR. BAILEY: So Plaintiffs assert reliance interests on the 2024 NOFO do not render its rescission arbitrary and capricious. I think importantly it didn't make any promises to Plaintiffs regarding the issuance of awards at any point in time. It certainly didn't make any promises to them about issuance of the 2025 awards on a particular timeline. And the 2024 NOFO, it carved out, it says HUD reserves the right to, you know, re-award to 2025. It wasn't some sort of entitlement. And importantly, it put all CoC participants on notice that HUD may issue a supplementary NOFO to accommodate a new Continuum of

Care Program or any the priority. And so I don't think they can have very persuasive or provide full reliance interest when you're put on notice that this is subject to change. These are sophisticated actors, a lot of money is involved here, and in that situation I don't think that the reliance interests are enough to tip the scales.

Again, in July Plaintiffs were put on notice that HUD was very clear in its e-mail that the status quo was unacceptable, it was going to be changing priorities and that they should expect a new application process and new NOFO. So again, as of July it just confirmed what was already flagged back in July of 2024, that there's going to be a new process and, again, any reliance on what was there before is just not reasonable. So for those reasons, I'd like to move into remedy, which I think also involves on reliance interest.

So even if the Court were to determine that the rescission violated the APA, either as contrary to law or arbitrary and capricious, the government's position is that the proper remedy is at most to stay or vacate the rescission. An injunction barring HUD from rescinding or replacing the 2024 NOFO is just not the proper remedy under this part of the APA. And I

understand if we think about the three requests the National Alliance Plaintiffs made, they requested the Court enjoin HUD from issuing a new NOFO, as the second request, and the third request that the Court require HUD to begin processing applications consistent with the 2024. Those are functionally the same. If the Court was -- an injunction barring HUD from issuing a new NOFO would be the same as, functionally the same as requiring it to operate under --

(Overlapping speech)

THE COURT: Can we agree the government has waived its objections and agreed or conceded by not -- that the substance of the now-rescinded 2025 NOFO that the Plaintiffs have said are unlawful, the government didn't engage with that in briefing or in argument, and so is that conceded? I would assume it is. That's what the law says, that I can assume that the government has conceded that; correct?

MR. BAILEY: Your Honor, we did raise threshold mootness arguments, which would take care of that claims. No, we certainly did not concede that.

THE COURT: I think you did though because you didn't argue in the alternative Hey, if you don't find this to be moot, judge, here's why these parameters or things that are set forth are not contrary to law. So

I think you did waive it.

MR. BAILEY: Your Honor, I think the question of whether we conceded something or whether we waived something is different and maybe we're just talking colloquially, --

THE COURT: Maybe.

MR. BAILEY: -- talking over each other, so I apologize. I just want to be careful with the representation I didn't hear that. We did not concede --

(Overlapping speech)

THE COURT: I gotcha.

MR. BAILEY: -- but your Honor is absolutely correct, we did not in our briefing take on the merits that challenged the 2025 conditions. We instead extended this argument.

THE COURT: Right. You didn't concede it, and I shouldn't -- and that's my fault for using the improper term. It's waived, not conceded. So, but the Court is entitled to consider those arguments waived; correct?

MR. BAILEY: Your Honor, we did not address it on the merits, and so I'm not going to push back on that anymore.

THE COURT: Okay. Thank you.

MR. BAILEY: So as I said, the government's

position is that the proper remedy under the APA Section 7062 is either stay or vacatur. It is not to predetermine the agency's conduct on remand.

And so what we're asking for here if the Court were to determine that the rescission is unlawful, the agency be given a chance to do what the agency does on remand and come up with a plan that addresses the concerns that were raised by Plaintiffs.

Another way that I found helpful of looking at this is stopping HUD from even issuing a revised NOFO, that's the same as this Court holding that any revised NOFO, no matter what it requires or how it's justified would be unlawful. And I just, I don't think that's the proper frame of analysis under the APA. I think the agency is entitled to a chance on remand to fix its own errors if there are any. Again, here, it's possible that 2025 NOFO will have a contingency plan with respect to funding, alleged funding gaps, or alternatively a, you know, a sufficiently fulsome record to show that they considered those.

And so again, your Honor, if this Court were to conclude that the 2024 rescission was unlawful, we're just asking this Court follow ordinary remand rules and give the agency another chance, which it has been working diligently to address Plaintiffs' concerns.

THE COURT: Okay. And if the Court were to take up what you are offering, and you're saying that a new NOFO could be issued as soon as, you know, today, can you maintain the status quo while you're doing that?

And my other question is since you have waived the argument about the substance, I'm assuming that notwithstanding your footnote, the new NOFO won't have the challenged conditions.

MR. BAILEY: Your Honor, I can't, I can't speak to what the new conditions are of the NOFO. I don't know that yet. What I will say is I was told by agency counsel that the expectation is that it is today, by close of business today. I'm not making promises for the federal government.

THE COURT: No, absolutely. Believe me, I get it.

MR. BAILEY: But --

THE COURT: But it cannot -- if the Court says, if the Court were to take your invitation and said you know what, the rescission is enjoined, but I'm not going to do these other things; I'm going to let agency do its job. I have two questions: (1) status quo, and (2) does the agency understand that they've waived the argument about the lawfulness of the conditions that are in the now-rescinded 2025 NOFO?

MR. BAILEY: Well, your Honor, I don't -- I think if this Court were to include that the arguments were waived for purposes of this PI, I don't think that that mean the government then estops in a different PI from addressing that, and that would be a different proceeding over the new NOFO. So I would respectfully push back strongly on the idea that the government is somehow estopped from addressing those arguments on the merits.

THE COURT: Okay.

MR. BAILEY: And certainly if we thought that that were the case we would have briefed the arguments, and we would certainly appreciate the opportunity to do so if the Court is inclined to find that way.

THE COURT: Understood. That makes sense.

But what the status quo?

MR. BAILEY: Your Honor, I apologize. What do you mean by the status quo?

THE COURT: So we're in a funding lapse, and I know that other people have been beyond the three months; you're arguing that it's not jurisdictional and so the HUD can issue these things late. But you haven't pointed to any case where they issued them late and there was a potential funding gap and told us what the agency did. So can the agency, can the Court order

the agency or will the agency maintain the status quo, continue the programs as they're funded now until a future NOFO is issued, the proper amount of time is allowed for applications and consideration and then, you know, funding is reissued pursuant to that NOFO.

Is the agency going to continue -- because the problem that we have here is the late in the day kind of thing; right?  Had we done this in March or April, May, even June or July, we would have time for the agency to issue an appropriate NOFO; to have states and agencies go through the process, get the funding pursuant to whatever policy that lawfully is part of that NOFO; and then, you know, for the agencies that were going to continue to receive funding, they would continue to receive that funding.

But what you, what you appear to be doing now is saying Hey, when there's no funding there's no funding, you know, people will now be homeless, because of this sort of lack of diligence in moving these things forward.  Does that make sense?

MR. BAILEY:  I think I understand, your Honor. I can't make any representations sitting here today about what the agency is or is not willing to do.  But I understand the status quo.  Even if the Court were to, again, set aside the rescission, the 2024 NOFO, as

I started with, it didn't require the agency to renew awards. It didn't require the agency to award a particular grant and any particular person, especially any particular timeline.

THE COURT: But it did allow the agencies and states and whoever are applicants to not apply for continued funding and have that funding just continue; and I guess that's what I'm asking about.

MR. BAILEY: I'm sorry, could say it one more time.

THE COURT: Maybe. I'm not sure if -- that was unclear even to me. I apologize.

The 24-25 NOFO had a provision, as I understood it and, you know, I'm a generalist, not a specialist as you folks are in these areas of the law -- but had a provision that be permitted the agency, HUD, to continue funding a second year without the need for new applications. Is that accurate?

MR. BAILEY: Yeah, absolutely, at least as to some participants and programs it allowed the agency to renew without a new application, absolutely.

THE COURT: But not just to renew, to continue; right? Like no new application, no new changes, no whatever. They could just say, you know, you're getting X number of dollars this year and you're going

to get the same amount next year, or we're increasing it by whatever, you know, cost of living has gone up in the last year, or reducing it, or whatever it is.

But is the agency willing to continue that until a new NOFO is lawfully in place?

MR. BAILEY: Obviously, your Honor, I can't make any representations about what my clients are willing to and I think it's -- we might be talking past each other or perhaps sort of getting back into the merits of what the NOFO requires, but -- and my clients' view is not that the 2024 NOFO while it was in place required it to actually continue these programs to a second year; it gave --

THE COURT: It gave them the option, but with the 2024 NOFO in place and no 2020 -- with the 24-25 NOFO in place and no new NOFO, my question is what does the agency plan to do with that provision in the two-year NOFO? Because if it's reinstated, then it's at the agency discretion to continue it; but it can't be arbitrary and capricious, has to follow the rules, it has to do all these things; correct?

MR. BAILEY: Absolutely has to follow the APA, your Honor. I think perhaps where we're missing each other is -- I expect the new 2025 NOFO to be issued today and then that would govern the next fiscal year's

appropriation. So I don't -- I can't make a representation. I don't think my clients would be willing to say that they're going to operate under the 2024 NOFO because, again, the intention here as of this afternoon we have a new 2025 NOFO. And Plaintiffs, if it does not address Plaintiffs' concerns they're free to challenge that, and we will work in good faith with our briefing schedule and address it.

THE COURT: But -- okay. But if -- okay. I think you've answered it; never mind.

I think that the issue for the Court is that you keep doing this forever and never push out any money from the agency and then that sort of contravenes Congress's intent when they issued the appropriations statute back in March, the budget bill, and when the law was originally enacted. But I understand what you're saying; and I didn't mean to make you the spokesperson for the entire HUD just relative to this case.

It's very difficult at this point because we don't know what this new NOFO is going to say, so we have to act I think as if it's not coming today. So I want -- if you're done I would like to, I have a question for the Plaintiffs.

MR. BAILEY: Your Honor, could I please just

readdress the --

(Overlapping speech)

MR. BAILEY: -- mootness issue.

THE COURT: Sure.

MR. BAILEY: So we would just like to clarify here, I'm not going to push back and say we do not concede anything and we do not waive anything, there was no intentional giving up a right, so that is our position. I understand the Court's view on our arguments.

But as to the mootness argument itself, I think that all agree that the rescinded 2025 NOFO conditions are moot unless an exception applies, and the voluntary cessation exception does not apply here because what that's trying to get it is when an agency is trying to evade a court's jurisdiction; and respectfully, your Honor, respectfully, I understand -- I bring it up intentionally because we would not (indecipherable) standards on one day and put the Court on notice of what's going on if we were trying to evade this Court's jurisdiction.

THE COURT: But if they have one that's going to be ready by the close of business today, they have one that could have been ready by the close of business yesterday, so it does -- and the constant sort of

churning and the chaos, as I said at the beginning, seems to be the point. And I'm not putting that on you, Mr. Bailey; you've done a very good job of answering the questions that I've had and briefing and all of that. But I think that saying, well, we didn't waive anything and we might issue the exact same NOFO again, it is evading the Court's jurisdiction, notwithstanding what your position might be, or is an attempt to evade it, I should say. So I understand what you're saying. I realize that -- it's not directed at you; it is sort of the chaos that's created by these quick rescissions and issuing of things without them being properly vetted through lawyers, maybe, who know what the APA says and requires, know what the statute says and requires. So that's the concern I have. And I realize that's not for you to answer, but it does appear to be an intentional evasion of the Court's jurisdiction by the agency.

MR. BAILEY: Well, I can tell you, your Honor, it's my understanding and impression that working diligently to revise the NOFO and get it right; so I don't, respectfully, think it's quite fair to say they could have just had it ready in time if you want to get it right and hope to avoid further litigation over the revised NOFO that I understand will have material

changes designed to address Plaintiffs' concerns.

So the last thing that I'll say on this, I promise this will be very quick.

THE COURT: Sure.

MR. BAILEY: Even the Alliance, National Alliance (indecipherable) don't actually need that, we don't actually need preliminary relief on the rescinded conditions, and I think that's in a footnote in the brief. And so I think they even acknowledge they're not being irreparably harmed by conditions that have been rescinded that might not come back. And so there is no irreparable harm here for just because these conditions -- even if this Court concludes the conditions could be reimposed.

The funding gap that the State Plaintiffs pointed to, that's not -- that has nothing to do with the challenged conditions. That's what the 2024 renewal rescission (indecipherable).

So this will really be the last thing that I say. I think as a matter of judicial economy it would make sense to wait for the, to my understanding revised NOFO to then address those provisions.

THE COURT: Wouldn't it just for judicial economy -- and by the way, I think that ship has sailed. But wouldn't it have made sense to issue it

yesterday? That's what I'm asking you, because we're going through this whole thing; I've been working on it and I have a law clerk who's working on it exclusively for, you know, weeks on these things. And the question becomes like, you know, why today by the close of business? And I'm not -- that's not to you, Mr. Bailey. That's to the agency lawyers who are drafting these things. They know what is and is not lawful, they know what is and is not arbitrary and capricious, and the timing seems to be strategic. That's all I'll say on that.

But I am going to ask -- I'm think the Plaintiffs need to address something -- but I don't want to cut you off. You don't need to rush through your argument if there's more that you want to say, Mr. Bailey.

MR. BAILEY: I had one point that we didn't have the information available at the time of our briefing, so I think this helps contextualize why it would be improper to order that the agency start using the 2024 NOFO even if the Court sets aside the rescission.

So the 2024 NOFO, as we discussed, it contemplated applications -- I'm sorry -- it contemplated those participants in 2024 also being funded in 2025 using those same applications. But it

also stated that there would be, there could be new applications in certain circumstances, and that new application deadline was I believe August 30th, 2025. And because the agency wound down the 25-4 NOFO (verbatim) starting in June of -- January of this year when they removed it from the website, then in July where they sent out e-mails saying there's going to be a new one. And then -- I confirmed this with agency counsel -- they shut down the portal that could be used to submit new applications, and it did not accept new applications; the idea being is that this is a competitive process. You can't have two NOFOs in the system at once; right? So all CoC participants were going, were going to be judged under the forthcoming 2025 NOFO.

So if this Court were to restore the 2024 NOFO and say that the agency has to start immediately acting under it, that would certainly help these Plaintiffs, but it would foreclose any new applicants from participating in the process.

THE COURT: But is that because of the court's action or because of the agency's lack of diligence in acting quickly and within the timeframe set forth by Congress?

MR. BAILEY: Your Honor --

THE COURT: That's rhetorical; I shouldn't make you answer that. I can tell you it's because of the Agency, not because of the Court.

So I understand your argument. It's a good argument. I think the problem is that, you know, we're talking about equity, and the agency can't say, well, it's not fair, but they shut down the process, they didn't accept applications, they didn't do anything to make the process happen; they just sort of broke it and said we'll fix it later and haven't yet done that. That's how it looks from here. And I realize it's a very unsophisticated way of putting it, but that I think is the core of the issue with those arguments.

So I understand what you're saying. I take that and note what you're saying, that isn't fair to other states, other agencies who didn't have an opportunity, but that unfairness is created by the Agency, not by the Court or the Plaintiffs in this case, these cases.

If you're through I do want to ask the Plaintiffs' attorney to address a couple of issues.

MR. BAILEY: Yes, your Honor. Thanks for the time.

THE COURT: Thank you.

Ms. Bateman or Mr. Muller, the government makes the argument that you're arguing that that three months

is jurisdictional and that in the past other administrations, other budgets, other whatever, other HUD agencies have gone past that deadline, well past that deadline, six months in 2015 according to Mr. Bailey.

So why should it be strictly applied here? It doesn't appear to be jurisdictional.

MS. BATEMAN: So I disagree, your Honor. This goes back to the distinction I was talking about earlier, which is when there is a deadline, when Congress tells an agency you have to do something and you have to do it by this date. If the agency blows the deadline, they don't get off the hook from doing the thing that Congress required it to do. The idea is basically it's better late than never.

But that same logic does not apply where the agency has done the required thing already. So here, the agency fulfilled its requirement to issue a NOFO. It did that in 2024 when it issued the two-year 24-25 NOFO. It satisfied its obligation to issue a NOFO for 2025 at that point. So at that point the deadline is sort of mandatory, and if the deadline passes the agency does not have authority to just keep doing it again and again, or else the deadline would have no effect.

MR. MULLER: If I may, your Honor, just one thing I would add is the way this program has worked since its inception is that, you know, approximately 90 percent of funds that have been dispersed by HUD have been disbursed on a renewal basis. So there was no mystery about sort of whether a project could count on its funding for following year.

And here, you know, in the 2025 NOFO, HUD arbitrarily said we're going to cut two-thirds of those renewal funds. And so the idea that this is sort of, you know, just the same, normal practice, we always sort of miss this deadline is really I think misplaced, your Honor.

THE COURT: So what you're saying is that because there's a two-year NOFO that was issued, and the agency didn't act within the time frame and tried to act well after the time frame in such a manner as to sort of undermine what has been done in previous years, that -- it puts sort of more meat into the deadline? Is that essentially what you're saying? Maybe I'm not understanding. I know I'm not articulating it, so maybe I can ask you to say that again.

MR. MULLER: Again, your Honor, it's about reading the statute coherently and reading the statute against the past practice that HUD has always followed;

and it also gets to the irreparable harm piece because the fact that, you know, funds are not going to be disbursed in a timely manner, that, you know, projects that have consistently relied on this funding are not going to have it is why, why the timing piece is a problem this year when it has not been in years past.

THE COURT: And so I guess that's sort of what I was asking Mr. Bailey, and maybe I should have asked the States.

But in the past when that deadline has passed, funding continued. There were no gaps in funding, is that correct, for the programs that were approved under the previous NOFO?

MS. BATEMAN: In the past there were no gaps like this. Awards went out typically in January, which is when the awards would begin expiring. There are a few years in which awards went out as late as March, never later that that, first of all. But second of all, that was against the context that Mr. Muller was talking about where the agency had said Hey, we're going to -- CoC, you can designate 90 percent of your projects as Tier 1, and they're essentially guaranteed so long as there isn't some big problem. And so there was certainty and people could plan against that background of uncertainty and borrow from whatever

funds and that kind of thing.

This is truly unprecedented.

THE COURT: Okay.

Mr. Bailey, is there anything else you wanted to add?

MR. BAILEY: Nothing further, your Honor. Thank you.

THE COURT: Okay. Anybody else? Anything?

(Pause)

THE COURT: We're going to take a five-minute recess.

MR. MULLER: Sorry, your Honor, just briefly. I want to speak to the relief piece that the States are seeking because, as Mr. Bailey pointed out, there is -- Plaintiff States are seeking to enjoin the conditions of the challenged 2025 NOFO, and there are important reasons for that, your Honor.

You know, as Mr. Bailey has represented, there are new conditions coming out perhaps later today. Many of them may be the same, may be different from, you know, conditions that we're challenging. So for reasons we described in the mootness section of our brief, we think an order would be beneficial.

We also think, your Honor, that, you know, for the benefit, you know, in the event that there's an

order and the government decides to appeal it, we think that having the benefit of a ruling on the merits of those issues is important because, again, the uncertainty of sort of, you know, what the final outcome is going to be here, and the uncertainty around that is a big piece of the harm and so we think it's better to sort of flesh all these issues out as quickly as possible and to provide that clarity.

The final piece too, your Honor, you spoke about, you know, the sort of status quo issue. You know, the problem is that the government can't fix the timing piece, right, regardless of what the new NOFO says. And, you know, there is widespread newspaper reporting, your Honor, that when HUD prepared the original NOFOs, that people who were preparing it were actually forbidden from speaking with any HUD lawyers; and so the idea that they sort of need just another chance, a little more time, and that that delay should fall on the feet of, you know, homeless individuals and families is just a little bit hard to countenance. So that's all.

Thank you.

THE COURT: We're going to take a five-minute recess and we'll be back. I'm not sure whether I'm going to issue a ruling now or whether I am going to

issue -- I mean I am definitely going to issue a written ruling. The question is whether I'm going to give you a verbal ruling first. And the problem here is the anticipated NOFO because if that NOFO wasn't, you know, was something we knew about what was coming -- and Mr. Bailey, this has nothing to do with you. Please know that I don't think that you're somehow, you know, withholding this. But I think it's intentionally being withheld until after this hearing because, you know, I criticized the agency for withdrawing the last one right before the last hearing maybe, but also I think in order to sort of, you know, evade court jurisdiction.

So we're going to take a five-minute recess, and I will be back.

(Recess)

THE CLERK: All set, Judge.

THE COURT: Okay. Thank you.

Okay. This is not one of, you know, it's not an easy case and it is made a little more speculative by not knowing what the agency intends to do today. Mr. Bailey, to be clear, that's not on you at all.

So the matter is before the Court on the motions for temporary restraining orders and preliminary injunctions in State of Washington versus HUD, and the

National Alliance to End Homelessness versus HUD, and the motions were converted into preliminary injunction motions; they were TROs.

So a request for a preliminary injunction is a request for extraordinary relief. Everybody, every court to address it says it. To secure a preliminary injunction, a plaintiff has to show a substantial likelihood of success on the merits, a significant risk of irreparable harm if the injunction is withheld, a favorable balance of the hardship, and that the injunction is in the public interest. Here, as in these cases with the government, where the government is the opposing party, the last two issues merge.

So preliminarily I reject the Defendants' contention that these cases are moot based on its rescission of the fiscal year 2025 NOFO. This is sort of a classic voluntary cessation scenario, and the Defendants have a heavy burden of showing that the challenged conduct cannot reasonably be expected to reoccur. And they have not only not met that burden, but, to the contrary, they expressly reserve the right to re-issue the same or similar conditions, and so I find that concession defeats mootness and effective relief remains available at least for the issues that are live.

So the Plaintiffs in both actions have demonstrated a likelihood of success on the merits, and at this stage the record plausibly shows that HUD's rescission of the two-year NOFO and issuance of the 2025 NOFO conflicts with the statutory mandates of the McKinney Vento Act, including Congress's prioritization of permanent housing and renewal stability and the formula-based allocations scheme, as well as the statutory deadline for issuance of a NOFO.

The Plaintiffs have shown serious questions under the APA both substantively and procedurally, including unexplained departures from longstanding policy, failure to consider reliance interests, and adoption of sweeping new grant conditions without required notice and comment.

The Plaintiffs have further established irreparable harm. The withdrawal of the operative NOFO and the delayed and conditional replacement guarantee funding gaps, and these are concrete, imminent harms that cannot be remedied by money damages; so the rescission sort of exacerbates rather than alleviates those harms. And I think it's noted that we don't know what the agency intends to do, although we know they intend to do it today.

The balance of the equities and the public

interest strongly favor temporary relief, and the Plaintiffs seek to preserve the status quo Congress authorized and on which states, local governments, and service providers have relied.

So they haven't, the Defendants haven't identified a comparable framework from maintaining -- a hardship for the government for maintaining that framework for the short period while the Court adjudicates the merits, or, the agency lawfully issues a NOFO that complies with the statutes, the law, and this Court's orders. Ensuring lawful agency action, continuity of housing, and stability for vulnerable populations is clearly in the public interest.

So the motions for preliminary injunction in 25-626 and 25-636 are granted. The Defendants are enjoined from implementing or enforcing the fiscal year 2025 NOFO and its conditions. And I realize that it's been withdrawn, but it's important to note that the government has not engaged with or challenged or supported the legality of those conditions and the prior fiscal -- the important thing is the Court is enjoining the rescission of the 2024-25 NOFO, and that will remain in effect pending agency action consistent with the law and this Court's rulings.

And so I'm going to follow this with a written

order but -- and I'm asking the Plaintiffs to provided the Court and opposing counsel with proposed language specifically stating the terms of the preliminary injunction.

So the 2024 rescission is enjoined. It is -- the agency is ordered to maintain status quo unless and until a lawful order, a lawful NOFO consistent with law and this Court's order is substituted.

Okay. So we'll get something in writing out to you early next week. As soon as there's a new NOFO, I would like the parties to consult with each other to determine whether or not that ends this case; and if it is agreed that it does, then let the Court know. And if it doesn't, provide a copy of the new NOFO to the Court as soon as it issues, okay?

MR. MULLER: Yes, your Honor.

THE COURT: Okay. Is there anything further for this hearing?

MR. BAILEY: Not from the government, no.

THE COURT: Okay. And we will issue a written order, but it may become not necessary depending on what the new NOFO that we're expecting today does, so we'll have to address that. But if everybody just gets me the language they want, then we can at least look at it over the weekend and determine whether or not that's

necessary, okay?

MR. BAILEY: Yes, your Honor.

THE COURT: Okay.

(Overlapping speech)

THE COURT: I'm sorry?

MR. BAILEY: I apologize. Did you want the government to propose language as well?

THE COURT: You're welcome to propose language if you'd like to, yes, but you could also engage with the Plaintiffs' proposal language and figure it out. I realize that you don't speak for the agency, you're their lawyer, so, you're their litigation counsel, so that might not be possible, but, sure, propose the language you think is appropriate, okay?

All right. Everybody have a good day, a good weekend, Merry Christmas, Happy Hanukkah, Happy New Year. And but get me that stuff as soon as possible, and if we need to issue a written order if it doesn't moot out the case, we'll do that hopefully early next week, okay?

MS. BATEMAN: Thank you, your Honor.

THE COURT: Okay. Thank you.

(Adjourned)

C E R T I F I C A T I O N

I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Denise P. Veitch
Denise P. Veitch, RPR
Federal Official Court Reporter

December 27, 2025
Date

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF WASHINGTON, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>Defendants.<br><br>AND<br><br>NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>Defendants. | Case Nos. 25-cv-626-MSM-AEM<br>25-cv-636-MSM-AEM<br><br>District Judge Mary S. McElroy<br>Magistrate Judge Amy E. Moses |

**NOTICE OF PUBLICATION OF
NEW 2025 NOTICE OF FUNDING OPPORTUNITY**

Defendants respectfully advise the Court that the Department of Housing and Urban Development (HUD) has published a new 2025 HUD Continuum of Care Notice of Funding Opportunity ("New 2025 NOFO") for public review. *See* Exhibit A; *see also* New 2025 NOFO Website Publication Notice, Exhibit B. Defendants understand the New 2025 NOFO to be enjoined pursuant to the preliminary injunctions entered by the Court on December 19, 2025. *See* Min. Entry, *State of Washington, et al. v. HUD*, 25-cv-626 (Dec. 19, 2025); Min. Entry, *National Alliance to End Homelessness, et al. v. HUD*, 25-cv-636 (Dec. 19, 2025). Defendants will not implement or enforce the New 2025 NOFO pending further court order. The New 2025 NOFO

**Suppl. App. 561**

provides notice to the public that HUD is enjoined from implementing or enforcing the NOFO. *See* Exhibit A at 5–6; *see also* Exhibit B.

As directed by the court, Defendants will confer with Plaintiffs to determine appropriate next steps, including whether Plaintiffs will continue with their litigation and, if so, whether they will narrow their claims.

DATE: December 19, 2025                         Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

JOHN BAILEY
Counsel to the Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director

PARDIS GHEIBI
Trial Attorney

PETER R. GOLDSTONE
Trial Attorney

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20530
Tel.: (202) 353-7578
Fax: (202) 616-8640
Email: william.s.jankowski@usdoj.gov

*Attorneys for Defendants*

1

**Suppl. App. 562**

## CERTIFICATE OF SERVICE

I certify that on December 19, 2025, the above document was filed with the CM/ECF filing system.

/s/ *William S. Jankowski*

2

A

**Suppl. App. 564**



U.S. Department of Housing
and Urban Development

# FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO

FR-6901-N-25

Community Planning and Development

Suppl. App. 565

# TABLE OF CONTENTS

Suppl. App. 566

I. BASIC INFORMATION..........................................5

A. Summary.............................................................5

B. Agency Contact(s) ...............................................7

II. ELIGIBILITY......................................................10

A. Eligible Applicants.............................................10

B. Cost Sharing or Matching ..................................11

III. PROGRAM DESCRIPTION..............................13

A. Purpose..............................................................13

B. Goals and Objectives.........................................13

C. Authority............................................................21

D. Unallowable Costs.............................................21

E. Indirect Costs......................................................21

F. Program History .................................................22

G. Other Information...............................................24

IV. APPLICATION CONTENTS AND FORMAT.....32

A. Standard Forms, Assurances, and Certifications32

B. Budget................................................................34

C. Narratives and Other Attachments .....................42

D. Other Application Content .................................42

V. APPLICATION REVIEW INFORMATION..........59

A. Threshold Review ..............................................59

B. Merit Review ......................................................74

C. Risk Review........................................................97

D. Selection Process................................................98

E. Award Notices..................................................105

VI. SUBMISSION REQUIREMENTS AND

DEADLINES.........................................................107

A. Deadlines..........................................................107

B. Submission Methods ........................................108

C. Other Submissions ...........................................114

D. False Statements...............................................115

VII. POST-AWARD REQUIREMENTS AND

ADMINISTRATION ..............................................117

A. Administrative, National and Departmental Policy
Requirements, and General Terms and Conditions
.............................................................................117

B. Environmental Requirements ...........................119

C. Remedies for Noncompliance ..........................120

D. Reporting ..........................................................121

VIII. CONTACT AND SUPPORT .........................125

A. Agency Contact ................................................125

B. esnaps.hud.gov ................................................126

C. SAM.gov ...........................................................126

D. Debriefing and Appeals ...................................126

E. Applicant Experience Survey............................131

F. Other Online Resources....................................131

APPENDIX.............................................................133

Appendix I. Definitions ..........................................133

# BEFORE YOU BEGIN

If you believe you are a good candidate for this funding opportunity, register in the appropriate systems now and review the application package. If you are already registered, make sure your registration is active and up-to-date.

**SAM.gov Registration**

You must have an active and up-to-date account with SAM.gov, at the time of application and throughout the life of any award.

To register, go to SAM.gov Entity Registration and click Get Started. From the same page, you can also click on the Entity Registration Checklist for the information you will need to register.

It can take several weeks to register in SAM.gov, so please get started now if you are planning to apply. SAM.gov also provides each organization with a unique entity identifier (UEI). A valid UEI is required to apply for funding.

**esnaps.hud.gov Registration**

You must have an active esnaps.hud.gov account to submit your application. See step-by-step instructions at the CoC Registration and Competition home page.

See Section VI.B. Submission Methods.

**Find the Application Package**

Use the Grants Search at Grants.gov and search for opportunity number FR-6901-N-25 . The application package has all the online forms you need to apply. You also need to access the Download Instructions link and review the content before you apply.

If you have other technical difficulties using Grants.gov, access the Support Center on Grants.gov for assistance.

To get updates on changes to this notice of funding opportunity (NOFO), click Subscribe from the View Grant Opportunity page for this NOFO on Grants.gov.

---

**Application Deadline**

See Section VI.A. of this NOFO.

**HUD Listserv**
If you are interested in email notices about upcoming funding opportunities, subscribe to HUD's Funding Opportunities listserv.
**Note**: To help you find what you need, this NOFO uses internal links. In Adobe Reader, you can go back to where you were by pressing Alt + Left Arrow (Windows) or Command + Left Arrow (Mac) on your keyboard.

---

**Suppl. App. 567**

# I. BASIC INFORMATION

I.  Basic Information

   A.  Summary

   B.  Agency Contact(s)

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 6 of 138 PageID #: 1383

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# I. BASIC INFORMATION

See <u>Contact and Support</u> section of this NOFO.

## A. Summary

**Federal Agency Name:**

United States Department of Housing and Urban Development (HUD)

**HUD Program Office:**

Community Planning and Development

**Announcement Type:**

Initial

**Program Type:**

Discretionary

**Paperwork Reduction Act Information:**

2501-0044

**Due Date for Intergovernmental Review:**

See <u>Section VI.C.1.</u>

<table>
<tr><td>

**Key Facts**

**Opportunity Name:**
FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO
**Opportunity Number:**
FR-6901-N-25
**Federal Assistance Listing:**
14.267

</td><td>

**Key Dates**

**Application Due Date: 8PM Eastern Time on**:
02/25/2025
**Anticipated Award Date:**
03/31/2026
**Estimated Performance Period Start Date:**
03/31/2026
**Estimated Performance Period End Date:**
12/31/2027

</td></tr>
</table>

## 1. NOFO Summary

**The Department of Housing and Urban Development (HUD) is issuing this Notice of Funding Opportunity (NOFO) for the 2025 Fiscal Year for public review. HUD understands this NOFO to be enjoined pursuant to a preliminary injunction entered in *State of Washington, et al. v. HUD*, No. 1:25-cv-00626-MSM-AEM (District of Rhode Island), and *National Alliance to End Homelessness, et al. v. HUD*, No. 1:25-cv-00636-**

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 7 of 138 PageID #: 1384

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

==**MSM-AEM (District of Rhode Island). HUD will not implement or enforce this NOFO pending further court order. HUD will issue further clarification on the status of this or any other future Fiscal Year 2025 NOFO as necessary. HUD will provide further notice as to when the application portal will open.**==

The Continuum of Care (CoC) Program is a competitive and results oriented program designed to:

- promote a community-wide commitment to the goal of ending homelessness;

- provide funding for efforts by nonprofit providers, States, Indian Tribes or Tribally Designated Housing Entities [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)], and local governments to quickly rehouse individuals and families experiencing homelessness, persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, and youth experiencing homelessness while minimizing the trauma and dislocation caused by homelessness;

- promote access to, and effective utilization of, mainstream programs and programs funded with State or local resources; and

- optimize self-sufficiency among individuals and families experiencing homelessness.

This does not alter all applicable protections and obligations under the original Violence Against Women Act of 1994 (Pub.L. 103-322), codified mainly in 42 U.S.C. 13925 et seq., appearing in 108 Stat. 1796; as well as the Violence Against Women Reauthorization Act of 2022, Pub. L. 117-103) 34 (e.g., 34 U.S.C. 12491 (VAWA).

The goal of the Youth Homelessness Demonstration Program (YHDP) is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness and sharing that experience with and mobilizing communities around the country toward the same end. The population to be served by the demonstration program is youth ages 24 and younger who are experiencing homelessness, including unaccompanied and pregnant or parenting youth.

**This NOFO establishes two deadlines for submitting applications to HUD.**
**Application Due Date: 8PM Eastern Time on**:
Normal Track: 01/28/2026 for $2,655,600.
Extended Track: 02/25/2026 for $1,262,400 in funding for new Permanent Housing projects for individuals and families with a disability.
**Anticipated Award Date:**
Normal Track: 03/31/26
Extended Track: 04/28/26

## 2. Funding Details

**Type of Funding Instrument**

G (Grant)

## Available Funds

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 8 of 138 PageID #: 1385

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Funding of approximately **$3,918,000,000** is available through this NOFO.

Additional funds may become available for award. Use of these funds is subject to statutory constraints. All awards are subject to the selection process contained in this NOFO.

On March 15, 2025, the President signed H.R. 1968 authorizing the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4) which makes approximately the same amount of CoC Program funding available for FY 2025 as the Consolidated Appropriations Act, 2024 (Public Law 118-42, approved March 9, 2024). Pursuant to the Full-Year Continuing Appropriations and Extensions Act, 2025, HUD will repurpose $100,000,000 in funds previously outlined in paragraph (5) of the Consolidated Appropriations Act, 2024, under the heading 'Department of Housing and Urban Development—Community Planning and Development—Homeless Assistance Grants', to supplement the FY 2025 CoC Program Competition. Approximately $294,000,000 in amounts available pursuant to section 231 of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94, division H, title II, section 231; 42 U.S.C. 11364a) is also being made available as part of this Notice.

Of the $3,918,000,000 HUD is making available:

- Approximately $52,000,000 in funding is available for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in sections IV.D.1.e and IV.D.1.f of this NOFO.

- Approximately $129,000,000 for the renewal of projects originally awarded as part of the Unsheltered and Rural Homelessness Supplemental NOFO.

- Approximately $228,000,000 for the competitive renewal and replacement of expiring YHDP grants.

All requirements in the FY 2025 application process, including requirements for the entire CoC Consolidated Application, and the total amount of funds available are included in this NOFO.

**Number of Awards**
HUD expects to make approximately 7000 awards from the funds available under this NOFO.

**Length of Performance Period:**

12-month project period and budget period

18-month project period and budget period

24-month project period and budget period

36-month project period and budget period

42-month project period and budget period

48-month project period and budget period

60-month project period and budget period

Length of Periods Explanation:

## B. Agency Contact(s)

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 9 of 138 PageID #: 1386

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |
|---|---|---|---|---|---|---|---|---|

See Contact and Support section of this NOFO.

**Suppl. App. 572**

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 10 of 138 PageID #: 1387

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# II. ELIGIBILITY

II. Eligibility

A. Eligible Applicants

B. Cost Sharing or Matching

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 11 of 138 PageID #: 1388

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# II. ELIGIBILITY

You are invited to apply if your organization is an eligible entity type and meets the funding conditions included in the NOFO. HUD will review applications from eligible applicants using the criteria in Section V. of this NOFO.

## A. Eligible Applicants

### 1. Eligible Entity Types:

00 (State governments)

01 (County governments)

02 (City or township governments)

04 (Special district governments)

06 (Public and State controlled institutions of higher education)

07 (Native American tribal governments (Federally recognized))

08 (Public housing authorities/Indian housing authorities)

11 (Native American tribal organizations (other than Federally recognized tribal governments))

12 (Nonprofits having a 501(c)(3) status with the IRS, other than institutions of higher education)

20 (Private institutions of higher education)

25 (Others (see text field entitled "Additional Information on Eligibility" for clarification))

Additional Information on Eligibility

Faith-based organizations may apply on the same basis as any other organization. HUD does not engage in any unlawful and improper conduct, policies, or practices that target faith-based organizations.

Individuals are ineligible applicants.

a. Faith-based organizations may apply for this award on the same basis as any other organization, as set forth at 24 CFR 5.109, and subject to the protections and requirements of 42 U.S.C. § 2000bb et seq. HUD will not, in the selection of recipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

b. A faith-based organization that participates in this program will retain its independence and may continue to carry out its mission consistent with religious freedom and conscience protections in Federal law, including the Free Speech and Free Exercise Clauses of the Constitution, 42 U.S.C. § 2000bb et seq., 42 U.S.C. § 238n, 42 U.S.C. § 18113, 42 U.S.C. §§ 2000e-1(a) and 2000e-2(e), 42 U.S.C. § 12113(d), and the Weldon Amendment, among others. Religious accommodations may also be sought under many of these religious freedom and conscience protection laws. A religious organization's exemption from the Federal prohibition on employment discrimination of the basis of religion, set forth in section 702(a) of the Civil Rights Act of 1964(442 U.S.C. 2000e-1) is not forfeited when the

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 12 of 138 PageID #: 1389

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

organization participates in a HUD program. See 24 C.F.R. 5.109(i).

c. Religious accommodations may also be sought under many of these religious freedom and conscience protection laws. Nothing in this Notice shall interfere with rights of such Eligible Applicants, as provided under the Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488, codified at 42 U.S.C. § 2000bb through 42 U.S.C. § 2, nor the processes and guarantees provided in HUD regulations regarding applicants' activities and assessments (see 24 CFR 578.93(b)(2) and 24 CFR 578.93(d)(2) and 24 CFR 5.110 and their right to apply as a qualified solo applicant as provided in Section VIII.D.4 of this NOFO (24. CFR 578.35(b).

To be eligible for funding under the FY 2025 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO, project applicants must meet all statutory and regulatory requirements in the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act) and the CoC Program Rule found in 24 CFR part 578 (the Rule). For more information on Applicant eligibility see Section V.A.1 of this NOFO.

### 2. Restrictions

### a. Statutory and Regulatory Requirements Affecting Eligibility

You must comply with the current General Statutory and Regulatory Requirements Affecting Eligibility for HUD's Competitive Programs. HUD will review your eligibility before issuing an award. As part of this review, HUD uses SAM.gov and Department of Treasury data.

Project applicants can obtain a copy of the Act and the Rule on HUD's website or by contacting the NOFO Information Center at 1-800-483-8929. Individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities may visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs for more information on how to make an accessible telephone call to HUD.

### b. Application Eligibility

Your application is considered for funding if it satisfies the application review requirements in Section V. of this NOFO.

For-profit entities are not eligible to apply for grants or to be subrecipients of grant funds.

## B. Cost Sharing or Matching

This Program requires cost sharing or matching, as described below.

24 CFR 578.73 of the Rule requires that recipients must match all grant funds, except for leasing funds, with no less than 25 percent of funds or in-kind contributions from other sources. 24 CFR 578.73.

Project applicants that intend to use program income as a match must provide an estimate of how much program income will be used for the match. HUD will not require YHDP Renewal or replacement projects to meet the 25 percent match requirement if the applicant is able to demonstrate it has taken reasonable steps to maximize resources available for youth experiencing homelessness.

# III. PROGRAM DESCRIPTION

III. Program Description

A. Purpose

B. Goals and Objectives

C. Authority

D. Unallowable Costs

E. Indirect Costs

F. Program History

G. Other Information

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 14 of 138 PageID #: 1391

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# III. PROGRAM DESCRIPTION

## A. Purpose

The Continuum of Care (CoC) Program (24 CFR part 578) is a competitive and results oriented program designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, states, local governments and Indian Tribes or tribally designated housing entities (as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)) to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs and programs funded with State or local resources; and to optimize self-sufficiency among those experiencing homelessness.

As described in detail below, a "Housing First" approach to homelessness has failed to deliver on the CoC Program's primary goal: to end homelessness.

The FY 2025 CoC Program NOFO funds the renewal of existing CoC grants, including DV Renewal projects and projects originally funded under the Special NOFO to Address Unsheltered and Rural Homelessness, and the competitive renewal or replacement of existing YHDP grants that are expiring in Calendar Year 2026. This NOFO also provides funding for new projects, including those created with DV Bonus, CoC Bonus, and the reallocation of existing renewal projects.

For FY 2025, HUD requires Collaborative Applicants to rank all project applications, except for CoC Planning, and if applicable, UFA Costs project applications.

## B. Goals and Objectives

This section provides context to help applicants better understand how the merit criteria found in section V.B of this NOFO advance HUD's implementation of the Continuum of Care program's goal of ending homelessness.

"Housing First" has been a profound failure by any measure. Far from ending homelessness as promised, chronic homelessness has increased by 75% in just a decade. And that is despite artificially lowered numbers and nearly triple the amount of Permanent Housing since 2007. HUD is returning the CoC program to its original goals of solving homelessness by improving outcomes, expanding competition, and prioritizing treatment, economic independence, and law and order to address the diverse root causes of homelessness.

More than a decade ago, advocates of "Housing First" argued that the approach would end all types of homelessness in 10 years.[1] By focusing on permanently subsidized housing with no conditions, the Obama Administration said it would end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020.[2]

In 2025, it is evident that those promises have profoundly failed. Last year, homelessness in the U.S. reached the highest number ever recorded at the highest rate of increase ever recorded.[3] Unsheltered homelessness has increased every year since 2015.[4] Between 2023 and 2024, only six states reported a decrease in homelessness.[5]

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 15 of 138 PageID #: 1392

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Chronic homelessness, which Permanent Supportive Housing was intended to address, has increased by 74.5% since 2015 to the highest number on record. This is despite a 24.7% increase nationwide in Permanent Supportive Housing beds during the same time. In California alone, chronic homelessness increased 128.1% since 2015 despite a 55.2% increase in Permanent Supportive Housing.[6]

According to the McKinney-Vento Act, HUD considers individuals and families living in Transitional Housing, but not Permanent Housing, to be experiencing homelessness. Although Transitional Housing and Rapid Rehousing are both housing limited to 24-months, HUD chose to consider Rapid Rehousing to be Permanent Housing. The effect of this counting method is artificially lower numbers of people experiencing homelessness, and a system that incentivized the speed at which individuals could receive subsidized housing rather than the quality of services individuals could receive in order to reach self-sufficiency and independent living.[7]

There are more people today than ever before who are dependent on indefinitely subsidized housing for homelessness — Permanent Housing. The nation's supply of Permanent Supportive Housing has increased by 111% (more than double) since 2007. When Rapid Rehousing is included, the supply of Permanent Housing (Permanent Supportive Housing and Rapid Rehousing) has increased by 188%. During the same time period, the nation's supply of Transitional Housing has decreased by 59.5% (more than half).

## 1. Improving Outcomes.

One of the main objectives for the CoC program, as set out in the McKinney-Vento Act, 42 U.S.C. § 11381(4), is to optimize self-sufficiency among individuals and families experiencing homelessness. CoCs should review all projects eligible for renewal under this NOFO to determine their effectiveness in reducing homelessness and increasing self-sufficiency. CoCs should prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

This NOFO includes several options to help CoCs improve their effectiveness, including reallocation, expansion, and transition grants, and CoC's should take advantage of these options to expand the pool of successful providers, including faith-based providers, and improve the overall performance of the CoC. This NOFO also makes a significant investment in Transitional Housing and Supportive Service Only projects to ensure that those who can recover and achieve self-sufficiency have the support to do so.

## 2. Restoring Balance to the Continuum of Care

From 2007 to 2009 there was a nearly equal distribution of Emergency Shelter beds, Transitional Housing beds, and Permanent Supportive Housing beds.[1] During this time, the number of people experiencing homelessness was decreasing consistently. Beginning in 2010, and reinforced by HUD's 2013 NOFO, the distribution of homelessness assistance grew dramatically and became imbalanced.

The numbers cited above, and the graph from HUD's Annual Homelessness Assessment Report, reference nationwide bed counts. The trend and disparities between Permanent Housing and Transitional Housing is even more apparent when narrowed to CoC-funded housing in particular. Last year, 88% of the CoC national award went to Permanent Housing,

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 16 of 138 PageID #: 1393

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

and only 1% supported transitional housing projects.[2]

Instead of a balanced continuum of assistance, the CoC Program has become a "one size fits all" response to homelessness that restricts the spectrum of eligible program components to one component, excluding a wide array of community providers in the process. By investing in Transitional Housing and Supportive Service Only projects, HUD intends to restore the "continuum" to the Continuum of Care Program to help able-bodied people move to self-sufficiency. Individuals who are likely to never be able to return to the workforce—over 62 years old, physically disabled, developmentally disabled—should be prioritized for Permanent Supportive Housing. Instead, many Permanent Supportive Housing units prioritize certain disabilities over others at the cost of serving the most vulnerable. Many individuals and families that have these certain disabilities, such as impairment due to substance abuse, are able to recover and regain self-sufficiency and deserve every opportunity to receive treatment and services to help them do so.

To the extent permitted by law, HUD is shifting its focus from awarding nearly 90% of CoC funding to Permanent Housing to expand opportunities for other components of the CoC Program, and it is also prioritizing Permanent Housing that has robust services with participation requirements.

### 3. Prioritizing Treatment and Recovery as a Means to Self-Sufficiency.

According to a nationwide study, 75% of a survey sample of 64,000 people experiencing unsheltered homelessness reported a substance use disorder and 78% reported a mental health condition. The study found that substance use disorder contributed to the loss of housing for 50% of the unsheltered population, and mental health conditions contributed to loss of housing for 51% of the population.[3] Another study found that two-thirds of people experiencing homelessness self-reported regular use of hard drugs like methamphetamine, cocaine, and opiates. Of those, 29% reported wanting treatment and being unable to receive it.[4] Based on HUD's 2024 Point-In-Time Count data, which asks individuals if they wish to self-report substance abuse, 24.7% of individuals experiencing unsheltered homelessness select to self-report substance abuse. The results of ignoring the prevalence of substance use disorder among people experiencing homelessness is deadly.

According to a 2022 study from JAMA, "deaths among people experiencing homelessness in San Francisco more than doubled to 331 deaths during the first year of the COVID-19 pandemic, driven by a large increase in overdose deaths."[5] The risk of fatal overdose inside Permanent Supportive Housing is noteworthy, and tragic. The City of Seattle reported a 282% increase in overdose deaths in King County's Permanent Supportive Housing (and other subsidized housing) between 2020 and 2023.[6] According to HUD's own data, 19.5% of exits from Permanent Supportive Housing among adults living alone are due to death. Between 2019 and 2022, the share of adults living alone who died in Permanent Supportive Housing increased from 13% of exits to 20%, and the *number* of adults who died increased by 31%.[7]

A National Academies of Sciences, Engineering, and Medicine review of studies on Permanent Supportive Housing concluded that "there is no substantial published evidence as yet to demonstrate that Permanent Supportive Housing improves health outcomes or reduces healthcare costs" and that "the studies reviewed did not demonstrate improvements in

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 17 of 138 PageID #: 1394

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

psychiatric symptomatology or substance use behavior."[8] This review was published in 2018, just prior to the explosion of Fentanyl use in the U.S..

Despite the tragic realities of substance abuse and fatal overdose among people experiencing homelessness or living in Permanent Supportive Housing, there are recipients of CoC funding who reportedly, under the misnomer of "harm reduction", permit, and even encourage, the use and distribution of illicit drugs on their property including by distributing drug paraphernalia like needles, pipes, and foil. This NOFO provides communities opportunities to invest in treatment services and recovery housing, and prohibits recipients from distributing drug paraphernalia or permitting the use and distribution of fatal, illicit drugs on their properties.

CoCs should prioritize projects that provide the treatment and services people need to recover and regain self-sufficiency including on-site behavioral health treatment, robust wraparound supportive services, and participation requirements. This NOFO devotes resources to Transitional Housing programs and Supportive Service Only projects with the goal of improving health and long-term economic independence for individuals and families experiencing homelessness. HUD encourages CoCs to utilize the full array of mainstream programs and local and private resources to provide housing and healthcare needed to maintain safe and stable housing.

### 4. Promoting Economic Self-Sufficiency.

One of the primary purposes of the CoC Program, as outlined in 42 U.S.C. § 11381, is to optimize self-sufficiency. In fact, self-sufficiency is one of only four purposes Congress provided for the CoC Program. CoCs should partner with workforce development centers, employers, childcare, and other supportive service providers to increase employment and employment income for program participants. CoCs should prioritize projects that help lead to long-term economic independence for individuals and families to exit homelessness to unsubsidized housing and prevent future returns to homelessness.

Although a chief goal of the program is self-sufficiency, HUD's data reveals low rates of increased employment income and exits to unsubsidized housing. As of 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned, employment income during that reporting period. In comparison, 33% of individuals in CoC-funded housing increased their benefits and welfare income.[9] Nationwide, 76.1% of Permanent Supportive Housing residents are under age 65, with a significant 17.4% under age 18.[10] Yet in Permanent Supportive Housing, only 13.2% of all households exited their housing. Of that percentage, only 12.9%, or 1.7% of participating households, exited to unsubsidized housing. Nearly twice as many exits were due to death.[11]

One way to advance both recovery and self-sufficiency is through supportive service participation requirements. Service participation requirements have been successfully employed in most federal social service programs and were integral to the welfare policy reforms enacted under President Clinton in 1996. For example, PELL Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. Unemployment insurance benefits require program participation, including demonstrated participation in prescriptive job searches. Temporary Assistance for Needy Families (TANF) requires beneficiaries to work or advance their education.

Case 1:25-cv-00626-MSM-AEM Document 66-1 Filed 12/19/25 Page 18 of 138 PageID #: 1395

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

According to a national poll in 2024, there is strong bipartisan support for supportive service participation requirements, with 69% of respondents in favor of "requiring participation in programs for housing benefits."[12]

In accordance with 24 CFR 578.75(h), HUD encourages supportive service agreements that meet individual needs and advance individual progress towards self-sufficiency and independent living goals set forth in 42 U.S.C. 11386a(b)(1)(F).

### 5. Creating Competition to Improve Innovation and Accountability.

The Continuum of Care Program was intended to be a "national competition between geographic areas" (42 U.S.C § 11386a), which is also consistent with Office of Management and Budget requirements that federal grants be awarded on a competitive, objective basis, even for renewals. 2 CFR 200.205, 200.309. Last year, 90% of every CoC's Annual Renewal Demand was conditionally awarded without any connection to CoC score or project merit.[13] This means that only about 10% of CoC awards were competed on the basis of merit between geographic areas. In fact, since 2013, the most competitive CoC competition required only 15% competition on the basis of merit, and the least competitive required merely 5% competition.

Competition drives outcomes, effectiveness, innovation, and accountability which is why HUD is competing 70% of Annual Renewal Demand on the basis of merit between geographic areas. Increased competition brings the CoC Program back to its original intent as a competitive program, not an entitlement program or block grant. Competition ensures that CoCs consistently evaluate the effectiveness of their projects and invest in new projects that deliver the best results at reducing homelessness and optimizing self-sufficiency. The historic lack of competition has meant that the same projects are awarded every year regardless of their impact on homelessness.

### 6. Ending the Crisis of Homelessness on Our Streets.

The number of people experiencing unsheltered homelessness is at an all-time high.[14] People living on the streets and in encampments have high rates of substance use disorder and mental illness.[15] HUD intends to focus increasingly on reductions in unsheltered homelessness and movement through Transitional Housing and out of Permanent Housing to self-sufficiency.

CoCs should direct resources towards outreach, intervention, and assistance that helps people move out of unsheltered homelessness and regain self-sufficiency. By expanding opportunities for new providers and historically disincentivized program components, HUD is assisting community-wide efforts to address homelessness with the most effective solutions.

### 7. Advancing Public Safety for All.

Safety and security for all members of the public, especially those living unsheltered, is essential to promoting a community-wide commitment to the goal of ending homelessness. CoCs should cooperate with law enforcement to advance public safety for the entire community impacted by homelessness. No one should sleep outside on the street or in dangerous encampments, and everyone should be able to enjoy public spaces safely. HUD encourages CoCs to assist in preventing and minimizing the trauma associated with living on

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 19 of 138 PageID #: 1396

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

the streets or in encampments, especially for women and youth that are the victims of sexual assault and trafficking. Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

Respecting the rule of law is critical to community-wide efforts to address homelessness and protect all residents. According to one report, as unsheltered homelessness increased in King County, gun crimes tied to homeless encampments increased by 122% in just the first six months of 2022. Between 2017 and 2020, 50% of all arrests in Portland, Oregon were of individuals experiencing homelessness despite the homelessness population comprising only 2% of the total population. According to the same report, drug overdoses were the most common cause of death among individuals experiencing homelessness in New York City between 2018 and 2021. The number of deaths doubled during that short time period.[16] One recent study indicates that in some states, as many as half of unsheltered individuals experiencing homelessness are registered sex offenders.[17]

None of the realities above suggest that the entire population experiencing homelessness is engaged in criminal or illicit activity despite significant disproportionality. Data also indicates that people experiencing homelessness are the victims of crime at higher rates than the general public.[18] Gun violence in encampments, fatal drug overdoses on the streets, and sexual assault in encampments all perpetuate harm and trauma to individuals experiencing homelessness. It is common sense to acknowledge the close relationship between unchecked homelessness and illicit activity with its many victims. Enforcing the rule of law is critical to protecting the safety of everyone regardless of their housing status, which in turn promotes one of the core purposes of McKinney-Vento, "community-wide commitment to the goal of ending homelessness." 42 U.S.C. § 11381(1).

In 2024, The City of Seattle reported that 76% of residents surveyed in a downtown neighborhood disagreed or strongly disagreed with the statement "I feel safe in my neighborhood." The respondents included residents of three Permanent Supportive Housing buildings in the neighborhood. The city described a downtown environment that creates "opportunities for illegal street markets, drug markets, and unsanctioned tent encampments to form."[19]

The public is supportive of policies that advance public safety related to homelessness. According to national polling in 2024, there is string bipartisan support for public camping bans and stricter enforcement of drug laws, with 72% of voters in favor of "moving individuals into shelters over allowing camping" and 60% of voters in favor of "stricter drug enforcement near service, providers, including penalties for facilities permitting drug activity."[20]

Advancing public safety policies has been shown to decrease homelessness. Two years after the City of Austin reinstated a ban on public camping, unsheltered homelessness decreased by one-third.[21] Several years after Colorado Springs restricted public camping near creeks and waterways, unsheltered homelessness decreased by 14%.[22]

First responders are critical partners in engaging people into treatment and services and protecting public order and vulnerable individuals experiencing homelessness. In *Grants Pass v. Johnson,* the Supreme Court of the United States upheld the authority of local governments to prohibit public camping.

First responders and law enforcement are often the first to encounter our most vulnerable

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 20 of 138 PageID #: 1397

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

members of society and should be aware of the available services to triage individuals into safe and appropriate services, ideally alongside non-law enforcement service providers in the Continuum of Care. Executive Order 14321 reflects the need for cooperation. CoCs should work with law enforcement, first responders, and their state and local governments to reduce encampments, public camping, and public drug use in order to address barriers to maintaining housing and increasing self-sufficiency.

**8. Minimizing Trauma for Vulnerable Populations.**

One of the purposes of the CoC program is to minimize the trauma associated with homelessness 42 U.S.C. § 11381(2). CoCs should encourage providers to provide trauma informed care and ensure participant safety in programs, especially for youth and survivors of domestic violence, dating violence, sexual assault, and stalking. Women experiencing homelessness or domestic violence should have access to safe, single-sex spaces and other considerations for personal privacy (24 CFR 578.93(b)).

**9. Expanding Access Based on Merit, not Ideology.**

HUD is committed to providing an equal opportunity to every applicant, recipient, and program participant free from discrimination. Part of this commitment is recognizing that faith-based providers deserve a level playing field to compete for CoC funding and participate in the community-wide efforts of their local CoCs. Faith-based organizations first served the nation's homelessness population long before the Federal government was ever involved.[23]

To the fullest extent permitted by law, HUD will ensure that faith-based organizations can participate in the CoC program and operate consistent with their sincerely held religious beliefs, recognizing all relevant protections provided by subsection c of HUD's Equal Participation Rule, 24 CFR § 5.109, the Religious Freedom Restoration Act, and the First Amendment. Promoting equal access for faith-based organizations directly advances the goals of the CoC program by increasing the number and diversity of program providers and increasing overall competition for CoC funds.

Likewise, HUD is committed to promoting equal access to CoC programs for homeless individuals and program participants regardless of their race or other protected status. The prior administration wrongly and illegally pressured or required providers to discriminate against participants based on their race, sex, or other protected status. In *Students for Fair Admissions (SFFA) v Harvard*, 600 U.S. 181 (2023), the Supreme Court ruled Harvard's race-conscious admissions violated the Fourteenth Amendment's Equal Protection Clause, effectively ending affirmative action as previously practiced by using race as a "plus" factor for diversity, finding it led to racial stereotyping, lacked a logical endpoint, and failed strict scrutiny by not being narrowly tailored to serve a compelling government interest. HUD believes that these harmful and illegal practices promoted division and waste and wants to increase access to homelessness relief for *all* individuals and families.

[1]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[2]CoC_AwardComp_NatlTerrDC_2024.pdf

[3]Health Conditions Among Unsheltered Adults in the US

[4]CASPEH_Report_62023.pdf

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 21 of 138 PageID
#: 1398

I. Basic
Information

II. Eligibility

III. Program
Description

IV. Application
Contents and
Format

V. Application
Review
Information

VI. Submission
Requirements and
Deadlines

VII. Post-Award
Requirements and
Administration

VIII. Contact and
Support

Appendix

[5] Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic | Public Health | JAMA Network Open | JAMA Network

[6]Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

[7]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[8]Evidence of Effect of Permanent Supportive Housing on Health - Permanent Supportive Housing - NCBI Bookshelf

[9]System-Performance-Measures-Data.xlsx

[10]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[11]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[12]2024 National Public Safety and Homelessness Poll | Cicero Institute

[13] Tier 1 of FY24-25 CoC NOFO

[14]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[15]Health Conditions Among Unsheltered Adults in the US

[16]How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

[17]Sex Offenders: An Overlooked but Significant Subpopulation of the Homeless | Cicero Institute

[18]Homeless Data and Plan News Release FINAL 3-21-22.pdf

[19]Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

[20]2024 National Public Safety and Homelessness Poll | Cicero Institute

[21]Austin's homeless population dispersing after 2 years of camping ban enforcement | Community Impact

[22]20240304161555229_23-175 Amicus BOM Cicero PDFA.pdf

[23]History of The Salvation Army

[1]Are Cities' Pledges to End Homelessness Working?

[2]USICH Opening Doors - Federal Strategic Plan to Prevent and End Homelessness - HUD Exchange

[3]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[4] Ibid.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 22 of 138 PageID #: 1399

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

[5] Ibid.

[6]The Future of Housing for the Homeless

[7]How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

## C. Authority

The CoC Program is authorized by subtitle C of title IV of the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act), and the CoC Program rule found in 24 CFR part 578 (the Rule). Pursuant to 42 U.S.C 11386a(a) and 42 U.S.C. 11386a(b)(1)(G), the Secretary can establish criteria for the awarding of funds including factors deemed appropriate to carry out the CoC Program in an effective and efficient manner.

FY 2025 funding for CoC Program Competition NOFO, including the competitive or noncompetitive renewal or replacements of YHDP grants under the CoC program, is authorized by the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025). Under this NOFO, HUD will competitively renew or replace YHDP grants under the CoC Program.

HUD is including up to $294,000,000 in funding under Section 231(a)(1) and 231(a)(3) of the 2020 Consolidated Appropriations Act.

HUD is also utilizing authority under the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025) to enable HUD to repurpose $100 million made available for Permanent Supportive Housing to fund CoC projects under this NOFO.

## D. Unallowable Costs

HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## E. Indirect Costs

If you expect to charge indirect costs to the award, submit the Indirect Cost Rate Certification form (HUD-426) with your application.

The HUD-426 form is built into the *e-snaps* Project Applicant Profile where you will complete the information if requesting indirect costs, and you will also see the information transferred within your project application.

Indirect cost rules under 2 CFR part 200, as may be amended from time to time, apply. Project applicants that intend to charge indirect costs to the award must clearly state in the project application(s) the rate and distribution base the recipient intends to use, and if applicable, the rate and distribution base to be used by any subrecipient(s). If the rate is a Federally negotiated indirect cost rate, the project application must include the corresponding negotiated indirect cost rate agreement signed by the cognizant agency. A government department or agency unit that receives no more than $35 million in direct federal funding per year and has developed and maintains an indirect cost rate proposal and supporting documentation in accordance with 2 CFR part 200, appendix VII, may use the rate and distribution base specified in that indirect cost rate proposal. These governmental departments or agencies are not required to submit their proposals unless they are

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 23 of 138 PageID #: 1400

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

specifically requested to do so by an awarding Federal agency. The Federal agency's review should be limited to ensuring the proposal is consistent with the principles of this part.

For each applicant or intended subrecipient that meets the conditions for using the de minimis rate under 2 CFR 200.414(f) and will use that rate to charge indirect costs, the project application must clearly state the intended use of the de minimis rate. As described in 2 CFR 200.403, costs must be consistently charged as either indirect or direct costs but must not be double charged or inconsistently charged as both. Once an organization elects to use the de minimis rate, the organization must apply this methodology consistently for all Federal awards until the organization chooses to negotiate for a rate, which the organization may apply to do at any time. Documentation of the decision to use the de minimis rate must be retained on file for audit.

## F. Program History

FY 2025 CoC awards will be made through this NOFO. This NOFO rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024, and includes several changes.

**1. Investment in New Permanent Housing with Robust Supportive Services for Individuals and Families with a Disability.**

This NOFO provides a set-aside of 30% of all ESG and COC funds,[1] as contained in 42 U.S.C. § 11386b, for new permanent housing projects for homeless individuals and families with disabilities, including PH-PSH and PH-RRH. As outlined in the Threshold Criteria in V.A.4, new PH-PSH and PH-RRH projects must serve individuals and families with disabilities.

This NOFO aligns with the program statutory requirements to fund new permanent housing. CoCs have discretion to determine if or how much of their Annual Renewal Demand (ARD) will be used for the creation of new Permanent Housing projects.

For CoCs applying for new Permanent Housing projects, those projects:

- Must be submitted by the Extended Track deadline.

- Must be ranked by the CoC in an Extended Track Priority Listing.

- Must not be included in the Normal Track FY25 CoC Priority Listing.

- May be CoC Bonus projects.

- May be DV Bonus projects, if it meets DV and new project criteria.

- May be the expansion portion of an expanding renewal project.

- May be Transition Grant projects.

- Will not be considered if they exceed the CoC's maximum award based on the CoC's combined Priority listings. In other words, these projects should not, in combination with the Normal Track FY25 CoC Priority Listing, exceed the CoC's maximum award

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 24 of 138 PageID
#: 1401

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

amount.

**2. Two-Track Application Process for Increased Flexibility.**

In order to provide time and flexibility for CoCs to solicit new Permanent Housing project applications, HUD is creating a separate deadline for new Permanent Housing projects.

Normal Track: $2,655,600,000 in funding, January 28, 2026 deadline and March 31, 2026 estimated award date. HUD reserves the right to award projects in Tier 1 of CoC Priority Listings prior to the rest of awards.

Extended Track: $1,262,400,000 in funding, February 25, 2026 deadline and April, 22, 2026 estimated award date. For new Permanent Housing projects only.

**3. FY 2025 CoC Consolidated Application.**

All CoCs must complete and submit the FY 2025 CoC Consolidated Application that includes the CoC Application and CoC Priority Lising with all submitted projects ranked or rejected based on the criteria set forth in this NOFO. CoCs applying for new Permanent Housing projects on the Extended Track timeline must submit a separate Extended Track Priority Listing of new Permanent Housing projects. CoCs should not submit projects in Normal Track and Extended Track that, when combined, exceed their maximum award amount.

**4. Increase in Competition and Expedited Awards.**

The Continuum of Care program is a national competition (42 U.S.C. 11386a). Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD). HUD reserves the right to award projects in Tier 1 of CoC Priority Listings prior to the rest of awards.

**5. Investment in Transitional Housing and Supportive Service Only Projects.**

In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund the renewal of existing Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects.

6. **Program Components that are eligible under this NOFO.**

Provisions at 24 CFR 578.37 provide that CoC funds may be used for projects under five program components: transitional housing, supportive services only, HMIS, permanent housing (including rapid re-housing and permanent supportive housing), and in some cases, homelessness prevention. This NOFO is different than prior years in that applicants may apply for Transitional Housing (TH) and Supportive Services Only (SSO) projects including street outreach. Only designated High Performing Communities (HPC), may carry out homelessness prevention activities through the CoC program and there are currently no HPCs. Therefore, the four components that will be funded through this CoC Program Competition are: (a). Transitional Housing; (b). Supportive Services Only; (c). Permanent Housing; and (d). HMIS. Additionally:

> **a.** HUD will allow renewal project applications for Joint T/PH-RRH component projects, which combine two existing program components in a single project (see section III.G.4of this NOFO for more information). No new Joint TH/PH-RRH component project applications will be allowed.

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 25 of 138 PageID #: 1402

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**b.** Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. These projects must meet the project quality threshold criteria in section V.A.4.b.(5)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in section V.A.4.b.(5)(b) of this NOFO.

The components are fully described at 24 CFR 578.37.

### 7. Special CoC NOFO grants.

Grants originally awarded funding under the Special NOFO to Address Unsheltered and Rural Homelessness, that are expiring in Calendar year 2026 are eligible to renew under this NOFO.

### 8. Reallocation.

CoCs may reallocate funding from any eligible renewal grant, including grants that have not previously renewed under the CoC Program, so long as the project has an executed grant agreement with an expiration date in Calendar Year 2026. For more information on Reallocation requirements see section III.G.3 of this NOFO.

### 9. Competitive Renewal or Replacement of YHDP Grants.

HUD will competitively renew or replace YHDP projects. Additionally, YHDP projects may be reallocated by CoCs to create new YHDP grants. If significant changes to a renewing YHDP project are needed the YHDP project may replace its current project with a new YHDP Replacement project, that may wholly or in part include activities ineligible under the CoC Program as outlined in section IV.D.1.h of this NOFO.

[1] HUD estimates that this amount is $1,262,400,000.

## G. Other Information

### 1. CoC Program NOFO Requirements.

All requirements for submitting the entire CoC Consolidated Application, including applications for projects eligible for FY 2025 CoC and YHDP funding and the total amount of funds available, are contained in this NOFO. Applicants should read this information carefully and respond to all submission requirements and deadlines as described.

**a.** CoCs should consider the Goals and Objects established in Section III.B of this NOFO in conjunction with local priorities to determine the ranking of new and renewal project application requests.

**b.** Collaborative Applicants that are designated Unified Funding Agencies (UFAs) or High Performing Communities (HPCs) by HUD during the FY 2024 CoC Program Registration process will maintain their UFA and/or HPC designation for the FY 2025 CoC Program Competition.

**c.** HUD will conduct threshold reviews of project applicants, and project applications for all CoC Consolidated Applications that are submitted by the application submission deadline as described in section V.A.4.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 26 of 138 PageID #: 1403

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**d.** HUD may issue more than one conditional funding announcement, including for instances where a CoC has been affected by a disaster and for which HUD has extended the deadline for application submission.

**e.** HUD will score the FY 2025 CoC Application portion of the Consolidated Application in accordance with the criteria set forth in section V.B of this NOFO.

**f.** With the exception of CoC Planning and, if applicable, UFA Cost applications, CoCs must rank all project applications. This includes CoC Bonus, DV Bonus, CoC Renewal (including DV Renewal projects), New CoC Reallocation, New DV Reallocation, and YHDP Renewal and YHDP Reallocation projects. CoC Planning and, if applicable, UFA Costs project applications are not ranked and will be selected provided they pass project eligibility and project quality threshold review.

## 2. Eligible Renewal Project.

YHDP and CoC projects originally funded in FY 2024 or earlier, including projects originally funded under the Special NOFO or DV Bonus are eligible to renew under this NOFO, provided the projects have an expiration date in CY 2026 (between January 1, 2026, and December 31, 2026). Renewal project applications must be submitted by the recipient currently under grant agreement to operate the project. See section IV.D.2 for more information on renewal project requirements.

In cases where an expiring grant agreement is amended to have a new recipient after a renewal application is submitted, the new recipient will be eligible to receive the renewal award (Section V.D.8).

## 3. Reallocation.

Reallocation is a process CoCs use to shift funds in whole or in part from existing eligible CoC renewal projects to create one or more new projects without decreasing the CoC's ARD. CoCs may only reallocate eligible renewal projects so long as the renewal project being reduced or eliminated has a current grant agreement with an expiration date in CY 2026. Additionally, new projects created through reallocation must meet the project eligibility and project quality thresholds established in sections V.A.4.a and V.A.4.b of this NOFO. For more information on the requirements for projects created through reallocation, see sections IV.D.1.e and IV.D.1.f (DV Reallocation), IV.D.1.g (CoC Reallocation), and IV.D.1.i (YHDP Reallocation) of this NOFO.

To create a Transition Grant through the reallocation process, the CoC must wholly eliminate one or more projects and use those funds to create the single, new transition grant [see section IV.D.1.l of this NOFO].

## 4. Joint TH/PH-RRH Component Project.

The Joint TH/PH-RRH component project combines two existing program components – Transitional Housing and Permanent Housing-Rapid Rehousing – in a single project to serve individuals and families experiencing homelessness.

If funded, HUD will limit eligible costs as follows, in addition to other limitations found in the Rule:

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 27 of 138 PageID #: 1404

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**a.** leasing of a structure or units, and operating costs to provide transitional housing;

**b.** short- and medium-term tenant-based rental assistance on behalf of program participants to pay for the RRH portion of the project;

**c.** supportive services;

**d.** costs of contributing data to the HMIS; and

**e.** project administrative costs.

Renewal project applicants must include details in the project description of how TH and PH-RRH assistance will be provided. Additionally, if CoC Program funds are not being requested for both TH and PH-RRH units, the renewal project application must describe and include the number of the project's TH units and PH-RRH units that will be paid for from another funding source. Applicants may only use CoC Program Leasing funds or non-CoC Program Funds to pay for the cost of housing program participants enrolled in the TH portion of the project.

When a program participant is enrolled in a Joint TH/PH-RRH component project, the recipient or subrecipient must be able to provide both components, including the units supported by the TH component and the tenant-based rental assistance and services provided through the PH-RRH component, to all participants. A program participant may choose to receive only the assistance provided through the TH portion of the project or the assistance provided through the PH-RRH component, but the recipient or subrecipient must make both types of assistance available.

**5. Supportive Services Only (SSO) projects not dedicated to Coordinated Entry.**

Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. Projects that are primarily providing these outreach services and identify themselves as such in the project application, must meet the project quality threshold criteria in Section V.A.4.b.(5)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in Section V.A.4.b.(5)(b) of this NOFO.

**6. Centralized or Coordinated Assessment System (Coordinated Entry).**

In general, 24 CFR 578.23(c)(9) and (11) requires all CoC program recipients and subrecipients to use the centralized or coordinated assessment system established by CoCs. The definition of Centralized or Coordinated Assessment (also known as Coordinated Entry) is found at 24 CFR 578.3. 24 CFR 578.7(a)(8) details the responsibilities of the CoC to establish and operate this required system. In addition to the definition and responsibilities established in the Rule, HUD posted on its website, *CPD-17-01: Notice Establishing Additional Requirements for a Continuum of Care Centralized or Coordinated Assessment System*, establishing additional requirements related to the development and use of a centralized or coordinated entry assessment system. These systems help communities assess the needs of program participants and effectively match individuals and families experiencing homelessness with the most appropriate resources available to address their supportive service and housing needs. CoCs may use planning costs to design and plan for the implementation of a Coordinated Entry system; however, once the system is established and operating, the costs of operating it are not eligible planning costs. CoCs must operate the

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 28 of 138 PageID #: 1405

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

system with CoC Program funds, other funds, or a combination of the two. Section 578.23(c)(9) of the CoC Program Rule exempts victim service providers from using the CoC's coordinated entry process if victim service providers use a coordinated entry process that otherwise meets HUD's requirements.

### 7. Non-Dedicated Permanent Supportive Housing Beds.

A Permanent Supportive Housing bed within a CoC's geographic area that is not currently classified as dedicated for use by chronically homeless individuals and families or as DedicatedPLUS.

### 8. Beds Dedicated to Chronically Homeless Individuals and Families.

A Permanent Supportive Housing bed that is dedicated specifically for use by individuals and families experiencing chronic homelessness [see 24 CFR 578.3 definition of Chronically Homeless] within a CoC's geographic area, as reported in the CoC's housing inventory count (HIC) and permanent housing (PH) project applications.

### 9. DedicatedPLUS Project.

**a.** A PSH project where 100 percent of the beds are dedicated to serve individuals, households with children, and unaccompanied youth (including pregnant and parenting youth) that at intake meet one of the following categories:

**(1)** experiencing chronic homelessness, meaning they qualify as "chronically homeless" as defined in 24 CFR 578.3;

**(2)** residing in a TH project that will be eliminated and meets the definition of chronically homeless in effect at the time in which the individual or family entered the TH project;

**(3)** residing in a place not meant for human habitation, emergency shelter, or Safe Haven and had been admitted and enrolled in a PH project within the last year but were unable to maintain a housing placement and met the definition of chronically homeless as defined by 24 CFR 578.3 prior to entering the project;

**(4)** residing in transitional housing funded by a Joint TH/PH-RRH component project and who were experiencing chronic homelessness as defined by 24 CFR 578.3;

**(5)** residing and has resided in a place not meant for human habitation, Safe Haven, or emergency shelter for at least 12 months in the last three years, but has not done so on four separate occasions and the individual or head of household meet the definition of 'homeless individual with a disability; or

**(6)** receiving assistance through a Department of Veterans Affairs (VA)-funded homeless assistance program and met one of the above criteria at initial intake to the VA's homeless assistance system.

**b.** A renewal project where 100 percent of the beds were dedicated to individuals and families experiencing chronic homelessness may either be reallocated to create a DedicatedPLUS project or may continue as a renewal project dedicating 100 percent of its beds to individuals and families experiencing chronic homelessness. If the project is reallocated as a DedicatedPLUS project, the project must adhere to all fair housing

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 29 of 138 PageID #: 1406

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

requirements at 24 CFR 578.9.

**c.** Projects HUD awarded as DedicatedPLUS in a previous CoC Program Competition must continue to include households with children to qualify as a DedicatedPLUS project in the FY 2025 CoC Program Competition.

### 10. Participant Eligibility.

Projects funded through this NOFO must have the following eligibility criteria for program participants. All references to paragraphs of the definition of homeless that are found throughout this NOFO refer to the paragraphs listed under the definition of "homeless" in 24 CFR 578.3 and include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All specific references to the definition of "homeless" under paragraph (4) of 24 CFR 578.3 that are found throughout this NOFO also include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All projects must participate in coordinated entry, and the selection of program participants must be consistent with the CoC's coordinated entry process. As provided by the Consolidated Appropriations Act, 2025, youth aged 24 and under must not be required to provide third-party documentation that they meet the homeless definition in 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act as a condition for receiving services funded under this NOFO. Additionally, any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under or families headed by youth aged 24 and under who are living in unsafe situations. HUD interprets "youth-serving provider" as a private nonprofit organization whose primary mission is to provide services to youth aged 24 and under and families headed by youth aged 24 and under. HUD interprets "living in unsafe situations" as having an unsafe primary nighttime residence and no safe alternative to that residence. These youth-related requirements supersede any conflicting requirements under this NOFO or the Rule.

Participants eligible to be served by projects funded under this NOFO, are as follows:

**a.** PH-PSH projects awarded CoC funds must serve one of the following:

**(1)** persons eligible to be served by DedicatedPLUS projects as described in section III.G.9 of this NOFO in which case all units funded by the project must be used to serve program participants who meet the qualifications for DedicatedPLUS;

(2) persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act; or

**(3)** for renewal projects, the same population of individuals and families indicated in the expiring grant agreement (e.g., PSH projects originally awarded under the Special NOFO Competition projects through the Unsheltered Set Aside must serve individuals and families who qualify under paragraph (1) or (4) of the definition of homeless).

**b.** TH, PH-RRH, Joint TH/PH-RRH, SSO projects awarded CoC funds must serve persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act with the following exception:

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 30 of 138 PageID #: 1407

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

PH-RRH, TH, Joint TH/PH-RRH, SSO- may serve persons who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**c.** DV Bonus, DV Renewal and DV Reallocation projects must serve individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 with the following exception:

PH-RRH, Joint TH/PH-RRH, SSO- projects may serve individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**d.** YHDP Renewal and Replacement projects including YHDP projects created through reallocation must serve youth aged 24 or younger, including unaccompanied and pregnant or parenting youth who:

**(1)** qualify as homeless under paragraphs (1), (2), or (4) of the homeless definition in 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act;

**(2)** have an unsafe primary night-time residence and no safe alternative to that residence; or

**(3)** qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

## 11. Performance-Based Decisions.

**a.** The CoC must review each project application submitted to the CoC for inclusion on the FY 2025 CoC Priority Listing as part of the CoC Consolidated Application and either approve and rank or reject project application submissions. All project applications approved by the CoC must be listed on the CoC Priority Listing in rank order.

Higher ranked projects will be assigned to Tier 1 and lower ranked projects will be assigned to Tier 2 as described in sections V.D.3.a and V.D.3.b of this NOFO. This two-tiered approach for CoCs notifies HUD which projects are prioritized for funding based on project performance, local needs, and gaps.

**b.** Consistent with the requirements of the Consolidated Appropriations Act, 2024:

**(1)** Requests for new CoC project applications are allowed if the CoC evaluates and competitively ranks projects based on how they improve the CoC's system performance as outlined in section V.B.1.a.(1) of this NOFO; and

**(2)** HUD will prioritize funding for CoCs that have demonstrated the capacity to reallocate funding from lower to higher performing projects.

## 12. Coordination with Housing and Healthcare.

The Consolidated Appropriations Act, 2024 directs HUD to provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid rehousing services. In the 2025 CoC Program

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 31 of 138 PageID #: 1408

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Competition, CoCs may receive up to 4 points on the CoC Application if the FY 2025 CoC Priority Listing includes new TH, PH-PSH or PH-RRH project applications created through reallocation or CoC Bonus that utilizes housing resources and healthcare provided through an array of healthcare services and housing providers. See section V.B.1.c of this NOFO for additional details.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 32 of 138 PageID #: 1409

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# IV. APPLICATION CONTENTS AND FORMAT

IV.   Application Contents and Forms

A. Standard Forms, Assurances, and Certifications

B. Budget

C. Narratives and Non-Form Attachments

D. Other Application Content

TABLE OF CONTENTS

**Suppl. App. 595**

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 33 of 138 PageID
#: 1410

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# IV. APPLICATION CONTENTS AND FORMAT

Applications must include three main elements: a) standard forms, assurances, and certifications; b) budget; and c) narratives and other attachments. The content, forms, and format for each element are included in this section.

You may use this section as a checklist to ensure you submit a complete application.

If you don't provide the required documents in the correct format, your application is incomplete.

Do not submit password protected or encrypted files.

While the CoC Program NOFO is officially posted on Grants.gov, the standard forms, assurances, certifications, budgets, narrative responses, and the ability to include attachments are built into e-snaps, an electronic application system.

HUD does not accept faxed applications or supportive documents.

There are two types of applications under this NOFO that are part of the CoC Consolidated Application;

- CoC Application that includes the CoC responses to the rating factors in Section V.B of this NOFO; and

- Project applications that must be approved by CoCs to be included as part of the CoC Consolidated Application. See Sections IV.D.1 and V.A.4 of this NOFO for information on eligible project applications and submission requirements.

_____ pages is the total maximum length of all narratives.

## A. Standard Forms, Assurances, and Certifications

You must properly complete and submit with your application the standard forms, assurances, and certifications identified below. You can find all forms in the application package or review them and their instructions at Grants.gov Forms. You can also read more about standard forms on HUD's Funding Opportunities page.

The identified forms below are included in the project applicant profile in e-snaps and must be completed by the project applicant before gaining access to the application.

| Forms/Assurances/Certifications | Submission Requirement |
| --- | --- |
| **Application for Federal Assistance (SF-424)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Applicant and Recipient Assurances and Certifications (HUD-424B)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Applicant/Recipient Disclosure/Update** | Required with the application and completed |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 34 of 138 PageID #: 1411

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| Report (HUD-2880) | in e-snaps via the information from the Project Applicant Profile. |
|---|---|
| **Certification Regarding Lobbying** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Disclosure of Lobbying Activities (SF-LLL)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification for a Drug-Free Workplace (HUD-50070)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Assurances for Construction Programs (SF-424D)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification of Need and Compliance with Housing Quality and Habitability Standards.** | If applicable, required with the application and included in e-snaps.<br><br>Collaborative Applicants must certify there is a demonstrated need for all PH renewal projects included in the Renewal Project Listing. Additionally, Collaborative Applicants must certify these projects comply with program requirements and appropriate standards of housing quality and habitability on the Renewal Project Listing. |
| **Certification for Opportunity Zone Preference Points (HUD 2996)** | If applicable. The HUD-2996 form is not built into e-snaps and must be submitted as an attachment to the CoC application in e-snaps on the Attachment screen if the CoC is requesting Opportunity Zone Preference Points. |
| **Indirect Cost Rate Certification (HUD-426)** | If applicable, required with the application and included in e-snaps. |

Attachment of the forms that are built into e-snaps, as indicated above, is not required. These forms must be completed before you will have access to the e-snaps application screens.

**The following forms are not built into e-snaps but are required to be submitted by Collaborative applicants with the CoC Priority listing:**

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 35 of 138 PageID #: 1412

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**1. Certification of Consistency with the Consolidated Plan Form HUD-2991.**

The standard form, Certification of Consistency with the Consolidated Plan (form HUD-2991), in which a state or local official certifies that the proposed activities or projects are consistent with the jurisdiction's Consolidated Plan and, if the project applicant is a state or unit of local government, that the jurisdiction is following its Consolidated Plan per the requirement of 24 CFR part 91. Collaborative Applicants must download a new HUD-2991 and complete it for all project applications submitted and listed on the CoC Project Listings either by submitting one correctly signed and dated HUD-2991 form from the appropriate jurisdiction(s) that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction.

The FY 2025 Form HUD-2991 must be completed and dated between November 1, 2024 and February 25, 2026 and attached to the FY 2025 CoC Priority Listing.

**2. Tribal Resolution for Projects on Trust Land or Reservations, if applicable.**

Any applicant that is not a Tribe or TDHE proposing to site a project on a reservation or trust land must include a Tribal resolution or a letter from an official or principal of the Indian Tribe or TDHE, who is authorized to act on behalf of the Indian Tribe or TDHE. Tribes do not need to include a Tribal resolution to site a project on their own reservation or trust land. A Tribal resolution is the formal manner in which the Tribal government expresses its legislative will in accordance with its organic documents. In the absence of such organic documents, a written expression adopted pursuant to Tribal practices is acceptable.

A CoC that is not a Tribe or TDHE that proposes to locate a new project on a reservation or trust land that is not currently included in the CoC's approved geographic service areas, identified during the CoC Registration process, are required to obtain a Tribal Resolution from the Tribe or TDHE and attach it to the CoC Priority Listing.

## B. Budget

You must submit a budget with your application to support your project narrative.

At a minimum, your budget must indicate direct and any indirect costs.

You must also submit form HUD-426, based on the requirements in Section III.E. of this NOFO.

The project application in e-snaps includes the budget forms available under this NOFO. Project applicants will select the appropriate budget form(s) based on the requested activities and must be completed for the proposed project. Additionally, there is a section to capture indirect cost rate and the HUD-426 form, if applicable.

**Eligible Costs.**

Except as otherwise stated below, 24 CFR 578.37 through 578.63 identifies the eligible costs that applicants may request under the CoC Program.

**1. YHDP Costs.**

Eligible costs for YHDP projects originally funded under the YHDP Competition are also eligible YHDP Renewal project costs under this NOFO (see section IV.D.1.h of this NOFO).

Additionally, YHDP Renewal projects may include the YHDP Special Activities described in IV.B.2 below, subject to Renewal project requirements in sections IV.D.2 including IV.D.2.f.(2) of this NOFO. YHDP Replacement including YHDP Reallocation project applications under this NOFO may include requests for eligible CoC Program Costs, the YHDP activities described in section IV.D.1.i and the YHDP Special Activities in section IV.B.2 below. HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## 2. Special YHDP Activities.

YHDP Renewal and YHDP Replacement including YHDP Reallocation projects may submit applications that include the following special YHDP activities, which are ineligible under the CoC Program, subject to the conditions specified in this section:

**a.** Recipients may carry out the activities below with written notice to the Director of HUD's Office of Special Needs Assistance Programs (SNAPS), subject to the requirements governing grant agreement amendments at 24 CFR 578.105. HUD will consider the inclusion of these activities in the project application as notification to the Director of SNAPS.

**(1)** Housing projects may have leases for a minimum term of 1 month plus 1 day under rental assistance budget line items.

**(2)** Projects may use leasing, sponsor-based rental assistance, and project-based rental assistance in RRH projects.

**(3)** In addition to the eligible costs listed in 24 CFR 578.59(a), recipients may use project administration funds to support costs of involving youth with lived experience in project implementation, execution, and improvement.

**(4)** Recipient may use project administrative funds to attend conferences and trainings that are not HUD-sponsored or HUD-approved, provided that the subject matter is relevant to youth homelessness.

**(5)** Projects may employ youth who are receiving services, or housing assistance, from the recipient organization. Recipients that use this special YHDP activity must maintain documentation that discloses the nature of work that the youth performs, and that the youth is not in a position that creates a conflict of interest.

**(6)** Projects may use habitability standards in 24 CFR 576.403(c) rather than the housing standards in 24 CFR 578.75 for short- or medium-term (up to 24 months) housing assistance. Recipients implementing this special YHDP activity must keep documentation of which standards they apply to the units and proof that the units complied with standards before assistance is provided for every unit funded.

**(7)** Recipients may provide moving expenses to a program participant more than once.

**(8)** Recipients may provide payments of up to $500 per month for families that provide housing under a host home and kinship care model to offset the increased costs associated with having youth housed in the unit.

**(9)** YHDP recipients may continue providing supportive services to program participants for up to 12 months after the program participant exits homelessness, transitional housing or after the end of housing assistance.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 37 of 138 PageID
#: 1414

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(10)** Projects using grant leasing funds may pay above the Fair Market Rent (FMR) for individual units as long as the amount paid is consistent with the reasonable rent standards at 24 CFR 578.51(g).

**(11)** Recipients may use grant funds for the following if they are necessary to assist program participants to obtain and maintain housing. Recipients and subrecipients must maintain records establishing how it was determined that paying the costs was necessary for the program participant to obtain and retain housing and must also conduct an annual assessment of the needs of the program participants and adjust costs accordingly:

**(a)** Security deposits for units in an amount not to exceed 2 months of rent.

**(b)** The costs to pay for any damage to housing due to the action of program participants, which may be paid while the youth continues to reside in the unit. The total costs paid for damage per program participant may not exceed the cost of 2 months' rent.

**(c)** The costs of providing household cleaning supplies to program participants.

**(d)** Housing start-up expenses for program participants, including furniture, pots and pans, linens, toiletries, and other household goods, not to exceed $300 in value per program participant.

**(e)** The one-time cost of purchasing a cellular phone and service for program participant use, provided access to a cellular phone is necessary to obtain or maintain housing and the costs of the phone and services are reasonable per 2 CFR 200.404.

**(f)** The cost of internet in program participants' units if the costs of the service is reasonable per 2 CFR 200.404.

**(g)** Payment of rental arrears consisting of a one-time payment for up to 6 months of rent in arrears, including any late fees on those arrears.

**(h)** Payment of utility arrears of up to 6 months per utility.

**(i)** Up to 3 months of utilities for a program participant, based on the utility costs schedule for the unit size and location.

**(j)** In addition to transportation costs eligible in 24 CFR 578.53(e)(15), recipients may pay gas and mileage costs for a program participant's personal vehicle for trips to and from medical care, employment, childcare, or other services eligible under this section.

**(k)** Legal fees, including court fees, bail bonds, and required courses and equipment.

**(l)** Program participant's past driving fines and fees that are blocking a young person from being able to obtain or renew a driver's license and impacting their ability to obtain or maintain housing. Additionally, recipients may pay for program participants' costs for insurance and registration for personal vehicles, if the personal vehicle is necessary to reach medical care, employment, childcare, or

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 38 of 138 PageID #: 1415

other services eligible under this section.

**(12)** Recipients of housing projects (RRH, TH, TH-RRH, and PSH) may use YHDP funds to pay for owner incentive and retention payments before occupancy of the unit, or at any point thereafter, provided that the overall amount paid with program funds per unit occupied by the program participant does not exceed three times the rent charged for the unit. These payments may include signing bonuses (a payment offered to an owner as an incentive for leasing a unit to be occupied by a program participant), repairs to bring the unit into compliance with program requirements, or holding fees to reserve a unit for an individual or family experiencing homelessness.

**b.** *YHDP Exceptions.* Under the conditions specified below, recipients may make use of the following built-in exceptions to this NOFO's requirements, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. To expedite grant agreement processing, applicants should include as much information as possible as part of their project application to demonstrate they meet the conditions specified below.

**(1)** Projects may provide up to 36 months of RRH rental assistance to program participants if the recipient demonstrates: (1) the method it will use to determine which youth need rental assistance beyond 24 months and (2) the services and resources that will be offered to ensure youth are able to sustain their housing at the end of the 36 months of assistance.

**(2)** Projects may continue providing supportive services to program participants for up to 24 months after a program participant exits homelessness, transitional housing or after housing assistance ends if the recipient demonstrates: (1) the proposed length of extended services to be provided; (2) the method it will use to determine whether services are still necessary; and (3) how those services will result in self-sufficiency and ensure stable housing for program participants.

**(3)** Projects may continue providing supportive services to program participants for up to 36 months after program participants exit homelessness, if the services are in connection with housing assistance, such as the Foster Youth to Independence initiative, or if the recipient can demonstrate that extended supportive services ensures continuity of caseworkers for program participants.

**(4)** Rental assistance may be combined with leasing or operating funds in the same unit, provided that the recipient submits a project plan that includes safeguards to ensure that no part of the project would receive a double subsidy.

**(5)** Projects may provide payments of up to $1,000 per month for families that provide housing under a host home and kinship care model, provided that the recipient can show that the additional cost is necessary to recruit hosts to the program.

**(6)** YHDP recipients may pay for short-term (up to three months) emergency lodging in motels or shelters as the transitional housing component in a Joint transitional housing-rapid rehousing (TH-RRH) project, provided that the recipient can demonstrate that use of the hotel or motel room is accessible to supportive services.

**c.** *Innovative Activities.* In addition to the specific activities authorized above or in 24

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 39 of 138 PageID #: 1416

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

CFR part 578, other innovative activities to reduce youth homelessness may be carried out in a YHDP project, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. Requests to carry out YHDP innovative activities are permitted to be requested in any YHDP application. YHDP Replacement applicant must demonstrate to HUD that the activity meets the following criteria; and to expedite grant agreement processing, must include as much information as possible as part of their project application.

YHDP Renewal or YHDP Replacement applications requesting to carry out Innovative Special YHDP Activities must demonstrate the following:

**(1)** The activity is approved by both the Youth Action Board (YAB) and the CoC, as evidenced by letters of support from each organization. For purposes of this section, a YAB is defined as a group of at least 4 youth – aged 24 or younger - with voting power on policy decisions of the CoC (particularly on policies that relate to preventing and ending youth homelessness, and where at least two-thirds of the members have lived experience/expertise of homelessness. The YAB must be a formal committee of the CoC. The YAB should be representative of the youth and young adult population experiencing homelessness in the community;

**(2)** That activity will be testing or likely to achieve a positive outcome in at least one of the four core outcomes for youth experiencing homelessness (stable housing, permanent connections, education/employment, and well-being);

**(3)** The activity is cost-effective; and

**(4)** The activity is not in conflict with fair housing, civil rights, or environmental regulations.

## 3. Rural Costs for Projects Originally Awarded Under the Rural Set Aside of the Special CoC NOFO Competition.

Projects originally awarded under the Rural Set Aside through the Special CoC NOFO Competition may submit applications that include the following costs (Note: CoC Projects not originally funded under the Rural Set Aside of the Special NOFO Competition are not permitted to request funding under this cost category):

**a.** Rent or utility assistance after 2 months of nonpayment of rent or utilities to prevent eviction or loss of utility service. Funds may be used to pay rent or utility arrear payments up to 6 months on behalf of program participants residing in permanent housing.

**b.** Repairs, (such as insulation, window repair, door repair, roof repair, and repairs) that are necessary to make housing habitable to be used for transitional or permanent housing by people experiencing homelessness. The total cost of repairs may not exceed $10,000 per structure.

**c. *Capacity building activities.*** Capacity building activities are those activities that maintain or improve the skills of recipients. Eligible capacity building activities include employee education, job training, staff retention activities such as financial incentives to staff, paying for continuing education opportunities, cross-training within an organization, staff training and professional licensing or certification, and other professional

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 40 of 138 PageID #: 1417

development activities. An applicant may apply for up to 20% of funds requested as part of the project, including project administrative costs, for capacity building activities.

**d. *Emergency food and clothing assistance.*** The cost of providing meals or groceries and clothing to program participants are eligible costs.

**e.** Costs associated with making use of Federal Inventory property programs to house individuals and families experiencing homelessness. Federal Inventory property programs means the Use of Federal Real Property to Assist the Homeless program authorized by title V of the Act, and implemented by 24 CFR part 581, and the Single Family Property Disposition Program authorized by section 204(g) of the National Housing Act (12. U.S.C. 1710(g)) and implemented at 24 CFR part 291 Eligible costs are: preparing and submitting applications to obtain ownership of the real property; transfer taxes; recording fees; closing costs; building permit and zoning fees; attorney's fees; rehabilitation of buildings and structures on the property necessary to bring them into compliance with local building codes and to convert them to the intended homeless assistance use; water, sanitation, sewer and utility hook-up fees and deposits and bringing lines to the property; wells; septic systems; and improving access to the real property from public roads.

## 4. VAWA Costs Information.

Section 605(a)(2) of VAWA 2022 amended section 423(a) of the McKinney-Vento Homeless Assistance Act to add the following eligible activity to the CoC program: "Facilitating and coordinating activities to ensure compliance with the emergency transfer plan requirement in [34 U.S.C. 12491(e)] and monitoring compliance with the confidentiality protections in [34 U.S.C. 12491(c)(4)]."

HUD has determined that eligible activities paid for under the VAWA costs category are not subject to the CoC program's spending caps on administrative costs under section 423(a)(10), (11), and (12). This activity may be included in new project applications, added to eligible renewal projects through expansion or added to eligible renewal projects by shifting up to 10 percent of funds from one eligible activity to the VAWA costs line item.

**a.** Examples of eligible costs for emergency transfer facilitation include the costs of assessing, coordinating, approving, denying and implementing a survivor's emergency transfer which includes:

**(1)** Assistance with moving costs. Reasonable moving costs to move survivors for an emergency transfer.

**(2)** Assistance with travel costs. Reasonable travel costs for survivors and their families to travel for an emergency transfer.

**(3)** Security Deposits. Grant funds can be used to pay for security deposits of the safe units the survivor is transferring to via an emergency transfer.

**(4)** Utilities. Grant funds can be used to pay for costs of establishing utility assistance in the safe unit the survivor is transferring to.

**(5)** Housing Fees. Fees associated with getting survivors into a safe unit via emergency transfer, includes but not limited to application fees, broker fees, holding fees, trash fees, pet fees where the person believes they need their pet to be safe, etc.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 41 of 138 PageID #: 1418

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(6)** Case management. Grant funds can be used to pay staff time necessary to assess, coordinate and implement emergency transfers.

**(7)** Housing navigation. Grant funds can be used to pay staff time necessary to identify safe units and facilitate moves into housing for survivors through emergency transfers.

**(8)** Technology to make an available unit safe. Grant funds can be used to pay for technology that the individual believes is needed to make the unit safe, including but not limited to doorbell cameras, security systems, phone and internet service when necessary to support security systems for the unit, etc.

**b.** Examples of eligible costs for monitoring compliance with the VAWA confidentiality requirements include the costs of ensuring compliance with the VAWA confidentiality requirements which includes:

**(1)** Monitoring and evaluating compliance with VAWA confidentiality requirements.

**(2)** Developing and implementing strategies for corrective actions and remedies.

**(3)** Program evaluation of confidentiality policies, practices and procedures.

**(4)** Training on compliance with VAWA confidentiality requirements.

**(5)** Reporting to Collaborative Applicant, HUD and other interested parties on compliance with VAWA confidentiality requirements.

**(6)** Costs for establishing methodology to protect survivor information.

**(7)** Staff time associated with maintaining adherence to confidentiality requirements.

**5. Rural Costs Information.**

Section 5707 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (PL 117-263, December 23, 2022, 136 Stat 2395) amended section 423(a) of the McKinney-Vento Homeless Assistance Act to allow projects in rural areas [as defined in section 2.b.(9) of the Appendix] to use program funds to pay for the following eligible activities:

**a.** Payment of short-term emergency lodging, including in motels or shelters, directly or through vouchers.

**b.** Repairs to units in which individuals and families experiencing homelessness will be housed; or are currently not fit for human habitation.

**c.** Staff training, professional development, skill development, and staff retention activities.

HUD has determined that eligible activities paid for under the rural costs category may be included in new project applications or added to eligible renewal projects through expansion. This rural cost category does not apply to projects originally awarded under the Rural Set Aside through the Special NOFO.

HUD published a list of CoCs located in rural areas on the CoC Program page on the HUD.gov website.

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 42 of 138 PageID #: 1419

| | | |
|---|---|---|
| Budget Information for Non-Construction Programs (SF-424A) | If applicable with the application | Page limit: Not Applicable<br><br>File name: SF-424A |
| Budget Information for Construction Programs (SF-424C) | If applicable, required with the application | Page limit: Not applicable<br><br>File name: SF-424C |
| Grant Application Derailed Budget (HUD-424-CB) | Required with the application | Page limit: Not applicable<br><br>File name: HUD-424CB<br><br>Form location: download instruction |
| Grant Application Detailed Budget Worksheet (HUD-424-CBW) | Required with the application | Page limit: Not applicable<br><br>File name: HUD-424CBW<br><br>Form location: download instructions |
| Indirect Cost Information Certification (HUD-426) | If applicable, this document is required with the application and after award | Page limit: Not applicable<br><br>File name: ICR Doc.<br><br>Form location: download instructions |

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|
| Budget Information for Non-Construction Programs (SF-424A) | If applicable with the application | Page limit: Not Applicable<br><br>File name: SF-424A |
| Budget Information for Construction Programs (SF-424C) | If applicable, required with the application | Page limit: Not applicable<br><br>File name: SF-424C |
| Grant Application Derailed Budget (HUD-424-CB) | Required with the application | Page limit: Not applicable<br><br>File name: HUD-424CB<br><br>Form location: download instruction |
| Grant Application Detailed Budget Worksheet (HUD-424- | Required with the application | Page limit: Not applicable |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 43 of 138 PageID #: 1420

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| CBW) | | File name: HUD-424CBW Form location: download instructions |
|---|---|---|
| Indirect Cost Information Certification (HUD-426) | If applicable, this document is required with the application and after award | Page limit: Not applicable File name: ICR Doc. Form location: download instructions |

## C. Narratives and Other Attachments

If applicable, you must upload narrative and non-form attachments in e-snaps.hud.gov. When adding the attachments to the form, you can upload PDF, Word or Excel formats.

Collaborative Applicants will provide narrative responses about the CoC planning body, governance structure, overall performance, and the strategic planning processes in esnaps. The CoC Application describes the CoC's plan for ending homelessness and increasing self-sufficiency and recovery, its system-level performance, and addresses the merit criteria specified in section V.B of this NOFO. HUD scores this part of the application with all charts and narratives completed (as applicable) and all required attachments to determine the order in which competitively ranked CoC projects are funded.

Project applicants will provide narrative responses to questions in e-snaps that demonstrate their ability to meet project eligibility and project quality threshold requirements.

## D. Other Application Content

### 1. Eligible Project Applications.

The following types of project applications will be eligible for completion and submission under this NOFO.

**a. *CoC Planning projects.*** All Collaborative Applicants are eligible and encouraged to apply for CoC Planning funds which they may use according to 24 CFR 578.39. CoC Planning project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. Planning projects will not affect a CoC's available amount for new and renewal project applications because it is not included in the CoC's ARD calculation.

**b. *UFA Costs projects.*** Only those CoC-designated Collaborative Applicants approved for UFA designation by HUD are eligible to apply for UFA Costs project funds as described in 24 CFR 578.41. UFA Costs project application must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. UFA Costs projects will not affect a CoC's available amount for new and renewal project applications as it is not included in the CoC's ARD calculation.

**c. *CoC Bonus Project.*** The CoC Bonus allows CoCs to use up to 20 percent of their Final Pro Rata Need (FPRN) to create one or more new project applications. New projects

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 44 of 138 PageID #: 1421

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

created through the CoC Bonus must meet the project eligibility and project quality threshold requirements established by HUD in sections V.A.4.a and V.A.4.b of this NOFO. To be eligible to receive a CoC Bonus project, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.1.a.(1) of this NOFO.

**d.** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Renewal Projects (DV Renewal Projects).* Are eligible renewal projects that were previously funded, in whole or in part, with DV Bonus funding or were at some point expanded using DV Bonus funding to continue serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraphs (1) or (4) of the definition of homelessness at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. This incorporates by reference all applicable protections and obligations under VAWA as provided for in Section I.A.

**e.** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking New Projects (DV Bonus and DV Reallocation Projects).* A new project that is dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under the paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. As described in section 2.b.(5) of the Appendix , survivors of human trafficking may also qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act because they are often also victims of domestic violence, dating violence, sexual assault, or stalking, however a DV Bonus project may not exclusively serve people fleeing or attempting to flee human trafficking. CoCs may apply for DV Bonus projects where the total amount for one year of funding for all DV Bonus applications is up to 10 percent of its Preliminary Pro Rata Need (PPRN); however, this amount is limited to:

- A minimum of $50,000 if 10 percent of the CoC's PPRN is less than $50,000; or
- A maximum of $5 million if 10 percent of the CoC's PPRN is more than $5 million.

See sections V.A.4.b and V.D.3.d of this NOFO for project application requirements and how DV Bonus projects will be reviewed and selected.

**(1)** To be eligible to receive DV Bonus projects, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.1.a.(1) of this NOFO.

**(2)** CoCs may reallocate eligible DV Renewal to create new DV Reallocation projects that are dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraphs (1) or (4) of the definition of homelessness act. DV Bonus funding and funding made available from the reallocation of expiring DV Renewal projects may be used for "new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence,

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 45 of 138 PageID #: 1422

sexual assault, or stalking."

**(3)** New projects or expansion projects created with DV Bonus or DV Reallocation funding, must meet DV Bonus and DV Reallocation project requirements. Additionally, the sum of all DV Reallocation applications must be for the same amount of funding made available from the DV Renewal funding being reallocated. If a CoC reallocates funding from a DV Renewal grant and does not use those funds for new project(s) that are 100 percent dedicated to the eligible population established in this section, HUD may condition the project applications to ensure the projects are serving the required subpopulation. If an applicant does not resolve the condition placed on the project, HUD may withdraw the award. To avoid any potential delays in funding or a loss in ARD, CoCs should review the FY 2025 GIW provided by HUD to determine which renewal projects were originally awarded DV Bonus or DV Reallocation funds, including CoC projects that were expanded with DV Bonus or DV Reallocation funding in a prior year competition.

The following restrictions apply to the DV Reallocation process:

**(a)** DV Renewal projects that have a SSO-CE component cannot be reallocated.

**(b)** Reallocated DV Renewal funding cannot be used to expand a CoC or YHDP Renewal grant.

**(c)** DV Renewal projects cannot be reallocated to create new non-DV CoC projects. If HUD determines that a project applicant incorrectly classified one or more new projects as a DV Reallocation, HUD may reclassify the project(s). For example, if the proposed project is not dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, HUD may condition the project to ensure the required population is served.

**(d)** If a project does not have enough funding available from reallocation sources, HUD will reduce the project to the amount available, if any, and determine if the project is feasible at the reduced rate.

**f.** *New Projects Created Through DV Bonus or DV Reallocation Processes.*

**(1)** DV Bonus and DV Reallocation may only be used to create new SSO-Coordinated Entry, Rapid Re-housing (PH-RRH), and Transitional Housing (TH) projects.

**(2)** For PH-RRH and TH projects, the application must demonstrate:

**(a)** The project applicant's experience serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and their ability to house survivors and meet safety outcomes.

**(b)** The project's inclusion of victim-centered practices.

**(c)** Demonstration of plan to include survivors with lived expertise.

**(3)** Supportive Services Only Coordinated Entry (SSO-CE) must be designed to implement policies, procedures, and practices that equip the CoC's coordinated entry

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 46 of 138 PageID
#: 1423

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

to better meet the needs of people experiencing homelessness who are experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking (e.g., to implement policies and procedures that are trauma-informed, client-centered or to better coordinate referrals between the CoC's coordinated entry and the victim service providers coordinated entry system where they are different). SSO-CE project applications created with DV Bonus and DV Reallocation funding must also demonstrate its plan to involve survivors in policy and program development throughout the project's operation.

**g.** *New Projects Created with CoC Bonus or Through the CoC Reallocation process.* CoCs may apply for the following types of new CoC projects through the CoC Bonus or CoC Reallocation processes:

**(1)** SSO projects.

**(2)** TH projects.

**(3)** PH-PSH projects.

**(4)** PH-RRH projects.

**(5)** Dedicated HMIS project for the costs at 24 CFR 578.37(a)(4) that may only be carried out by the HMIS Lead, which is the recipient or subrecipient of an HMIS grant and is listed on the HMIS Lead form in the CoC Applicant Profile in e-snaps. Additionally, if the CoC has organizations within its geographic area that are victim service providers, the HMIS Lead, or subrecipient, may request HMIS funds for a comparable database. Victim service providers may also request HMIS funds in their project application budgets to enter data into a comparable database.

**(6)** SSO-CE project to develop or operate a Coordinated Entry system.

Prior to completing a new project application created using CoC Bonus funds or through the reallocation process, project applicants should consult with the CoC to determine which of these options is available to be locally selected as part of the CoC.

If HUD determines that a CoC Bonus or CoC Reallocation project applicant or a Collaborative Applicant incorrectly classified one or more new projects as reallocation or CoC Bonus, HUD may reclassify the project(s) as either reallocation or CoC Bonus if the CoC exceeded either its reallocation or CoC Bonus amounts. For example, if a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, and there are CoC Bonus funds available, HUD may reclassify the new project application as CoC Bonus during its review. If a project applicant uses both reallocation and CoC Bonus amounts to create a single new project but did not have enough available from either source, HUD will reduce the project to the amount available, if any.

If a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, HUD may reduce the funding amount or reject the new project application during its review.

For new projects created through the CoC Bonus process, HUD must determine the CoC

Case 1:25-cv-00626-MSM-AEM Document 66-1 Filed 12/19/25 Page 47 of 138 PageID #: 1424

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

has demonstrated that the projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**h. *Youth Homeless Demonstration Program (YHDP).*** Consistent with the requirements of the Consolidated Appropriations Act, 2024, funding for the CoC Program may be used to competitively or non-competitively renew or replace grants for YHDP projects.

In order to ensure the best use of federal dollars, HUD will competitively award all YHDP projects, including renewal and replacement YHDP projects. CoCs seeking to reallocate YHDP projects may only reallocate to other youth projects. See section IV.D.1.i below of this NOFO for additional information.

While YHDP projects can use the replacement process to consolidate projects as outlined in section IV.D.1.i and IV.D.1.k below, these projects cannot consolidate with non-YHDP projects. YHDP Renewal projects may apply to expand its current project through the YHDP Replacement process. Unified Funding Agencies (UFAs) are prohibited from moving funds out of or into YHDP-funded projects and mixing funding from any other non-YHDP funded project. UFAs may replace eligible YHDP renewal projects.

All YHDP Renewal and YHDP Replacement projects, including YHDP reallocation, are subject to the following provisions of the Rule, as may be amended from time to time, except where they conflict with the NOFO requirements, with the Special YHDP Activities identified in section IV.B.2 of this NOFO, or the requirement that grant funds may only be used to serve homeless youth, age 24 and younger: 24 CFR 578.3, 578.15, 578.23, 578.25, 578.27, 578.29, 578.37, 578.43, 578.45, 578.47, 578.49, 578.51, 578.53, 578.55, 578.57, 578.59, 578.61, 578.63, 578.73, 578.75, 578.77, 578.79, 578.81, 578.83, 578.85, 578.87, 578.89, 578.91, 578.93 except in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located, 578.95, 578.97, 578.99, 578.103(a)(3) - (18) and (b) – (e), 578.105, 578.107 and 578.109. The requirements of 2 CFR 200.306, as may be amended from time to time, with the exception of 200.306(b)(5) apply. All YHDP Renewal, YHDP Replacement and new YHDP Reallocation projects must comply with 24 CFR 578.93, except that in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located. Federal fair housing and nondiscrimination requirements cannot be waived.

**i. *New YHDP Projects Created through YHDP Replacement processes.*** CoCs may replace renewing YHDP project(s) to create one or more new YHDP Replacement projects, including YHDP Reallocation (see section 2.b.(12) of the Appendix for more information).

> **(1)** YHDP Renewal project applicants may submit renewal applications for minor changes to a project, including adding or modifying select Special YHDP Activities under section IV.B.2; however, if a renewing YHDP project applicant chooses to modify the current project in a way that does not meet the definition of renewal project found at IV.D.2 of this NOFO, it must submit a YHDP Replacement project application.

> **(2)** A YHDP Renewal project applicant may apply to expand its current project through the YHDP Replacement process. See section IV.D.1.j.(3) for more information.

> **(3)** A YHDP Replacement project application must:

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 48 of 138 PageID #: 1425

**(a)** demonstrate that the project is consistent with the CoC's most recent Coordinated Community Plan; and

**(b)** For YHDP replacement projects that are not reallocations, include the grant number from the YHDP Renewal project(s) being replaced with the YHDP Replacement project application. The CoC's Collaborative Applicant is responsible for ensuring that only a renewal YHDP or replacement YHDP project application is submitted through the CoC Project Priority Listing. If the Collaborative Applicant submits both a renewal and replacement YHDP project application for the same project, HUD will only select the renewal YHDP project application;

**(4)** HUD will only fund new YHDP Reallocation projects through the YHDP Replacement process as described below and in sections IV.D.1.h and IV.B.2 of this NOFO:

**(a)** TH or Crisis Residential Transitional Housing which is a form of transitional housing that is short-term, low-barrier, using a congregate living setting, and provides access to the following supportive services in particular: family engagement and unification, case management, emergency triage services and other supportive services whose purpose is to move youth rapidly into stable housing.

**(b)** SSO, including, but not limited to, housing search and placement services, case management, or street outreach.

**(c)** SSO-CE.

**(d)** SSO - Host Home and Kinship Care. A model in which a family agrees to permit a youth to reside with them. Recognizing that the addition of another person in the home may increase costs to the family, HUD will entertain applications that propose to house youth with families and to subsidize the additional costs attributable to housing the youth. The residence is in a community-based setting. The family could be related to the youth and the length of stay may be time-limited or without time limits. YHDP funds may be used to subsidize the increased costs to the family that are attributable to housing the youth. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination by the recipient for HUD review upon request.

**(e)** HMIS.

**(5)** HUD will review new YHDP Reallocation and YHDP Replacement project applications to ensure the activities requested are eligible and the amounts requested do not exceed the amounts available for YHDP reallocation or, in the case of YHDP Replacements, the ARA of the renewal project(s) being replaced. HUD will not reject YHDP project applications; however, HUD may require YHDP grant recipients to correct or revise information submitted after the final award announcement, prior to executing the grant agreement.

**j.** *Expansion Project.* The process used by eligible renewal project applicants to add

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 49 of 138 PageID #: 1426

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

funds to an existing CoC Renewal, DV Renewal or YHDP Renewal project to expand its current operations either through reallocation, DV Bonus or a CoC Bonus project application. The new funding being added to the existing renewal must be submitted as a new project in e-snaps. This portion of the project is known as new expansion project. Expansion projects for permanent housing should be included in the Extended Track Priority Listing.

HUD will allow project applicants to apply for new expansion projects to expand existing projects to increase the number of units, persons served, services provided to existing program participants, or to add additional activities to HMIS and SSO-CE projects.

The new expansion project applications must meet the project eligibility and project quality thresholds in V.A.4.a and V.A.4.b of this NOFO and must be for the same component as the project being expanded. Additionally, the renewal project being expanded must have an expiration date in CY 2026.

In the case of YHDP Replacement applications to expand existing YHDP Renewal projects, applicants must submit a YHDP Replacement and a YHDP Reallocation application separately and each project must be included in the CoC's Priority Listing.

If a project application does not meet the following requirements, or if the renewal project the new project application is proposing to expand is not selected for award, HUD will review the new expansion project and will consider it as a standalone project during the selection process provided that the project is feasible on its own with its requested funding and provided it passes project eligibility and project quality threshold requirements.

If both the new expansion project and the renewal project it expands are conditionally selected for funding, one grant agreement incorporating both approved project applications will be executed.

**(1)** The following limitations apply to expansion grant applications:

**(a)** If the new expansion project exceeds the amount of funding available to the CoC under the reallocation or Bonus processes, HUD will reduce the funding request for the new expansion project to the available amount, which could affect the activities of the new expansion project.

**(b)** HUD will not fund expansion applications that include requests for capital costs (i.e., new constructions, rehabilitation, or acquisition) and will only allow 1-year funding requests.

**(c)** Recipients cannot apply to expand a project included in a grant consolidation during the same funding year. If an applicant applies to expand a project included in a grant consolidation, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(d)** CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding cannot be used to expand a YHDP renewal project.

**(e)** If CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding is used to expand a DV Renewal project, the entire expanded project must be 100 percent dedicated to serving individuals and families who are fleeing or attempting to flee

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 50 of 138 PageID #: 1427

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraph (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and the project must meet all the DV project requirements in sections IV.D.1.e and IV.D.1.f of this NOFO.

**(f)** New YHDP projects created with reallocated YHDP funding may be used to expand an existing YHDP renewal project through the YHDP Replacement process. The expansion YHDP project must meet the requirements of a new YHDP Replacement application.

**(2)** Project applicants expanding an eligible CoC Renewal or DV Renewal project must:

**(a)** submit a separate renewal project application and the new project application with expansion information (both projects must be ranked by the CoC with unique rank numbers);

**(b)** in the new project application, enter the grant number of the eligible renewal project proposed for expansion;

**(c)** indicate how the new project application will expand units, beds, services, persons served, or services provided to existing program participants, or in the case of HMIS or SSO-CE projects, how the current activities will be expanded for the CoC's geographic area; and

**(d)** ensure the funding request for the expansion grant is within the funding parameters allowed under CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation amounts available.

**(3)** Project applicants expanding an eligible YHDP Renewal project through the YHDP Replacement process must:

**(a)** submit a new YHDP Reallocation project application with the expansion information through the YHDP Replacement process, including the grant number of the YHDP Renewal project being expanded.

**(b)** indicate how the expansion project application will expand units, beds, services, persons served, or services provided to existing program participants.

**(c)** ensure the funding request for the YHDP Reallocation application to expand the YHDP Renewal project is within the funding parameters allowed under the YHDP Reallocation amount available.

**(d)** ensure the YHDP Renewal and YHDP Reallocation project applications meet the requirements in sections IV.D.1.h and IV.D.1.i of this NOFO.

**(4)** DV Bonus and DV Reallocation Expansion Applications.

**(a)** DV Bonus and DV Reallocation funds can only be used for an application to expand an existing renewal project if the new expansion project is dedicated to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 51 of 138 PageID #: 1428

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(b)** Project applicants may use DV Bonus funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population; however, only the new project application for the expansion will be considered for DV Bonus funds.

**(c)** If an applicant proposes to use DV Reallocation funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population, the entire project, including the renewal project being expanded, must serve 100 percent individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. In the case of DV Reallocation Projects, HUD will use the Tier 1 and Tier 2 selection process described in sections V.D.3.a, V.D.3.b and V.D.3.c of this NOFO.

**k. *Consolidation Project.*** Applicants intending to use the consolidation process to combine two or more, but no more than 10, eligible renewal projects (including renewing YHDP projects and renewal Special CoC NOFO Competition projects), may do so through the renewal project application. The projects being combined during a grant consolidation will continue uninterrupted. To be eligible for consolidation, the projects must have the same recipient and be for the same component.

**(1)** The period of performance and budget period of the expiring grants must have end dates in CY 2026. Applicants intending to use the consolidation process must ensure:

**(a)** Budget Line Items (BLIs) for the consolidated project application submitted, exactly match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended;

**(b)** inclusion of the expiring grant numbers with period of performance and budget period start and end dates for the projects that are consolidating;

**(c)** are in good standing with HUD, meaning none of the projects have:

i. outstanding audit or monitoring findings,
ii. outstanding obligation to HUD that is in arrears,
iii. unresolved construction delays,
iv. a history of poor financial management/drawdown issues,
v. history of low occupancy levels, or lack experience in administering the project type, or
vi. other capacity issues.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 52 of 138 PageID #: 1429

**(d)** the projects have the same recipient and are for the same component.

**(2)** YHDP Renewal projects that wish to consolidate may establish a single YHDP Replacement grant to replace multiple YHDP Renewal grants.

**(3)** The following projects cannot be consolidated and if a project application meeting these characteristics attempts to consolidate, HUD will not consider the consolidation, but rather select the projects individually provided they pass project eligibility and project quality threshold requirements:

**(a)** a DV Renewal project cannot consolidate with a CoC Renewal project (a project not dedicated to serving individuals and families who meet the eligibility criteria in Section III.G.10.(c) of this NOFO, including a project originally funded under the Special NOFO Competition, and a YHDP Renewal project), or a project originally funded under the Special CoC NOFO Competition;

**(b)** a YHDP Renewal project cannot consolidate with a CoC Renewal project (including those projects originally funded **under the Special CoC NOFO Competition) or a DV Renewal project;**

**(c)** a project originally funded under the Special CoC NOFO Competition through the Rural Set Aside cannot consolidate with any other type of project (e.g., a project originally funded with DV Bonus or a project originally funded through the Unsheltered Set Aside in the Special NOFO Competition) except another project originally funded through the Rural Set Aside. This means, a project originally funded under the Special NOFO through the Rural Set Aside can only consolidate with another Special CoC NOFO Competition project originally funded through the Rural Set Aside;

**(d)** a TH and a PH project cannot consolidate to form a Joint TH/PH-RRH component project;

**(e)** transition grants cannot consolidate with any other project; and

**(f)** recipients cannot apply to consolidate projects and apply to expand the consolidated project during the same funding year. If an applicant applies to expand projects that are involved in a consolidation of grants, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(4)** To request the consolidation of eligible renewal projects, project applicants must submit renewal projects for the individual projects to be included in the consolidation and each project application must identify the grant number that will survive which must be the grant number with the earliest start date CY 2026. Project applications for the grants that are proposed to be part of the consolidation must be ranked with a unique rank number for each project, and if all those grants are selected, HUD will conditionally award the single surviving grant based on its ranked position to include the amount of funding of all grants included in the consolidation. All other project applications included in the surviving grant will be removed from the CoC's ranking resulting in project applications below to slide up one ranked position. Project applicants must not submit a consolidated project application that contains two

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 53 of 138 PageID #: 1430

different components (e.g., PH and TH).

**(5)** The start date for the consolidated grant, if conditionally awarded, will be the day after the expiration date of the eligible renewal project with the earliest expiration date. HUD will calculate the expiration date for the consolidated grant by averaging the expiration dates for all expiring grants included in the consolidated grant weighted by the size of each expiring grant. If that date falls on the first through the fifteenth of a month, then the expiration date will be the last day of the previous month. If the date falls on the sixteenth through the end of the month, then the expiration date will be the last day of the month.

**(6)** HUD will calculate the expiration date for the consolidated grant as follows: It will be 'X' months after the end of the 12th month after the start date for the consolidated grant with 'X' determined by calculating the sum for all grants of the total award times the number of months after the expiration of the first expiring grant that the grant expires and dividing that sum by the total award for the consolidated grant. If the calculation of 'X' results in a partial month, if it is less than 0.5, then the consolidated grant will expire on the last day of the previous month, and if it is 0.5 or more, then the consolidated grant will expire on the last day of the calculated month.

**(7)** Collaborative Applicants designated by HUD as UFAs have more flexibility in how they manage their CoC Program-funded projects, making the consolidation of projects during the CoC Program competition unnecessary. A Collaborative Applicant with UFA designation can consolidate projects during the grant term, so long as the consolidations are not combining different component types and the projects are funded under the same grant (e.g., projects are currently funded under the same renewal grant). If a UFA-designated Collaborative Applicant consolidates projects during the grant term, it can apply to renew them during the CoC Program Competition as consolidated projects.

**I.** *Transition Grant.* A Transition grant is an application to fund a new CoC project through the reallocation process to transition an eligible CoC renewal project (including a Special NOFO project or DV Renewal project) from one program component to another eligible component over a 1-year period. The renewal project transitioning to a new component must be fully eliminated through reallocation. Transition grant applications awarded FY 2025 funds must fully transition to the new component by the end of the 1-year grant term and may only apply for renewal in the next CoC Program Competition under the component to which it transitioned.

**(1)** Renewal Grants expiring in CY 2026 may submit a FY 2025 transition grant application to request a component type change. The transition grant's operating start date will be the day after the end of the previous grant term for the expiring component. For transition grants reallocated from more than one project, the operating start date of the transition grant will be the day after the end of the earliest expiring grant term. The grant term may be extended consistent with 2 CFR 200.308 and 2 CFR 200.309.

**(2)** Applicants wishing to apply for a transition grant must have the consent of its Continuum of Care; and the new project application must meet project eligibility and

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 54 of 138 PageID #: 1431

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

project quality thresholds established by HUD in sections V.A.4.a and V.A.4.b of this NOFO. If the project application identifies the project as a transition grant and the CoC accepts the new transition grant project on the New Project Application Project Listing in the CoC Priority Listing, HUD will consider this as CoC consent.

**(3)** For a new project to be considered a transition grant, the new project applicant must be the recipient listed on the current grant agreement for the eligible renewal grant(s) being eliminated and must include the grant number(s) of the project(s) being eliminated to create the new project and attach a copy of the most recently awarded project application. For example, expiring FY 2024 grants applying to transition to a new component during the FY 2025 funding process will attach a copy of the FY 2024 CoC Program Competition project application.

**(4)** Transition Grant Restrictions: YHDP Renewal grants are not eligible to use the transition grant process. YHDP Renewal grants must submit a YHDP Replacement application to change component types.

If HUD determines a new project submitted as a transition grant does not qualify, but meets all other new project requirements, HUD may award the project as a new non-transition grant project. If this occurs, the new project operating start date will be reflected in the grant agreement.

## 2. Renewal Project Requirements.

As set forth in 24 CFR 578.33, projects may renew under the CoC Program NOFO to continue ongoing leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs.

Awards HUD made under the CoC Program (including projects awarded 1-year of funding under the FY 2024 CoC Program funding opportunity), projects originally awarded under the Special NOFO, and YHDP projects are eligible for renewal with FY 2025 CoC Program funds if they are currently operating and have an expiration date in CY 2026 (the period from January 1, 2026, through December 31, 2026).

**a.** Renewal project applications must be submitted by the same recipient that signed the executed grant agreement for the grant being renewed, or entity that became the recipient through a grant agreement transfer amendment. To be eligible as a renewal project, the application must (1) be for the same amount of funding before any adjustments described in this NOFO (e.g. FMR adjustments), or the amount reduced due to reallocation ; (2) be for the same program component; and (3) in the case of DV Renewal projects and YHDP Renewal projects, must continue to serve the same subpopulation.

**b.** If HUD conditionally selects a renewal grant for funding that does not have an expiration date that meets the renewal eligibility requirements prescribed by this NOFO, HUD will withdraw any funds conditionally selected for award.

**c.** Projects that were eligible under predecessor programs, specifically Safe Haven projects, will continue to be eligible under the CoC Program and will continue to be eligible for renewal of leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs under 24 CFR 578.33(d)(1) so long as the project continues to serve the same population and the same number of program participants or units in the

same type of housing as identified in their most recent grant agreement, amended grant agreement, signed before August 31, 2012. No new Safe Haven projects will be funded; however, existing Safe Haven projects may be renewed to continue to carry out activities that are eligible costs under Subpart D of the Rule.

**d.** The total request for each renewing project, including YHDP Renewal and YHDP Replacement projects, is limited to a project's ARA. Additionally, where two or more eligible projects are being consolidated through the project application, the total ARA of the consolidation project must be equal to or less than the sum of the original ARA of the renewal projects before consolidation. Because funds for acquisition, new construction, and rehabilitation are not renewable, grants being renewed whose original expiring award included acquisition, new construction, and rehabilitation funds may only renew leasing, supportive services, rental assistance, operating, and HMIS costs and must not exceed 10 percent in administrative costs.

**e.** HUD will recapture grant funds remaining unspent at the end of the previous grant period when it renews a grant.

**f.** HUD encourages the consolidation of eligible renewal grants as provided in Section IV.D.1.k of this NOFO. This does not apply to CoCs that HUD designates as UFAs, because UFAs enter into a single renewal grant agreement with HUD for the CoC's entire geographic area. If applicable, HUD issues a separate UFA grant agreement that only includes YHDP grants.

**g.** Subject to HUD approval and the terms of the NOFO, the following requests may be included in a renewal application:

**(1)** CoC renewal project applications (including DV Renewal projects and projects originally funded under the Special NOFO) may include non-significant changes including shifting up to 10 percent of funds from one approved eligible activity to another.

**(2)** YHDP Renewal project applications from any round may include non-significant changes including adding select Special YHDP Activities in section IV.B.2 and shifting up to 10 percent of funds from one approved eligible activity to another.

**(3)** Renewal applications that include requests to shift more than 10 percent of funds from one approved eligible activity to another and other significant changes as defined at 24 CFR 578.105 will not be considered during the CoC Program Competition by HUD. If an application includes a budget shift that exceeds 10 percent, HUD will correct the project budget to reflect the previously awarded budget amounts. Applicants seeking to make significant changes to their grant, such as shifting more than 10 percent of funds from an approved eligible activity, should contact their Field Office and request a grant agreement amendment.

**(4)** CoC renewal project applicants may also apply to transition an eligible renewal project from one program component to another eligible new component through reallocation and use those funds to create a single, new transition grant (see section IV.D.1.l of this NOFO). YHDP Renewal project applicants are not permitted to utilize the transition grant application process. YHDP applicants must submit a YHDP

Replacement application to change program components.

**(5)** YHDP Replacement projects cannot request capital costs (i.e., new construction, acquisition, or rehabilitation).

**h.** *Actual Per Unit Cost – Renewal Grants.* Applicants requesting renewal of grants for rental assistance may request a per-unit amount less than the Fair Market Rent (FMR) if the actual rent per unit under lease is less than the FMR. This will help reduce the number of projects receiving rental assistance that have large balances of unspent funds remaining at the end of the operating year. Renewal project applicants must ensure the amount requested will be sufficient to cover all eligible costs as HUD cannot provide funds beyond the amount awarded through the FY 2025 CoC Program funding process. Project applications for rental assistance cannot request more than 100 percent of the published FMR. New project applications must adhere to 24 CFR 578.51(f) and must request the full FMR amount per unit. See section V.D.5.a of this NOFO for additional information regarding FMR adjustments for projects receiving funds for rental assistance.

**i.** *Renewal Project Grant Terms.* Renewal project applications are limited to a 1-year grant term with 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309.

Any renewal PH project that receives project-based rental assistance or operating costs may request up to a 15-year grant term; however, project applicants may only request 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309. Project applicants must apply for the additional funds as a renewal project application prior to the anniversary of the first expenditure of grant funds by which date grant funds should have been expended; or, if HUD extends the date that funds must be expended, the date the extension expires. HUD does not guarantee CoC Program funds past the 1 year of renewal funding.

**j.** *Compliance and re-evaluation.* To maintain the competitive and objective nature of the CoC Program under the McKinney Vento Act and comply with 2 CFR 200.309 and 200.205, which together require renewals for federal grants to be issued based on objective and merit-based criteria, all renewals will be re-evaluated each year. Further, HUD may condition renewal on compliance with audits for large grant recipients (over $1,000,000) as required by 2 CFR 200.501.

### 3. New Project Requirements.

CoCs are encouraged to submit new projects created through CoC Bonus, DV Bonus, CoC Reallocation, DV Reallocation or YHDP Replacement including YHDP Reallocation. A CoC designated Collaborative Applicant may submit a new CoC Planning project application, and if applicable, a UFA Costs project application in FY 2025.

To expend funds within statutorily required deadlines, applicants funded for sponsor-based and project-based rental assistance must execute the grant agreement and begin providing rental assistance within 2 years. However, HUD strongly encourages all rental assistance to begin within 12 months of award. Applicants that are unable to begin rental assistance within the 12-month period should consult with the local HUD CPD field office.

**a.** HUD will review project subrecipient eligibility as part of the project quality threshold

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 57 of 138 PageID #: 1434

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

review process. Project applicants must submit documentation of the subrecipient's eligibility with the project application.

**b.** Any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under (or families headed by youth aged 24 and under, including pregnant or parenting youth) who have an unsafe primary nighttime residence and no safe alternative to that residence.

**c.** Per the Consolidated Appropriations Act, 2024, to receive funding for a new CoC project, except those created through reallocation, HUD must determine the CoC has demonstrated that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance (See more information on System Performance in sections III.B.6 and V.B.1.a.(1) of this NOFO).

**d.** ***New Project Grant Terms.*** The initial grant term for new project applications may be 1-year, 2-years, 3-years, 4-years, 5-years, or 15-years. HUD may extend the grant consistent with 2 CFR 200.308 and 2 CFR 200.309. The following exceptions apply:

**(1)** HUD will allow new projects to request 1 year of funding with a longer initial grant term not to exceed 18 months. HUD has determined that most new projects requesting 1 year of funding normally take approximately 3 to 6 months to begin fully operating the new project (e.g., hiring staff, developing partnerships with landowners if leasing or renting). Therefore, a new project requesting 1 year of funding may request a grant term of 12 months to 18 months that will allow for the additional start-up process. Any new projects requesting capital costs (i.e., new construction, acquisition, or rehabilitation) are not eligible for 1-year funding requests. See (7) below for more information on new projects requesting capital costs. Transition grant applications cannot request 18-month grant terms.

**(2)** Any new expansion project submitted to expand an eligible renewal CoC Program-funded project may only request a 1-year grant term, regardless of the project type.

**(3)** Any new project that requests tenant-based rental assistance may request a 1-year, 2-year, 3-year, 4-year, or 5-year grant term.

**(4)** Any new project that requests leasing costs - either leasing costs only or leasing costs plus other costs (e.g., supportive services, HMIS) - may request up to a 3-year grant term.

**(5)** The first year of funding for YHDP Replacement projects will be based on the 1-year renewal amount of the current YHDP project being replaced. The YHDP Replacement project's operating start date will be the day after the end of the previous grant term for the project being replaced.

**(6)** Any new project that requests project-based rental assistance or sponsor-based rental assistance, or operating costs may request up to a 15-year grant term; however, the project applicant may only request up to 5 years of funds. Funding for the remainder of the term is subject to availability. Applicants must apply for additional funds through a renewal project application in the competition held in the calendar year prior to the anniversary of the first expenditure of grant funds, or if HUD has extended the grant term, the date the extension expires. HUD does not guarantee

CoC Program funds past the initial 5-year grant term, if conditionally awarded.

**(7)** Any new project that requests operating costs, supportive services only, HMIS, and project administrative costs may request 1-year, 2-year, 3-year, 4-year, or 5-year grant terms with funding for the same number of years.

**(8)** Any new project conditionally selected by HUD that requests new construction, acquisition, or rehabilitation costs (capital costs) must request a minimum of a 3-year grant term and may request up to a 5-year grant term. Any new projects requesting capital costs are not eligible for 1-year funding requests. If a new project requests 1 year of funding with capital costs, HUD will increase the grant term to 3-years and the new project must spend the funds requested over a 3-year period.

If an applicant requests funds for new construction, acquisition, or rehabilitation in addition to requesting funds for operating, supportive services, or HMIS, the funding will be for the 3-years to 5-years requested, and the grant term will be 3-years to 5-years plus the time necessary to acquire the property, complete construction, and begin operating the project. HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

**(9)** All new CoC Planning or UFA Costs project applications are limited to 1-year grant terms and 1 year of funding.

**(a)** The maximum amount for one year of funding to spend on administrative costs associated with the CoC planning activities listed at 24 CFR 578.39 is 5 percent of FPRN, up to a maximum of $1,500,000, or $50,000 whichever is greater.

**(b)** The maximum amount for one year of funding to spend on administrative costs associated with the UFA costs described at 42 USC 11360(g) is up to 3 percent of FPRN or $1,250,000 per fiscal year; whichever is less.

**(c)** CoC Planning and UFA Costs grants are not renewable.

**(10)** Any new project that is requesting consideration under the DV Bonus or DV Reallocation process may only request 1 year of funding, but may request a longer initial grant term not to exceed 18 months regardless of project application component type.

I. Basic Information

II. Eligibility

III. Program Description

IV. Application Contents and Format

V. Application Review Information

VI. Submission Requirements and Deadlines

VII. Post-Award Requirements and Administration

VIII. Contact and Support

Appendix

# V. APPLICATION REVIEW INFORMATION

V.  Application Review Information

A.  Threshold Review

B. Merit Review

C. Risk Review

D. Selection Process

E. Award Notices

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 60 of 138 PageID #: 1437

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# V. APPLICATION REVIEW INFORMATION

## A. Threshold Review

HUD reviews each application to make sure it meets the following threshold requirements. If you meet all threshold requirements, your application will advance to a merit review. If you fail to meet one or more threshold requirements, your application is not eligible for HUD funding.

### 1. Eligible Applicant

You must meet the applicant eligibility criteria in this NOFO. Applications from ineligible applicants are not rated or ranked and will not receive HUD funding.

**a.** *Eligible Project Applicants (McKinney-Vento Act, 24 CFR 578.15, 24 CFR 5.100).* Eligible project applicants for the CoC Program Competition are found at 24 CFR 578.15 and in the Act and include nonprofit organizations, states, local governments, instrumentalities of state and local governments, Indian Tribes and TDHE [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)]. Public housing agencies, as such term is defined in 24 CFR 5.100, are eligible without limitation or exclusion. For-profit entities are ineligible to apply for grants and are prohibited from being subrecipients of CoC Program grant funds.

**b.** *Collaborative Applicants.* Only CoCs with a valid FY 2025 e-snaps registration will have access to the FY 2025 CoC Program and YHDP Funding Opportunity in e-snaps, which includes the Consolidated Application (i.e., the CoC Application, the CoC Priority Listing and the project application(s). CoCs should not attempt to change Collaborative Applicants during the FY 2025 CoC Program and YHDP Funding Opportunity without prior HUD approval unless HUD replaces the CoC's designated Collaborative Applicant under the authority of Section 402(c) of the Act. HUD will approve Collaborative Applicant changes outside the annual CoC Program Registration process under the following circumstances:

- the Collaborative Applicant made an error when entering the Collaborative Applicant name in the CoC Applicant Profile;
- the CoC-designated Collaborative Applicant is no longer in business;
- the CoC designates a new Collaborative Applicant; or
- HUD designated a new Collaborative Applicant as a remedial action under Section 402(c) of the Act.

In cases where the CoC changes its designated Collaborative Applicant during the CoC Program Registration process, the CoC must notify the local HUD CPD field office, in writing, stating the reason for the Collaborative Applicant change. The notice to HUD must provide documentation of the CoC's approval of the change (e.g., a copy of the meeting minutes to include the date and attendees).

**c.** *Indian Tribes and Tribally Designated Housing Entities (TDHE).* The Consolidated Appropriations Act, 2021 (Public Law 116-260, approved December 27, 2020) amended Title IV to add Section 435 of the Act to allow Indian Tribes and Tribally Designated Housing Entities (TDHE) to be Collaborative Applicants, eligible entities, or subrecipients of the CoC Program in addition to amending Title IV Section 401 to add the terms

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 61 of 138 PageID
#: 1438

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

"Formula Area" and "Indian Tribe." These amendments mean that not only may Tribes and TDHEs apply for grants through other CoCs, but that formula areas, as that term is defined in the Indian Housing Block Grant program at 24 CFR 1000.302, are eligible to be added to the geographic areas of existing CoCs or may be included in newly formed CoCs through the CoC registration process (see Notice CPD-22-02).

Indian Tribes and TDHEs may:

**(1)** create a CoC;
**(2)** be a Collaborative Applicant;
**(3)** be an eligible project applicant; or
**(4)** receive grant amounts from another entity that receives a grant directly from HUD (i.e. be a CoC grant subrecipient).

However, under 42 U.S.C. 11383(g) only States, Units of General Local Government, nonprofit organizations, and Public Housing Agencies may administer permanent housing rental assistance.

**d. *Solo Applicants.*** Eligible project applicants that attempted to participate in the CoC planning process in the geographic area in which they operate that believe they were denied the right to participate in a reasonable manner, may submit a solo project application to HUD by following the procedure found in 24 CFR 578.35. If HUD finds in favor of the solo applicant, HUD may award grant funds. Solo applicants requesting FY 2025 funding must submit their solo project application in e-snaps to HUD by 8:00 PM EST, on January 14, 2026. See section VIII.D.4 of this NOFO for additional information regarding the Solo Applicant appeal process.

## 2. Resolution of Civil Rights Matters

Applicants with outstanding, unresolved judgments against them for violations of civil rights laws must resolve those judgments before the application submission deadline or the applicant will be deemed ineligible.

a. An applicant is ineligible for funding if the applicant has received notice of a judgment imposed against them for violations of:

1. the Fair Housing Act or a substantially equivalent state or local fair housing law for discrimination because of race, color, religion, sex, national origin, disability or familial status; or

2. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, the Americans with Disabilities Act, or the Violence Against Women Act or substantially equivalent state or local laws.

b. HUD will determine if actions to resolve the judgment taken before the application deadline date will resolve the matter. Examples of actions that may be sufficient to resolve the matter include, but are not limited to:

1. Current compliance with a voluntary compliance agreement signed by all the parties;

2. Current compliance with a HUD-approved conciliation agreement signed by all the parties;

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 62 of 138 PageID #: 1439

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

3. Current compliance with a conciliation agreement signed by all the parties and approved by the state governmental or local administrative agency with jurisdiction over the matter;

4. Current compliance with a consent order or consent decree; or

5. Current compliance with a final judicial ruling or administrative ruling or decision.

## 3. Timely Submission of Applications

Late applications are not eligible for funding. See deadlines in <u>Section VI of this NOFO</u>.

Applicants should review and follow the steps outlined below to ensure applications are complete and submitted by the deadlines established in this NOFO. Documents referenced in this section can be found on the CoC Program page of HUD's website: <u>https://www.hud.gov/program_offices/comm_planning/coc.</u>

4. Threshold Criteria.

Applicants who fail to meet the following threshold eligibility requirements are ineligible.

**a. *Project Eligibility Threshold.*** HUD will review all projects to determine if they meet the following project eligibility threshold requirements on a pass/fail standard. If HUD determines the applicable standards are not met for a project, HUD will reject the project. HUD will consider any project requesting renewal funding as having met these requirements through its previously approved grant application unless HUD receives information to the contrary (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient routinely does not draw down funds from eLOCCS at least once per quarter, consistently late Annual Performance Report (APR) submissions). Approval of new and renewal projects is not a determination by HUD that a recipient is compliant with applicable fair housing and civil rights requirements.

**(1)** Project applicants and potential subrecipients must meet the eligibility requirements of the CoC Program as described in the Act and the Rule and provide evidence of eligibility required in the application (e.g., nonprofit documentation).

**(2)** Project applicants and subrecipients must demonstrate the financial and management capacity and experience to carry out the project as detailed in the project application and the capacity to administer federal funds. Demonstrating capacity may include a description of the applicant and subrecipient experience with similar projects and with successful administration of SHP, S+C, or CoC Program funds or other federal, state, local, or private resources.

**(3)** Project applicants must submit the required certifications specified in this NOFO.

**(4)** The population to be served must meet program eligibility requirements as described in the Act, the Rule, and section III.G.10 of this NOFO.

**(5)** Project applicants, except Collaborative Applicants that only receive awards for CoC Planning costs and, if applicable, UFA Costs, must agree to participate in a local HMIS system. However, in accordance with Section 407 of the Act, any victim service provider that is a recipient or subrecipient must not disclose, for purposes of HMIS, any personally identifying information about any client. Victim service providers must

Case 1:25-cv-00626-MSM-AEM Document 66-1 Filed 12/19/25 Page 63 of 138 PageID #: 1440

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

use a comparable database that meets the needs of the local HMIS.

**(6)** Project applicants must certify affirmatively to the following:

| | |
|---|---|
| The project applicant will not engage in illegal discrimination including illegal racial preferences This is consistent with the objectives outlined in Section III.B.10 above and is consistent with the requirements of 2 CFR 200.300(a). | |
| The project applicant will not operate illegal drug injection sites or "safe consumption sites" in violation of 21 u.s.c. 856. This is consistent with the objectives outlined in Section III.B above and is consistent with the requirements of 2 CFR 200.300(a). | |

**b.** *Project Quality Threshold.* HUD will review all new project applications to determine if they meet the following project quality threshold requirements HUD will not award funds to a new project unless the project was created through reallocation, or the CoC has demonstrated to HUD's satisfaction that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**(1)** HUD will consider any project requesting renewal funding, including renewing YHDP and renewing Special NOFO projects, as having met project quality threshold requirements through its previously approved grant application unless HUD receives information to the contrary or if the renewal project has compliance issues which results in the project not operating in accordance with the Rule.

**(2)** HUD will consider YHDP Replacement project applications including applications for new YHDP projects created through YHDP reallocation as having met project quality threshold requirements if the project application activities and costs are eligible under this NOFO. If a YHDP Replacement (including YHDP Reallocation) project application is not for activities and costs that are eligible under this NOFO, HUD will not reject the project under this project quality threshold, but HUD will require the project applicant to correct or revise information submitted after the final CoC Program award announcement but before executing the grant agreement.

**(3)** HUD will review the UFA Costs submitted by the UFA designated Collaborative Applicant to ensure appropriate match and eligibility of costs requested.

**(4)** HUD will assess all new project applications for the following minimum project eligibility, capacity, timeliness, and performance standards.

**(a)** project applicants must have satisfactory capacity, drawdowns, and performance for existing grant(s) funded under the CoC Program, as evidenced by timely reimbursement of subrecipients, regular drawdowns, and timely resolution of any monitoring findings; however, this does not apply to project applicants who

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 64 of 138 PageID #: 1441

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

have never received a CoC Program funded project;

**(b)** for expansion project applications, project applicants must describe the part of the project that is being expanded and demonstrate the project is not replacing other funding sources; and

**(c)** project applicants must demonstrate their ability to meet all timeliness standards per 24 CFR 578.85. HUD reserves the right to deny a funding request for a new project, if the request is made by an existing recipient that HUD finds to have significant issues related to capacity, performance, unresolved audit, or monitoring findings related to one or more existing grants; or does not routinely draw down funds from eLOCCS at least once per quarter. HUD also reserves the right to withdraw funds if no APR is submitted on the prior grant.

**(5)** HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons:

**(a)** evidence that the project conducts activities that subsidize or facilitates illegal discrimination including illegal racial preferences.

**(b)** evidence that the project operates illegal drug injection sites or "safe consumption sites," in violation of 21 U.S.C. § 856

**(6)** Additionally, for HUD to consider new projects as meeting project quality threshold, each new project must meet the following criteria as applicable. If awarded, a recipient must meet all the criteria listed in the criteria column for its component.

**(a) Transitional Housing (TH)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New Transitional Housing projects must receive at least 7 out of 10 points available for this project type. New TH projects that do not receive at least 7 points will be rejected. | 2 | Demonstrate that the project will provide and/or partner with other organizations to provide eligible supportive services that are necessary to assist program participants to obtain and maintain housing. |
| | 1 | The applicant has prior experience operating transitional housing or other projects that have successfully helped homeless individuals and families exit homelessness within 24 |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 65 of 138 PageID #: 1442

|  |  | months. |
|---|---|---|
|  | 1 | The applicant has previously operated or currently operates transitional housing or another homelessness project, or has a plan in place to ensure, that at least 50 percent of participants exit to permanent housing within 24 months and at least 50 percent of participants exit with employment income as reflected in HMIS or another data system used by the applicant. |
|  | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
|  | 2 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment, etc) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
|  | 2 | Demonstrate that the proposed project will provide 40 hours per week of customized services for each participant (e.g. case |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 66 of 138 PageID #: 1443

| | | |
|---|---|---|
| | | management, employment training, substance use treatment, etc.). |
| | | The 40 hours per week may be reduced proportionately for participants who are employed. |
| | | The 40 hours per week does not apply to participants over age 62 or who have a physical disability/impairment or a developmental disability as defined under 24 CFR 582.5 |
| | 1 | Demonstrate the average cost per household served for the project is reasonable, consistent with 2 CFR 200.404. |

**b) Supportive Services Only (SSO) Standalone (24 C.F.R. 578.37(a)(3) and 578.53)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO – Standalone project applications must receive at least 4 out of the 5 points available for this project type. New SSO standalone projects that do not receive at least 4 points will be rejected. | 1 | The Supportive Services project is necessary to assist people in exiting homelessness and increasing self-sufficiency and the Recipient will conduct an annual assessment of the service needs of the program participants. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 67 of 138 PageID #: 1444

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
|---|---|---|
| | 1 | The services provided are cost-effective consistent with 2 CFR 200.404. |

**(c) Supportive Services Only (SSO) Street Outreach**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO project applications that focus on street outreach and indicate so in their project application must receive at least 5 out of the 6 points available for this project type. Projects that do not receive at least 5 points will be rejected. | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |
| | 1 | Demonstrate that the applicant has a history of partnering with first responders and law enforcement to engage people living in places not meant for human habitation to access emergency shelter, treatment |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 68 of 138 PageID #: 1445

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

## V. Application Review Information

| | | programs, reunification with family, transitional housing or independent living. The applicant must cooperate, assist, and not interfere or impede with law enforcement to enforce local laws such as public camping and public drug use laws. |
| :-- | :--: | :-- |
| | 1 | The applicant has experience providing outreach services consistent with the activity description at 24 CFR 578.53(e)(13) and has demonstrated effectiveness at helping people successfully exit from places not meant for human habitation to emergency shelter, treatment programs, transitional housing or permanent housing programs. |
| | 1 | The services provided are cost-effective consistent with 2 CFR 200.404. |

**(d) SSO-Coordinated Entry (SSO-CE)**

| New Project Application Rating Factors | Points Available | Criteria |
| :-- | :--: | :-- |
| New SSO-CE project applications (also known as centralized or coordinated assessment) must receive at least 3 out of the 4 points available for this project type. New SSO-CE projects that do not receive at least 3 points will be rejected. | 1 | The Coordinated Entry system is easily available and reachable for all persons within the CoC's geographic area who are seeking homelessness assistance. The system must also be accessible for persons with disabilities within the CoC's geographic area. |
| | 1 | There is a strategy for |

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 69 of 138 PageID
#: 1446

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | advertising that is designed specifically to reach households experiencing homelessness with the highest needs. |
|---|---|
| 1 | There is a standardized assessment process. |
| 1 | The project will ensure program participants are directed to appropriate housing and services that fit their needs. |

**(e) Permanent Housing: Permanent Supportive Housing (PH-PSH)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New Permanent Housing projects must receive at least 4 out of the 6 points available for this project type. New Permanent Housing projects that do not receive at least 4 points will be rejected. | 1 | The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants. |
| | 1 | The type of supportive services and assistance that will be offered to program participants will ensure that the participant is able to successfully obtain and retain permanent housing and in a manner that fits their needs (e.g. transportation, safety planning, enhanced case management). If the applicant is proposing to expand an existing PH project, it must demonstrate how they are expanding supportive services to program participants, including where appropriate, on-site supportive services. |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 70 of 138 PageID #: 1447

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

V. Application Review Information

| | | |
|---|---|---|
| | 1 | The project will serve homeless individuals or families with a disability. The services offered must be designed to serve any type of disability covered under 42 U.S.C. 11360(10), which includes disabled elderly individuals and/or individuals with a physical disability/impairment or a developmental disability (24 CFR 582.5) and not to the exclusion or priority of any one disability over another. |
| | 1 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, life skills, substance use treatment) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 1 | The average cost per household served is reasonable, consistent with 2 CFR 200.404, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 71 of 138 PageID #: 1448

---

## V. Application Review Information

|  |  | as Medicare, Medicaid, SSI, and SNAP. |
|---|---|---|

### (e) Permanent Housing: Rapid Rehousing (PH-RRH)

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New Permanent Housing projects must receive at least 6 out of the 8 points available for this project type. New Permanent Housing projects that do not receive at least 4 points will be rejected. | 1 | The provision of tenant-based rental assistance will help individuals and families achieve self-sufficiency within 3 months or up to 24 months. |
|  | 2 | The type of supportive services and assistance that will be offered to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance) will ensure that the participant is able to successfully obtain self-sufficiency and exit homelessness. |
|  | 1 | The applicant has previously operated homelessness projects where outcomes for employment income were improved compared to the average project in the CoC, or has a plan in place to ensure this. |
|  | 1 | The project will serve homeless individuals or families with a disability. The services offered must be designed to serve any type of disability covered under 42 U.S.C. 11360(10) and not to the preference or exclusion of one protected disability over |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 72 of 138 PageID #: 1449

| | | |
|---|---|---|
| | | another. |
| | 1 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 1 | The average cost per household served is reasonable, consistent with 2 CFR 200.404, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

**(g) Homeless Management Information System (HMIS)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New HMIS project applications must receive at least 3 out of the 4 points available for this project type. New HMIS projects that do not | 1 | How the HMIS funds will be expended in a way that furthers the CoC's HMIS implementation and ability to use HMIS as a proactive case |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 73 of 138 PageID #: 1450

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| receive at least 3 points will be rejected. | | management tool to promote treatment and recovery. |
|---|---|---|
| | 1 | The HMIS collects all Universal Data Elements as set forth in the HMIS Data Standards. |
| | 1 | The ability of the HMIS to un-duplicate client records. |
| | 1 | The HMIS produces all HUD-required reports and provides data as needed for HUD reporting (e.g., APR, quarterly reports, data for CAPER/ESG reporting) and other reports required by other federal partners. |

**(h) CoC Planning – Collaborative Applicants Only**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New CoC Planning projects, submitted only by the CoC's designated Collaborative Applicant, must receive at least 3 out of the 5 points available for this project type. CoC Planning projects that do not receive at least 3 points will be rejected. | 1 | Governance and Operations-The CoC conducts meetings of the entire CoC membership that are inclusive and open to members and demonstrates the CoC has a written governance charter in place that includes CoC policies. |
| | 1 | CoC Committees-The CoC has CoC-wide planning committees, subcommittees, or workgroups to address the needs of persons experiencing homelessness in the CoC's geographic area that recommends and sets policy priorities for the CoC. |
| | 2 | The proposed planning project |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 74 of 138 PageID #: 1451

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

|  |  | that will be carried out by the CoC with Planning grant funds are compliant with the provisions of 24 CFR 578.7. |
|---|---|---|
|  | 1 | The funds requested will improve the CoC's ability to evaluate the outcome of both CoC Program-funded and ESG-funded projects. |

**c.** *Project Renewal Threshold.* CoCs must consider the need to continue funding for projects expiring in CY 2026 (January 1, 2026 to December 31, 2026) when applying for FY 2025 CoC and YHDP funding. Renewal projects must meet the minimum project eligibility, capacity, timeliness, and performance standards identified in this NOFO or they will be rejected from consideration for funding:

**(1)** When considering renewal projects for award; HUD will review information in eLOCCS, APRs, and information provided from the local HUD CPD field office; including monitoring reports and audit reports as applicable, and performance standards on prior grants, and will assess projects using the following criteria on a pass/fail basis:

**(a)** whether the project applicant's performance met the plans and goals established in the initial application, or grant as amended;

**(b)** whether the project applicant demonstrated all timeliness standards for grants being renewed have been met, including those standards for the expenditure of grant funds;

**(c)** the project applicant's performance in assisting program participants to achieve and maintain self-sufficiency and independent living and records of success, except dedicated HMIS projects are not required to meet this standard; and

**(d)** evidence of unwillingness of project applicants to accept technical assistance, a history of inadequate financial accounting practices, indications of project mismanagement, a drastic reduction in the population served, program changes have been made without prior HUD approval, or the loss of project site control.

**(2)** HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons:

**(a)** outstanding obligation to HUD that is in arrears or for which a payment schedule has not been agreed upon;

**(b)** audit finding(s) for which a response is overdue or unsatisfactory;

**(c)** history of inadequate financial management accounting practices;

**(d)** evidence of untimely expenditures on prior award;

**(e)** history of other major capacity issues that have significantly affected the

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 75 of 138 PageID
#: 1452

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

operation of the project and its performance;

**(f)** history of not reimbursing subrecipients for eligible costs in a timely manner, or at least quarterly; and

**(g)** history of serving ineligible program participants, expending funds on ineligible costs, or failing to expend funds within statutorily established timeframes.

**(h)** evidence that the project conducts activities that subsidize or facilitates illegal discrimination including illegal racial preferences.

**(i)** evidence that the project operates illegal drug injection sites or "safe consumption sites," in violation of 21 U.S.C. § 856.

## B. Merit Review

HUD expects to evaluate and score your application using the following merit criteria and process. Merit reviewers evaluate and score all applications that pass the threshold review. Merit reviewers may include Federal and non-Federal persons. Reviewers receive a copy of your application to evaluate and score each application separately.

**Merit Review Summary**

| Merit Review Summary | |
|---|---|
| **Criterion** | **Maximum number of points = 130** |
| **a. Project Capacity, Review, and Ranking.** | 9 |
| **b. System Performance.** | 40 |
| **c. CoC Coordination and Engagement.** | 81 |
| **Bonus Points** | |
| CoC Merger Bonus (V.B.1.e) | 15 |
| Policy Initiative Preference Points (V.B.2) | 4 |

## 1. Rating Factors

Your application must include a response to the following criteria.

HUD will use all of the factors outlined in this section to establish the CoC's score for the FY 2025 CoC Program Competition.

**Rating Factors Details**

**a. *Project Capacity, Review, and Ranking.*** HUD will award up to 9 points to CoCs that demonstrate the existence of a coordinated, inclusive, and outcome-oriented community process for the solicitation, objective review, ranking, and selection of project applications.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) *Objective Criteria and System Performance.*** | 6 | The CoC must attach the written process or tool it used to review, rate, and rank project applications for this |

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 76 of 138 PageID #: 1453

| | | |
|---|---|---|
| | | NOFO. This written process or tool must: |
| | | Demonstrate it used objective criteria (e.g., cost-effectiveness, performance data, type of population served) to review, rate, and rank project applications and that these factors account for at least 50% of the total available points (up to 1 point). |
| | | Demonstrate that at least 25% of the total points available for housing projects (TH, PH-PSH, PH-RRH) account for the following: |
| | | • Returns to homelessness performance measure (up to 1 point);<br><br>• Employment income performance measure (up to 1 point); and<br><br>• Supportive service participation requirements (up to 3 points). |
| **(2) *Ranking and Selection Process.*** | 2 | The CoC must:<br><br>• Invite new proposals from entities that have not previously received funding;<br><br>• Prior to the application deadline, post on their website all parts of the Consolidated Application, and notify community members and key stakeholders. CoCs that do not have |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 77 of 138 PageID #: 1454

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | | a website must post this information to a partner website within the CoC (e.g., a city or county website); |
| --- | --- | --- | --- |
| | | | • Attach a listing of all projects submitted to HUD from their CoC's local competition that includes all projects their CoC considered during their local competition: (1) the final score, (2) project rank, (3) accepted or rejected status, (4) funding amounts, (5) reallocated funds added to or subtracted from projects listed; and |
| | | | • Notify project applicants, in writing outside of *e-snaps*, who submitted their project applications to the CoC by the CoC-established deadline, whether their project application(s) will be accepted and ranked, rejected, or reduced on the CoC Priority Listing no later than 15 days before the NOFO application submission deadline, and where a project application is being rejected or reduced, the CoC must indicate the reason(s) for the rejection or reduction. |
| **(3) *Reallocation.*** | | 1 | The CoC must show: |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 78 of 138 PageID #: 1455

|  |  | • Their CoC actively reviews the performance of existing CoC Program funded projects and have a standard process for reallocating funding from lower performing projects to create new high performing projects; |
|  |  | OR |
|  |  | • They have cumulatively reallocated at least 20 percent of their CoC's ARD between the FY 2021 and the FY 2025 CoC Program Competitions. |

**b. *System Performance.*** HUD will award up to 40 points to CoCs that have a CoC system-wide performance measurement process related to reducing homelessness.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) *Reducing the Number of Homeless Individuals and Families.*** | 17 | The CoC will receive: <br><br>• Up to 5 points for demonstrating a decrease of at least 20 percent in the number of unsheltered homeless individuals and families in the 2025 PIT compared to the prior year's data. <br><br>• Up to 4 points for demonstrating decreases in the number of unsheltered homeless individuals and families between the 2023 and 2024 PIT Counts AND the 2024 |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 79 of 138 PageID #: 1456

|  |  |  | and 2025 PIT Counts. |
|---|---|---|---|
|  |  |  | • Up to 3 points for demonstrating a decrease in the number of unsheltered homeless individuals and families between the 2023 and 2025 PIT Counts. |
|  |  |  | • Up to 3 points for demonstrating a 5% decrease in the number of individuals and families experiencing chronic homelessness between the 2024 and 2025 PIT Counts. |
|  |  |  | • Up to 2 points for demonstrating a decrease of at least 20 percent in the combined number of sheltered and unsheltered individuals and families in the 2025 PIT compared to the prior year's data. |
| **(2) *Reduce First Time Homelessness.*** | 1 |  | The CoC must: • Demonstrate a reduction in the number of first-time homeless of at least 20% as reported in HDX; • Identify the strategies (including funding sources and timeframes) in place to address individuals and families at risk of becoming homeless; and • Identify the |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 80 of 138 PageID #: 1457

|  |  |  |
|---|---|---|
|  |  | organization or position that is responsible for overseeing the CoC's strategy to reduce or end the number of persons experiencing homelessness for the first time. |
| **(3)** *Length of Time Homeless.* | 1 | The CoC must:<br><br>• Demonstrate a reduction in the length-of-time homeless compared to the prior year's data as reported in HDX;<br><br>• Identify the strategies (including funding sources and timeframes) in place to address individuals and families at risk of becoming homeless; and<br><br>• Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce the length of time individuals and families remain homeless. |
| **(4)** *Successful Permanent Housing Placement.* | 5 | The CoC must:<br><br>• Demonstrate that the rate of successful exit from ES, TH, and RRH is at least 50% (up to 2 points);<br><br>• Demonstrate that at least 20% of program participant exits from TH/RRH/PSH |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 81 of 138 PageID #: 1458

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | collectively are to unsubsidized housing using HMIS data (up to 2 points). |
| | | • Indicate the strategy (including funding sources and timeframes) the CoC is taking to improve permanent housing placement and stability including how the CoC connects participants to non-subsidized housing and furthers successful transitions from CoC-funded projects to other housing options; and |
| | | • Identify the organization or position that is responsible for overseeing the CoC's strategy to increase the rate at which persons exit to permanent housing destinations (up to 1 point). |
| **(5) _Returns to Homelessness._** | 7 | The CoC must: |
| | | • Demonstrate the rate at which persons who exited to permanent housing destinations experienced additional spells of homelessness over a 12- month and 24-month period as reported in HDX: |
| | | Is less than 8% over 24 months (3 points, or 1 point if less than 16% over 24 months). |
| | | Is less than 7% over 12 |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 82 of 138 PageID #: 1459

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

V. Application Review Information

| | | |
|---|---|---|
| | | months (3 points, or 1 point if less than 11% over 12 months). |
| | | • Indicate a strategy to account for returns to homelessness that occur outside of the geographic area to the extent practicable (i.e., statewide HMIS sharing, long-term follow-up with clients.) |
| | | • Indicate the strategy that will reduce returns to homelessness over the long term. Additionally, identify the funding sources that will be used to accomplish specific tasks within the strategy and the timeframes for completing specific tasks within the strategy; and |
| | | • Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce returns to homelessness. |
| **(6) *Jobs and Income Growth.*** | 7 | The CoC must: <br><br> • Demonstrate that the percentage of program participants who had an increase in income from employment (not government assistance) in the CoC was 20 percent or higher as reported in |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 83 of 138 PageID #: 1460

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | HDX (up to 3 points); |
|---|---|---|
| | | • Demonstrate that at least 25 percent of people leaving programs in the CoC had an increase in income from employment (up to 3 points); |
| | | • Identify the strategy (including funding sources and timeframes) that has been implemented to increase employment and non-employment cash sources, including through employment training; |
| | | • Identify how the CoC works with child care organizations to facilitate employment for parents experiencing homelessness; and |
| | | • Identify the organization or position that is responsible for overseeing the CoC's strategy to increase jobs and income from employment and non-employment cash sources. |
| **(7) _Timely Submission of Data._** The CoC collected and submitted data in a timely manner. | 1 | The CoC must demonstrate it: <br>• Conducted a Housing Inventory (HIC) and Point-in-Time (PIT) count during the last 10 days in January 2025, |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 84 of 138 PageID #: 1461

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

|  |  | or if an exception was provided by HUD, during the time period agreed upon by the CoC and HUD; |
|---|---|---|
|  |  | • Submitted both the 2025 HIC and PIT count data in HDX 2.0 by June 13, 2025, 8:00 PM EDT, or an alternate date approved by HUD; |
|  |  | • Submitted their Longitudinal System Analysis (LSA) data in HDX 2.0 by the submission deadline of January 9, 2025, 11:59 PM EST, or an alternate date approved by HUD; and HUD determined that there were at least 2 usable files; and |
|  |  | • Submitted FY 2024 System Performance Measures data in HDX 2.0 by the submission deadline of 8:00 PM EDT on April 11, 2025, or an alternate date approved by HUD. |
| **(8) HMIS and Comparable Database Participation** | 1 | The CoC must demonstrate at least 85 percent of the beds in their CoC's geographic area are covered in HMIS and comparable databases. The bed coverage rate is the number of HMIS and comparable database participating beds divided by the number of year-round beds dedicated to persons |

| | | experiencing homelessness in the geographic area covered by the CoC. |

**c. *CoC Coordination and Engagement.*** HUD will award up to 81 points to CoCs that demonstrate coordination with other systems of care that serve homeless individuals and families.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1)** *Accountable Structure and Participation.* | | |
| **(a)** has a membership of a variety of stakeholders within the geographic area and considers the needs of all relevant subpopulations; | 0.5 | The CoC must demonstrate it has participation from a broad array of stakeholders, not limited to organizations listed in 24 CFR 578.5(a), within the geographic area: Relevant organizations include nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies including CCBHCs and CMHCs, hospitals, universities, affordable housing developers, law enforcement, and organizations that serve veterans and homeless and formerly homeless individuals. |
| **(b)** has a governance board representative of the community | 4 | The CoC must demonstrate it has a decision-making governance board that includes: <br> • at least 1 person with a former experience of |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 86 of 138 PageID #: 1463

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | homelessness;<br><br>• at least 3 elected public officials;<br><br>• at least 1 representative of the business community;<br><br>• at least 2 representatives of law enforcement. |
|---|---|---|
| **(c)** has an invitation process for new members to join; | 0.5 | The CoC must demonstrate it has a transparent process (e.g., communicated in a public manner such as on the CoC's website) in place to invite new members to join and the invitation process is publicly available within the CoC's geographic area at least annually. |
| **(d)** solicits and considers opinions from knowledgeable individuals and organizations; and | 0.5 | The CoC must demonstrate a transparent process (e.g., communicated in a public manner such as on the CoC's website) is in place to solicit and consider opinions regarding the CoC's general performance, strategies, and priority setting process from individuals and organizations with knowledge of homelessness in the geographic area or an interest in preventing or ending homelessness in the geographic area. |
| **(e)** accepts and considers proposals from organizations that have not previously received CoC Program funding. | 0.5 | The CoC must demonstrate it has a transparent process is in place to accept and consider proposals from organizations that have not previously received CoC |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 87 of 138 PageID #: 1464

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

|  |  | Program funding including faith-based organizations. |
| --- | --- | --- |
| **(2) *Availability of Treatment and Recovery Services.*** | 16 | The CoC must demonstrate:<br><br>• Substance use treatment is available on-site for at least 30% of projects (attach agreements or letters of commitment);<br><br>• The creation or current existence of projects with the purpose of providing substance abuse treatment services for people experiencing homelessness in which program participants are required to take part in such services as a condition of continued participation in the program (attach contracts or occupancy agreements);<br><br>Provide a list of the beds/projects and occupancy agreements demonstrating the purpose of the project and the requirement for participation in substance abuse treatment.<br><br>-For geographic areas with a population greater than 2,500,000, demonstrate at least 500 beds.<br><br>-For geographic areas with a population between 1,000,000 and |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 88 of 138 PageID #: 1465

| | | 2,499,999, demonstrate at least 250 beds. |
| | | -For geographic areas with a population between 500,000 and 999,999, demonstrate at least 100 beds. |
| | | -For geographic areas with a population between 100,000 and 499,999, demonstrates at least 50 beds. |
| | | -For geographic areas with less than 100,000, demonstrate 25 beds. |
| | | The bed count described above may include CoC-funded per diem beds located outside the geographic area of the CoC. Provide a list of the beds/projects and occupancy agreements demonstrating the purpose of the project and the requirement for participation in substance abuse treatment. |
| | | • There is 24/7 access to detox or inpatient treatment within the geographic area of the CoC; |
| | | • Formal partnership with a Certified Community Behavioral Health Clinic (CCBHC) or Community Mental Health Center (CMHC) or a similar facility if no CCBHCs or CMHCs |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 89 of 138 PageID #: 1466

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | |
|---|---|---|
| | | are located in the geographic area;<br><br>• The availability or proposed creation of sober housing for people in recovery in accordance with 24 CFR 578.93(b)(5); and<br><br>• They are investing adequately in supportive services by showing either:<br><br>    ○ through proposed CoC funding, leveraging, match, and other formal partnerships, the CoC is providing supportive services with a value of 50% of the CoC's Annual Renewal Demand; or<br><br>    ○ 30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand. |
| **(3) *Participation Requirements for Supportive Services.*** | 10 | The CoC must demonstrate that projects require program participants to take part in supportive services (e.g. case management, employment training, substance use disorder treatment) in line with 24 CFR 578.75(h) by attaching supportive service |

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 90 of 138 PageID #: 1467

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

V. Application Review Information

| | | agreements (contract, occupancy agreement, lease, or equivalent).<br><br>• 100% of CoC projects have participation requirements (10 points).<br><br>• 50% of CoC projects have participation requirements (5 of the 10 points). |
|---|---|---|
| **(4)** *Reduce encampments.* | 10 | The CoC must demonstrate a reduction in the number of encampments or the number of people residing in encampments by at least 20%. |
| **(5)** *Coordination with Federal, State, Local, Private, and Other Organizations.* | 2 | The CoC must:<br><br>• Demonstrate coordination with other federal, state, local, private, and other organizations in the planning and operation of projects; and<br><br>• Describe how they have and plan to continue to consult with ESG recipients in the planning and allocation of ESG funds; and Describe how they have or will share PIT, HIC, HMIS, and System Performance data with state and local government as permitted by law. |
| **(6)** *Discharge Planning.* | 2 | The CoC must coordinate with state or local planning efforts |

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 91 of 138 PageID #: 1468

| | | | |
|---|---|---|---|
| | | | to prevent homelessness among people transitioning from public systems (prisons, jails, health care facilities, residential care facilities, and foster care.) |
| **(7)** *Collaboration Related to Children and Youth.* | | 2 | The CoC must:<br><br>• Indicate written agreements are in place between their CoC or its HUD-funded projects and educational supports and services for children ages 0-5, such as Public Pre-K, Head Start, Child Care (including Child Care and Development Fund), or home visiting (including Maternal, Infant and Early Childhood Home and Visiting or MIECHV);<br><br>• Identify formal partnerships the CoC has with youth education providers, local educational authorities, or school districts; and<br><br>• Show policies and procedures that have been adopted to inform individuals and families who become homeless of their eligibility for educational services. |
| **(8)** *Coordination with Veteran Organizations.* | | 6 | The CoC must indicate that they partner with the Department of Veterans Affairs or other Veteran |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 92 of 138 PageID #: 1469

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | Serving Organizations to do the following: <br><br> • Refer veterans identified by the CoC to VA or other Veteran Serving Organizations for assistance; <br><br> • Coordinate the provision of emergency shelter, supportive services, and housing; and <br><br> • Identify and fill service gaps for veterans. |
|---|---|---|
| **(9)** *Addressing the Needs of Survivors of Domestic Violence, Dating Violence, Sexual Assault, and Stalking* | 2 | The CoC must partner with victim service providers, state domestic violence coalitions, state sexual assault coalitions, anti-trafficking service providers or other organizations who help provide shelter, housing, and services to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking. |
| **(10)** *Street Outreach.* | 6 | The CoC must show that: <br><br> • An increasing number of people exit street outreach to a positive destination; and <br><br> • Street Outreach projects cooperate with first responders and law enforcement to increase positive interaction in order to increase housing and |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 93 of 138 PageID #: 1470

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | |
|---|---|---|
| | | service engagement and promote use of CoC services. |
| **(11)** *Partnering with Public Housing Agencies.* | 2 | The CoC must:<br><br>• Show they have an agreement in place with one or more of their public housing agencies to enable participants to transition from Transitional Housing, Rapid Re-Housing, and Permanent Supportive Housing to HUD assisted housing; and<br><br>• Describe the strategy for helping participants who are able to live independently move from homelessness assistance to permanent housing taking into account employment and economic stability. |
| **(12)** *Leveraging housing and healthcare resources.* These points are available for CoCs that apply for at least one new TH, PSH or RRH project that that utilizes housing and healthcare resources not funded through the CoC or ESG Programs. Examples of housing and healthcare resources include those provided by:<br><br>• Private organizations<br><br>• State or local government sources | 4 | • The CoC must demonstrate that:<br>    ○ In the case of housing subsidies for PSH or TH projects, the leveraged resources provide at least 25 percent of the units included in the project;<br>    ○ In the case of housing subsidies for a |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 94 of 138 PageID #: 1471

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | RRH project, the leveraged resources serve at least 25 percent of the program participants included in the project. |
| --- | --- | --- |
| • Public housing agencies<br><br>• Faith-based organizations | | • The CoC must attach letters of commitment, contracts, or other formal documents that demonstrate the commitment. CoCs can receive less than full points for demonstrating commitments less than the threshold above.<br><br>• The CoC must demonstrate that:<br><br>    ○ In the case of an organization that provides substance use disorder treatment or recovery services, the leveraged resource provides access to all participants who qualify for those services; or<br><br>    ○ In the case of healthcare or behavioral health resources, the value of assistance being |

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 95 of 138 PageID #: 1472

| | | |
|---|---|---|
| | | provided is at least an amount that is equivalent to 25 percent of the funding being requested by the project.

The CoC must attach letters of commitment, contracts, or other formal documents that demonstrate that commitment. CoCs can receive less than full points for demonstrating commitments less than the thresholds described above. |
| **(13) Protecting Public Safety.**

HUD encourages the most effective use of funding for efforts to end homelessness, quickly rehouse individuals, and minimize trauma (42 U.S.C 11381). Law enforcement and public safety protections play a critical role in accomplishing these purposes. | 13 | CoCs must conduct assessments of their geographic area to determine the effect of location on success in attaining the program goals:

- Demonstrate, by providing evidence, that the CoC's entire geographic area (up to 4 points):
  - Quickly clears tents and encampments on public property and connects individuals who are camping in public with appropriate services. In your response, describe how the CoC cooperates with law enforcement to |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 96 of 138 PageID #: 1473

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

V. Application Review Information

| | | |
|---|---|---|
| | | achieve this and the current status of tents and encampments in the geographic area. |
| | |   o  Does not tolerate the public use of illicit drugs and quickly connects individuals who are using illicit drug in public with appropriate services and/or law enforcement. In your response, describe how the CoC cooperates with law enforcement to achieve this and the current status of overdoses and illicit drug use in public spaces in the geographic area. |
| | | • Demonstrate utilization of standards that address individuals experiencing homelessness who are a danger to themselves or others including involuntary commitment; (up to 3 points point) |
| | | • Indicate that the state is substantially compliant |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 97 of 138 PageID
#: 1474

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | with the registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); (up to 3 points) |
| | | • Indicate (up to 3 points) that the CoC: |
| | |     o When asked by law enforcement, assists in adequately mapping and checking the location of homeless sex offenders; and |
| | | Cooperates, assists, and does not interfere or impede with law enforcement or co-response to connect violators of public camping or drug use laws with services. |

**d. _CoC Merger Bonus Points._** As stated in section 2.b.(2) in the Appendix of this NOFO, HUD will award up to a possible 15 bonus points to CoCs that merged after the FY 2024 CoC Program Registration deadline. To receive consideration as a merged CoC, new CoCs must contain all the geographic area of at least two CoCs that were considered completely separate CoCs in prior CoC Program competitions.

| **Rating Factor** | **Maximum Points** | **To Receive Maximum Points** |
|---|---|---|
| **Merged CoCs after the FY 2024 CoC Program Registration CoC Program Registration deadline.** | 15 | Merged CoCs - all CoCs that merged will receive this minimum number of points. |

## 2. Policy Initiative Preference Points

Preference points are added to your overall application score. You do not need to address the policy initiatives in this section to receive an award. If you choose to address a policy initiative in your application, you must adhere to the information with any award.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 98 of 138 PageID #: 1475

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

This NOFO supports the following policy initiatives, for which a maximum of fourteen (14) preference points may be awarded.

### a. Opportunity Zones

You may receive up to four (4) points if your proposed activities are within an Opportunity Zone. To receive points, you must complete and submit form HUD-2996, Certification for Opportunity Zone Preference Points. If you expect to use less than 50% of the award in Opportunity Zones, you won't receive preference points.

### b. Prohibiting Illicit Drug Enablement

Apart from the required selection criteria, you may receive up to ten (10) points if you can indicate that all housing projects submitted by the CoC will not operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of "harm reduction."

### 3. Other Factors

### a. Budget

The panel will review but not approve the budget. The panel will assess whether the budget aligns with planned program activities and objectives. Panel members will consider whether the budget and the requested performance period are fully justified and reasonable in relation to the proposed project.

The budget information will be reviewed to ensure:

- The requested costs are eligible under the CoC Program and this NOFO.

- The total amount of funding is within the amount of funding available to the CoC as described in Section I.A.2 of this NOFO.

- If funds are requested for project administrative costs, the amount requested is no more than 10 of the total funding requested.

### b. Certification of Consistency with the Consolidated Plan

You must make sure your application activities are consistent with your local Consolidated Plan.

All project applications submitted and listed on the CoC Priority Listing by Collaborative Applicants must be included in the certification either by submitting one correctly signed and dated HUD-2991 from the appropriate jurisdiction that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction. See section IV.A.1 for more information.

## C. Risk Review

Before making an award, HUD will evaluate each applicant's likelihood of successfully implementing an award based on the following criteria.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 99 of 138 PageID #: 1476

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

- OMB-designated repositories of governmentwide data, as noted in 2 CFR 200.206(a)

- Other public sources such as newspapers, Inspector General or Government Accountability Office reports or findings, or other complaints that have been proven to have merit

- Financial stability

- Quality of management systems and ability to meet the management standards prescribed in 2 CFR part 200

- Reports and findings from audits performed under 2 CFR part 200, subpart F—Audit Requirements or the reports and findings of any other available audits

- The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on non-Federal entities

- Capacity of the applicant, including staffing structures and capabilities

- History of timely completion of activities and receipt and expenditure of promised matching or leveraged funds

- Ability to promote self-sufficiency and economic independence

- Ability to produce positive outcomes and results

- History of subsidizing or facilitating activities that impede law enforcement related to vagrancy, drug use, or other illicit activities that conflict with the purposes of this NOFO.

- History of performance. The applicant's record in managing Federal awards, if it is a prior recipient of Federal awards, including timeliness of compliance with applicable reporting requirements, failing to make significant progress in a timely manner, failing to meet planned activities in a timely manner, conformance to the terms and conditions of previous Federal awards, and, if applicable, the extent to which any previously awarded amounts will be expended prior to future awards. HUD will not penalize a renewal applicant who sufficiently complied with the terms and conditions FY2024 NOFO that are in direct conflict with those contained herein.

HUD may use the results of the risk review to make funding decisions and to apply award conditions.

This assessment helps identify risks that may affect the advancement toward or the achievement of a project's goals and objectives. 2 C.F.R. 200.206(b)(1).

## D. Selection Process

When making funding decisions, HUD will consider:

- Eligibility requirements, including threshold review results.

- Merit review results.

- Risk review results.

To the extent allowed by law, HUD may:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 100 of 138 PageID #: 1477

- Fund applications in whole or in part.

- Fund applications at a lower amount than requested.

- Choose to fund no applications under this NOFO.

- Adjust funding for an application, to ensure funding or geographic dispersion, and alignment with program or administrative priorities.

- Withdraw an award offer and make an offer of funding to another eligible application, if terms and conditions are not finalized or met.

- Use additional funds made available after NOFO publication to either fully fund an application or fund additional applications.

- Correct HUD review and selection errors. If HUD commits an error that causes an applicant not to be selected, HUD may make an award to that applicant when and if funding is available.

- Release another NOFO, if funding is available and if HUD does not receive applications of merit.

### 1. Threshold Review.

HUD will conduct a project eligibility and project quality threshold review on all project applicants.

HUD will review new project applications to determine whether applicants meet the applicant eligibility in section V.A.1, and whether the project applications meet the project eligibility and project quality thresholds detailed in sections V.A.4.a and V.A.4.b of this NOFO. HUD will review renewal projects to determine if project applicants and subrecipients meet the renewal project threshold requirements detailed in section V.A.4.c of this NOFO. If HUD determines these standards are not met, HUD will reject the project application, unless otherwise provided in this NOFO.

If a new project application passes the project eligibility threshold review in section V.A.4.a and receives enough points to pass the project quality threshold review in section V.A.4.b of this NOFO but does not receive all the points available for its project type, HUD may place conditions on the grant award that must be satisfied before HUD will execute a grant agreement with the applicant for the project. If an applicant is unable to satisfy the condition(s) within the timeframe specified by HUD, HUD reserves the right to withdraw the conditionally awarded funds.

### 2. Conditional Selection and Adjustments to Funding.

HUD Headquarters will conditionally select project applications for funding using the following process:

**a. *HUD Funding Process.*** All project applications, including YHDP renewal and replacement projects, must be competitively ranked, except for CoC Planning and, if applicable, UFA Costs Applications. All new Permanent Housing projects must be separately ranked in their own, Extended Track Priority Listing. If a CoC is applying for one new Permanent Housing project, it must still be listed on the Extended Track Priority

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 101 of 138 PageID #: 1478

Listing. HUD will not consider new Permanent Housing projects if submitted in Normal Track. CoCs should ensure that their projects submitted in Normal Track and Extended Track do not, when combined, exceed their maximum award amount.

HUD will select Normal Track projects in the following order in an amount up to $2,655,600,000:

> (1) HUD will select all CoC Planning and UFA Costs applications that meet project quality threshold requirements. Only one CoC Planning and one UFA Costs (if applicable) project application can be submitted per CoC.

> (3) HUD will then select all projects in Tier 1 that pass project quality and project eligibility thresholds as described in section V.D.3.a below.

> (4) HUD will then select projects that meet project quality and project eligibility thresholds that are ranked in Tier 2 in the order of project score as described in Section V.D.3.b below:

>> (a) If at any point, HUD selects Permanent Housing renewal projects in an amount more than 30 percent of a CoC's Annual Renewal Demand (ARD), HUD will remove all remaining unselected Permanent Housing renewal projects from that CoC's priority listing, recalculate their Tier 2 project score, and continue selection.

>> (b) HUD will not consider new Permanent Housing projects in Normal Track. New Permanent Housing projects must be submitted in a separate Extended Track Priority Listing.

HUD will select Extended Track projects in the following order in an amount up to $1,262,400,000:

> (1) HUD will select all new Permanent Housing projects that meet project quality and project eligibility thresholds that are ranked in the Extended Track Priority Listing in the order of project score using the Tier 2 100-point score scale described in Section V.D.3.b below.

>> **(a)** In selecting projects, HUD will not exceed a CoC's maximum award amount. CoCs should ensure that their projects submitted in Normal Track and Extended Track do not, when combined, exceed their maximum award amount. HUD will use a CoC's Priority Listings for Normal Track and Extended Track to determine if and when a CoC exceeds their maximum award amount. CoCs may not submit Priority Listings that, when combined, exceed their maximum award amount.

HUD will then review DV Bonus projects already selected for funding through the above process and determine whether $52,000,000 has been awarded to DV Bonus projects:

> (a) If at least $52,000,000 has been selected for conditional award no further action is needed.

> (b) If $52,000,000 has not been selected for conditional award – continue down the list and fund additional DV Bonus projects by project-level score until at least $52 million has been selected.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 102 of 138
PageID #: 1479

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**b.** As authorized under the Consolidated Appropriations Act, 2017 (Public Law 115-31; 131 Stat. 135) for fiscal year 2017 and hereafter, HUD will conditionally select a renewal grant that exceeds $10 million that was originally awarded pursuant to the matter under the heading "Department of Housing and Urban Development–Permanent Supportive Housing" in chapter 6 of title III of the Supplemental Appropriations Act, 2008 (Public Law 110-252; 122 Stat. 2351).

**c.** If an ineligible renewal project submitted under this NOFO is used in the reallocation process; or an ineligible YHDP Renewal or YHDP Replacement project is submitted, HUD will remove the ineligible project when calculating the final ARD amount for the CoC. To be eligible for renewal, reallocation, or replacement in the FY 2025 CoC and YHDP Funding Process, a project must have an expiration date in Calendar Year (CY) 2026 (between January 1, 2026, and December 31, 2026).

### 3. HUD Funding Process.

CoCs and applicants should ensure there is a thorough understanding of the information provided in this NOFO. HUD has a two-tier funding selection process for FY 2025 funding. HUD will establish Tier 1 and Tier 2 amounts for each CoC, based on each CoC's Annual Renewal Demand. HUD will post a report that lists the available amounts for each CoC's PPRN, estimated ARD, Tier 1, CoC Planning, estimated CoC Bonus amounts, and estimated DV Bonus amounts on HUD's website.

The maximum amount a CoC may apply for (Normal Track and Extended Track combined) is the sum of the CoC's ARD, eligible CoC Bonus amounts, eligible DV Bonus amounts, eligible CoC planning amounts and if applicable, eligible UFA costs amounts.

The selection process described in this section of the NOFO will also be used for CoC Collaborative Applicants designated as UFAs.

Note that for FY 2025, DV Bonus and YHDP projects will be selected using the Tier 1 and Tier 2 selection process.

**a. *Tier 1*.** Tier 1 is equal to 30 percent of the CoC's Annual Renewal Demand (ARD). HUD will conditionally select project applications in Tier 1 from the highest scoring CoC application to the lowest scoring CoC application and according to the rank assigned by the CoC on the CoC Priority listing, provided the project applications pass both project eligibility and project quality threshold review, and if applicable, project renewal threshold.

Any competitively ranked project may be placed in Tier 1 according to the CoC's local rating and ranking process and based on local needs and priorities.

**b. *Tier 2.*** Tier 2 is the difference between Tier 1 and the sum of each CoC's ARD, CoC Bonus, and DV Bonus.

HUD will evaluate project applications placed in Tier 2 for project eligibility and project quality threshold requirements and project renewal threshold requirements, if applicable; and HUD will determine funding using the CoC Application score as well as the CoC project ranking.

HUD will award a point value to each ranked new and renewal project application that is in Tier 2 using a 100-point scale, and conditionally select applications in Tier 2 using this

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 103 of 138
PageID #: 1480

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

point value from the highest scoring project application to the lowest:

**(1)** *CoC Score.* Up to 50 points in direct proportion to the score received on the CoC Application, e.g., if a CoC received 65 out of 130 points on the CoC Application, the project application would receive 25 out of 50 points for this criterion.

**(2)** *CoC Project Ranking.* Up to 40 points for the CoC's ranking of the project application(s). To consider the CoCs ranking of projects, HUD will assign point values directly related to the CoCs' ranking of project applications. The calculation of point values will be 40 times the quantity (1-x) where x is the ratio of the cumulative funding requests for all projects or portions of projects ranked higher by the CoC in Tier 2 plus one half of the funding of the project of interest to the total amount of funding available in Tier 2 for the CoC.

**(3)** *Service Participation.* Up to 10 points for projects that have or will incorporate supportive service participation requirements in their program design, based on individual need and evidenced by direct language from an occupancy agreement or equivalent document. Supportive Service Only (SSO) projects will automatically receive 10 points in this category.

**c.** *Projects Straddling Tiers.* If a project application straddles the Tier 1 and Tier 2 funding line, HUD will conditionally select the project up to the amount of funding that falls within Tier 1. Using selection criteria in section V.D.3.b above, HUD may fund the Tier 2 portion of the project. If HUD does not fund the Tier 2 portion of the project, HUD may award the project at the reduced amount based on the amount of funding that falls within Tier 1, provided the project is still feasible with the reduced funding (e.g., is able to continue serving homeless program participants effectively).

**d.** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus).* This NOFO provides approximately $52 million for "rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking." In this NOFO, Transitional Housing is an eligible activity determined critical to assist survivors of domestic violence, dating violence, sexual assault, or stalking.

Each CoC may only submit one new SSO-CE DV Bonus project; however, there is no limit to the number of TH projects and PH-RRH projects CoCs may apply for, provided each application is for at least $50,000. A project applicant may also apply to expand an existing renewal project, including one that was previously awarded with DV Bonus funding, in accordance with section IV.D.1.j.(4) of this NOFO; however, only the new project application for the expansion will be considered for DV Bonus funds through this process. DV Bonus funding may be used to expand an existing renewal project that is not dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act so long as the DV Bonus funds for expansion are solely for additional units, beds, or services dedicated to persons eligible to be served with DV Bonus funding.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 104 of 138 PageID #: 1481

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

CoCs must rank all new DV Bonus project applications on the New Project Listing of the CoC Priority Listing with a unique number ranking and when the project is part of an expansion, the corresponding renewal project application must be on the Renewal Project Listing with a unique rank number as well. HUD will only select a new DV Bonus project that expands an existing renewal project if HUD conditionally selects the existing renewal project for funding.

### 4. Conflict of Interest of Consultants or Technical Experts Assisting HUD.

Consultants and technical experts who assist HUD in evaluating applications for funding under published CoC Program NOFOs are subject to 18 U.S.C. 208, the Federal criminal conflict-of-interest statute, and the Standards of Ethical Conduct for Employees of the Executive Branch regulation published at 5 CFR 2635. Therefore, consultants and technical experts who have assisted or plan to assist applicants with preparing applications for CoC Program NOFOs are prohibited from serving on a selection panel or serving as a technical advisor to HUD. Anyone involved in reviewing CoC Program NOFO applications, including departmental staff, experts, and consultants, must avoid conflicts of interest or the appearance of such conflicts. These individuals must also disclose to HUD's Office of General Counsel Ethics Law Division the following information, if applicable:

**a.** How the selection or non-selection of any applicant under a CoC Program NOFO will affect the individual's financial interests, as provided in 18 U.S.C. 208, or

**b.** How the application process involves a party with whom the individual has a covered relationship under 5 CFR 2635.502.

The consultant or technical expert assisting HUD must disclose this information before participating in any matter regarding a program NOFO. Applicants with questions regarding these provisions or concerning a conflict of interest should call the Office of General Counsel Ethics Law Division, at (202)708-3815 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

### 5. Adjustments to Projects.

HUD may adjust the selection of competitive projects as follows:

**a.** *CoC Maximum Award and FMR Adjustments.* The process for determining a CoC's maximum award amount is detailed in 24 CFR 578.17(b). HUD must adjust awards for leasing, operating, and rental assistance BLIs based on changes to the Fair Market Rents (FMR). 24 CFR 578.51(f) requires that HUD will determine the award amount for Rental Assistance projects by multiplying the number and size of units proposed by the FMR of each unit on the date the application is submitted to HUD.

HUD will make these adjustments as follows:

**(1)** Funds awarded for rental assistance will be adjusted in one of two ways:

**(a)** Funds awarded for rental assistance requesting the FMR will be adjusted by applying the FMR in effect at the time applications are due, including instances where the FMR for a specific area has decreased from the project award year.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 105 of 138
PageID #: 1482

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**(b)** Funds awarded for rental assistance for renewal projects that request less than FMR, that is, a per-unit amount based on the actual rent costs per unit (section IV.D.2.h), will be increased based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. If the FMR for a specific area had a net decrease from the project award year, the award will not exceed the FMR after adjustment. If the FMR for the project applicant's entire area decreased from the project award year, the project will be awarded the lesser amount of the per-unit amount requested by the project applicant, based on the actual rent costs per unit, or the FMR after adjustment.

**(2)** HUD will increase funds awarded for operating and leasing in PH projects based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. Because leasing and operating costs do not decrease relative to rent amounts for specific units (e.g., operating costs for 10 units that have rents of $500 are likely the same as for 10 units that have rents that are $450) HUD will not decrease leasing and operating BLIs if FMRs decrease in the geographic area. The operating and leasing BLIs in these projects will remain the same as in the most recent grant agreement or grant agreement amendment.

**b.** *Cost of Living Adjustment Factor.* HUD will adjust amounts for the supportive services and HMIS Costs budget lines for renewing projects by the following factor: Most recent three-year average of changes in State Quarterly Census of Employment and Wages (QCEW) for the category Social Assistance (NAICS 624). Data can be found at: https://www.bls.gov/cew/data.htm.

## 6. Geographic Diversity.

HUD has determined that geographic diversity is an appropriate consideration in selecting homeless assistance projects in the CoC Program Competition. HUD believes that geographic diversity can be achieved best by awarding grants to as many CoCs as possible. To this end, in instances where any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Northern Mariana Islands, the Virgin Islands, and American Samoa do not have at least one funded CoC, HUD reserves the right to fund eligible project(s) with the highest total score in the CoC.

## 7. Funding Diversity.

HUD reserves the right to reduce the amount of a grant, if necessary, to ensure that no more than 10 percent of assistance made available under this NOFO will be awarded for projects located within any one unit of general local government or within the geographic area covered by any one CoC.

## 8. Approval from HUD Headquarters is required before a grant awarded under this NOFO may be transferred.

Under this NOFO, HUD will treat the change of project applicant as a curable deficiency. This occurs when a Recipient of an expiring grant awarded under a prior FY CoC or YHDP competition NOFO applies to renew their award under this NOFO and during the period between applying for FY 2025 funds and before HUD announces FY 2025 awards, HUD executes a grant agreement amendment to transfer the expiring grant to a New Recipient.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 106 of 138
PageID #: 1483

I. Basic
Information

II. Eligibility

III. Program
Description

IV. Application
Contents and
Format

V. Application
Review
Information

VI. Submission
Requirements and
Deadlines

VII. Post-Award
Requirements and
Administration

VIII. Contact and
Support

Appendix

This grant transfer results in a FY 2025 CoC renewal application that does not reflect the New Recipient as the applicant. In this type of situation, HUD will treat the change of project applicant as a curable deficiency.

**9. Use of unawarded funds.**

In the case that funding remains available under this NOFO after HUD follows the selection process described in V.D.2 and V.D.3 above and any subsequent appeals process as described in VII.D below, HUD reserves the right to issue a supplemental NOFO.

## E. Award Notices

If you are successful, HUD will email an award notice to the authorized official representative from the SF-424. HUD will also notify unsuccessful applicants.

The award notice communicates the amount of the award, important dates, and the terms and conditions you need to follow. HUD may impose specific conditions on an award as provided under 2 CFR 200.208.

You agree to the award terms and conditions by either drawing funds from HUD's payment system or signing the agreement with HUD. If you do not agree to the award terms and conditions, HUD may select another eligible applicant.

Under 2 CFR 200.458 pre-award costs are allowable with written approval from HUD if such costs: a) are consistent with 2 CFR 200.458; and b) would be allowable as a post-award cost; and c) do not exceed 10 percent of the total funds obligated to this award. However, HUD will not consider eligibility for pre-award costs until after the date of the HUD selection notice. Additionally, the incurrence of pre-award costs in anticipation of an award imposes no obligation on HUD either to make the award, or to increase the amount of the approved budget, if the award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred.

For selected projects, HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

If the award includes funds for acquisition, HUD may allow recipients to draw down acquisition funds before recording the Declaration of Restrictive Covenant if the HUD Field Office confirms that the escrow agent has received the Declaration of Restrictive Covenant and the recording instructions. The recipient or subrecipient may not draw down any funds other than acquisition funds until HUD Field Counsel has confirmed the Declaration of Restrictive Covenants has been recorded.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 107 of 138 PageID #: 1484

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

VI. Submissions Requirements and Deadlines

   A.   Deadlines

   B.   Submission Methods

   C.   Other Submissions

   D.   False Statements

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 108 of 138
PageID #: 1485

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

You must apply electronically. See Find the Application Package to make sure you have everything you need to apply online. See Application Waiver if you qualify to submit a paper application.

Make sure you are current with SAM.gov and UEI requirements before applying for the award. See the Before You Begin section of this NOFO.

## A. Deadlines

### 1. Application submission deadline:

The application deadline is 8 PM Eastern time on:

02/25/2025

HUD must receive your application by the deadline. Applications received after the deadline are late. Late applications are not eligible for HUD funding.

If HUD receives more than one application from you, HUD will review only the last submission.

HUD may extend an application due date based on emergency situations such as Presidentially-declared natural disasters. Improper or expired registration and password issues are not causes to allow HUD to accept applications after the deadline date.

Applicants must complete and submit their applications in *e-snaps* at **https://esnaps.hud.gov/**. The deadline to submit applications for FY 2025 funding is 8:00 PM EST on January 28, 2026 for Normal Track applications and February 25, 2026 for Extended Track applications.

24 CFR 578.9 requires CoCs to design, operate, and follow a collaborative process for the development of an application in response to a NOFO issued by HUD. As part of this collaborative process, CoCs must implement internal deadlines to ensure transparency and fairness at the local level. CoCs may operate separate collaborative processes and establish separate deadlines for Normal Track and Extended Track applications. The implementation of deadlines that meet the standards outlined below for FY 2025 CoC Program project applications are part of the scoring criteria as detailed in section V.B.1.a of this NOFO.

 **a.** *Project Application.* All project applications must be submitted to the CoC before HUD's CoC Program application submission deadline.

 **b.** *CoC Notification to Project Applicants.* The CoC is required to notify, in writing outside of e-snaps, all project applicants who submitted their project applications to the CoC by the local CoC-established deadline whether their project application(s) will be accepted and ranked on the CoC Priority Listing, rejected, or reduced by the CoC no later than 15 days of the FY 2025 CoC Program application submission deadline.

 Where a project application is being rejected or reduced, the CoC must provide the project applicant with the reason(s) for the rejection or reduction. CoCs failing to provide this information to a project applicant that submits its project application by the local competition deadline will receive 0 points under section V.B.1.a.(2) of this NOFO.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 109 of 138
PageID #: 1486

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

2. Major Disaster Areas.

If a major disaster impacts a CoC's geographic area, as declared by the President under the Stafford Act, during the CoC Program application process that will impact the submission of the CoC Priority Listing and FY 2025 project applications, the CoC's Collaborative Applicant must send written notification to Norm Suchar, Director, Office of Special Needs Assistance Program (SNAPS) at CoCDisaster@hud.gov. The email must include:

**a.** the nature of the disaster, date(s) the major disaster occurred, how the major disaster affected the Collaborative Applicant, the CoC, or its project(s);

**b.** the duration, and the impact on the Collaborative Applicant, the project applicants, or the CoC to meet the local competition deadline; and

**c.** the anticipated amount of time the CoC is requesting for an extension (e.g., number of days, weeks, or months). This does not mean HUD will allow the full amount of time requested.

Based on the timing and the extent of the major disaster, HUD may extend the application deadline for the affected CoC(s). All requests received will be confirmed via the Federal Emergency Management Agency (FEMA) website, https://www.fema.gov/disaster.

## B. Submission Methods

### 1. Electronic Submission

The official documents HUD uses to solicit applications for this NOFO are posted on Grants.gov; however, you must register and submit your application through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

### 1. Electronic Submission

Applicants must register and submit project applications through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

**a. *CoC Registration.*** Collaborative Applicants that Registered their CoCs in FY 2024 were not required to register again for FY 2025 funding. HUD moved all FY 2024 CoC Program Registrations forward for FY 2025 on behalf of all existing Collaborative Applicants in accordance with Notice CPD-22-02: Continuum of Care Program Registration. Collaborative Applicants that were designated by HUD as UFAs during the FY 2024 Registration were not required to reapply during the FY 2025 funding year.

**b. *CoC Review of Project Applications Prior to Submission to HUD.*** HUD expects CoCs to implement a thorough review and oversight process at the local level for both new and renewal project applications to be submitted to HUD for the FY 2025 CoC Program Competition. HUD's experience is that many project applications contain information resulting in conditions on the grant; or for more serious infractions, HUD rejecting a project application. Deficient project applications prolong HUD's review process, which results in delayed funding announcements, lost funding for CoCs due to

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 110 of 138 PageID #: 1487

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

HUD rejecting projects, and delays accessing project funds to house and assist individuals and families experiencing homelessness. HUD expects CoCs to closely review the information provided in each project application, including Renewal, Replacement, or Reallocation projects, to ensure:

**(1)** all proposed program participants will be eligible for the program component type selected;

**(2)** the information provided in the project application and proposed activities are:

**(a)** eligible and consistent with program requirements in the Rule;
**(b)** eligible and consistent with DV Renewal, DV Reallocation and DV Bonus requirements in sections IV.D.1.d, and IV.D.1.e, and I.D.1.f of this NOFO; or
**(c)** eligible and consistent with YHDP Renewal and YHDP Replacement project requirements which includes YHDP Reallocation provided in sections IV.D.1.h and IV.D.1.i of this NOFO;

**(3)** each project narrative is fully responsive to the question being asked and that it meets all the criteria for that question as required by this NOFO;

**(4)** the data provided in various parts of the project application are consistent; and

**(5)** all required attachments correspond to the list of attachments in e-snaps, must contain accurate and complete information and must be dated between November 1, 2024 and February 25, 2026.

**c.** ***Collaborative Applicant Submission Requirements***. Collaborative Applicants must submit the FY 2025 Consolidated application by the FY 2025 application submission deadline. HUD will consider the CoC Consolidated Application properly submitted for review when the Collaborative Applicant submits the FY 2025 CoC Application, the FY 2025 CoC Priority Listing, and all FY 2025 project applications on behalf of the CoC.

If a CoC is submitting new Permanent Housing project applications, the CoC must submit a separate, Extended Track Priority Listing by the Extended Track deadline of February 25, 2026. HUD will not fund CoCs beyond their maximum award amount. CoCs should ensure that their Fy 2025 Priority Listing and Extended Track Priority Listing do not exceed their maximum award amount.

The FY 2025 CoC Application and the FY 2025 CoC Priority Listing and Extended Track Priority Listing are separate submissions in e-snaps. Collaborative Applicants must ensure both the CoC Application and the CoC Normal Track Priority Listing, that includes project applications either approved and ranked or rejected, are submitted in e-snaps prior to the Normal Track CoC Program application submission deadline. The Extended Track Priority Listing must be submitted by the Extended Track application submission deadline.

The "Submit" button will not be available on the Submission Summary of the FY 2025 CoC Application and FY 2025 CoC Priority Listing until all required sections of the application and all parts of the listings have been completed. Collaborative Applicants should review the Submission Summary form carefully to ensure no sections state "Please Complete."

Collaborative Applicants should export a PDF copy of the Submission Summary form from

the FY 2025 CoC Application and the FY 2025 CoC Priority Listing and Extended Track Priority Listing after they have been submitted to HUD and before closing their internet browser. This is the Collaborative Applicant's receipt of submission and proof of compliance with the FY 2025 application deadline.

The CoC Consolidated Application includes the following:

**(1) FY 2025 CoC Application which includes the following:**

**(a) CoC Review, Score, and Ranking Procedures.** The CoC's written procedures that are publicly posted for all interested stakeholders and applicants that clearly describe the project-level review and ranking process that is used by the CoC to determine how CoC Program project applications submitted to the CoC are reviewed, scored, and ranked.

**(b) CoC Public Notice.** A screenshot(s) from the CoC's, or a partner website, that includes the date the CoC notified the public of its local competition process, the due date for project applications, and the full CoC Application and CoC Priority Listing that includes all Project Listings of project applications submitted to HUD as accepted (in the case of non-competitive CoC Planning and UFA costs), approved and ranked or rejected.

**(c) CoC Review and Ranking Process.** Documents the process used by the CoC in the local competition to review, assess, and score new and renewal project applications, a copy of one scored project application form used by most renewal project applicants that includes the objective criteria and system performance criteria and their respective maximum point values and the actual points your CoC awarded to the project applicant; and the local competition selection results for new and renewal project applications.

**(d) Notification to Project Applicants of projects rejected or reduced.** The notification of the action (rejection or reduction) that must be sent to the project applicant at least 15-days prior to the HUD application submission deadline, if a new or renewal project application was submitted to the CoC in the local competition and the CoC rejected it or reduced its funding request as part of the CoC's local process.

**(e) Public Notification of Ranked Project Applications.** The notification of action that all project applicants who submitted new and renewal project applications in the local CoC competition are notified at least 15-days prior to the HUD application submission deadline of the CoC's acceptance that includes the ranked position of the project applications. This notification may be posted publicly or sent via email to individual project applicants.

**(f) PHA Administrative Plan.** If the CoC is seeking points under section V.B.1.c.(11) of this NOFO, a copy or the relevant excerpt from the local PHA(s) administrative planning document(s), or other written policy developed between the CoC and the PHA(s) that describes the PHA(s) preference for persons experiencing homelessness. Instead of a relevant excerpt from the written plan, a letter from the PHA(s) that describes the PHA(s) preference for persons

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 112 of 138 PageID #: 1489

experiencing homelessness may be attached.

**(g) Leveraging Housing and Healthcare Resources.** If the CoC is seeking points under section V.B.1.c.(12) and (13) written commitment(s), contract(s), or other formal written documents that demonstrate the number of housing subsidies, housing units, and healthcare resources that will be provided.

**(h) Projects to Serve Persons Defined as Homeless under paragraph (3) of 24 CFR 578.3.** If the CoC is seeking to serve persons defined as homeless under paragraph (3) of the homeless definition, a list of projects that will serve persons defined as homeless under paragraph (3) of the homeless definition.

**(i) The FY 2025 HDX Competition Report.** The FY 2025 HDX Competition Report contains data submitted to HUD via HUD's Homelessness Data Exchange (HDX), including HIC, PIT count, and system performance data.

**(2) FY 2025 Project Application(s), including for each project application:**

**(a) Charts, narrative responses, and attachments.**

**(b) Documentation of Applicant and subrecipient Eligibility.** All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

**(c) HUD required forms.** The following HUD required forms are built into e-snaps and must be fully completed and electronically signed before project applicants have access to the project application (see section IV.F.A of this NOFO).

**(3) FY 2025 CoC Priority Listing, including.** The CoC Priority Listing in e-snaps must include the following completed forms, certifications and attachments:

**(a) Project Reallocation Form.** The Reallocation form allows CoCs to indicate which eligible new projects, if any, will be reduced or eliminated through the reallocation process.

**(b) CoC and YHDP Project Listings.** The CoC project listing forms require the following project applications to be ranked, with unique rank numbers, in order of priority. Any project not ranked with a unique rank number must be rejected. The forms under this requirement include:

**i.** CoC New Projects (including CoC Bonus and CoC Reallocation projects;
**ii.** CoC Renewal Projects (including DV Renewal and Special NOFO Renewal projects);
**iii.** DV Bonus Projects;
**iv.** DV Reallocation Projects;

**v.** YHDP Renewal Projects;

**vi.** YHDP Replacement Projects (including YHDP Reallocation projects).

**(c)** CoC Planning and UFA Costs Project Application Listings. These project listing forms include the following non-ranked project applications:

**i.** CoC Planning Project Listing; and

**ii.** UFA Costs Project Listing, if applicable.

Collaborative Applicants must ensure the CoC only submits one project application for CoC Planning, and if the CoC's Collaborative Applicant is a HUD-designated UFA, one UFA Costs project application.

**(d)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(e)** Tribal Resolution, if applicable (See section IV.1.2 of this NOFO).

**(4) Extended Track Priority Listing.** For CoCs that are applying for new Permanent Housing projects, the Extended Track Priority Listing in e-snaps must include project applications that are ranked, with unique rank numbers, in order of priority. If a CoC is only applying for one new Permanent Housing project, it must still submit a Extended Track Priority Listing. The Extended Track Priority Listing must also include:

**(a)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(b)** Tribal Resolution, if applicable (See section IV.1.2 of this NOFO).

### d. Project Application Submissions.

Project applications must include the population(s) and subpopulation(s) they will serve, the type of housing and services they will provide, and the budget activities they are requesting. Project applicants must also provide documentation of applicant and subrecipient eligibility. All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

Collaborative Applicants applying for CoC Planning and UFA Costs (if designated as a UFA by HUD) must provide a description of the activities that will be carried out with CoC Program grant funds.

Additionally, all project applicants must ensure their organization has a Code of Conduct that complies with the requirements of 2 CFR part 200, as may be amended from time to time, and is included on HUD's website. If the organization's Code of Conduct does not appear on HUD's website, the project applicant must attach its Code of Conduct that includes all required information to its Project Applicant Profile in e-snaps.

For more information on project applications, see section IV.D of this NOFO.

### e. Timely Submissions.

HUD will not fund applications that are not received on time. Also, failure to submit a complete CoC Consolidated Application may result in HUD finding that the CoC does not meet the requirements of the Act or its implementing regulations under 24 CFR 578.13. If the Secretary makes that finding, HUD may take remedial action to ensure fair distribution of grant funds to eligible entities within the CoC's geographic area, which includes the possibility that HUD will designate another eligible applicant to be the Collaborative Applicant for the CoC. In addition to the remedial actions listed in 24 CFR 578.13(a), HUD may also impose

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 114 of 138 PageID #: 1491

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

another remedial action, such as requiring the CoC to create new policies and procedures to ensure that the Collaborative Applicant performs its duties.

### f. Resolving Technical Difficulties.

CoC and project applicants experiencing technical difficulty with any part of the Application should notify HUD immediately for assistance and document all attempts to obtain assistance. Notification of technical difficulties are to be sent to CoCNOFO@hud.gov. HUD will not provide assistance directly related to content, only to troubleshoot submission issues.

CoCs that are submitting new and renewal applications for FY 2025 CoC and YHDP funding should print the Submission Summary form for the FY 2025 CoC Priority Listing for proof of compliance with the FY 2025 application deadline. HUD will not give funding consideration to any Collaborative Applicant whose FY 2025 CoC Priority Listing is determined to be late and the Collaborative Applicant is unable to provide HUD with a record of submission that verifies the CoC Consolidated Application was submitted prior to the application deadline date and time.

HUD strongly suggests that applicants use the "Export to PDF" functionality in e-snaps to save a hard copy of all submission documents for their records. This can be completed prior to or after submission.

If after notice and reasonable opportunity to be heard, HUD finds pursuant to 24 CFR 578.13, that one or more CoCs have failed to comply with the requirements of the Act and the Rule, HUD may, solely at its discretion and only if sufficient funds become available by recapture, publish a new NOFO for eligible applicants in CoCs that HUD determined do not meet the requirements of the Act and program regulations.

**Need Help?** See the Contact and Support section of this NOFO.

### 2. Electronic Submission Application Waiver

You may request a waiver from the requirement to submit your application electronically. The request must show good cause and detail why you are technologically unable to submit electronically. An example of good cause may include: a valid power or internet service disruption in the area of your business office. Lack of SAM.gov registration is not good cause.

Use the information in the Contact and Support section of this NOFO to submit a written request to HUD. You must **submit your waiver request at least 15 calendar days before the application deadline**.

The regulatory framework of HUD's electronic submission requirement is the final rule established in 24 CFR 5.1005. CoCs seeking a waiver of the electronic submission requirement must request a waiver in accordance with 24 CFR 5.1005. If a Collaborative Applicant finds it cannot submit its application electronically and must seek a waiver of the electronic grant submission requirement, its request must be postmarked no later than 60 days after the publication date of this NOFO. To expedite the receipt and review of each request, Collaborative Applicants may email their written requests to Norm Suchar, Director, Office of Special Needs Assistance Program (SNAPS) at CoCNOFO@hud.gov. If HUD does not have sufficient time to process the waiver request, HUD will not grant a waiver. HUD will not consider paper applications received without a prior approved waiver or after the

established deadline.

## C. Other Submissions

### 1. Intergovernmental Review

This NOFO is not subject to Executive Order 12372. No action is needed.

### 2. Technical Application Errors

HUD may contact you to fix a technical error with your timely application after the due date. Technical errors that you may fix are not submitted to satisfy merit review criteria. And you may not fix technical errors related to threshold review except eligibility entity documentation. Examples of technical errors include: inconsistencies in funding requests; improper signature on a form; a missing or incomplete form; and nonprofit status documentation.

HUD will send notice to the authorized organization representative from the SF-424 to fix a technical error.

Your application is not eligible for funding, if you fail to fix the error to HUD's satisfaction and by the due date in HUD's notice. HUD will not review information submitted after the application due date in HUD's notice.

Applicants should compare their application submission with the requirements in the CoC Program NOFO. The FY 2025 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO located on Grants.gov is HUD's official NOFO. If a discrepancy in the CoC Program NOFO posted on Grants.gov or other information provided in any other version or supporting documentation is found, please notify HUD immediately as indicated in section VIII of this NOFO. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

HUD will post any corrections or amendments to a CoC Program NOFO on Grants.gov.

For projects conditionally selected for award, HUD verifies that your organization has an active SAM registration prior to release of awarded funds and will withhold processing funds if your organization's SAM registration has expired or isn't consistent with the information provided on the SAM.gov website. A UEI discrepancy may also occur if HUD approves a grant to be amended to a new recipient (see section V.D.7 of this NOFO).

UEI discrepancies are a curable deficiency that may be corrected by the applicant with timely action. If a UEI discrepancy isn't resolved within the timeframe prescribed by the Notification of Curable Deficiency the applicant receives from HUD, HUD may reject the project.

### a. Fix Errors in Electronic Applications

To fix an error in response to a HUD notice, you must email the corrections to HUD at CoCNOFO@hud.gov.

HUD allows 7 calendar days from the date of the HUD notice to fix an error. If the due date to fix an error falls on a Saturday, Sunday, Federal holiday, or on a day when HUD's Headquarters office in Washington, DC is closed, then the due date is the next business day.

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 116 of 138 PageID #: 1493

## b. Fix Errors in Paper Applications

You must fix an error in your paper application, in accordance with HUD's notice. If your paper application includes an incorrect UEI, HUD will request you supply the correct UEI.

## D. False Statements

By submitting an application, you acknowledge your understanding that providing false or misleading information during any part of the application, award, or performance phase of an award may result in criminal, civil or administrative sanctions, including but not limited to: fines, restitution, and/or imprisonment under 18 USC 1001, 18 USC 1012, 18 USC 1010, 18 USC 1014, or 18 USC 287; treble damages and civil penalties under the False Claims Act, 31 USC 3729 et seq.; double damages and civil penalties under the Administrative False Claims Act, 31 USC Sections 3801-3812; civil recovery of award funds; suspension and/or debarment from all federal procurement and non-procurement transactions, FAR Part 9.4 or 2 CFR Part 180; and other remedies including termination of active HUD award.

# VII. POST - AWARD REQUIREMENTS AND ADMINISTRATION

VII. Post-Award Requirements and Administration

A.   Administrative, National and Departmental Policy Requirements and General Terms and Conditions

B.   Environmental Requirements

C.   Remedies for Noncompliance

D.   Reporting

TABLE OF CONTENTS

**Suppl. App. 680**

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 118 of 138
PageID #: 1495

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# VII. POST-AWARD REQUIREMENTS AND ADMINISTRATION

## A. Administrative, National and Departmental Policy Requirements, and General Terms and Conditions

You must follow the applicable provisions in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2025. You must comply with these applicable provisions:

1. The Fair Housing Act (42 USC 3601-3619) and Civil Rights laws which encompass the Fair Housing Act and related authorities (24 CFR 5.105(a))

2. Affirmatively Furthering Fair Housing (AFFH) requirements, (42 USC § 3608(e)(5)) and implementing regulations at 24 CFR 5.150 et seq.as amended by 90 FR 11020.

3. Economic Opportunities for Low-and Very Low-income Persons (12 USC 1701u) requirements, including those listed at 24 CFR part 75

4. Compliance with Immigration Requirements (8 U.S.C. 1601-1646; Executive Order 14218)

5. Accessible Technology requirements, (29 USC § 794d, 29 USC 794, 42 USC 12131-12165) and implementing regulations at 36 CFR part 1194 (Section 508 regulations),24 CFR § 8.6 (Section 504 effective communication regulations), 28 CFR part 35, subpart H (DOJ Web Access Rule), and 28 CFR part 35, subpart E (DOJ's Title II communications regulations)

6. Ensuring, when possible, small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms receive consideration consistent with 2 CFR 200.321

7. Equal Participation of Faith-based Organizations in HUD Programs and Activities consistent with 42 U.S.C. 2000bb et seq.; 42 U.S.C. 2000d et seq.; 24 CFR 5.109; and Executive Orders 14202, *Eradicating Anti-Christian Bias* and EO 14205, *Establishment of the White House Faith Office*.

8. Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 USC § 4601 et seq.) (URA) requirements, 49 CFR part 24, and applicable program regulations

9. Participation in HUD-Sponsored Program Evaluation (12 USC 1701z-1; 12 USC 1702z-2; 24 CFR part 60; and FR-6278-N-01)

10. OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR part 200)

11. Drug-Free Workplace requirements (2 CFR part 2429)

12. HUD requirements related to safeguarding resident/client files (e.g., 2 CFR 200.303(e))

13. The Federal Funding Accountability and Transparency Act of 2006 (2 CFR part 170) (FFATA), as amended

15. Accessibility for Persons with Disabilities requirements (29 USC § 794) and implementing

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 119 of 138 PageID #: 1496

I. Basic Information   II. Eligibility   III. Program Description   IV. Application Contents and Format   V. Application Review Information   VI. Submission Requirements and Deadlines   VII. Post-Award Requirements and Administration   VIII. Contact and Support   Appendix

regulations at 24 CFR parts 8 and 100; 28 CFR part 35

16. Applicable Violence Against Women Act requirements in the Housing Chapter of VAWA (34 USC § 12491-12496) 24 CFR part 5, subpart L, and program-specific regulations.

17. Conducting Business in Accordance with Ethical Standards/Code of Conduct, including 2 CFR 200.317, 2 CFR 200.318(c) and other applicable conflicts of interest requirements

18. Build America, Buy America (BABA) Act procurement purchase requirements

20. Environmental requirements that apply in accordance with 24 CFR part 50 or part 58

22. Unless prohibited by law and to the extent permitted under the Freedom of Information Act (FOIA), your application and post-award content may be released to the public in response to FOIA requests, except to the extent that certain information may be withheld under a FOIA exemption (5 USC § 552(b); 24 CFR 15.107(b)). HUD may also share your information within HUD or with other Federal agencies if HUD determines that sharing is relevant to the respective program's objectives.

23. Waste, Fraud, Abuse, and Whistleblower Protections. 41 USC § 4712, which includes informing your employees in writing of their rights and remedies, in the predominant native language of the workforce. Under 41 U.S.C. § 4712, employees of a contractor, subcontractor, grantee, subgrantee, and personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant. (See Federal Contractor or Grantee Protections | Office of Inspector General, Department of Housing and Urban Development (hudoig.gov))

24. Implementing Presidential Executive Actions affecting federal financial assistance programs, as advised by the Department, unless otherwise restricted by law or by a court of competent jurisdiction: Executive Order (EO) 14219 (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative); 14218 (Ending Taxpayer Subsidization of Open Borders); guidance resulting from the White House Task Force established by 14202 (Eradicating Anti-Christian Bias) and the Senior Advisor to the White House Faith Office assigned by 14205 (Establishment of the White House Faith Office); 14182 (Enforcing the Hyde Amendment); 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity); 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government); 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing); and 14148 (Initial Rescissions of Harmful Executive Orders and Actions)

In addition:

1. Awards made under this NOFO will not be used to conduct activities that subsidize or facilitate illegal racial preferences or other forms of illegal discrimination, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation; 14332 (Improving Oversight of Federal Grantmaking).

**Suppl. App. 682**

2. Awards made under this NOFO will not be distributed in a way that violates or otherwise is used to interfere with constitutional protections guaranteed for speech and religious beliefs and the free exercise of religion.

3. Awards made under this NOFO will not be used to fund, promote, encourage, subsidize or facilitate the use of illicit drugs.

4. Awards made under this NOFO will not be used to fund any project, service provider, or organization that operates illegal drug injection sites or "safe consumption sites" in violation of 21 U.S.C. § 856..

5. All agreements or contracts made with subrecipients under this NOFO must contain the identical terms and conditions as those in the grant agreement issued by HUD. Any additional or conflicting terms and conditions must be approved by HUD.

6. If any part or provision of the grant Agreement or terms of this Notice are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment and shall not invalidate or affect the legality or enforceability of the remaining provisions and applications of the Agreement and Notice. In the event the enjoinment of such provisions is stayed, dissolved or reversed, the full terms of the grant agreement and Notice, including such provisions, will automatically become effective. This clause is self-executing and will become effective, binding, and enforceable automatically upon issuance of this Notice.

## B. Environmental Requirements

### 1. Environmental Review

You must follow these environmental review requirements, including regulations at:

24 CFR part 50

24 CFR part 58

Notwithstanding 24 CFR 578.31 and 24 CFR 578.99(a) of the Rule, and in accordance with Section 100261(3) of MAP-21 (Pub. L. 112-141, 126 Stat. 405), activities under this NOFO are subject to environmental review by a responsible entity under HUD regulations at 24 CFR part 58 or by HUD under 24 CFR part 50.

a. All HUD assisted activities, even projects that only involve exempt activities, require some level of environmental review. Two types of projects are Categorically Excluded from review under the National Environmental Policy Act (NEPA) and not subject to compliance with the laws and authorities listed under 24 CFR 58.5 (CENST): All scattered-site projects where program participants choose their own unit and are not restricted to units within a pre-determined specific project site or sites are categorized in 24 CFR 58.35(b)(1) as CENST. This includes both tenant-based rental assistance and tenant-based leasing projects where program participants choose their own unit and do not involve any physical work or impacts beyond routine maintenance as defined by Notice CPD-16-02: Guidance for Categorizing an Activity as Maintenance for Compliance with HUD Environmental Regulations. The Exempt/CENST environmental review form is only required for each project, not every unit.

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 121 of 138 PageID #: 1498

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**b.** For activities under a grant to a recipient other than a state or unit of general local government that generally would be subject to review under 24 CFR part 58, HUD may make a finding in accordance with 24 CFR 58.11(d) and may itself perform the environmental review under the provisions of 24 CFR part 50 if the recipient objects in writing to the responsible entity's performing the review under part 24 CFR part 58.

**c.** Irrespective of whether the responsible entity in accordance with 24 CFR part 58 (or HUD in accordance with 24 CFR part 50) performs the environmental review, the recipient must supply all available, relevant information necessary for the responsible entity (or HUD, if applicable) to perform for each property any required environmental review. The recipient also must carry out mitigating measures required by the responsible entity (or HUD, if applicable) or select alternative property.

**d.** The recipient, its project partners, and their contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct property for a project under this NOFO, or commit or expend HUD or non-HUD funds for such eligible activities under this NOFO, until the responsible entity (as defined by 24 CFR 58.2(a)(7)) has completed the environmental review procedures required by 24 CFR part 58 and the environmental certification and Request for Release of Funds (RROF) have been approved or HUD has performed an environmental review under 24 CFR part 50 and the recipient has received HUD approval of the project. HUD will not release grant funds if the recipient or any other party commits grant funds (i.e., incurs any costs or expenditures to be paid or reimbursed with such funds) before the recipient submits and HUD approves its RROF (where such submission is required).

## 2. NOFO Impact Determination Related to the Environment

This NOFO has no significant impact related to the environment. HUD has made a Finding of No Significant Impact (FONSI) as required by HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 USC § 4332(2)(c)). To learn more about this FONSI, go to HUD's Funding Opportunities web page.

## 3. Lead-Based Paint Requirements

You must follow the lead-based paint rules below if you fund any work on pre-1978 housing. This includes buying, leasing, support services, operating, or work that disturbs painted surfaces.

- HUD's rules (Lead Disclosure Rule; and Lead Safe Housing Rule).
- EPA's rules (Renovation, Repair and Painting Rule, and Lead Abatement, Inspection and Risk Assessment Rule).

You must discuss the Lead Disclosure Rule if you fund education or counseling on buying or renting housing that may have been built before 1978. You must also discuss the Lead Safe Housing Rule if the education or counseling focuses on buying or renting HUD-assisted pre-1978 housing.

## C. Remedies for Noncompliance

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 122 of 138
PageID #: 1499

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

HUD may terminate all or a part of your award as described under 2 CFR 200.340 through 200.343 pursuant to the terms and conditions of your award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. HUD may also impose specific conditions on your award or take other remedies as described by 2 CFR 200.339 through 200.343, if you do not comply with your award terms and conditions.

For more information on CoC Program sanctions and remedies for noncompliance see 24 CFR 578.107.

## D. Reporting

HUD requires recipients to submit the performance, financial, and program reports as outlined below. You must comply with these reporting requirements to remain eligible for HUD funding. See Section VII.C. of this NOFO.

HUD is implementing new grants management and reporting tools, which will be rolled out for your use in the near term. As a grantee, you will be required to report on grant performance and financial activities (including vendor and cash disbursement supporting details for yourself and your sub-recipients) using these new tools when they are released. HUD will work with you to support your transition to this new reporting environment. Once implemented, timely reporting in this new environment will be mandatory. HUD reserves the right to exercise all available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include requiring 100% review or stopping future disbursements altogether if reporting is not timely submitted.

| Report | Description | When |
|---|---|---|
| Federal Funding Accountability and Transparency Act (FFATA) | • Awards equal to or greater than $30,000 <br> • Data on executive compensation and first-tier subawards <br> • See Public Law 109-282 and 2 CFR part 170 <br> • HUD reports initial prime recipient data to usaspending.gov <br> • Submit via SAM.gov | See 2 CFR Appendix A to Part 170(a)(2)(ii) |
| Reporting on Recipient Integrity and Performance Matters | • Total value of all current Federal awards exceed $10,000,000 for any period of time during the period of | See 2 CFR Appendix-XII to Part 200 I.(d) |

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 123 of 138
PageID #: 1500

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| | | |
|---|---|---|
| | performance of this Federal award<br>• See Appendix XII to 2 CFR 200<br>• Submit via SAM.gov | |
| Annual Performance Report (APR) | • Collect and report data use of funds annually.<br>• Projects receiving funds for acquisition, new construction, or rehabilitation must submit APRs for 15 years from the date of initial occupancy or the date of initial service provision. | See 24 CFR 578.103(e) |
| Federal Financial Report, SF-425 | • Summary of key financial data<br>• See 2 CFR 200.328 | See 2 CFR 200.328 or award terms |
| Race, Ethnicity, and Other Data Reporting | Recipients that provide HUD-funded program benefits to individuals or families, report data on the race, color, religion, sex, national origin, age, disability, and family characteristics of persons and households funded by this program. | Annually through the Homeless Data Exchange submission. |
| Audited financial statement | Recipient's organizational structure, any sub-grantees or sub-recipients, and how each disbursement of grant funds was applied to an eligible cost throughout the life of the grant to receive disbursements of Federal funds. | No less than annually. |

**1. Program Specific Reporting Requirements.**

   **a.** In accordance with program regulations at 24 CFR 578.103, project recipients must

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 124 of 138 PageID #: 1501

maintain records within the timeframe required and make any reports that HUD may require. Project recipients may report the data as part of their APR submission to HUD. Also, project recipients who expend $750,000 or more in 1 year in federal awards must have a single or program-specific audit for that year in accordance with the provisions of 2 CFR part 200, subpart F.

**b. Section 3 Reporting Regulations.** Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. See HUD's Section 3 website for additional information including annual reporting requirements.

**c.** Award notices may also include requirements for sub-award reporting in compliance with the requirements of the Federal Financial Assistance Accountability and Transparency Act of 2006 (Pub. L. 109-282) (FFATA) and Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417), referred to as "Section 872." See the General Section for further information.

**e.** An estimate of the reporting and recordkeeping burden of the CoC Program can be found in the Federal Register Publication of the Rule.

## 2. Administrative and Other Program Requirements.

Federal agencies are required to measure the performance of their programs. HUD captures this information from monitoring visits and APRs

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 125 of 138 PageID #: 1502

# VIII. CONTACT AND SUPPORT

VIII. Contact and Support

A.   Agency Contact

B.   Grants.gov

C.   Sam.gov

D.   Debriefing

E.   Applicant Experience Survey

F.   Other Online Resources

TABLE OF CONTENTS

**Suppl. App. 688**

Case 1:25-cv-00626-MSM-AEM  Document 66-1  Filed 12/19/25  Page 126 of 138 PageID #: 1503

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# VIII. CONTACT AND SUPPORT

Individuals who are deaf or hard of hearing, as well as individuals who have speech or communication disabilities may use a relay service. To learn more about how to make an accessible telephone call, visit the webpage for the Federal Communications Commission.

## A. Agency Contact

### 1. Program and Application Requirements

Name: HUD Office of Community Planning and Development

Phone: 800-347-3735

Email: CoCNOFO@hud.gov

Note: HUD's assistance is limited by the standards at 24 CFR 4.26.

HUD staff will be available to provide general clarification on the content of this NOFO; however, HUD staff are prohibited from assisting any applicant in preparing the application(s) in e-snaps.

**a. Local HUD Community Planning Development (CPD) Office.** Questions regarding specific program requirements should be directed to the local HUD CPD field office, a directory of which can be found at https://www.hud.gov/program_offices/field_policy_mgt/localoffices.

**b. Training and Resources.** Collaborative Applicants and project applicants that need assistance completing the applications in e-snaps or understanding the program requirements under the CoC Program may access the Rule, training materials, and program resources via https://www.hud.gov/hud-partners/community-coc.

**c. Questions.** CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions up to the deadline of 8:00 PM EST on January 14, 2026. Applicants experiencing technical difficulty should contact CoCNOFO@hud.gov immediately for assistance and document their attempts to obtain assistance.

### 2. Paper Application Waiver Request

Name: HUD Office of Community Planning and Development

Email: CoCNOFO@hud.gov

Phone: (202) 708-4300

HUD Organization: Community Planning and Development

Street: 451 7th Street SW

City: Washington

DC DISTRICT OF COLUMBIA

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 127 of 138 PageID #: 1504

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

20410

**HUD Reform Act.** HUD is prohibited from disclosing covered selection information during the selection process. The selection process includes NOFO development and publication, and concludes with the announcement of selected recipients of financial assistance. HUD will not assist you with completing your application.

HUD will only return calls related to paper application requests. All other calls will not be returned.

All other requests or questions regarding this NOFO must be sent via email to CoCNOFO@hud.gov

## B. esnaps.hud.gov

CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions

## C. SAM.gov

If you need help, you can call 866-606-8220 or live chat with the Federal Service Desk.

## D. Debriefing and Appeals

1. After public announcement of awards, HUD will debrief the Collaborative Applicant upon your written request. Submit your written request to the agency contact for program and application requirements in this NOFO. HUD may limit the information provided to protect the integrity of the competition.

2. You may appeal an application decision or a HUD funding decision. Email your appeal to snapsappeals@hud.gov. The subject line of your email must include the CoC Number, "Appeal Notice," and type of appeal, i.e., Participation, HUD Error, or Consolidated Plan Certification. A sample email Subject Line is, Subject: XX-500 – Appeal Notice–Consolidated Plan Certification.

24 CFR 578.35 provides the appeal process options. Sections 578.35(b)(3), (b)(4), (c)(1), and (d)(2) authorize HUD to establish requirements for the form and manner of submissions for appeals by Solo Applicants, applicants with denied or decreased funding, and from competing CoCs. For HUD to consider an appeal under 24 CFR 578.35(b) or (c), the solo project applicant must follow the applicable application process set forth in this NOFO. This NOFO also provides guidance to CoCs and applicants regarding appeals of a jurisdiction's refusal to sign the Consolidated Plan certification for a project under 24 CFR 578.35(c).

Additionally, HUD is clarifying the impact that Solo Applicant appeals will have on HUD signing grant agreements for funds awarded under this NOFO. If HUD receives one or more Solo Applicant appeals from a CoC, HUD will determine the amount of funding the Solo Applicant(s) have requested which may delay signing grant agreements for the awarded project(s) listed at the bottom of the CoC's Priority Listing that has requested funding under this NOFO equal to double the amount requested by the Solo Applicant(s). Refer to the Solo Applicant appeal process in section VIII.D.4 of this NOFO for additional information about the

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 128 of 138
PageID #: 1505

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Solo Application appeal process.

Finally, for the purposes of the appeals identified in this NOFO where 24 CFR 578.35 requires that all evidence be sent to the CoC and that the CoC respond to evidence, this means that correspondence to the CoC should be addressed to the CoC-designated Collaborative Applicant and all correspondence to HUD from the CoC should be addressed from the CoC's designated Collaborative Applicant. If the CoC has authorized another entity other than the Collaborative Applicant to respond to the appeals identified in this NOFO on its behalf, it should notify HUD by sending an email to snapsappeals@hud.gov.

### 3. Types of Appeals.

The provision at 24 CFR part 578 sets forth the following types of appeals:

**a.** *Solo Applicants.* A process for eligible project applicants that attempted to participate in their CoC planning process and believe they were denied the right to participate in a reasonable manner.

**b.** *Denied or Decreased Funding.* A process for eligible applicants that are denied funds by HUD or that requested more funds than HUD awarded to them.

**c.** *Consolidated Plan Certification.* A process for eligible applicants whose jurisdiction refused to provide a Certification of Consistency with the Consolidated Plan (form HUD-2990).

**d.** *Competing CoCs.* A process when more than one CoC selects the same geographic area, for eligible applicants of lower-scoring CoCs, to appeal to HUD's decision to fund the competing CoC. Should two or more CoCs select the same geographic codes associated with formula areas during the CoC Program Registration process, HUD will use the competing CoC process provided by 24 CFR 578.35(d).

### 4. Solo Applicant.

Per the Act, "A solo applicant may submit an application to the Secretary for a grant under subsection (a) and be awarded such grant on the same basis as such grants are awarded to other applicants based on the criteria described in section 427, but only if the Secretary determines that the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner. The Secretary may award such grants directly to such applicants in a manner determined to be appropriate by the Secretary."

To apply as a solo applicant, the project applicant must submit a Solo Applicant Project Application in e-snaps by the application submission deadline of January 14, 2026 at 8:00 PM EST. Additionally, the solo applicant, Collaborative Applicant, and HUD must take the following steps (See 24 CFR 578.35 for more information):

**a.** *Written Notice of Intent to Appeal.* The solo applicant must submit a written notice of intent to appeal, with a copy to the CoC, with their funding application.

**b.** No later than 30 days after the date that HUD announces the awards, the solo applicant shall submit in writing, with a copy to the Collaborative Applicant, all relevant evidence supporting its claim. The submission shall be emailed to

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 129 of 138 PageID #: 1506

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

snapsappeals@hud.gov.

**c.** The CoC has 30 days from the date of its receipt of the solo applicant's evidence to respond to HUD in writing, with a copy to the solo applicant. The submission must be emailed to snapsappeals@hud.gov.

**d.** HUD will notify the solo applicant and the CoC of its decision within 60 days of receipt of the CoC's response.

**e.** If HUD finds that the solo applicant was not permitted to participate in the Continuum of Care planning process in a reasonable manner, then HUD may award a grant to the solo applicant when funds next become available and may direct the Continuum of Care to take remedial steps to ensure reasonable participation in the future. HUD may also reduce the award to the Continuum's applicant(s).

## 5. Denied or Decreased Funding.

Eligible applicants, including project applicants and Collaborative Applicants, that submitted an application to HUD in response to this NOFO, that were either not awarded funds by HUD, or that requested more funds than HUD awarded, may appeal HUD's decision within 45 days after the final funding announcement. HUD will only consider for funding or additional funding applicants the CoC ranked within the CoC's maximum amount available. Collaborative Applicants that submitted CoC planning, and if applicable, UFA Costs project applications can appeal decreased funding if they can demonstrate HUD decreased the submitted project application's funding request to less than 5 percent of the CoC's FPRN or $1,250,000; whichever is less. To appeal HUD's decision, the applicant must submit a written appeal to HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant. The written appeal must include evidence demonstrating HUD error and follow the instructions in this section.

The applicant must submit its written appeal by email to snapsappeals@hud.gov, from the organization's email address on the organization's letterhead and signed by the authorized representative–electronic signatures are acceptable.

**a.** *Denied Funding.* To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in Section VIII.D.6 of this NOFO within 45 days of the date of the funding announcement of the conditional awards from HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant.

**(1)** Projects, including projects for CoC Planning funds and Unified Funding Agency (UFA) costs, could have been rejected by HUD because:

**(a)** the individual project application failed to meet project eligibility, project quality, and project renewal thresholds set forth in this NOFO;

**(b)** the individual project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO, but was ranked in a position where a portion of the grant funds was outside the CoC's maximum award amount, and after HUD reduced its funding to fit within the CoC's maximum award amount, HUD determined that the project was no longer feasible; or

**(c)** HUD did not have sufficient funding to fund all eligible projects ranked within

the CoC's maximum award amount.

**(2)** For applicants that were fully denied funding for a grant, the applicant must provide evidence that demonstrates HUD error in not awarding the grant. Documentation submitted by the applicant must include:

**(a)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(b)** evidence from the project application supporting the applicant's claim that the project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO; and

**(c)** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO, which resulted in the project not being funded.

**(3)** For applicants that were denied funding due to the individual project's funding being decreased to such a level that the project was no longer feasible, documentation submitted by the applicant must include:

**(a)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(b)** evidence from the project application supporting the applicant's claim that the project application met project eligibility and project quality thresholds set forth in this NOFO;

**(c)** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO which resulted in the project not being funded (e.g., selecting a lower-scored project within the CoC or a similar project from another CoC); and

**(d)** the evidence in section VI.B.1.b of this NOFO as well as evidence for decreased funding in section VIII.D.5.b of this NOFO.

**(4)** For CoCs that were denied funding due to the score of the CoC Application or the score of the project application not being high enough to result in the funding of project(s) within the CoC, and the lower score for one or both application types was the result of HUD error, the CoC may appeal the CoC or project application score and request funding for affected projects. Documentation submitted by the Collaborative Applicant on behalf of the CoC must include evidence of HUD error when calculating the Coc Application or project application score.

**b.** *Decreased Funding.* To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in section VIII.D.2 of this NOFO within 45 days of the date of the final funding announcement of the conditional awards from HUD, with a copy to the authorized representative of the CoC's designated Collaborative Applicant. Documentation submitted by the applicant must include evidence of the HUD error the applicant believes was made.

occurred, and the applicant should have been awarded additional funding, HUD will provide funding from the next available funds and make necessary adjustments by amending the award. HUD will reverse a decision only when the applicant can show that HUD error caused

**Suppl. App. 693**

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 131 of 138
PageID #: 1508

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

the denial or decrease.

## 6. Written Appeal.

An applicant may appeal to HUD a jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan. The appeals process is as follows:

With the project application that is submitted by the application deadline, the applicant must submit a written appeal. Project applicants may submit its appeal in e-snaps with its project application. When submitted with the project application in e-snaps, the applicant must also email a copy of this appeal to the jurisdiction that denied the Certification of Consistency with the Consolidated Plan and should send a copy to the authorized representative from the CoC's designated Collaborative Applicant, unless it is the Collaborative Applicant that is filing the appeal. Otherwise, the project applicant or Collaborative Applicant may submit the appeal to HUD using one of the methods in section VIII.D of this NOFO. The written appeal must include the following information:

**a.** a copy of the applicant's request to the jurisdiction for the Certification of Consistency with the Consolidated Plan;

**b.** a copy of the jurisdiction's response stating the reasons for denial, including the reasons the proposed project is not consistent with the jurisdiction's Consolidated Plan in accordance with 24 CFR 91.510(c); and

**c.** a statement of the reasons why the applicant believes its project is consistent with the jurisdiction's Consolidated Plan.

The appeal may include additional information the applicant believes supports its appeal, including:

**(1)** any additional communication between the applicant and the jurisdiction regarding the request for certification of consistency; and

**(2)** documentation that identifies to whom within the jurisdiction the evidence was sent and the date on which it was sent.

**d.** *Jurisdiction Response.* The jurisdiction will have 10 days after the receipt of the applicant's written appeal to submit a written response to HUD. The response must be sent by email to snapsappeals@hud.gov on the organization's letterhead, with a copy to the project applicant and the authorized representative of the CoC's designated Collaborative Applicant. The response must include the following information:

**(1)** an explanation of the reasons originally given for refusing to provide the Certification of Consistency with the Consolidated Plan; and

**(2)** written rebuttal to any claims made by the applicant in the written appeal.

**e.** *HUD Decision and Notification of Decision.*

**(1)** HUD will review the submissions and will provide written notification, by email, of its decision to the applicant and the jurisdiction, with a copy to the authorized representative from the CoC's designated Collaborative Applicant within 45 days of the date of the receipt of the jurisdiction's response. In making its decision, HUD will consider whether the applicant submitted the request to the appropriate certifying

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 132 of 138 PageID #: 1509

jurisdiction and the reasonableness of the jurisdiction's refusal to provide the certificate.

**(2)** If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was reasonable, then HUD will automatically reject the project application. If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was not reasonable, then HUD will consider the project application for funding in the respective FY CoC Program Competition in accordance with the review standards set forth in this NOFO.

**(3)** If the jurisdiction failed to provide written reasons for refusal, including the reasons why the project is not consistent with the jurisdiction's Consolidated Plan in its initial response to the applicant's request for a certification, HUD will find for the applicant without further inquiry or response from the political jurisdiction.

**(4)** HUD will provide written notification of its decision within 45 days of the date of HUD's receipt of the jurisdiction's response. Where the jurisdiction failed to provide a written response, HUD will provide written notification of its decision within 55 days of the date of HUD's receipt of the project applicant's response.

## E. Applicant Experience Survey

You are encouraged to provide feedback on your application experience by completing our Applicant Experience Survey. Your feedback is optional; you are not required to provide personal information. HUD may use your feedback to improve future NOFOs. Your feedback has no impact on funding decisions.

## F. Other Online Resources

You are encouraged to review the online resources for context on some of the NOFO requirements.

# APPENDIX

Appendix

Appendix I Definitions

TABLE OF CONTENTS

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 134 of 138 PageID #: 1511

# APPENDIX

## Appendix I. Definitions

### 1. Standard Definitions

For standard definitions not listed below, refer to 2 CFR 200.1.

**Affirmatively Furthering Fair Housing (AFFH)** - statutory obligation to affirmatively further the purposes and policies of the Fair Housing Act (see also 24 CFR 5.151, as amended by 90 FR 11020).

**Authorized Organization Representative (AOR)** is the official within your organization with the legal authority to: give assurances, make commitments, submit your application to HUD, enter into agreements, and execute such documents on behalf of your organization. The AOR is not necessarily the Project Director. The AOR has defined privileges within Grants.gov.

**Consolidated Plan** has the same meaning as defined at 24 CFR part 91.

**Eligibility requirements** are mandatory requirements for an application to be considered for funding.

**Opportunity Zone (OZs)** are defined in 26 U.S.C. 1400Z-1. In general, OZs are census tracts located in low-income communities where new investments, under certain conditions, may be eligible for preferential tax treatment.

**Primary Point of Contact (PPOC)** is the person HUD may contact with questions about the application submitted. The PPOC is listed in item 8F on the SF-424.

**System for Award Management (SAM)** has the same meaning as 2 CFR 25.100(b).

**Threshold Requirements** are eligibility requirements you must meet before HUD advances to a merit review of your application.

**Unique Entity Identifier (UEI)** has the same meaning as 2 CFR 25.100(a).

### 2. Program Definitions.

Regulatory citations are provided below so applicants can refer to specific areas of the Rule. Projects awarded CoC Program funds are subject to the program regulations as they may be amended from time to time. However, YHDP Renewal and YHDP Replacement projects and awards are subject to CoC Program regulations except as otherwise provided in this NOFO.

The definitions and concepts contained in this section include terms that are important for all applicants to understand in order to operate projects under this NOFO.

   **a.** ***The following terms are defined in 24 CFR 578.*** Applicants must refer to the Rule for the definitions contained in this section.

   **(1)** Annual Renewal Amount (ARA)
   **(2)** Applicant
   **(3)** Centralized or Coordinated Assessment System
   **(4)** Chronically Homeless

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM    Document 66-1    Filed 12/19/25    Page 135 of 138    PageID #: 1512

**(5)** Collaborative Applicant

**(6)** Continuum of Care

**(7)** Consolidated Plan

**(8)** Establishing and Operating the CoC. -24 CFR 578.5 and 24 CFR 578.7 detail the requirements for the establishment of a CoC and its responsibilities.

**(9)** Final Pro Rata Need (FPRN)

**(10)** High Performing Community (HPC)

**(11)** Homeless Management Information System (HMIS)

**(12)** HMIS Lead

**(13)** Homeless. - Although not reflected in the regulation, section 605 of Violence Against Women Act Reauthorization Act of 2022 amended Section 103(b) of the Act and requires HUD to consider certain individuals and families as homeless. This amendment took effect on October 1, 2022. Notwithstanding anything to the contrary contained elsewhere in this NOFO, where 578.3 paragraph (4) is referenced,

**(14)** Permanent Housing

**(15)** Permanent Supportive Housing

**(16)** Preliminary Pro Rata Need (PPRN)

**(17)** Private Nonprofit Organization

**(18)** Program Participant

**(19)** Project

**(20)** Rapid Rehousing (RRH).

**(21)** Recipient

**(22)** Subrecipient

**(23)** Transitional Housing

**(24)** Unified Funding Agency

**(25)** Victim Service Provider

**b.** *CoC Program NOFO Terms*. The following terms may be used during the administration of CoC Program grants. The definitions and specific concepts pertaining to these terms are further explained below:

**(1) Annual Renewal Demand (ARD) (24 CFR 578.17(b)(2)).** The total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items (BLIs) based on FMR changes. HUD will calculate the ARD by combining the total amount of funds requested by eligible renewal projects in each FY funding opportunity, including:

**(a)** renewal projects approved and ranked on the Renewal Project Listing;

**(b)** renewal project amount(s) that were reallocated as recorded on the reduced or eliminated reallocation forms of the CoC Project Listing;

**(c)** YHDP renewal projects on the YHDP Renewal Project Listing; and

**(d)** YHDP Replacement projects, including YHDP Reallocation projects, on the YHDP Reallocation and Replacement Project Listing. YHDP Replacement projects are eligible for funding through the replacement of YHDP Renewal projects. The YHDP Replacement application must request the same amount of funding that is eligible for YHDP Renewal.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 136 of 138 PageID #: 1513

**(2) CoC Merger.** The CoC merger is a process where two or more CoCs voluntarily agree to merge the entire geographic area of all CoCs into one larger CoC. HUD strongly encourages CoCs that struggle with capacity to merge with a neighboring CoC or Balance of State CoC during each fiscal year's CoC Program Registration process. To encourage CoC mergers and mitigate the potential adverse scoring implications that may occur when a high performing CoC merges with one or more lower-performing CoC(s), HUD will award 5 bonus points to the FY 2025 CoC Application Score for CoCs that registered as a merged after the FY 2024 CoC Program Registration deadline.

**(3) Formula Area**. Defined in the Indian Housing Block Grant Program at 24 CFR 1000.302.

**(4) CoC Geographic Area.** 24 CFR 578.5 requires representatives from relevant organizations within a geographic area to establish a CoC to carry out the duties within the geographic area. The boundaries of identified CoC geographic areas cannot overlap, and any overlapping geographies are considered Competing CoCs. HUD follows the process at 24 CFR 578.35(d) to determine which CoC HUD will fund in the case of CoC geographic areas that overlap.

**(5) Homelessness and Human Trafficking.** HUD is clarifying that persons who are fleeing or attempting to flee human trafficking may qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and may be eligible for certain forms of homeless assistance under the CoC Program, subject to other restrictions that may apply. HUD considers human trafficking, including sex trafficking, to be "other dangerous or life-threatening conditions that relate to violence against the individual or family member" under paragraphs (1) and (4) of the definition of homeless at 24 CFR 578.3 and "other dangerous, traumatic, or life-threatening conditions related to the violence against the individual or a family member in the individual's or family's current housing situation" under section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(6) Host Home and Kinship Care.** Host Home and Kinship Care is limited to YHDP Renewal and replacement grants. This is a model of housing where a family agrees to permit a youth program participant to reside with them. Recognizing the addition of another person in the home may increase costs to the family, HUD will consider YHDP Replacement project applications that propose to house youth with families and subsidize the additional costs attributable to housing the youth, including recruitment of hosts. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination for HUD review upon request. The residence is in a community-based setting and the family may be related to youth program participants with a time-limited or unlimited length of stay.

**(7) Housing Inventory Count (HIC).** A complete listing of the CoC's HUD and non-HUD funded beds dedicated to individuals and families experiencing homelessness in the CoC's geographic area.

**Suppl. App. 699**

**(8) Reservation and Trust Land.** For purposes of this Notice, Reservations and Trust Land are types of formula areas as specifically delineated under HUD's IHBG program at 24 CFR 1000.302.

**(9) Rural Area.** For this competition a rural area is a county which:

**(a)** has no part of it within an area designated as a standard metropolitan statistical area by the Office of Management and Budget;

**(b)** is within an area designated as a metropolitan statistical area or considered as part of a metropolitan statistical area and at least 75 percent of its population is local on U.S. Census blocks classified as non-urban; or

**(c)** is located in a state that has a population density of less than 30 persons per square mile (as reported in the most recent decennial census), and of which at least 1.25 percent of the total acreage of such State is under Federal jurisdiction, provided that no metropolitan city in such State is the sole beneficiary of the grant amounts awarded under this NOFO. A metropolitan city means a city that was classified as a metropolitan city under section 102(a) of the Housing and Community Development Act of 1974 (42. U.S.C. 5302(a)) for the fiscal year immediately preceding the fiscal year for which Emergency Solutions Grants program funds are made available.

**(10) Shared Housing.** YHDP Renewal, YHDP Replacement and YHDP Reallocation grants may provide rental assistance for shared housing where youth may reside with family or another unrelated person. The youth leases from the property owner and shares the unit with the family or unrelated person. The unit may be a house or an apartment.

**(a)** YHDP rental assistance cannot be provided to a youth to reside in a unit occupied by an immediate family member. For this NOFO "immediate family member" includes parents, grandparents, and legal guardians.

**(b)** YHDP rental assistance cannot be provided to a youth in a shared housing unit if the landlord is an immediate family member of the youth.

**(c)** YHDP rental assistance may only be provided to a youth if the youth can enter into a valid, binding, and enforceable lease under applicable state or local law. This includes a legally appointed guardian executing a lease on behalf of a youth or an emancipated youth entering into a lease.

**(d)** YHDP Renewal and replacement grants may provide a shared housing option for youth program participants who are not part of a household but are interested in sharing a housing unit with a roommate unrelated to the program participant.

**(11) Special NOFO.** A competition administered under the Continuum of Care Supplemental to Address Unsheltered and Rural Homelessness designed to target efforts to reduce unsheltered homelessness in communities with very high levels of unsheltered homelessness and homelessness in rural areas. Funding through this Competition was awarded through either the Unsheltered Set Aside or the Rural Set Aside.

Case 1:25-cv-00626-MSM-AEM   Document 66-1   Filed 12/19/25   Page 138 of 138 PageID #: 1515

**(12) YHDP Replacement Process, including YHDP Reallocation.** The YHDP Replacement process occurs when: (1) a CoC reallocates a YHDP Renewal project to create one or more new YHDP project(s) that has the same recipient referred to as YHDP Replacement in this NOFO; (2) a CoC is reallocating a YHDP Renewal project to create one or more new projects with a new recipient referred to as YHDP Reallocation in this NOFO; or (3) a CoC is reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process. For more information on YHDP Reallocation, see sections IV.D.1.i of this NOFO.

Appendix 2: Funding Opportunity Goals

1. Improving Outcomes

2. Restoring Balance to the Continuum of Care

3. Prioritizing Treatment and Recovery as a Means to Self-Sufficiency

4. Promoting Economic Self-Sufficiency

5. Creating Competition to Improve Innovation and Accountability

6. Ending the Crisis of Homelessness on Our Streets

7. Advancing Public Safety for All

8. Minimizing Trauma for Vulnerable Populations

9. Expanding Access Based on Merit, not Ideology

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

STATE OF WASHINGTON, et al.,

                    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, et al.,

                    Defendants.

C.A. No. 1:25-cv-00626-MSM-AEM

**PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT**

**Suppl. App. 702**

**TABLE OF CONTENTS**

I.          INTRODUCTION ........................................................................................... 1

II.        BACKGROUND ............................................................................. 4

        A.     Congress Created the Continuum of Care Program to Address the Unprecedented Crisis of Homelessness by Funding Housing Solutions ...................................................... 4

        B.     Through the CoC Program, HUD Has Consistently Promoted Permanent Housing as Part of a Housing First Approach to Reducing Homelessness ............................................. 7

        C.     Through the CoC Program, HUD Has Sought to Address the Needs of the Diverse Population it Serves ....................................... 11

        D.     The Trump Administration Reverses HUD's Decades-Long Policy of Housing First ...................................................... 13

        E.     The Administration Takes Actions to Target So-Called "Gender Ideology" ................................................................... 14

        F.     HUD Upends the CoC Program by Issuing a New Fiscal Year 2025 NOFO .............................................................. 15

        G.     Defendants Issue Yet Another New NOFO that Includes Unlawful Conditions and Policies Concerning Permanent Supportive Housing, Gender Identity, Public Safety, and Funding Amounts ......................... 17

               1.  Ending Housing First ................................................................. 17

               2.  Tier 1 Cap ................................................................................. 21

               3.  Gender Ideology Conditions ...................................................... 21

               4.  Geographic Discrimination Conditions ...................................... 22

        H.     Plaintiff States Rely on Federal CoC Funding to Address Homelessness ............................................................. 24

III.       ARGUMENT .................................................................................. 28

        A.     Legal Standard ............................................................................. 28

B.      HUD's Rescission of the FY 2024–2025 NOFO and Issuance of the December NOFO are Final Agency Actions ........................ 28

C.      HUD's Untimely Rescission of the FY 2024–2025 NOFO Was Unlawful ..................................................... 30

      1.  HUD's untimely rescission was contrary to statute ......................................... 30

      2.  HUD's untimely rescission was arbitrary and capricious ............................... 33

D.      The December NOFO is Unlawful ........................................................ 36

      1.  The challenged conditions were adopted without notice-and-comment .......... 36

      2.  The challenged conditions are contrary to law ................................................ 38

           a.      HUD lacked authority to implement its own conditions on congressionallyauthorized funding ............ 38

           b.      The Challenged Conditions violate the McKinney-Vento Act and HUD statutes and regulations in multiple respects ................ 40

      3.  HUD's adoption of the challenged conditions is arbitrary and capricious ...... 45

           a.      Defendants failed to consider the impacts of the Challenged Conditions on individuals who are likely to lose their housing ...................... 46

           b.      After initially refusing to provide any explanation for the Challenged Conditions, Defendants subsequently adopted post hoc rationalizations that fail to justify the Challenged Conditions ..................................... 47

           c.      Defendants relied on factors Congress did not intend them to consider .................................... 57

           d.      Defendants failed to consider reliance interests ........................... 58

      4.  The Challenged Conditions Violate Separation of Powers ............................. 61

E.      Plaintiffs are Entitled to Summary Judgment on their § 706(1) Claim ................ 63

F.      Plaintiffs are Entitled to the Full Suite of APA and Injunctive Relief ................. 68

      1.  The Court should vacate and set aside the unlawful rescission of the FY 2024-2025 NOFO ........................................... 68

**Suppl. App. 704**

2.  The Court should vacate and set aside
    the December NOFO, including the Challenged Conditions...........................69

3.  The Court should enjoin Defendants
    from implementing the Challenged Conditions................................................69

4.  The Court should enter an injunction that
    requires Defendants to process renewal applications
    and conduct the CoC competition under
    the terms of the FY 2024–2025 NOFO.............................................................74

IV.        CONCLUSION....................................................................................... 75

**Suppl. App. 705**

## TABLE OF AUTHORITIES

### Cases

*AFL-CIO v. Chao,*
  496 F. Supp. 2d 76 (D.D.C. 2007) ................................................................. 69

*Am. Acad. of Pediatrics v. U.S. Food & Drug Admin.,*
  330 F. Supp. 3d 657 (D. Mass. 2018) .......................................... 64, 65, 67

*Am. Hosp. Ass'n v. Kennedy,*
  No. 2:25-CV-00600-LEW,
  2025 WL 3754193 (D. Me. Dec. 29, 2025) ............................................... 61

*Bennett v. Spear,*
  520 U.S. 154 (1997) ...................................................................................... 28

*Bos. Redevelopment Auth. v. Nat'l Park Serv.,*
  838 F.3d 42 (1st Cir. 2016) ......................................................................... 28

*Boston Bit Labs, Inc. v. Baker,*
  11 F.4th 3 (1st Cir. 2021) ............................................................................ 43

*Brock v. Pierce County,*
  476 U.S. 253 (1986) ........................................................................ 30, 31, 32

*Brown v. Ent. Merch. Ass'n,*
  564 U.S. 786 (2011) ...................................................................................... 50

*Castañeda v. Souza,*
  810 F.3d 15 (1st Cir. 2015) ......................................................................... 31

*City and Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ............................................................... 61, 62

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ...................................................................................... 38

*City of Providence v. Barr,*
  385 F. Supp. 3d 160 (D.R.I. 2019) ....................................................... 64, 66

*City of Providence v. Barr,*
  954 F.3d 23 (1st Cir. 2020) .............................................................. 38, 39, 62

iv

*City of Seattle v. Trump*,
  No. 2:25-cv-01435-BJR,
  2025 WL 3041905,
  (W.D. Wash. Oct. 31, 2025)......................................................................... 39, 41

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ..................................................................................... 39, 62

*Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*,
  802 F.3d 413 (2d Cir. 2015)............................................................................. 44

*Comm. For Fairness v. Kemp*,
  791 F. Supp. 888 (D.D.C. 1992) ...................................................................... 37

*Connectu LLC v. Zuckerberg*,
  522 F.3d 82 (1st Cir. 2008) .............................................................................. 43

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) .......................................................................................... 68

*Cox v. City of Bos.*,
  734 F. Supp. 3d 173 (D. Mass. 2024) .............................................................. 53

*Cummings v. Premier Rehab Keller*,
  *PLLC*, 596 U.S. 212 (2022)............................................................................. 38

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) .......................................................................................... 45

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ...................................................................................... passim

*Doe v. Noem*,
  778 F. Supp. 3d 1151 (W.D. Wash. 2025) ....................................................... 43

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) .......................................................................................... 69

*Env't Def. Fund v. FERC*,
  2 F.4th 953 (D.C. Cir. 2021) ............................................................................ 68

*FBI v. Fikre*,
  601 U.S. 234 (2024) .......................................................................................... 43

*FCC v. Fox Television Stations, Inc.*,
  *556 U.S. 502 (2009)* ................................................................................... 36, 40

v

**Suppl. App. 707**

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021) ................................................................ 33, 45

*Gent v. CUNA Mut. Ins. Soc'y*,
611 F.3d 79 (1st Cir. 2010) ................................................................ 53

*Genuine Parts Co. v. E.P.A.*,
890 F.3d 304 (D.C. Cir. 2018) ................................................................ 53

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ................................................................ 68

*Healey v. Spencer*,
765 F.3d 65  (1st Cir. 2014) ................................................................ 69

*Hous. Auth. of San Francisco v. Turner*,
No. 4:25-cv-08859-JST,
2025 WL 3187761,
(N.D. Cal. Nov. 14, 2025) ................................................................ 29

*Illinois v. Fed. Emergency Mgmt. Agency*,
No. 1:25-cv-00206-WES-PAS,
2025 WL 2716277
(D.R.I. Sept. 24, 2025) ................................................................ 30, 68, 69

*Illinois v. Noem*,
No. 1:25-cv-00495-MSM-PAS,
2025 WL 3707011
(D.R.I. Dec. 22, 2025) ................................................................ 68

*In re Core Commc'ns, Inc.*,
531 F.3d 849, (D.C. Cir. 2008) ................................................................ 65

*Int'l Org. of Masters v. NLRB*,
61 F.4th 169 (D.C. Cir. 2023) ................................................................ 61

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005) ................................................................ 37

*Jewell v. United States*,
749 F.3d 1295 (10th Cir. 2014) ................................................................ 31

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ................................................................ 38

*Little Sisters of the Poor v. Pennsylvania*,
591 U.S. 657 (2020) ................................................................ 58

vi

**Suppl. App. 708**

*Littlefield v. U.S. Dep't of the Interior,*
  85 F.4th 635 (1st Cir. 2023) ........................................................................ 28

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ..................................................................................... 40

*Maine v. Thomas,*
  874 F.2d 883 (1st Cir. 1989) ........................................................................ 43

*Martin Luther King, Jr. Cnty. v. Turner,*
  785 F. Supp. 3d 863 (W.D. Wash. 2025) ............................................... 39, 57

*Martin Luther King, Jr. Cnty. v. Turner,*
  798 F. Supp. 3d 1224 (W.D. Wash. 2025) ......................................... 44, 48, 71

*McCuin v. Sec'y of Health & Hum. Servs.,*
  817 F.2d 161 (1st Cir. 1987) ........................................................................ 42

*Melone v. Coit,*
  100 F.4th 21 (1st Cir. 2024) ........................................................................ 48

*Michigan v. E.P.A.,*
  576 U.S. 743 (2015) ..................................................................................... 46

*Modesto Irr. Dist. v. Gutierrez,*
  619 F.3d 1024 (9th Cir. 2010) ..................................................................... 57

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................. passim

*N.H. Hosp. Ass'n v. Azar,*
  887 F.3d 62 (1st Cir. 2018) .......................................................................... 37

*Nat'l All. to End Homelessness v. Turner,*
  No. 25-cv-00447-MSM-AEM,
  2025 WL 2638377,
  (D.R.I. Sept. 14, 2025) ........................................................................... 38, 43

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) ................................................................... 70

*Nat'l Parks Conservation Ass'n v. Env't Prot. Agency,*
  788 F.3d 1134 (9th Cir. 2015) ..................................................................... 52

*Nielsen v. Preap,*
  586 U.S. 392 (2019) ..................................................................................... 30

**Suppl. App. 709**

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ...................................................................................... 64

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) ........................................................................................ 63

*Penobscot Nation v. Frey*,
  3 F.4th 484 (1st Cir. 2021) ......................................................................... 45

*Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*,
  946 F.3d 1100 (9th Cir. 2020).................................................................... 40

*Prometheus Radio*
  592 U.S. 414 (2021) .................................................................................... 36

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004) .................................................................. 57

*R.I. Coal. Against Domestic Violence v. Kennedy*,
  C.A. No. 1:25-cv-00342-MRD-PAS,
  2025 WL 2988705
  (D.R.I. Oct. 23, 2025)....................................................................... 29, 47, 48

*Ramirez v. U.S. Immigr. & Customs Enf't*,
  568 F. Supp. 3d 10 (D.D.C. 2021) .............................................................. 69

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985) ................................................................ 42, 44

*Sierra Club v. Babbitt*,
  69 F. Supp. 2d 1202
  (E.D. Cal. 1999) ........................................................................................... 33

*Snegirev v. Asher*,
  2:12-cv-01606-MJP,
  2013 WL 942607
  (W.D. Wash. Mar. 11, 2013)........................................................................ 31

*South Dakota v. Dole*,
  483 U.S. 203 (1987) .................................................................................... 62

*Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ................................................................ 65, 67

*Town of Wellesley v. FERC*,
  829 F.2d 275 (1st Cir. 1987) ...................................................................... 65

**Suppl. App. 710**

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ................................................................................. 43

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................................. 68

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ................................................................................. 29

*United States v. Jacques*,
  784 F. Supp. 2d 59 (D. Mass. 2011) ....................................................... 50

*United States v. Montalvo-Murillo*,
  495 U.S. 711 (1990) ................................................................................. 31

*Washington v. U.S. Dep't of Health & Hum. Servs.*,
  No. 6:25-cv-01748-AA,
  2025 WL 3002366
  (D. Or. Oct. 27, 2025) ............................................................................. 43

## <u>Statutes</u>

34 U.S.C. § 12351 ........................................................................................ 20, 74

42 U.S.C. § 10408 ........................................................................................ 20, 74

42 U.S.C. § 11301 ................................................................................................. 4

42 U.S.C. § 11360 ............................................................................................... 45

42 U.S.C. § 11381 .................................................................................... 4, 45, 47, 58

42 U.S.C. § 11382 .................................................................................. 7, 30, 32, 64

42 U.S.C. § 11383 ............................................................................................... 5, 8

42 U.S.C. § 11385 ............................................................................................... 9, 42

42 U.S.C. § 11386 ............................................................................................ 6, 39, 41

42 U.S.C. § 11386a .......................................................................................... passim

42 U.S.C. § 11386b .................................................................................. 9, 41, 49, 58

42 U.S.C. § 11386c .......................................................................................... passim

42 U.S.C. § 12711 ............................................................................................. 23, 44

ix

42 U.S.C. §11386b ........................................................................................................... 6

5 U.S.C. § 553 ............................................................................................................... 36

5 U.S.C. § 703 ............................................................................................................... 69

5 U.S.C. § 706 ......................................................................................................... passim

Consolidated Appropriations Act,
   2024 Pub. L. No. 118-42, 138 Stat. 9 (2024) ...................................................... 7, 41

Full-Year Continuing Appropriations and Extensions Act,
   2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) .................................................. 7, 16, 30

## Rules

Local Rule Cv 7 ............................................................................................................... 4

## Regulations

24 C.F.R § 578.13 .......................................................................................................... 23

24 C.F.R § 578.3 ........................................................................................................ 5, 45

24 C.F.R § 578.75 .......................................................................................................... 19

24 C.F.R. § 10.1 ............................................................................................................. 37

24 C.F.R. § 5.106 ...................................................................................................... 11, 43

24 C.F.R. § 578.17 ................................................................................................. 5, 23, 44

24 C.F.R. § 578.37 .................................................................................................... 5, 8, 9

24 C.F.R. § 578.5 ........................................................................................................... 23

24 C.F.R. § 578.73 .......................................................................................................... 25

24 C.F.R. Part 578 ..................................................................................................... 25, 26

24 C.F.R. § 578.75 .......................................................................................................... 19

69 Fed. Reg. 27495 (May 14, 2004),
   https://archives.hud.gov/funding/2004/cocpsec.pdf ............................................... 10

81 Fed. Reg. 48366 (July 25, 2016) ................................................................................ 37

x

Exec. Ord. No. 14168
  90 Fed. Reg. 8615 (Jan. 20, 2025) ................................................................. 14, 62

Exec. Ord. No. 14321,
  90 Fed. Reg. 35817 (Jul. 24, 2025) ........................................................... 13, 14, 62

## Other Authorities

Alap Davé,
  *How one state almost solved America's homelessness problem*,
  Catalyst (2023),
  https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-
  problem.................................................................................................................. 7, 9

Grants.gov,
  Related Documents, *2021 Continuum of Care* (2021),
  https://grants.gov/search-results-detail/335322
  (last visited Nov. 25, 2025) ................................................................................. 10

Grants.gov,
  Related Documents,
  *FY 2012 Notice of Funding Availability for Continuum of Care*,
  https://grants.gov/search-results-detail/206173.................................................. 12

Grants.gov,
  Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*,
  https://grants.gov/search-results-detail/265408
  (last visited Nov. 25, 2025) ................................................................................. 10

Grants.gov,
  Related Documents, *FY 2019 Notice of Funding Opportunity for Continuum of Care*,
  https://grants.gov/search-results-detail/318022 (last visited Nov. 25, 2025)............ 12

HUD,
  *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal
  Year (FY) 2018 Continuum of Care Program Competition* (2018),
  https://archives.hud.gov/funding/2018
  /FY18-CoC-NOFA.pdf ................................................................................. 10, 12

HUD,
  *Office of Community Planning and Development Homeless Assistance Grants*,
  https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf
  (last visited Nov. 25, 2025) ................................................................................. 10

xi

**Suppl. App. 713**

HUD,
   *Secretary Scott Turner Halts Enforcement Actions of HUD's Gender Identity Rule*,
   https://www.hud.gov/news/hud-no-25-026#close (last visited Nov. 5, 2025).......................... 15

Jason Deparle,
   *Trump AdministrationProposes a Drastic Cut in Housing Grants*(Nov. 12, 2025),
   https://www.nytimes.com/2025/11/12/us/politics/trump-homeless-funding.html.............. 18, 59

Josh Leopold & Mary K. Cunningham,
   *To end homelessness, Carson should continue Housing First approach*, Urban Institute
   (Jan. 19, 2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-
   housing-first-approach ...................................................................................................... 7, 9

Josh Leopold,
   *Five Ways HEARTH Act Changed Homelessness*, Urban Institute (2019),
   https://www.urban.org/urban-wire/five-ways-hearth-act-changed-homelessness-assistance..... 9

Katherine Hapgood,
   *Trump admin looks at deep cuts to homeless housing program*, Politico(Sept. 29, 2025),
   https://www.politico.com/news/2025/09/29/trump-admin-looks-at-deep-cuts-to-homeless-
   housing-program-00585770?nid=0000014f-1646-d88f-a1cf-
   5f46b7bd0000&nname=playbook&nrid=0000015d-4ff3-d6d3-a75d-4ff30bd80000 ........ 18, 19

National Academies of Sciences,
   Engineering, and Medicine, *Evidence of Effect of Permanent Supportive Housing on Health*
   (July 11, 2018), https://www.ncbi.nlm.nih.gov/books/NBK519591/ ...................................... 54

*Provisional Drug Overdose Death Counts*,
   U.S. Centers for Disease Control and Prevention, National Center for Health Statistics,
   https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm
   (last visited Jan 6, 2026)...................................................................................................... 53

*Recovery Residences*,
   Washington Health Care Authority,
   https://www.hca.wa.gov/free-or-low-cost-health-care/i-need-behavioral-health-
   support/recovery-residences (last visited Jan. 5, 2026)............................................................ 53

*S. Hum. Servs. Comm. Pub. Hr'g on ESSB 5599*
   (TVW, Feb. 6, 2023),
   https://tvw.org/video/senate-human-services-2023021142/?eventID=2023021142................. 11

Scott Turner (@SecretaryTurner),
   X (Mar. 13, 2025, 11:47AM),
   https://x.com/SecretaryTurner/
   status/1900257331184570703.............................................................................................. 15

xii

The Trevor Project,
*Homelessness and Housing Instability Among LGBTQ Youth*,
https://www.thetrevorproject.org/wp-
content/uploads/2022/02/Trevor-Project-
Homelessness-Report.pdf
(last visited Nov. 25, 2025) ................................................................................................. 11

U.S. Department of Housing and Urban Development,
*Continuum of Care Program*,
https://www.hud.gov/hud-partners/community-coc (last visited Nov. 25, 2025)....................... 4

United States Interagency Council on Homelessness,
*Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation*,
3 n.1 (Sept. 2016), https://www.usich.gov/sites/default/files
document/Housing_First_Checklist_FINAL.pdf........................................................................ 8

**Suppl. App. 715**

## PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Congress created the Continuum of Care Program recognizing that homelessness is a crisis of instability, and that effective intervention requires immediate stabilization and uninterrupted support. For decades, the CoC Program has operated with the continuity and predictability mandated by statute: through the CoC Program, the Department of Housing and Urban Development distributes billions of dollars each year to state, local, and non-profit entities to provide housing and services to families and individuals facing homelessness, with the vast majority of funding directed to renewing permanent housing, rental assistance, and supportive service projects that have been shown to work. Congress designed the program to preserve stability so providers can reliably serve people whose lives depend on it.

But over the past two months, Defendants have thrown the CoC Program into chaos. In November, months after the statutory deadline passed, HUD rescinded the CoC Notice of Funding Opportunity for Fiscal Year 2025 that had been issued the prior year (the "FY 2024-2025 NOFO"). In a new NOFO for FY 2025 (the "November NOFO"), HUD adopted policies that threaten to cancel thousands of existing projects, require funding recipients to fundamentally reshape their programs on an impossible timeline, and essentially guarantee that tens of thousands of formerly homeless individuals and families will be evicted back into homelessness. Then, in a bid to avoid an injunction from this Court, HUD withdrew that November NOFO on the eve of a hearing. Eleven days later—just before midnight on December 19, and mere hours after this Court enjoined HUD's rescission of the FY 2024-2025 NOFO and the unlawful policies of the November NOFO—HUD published yet another NOFO that contained largely the same unlawful conditions that the Court had enjoined just that day (the "December NOFO").

1

Defendants' haphazard approach to this life-saving program has stoked chaos at every turn. Enough is enough. This Court should end the chaos by vacating HUD's rescission of the FY 2024-2025 NOFO, enjoining HUD from implementing the unlawful conditions that have permeated their two 2025-issued NOFOs, and ensuring that the CoC program is operated as Congress directed.

By now, Defendants' many legal failures are familiar to the Court. Defendants rescinded the FY 2024-2025 NOFO long after their statutory deadline to do so and failed to explain why. Defendants adopted an arbitrary and unexplained thirty percent funding cap on permanent housing, which renders nearly sixty percent of CoC projects set to expire in 2026 ineligible for funding, in derogation of Congress' explicit direction to prioritize permanent housing. This cap alone jeopardizes stable, long-term housing options for tens of thousands of our most vulnerable residents. HUD has paired this cap with a new policy in which Tier 1 funding—essentially guaranteed funding for renewals—is slashed from ninety percent of available funding to thirty percent, meaning projects that would otherwise be renewed will now be canceled and formerly homeless individuals and families left without housing. This, too, violates statutory requirements to renew funding for existing projects.

Defendants have also adopted a spate of new funding conditions and scoring criteria (some of which they now claim are moot) that push applicants to require program participants to engage in services in exchange for housing, that deny funding to any organization that fails to toe the Administration's line on so-called "gender ideology," and that punish applicants who are in a locality whose approach to homelessness differs from this Administration's. These changes to longstanding HUD policy were all adopted without the notice-and-comment procedure required by the APA. And none of them were authorized by Congress. Indeed, each of these conditions is

2

**Suppl. App. 717**

contrary to either the CoC's authorizing statute, HUD's regulations, or both. And as the administrative record in this matter reveals, each of these conditions is arbitrary and capricious because Defendants have failed to explain or justify their complete reversal of longstanding policies, have failed to consider the factors Congress directed them to, have failed to consider the reliance interests of CoC and applicants who have built their programs in reliance on HUD's longstanding policies, and have utterly and completely failed to address the undeniable fact that these policies would result in massive numbers of formerly homeless people being evicted back to homelessness.

Each of these policies is unlawful and harmful on its own. Taken together, they fundamentally upend the CoC program, with disastrous results. The Administration is now holding CoC funding hostage, threatening to cut off funds that provide housing for people with disabilities, seniors, families with children, veterans, LGBTQ+ people, survivors of domestic violence and sexual assault, and others facing homelessness, all to coerce states, local governments, and non-profits to adopt the Administration's preferred policies, in contravention of Congressional intent. Plaintiff States—as well as other states, localities, and non-profits—rely on CoC funding to house their residents. They have built programs over years based on HUD's longstanding, but now abandoned, guidance. These programs are now facing unprecedented upheaval, as providers are forced with the impossible choice of radically reshaping fundamental aspects of their programs on an impossible timeline or foregoing critical funding. All while facing a very real risk of interruption or loss of federal funding, with potentially catastrophic results for the States, service providers, and vulnerable residents. To avoid this irreparable harm caused by Defendants' unlawful actions, the Plaintiff States request that this Court grant summary judgment to Plaintiffs, vacate the rescission of the FY 2024-2025 NOFO and the unlawful conditions, and enjoin Defendants from

3

**Suppl. App. 718**

implementing either. Pursuant to Local Rule Cv 7, Plaintiffs respectfully request oral argument with thirty minutes provided for each side.

## II.   BACKGROUND

**A.   Congress Created the Continuum of Care Program to Address the Unprecedented Crisis of Homelessness by Funding Housing Solutions**

Congress passed the McKinney-Vento Homeless Assistance Act to address the "immediate and unprecedented crisis" of homelessness. 42 U.S.C. § 11301(a)(1). Through the Act, Congress aimed "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b)(3). The purpose of the CoC program is "to promote community-wide commitment to the goal of ending homelessness"; "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[]"; "to promote access to, and effective utilization of, mainstream programs" for individuals and families experiencing homelessness"; and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

The CoC program "provide[s] funding for efforts by nonprofit providers, states, Indian Tribes or tribally designated housing entities . . . and local governments to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness."[1] To this end, Congress has directed that CoC funding "shall be used to carry out projects that serve homeless individuals or families[,]" including permanent housing, permanent supportive housing

---

[1] U.S. Department of Housing and Urban Development, *Continuum of Care Program*, https://www.hud.gov/hud-partners/community-coc (last visited Nov. 25, 2025).

**Suppl. App. 719**

for individuals with disabilities (including mental health and substance use issues), rapid rehousing, supportive services, the Homeless Management Information System, and homelessness prevention. *See* 42 U.S.C. § 11383; 24 C.F.R. § 578.37.

HUD issues grants to local coalitions—known as "Continuums of Care"—pursuant to a NOFO. Each Continuum represents a "geographic area," for example, a county or multi-county region within a state. 24 C.F.R § 578.3. CoC funding is distributed among geographic areas via a hybrid of a formula and competitive process. By statute, the selection criteria for awards "shall . . . include the need within the geographic area for homeless services, determined . . . by a formula, which shall be developed by the Secretary[.]" 42 U.S.C. § 11386a(b). This formula, called the Preliminary Pro Rata Need, allocates certain percentages to each geographic area, based primarily on the Community Development Block Grant formula, with adjustments made to ensure, as far as possible, that all CoC projects eligible for renewal can be renewed. 24 C.F.R. § 578.17. "HUD *will* apply th[is] formula . . . to the amount of funds being made available under the NOF[O]." 24 C.F.R. § 578.17(a)(2) (emphasis added). The formula thus acts as a minimum allocation for each Continuum.

The statute additionally directs HUD to renew existing projects. It provides that "[t]he sums made available" under the CoC program "shall be available for the renewal of contracts . . . at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations[.]" 42 U.S.C. § 11386c(b). The HUD "Secretary shall determine whether to renew a contract for . . . a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary." *Id.* By prioritizing renewals of existing projects,

**Suppl. App. 720**

Congress wrote the statute to ensure that programs can continue to provide stable housing to formerly homeless individuals, and that tens of thousands of formerly chronically homeless individuals and families are not evicted back to homelessness.

On top of this formula funding and funding earmarked for renewals, CoC funding is competitive in two respects. First, HUD awards grants competitively to applicants within a Continuum. That is, when a Continuum applies to the NOFO, it will rank projects within its geographic area, and HUD will select projects for awards within each Continuum's application up to at least the formula amount. ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 12-17. Second, HUD awards "bonuses [and] other incentives to geographic areas for using funding . . . for activities that have been proven to be effective at reducing homelessness . . . or achieving homeless prevention and independent living goals . . . set forth in" the CoC statutes. 42 U.S.C. §11386b(d)(1).

The McKinney-Vento Act includes lengthy "Required Criteria" for assessing grant applications, such as "the previous performance of the recipient regarding homelessness" with respect to the length of time individuals remain homeless and related factors, whether the recipient will incorporate "comprehensive strategies for reducing homelessness" such as permanent supportive housing, and many other specific factors. 42 U.S.C. § 11386a. Similarly, the Act already specifies what information HUD should require project sponsors to certify in order to receive CoC funding. *Id.* § 11386(b)(4). For example, project sponsors must certify their compliance with certain confidentiality and privacy terms and that children in family programs are enrolled in school and connected to certain services. *Id*. Notably absent from these requirements are any of the funding conditions at issue in this litigation.

Funding for CoC grants comes from congressional discretionary appropriations. The McKinney Vento Act requires that HUD issue a notification of funding availability for CoC grants

**Suppl. App. 721**

"for a fiscal year not later than 3 months after" Congress has enacted its yearly appropriations act. 42 U.S.C. § 11382(b). On March 15, 2025, the President signed H.R. 1968 authorizing the Full-Year Continuing Appropriations and Extensions Act, 2025 (Pub. L. No. 119-4, 139 Stat. 9 (2025)) which makes approximately the same amount of CoC Program funding available for FY 2025 as the Consolidated Appropriations Act, 2024 (Pub. L. No. 118-42, 138 Stat. 9 (2024)). Accordingly, the deadline for HUD to issue a NOFO for FY 2025 was June 15, 2025.

**B.      Through the CoC Program, HUD Has Consistently Promoted Permanent Housing as Part of a Housing First Approach to Reducing Homelessness**

For at least two decades, HUD has implemented the CoC Program to further its stated policy of "implement[ing] a Housing First approach to reducing homelessness, and driv[ing] equitable community development." ECF No. 12-1 (Hughes Decl.), Ex. 1 (HUD FY 2022–2026 Strategic Plan) at 19; *see also* Alap Davé, *How one state almost solved America's homelessness problem*, Catalyst (2023), https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-problem (George W. Bush Administration adopted Housing First program in 2004 as part of its goal to end homelessness); Josh Leopold & Mary K. Cunningham, *To end homelessness, Carson should continue Housing First approach*, Urban Institute (Jan. 19, 2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

In its FY 2024–2025 CoC NOFO, HUD described Housing First as "[a] model of housing assistance that prioritizes rapid placement and stability in permanent housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services." ECF No. 12-2 (Hughes

7

**Suppl. App. 722**

Decl.), Ex. 2 (FY 2024–2025 NOFO) at 19. HUD adopted its Housing First approach in recognition of the fact that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 27. As detailed in HUD's most recent strategic plan, a "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." *Id.* at 27.

Similarly, the United States Interagency Council on Homelessness has highlighted the "overwhelming evidence" in support of Housing First policy because "people experiencing homelessness can achieve stability in permanent housing if provided with the appropriate level of services." United States Interagency Council on Homelessness, *Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation*, 3 n.1 (Sept. 2016), https://www.usich.gov/sites/default/files/document/Housing_First_Checklist_FINAL.pdf.

The core Housing First intervention is "permanent housing"—including "permanent supportive housing" and "rapid rehousing"—in which individuals are provided stable housing "without a designated length of stay." 24 C.F.R § 578.37(a)(1). The McKinney-Vento Act supports permanent housing by providing that CoC funds may be used for, among other things, new construction, acquisition or rehabilitation of existing structures, leasing, rental assistance, operating costs, and supportive services, including for individuals or families in permanent supportive housing. 42 U.S.C. § 11383(a). Both the statute and HUD's regulations identify various options for permanent housing. For example, permanent supportive housing pairs housing with "[s]upportive services designed to meet the needs of the program participants" and is available for "individuals with disabilities and families in which one adult or child has a disability[.]"

8

**Suppl. App. 723**

24 C.F.R § 578.37(a)(1)(i). For rapid rehousing, CoC "funds may provide supportive services . . . and/or . . . tenant-based rental assistance . . . as necessary to help a homeless individual or family, with or without disabilities, move as quickly as possible into permanent housing and achieve stability in that housing." 24 C.F.R § 578.37(a)(1)(ii).

The McKinney-Vento Act specifically incorporates a Housing First approach. For example, as noted above, the law specifically directs HUD to fund "activities that have been proven to be effective at reducing homelessness," which the statute itself defines to include "permanent supportive housing for chronically homeless individuals and families" and "rapid rehousing services[.]" 42 U.S.C. § 11386b(d). The Act also makes clear in various provisions that sobriety, mental health treatment, employment, and the like are not to be treated as preconditions to permanent housing, but rather as issues to be addressed once individuals and families are stably housed. *See* 42 U.S.C. § 11385(a) ("To the extent practicable, each project shall provide supportive services for residents of the project and homeless persons using the project[.]"); 42 U.S.C. § 11386a(b)(1)(F) (noting that "independent living in permanent housing" can "includ[e] assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment[.]"). Taken together, these provisions "entrench federal support for Housing First" by "expand[ing] the availability of permanent housing" and "authoriz[ing] funds for rapid re-housing assistance to help people move into permanent housing."[2]

Consistent with these provisions of the McKinney-Vento Act, HUD has employed a Housing First and permanent supportive housing approach for over two decades.[3] As one recent

---

[2] Josh Leopold, *Five Ways HEARTH Act Changed Homelessness*, Urban Institute (2019), https://www.urban.org/urban-wire/five-ways-hearth-act-changed-homelessness-assistance.

[3] Davé, *supra*, at 7; Leopold & Cunningham, *supra*, at 7 (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

9

**Suppl. App. 724**

HUD document explained: "For 20 years, HUD has prioritized permanent supportive housing, which serves people with the highest levels of housing and service needs, especially people experiencing chronic homelessness."[4] Prior NOFOs and Funding Opportunity Descriptions from 2004 to the present reflect HUD's longstanding commitment to "permanent supportive housing" to "meet the long-term needs of homeless individuals and families" and "Housing First" as one of HUD's "Policy Priorities."[5] And HUD's current strategic plan, covering Fiscal Years 2022–2026, explicitly provides that HUD will "implement a Housing First approach to reducing homelessness." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 19.

Consistent with their FY 2022-2026 strategic plan and those congressionally-mandated priorities, HUD's CoC NOFO for FY 2024–2025 encourages applicants to "[u]se a Housing First Approach," explaining:

> Housing First prioritizes rapid placement and stabilization in permanent housing and utilizes housing as a platform for providing supportive services that improve a person's health and well-being. CoC Program funded projects should help individuals and families move quickly into permanent housing without preconditions and ensure that participants can choose the services they need to improve their health and well-being and remain in their housing. Additionally, CoCs should engage landlords and property owners to identify housing units available for rapid rehousing and permanent supportive housing participants, remove barriers to entry, and adopt client-centered service practices. HUD encourages CoCs to assess how well Housing First approaches are being implemented in their communities.

---

[4] HUD, *Office of Community Planning and Development Homeless Assistance Grants*, https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf (last visited Nov. 25, 2025).

[5] *See, e.g.*, *Continuum of Care Homelessness Assistance Programs*, 69 Fed. Reg. 27495, 27498 (May 14, 2004), https://archives.hud.gov/funding/2004/cocpsec.pdf (Fiscal Year 2004 Continuum of Care Homeless Assistance Programs Funding Opportunity Description states that one of the "basic components" of the "CoC system" is "Permanent housing, or permanent supportive housing, to help meet the long-term needs of homeless individuals and families"); *see also, e.g.*, Grants.gov, Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*, https://grants.gov/search-results-detail/265408 (last visited Nov. 25, 2025) (Fiscal Year 2014 Notice of Funding Availability for Continuum of Care Program awards applications "up to 10 points" for following a "Housing First" model and defines "Housing First" as one of HUD's "Policy Priorities"); *see also, e.g.*, HUD, *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (Fiscal Year 2018 NOFO includes the same provisions); *see also, e.g.*, Grants.gov, Related Documents, *2021 Continuum of Care* (2021), https://grants.gov/search-results-detail/335322 (last visited Nov. 25, 2025) (Fiscal Year 2021 NOFO includes the same provisions).

**Suppl. App. 725**

ECF No. 12-2 (Hughes Decl.), Ex. 2 at 10. The FY 2024–2025 NOFO also states that HUD would award "bonus projects" in part based on an applicant's "[c]ommitment to Housing First," providing "[u]p to 10 points based on the project application's commitment to follow a Housing First approach[.]" *Id.* at 31-32.

**C.    Through the CoC Program, HUD Has Sought to Address the Needs of the Diverse Population it Serves**

In addition to Housing First, HUD has also prioritized funding to address specific populations disproportionately impacted by homelessness, including LGBTQ+ people. As HUD and many others have recognized, "LGBTQ+ people experience homelessness at rates significantly higher than their representation in the general population." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 19.[6]

To that end, HUD's "Equal Access" regulation, which applies to the "Continuum of Care program," requires that funding recipients ensure that "[e]qual access to [Community Planning and Development] programs, shelters . . . services, and accommodations is provided to an individual in accordance with the individual's gender identity," that "[a]n individual is placed, served, and accommodated in accordance with the gender identity of the individual," that "[a]n individual is not subjected to intrusive questioning or asked to provide . . . evidence of the individual's gender identity[,]" and that "[p]lacement and accommodation of an individual in temporary, emergency shelters and other buildings . . . shall be made in accordance with the individual's gender identity." 24 C.F.R. § 5.106.

---

[6] *See also S. Hum. Servs. Comm. Pub. Hr'g on ESSB 5599* at 1:19:15–1:19:40 (TVW, Feb. 6, 2023), https://tvw.org/video/senate-human-services-2023021142/?eventID=2023021142 (testimony noting LGBTQ+ youth account for at least forty percent of youth experiencing homelessness in King County, Washington); *see also* The Trevor Project, *Homelessness and Housing Instability Among LGBTQ Youth*, https://www.thetrevorproject.org/wp-content/uploads/2022/02/Trevor-Project-Homelessness-Report.pdf (last visited Nov. 25, 2025) (thirty-five percent to thirty-nine percent of transgender or nonbinary youth have experienced housing instability).

**Suppl. App. 726**

And for over a decade, HUD's NOFOs for the Continuum of Care have consistently required that CoC funding recipients provide "Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity."[7] Prior NOFOs have also regularly awarded points to CoC applicants for "Addressing the Needs of LGBT Individuals."[8] Most recently, the FY 2024–2025 CoC NOFO emphasized the need to address the specific challenges of transgender and gender-diverse people. For example, its scoring system encouraged CoCs to "address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes," "ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation," and "partner with organizations with expertise in serving LGBTQ+ populations." ECF No. 12-2 (Hughes Decl.), Ex. 2 at 11. The FY 2024-2025 NOFO further required that "[a]pplicants must identify the steps they will take to ensure that traditionally underserved populations," including "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons . . . will be able to meaningfully participate in the planning process" for projects. *Id.* at 66. Likewise, HUD's most recent strategic plan, which includes the current fiscal year (FY 2026), specifically "focused on underserved populations to ensure equitable and fair access to housing and to Federal programs" and defined underserved populations to include, for example, "members of the lesbian, gay bisexual, transgender, and queer (LGBTQ+) community." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 21.

---

[7] *See, e.g.*, Grants.gov, Related Documents, *FY 2012 Notice of Funding Availability for Continuum of Care* 22, https://grants.gov/search-results-detail/206173; *see also, e.g.*, Grants.gov, Related Documents, *FY 2019 Notice of Funding Opportunity for Continuum of Care*, https://grants.gov/search-results-detail/318022 (last visited Nov. 25, 2025).

[8] *E.g.*, HUD, *Community Planning and Development Notice of Funding Availability (NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (FY 2018 Notice of Funding Availability for Continuum of Care).

12

Suppl. App. 727

**D.       The Trump Administration Reverses HUD's Decades-Long Policy of Housing First**

Since the 2025 presidential inauguration, the Administration has worked to reverse HUD's longstanding commitments to Housing First and equal access.

On July 24, 2025, the President signed an Executive Order addressing homelessness. The Order is called "Ending Crime and Disorder on America's Streets" (hereafter, the "Anti-Homeless Order"). Exec. Ord. No. 14321, 90 Fed. Reg. 35817 (Jul. 24,2025). The primary thrust of the Anti-Homeless Order is an effort to expand civil commitment of those experiencing homelessness—to incentivize states and local governments to adopt a "maximally flexible" approach to locking up people who lack a safe or reliable place to sleep. *See* Anti-Homeless Order §§ 1-2.

In addition, the Anti-Homeless Order directs HUD to "end[] support for 'housing first' policies that deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency[.]" Anti-Homeless Order § 5(a). The Order further directs HUD to "take steps to require recipients of Federal housing and homelessness assistance to increase requirements that persons participating in the recipients' programs who suffer from substance use disorder or serious mental illness use substance abuse treatment or mental health services as a condition of participation." *Id.* § 5(b). This is directly contrary to HUD's conclusion—in its still-operative strategic plan—that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 26.

The Anti-Homeless Order additionally directs the Attorney General, HUD, the Department of Health and Human Services, and the Department of Transportation to "[f]ight[] [v]agrancy" by "tak[ing] immediate steps" to prioritize grants for "States and municipalities that actively . . .

enforce prohibitions on open illicit drug use; . . . enforce prohibitions on urban camping and loitering; [and] enforce prohibitions on urban squatting." Anti-Homeless Order § 3.

As detailed below, HUD has now taken steps to implement the Anti-Homeless Order through the issuance of new NOFOs for the CoC program.

**E.    The Administration Takes Actions to Target So-Called "Gender Ideology"**

In addition to deprioritizing HUD's decades-long promotion of a Housing First policy, the Administration has likewise sought to reverse HUD's longstanding commitment to serving all people.

On January 20, 2025, the President's first day in office, he issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender Ideology Order). The purpose and effect of the Gender Ideology Order is to deny the existence of transgender and gender-diverse individuals. The Gender Ideology Order declares "[i]t is the policy of the United States to recognize two sexes, male and female." EO 14168 § 2. The Order purports to set definitions to govern all administration policy. *Id.* Section 2(a) defines "sex" to mean "an individual's immutable biological classification as either male or female[,]" which is "not a synonym for and does not include the concept of 'gender identity.'" Section 2(d) defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and Section 2(e) defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell." To effectuate the Gender Ideology Order, Section 3(e) directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Section 3(g) likewise commands that "[f]ederal funds shall not be used to promote gender ideology." Under the Order, "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.*

14

To implement the Gender Ideology Order, on February 7, 2025, HUD Secretary Scott Turner announced that HUD will stop enforcing this "Equal Access" rule.[9] But the regulation remains in effect. Later, on March 13, 2025, Secretary Turner announced in a post on X that CoC funds "will not promote DEI, enforce 'gender ideology,' [or] support abortion." Scott Turner (@SecretaryTurner), X (Mar. 13, 2025, 11:47AM), https://x.com/SecretaryTurner/status/190025 7331184570703. In response, HUD began presenting CoC grantees with grant agreements requiring grantees to certify that they would not use grant funds to promote "'gender ideology,' as defined in" the Gender Ideology Order. ECF No. 1 (Complaint) at 20-21, *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814-BJR (W.D. Wash. May 2, 2025).

The Gender Ideology Order is rooted in anti-transgender animus and lacks any scientific basis. Nonetheless, as detailed below, HUD has now taken steps to implement the Gender Ideology Order through its recent NOFOs.

**F.     HUD Upends the CoC Program by Issuing a New Fiscal Year 2025 NOFO**

The Administration has now brought its anti-homeless and anti-transgender agendas together in an effort to fundamentally alter the CoC program.

On November 13, 2025—nearly eight months after Congress appropriated FY 2025 funding for the CoC Program—HUD issued the November NOFO with an application due date of January 14, 2026 (the "November NOFO"). ECF No. 12-3 (Hughes Decl.), Ex. 3.

The November NOFO states that "FY 2025 CoC awards will be made through this NOFO." *Id.* at 16. But HUD already issued the FY 2025 NOFO on July 31, 2024, as part of a combined FY 2024–2025 NOFO. ECF No. 12-2 (Hughes Decl.), Ex. 2. As the FY 2024–2025 NOFO explained, "HUD's authority to issue a 2-year NOFO [is] authorized by the Consolidated Appropriations Act,

---

[9] HUD, *Secretary Scott Turner Halts Enforcement Actions of HUD's Gender Identity Rule*, https://www.hud.gov/news/hud-no-25-026#close (last visited Nov. 5, 2025).

**Suppl. App. 730**

2024 and any FY 2025 funding will be authorized by a FY 2025 Congressional Appropriation." *Id.* at 5-6. To streamline matters, the FY 2024–2025 NOFO told applicants that "[p]rojects that are awarded FY 2024 funds may be eligible for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds." *Id.* at 6. As described above, the FY 2024–2025 NOFO required and endorsed a Housing First approach and encouraged CoCs to address the specific needs of transgender, gender non-conforming, and non-binary individuals and families, among other requirements.

Despite CoCs undergoing a two-year planning process pursuant to the FY 2024–2025 NOFO and the CoC program requirements, the November NOFO purported to "rescind[] and supersede[]" the prior NOFO with respect to FY 2025. ECF No. 12-3 (Hughes Decl.), Ex. 3 at 16. This purported rescission came more than three months after Congress' March 15, 2025, continuing resolution appropriating $3.544 billion for the Continuum of Care program and related programs. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12), 139 Stat. 9, 12 (2025). In making this announcement, HUD failed to provide any explanation as to why it was issuing a new FY 2025 NOFO when a NOFO for FY 2024–2025 had already been issued. Due to this announcement by HUD on July 3, 2025, no FY 2025 funds were awarded under the FY 2024–2025 NOFO before it was replaced by the November NOFO.

The November NOFO was untimely and added a passel of unlawful conditions pursuant to the Anti-Homeless and Gender Ideology EOs. ECF No. 12-3 (Hughes Decl.), Ex. 3 at 13 (noting that NOFO implements Anti-Homeless EO); 109 (noting that NOFO implements Gender Ideology EO); ECF No. 1 at ¶¶ 113-134 (detailing the Challenged Conditions). These new conditions were not authorized by Congress, are neither reasonable nor reasonably explained, and flout the significant reliance interests of CoC applicants.

16

**Suppl. App. 731**

As a result, Plaintiff States filed suit and moved for a preliminary injunction challenging the November NOFO, which the Court converted to a motion for temporary restraining order. ECF Nos. 1, 11. On December 8, less than an hour before a hearing on Plaintiffs' motion for a temporary restraining order, Defendants filed a Notice claiming that "HUD has withdrawn the 2025 NOFO in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." ECF No. 41. Not only did Defendants contend that this Notice "moot[ed]" Plaintiffs' then-pending request for preliminary injunctive relief, *id.*, they simultaneously stated that "The Department still intends to exercise [its] discretion and make changes to the previously issued CoC NOFO to account for new priorities." ECF No. 41-2; *see also* Dec. 19, 2025 Hr'g Tr. 56:22-57:18 (the Court stated that "I think that [Defendants] saying, well, we didn't waive anything and we might issue the exact same NOFO again, it is evading the Court's jurisdiction . . . or is an attempt to evade it").

**G.      Defendants Issue Yet Another New NOFO that Includes Unlawful Conditions and Policies Concerning Permanent Supportive Housing, Gender Identity, Public Safety, and Funding Amounts**

Just before midnight on December 19—after this Court orally entered a preliminary injunction enjoining Defendants' rescission of the FY 2024–2025 NOFO and the Challenged Conditions of the November NOFO—Defendants issued a new NOFO (the "December NOFO"). ECF No. 66. The December NOFO was, of course, promulgated long after the statutory three-month NOFO deadline had passed. Moreover, the December NOFO continues nearly all of the unlawful conditions from the November NOFO.

**1.      Ending Housing First**

First, the December NOFO reverses HUD's decades-long Housing First policy by placing an unauthorized and arbitrary cap on the funding of permanent housing projects. Using nearly the same language as the unlawful November NOFO, the December NOFO provides that "no more

17

**Suppl. App. 732**

than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund the renewal of Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects" (the "Permanent Housing Cap"). ECF No. 66-1 at 24; *compare* ECF 12-3 (Hughes Decl.), Ex. 3 at 16 (November NOFO with nearly identical language).

The "Annual Renewal Demand" is defined in the NOFO as "[t]he total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items . . . based on [fair market rent] changes." ECF No. 66-1 at 135. In other words, ARD is "the total amount of funds requested by eligible renewal projects in each FY funding opportunity." *Id.* at 135. "PH" here refers to Permanent Housing, "PSH" to Permanent Supportive Housing, and "RRH" to Rapid Rehousing. Thus, the Permanent Housing Cap mandates that only thirty percent of funding for project renewals may go to permanent housing.

If allowed to go into effect, the Permanent Housing Cap, will drastically cut funding for existing permanent housing projects. "Currently, 87 percent of all CoC program funds ending in 2026 are slated to support permanent housing in some capacity. Under the policy change, only 30 percent of the funds will be allowed to be used for that purpose." Katherine Hapgood, *Trump admin looks at deep cuts to homeless housing program*, Politico (Sept. 29, 2025), https://www.politico.com/news/2025/09/29/trump-admin-looks-at-deep-cuts-to-homeless-housing-program-00585770?nid=0000014f-1646-d88f-a1cf-5f46b7bd0000&nname=playbook&nrid=0000015d-4ff3-d6d3-a75d-4ff30bd80000.

This "shift" is the "most consequential in a generation." Jason Deparle, *Trump Administration Proposes a Drastic Cut in Housing Grants* (Nov. 12, 2025), https://www.nytimes.com/2025/11/12/us/politics/trump-homeless-funding.html. "In limiting

18

spending on long-term housing to just 30 percent of the $3.9 billion in aid—from about 90 percent this year—the [Permanent Housing Cap] could deal a crippling blow to" HUD's longstanding policy of "Housing First[.]" *Id.* According to the New York Times, the Permanent Housing Cap could "quickly place as many as 170,000 formerly homeless people at risk of returning to the streets." *Id.*

In addition to imposing the Cap, the December NOFO (like the November NOFO) reverses HUD's longstanding Housing First policy via new scoring criteria aimed at forcing applicants to require participants to enroll in services to receive housing (the "Service Requirement Conditions"). For example, the Challenged NOFOs award up to sixteen points (out of a maximum of 130) for "Availability of Treatment and Recovery Services" which includes substance abuse treatment services in which "program participants are *required* to take part in such services as a condition of continued participation in the program" and the demonstration of "the *requirement* for participation in substance abuse treatment." ECF No. 66-1 at 87(emphasis added); *compare* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 78-79) (same language).

Likewise, the December NOFO (like the November NOFO) awards up to ten points if a CoC can "demonstrate that projects *require* program participants to take part in supportive services . . . in line with 24 C.F.R. 578.75(h)." ECF No. 66-1 at 88-89 (emphasis added); *compare* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 79 (same language). Yet, 24 C.F.R § 578.75(h) only says that programs "may" require program participants to participate in services, not that they are required or incentivized to do so. Instead, the statute requires incentives for permanent supportive housing, as described above. And as recently as last year, HUD explicitly encouraged applicants *not* to require services as a condition for stable housing. *See* ECF No. 12-2 (Hughes Decl.), Ex. 2 at 89 (to receive full points, applicants "must [d]emonstrate at least 75 percent of all project

**Suppl. App. 734**

applications that include housing . . . are using the Housing First approach by providing low barrier projects that do not require preconditions to accessing housing nor participation in supportive services . . . and prioritize rapid placement and stabilization in permanent housing.").

The new scoring system effectively eliminates funding for rapid rehousing without supportive services. The scoring system establishes a "project quality threshold" such that "Permanent Housing projects must receive at least 6 out of the 8 points available" to be considered for funding. ECF No. 66-1 at 63-71.[10] Three of the available eight points are for "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)" and "[d]emonstrat[ing] that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment)[.]" *Id.* at 71-72; *see also id.* at 74 (providing that these thresholds apply to renewals as well as new projects). An applicant that does not earn the three points for providing supportive services cannot meet the six-point minimum threshold and cannot qualify for funding.

These changes particularly threaten providers serving survivors of domestic violence that also receive funding under Violence Against Women Act (VAWA) or the Family Violence Prevention Service Act (FVPSA), which prohibit grant recipients from imposing service participation requirements. *See* 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). These Conditions would place VAWA and FVPSA grantees who also rely on CoC funds at a severe disadvantage against other projects, as they would automatically surrender twenty-nine out of a possible 130 points against competing projects that impose service requirements.

---

[10] Confusingly, the NOFO says both that "projects must receive at least 6 out of the 8 points available for this project type" and that "projects that do not receive at least 4 points will be rejected." ECF No. 66-1 at 70.

**Suppl. App. 735**

## 2.    Tier 1 Cap

Second, HUD has further undermined the statutory and regulatory requirements prioritizing renewals by slashing the number of projects CoCs may designate as "Tier 1" projects. Historically, HUD has permitted CoCs to designate certain projects as Tier 1, meaning they were essentially guaranteed funding so long as they met threshold criteria. *See* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 92 ("HUD will . . . select all projects in Tier 1 that pass project quality and project eligibility thresholds[.]"). This ensured CoCs could budget around a steady stream of funding and ensured stability for individuals and families living in CoC-funded housing or receiving CoC-funded services. Tier 1 is set as a percentage of Annual Renewal Demand. And consistent with statutory and regulatory mandates for renewals, Tier 1 is generally set at a percentage commensurate with the amount of projects up for renewal. So, in FY 2024, "Tier 1 [wa]s set at 90 percent of the CoC's Annual Renewal Demand (ARD)." ECF No. 12-2 (Hughes Decl.), Ex. 2 at 6.

The December NOFO drastically slashes that amount. Using, again, the exact same language as the November NOFO, the December NOFO provides that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." ECF No. 66-1 at 23; *compare* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 16 (same language). Although the upshot of this new condition—the "Tier 1 Cap"—is not entirely clear (since HUD's obligation to fund renewals arises independently of the NOFO's tiering system), HUD put this condition under the heading "Increase in Competition[.]" ECF No. 66-1 at 24. It appears, then, that HUD intends to create a new national competition for previously renewed projects. Thus, the Tier 1 Cap is another effort by HUD to steer funding away from renewals, and stability, in violation of congressional directive and its own regulations.

## 3.    Gender Ideology Conditions

Third, as this Court is aware, the November NOFO provided that "[a]wards made under this NOFO [would] not be used to . . . conduct activities that rely on or otherwise use a definition

21

of sex as other than binary in humans." ECF No. 12-3 (Hughes Decl.), Ex. 3 at 109. Moreover, under that NOFO, "HUD reserve[d] the right to reduce or reject a project application" if it concludes there is any "evidence that the project has previously or currently . . . conduct[ed/s] activities that rely on or otherwise use a definition of sex other than as binary in humans," (the "Gender Ideology Conditions"). *Id.* at 66; *see also id.* at 56.

The December NOFO strips out this language. Nonetheless, under "Post-Award Requirements and Conditions," the NOFO provides that CoC funding recipients "must comply with . . . Presidential Executive Actions affecting federal financial assistance programs, as advised by the Department, unless otherwise restricted by law or by a court of competent jurisdiction," including "[EO] 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government)[.]" ECF No. 66-1 at 119. Because the Gender Ideology EO imposes obligations only on the federal government, and not on any funding recipient, it does not appear that this term imposes any obligations on Plaintiffs. Nonetheless, because the Gender Ideology EO directs agencies (including HUD) to "to end the Federal funding of gender ideology," the December NOFO at a minimum suggests that HUD will abide by the terms of the Gender Ideology Order by withholding funding from recipients who abide by HUD's longstanding Equal Access policies by providing services consistent with an individual's gender identity may find themselves ineligible for CoC funding—leaving their clients facing a loss of services or eviction.

### 4.    Geographic Discrimination Conditions

Fourth, the December NOFO carries forward unlawful conditions from the November NOFO under the guise of "public safety." Broadly speaking, these conditions would put a thumb on the scale based on whether the state or local jurisdiction in which an applicant is located is, by

this Administration's standards, sufficiently tough on "vagrancy"—something the applicant has no control over (the "Geographic Discrimination Conditions"). These include the following requirements, for which points are awarded:

    a.     "CoCs must . . . [d]emonstrate . . . that the CoC's entire geographic area . . . [q]uickly clears tents and encampments on public property";

    b.     "CoCs must . . . [d]emonstrate . . . that the CoC's entire geographic area . . . [d]oes not tolerate the public use of illicit drugs";

    c.     CoCs must" demonstrate utilization of standards like "involuntary commitment," which are a matter of state and local law;

    d.     "CoCs must" indicate that the state implements and is compliant with the registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); and

    e.     "CoCs must" assist law enforcement in checking the location of homeless sex offenders, and cooperate with law enforcement in connecting violators of public camping or drug laws with services.

ECF No. 66-1 at 95-97; *compare* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 87-88 (same language).

These conditions discriminate against applicants based on where they are located and, more precisely, based on the policy preferences of local voters. As detailed above, however, in creating the CoC program, Congress committed to funding *every* geographic area in America based on need and nothing else. *See* 42 U.S.C. § 11386a(b). Up until 2025, HUD adopted regulations further implementing this Congressional direction. 24 C.F.R. § 578.17; *see also id.* §§ 578.5, .13. Moreover, these geographically discriminatory conditions are flatly inconsistent with 42 U.S.C. § 12711, which prohibits HUD from "establish[ing] any criteria for allocating or denying funds . . . based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law that is (1) adopted, continued, or discontinued in accordance with

23

the jurisdiction's duly established authority, and (2) not in violation of any Federal law."[11]

\* \* \*

Taken together, the conditions set forth in this section (the "Challenged Conditions") radically reshape the CoC Program. Indeed, each of these changes is bad on its own, and together they appear tailor-made to destroy the CoC Program as it has existed for decades, with devastating consequences for the most vulnerable Americans. And this is all contrary to Congress's intent and HUD's own regulations and without any reasoned explanation, let alone an explanation sufficient to explain HUD's profound change in position on an untenable and chaotic timeline. These Challenged Conditions are currently enjoined by this Court. ECF No. 68. If allowed to go into effect, however, these Conditions will choke off services, leaving tens of thousands of Americans soon facing imminent risk of eviction back to homelessness.

## H.     Plaintiff States Rely on Federal CoC Funding to Address Homelessness

The Plaintiff States rely on the CoC Program as a principal source of federal funding and coordination for assistance with addressing homelessness. ECF No. 13-15 (ME-Squirrell Decl.) ¶¶ 10, 12, 15; ECF No. 13-25 (PA-Vilello Decl.) ¶¶ 4-6; *see also* ECF No. 13-29 (CA-CICH Marshall Decl.) ¶¶ 13-16; ECF No. 13-3 (NY-DSS Johns Decl.) ¶¶ 2, 49. Within each State, CoC regions are locally defined geographies created by community stakeholders and recognized by HUD, reflecting historical collaboration patterns. ECF No. 13-8 (CT-Navarretta Decl.) ¶¶ 4-7; ECF No. (MA-Byron Decl.) ¶¶ 3-5. Each CoC is organized around the specific housing and service needs of the population it serves, structuring its governance, priorities, and project portfolio in

---

[11] The November NOFO a new scoring system for transitional housing and permanent supportive housing that would have disadvantaged programs that provide supportive services for mental and substance-abuse-derived disabilities, as opposed to only physical disabilities by making one out of an available six points each for TH and PH-PSH projects is awarded to projects that "serve . . . individuals with a physical disability/impairment or a developmental disability . . . not including substance abuse disorder" (the "Disability Condition"). ECF No. 12-3 (Hughes Decl.), Ex. 3 at 62. The Disability Condition was not included in the December NOFO.

24

response to local factors such as homelessness patterns, provider capacity, geography, and demographic characteristics. ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶¶ 8-9, 11; ECF No. 13-3 (KY-Kaye Smith Decl.) ¶¶ 8-10; ECF No. 13-2 (NY-Umholtz Decl.) ¶¶ 6-7; ECF No. 13-26 (VT-Sojourner Decl.) ¶¶ 5-6. Washington, for example, is organized into several HUD-designated CoCs, some of which cover particular counties, and a Balance of State CoC that covers the thirty-four smaller counties in Washington. ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 5-6. Rhode Island is coterminous with the Rhode Island Statewide Continuum of Care Program (RI-500), which serves homeless individuals across the State. ECF No. 13-6 (RI Ventura Decl.) ¶¶ 4-6. Each CoC has a designated Collaborative Applicant under 24 C.F.R. Part 578, responsible for communitywide planning, project ranking, and application for competitive HUD funding. ECF No. 13-13 (KY-Kaye Smith Decl.) ¶¶ 13-15, 18-23; ECF No. 13-25 (PA-Vilello Decl.) ¶¶ 6-8; ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 5-8, 16-17. Through their respective CoCs, service organizations, agencies and local governments in the Plaintiff States receive funding to support permanent supportive housing, rapid rehousing, transitional housing, and coordinated entry systems across the state. ECF No. 13-11 (DC-Miné Decl.) ¶¶ 10-14; ECF No. 13-4 (NY-HPD Warren Decl.) ¶¶ 3-8; ECF No. 13-15 (ME-Squirrell Decl.) ¶ 4; ECF No. 13-18 (MI-Van Dam Decl.) ¶¶ 3-8; ECF No. 13-21 (NJ Winter Decl.) ¶¶ 4-12; ECF No. 13-26 (VT-Sojourner Decl.) ¶¶ 8-9.

CoC funds not only supply direct federal aid but also leverage hundreds of millions in additional public and philanthropic funds essential for operations at publicly funded housing sites. ECF No. 13-12 (IL-Haley Decl.) ¶ 6 ("Illinois increased funding . . . by 154% to support the work of Home Illinois."); ECF No. 13-20 (MN-Leimaile Ho Decl.) ¶¶ 8-10; ECF No. 13-4 (NY-HPD Warren Decl.) ¶ 22; *see, e.g.*, ECF No. 13-13 (KY-Kaye Smith Decl.) ¶¶ 11-12 (detailing CoC funded projects). 24 C.F.R. § 578.73 requires that every CoC-funded project must provide a

**Suppl. App. 740**

twenty-five percent match for all eligible costs other than leasing, and CoC grants provide the backbone of funding that is supplemented by other public and private sources. Projects with guaranteed annual CoC renewals are able to attract other sources of funding, including state Housing Trust Fund dollars, Low-Income Housing Tax Credit (LIHTC) investment, and foundation-backed predevelopment loans. ECF No. 13-12 (IL-Haley Decl.) ¶¶ 8-9; ECF No. 13-23 (OR-Jolin Decl.) ¶¶ 20-23. The broader impact of federal cuts is therefore much greater than the direct funding loss alone.

In several Plaintiff States, state agencies operate as the Collaborative Applicant for the CoC. ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶¶ 4, 12-13; CO-Jaeckel Decl. ¶ 4; PA-Vilello Decl. ¶ 7; WA-Mondau Decl. ¶ 5. Agencies serving as the Collaborative Applicants are responsible for preparing and submitting the consolidated CoC Program application to HUD and ensuring that the application complies with all regulatory requirements under 24 C.F.R. Part 578. ECF No. 13-17 (MA-Byron Decl.) ¶¶ 6-7; ECF No. 13-16 (MD-Meister Decl.) ¶¶ 4-5; ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 5-8. They oversee system governance, establish required policies and procedures, and administer CoC grants on behalf of participating localities and service providers. ECF No. 13-15 (ME-Squirrell Decl.) ¶¶ 10, 12; ECF No. 13-2 (NY-Umholtz Decl.) ¶¶ 9-12. Collaborative applicants receive direct federal funding to administer the program locally. ECF No. 13-17 (MA-Byron Decl.) ¶ 6; ECF No. 13-25 (PA-Vilello Decl.) ¶ 9; ECF No. 13-1 (WA-Mondau Decl.) ¶ 9.

In addition to playing a direct role in CoCs, Plaintiff States organize their own homelessness responses around the CoC program. ECF No. 13-29 (CA-CICH Marshall Decl.) ¶¶ 2, 7; ECF No. 59 (CA-Buchanan Decl.) ¶¶ 5-7; ECF No. 13-12 (IL-Haley Decl.) ¶¶ 6, 14; ECF No. 37 (MA-McGeown Decl. ¶¶ 6-11); ECF No. 13-20 (MN-Leimaile Ho Decl.) ¶¶ 1-3, 7-10. For

26

example, California makes many of its homelessness and housing grants, such as Homekey and Homekey+ grants, Homeless Housing, Assistance and Prevention (HHAP) and Encampment Resolution Funding Program grants, available to CoCs and CoC grantees for the purpose of reducing homelessness and providing the most vulnerable populations in California with permanent supportive housing. ECF No. 13-28 (CA-Olmstead Decl.) ¶¶ 10-14. For instance, collectively, the fourty-four CoCs in California have been awarded a total of $982,849,999 in state HHAP grant funding over five award rounds, including $198,431,534 for permanent supportive housing projects. *Id*. ¶ 11. Additionally, California's Homekey Program has invested $3,555,211,382 to help individuals and families transition from homelessness, emergency shelter and/or transitional housing to permanent supportive housing through CoCs or in partnership with local governments and nonprofit organizations. *Id*. ¶ 12. Some Homekey projects rely on CoC funding for ongoing operational costs. *Id*. ¶ 22.

Many states make substantial investments in homelessness and supportive housing that presuppose the existence of this CoC-funded capacity, using state dollars to supplement rental assistance, expand services, or meet match requirements that pair with federal awards. ECF No. 13-9 (DE-Heckles Decl.) ¶¶ 7-10, 12-13; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 8-10; ECF No. 13-15 (ME-Squirrell Decl.) ¶ 19; ECF No. 60 (NM-Nair Decl.) ¶ 5 ("approximately $27 million in state funds appropriated specifically for homelessness"); ECF No. 13-27 (WI-Staff Decl.) ¶¶ 4-8. As a result, state and local expenditures rely on and are intertwined with the predictable funding, data systems, and structure of the federal CoC framework, and add up to billions of dollars' worth of investments over time based on expectations that the CoCs would continue to operate as Congress prescribed. ECF No. 13-7 (CO-Jaeckel Decl.) ¶¶ 8-9; ECF No. 60 (NM-Nair Decl.) ¶¶ 5,

27

**Suppl. App. 742**

7-8; ECF No. 13-23 (OR-Jolin Decl.) ¶¶ 20-23; ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 9-10; ECF No. 13-27 (WI-Staff Decl.) ¶ 9.

### III.    ARGUMENT

#### A.    Legal Standard

In a case under the Administrative Procedure Act (APA), a motion for summary judgment "is simply a vehicle to tee up a case for judicial review[.]" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). At summary judgment, the Court must "conduct a searching examination to ensure that the agency's decision is" lawful, including that it is "reasonably supported by the administrative record." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023). Defendants' rescission of the FY 2024–2025 NOFO and their implementation of the Challenged Conditions through their various FY 2025 NOFOs are procedurally improper, contrary to law, arbitrary and capricious, and unconstitutional. Accordingly, the Court should grant Plaintiff States' Motion for Summary Judgment.

#### B.    HUD's Rescission of the FY 2024–2025 NOFO and Issuance of the December NOFO Are Final Agency Actions

Defendants' rescission of the FY 2024–2025 NOFO and issuance of the December NOFO with the Challenged Conditions are "final agency action" reviewable under the APA.

For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified).

HUD's rescission of the FY 2024–2025 NOFO is a final agency action that is reviewable. This action marks the consummation of the agency's decisionmaking. Defendants announced and then rescinded the 2024–2025 NOFO to then purportedly replace it with the November 2025

NOFO (which Defendants then abruptly rescinded the morning of the TRO hearing in an improper attempt to moot this litigation). *See* DOJ-HUD-AR00002–00003 (AR). This rescission determines rights or obligations, in that it erased previously established criteria for federal funding, and HUD establish new criteria "instead of processing renewals . . . ." AR 2. As Courts addressing grant conditions cases have consistently found, such conditions (including NOFOs) set the rules of the game, including the lawful scope of activities permitted and may lead to denial of awards, terminations, and other legal consequences. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, C.A. No. 1:25-cv-00342-MRD-PAS, 2025 WL 2988705, at *5 (D.R.I. Oct. 23, 2025); *Hous. Auth. of San Francisco v. Turner*, No. 4:25-cv-08859-JST, 2025 WL 3187761, at *17 (N.D. Cal. Nov. 14, 2025). By rescinding the 2024–2025 NOFO, Defendants not only completely reversed these longstanding rules, but they also ensured that Plaintiffs and other funding recipients would see delays in receipt of critical federal funds. This clearly qualifies as final agency action under "the 'pragmatic' approach [courts] have long taken to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016) (quoting *Abbot Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

The issuance of the December NOFO too is reviewable final agency action because it marks the consummation of Defendants' decisionmaking process and represents a definitive legal position. *See R.I. Coal. Against Domestic Violence*, 2025 WL 2988705, at *5 (challenged grant conditions were final agency action); *Hous. Auth. of the City & Cnty. of San Francisco v. Turner*, No. 25-cv-08859-JST, 2025 WL 3187761, at *16 (N.D. Cal. Nov. 14, 2025) (same). Should the December NOFO be given operative effect, Plaintiff States would effectively be prevented from participating in the application process and from receiving funding Congress has appropriated if Plaintiffs decline to abide by the Challenged Conditions. Moreover, the Challenged Conditions

29

**Suppl. App. 744**

change the lawful scope of activities permitted with the grants and may lead to the termination of awards/legal consequences. *See Illinois v. Fed. Emergency Mgmt. Agency*, No. 1:25-cv-00206-WES-PAS, 2025 WL 2716277, at *8 (D.R.I. Sept. 24, 2025) ("Both [*Bennett*] prongs are met here: the new terms mark the consummation of DHS's rulemaking process and impose legal obligations on states by conditioning FY 2025 funding on immigration enforcement compliance.").

**C.    HUD's Untimely Rescission of the FY 2024–2025 NOFO Was Unlawful**

**1.    HUD's untimely rescission was contrary to statute**

Defendants' purported rescission and replacement of the FY 2024–2025 NOFO is "not in accordance with law" and is "in excess of statutory . . . authority" under the APA. 5 U.S.C. § 706(2)(A), (C). 42 U.S.C. § 11382(b) requires that HUD "shall release" a NOFO for grants for a particular fiscal year "not later than 3 months after the enactment of the act making the relevant appropriation." Congress made its appropriation for FY 2025 on March 15, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12), 139 Stat. 9, 10 (Mar. 15, 2025). At this point the FY 2024–2025 NOFO was already in effect. Therefore, the statutory deadline for issuance of a new NOFO for Fiscal Year 2025 was June 15, 2025. When that date came and went, the 2024–2025 NOFO remained in effect. As of the statutory deadline, HUD was and had been silent about any intention to rescind or replace the NOFO for FY 2025. ECF No. 55 at 18. Defendants therefore lacked the authority to rescind and replace that NOFO in November 2025, five months after the statutory deadline.

In their preliminary injunction opposition, Defendants sought to rely on cases in which courts have excused technical failures to meet procedural deadlines on the theory that "an official's crucial duties are better carried out late than never." *Nielsen v. Preap*, 586 U.S. 392, 411 (2019); *see also Brock v. Pierce County*, 476 U.S. 253, 260 (1986) ("We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent

30

agency action, especially when important public rights are at stake."); *United States v. Montalvo-Murillo*, 495 U.S. 711, 718 (1990) (similar). In other words, these cases all required the Court "to determine which mandatory obligation (the underlying obligation or the deadline) took precedence." *Jewell v. United States*, 749 F.3d 1295, 1299 (10th Cir. 2014).

Here, there is no such choice because HUD *did* issue a NOFO that was in effect within the statutory deadline: the FY 2024–2025 NOFO. Thus, "[t]his case is not like those in which enforcement of a time limit would require a court to fashion a coercive sanction . . . that would completely strip the government of authority 'to get [the]  . . . job done[.]'" *Castañeda v. Souza*, 810 F.3d 15, 40 (1st Cir. 2015) (Barron, J., for an equally divided *en banc* court) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 160 (2003)). To the contrary, the action was already taken. Plaintiff States merely seek to prevent the government from undoing that action and fundamentally changing course, *months* after the deadline has passed, when doing so will lead to chaos and disruptions in critical services. Preventing the government from changing course long after the deadline for doing so has passed is precisely what is needed to get the job done. *See Snegirev v. Asher*, 2:12-cv-01606-MJP, 2013 WL 942607, at *4 (W.D. Wash. Mar. 11, 2013) (distinguishing *Brock* line of cases where relief sought by plaintiff "is not a 'sanction,' because Respondent retains the authority to act"); *see also Brock*, 476 U.S. at 262 n.9 ("We . . . do not[] hold that a statutory deadline for agency action can never bar later action unless that consequence is stated explicitly in the statute.").

Moreover, unlike the cases they previously relied on, Defendants' violation of the statutory deadline is not a mere technicality but has significant effects on the CoC Program itself. For example, in *Brock*, the Supreme Court reversed a lower court holding that an agency's failure to adhere to a 120-day "procedural requirement" for the resolution of a grant audit eliminated the

31

agency's power to recover misused funds "when . . . there are less drastic remedies available for failure to meet a statutory deadline." *Brock*, 476 U.S. at 260; *see* ECF No. 55 at 51-52. But the plaintiff in that suit "conced[ed] that the Secretary did not lose jurisdiction to make a determination after 120 days had passed, [but] argued that it had suffered prejudice because of the lengthy delay[,]" and the reasoned that because the treating the deadline as prohibiting further agency action would "would prejudice the rights of the . . . public" and because "the Secretary's ability to complete [an audit] within 120 days is subject to factors beyond his control[,]" Congress had not intended to "impose a jurisdictional limitation on the Secretary's enforcement powers" if he missed the deadline. *Brock*, 476 U.S. at 261-62

By contrast, the belated rescission at issue here, which was entirely within HUD's control, undermines the public interest at stake: to make renewal funds available to performing projects on an annual basis. Here, there are no "less drastic remedies" available than enjoining HUD's unlawful rescission to prevent the harm to the "important public rights" at issue in this case. *Id.* at 260. The Secretary's ability to perform his statutory obligation to implement the CoC program in accordance with the law is fully dependent on the timely issuance of a lawful NOFO. *See, e.g.*, 42 U.S.C. § 11382(c)(2)(A) (generally requiring the HUD Secretary to announce conditional awards "within 5 months" of a NOFO's application deadline). The inevitable consequence of this belated rescission is that HUD will be unable to adhere to the statutorily-mandated renewal process that Congress commands HUD to undertake each annual appropriations cycle. *See* ECF No. 11 at 8, 31-32; 42 U.S.C. § 11386c(b) ("The sums made available under subsection (a) [the appropriations account for this subchapter] shall be available for the renewal of contracts in the case of tenant-based assistance, successive 1-year terms[.]"). Defendants' flagrant disregard of the statutory deadline has prevented their compliance with the core purpose and provisions of the statute. Under

32

these circumstances, *Brock* does not provide cover for an agency that seeks to take a do-over on statutory action months after the deadline has passed. *See Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1252 (E.D. Cal. 1999) (distinguishing *Brock* where "an agency has egregiously violated a procedural planning requirement which is closely linked to the ability of the agency to" carry out its substantive functions).

### 2. HUD's untimely rescission was arbitrary and capricious

Additionally, the purported rescission and replacement of the FY 2024–2025 NOFO was arbitrary and capricious because Defendants failed to provide any reasonable basis for doing so, particularly long after the statutory deadline passed. *See Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("[A]gency action [must] be reasonable and reasonably explained[.]"). Instead, in one sentence of the November NOFO (and subsequent December NOFO), HUD merely stated without explanation that the NOFO "rescinds and supersedes any mention of awards of FY 2025 CoC funds" in the FY 2024–2025 NOFO. ECF No. 12-3 (Hughes Decl.), Ex. 3 at 16. Defendants all but admitted the lack of reasoning that went into their rescission of the FY 2024–2025 NOFO when they abruptly yanked the November NOFO without explanation.

The purported rescission or replacement of the FY 2024–2025 NOFO is also arbitrary and capricious because Defendants did not consider Plaintiffs' significant reliance interests in the funding—and timeline for funding—that was promised by the FY 2024–2025 NOFO, which did not require FY 2024 applicants to reapply for FY 2025. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (where an agency is "not writing on a blank slate, it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns") (quotation omitted). The

33

November NOFO was issued just two months before many grants pursuant to the FY 2024–2025 NOFO were subject to renewal and the recipients of these grants had expected that the grants would be renewed pursuant to the FY 2024–2025 NOFO. The belated issuance of the November NOFO, however, caused considerable confusion and virtually ensured gaps in funding for the projects funded by these grants. Further, Defendants failed to consider the catastrophic disadvantages of rescinding the FY 2024–2025 NOFO, including that tens of thousands of formerly homeless individuals and families will be forced out of their housing and onto the streets. Defendants' recent withdrawal of the November NOFO on December 8, 2025—and their issuance of yet another, even later NOFO on December 19—compounds these harms and further necessitates reinstatement of the FY 2024–2025 NOFO. *See* ECF No. 49-1 (WA- Mondau Decl.) ¶¶ 8-14; ECF No. 49-2 ( Leone Decl.) ¶¶ 6-25.

Nowhere in the partial administrative record or their prior declaration is any evidence or explanation of how HUD "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). Indeed, the administrative record is bereft of any explanation whatsoever. It runs 279 pages, of which 257 pages—92.1%—is merely the FY 2024–2025 and November NOFOs. As already explained, those NOFOs contain no explanation whatsoever supporting Defendants' rescission. ECF No. 49 (Pls.' Mot. for Leave to Supp. Pls.' Mot. for Prelim. Inj.) at 3; ECF No. 58 (Pls.' Reply in Supp. of Mot. Prelim. Inj.) at 19-21. The remaining twenty-two pages include: four copies of a "Section 231 Notification letter" to congressional members detailing its plan to reallocate certain "recaptured funds," without explaining why or how those recaptured funds would be spent, plus a cover email (thirteen pages); a July 3 email sent to HUD listserv

34

recipients noting that HUD would be issuing a new NOFO, that was previously included as Exhibit 1 to the Declaration of Nicholas Mondau, ECF No. 13-1 at 15 (one page); two copies of an undated letter to members of Congress apparently responding to an inquiry, which inquiry itself is not included in the administrative record (five pages); and a November 13 email sent to HUD listserv recipients announcing the November NOFO (three pages). None of these documents acknowledge—let alone explain—the seismic shift to the CoC program represented by the December NOFO, or the fact that this new, fundamentally different NOFO was issued several months after the statutory deadline, so late to as virtually guarantee funding gaps and service interruptions. The closest any of these documents come is the November 13 email which lists, in bullet point, how "HUD intends to positively steward . . . valuable taxpayer resources[.]" AR 24. While that email lists some policy goals—such as "[p]romoting treatment and recovery"; "Welcoming Transitional Housing and Supportive Services projects including street outreach"; and "Increasing personal accountability through enhanced treatment requirements to combat the Fentanyl crisis"—the email makes no effort whatsoever to explain how or why the FY 2024–2025 NOFO allegedly fails to accomplish these goals, how the November NOFO accomplishes them, or why these goals require rescinding and replacing the FY 2024–2025 NOFO months after the statutory deadline. *Id.* And the email entirely ignores the significant downsides to the rescission, including the significant reliance interests at stake, or the fact that the very late rescission would essentially guarantee gaps in funding and services. This is a textbook example of unreasoned decisionmaking. *See Regents*, 591 U.S. at 30 (finding agency action arbitrary and capricious where the agency "entirely failed to consider [an] important aspect of the problem") (quotation omitted).

In opposing Plaintiff States' Motion for Preliminary Injunction, Defendants posited that because the FY 2024–2025 NOFO supposedly represented the Biden Administration's policies,

**Suppl. App. 750**

and the Trump Administration disagreed with some of those policies, it was perforce reasonable to rescind the NOFO. ECF No. 55 at 55-56. However, the APA requires more than the current president's purported "say so" to justify agency decisionmaking. *Id.* Defendants appear to argue that *any* "decision to rescind a NOFO premised on the prior Administration's policy directives" is "within the 'zone of reasonableness' under the APA," regardless of the substance of those decisions, the explicit Congressional purpose of the statute, or the impact of those decisions on relevant parties. *Id.* (citing *Prometheus Radio*, 592 U.S. at 423; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009)). But that is not what the case law says: courts must "*ensure*[] that the agency has acted within a zone of reasonableness[.]" *Prometheus Radio*, 592 U.S. at 423 (emphasis added) (rejecting APA challenge where agency "thoroughly examin[ed] . . . record evidence" and "addressed the possible impact on minority and female ownership."); *Regents*, 591 U.S. at 30. While it is true that a change in policy need not be justified by "reasons more substantial than those required to adopt a policy in the first instance[,]" the agency must still "examine the relevant data and articulate a satisfactory explanation for its action." *Fox Television Stations, Inc.*, 556 U.S. at 513-514 (quoting *State Farm*, 463 U.S. at 43).

## D.    The December NOFO Is Unlawful

### 1.    The challenged conditions were adopted without notice-and-comment

Under the APA, government agencies are required to publish "general notice of proposed rule making" and provide "interested persons an opportunity to participate in the rule making" by submitting comments on the proposed agency rule. 5 U.S.C. § 553(b), (c). The provisions of § 553 do not apply to matters relating to "public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). But HUD's regulations have long "provide[d] for public participation in rulemaking with respect to *all* HUD programs and functions, *including* matters that relate to public property, loans, grants, benefits, or contracts *even though such matters would not otherwise be*

36

*subject to rulemaking* by law or Executive policy." 24 C.F.R. § 10.1 (emphasis added). Where notice-and-comment is required, "[f]ailure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

The Challenged Conditions represent a sharply consequential shift in how HUD will prioritize nearly $4 billion in federal funds for homelessness—shifting away from long-term housing and towards transitional housing that requires work and addiction treatment. This administration's serious change in priorities includes restricting CoC funds for renewal of permanent housing projects to thirty percent and imposing a host of conditions that override or are untethered to the statutory purpose of the program and HUD's own regulations. Such substantive changes to the HUD CoC program must be made through notice-and-comment rulemaking—as required by HUD's own regulations—which HUD wholly failed to do.[12] *Cf. Comm. For Fairness v. Kemp*, 791 F. Supp. 888, 893 (D.D.C. 1992) (HUD's changed methods for calculating subsidies for public housing authorities were substantive or legislative rules and violated notice-and-comment); 81 Fed. Reg. 48366 (July 25, 2016) (HUD's own practice in seeking additional comment on the formula used to allocate CoC funds).

This case shows exactly why notice-and-comment procedures are required before agencies adopt wholly new policies. "Notice requirements are designed . . . to ensure that agency regulations are tested via exposure to diverse public comment," and "to ensure fairness to affected parties," among other reasons. *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Here, Defendants' last-minute policy switches left CoC applicants in the totally untenable position of having to fundamentally remake their housing

---

[12] Notice and public procedures may be omitted if HUD determines that, in a particular case or class of cases, notice and public comment procedures are "impracticable, unnecessary[,] or contrary to the public interest." 24 C.F.R. § 10.1. But to counsel's knowledge, HUD has not stated such a determination.

programs in the new Administration's image in a matter of weeks or forego federal funding. *See* ECF No. 11 at 40-46. And they have resulted in substantive rules that are not only unworkable and unreasonable, but unlawful as well. This sort of unreasoned chaos is exactly what notice-and-comment requirements are designed to protect against.

HUD's failure to follow procedure means the Challenged Conditions can and should be held unlawful and set aside. *See* 5 U.S.C. § 706(2)(D).

### 2. The challenged conditions are contrary to law

#### a. HUD lacked authority to implement its own conditions on congressionally authorized funding

As an agency, HUD's "power to act and how [it is] to act is authoritatively prescribed by Congress[.]" *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Accordingly, Defendants have "no power to act . . . unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). This is especially true when it concerns federal funding, as the Constitution assigns Congress the power to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires . . . and violates the Administrative Procedure Act[.]" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citations omitted); 5 U.S.C. § 706(2)(C).

Court after court has already concluded that HUD lacks the authority to add conditions like the ones challenged here to CoC funding. *See Nat'l All. to End Homelessness v. Turner*, No. 25-cv-00447-MSM-AEM, 2025 WL 2638377, at *1 (D.R.I. Sept. 14, 2025) (enjoining disbursement of Continuum of Care Builds funds due to conditions that the project be located in a jurisdiction that cooperates with federal immigration enforcement and that the applicant will not deny the sex binary or promote the notion that sex is a chosen or mutable characteristic);

38

*Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 887 (W.D. Wash. 2025) (finding that HUD was likely "acting in excess of statutory authority" and "run[ning] afoul of the Separation of Powers doctrine" when it "impose[d] . . . new funding conditions on recipients of the CoC funds," including Gender Ideology conditions); *City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, 2025 WL 3041905, at *6-9 (W.D. Wash. Oct. 31, 2025) (enjoining enforcement of Gender Ideology Order, including with respect to CoC funding). This is because the McKinney-Vento Act details what "required criteria" HUD must use in awarding CoC funds, 42 U.S.C. § 11386a, and which "certification[s]" are required from project sponsors, 42 U.S.C. § 11386(b)(4), but does not grant HUD any authority to add additional terms, like a thirty percent cap on permanent housing, a ban on recognizing transgender people, or conditions discriminating based on the legislative and enforcement priorities of the locality in which a CoC sits. Although the Secretary is empowered to require applicants to "comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner[,]" 42 U.S.C. § 11386, this does not give Defendants the unilateral authority to add whatever "substantively distinct and extraneous objective[]" they want, "untethered from the statutory purpose of ensuring efficient program administration." *City of Seattle*, 2025 WL 3041905, at *8. Rather, as the First Circuit has explained, an agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39. Indeed, Defendants make no effort, anywhere in their NOFO, to identify a statutory basis for any of these conditions—because there is none. All they rely on are Executive Orders, but the President has no more power "to enact, to amend, or to repeal statutes" than do agencies. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

39

**Suppl. App. 754**

Accordingly, Defendants' efforts to add conditions are "in excess of statutory . . . authority[.]" 5 U.S.C. § 706(2)(C).

> **b.    The Challenged Conditions violate the McKinney-Vento Act and HUD statutes and regulations in multiple respects**

"An agency may not . . . simply disregard rules that are still on the books." *Fox Television Stations*, 556 U.S. at 515. 5 U.S.C. § 706(2)(A) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). The Challenged Conditions violate multiple provisions of the McKinney-Vento Homeless Assistance Act and its implementing regulations and should therefore be enjoined.

To begin with, the Permanent Housing Cap and the Tier 1 Cap are "irreconcilable" with various provisions of the statute that require the majority of CoC funds to be used for renewal of permanent housing projects. *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1113 (9th Cir. 2020) (enjoining funding conditions incompatible with statutory requirements as contrary to law). Because eighty-seven percent of existing project funds eligible for renewal are permanent housing projects, the Permanent Housing Cap would preclude renewal of nearly two-thirds of those funds in plain violation of 42 U.S.C. § 11386c(b), which requires that renewal funds for existing projects "*shall* be available for the renewal of contracts in the case of tenant-based assistance, *successive* 1-year terms[.]" (emphasis added). By further directing that "[t]he Secretary shall determine whether to renew . . . *on the basis of certification by the collaborative applicant* . . . that (1) there is a demonstrated need for the project; and (2) the project complies with program requirements and appropriate standards of housing quality and habitability," Congress made clear that HUD lacks

discretion to arbitrarily withhold funds that Congress directed it to spend on renewals. *Id.* (emphasis added).

The Permanent Housing Cap would also override HUD's evaluation of projects based on statutorily "[r]equired [c]riteria" including "the extent to which the recipient will . . . incorporate comprehensive strategies for reducing homelessness," which by statute includes strategies "proven to be effective at reducing homelessness" like "permanent supportive housing" and "rapid rehousing[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d)(2); *see also* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 363 (2024) ("[T]he Secretary shall provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services[.]"). To the extent that the Tier 1 Cap results in projects otherwise eligible for renewal losing funding through the competitive process, it also violates these provisions.

Defendants will no doubt argue that because 42 U.S.C. § 11386c(b)(2) allows the Secretary to determine "program requirements" that projects must meet to be renewed, HUD therefore has discretion to impose a "program requirement" in the form of the Permanent Housing Cap. But the CoC "program requirements" are spelled out at 42 U.S.C. § 11386, and the Secretary's discretion to implement "other terms and conditions as [he] may establish to carry out this part in an effective and efficient manner," 42 U.S.C. § 11386(b)(8), is plainly limited to the same type of prosaic administrative conditions explicitly detailed in the statute and does not license a wholesale revision of the Congressional mandate. *See City of Seattle*, 2025 WL 3041905, at *8.

Likewise, the Service Requirement Conditions conflict with the statutory project selection criteria that prioritize projects that demonstrate success with rapid and permanent rehousing. "When Congress limits the purpose for which a grant can be made, it can be presumed that it

41

intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (per curiam). Under the selection criteria codified at 42 U.S.C. § 11386a(b)(1), HUD "shall" evaluate projects based on "previous performance" of service providers, as measured by, *inter alia*, "(i) the length of time individuals and families remain homeless; (ii) the extent to which individuals and families who leave homelessness experience additional spells of homelessness; (iii) the thoroughness of grantees in the geographic area in reaching homeless individuals and families; [and the] (iv) overall reduction in the number of homeless individuals and families[.]" Congress thereby made its instructions clear: projects are to be evaluated by how quickly they can get people housed and the extent to which they keep them housed. "In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions." *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 168 (1st Cir. 1987). Related provisions instruct that services and treatment are to be a complement, rather than a precondition, to housing placement. *See* 42 U.S.C. § 11385(a) ("*To the extent practicable*, each project shall provide supportive services for residents of the project and homeless persons using the project[.]") (emphasis added); 42 U.S.C. § 11386a(b)(1)(F) ("independent living in permanent housing" can "*includ[e]* assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment[]") (emphasis added).

The Gender Ideology Conditions, like the Service Requirement Conditions, disrupt the Congressionally mandated project selection criteria and are likewise contrary to the statutory

scheme.[13] And they are also unlawful because they violate HUD's own Equal Access regulation, which requires CoC funding recipients to provide services and accommodation in accordance with an individual's gender identity. *See* 24 C.F.R. § 5.106; *Maine v. Thomas*, 874 F.2d 883, 890 (1st Cir. 1989) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.") (quoting *Morton v. Ruiz,* 415 U.S. 199, 235, (1974)); *see also Doe v. Noem*, 778 F. Supp. 3d 1151, 1160 (W.D. Wash. 2025) (holding that agency action is "contrary to law" if it "disregard[s]" the agency's "own regulations and policies"). Courts have been quick to discard similarly misplaced ideological appendages to statutory grant conditions. *See, e.g.*, *Washington v. U.S. Dep't of Health & Hum. Servs.*, No. 6:25-cv-01748-AA, 2025 WL 3002366 (D. Or. Oct. 27, 2025) (enjoining gender-ideology-related grant conditions that "run counter to statutory authority and directly undermine congressional purpose"); *Nat'l All. to End Homelessness*, 2025 WL 2638377, at *1 (enjoining disbursement of CoC Builds funds due to, *inter alia*, gender ideology conditions). HUD seems to have conceded that the Gender Ideology Conditions as explicated in the November NOFO were indefensible and seeks instead to smuggle them in by reference in the December NOFO (*see* ECF No. 66-1 at 119), but they should be rejected in all their forms.

---

[13] Defendants have asked this Court to declare that "Plaintiffs' challenges to the [November] 2025 NOFO have been rendered moot" by HUD's voluntary rescission of that NOFO on the eve of the TRO hearing. ECF No. 55 at 20. Even though the revised Gender Ideology Condition does not impose any obligations on the Plaintiffs, they do still potentially direct HUD to withhold funding to Plaintiffs. Moreover, the Court should reject any mootness arguments because Defendants have not shown that the challenged aspects of the 2025 NOFO will not later be restored. "The burden of establishing mootness rests with the party urging dismissal. This burden is a heavy one." *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 88 (1st Cir. 2008) (internal citations omitted). Defendants cannot do that because they have made clear that the challenged aspects of the November NOFO are likely to and largely have recurred, putting this case squarely within the voluntary cessation doctrine. "[T]he voluntary-cessation doctrine exists to stop a scheming defendant from trying to immunize itself from suit indefinitely by unilaterally changing its behavior long enough to secure a dismissal and then backsliding when the judge is out of the picture[.]" *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021) (citation modified). "[V]oluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)); *see also FBI v. Fikre*, 601 U.S. 234, 241 (2024) (describing the voluntary cessation doctrine as a "formidable burden" for defendants).

Furthermore, the Geographic Discrimination Conditions cannot be squared with both statutory and regulatory provisions directing HUD to fund every geographic area based on need. *See* 42 U.S.C. § 11386a(b) ("[T]he need within the geographic area for homeless services, [shall be] determined . . . by a formula, which shall be developed by the Secretary, by regulation[.]"); 24 C.F.R. § 578.17(a) (describing formula for Preliminary Pro Rate Need for each geographic area). The Geographic Discrimination Conditions "tak[e] irrelevant or impermissible factors into account[,]" *Robbins*, 780 F.2d at 48, thwarting Congress's design for the dispersal of funds first by region and then by demonstrated success according to statutory criteria. They likewise violate 42 U.S.C. § 12711, which prohibits HUD from "establish[ing] any criteria for allocating or denying funds made available under programs administered by the Secretary based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law." In doing so, HUD makes an attempt at "leveraging the Non-CoC HUD Plaintiffs' dependence on federal funding to coerce them into replacing their own local policies with the Trump Administration's political agenda." *Martin Luther King, Jr. Cnty. v. Turner*, 798 F. Supp. 3d 1224, 1250-51 (W.D. Wash. 2025); *see also Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*, 802 F.3d 413, 433 (2d Cir. 2015) ("HUD may not . . . *condition* funding on changes to local policies.") (emphasis in original).

Finally, the Disability Condition from the November NOFO (which HUD excised from the December NOFO) favor programs that support participants with physical disabilities to the exclusion of those experiencing mental or substance-abuse-derived disabilities is likewise contrary to the plain language of the Act. The McKinney-Vento Act explicitly defines the term "homeless individual with a disability" to include an individual who "has a disability that . . . is a physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse[.]"

44

42 U.S.C. § 11360(10)(A)(i)(IV). HUD's own regulations incorporate this definition of disability into its definition of "chronically homeless." 24 C.F.R. § 578.3.[14]

Taken together, the Challenged Conditions would interfere with rather than promote "efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families" and therefore contravenes Congress's overall purpose in establishing the CoC program. 42 U.S.C. § 11381(2); *Penobscot Nation v. Frey*, 3 F.4th 484, 501 (1st Cir. 2021) ("[W]e cannot interpret . . . statutes to negate their own stated purposes." (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)). This Court should therefore enjoin those Conditions as contrary to law.

**3.     HUD's adoption of the challenged conditions is arbitrary and capricious**

The Challenged Conditions are also arbitrary and capricious. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). In doing so, the agency cannot rely on "factors which Congress has not intended it to consider[.]" *Id*. The "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

---

[14] As noted in footnote 13, Plaintiffs' challenges to conditions excised from the November NOFO remain live.

45

In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the alternative[s] that are within the ambit of the existing policy[,]" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted).

An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it. *Regents*, 591 U.S. at 25 (citation omitted); *see also id.* at 30. An agency must "pay[] attention to the advantages *and* the disadvantages" of its decision. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015).

As set forth below, the Challenged Conditions are arbitrary and capricious for each of four independent reasons: (1) Defendants failed to consider important aspects of their decision including the disadvantages of the decision, namely, what would happen when states and housing providers suddenly lost federal funding; (2) Defendants failed to provide a reasoned basis or explanation for their new policies; (3) the Challenged Conditions are inconsistent with Congress' directives; and (4) Defendants reversed longstanding prior policies without weighing reliance interests.

> **a.      Defendants failed to consider the impacts of the Challenged Conditions on individuals who are likely to lose their housing**

Defendants utterly failed to consider what is going to happen to the entities and, more importantly, people who will be cut off by the Challenged Conditions. *See Michigan*, 576 U.S. at 753 (an agency must "pay[] attention to the advantages *and* the disadvantages of [its] decisions").

There is simply no way around it: capping permanent housing renewals and Tier 1 funding at thirty percent, and denying funding to organizations that serve transgender individuals or exist in jurisdictions who don't enforce anti-vagrancy laws means that many organizations and projects

**Suppl. App. 761**

receiving funding, and that reasonably expected to continue receiving funding, will lose that funding. That loss of funding will have inevitable, obvious, and devastating effects on the vulnerable people living in the housing, many if whom will be evicted back into homelessness. Defendants entirely fail to address this. Nothing in the December NOFO or administrative record so much as considers the problem. *See* ECF No. 66-1 at 14-20; AR 293-97 (listing factors HUD considered). But almost certainly, tens of thousands of people, if not more, will end up being evicted back into homelessness. HUD's failure to consider, or even acknowledge, this basic reality is genuinely gobsmacking. The entire purpose of the Continuum of Care Program is to help those experiencing homelessness to find stable housing. 42 U.S.C. § 11381. In adopting policies that will evict untold number of Americans back into homelessness, Defendants have "entirely failed to consider an important aspect of the problem[.]" *State Farm*, 463 U.S. at 43; *see also R.I. Coal. Against Domestic Violence*, 2025 WL 2988705, at *7 (finding that Defendants failed to consider "the harmful impact their decision would have on the Coalitions and the vulnerable populations they serve[]").

**b.    After initially refusing to provide any explanation for the Challenged Conditions, Defendants subsequently adopted post hoc rationalizations that fail to justify the Challenged Conditions**

When Defendants first adopted the challenged conditions in the November NOFO, they utterly failed to provide any reasoned basis or explanation for the Challenged Conditions. Courts have previously analyzed this issue under very similar factual circumstances. For example, in a recent lawsuit challenging the imposition of CoC funding conditions—including those related to "gender ideology"—one court concluded that Defendants' actions were arbitrary and capricious because the "rote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relations to the

47

**Suppl. App. 762**

agency's underlying action—does not constitute 'reasoned decisionmaking.'" *Martin Luther King, Jr. Cnty.*, 798 F. Supp. 3d at 1252; *see also R.I. Coal. Against Domestic Violence*, 2025 WL 2988705, at *7 (finding likelihood of success on merits of arbitrary and capricious claim with respect to gender ideology and other conditions on Continuum of Care grants due to a failure to provide an explanation).

That is all Defendants did in their November NOFO, however. They failed to provide any reasoned basis for the Challenged Conditions beyond glancingly mentioning that they are incorporating the Gender Ideology and Anti-Homeless Orders. *See* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 13 (noting that NOFO implements Anti-Homeless EO); 109 (noting that NOFO implements Gender Ideology EO).

Now, after Plaintiffs already filed suit to enjoin these Challenged Conditions, Defendants have sought to explain their thinking and promulgated a memo—the December Memorandum—which tries to retroactively justify the very same Challenged Conditions. ECF No. 66-1 at 15-21; AR 286-99. But these *post hoc* rationalizations are insufficient as a matter of law. *See Regents*, 591 U.S. at 4 (finding agency action to be arbitrary and capricious because the agency's reasoning "consists primarily of impermissible '*post hoc* rationalization'") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *see also Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) (when assessing whether agency action is arbitrary and capricious, the Court "may consider only the agency's explanation given at the time the relevant decision was made, as opposed to [a] post hoc rationale") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). And while agencies may deal with problems "afresh" by taking new agency action, *Regents*, 592 U.S. at 21, HUD's recycling of the same Challenged Conditions in the middle of litigation—without complying with "the procedural requirements for new agency

48

action"—does not qualify as proper agency action and does not bless their post hoc justifications. *Id.*[15]

In any event, Defendants' post hoc rationalizations for the Challenged Conditions "run[] counter to the evidence before the agency[.]" *State Farm*, 463 U.S. at 43.

Start with the Permanent Housing and Tier 1 Caps. Defendants' argument that permanent housing is ineffective is dead on arrival because has explicitly found that "permanent supportive housing" and "rapid rehousing services" are among the "activities that have been proven to be effective at reducing homelessness[.]" 42 U.S.C. § 11386b(d)(2). Defendants lack the power to simply disregard these findings.

Defendants' change of heart also fails out of the gate because HUD's *own* recent analysis of data finds considerable support for a Housing First approach emphasizing permanent housing. For example, according to HUD's most recent strategic plan, "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 27.

By contrast, Defendants' recent about-face is entirely unsupported by the administrative record. The December NOFO and December Memorandum justify the Caps and the attendant Service Requirements by pointing to evidence that homelessness has increased in recent years (during which time CoC funding has largely gone to permanent housing). ECF No. 66-1 at 15-16; AR 287. And, tragically, it has. But Defendants do not point to *any* causal link between the increase

---

[15] Additionally, despite having been issued on December 19, 2025, the December Memorandum improperly purports to provide factors that HUD weighed no later than "mid-June" even when there is no other evidence (in the administrative record or otherwise) that this analysis ever occurred. AR 286.

49

in homelessness and HUD's longstanding commitment to fund permanent housing. *See Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 800 (2011) (explaining that studies "based on correlation, not evidence of causation," do not establish causation) (quotation omitted); *United States v. Jacques*, 784 F. Supp. 2d 59, 65 (D. Mass. 2011) ("Of course, without more, this statistic is virtually meaningless in light of the well-known principle that correlation does not imply causation.").

Defendants' reliance on the increase in homelessness is particularly weak because they cannot even show correlation. According to Defendants, "Permanent Supportive Housing beds began to skyrocket" "[b]y 2013" and "HUD has routinely renewed over 90% of CoC grants every year since 2013." AR 286, 288. But HUD's own data shows that homelessness *declined* after 2013, reaching a low of 549,928 in 2016. AR 596. And by 2022, the number of people experiencing homelessness was still well below where it was in 2007. *Id.* Homelessness in America only began its sharp increase following the COVID-19 pandemic:



Exhibit 1-1: PIT Estimates of People Experiencing Homelessness by Sheltered Status, 2007-2024

Note: The exhibit does not display the total count of people experiencing homelessness in 2021 or the count of all people experiencing unsheltered homelessness because of pandemic-related disruptions to counts. Estimates of the number of people experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

*Id.* So what is the correlation between HUD's longstanding policy of funding permanent housing and the recent increase in homelessness? HUD does not say.

HUD's own analyses also contradict its newfound claim that permanent housing policies are responsible for increased homelessness. According to HUD's "2024 Annual Homelessness Assessment Report (AHAR) to Congress," published less than a year before the November NOFO, "[s]everal factors likely contributed" to the recent spike in homelessness, including "[o]ur worsening national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, . . . the persisting effects of systemic racism, . . . public health crises, natural disasters that displaced people from their homes, rising number of people immigrating to the U.S., and the end of homelessness prevention programs put in place during the COVID-19 pandemic[.]" AR 585. HUD's correlation-only analysis simply ignores these alternative explanations. Additionally, HUD's reporting suggests that some of the apparent increase in homelessness might simply reflect better data-gathering, which identified individuals who were not previously counted as homeless. *See, e.g.*, AR 616, 628, 636. Moreover, Defendants' suggestion that permanent housing contributes to homelessness ignores the fact that people in permanent housing are not included in HUD's count of individuals experiencing homelessness. AR 586. In other words, each person who moves into permanent housing is one person less who is homeless. So it simply does not make sense to suggest, as Defendants do, that permanent housing contributes to an increase in homelessness.

Instead, the AHAR provides evidence in support of permanent supportive housing, including feedback from various CoCs that: (1) increased permanent supportive housing capacity and new permanent supportive housing initiatives reduced "homelessness among veterans [and] suggests a broader positive trend in addressing homelessness within the community"; and (2) a

51

decline in veteran homelessness is due to "expedite[d] referrals to permanent housing" and placing veterans "into permanent housing." AR 644, 650. HUD's "internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. Env't Prot. Agency*, 788 F.3d 1134, 1141 (9th Cir. 2015).

The December Memorandum also points to evidence that overdose deaths among individuals experiencing homelessness sharply increased between 2020 and 2023. AR 289. But here again, Defendants make no effort to show this increase had anything to do with any HUD policies. To the contrary, the San Francisco study they cite (and include in the AR) suggests that increased overdose mortality during the COVID-19 pandemic was likely "driven by the growing presence of fentanyl," combined with COVID-related disruptions in services and COVID mitigation policies that reduced contact between those at risk of overdose deaths and those who might have intervened. AR 852. And indeed, the study *specifically found* that "San Francisco's alternative shelter program," through which the City placed high-risk individuals in hotel rooms (without, apparently, requiring sobriety or other preconditions), "*did not appear* to be associated with increased overdose deaths among people experiencing homelessness[.]" *Id.* (emphasis added). Similarly, the December Memorandum cites a City of Seattle audit report that shows a 282% increase in overdose deaths between 2020 and 2023 for "people who are recently homeless and living in permanent supportive housing, subsidized housing, or recovery housing[.]" AR 863; *see also* AR 289. Except that this report undermines Defendants because as awful as that 282% increase is, it is much lower than the 436% increase in fatal overdoses "[f]or those living unsheltered or in emergency shelters[.]" AR 863. The City of Seattle report thus seems to show that those in permanent supportive housing saw much lower rates of overdose deaths than those

52

**Suppl. App. 767**

who were in emergency shelters.[16] More broadly, the City of Seattle report lends further support to the conclusion reached by the San Francisco study: that post-2020 increases in fatal overdoses were driven largely by fentanyl's relentless infiltration of the national drug supply, AR 859-60, not by any HUD policy. Defendants' decision "to rely on portions of studies in the record that support its position, while ignoring [information] in those studies that do[es] not" is arbitrary and capricious. *Genuine Parts Co. v. E.P.A.*, 890 F.3d 304, 313 (D.C. Cir. 2018).

Moreover, nationwide statistics bear out these studies' conclusions: overdose deaths sharply increased nationwide between 2020 and 2023 as fentanyl infiltrated the national drug supply. *Provisional Drug Overdose Death Counts*, U.S. Centers for Disease Control and Prevention, National Center for Health Statistics, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Jan 6, 2026).[17] But since 2023, nationwide numbers have begun to fall even more sharply, such that April 2025 overdose deaths were actually lower than April 2020 overdose deaths—despite the fact that HUD maintained its Housing First priority unchanged during the entire time period. *Id.* In other words, Defendants cannot show even a correlation between permanent housing and overdose deaths.

Defendants' causation argument also fails a second way. Because on top of failing to show that funding permanent housing has increased homelessness or other pathologies, Defendants have failed to cite any evidence whatsoever that defunding permanent housing, and shifting funds to

---

[16] The City of Seattle report also does not explain what it means by "recovery housing," but looking outside the AR, it appears it refers to the type of sober housing that the December NOFO aims to encourage. *See Recovery Residences*, Washington Health Care Authority, https://www.hca.wa.gov/free-or-low-cost-health-care/i-need-behavioral-health-support/recovery-residences (last visited Jan. 5, 2026).

[17] The Court may take judicial notice of "information published on the website of the Centers for Disease Control and Prevention (CDC)" at the summary judgment stage because the accuracy of this information "cannot reasonably be questioned." *Cox v. City of Bos.*, 734 F. Supp. 3d 173, 177 n.1 (D. Mass. 2024); *see also Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of factual information on CDC's website at summary judgment).

things like transitional housing, would actually reduce homelessness or other problems. Again, HUD has previously found that providing permanent housing as a front-line intervention to address homelessness leads to better outcomes than other approaches. ECF No. 12-1 (Hughes Decl.), Ex. 1 at 26-27. For example, HUD's "landmark Family Options study found that families who received priority access to deep housing subsidies experienced major decreases in returns to homelessness and increases in family well-being relative to those offered usual care in shelters, and documented major cost savings of rapid rehousing and permanent housing relative to shelter and transitional options on a per-month basis." *Id.* at 25-26 (citing Daniel Gubits et al., *Family Options Study: 3-Year Impacts of Housing and Services Interventions for Homeless Families*, Office of Policy Development and Research (Oct. 26, 2016), https://www.huduser.gov/portal/publications/Family-Options-Study.html). HUD similarly cited to a bevy of "[r]andomized controlled trials evaluating PSH programs that use a Housing First approach show that it improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." *Id.* at 27 (citing National Academies of Sciences, Engineering, and Medicine, *Permanent Supportive Housing: Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness*, (Jul. 11, 2018) https://www.ncbi.nlm.nih.gov/books/NBK519597/#ref_000409).[18]

So how does the administrative record address these studies that HUD previously relied on to find that permanent housing improves outcomes, over and above other interventions? It doesn't.

---

[18] Another study cited in the December NOFO (ECF No. 66-1 at 16-17) similarly finds that Housing First contributes to numerous quality-of-life improvements. *See* National Academies of Sciences, Engineering, and Medicine, *Evidence of Effect of Permanent Supportive Housing on Health* (July 11, 2018), https://www.ncbi.nlm.nih.gov/books/NBK519591/. It notes, for example, that "[s]everal studies have demonstrated that individuals experiencing homelessness who are also chronically ill who are randomized to PSH spend significantly fewer days homeless than those who receive usual care"; "that providing PSH to individuals with high medical needs who are also experiencing homelessness decreases emergency department use and hospital stays"; and "that supportive housing improves the housing status of individuals suffering from homelessness, mental illness, and substance abuse." *Id.*

The administrative record includes no evidence to show that, for example, transitional housing, or service requirements, or service-only approaches lead to better outcomes. And it utterly fails to address HUD's prior conclusions, or the evidence on which those conclusions rested. *See State Farm*, 463 U.S. at 43 (requiring the agency to "examine the relevant data and articulate a satisfactory explanation for its action").

To be sure, the administrative record does include reports from the Manhattan Institute and the Discovery Institute—two partisan thinktanks—that critique HUD's longstanding focus on permanent housing and housing first policies. AR 698, 711. In some respects, these reports raise perhaps legitimate challenges facing permanent housing projects. *See, e.g.*, AR 703-704 (addressing challenges in upkeep of permanent housing units), 704-704 (addressing potential opposition to permanent supportive housing projects amongst neighbors). But whatever the merits of these critiques, the December Memorandum does not consider them. *See* AR 286-98. Instead, the December Memorandum relies on the report solely for the flawed argument that the increase in homelessness is somehow proof that permanent housing does not work. *See* AR 287 (citing Manhattan Institute report for the proposition that "[c]hronic homelessness . . . has increased by 74.5% since 2015 . . . despite a 24.7% increase nationwide in Permanent Supportive Housing beds during the same time."). In any event, even crediting all their conclusions, nothing in these reports justifies HUD's draconian, inflexible thirty percent Permanent Housing Cap or its thirty percent cap on renewals. As a matter of fact, the Manhattan Institute report notes that "PSH will continue to play an important role in government's response to homelessness" and offers recommendations

55

to "consolidate[e] and improv[e] current [permanent supportive housing] programs[.]" AR 698, 707-709.[19]

In contrast to these highly partisan reports, Defendants' AR includes a June 2023 report from UCSF's Benioff Homeless and Housing Initiative called "Toward a New Understanding" that aims to "provide[] evidence to shape programs and policy responses to the homelessness crisis." AR 752, 757. That report noted that, "[i]n in-depth interviews" with individuals experiencing homelessness, "participants expressed an eagerness to obtain permanent housing, because they felt permanent housing would offer needed stability to seek employment and address physical and behavioral health issues. They explained that permanent housing would provide personal safety, security for belongings, access to meal preparation, and protection from the elements." AR 826. To achieve this goal, the Benioff Report offered numerous recommendations centered on low-barrier permanent housing, including that "[p]ermanent supportive housing *should be aligned with Housing First principles*," AR 839 (emphasis added); that localities should "[c]reate permanent supportive housing responsive to the needs of older adults," *id.*; and that localities should "[r]educe carceral response to homelessness . . . . Following encampment resolution best practices, including supporting access to low barrier housing, can reduce trauma, loss of documents, and support better health outcomes," AR 840. The December Memorandum simply ignores these and similar recommendations.

Similar logical gaps infect Defendants' justifications for the remaining Challenged Conditions. For example, in support of their Geographic Discrimination conditions, they point to the experience of Austin, Texas, writing: "[T]wo years after the City of Austin reinstated a ban on

---

[19] As a matter of fact, despite its vociferous disagreement with Housing First policies (largely untethered to any factual citations), the Discovery Institute report recommends a sixty percent cap on "housing vouchers, i.e., *twice* the 30% Permanent Housing Cap Defendants seek to implement. AR 716.

**Suppl. App. 771**

public camping, unsheltered homelessness decreased by one-third." AR 291. But the article they cite for this, which they include in the AR, begins: "Austin's unsheltered homeless population *is growing*, spreading out farther from the city center and living in more secluded areas, *a trend that's likely a result of the city's 2-year-old ban on public camping*." AR 1103 (emphasis added). As the article explained, Austin's public camping ban has apparently caused homeless Austinites to disburse to "less visible places . . . making it harder to find homeless residents and connect them with supportive services and shelter or housing." AR 1105. At best, Defendants misunderstood the data. At worst, they are actively misrepresenting it.

Finally, Defendants make no effort whatsoever to defend the Gender Ideology or Disability Conditions, and nothing in the AR even plausibly justifies them. Like the other Challenged Conditions, they are arbitrary and capricious. *See Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024, 1034 (9th Cir. 2010) ("Courts will not assume an agency has engaged in reasoned decision making when it implicitly departs from its prior precedent and provides no explanation for doing so." (citation modified)); *Martin Luther King Jr., Cnty.*, 785 F. Supp. 3d at 888-89 ("rote incorporation" of federal law in grant agreements, "does not constitute 'reasoned decisionmaking'").

### c.    Defendants relied on factors Congress did not intend them to consider

Defendants compounded their failure to provide a reasoned explanation by relying on factors which "Congress ha[d] not intended it to consider," *State Farm*, 463 U.S. at 43, and "neglect[ing] to consider a statutorily mandated factor[.]" *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

As noted above, there is perhaps no more glaring example of this than Defendants' blithe rejection of Congress' explicit finding that "permanent supportive housing" and "rapid rehousing services" are among the "activities that have been proven to be effective at reducing

homelessness[.]" 42 U.S.C. § 11386b(d)(2). The statute directs that Defendants "*shall* provide bonuses or other incentives to" CoCs that implement these strategies. 42 U.S.C. § 11386b(d)(1) (emphasis added). Defendants are not at liberty to overrule Congress on this point.

Moreover, as again discussed above, the McKinney-Vento Act already describes the "Required Criteria" that must be used to assess grant applications, directs HUD to fund every geographic area based on need, and explains which information HUD should require project sponsors to certify. Yet, rather than following these statutorily mandated and highly detailed criteria, Defendants have imposed the new Challenged Conditions. For example, the December NOFO favors CoCs that are located in a state or local jurisdiction that enacted and enforces policies related to illicit drug use, public camping and loitering, and other "public safety" matters, which CoCs have no control over. These conditions are arbitrary and capricious, as Defendants did not "look to" nor "discuss" statutory "requirements" while imposing them. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 682 (2020). Rather than addressing any of the above statutory requirements, the December NOFO's section on the Geographic Discrimination Conditions merely cites to the statute's general purposes, such as providing funding for efforts "to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[.]" 42 U.S.C. § 11381. The December Memorandum makes no effort to close that gap. AR 290-292. The statute's purposes do not include the specific requirements imposed by the Geographic Conditions, nor do such general purposes justify Defendants' imposition of these Conditions.

### d.      Defendants failed to consider reliance interests

Defendants also acted arbitrarily and capriciously by rescinding prior policies without considering alternatives within the ambit of the existing policies, assessing whether there were

reliance interests, and weighing any such interests against competing policy concerns. The Challenged Conditions are an extreme deviation from HUD's long history of applying a Housing First model, prioritizing renewals, recognizing an individual's gender identity, and ensuring that all geographic areas are funded based on need, not politics. But Defendants "failed to address whether there was 'legitimate reliance' on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996)).

For years, Continuums, applicants, and service providers developed their programs along the lines that HUD repeatedly urged. Per HUD's guidance, applicants have built Housing First and gender-inclusive programs to provide long-term, stable housing and services for individuals and families to exit homelessness. Now, suddenly, these entities will be immediately forced to fundamentally reshape their programs or forego this critical funding. Programs providing stable housing to formerly homeless individuals cannot simply turn on a dime to become transitional housing or suddenly develop relationships with service providers sufficient to meet the Service Requirement Conditions. Nor have Defendants apparently given any thought to whether there is sufficient supportive service capacity in any (let alone all) CoC geographic areas to even meet HUD's new requirements. Given that it would be extremely difficult for programs to quickly implement these abrupt shifts, many programs are likely to lose out on funding, with their clients bearing the worst of it. Indeed, according to the New York Times, the Permanent Housing Cap could "quickly place as many as 170,000 formerly homeless people at risk of returning to the streets." DeParle, *supra*, at 18; *see also* ECF No. 13-6 (RI-Ventura Decl.) ¶ 18; ECF No. 13-23 (OR-Jolin Decl.) ¶ 34; ECF No. 13-12 (IL-Haley Decl.) ¶ 21. The cuts in the Challenged NOFO would be "catastrophic" and "local governments and charities could not make up the aid." DeParle, *supra*, at 18; *see also* ECF No. 13-5 (NY-SHNNY Leone Decl.) ¶¶ 15, 34-42; ECF No. 13-19

**Suppl. App. 774**

(MI-MCAH Rennie Decl.) ¶ 15; ECF No. 13-9 (DE-Heckles Decl.) ¶¶ 27-28. But neither the December NOFO, nor the December Memorandum, breathes a word about the challenges or disadvantages of adopting these new funding conditions with little warning.

Moreover, it would also be impossible for many programs to comply with the Challenged Conditions because some conditions are beyond the applicants' control. The Geographic Discrimination Conditions punish applicants based solely on whether the jurisdictions in which they happen to sit adopt and/or enforce certain laws. Defendants not only failed to "weigh" these substantial interests "against competing policy concerns"; they "ignored" them altogether. *Regents*, 591 U.S. at 30-33.

Similarly, Defendants failed to consider the reliance interests of states who rely on CoC-funded projects as part of the homelessness response systems. Most notably the Permanent Housing and Tier 1 Caps threaten to destabilize existing CoC-funded permanent housing projects that receive state funding or other support. These projects rely on the availability of both CoC and state funding to remain viable and serve participants. Further, HUD fails to consider how the disruption to and potential failure of these jointly funded projects will increase the population of unsheltered homeless persons, increase utilization of State-funded healthcare, crisis response, and shelter-avoidance systems. In turn, these increases will inevitably place financial strains that they are not prepared to absorb and cannot readily address. Defendants fail to address or even mention these interests and the likely impacts of these caps on Plaintiff States homelessness response systems. This failure is even more problematic given that States reasonably relied on HUD's prior federal directives promoting the development of permanent housing and rapid rehousing when developing their own homelessness response systems.

60

Defendants' recent December Memorandum fails to consider Plaintiffs' reliance interests in this continued funding under the FY 2024-2025 NOFO. Instead, Defendants brush this away, inaccurately stating that "the proposed revision . . . allows CoCs to slowly transition their project from one component to another over the course of a year," AR 297-98 and focusing on reliance on the terms of the *November 2025* NOFO instead, AR 295. Defendants also claim that they indicated their intention to publish a new FY 2025 NOFO before doing so, AR 294-95, but "[n]oting a change in [the] program's operation is not the same as recognizing that the change" will have "detrimental" impacts and does not qualify as a consideration of "reliance interests." *Am. Hosp. Ass'n v. Kennedy*, No. 2:25-CV-00600-LEW, 2025 WL 3754193, at *6 (D. Me. Dec. 29, 2025).[20]

Because the Challenged Conditions were adopted "with no regard for the [States'] reliance interests[,]" and Defendants "did not acknowledge—much less justify—[their] adoption" of the new conditions, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023).

### 4.      The Challenged Conditions Violate Separation of Powers

The Challenged Conditions also independently violate the Administrative Procedure Act as contrary to a constitutional right—and the Constitution—because they violate the separation of powers. The United States Constitution "exclusively grants the power of the purse to Congress, not the President." *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "Congress may," of course, "attach conditions on the receipt of federal funds, and has repeatedly

---

[20] Even if the December Memorandum adequately considered Plaintiffs' reliance interests (which it does not), Defendants cannot retroactively consider reliance interests after HUD already decided to include the Challenged Conditions, nor would HUD's after-the-fact summary suffice when no other administrative record document indicates these considerations occurred. *Am. Hosp. Ass'n*, 2025 WL 3754193, at *6 (rejecting Defendants' assertion that reliance interests were considered because "Defendants are left only to rely on post-hoc rationalizations in the [declaration], which cannot substitute for the contemporaneous record").

**Suppl. App. 776**

employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). But "[t]here is no provision in the Constitution that authorizes the President"—or the agencies beneath him—"to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438. Meaning: "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco*, 897 F.3d at 1235; *see also Providence*, 954 F.3d at 39 (an agency cannot "create qualification requirements unrelated to the grant program simply to advance its own policy priorities[]").

The Challenged Conditions do just that. The Permanent Housing and Tier 1 Caps seek to withhold funding from projects that Congress has explicitly directed Defendants to fund—permanent housing and renewals (which amount to much the same thing)—to effectuate the Administration's goal of "ending support for 'housing first' policies[.]" Anti-Homeless Order § 5(a). Same with the Service Requirement Conditions. The Gender Ideology Condition, for its part, would blacklist certain service providers and force the termination of contracts not because of any law Congress passed, but to execute the President's fiat that "[f]ederal funds shall not be used to promote gender ideology." Gender Ideology Order § 3(g). And the Geographic Discrimination Conditions likewise chokes funding from geographic areas, over Congress's explicit direction, to coerce states and localities into, as the Administration puts it, "fighting vagrancy on America's streets." Anti-Homeless Order § 3 (capitalization omitted).

None of these conditions are authorized by Congress. Indeed, just as in *San Francisco*, Defendants do not even attempt to identify any federal law permitting them to impose the Challenged Conditions, resting instead entirely on the President's Executive Orders. But these are

62

not law. And no such law exists, much less in unambiguous terms required for a valid exercise of congressional spending power. The Supreme Court has likened Congress's power to condition federal funds as "much in the nature of a contract; in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The "legitimacy" of such conditions "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* (citations omitted). As such, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*

Congress did not do so. To the contrary, as detailed above, these conditions violate Congress's statutory directives and the overarching Congressional directive that agencies not act in a manner that is "arbitrary[ and] capricious." 5 U.S.C. § 706(2)(A). By attaching conditions to federal funding that were not only unauthorized by Congress but that contravene Congress's directions, the Challenged Conditions usurp Congress's spending and legislative power. This Court should vacate the Challenged Conditions and enjoin their implementation and enforcement. *See* 5 U.S.C. § 706(2)(B).

**E.      Plaintiffs Are Entitled to Summary Judgment on their § 706(1) Claim**

Plaintiffs are also entitled to summary judgment on their claim that Defendants unreasonably delayed agency action by failing to make CoC renewal funding available for FY 2025. The APA provides that the court "shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). To prevail on a claim under § 706(1), a plaintiff must show that (1) the action in question is "a discrete agency action that it is required to take,"

63

**Suppl. App. 778**

and (2) the agency failed to take, or unreasonably delayed in taking, that action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Both criteria are satisfied here.

First, renewing FY 2025 CoC funding is a discrete, required agency action. By statute, Defendants "*shall*" make funding "available for the renewal of contracts . . . at the discretion of the applicant or project sponsor and subject to the availability of annual appropriation," and "[t]he Secretary *shall* determine whether to renew a contract . . . on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability[.]" 42 U.S.C. § 11386c(b) (emphasis added). These straightforward provisions reflect discrete and required agency action. *See City of Providence v. Barr*, 385 F. Supp. 3d 160, 164-65 (D.R.I. 2019) (explaining that "because [the statute] requires that 'the Attorney General *shall . . . allocate*' . . . funding, there exist a mandatory duty on the DOJ to pay the funds as soon as possible"), *aff'd*, 954 F.3d 23 (1st Cir. 2020).

Second, Defendants have unreasonably delayed renewals of FY 2025 CoC funding.[21] Unlike when an agency unlawfully withholds action (which requires that Congress imposed a "date-certain deadline"), unreasonable delays occur when there is no "concrete deadline" imposed by Congress; instead, agencies are subject to the APA's requirement that they conclude matters "within a reasonable time." *Am. Acad. of Pediatrics v. U.S. Food & Drug Admin.*, 330 F. Supp. 3d 657, 663 (D. Mass. 2018).

---

[21] Separate from Defendants' unreasonable delay in granting renewals, Defendants also unlawfully withheld the issuance of a FY 2025 NOFO by repeatedly rescinding and replacing the NOFO after the statutory deadline. 42 U.S.C. § 11382(b). Additionally, Defendants are almost certainly about to unlawfully withhold the issuing of conditional awards, which is subject to a specific statutory deadline of January 29, 2026. *See* 42 U.S.C. § 11382(c)(2) (conditional awards are due five months after NOFO application deadline); *see also* ECF No. 12-2 (Hughes Decl.), Ex. 2 at 4 (FY 2024–2025 NOFO provides application deadline of August 29, 2025 for FY 2025 funds for new projects and certain other categories).

To determine whether there is unreasonable delay, courts ordinarily look to the six so-called "TRAC factors." *Town of Wellesley v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (applying *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC)*). The *TRAC* factors are: "(1) the time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *TRAC*, 750 F.2d at 80 (citations omitted). Not all factors need to be present. *See e.g.*, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855-57 (D.C. Cir. 2008) (explaining that the factors are not "ironclad" and treating the first factor as "most important" and "decisive here").

Here, the *TRAC* factors demonstrate that Defendants have unreasonably delayed CoC renewals for FY 2025. The first factor (whether the time the agency took comports with a "rule of reason") and the second factor (a statutory timetable or indication of speed informs the "rule of reason") are often considered together. *See. e.g.*, *Am. Acad. of Pediatrics*, 330 F. Supp. 3d at 666. Here, Defendants' delay fails to comport with any rule of reason. Rather than awarding renewals for FY 2025, Defendants belatedly rescinded the FY 2024–2025 NOFO after the deadline and released new FY 2025 NOFOs that drastically slash renewal funding and impose new unlawful terms on renewals. The statute indicates a reasonable timeline and straightforward process by

65

instructing Defendants to make renewal funding available "at the discretion of the applicant or project sponsor and subject to the availability of annual appropriation," which occurred in March 2025. 42 U.S.C. § 11386c(b). However, rather than processing and awarding renewals under the terms of the FY 2024–2025 NOFO as required, Defendants created extreme delays and uncertainty by repeatedly rescinding and reissuing late FY 2025 NOFOs that contain only a small percentage of guaranteed renewal funding at an unknown future date. *See City of Providence*, 385 F. Supp. 3d at 164-65 (granting plaintiffs' summary judgment motion and explaining that allocating funding should be completed as soon as possible, such that there was "unreasonable delay" under § 706(1)).

Further, funding that is *renewed* in "*successive*" terms necessarily means the funding does not lapse but instead is timely renewed so that there is continuous funding. 42 U.S.C. § 11386c(b) (emphasis added). Yet, CoC applicants' funding has begun lapsing without any guarantee of future renewal funding.[22] *See, e.g.*, ECF No. 49-1 (WA- Mondeau Decl.) ¶ 13; ECF No. 49-2 (Leone Decl.) ¶ 4. And despite this Court's explicit order that Defendants take "all steps necessary to process eligible renewals for FY 2025 CoC funding pursuant to the FY24-25 NOFO" that does not require new renewal applications (ECF No. 68 at 2-3), Defendants already indicated an intent to violate this order by imposing a new renewal application process and maintaining their prior insistence that awards will not be announced until May 2026. ECF No. 74-1 at 2.

The remaining *TRAC* factors also show that Defendants' delay is unreasonable. The third factor (whether human health and welfare are at stake) and fifth factor (nature and extent of

---

[22] In prior years, HUD recognized its obligation to grant renewals in almost all cases by designating most or all of an applicant's renewal funding as "Tier 1" funding that was "safe from potential cuts." *E.g.*, ECF No. 13-2 (NY_Umholtz Decl.) ¶ 22. Applicants were therefore assured ahead of time that they would receive consistent funding. In fact, Defendants themselves admit that CoC grantees with grant expiration dates in 2026 "are accustomed to having their grants *automatically* renewed with a period of performance *start date immediately following the expiration of their previous grant*." AR 297 (emphasis added).

**Suppl. App. 781**

prejudice) are also often considered together. *E.g.*, *Am. Acad. of Pediatrics*, 330 F. Supp. 3d at 666. Here, there is significant human health and welfare at stake, as tens of thousands of formerly homeless individuals and families may be evicted back onto the streets, and "it is well known that homelessness has devastating consequences for individuals' physical and mental health." ECF No. 13-12 (IL-Haley Decl.) ¶ 28. This will result in enormous burdens on state public services including "emergency medical systems." *Id*. Plaintiffs will be severely prejudiced by these continuing delays, which will result in unfunded contractual and rental obligations, harm to states' investments and loans, increased legal and administrative costs, and more. *See* ECF No. 11 at 43-39. With respect to the fourth factor, Defendants have failed to identify any higher or competing agency priorities that would be affected by expediting this agency action. *See* ECF No. 55 at 37 (failing to identify any specific agency priorities when discussing the fourth factor); *see also Am. Acad. of Pediatrics*, 330 F. Supp. 3d at 667 (finding no higher priorities and referring to the priorities "dictated by Congress"). Finally, with respect to the sixth factor, the court need not "find any [agency] impropriety" when finding an unreasonable delay. *TRAC*, 750 F.2d at 80 (quoting *Pub. Citizen Health Research Group v. Comm'r, Food & Drug Admin.*, 740 F.2d 21 (D.C. Cir. 1984)) However, given that this Court has already acknowledged Defendants' impropriety, Plaintiffs have far exceeded this standard. *See* Dec. 19, 2025 Hr'g Tr. 57:17-18 ("[I]t does appear to be an intentional evasion of the Court's jurisdiction by the agency").

For each of the above reasons, Plaintiffs respectfully request that the Court compel Defendants to grant renewals of CoC funding pursuant to the terms of the FY 2024–2025 NOFO.

**F.      Plaintiffs Are Entitled to the Full Suite of APA and Injunctive Relief**

      **1.      The Court should vacate and set aside the unlawful rescission of the FY 2024-2025 NOFO**

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of unlawful agency actions. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* at 830. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see Illinois v. Noem*, No. 1:25-cv-00495-MSM-PAS, 2025 WL 3707011, at *17 (D.R.I. Dec. 22, 2025) ("[E]xisting Supreme Court and First Circuit precedent affirms vacatur to be appropriate under the remedy."); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) (acknowledging the continuing vitality of this rule); *Illinois v. FEMA*, 2025 WL 2716277, at *15 (explaining that "[t]he holding in *Trump v. CASA* restricted universal injunctions, but the Court expressly left unaffected the APA's command to 'set aside' unlawful agency action").

Under §706(2), a court must "hold unlawful and set aside agency action" an agency action that is arbitrary and capricious, contrary to law, or in excess of statutory jurisdiction. Because the rescission of the FY 2024–2025 NOFO violated those standards, for the reasons discussed above, it should be vacated. *See Env't Def. Fund v. FERC*, 2 F.4th 953, 960-961 (D.C. Cir. 2021) (explaining that "vacatur is the normal remedy" under the APA, and vacating approval of a pipeline that had since entered operation (citation modified)).

68

2. **The Court should vacate and set aside the December NOFO, including the Challenged Conditions**

Similarly, because the December NOFO along with its Challenged Conditions violates the APA, it should be vacated. "[W]hen a court vacates agency action, it nullifies the action and removes its legal force." *Illinois v. FEMA,* 2025 WL 2716277, at *15; *see also AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 85 (D.D.C. 2007) ("[T]he effect of . . . vacatur . . . is to take the rule off the books and reinstate the prior regulatory regime."). By vacating the December NOFO, the Court removes any force of Defendants' unlawful NOFO and ensures renewals, awards, and allocations properly resume under the 2024–2025 NOFO.

3. **The Court should enjoin Defendants from implementing the Challenged Conditions**

Plaintiff States are also entitled to permanent injunctive relief to effectuate the vacatur of the Challenged Conditions and to protect Plaintiff States from future irreparable harm. In general, courts issue permanent injunctive relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

The APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703. "[C]ourts use this broad remedial power to issue permanent injunctive relief for APA violations." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021). The D.C. Circuit has held that, in the APA context, "once the court reache[s] the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there [is]

69

no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Wright & Miller's *Federal Practice & Procedure: Federal Rules of Civil Procedure* § 2944 (2d ed. 1995)). This principle alone suffices to support the issuance of permanent injunctive relief against implementation of the Challenged Conditions against Plaintiff States. Regardless, as discussed below, examining the equitable factors in greater detail leads to the same result for each of the unlawful actions taken by defendants.

An injunction enjoining the Challenged Conditions would effectively redress Defendants' unlawful actions and prevent Plaintiff States from suffering irreparable injury. State agencies and their partners have spent years building programs in alignment with HUD's prior emphasis on permanent housing and Housing First approaches. ECF No. 13-11 (DC-Miné Decl.) ¶¶ 5, 10-14; ECF No. 13-9 (DE-Heckles Decl.) ¶¶ 14-19, 23; ECF No. 13-7 (CO-Jaeckel Decl.) ¶¶ 9-10, 17-19; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 4-5, 19-34; *see, e.g.,* ECF No. 13-22) (NJ-NJHMFA Brewster Decl.) ¶¶ 5-7, 12-16 (detailing development of a Homeless Management Information System (HMIS) consistent with HUD requirements); ECF No. 13-23 (OR-Jolin Decl.) ¶¶ 5-33 (same). The Challenged Conditions would blow a hole through these carefully built structures. New York City CoC alone stands to lose approximately $106 million just due to the Permanent Housing Cap. ECF No. 13-3 (NY-Johns Decl.) ¶ 23. Other jurisdictions likewise face crippling losses. *See also* ECF No. 13-7 (CO-Jaeckel Decl.) ¶ 29 (estimating a $26 million reduction in PH funding); ECF No. 13-12 (IL-Haley Decl.) ¶ 14 (estimating a loss of $106 million in permanent housing resources); ECF No. 13-25 (PA-Vilello Decl.) ¶ 30 (estimating a loss of over $100 million in PH funding); ECF No. 13-26 (VT-Sojourner Decl.) ¶¶ 15-17, 23-27.

70

The Challenged Conditions will harm Plaintiff States across the board by leading to statewide increases in homelessness, shifting enormous costs to other state public services. ECF No. 59 (CA-Buchanan Decl.) ¶ 13 (estimating that "nearly 27,000 Californians could lose their housing due to the Administration's decision to decrease funding for permanent housing."); ECF No. 13-9 (DE-Heckles Decl.) ¶¶ 36-38; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 5, 10, 56-62; ECF No. 13-14 (ME-Payne Decl.) ¶¶ 22, 29; ECF No. 13-16 (MD-Meister Decl.) ¶ 18; ECF No. 13-21 (NJ-Winter Decl.) ¶¶ 31-34; ECF No. 13-3 (NY-DSS Johns Decl.) ¶¶ 23-27; ECF No. 13-2 (NY-Umholtz Decl.) ¶¶ 19-21; ECF No. 13-27 (WI-Staff Decl.) ¶¶ 12-16; ECF No. 13-28 (CA-Olmstead Decl.) ¶ 29; ECF No. 13-29 (CA-CICH Marshall Decl.) ¶¶ 16-19; *see, e.g.*, *Martin Luther King, Jr. Cnty.*, 798 F. Supp. 3d at 1254 (finding that plaintiffs demonstrated irreparable harm from loss of CoC funding due to unlawful funding conditions, such as "destabilization of immediate and future budgets, reductions in workforce, [and] hundreds of shelter-unstable families losing access to housing[]"). As just one example, Kentucky is at a high risk of losing seventy percent of its current $15 million in funding for permanent housing in a matter of months due to the Challenged Conditions. Putting Kentucky's permanent housing projects that are already funded under the FY 2024 award will put nearly 700 households at risk of returning to homelessness, including families with children, seniors, and people with disabilities. Approximately 1,200 people would lose their current housing during the next year. ECF No. 13-13 (KY-Kaye Smith Decl.) ¶ 29; *see also* ECF No. 37 (MA-McGeown Decl.) ¶¶ 18, 22 (explaining that the loss of permanent supportive housing would result in the loss of Housing Stability Support services for over 500 households).

This escalation places new burdens on emergency medical systems, state-funded behavioral-health providers, long-term inpatient facilities, local jails, and child-welfare programs

71

serving unhoused families. ECF No. 13-12 (IL-Haley Decl.) ¶ 28; ECF No. 13-13 (KY-Kaye Smith Decl.) ¶¶ 33-47; ECF No. 37 (MA-McGeown Decl.) ¶¶ 12-14; ECF No. 13-21 (NJ-Winter Decl.) ¶¶ 24, 32-34; ECF No. 60 (NM-Nair Decl. ¶¶ 12-13); ECF No. 13-5 (NY-SHNNY Leone Decl.) ¶ 33; ECF No. 13-23 (OR-Jolin Decl.) ¶¶ 15-16; ECF No. 13-24 (PA-Meyer Decl.) ¶ 9-13; ECF No. 13-6 (RI-Ventura Decl.) ¶¶ 18-19; ECF No. 13-27 (WI-Staff Decl.) ¶¶ 11-13, 15. Individuals with complex behavioral health needs who previously stabilized in permanent supportive housing will experience increased housing instability and higher rates of crisis service use. ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶¶ 18-19, 28-31; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 59, 62; ECF No. 13-21 (NJ-Winter Decl.) ¶ 21 ("approximately 3,300 New Jerseyans— including medically fragile individuals, people with disabilities, survivors of domestic violence, children, seniors and veterans—will be displaced within one year"); ECF No. 13-2 (NY-Umholtz Decl.) ¶ 22(e); ECF No. 13-24 (PA-Meyer Decl.) ¶ 15 ("Nearly 48% of Medicaid-enrolled adults experiencing homelessness have a diagnosed serious mental illness"); *see, e.g.,* ECF No. 13-19 (MI-MCAH Rennie Decl.) ¶¶ 5-15; ECF No. 13-4 (NY-Warren Decl.) ¶ 9.

Creating and prolonging homelessness among families with school-aged children has additional consequences for State-funded public education. ECF No. 13-7 (CO-Jaeckel Decl.) ¶ 23; *see also* ECF No. 13-4 (NY-HPD Warren Decl.) ¶¶ 3, 8-9, 20-23 (discussing impact on families and children). Children who experience homelessness are more likely to struggle in school and to require additional supportive services, many of which are paid for in part with State funds, which will further increase the harm to the Plaintiff States. *See, e.g.*, ECF No. 13-24 (PA-Meyer Decl.) ¶¶ 20-23 (discussing impact of CoC changes to child welfare services).

Accepting the terms of the Challenged Conditions in order to receive funding would significantly impede the ability of States and their service providers to engage and serve people

72

experiencing homelessness. ECF No. 13-8 (CT-Navarretta Decl.) ¶¶ 1-20; ECF No. 13-11 (DC-Miné Decl.( ¶ 7-8; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 58-62; *see, e.g.,* ECF No. 13-19 (MI-MCAH Rennie Decl.) ¶ 14 ("even for the CoCs that are the most agile and capable of such an overhaul . . . the best score that any Michigan CoC could achieve is 75/130-historically too low a score to be funded."); ECF No. 13-20 (MN-Leimaile Ho Decl.) ¶ 16 ("Minnesota CoCs are unlikely to score competitively based on criteria under this NOFO."); ECF No. 13-26 (VT-Sojourner Decl.) ¶ 11 ("The loss of these programs will put hundreds, if not thousands, of people at risk of returning to the streets and without the support they need to exit homelessness."). These conditions require CoCs and providers to overhaul intake processes, retrain staff, and redesign coordinated-entry workflows on an extremely short timelines, disrupting the delicate outreach relationships needed to reach individuals who are already distrustful of service systems. ECF No. 13-7 (CO-Jaeckel Decl.) ¶ 24 ("the sudden termination of project funding will force the State and providers to undertake expensive and rapid operational adjustments, including significant staff layoffs"); ECF No. 13-11 (DC-Miné Decl.) ¶¶ 30-32; ECF No. 13-5 (NY-SHNNY Leone Decl.) ¶¶ 28-32; ECF No. 13-1 (WA-Mondau Decl.) ¶ 27 ("It is not clear that it is even possible to provide services in the manner laid out in this NOFO.").

Collectively, these new conditions threaten to destabilize the service network that the Continuum of Care model created and depends on, directly undermining providers' ability to identify, engage, and safely house the people with the greatest needs. ECF No. 13-11 (DC-Miné Decl.) ¶ 32; ECF No. 13-9 (DE-Heckles Decl.) ¶ 17 ("The NOFO requires our COC to . . . decide— based on new arbitrary and capricious rules—that some Delawareans' housing-and, indeed, their lives-mater more than others."); ECF No. 13-17 (MA-Byron Decl.) ¶ 58 ("Beyond the re- traumatization and destabilization the NOFO's knock-on effects will have on impacted individuals

73

and families, people may end up on the streets, as nighttime temperatures . . . fall below freezing on most nights. Others—like survivors of domestic violence-may face the impossible choice of returning to an abuser or enduring unsheltered homelessness."); *see, e.g.*, ECF No. 13-19 (MI-MCAH Rennie Decl.) ¶ 15 ("Through over thirty-five years of operation and expertise, MCAH has never encountered a threat as devastating and extreme to persons in poverty. Not only will this application fracture the homeless service delivery infrastructure, which has taken decades to build, but lives will be lost.").

Plaintiffs also face irreparable harm from the Hobson's choice of either acceding to the unlawful Challenged Conditions or forgoing millions in critical CoC funding. Even if providers were to accede to the Challenged Conditions (which themselves slash the amount of available funding), these Challenged Conditions directly contradict other federal funding conditions that providers must follow. For example, projects that receive housing grants under the Violence Against Women Act (VAWA) or the Family Violence Prevention Service Act (FVPSA) are prohibited from requiring beneficiaries to participate in supportive services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). Therefore, these providers are now faced with the impossible choice of whether to greatly disadvantage their CoC applications under the December NOFO— which favors applicants who require participation in supportive services—or forego critical funding under VAWA and FVPSA.

> **4.    The Court should enter an injunction that requires Defendants to process renewal applications and conduct the CoC competition under the terms of the FY 2024–2025 NOFO**

For the foregoing reasons, Plaintiffs are entitled permanent injunctive relief requiring Defendants to process renewal applications and conduct the CoC competition in accordance with

74

the FY 2024–2025 NOFO. Without such relief, Plaintiffs will suffer irreparable harm, including gaps in funding and disruption of long terms projects that will have lasting impacts. ECF No. 13-13 (KY-Smith Decl.) ¶ 33 ("KHC is hearing urgent and widespread concern . . . regarding funding gaps that are all but inevitable"); ECF No. 60 (NM-Nair Decl.) ¶ 24. "Across New York State, at least 2,878 households are living in CoC-funded housing that has a contract expiring on May 31, 2026, or before." ECF No. 57-1 (Leone Decl.) ¶ 4. Without an order requiring the applications to be processed and the competition to be run under the terms of the FY 2024–2025 NOFO, these households are at high risk of becoming homeless again. ECF No. 57-1(Leone Decl.) ¶ 5; *see also* ECF No. 57 (Mondau Decl.) ¶ 13 ("The longer HUD takes, the more homelessness will increase."); ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶¶ 28-32; ECF No. 59 (CA-Buchanan Decl.) ¶ 12 ("[I]t will likely fall on the state and state social service agencies to fill these service gaps.")

A permanent injunction would ensure stability for providers and the communities they serve, allowing CoC programs to operate predictably, rather than leaving them vulnerable to delays, uncertainty, or the loss of renewals altogether. *See supra* pp. 70-71.

## IV.   CONCLUSION

The Court should grant Plaintiff States' motion for summary judgment.

DATED this 14th day of January 2026.

75

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ZANE MULLER*
ALIANA KNOEPFLER*
ANDREA ALEGRETT*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Zane.Muller@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Andrea.Alegrett@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON*
Special Counsel
VICTORIA OCHOA*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov

*Counsel for Plaintiff State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Plaintiff State of Arizona*

76

**Suppl. App. 791**

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for Plaintiff State of California*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov

*Attorneys for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Samantha Hall*
SAMANTHA HALL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov

*Attorneys for Plaintiff District of Columbia*

**Suppl. App. 792**

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
ROSE GIBSON*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov
Laurac.Tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor
ex rel. Andy Beshear, in His Official Capacity as
Governor of the Commonwealth of Kentucky*

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov

*Counsel for Plaintiff State of Illinois*


**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**Suppl. App. 793**

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6411
Jluh@oag.maryland.gov

*Attorney for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Michelle Pascucci*
KATHERINE DIRKS*
Chief State Trial Counsel
MICHELLE PASCUCCI*
NITA KLUNDER*
State Trial Counsel
ESME CARAMELLO
Director, Housing Affordability Unit
AARON DULLES*
LAUREN YAMAGUCHI*
Assistant Attorneys General
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Brian S. Carter*
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.carter@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER*
Deputy Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
Asamant@nmdoj.gov

*Attorneys for the State of New Mexico*

**Suppl. App. 794**

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
Jacobboyer@pa.gov
717-460-6786

*Attorney for Plaintiff Governor Josh Shapiro, in His Official Capacity as Governor of the Commonwealth of Pennsylvania*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov

*Attorney for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*

80

**Suppl. App. 795**